**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ATTENTIVE MOBILE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-87-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| STODGE INC. d/b/a POSTSCRIPT, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT STODGE INC. d/b/a POSTSCRIPT'S AMENDED ANSWER AND
COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Stodge Inc. d/b/a Postscript ("Postscript" or "Defendant") hereby answers the

Complaint for Patent Infringement ("Complaint") filed by Plaintiff Attentive Mobile Inc.

("Attentive" or "Plaintiff") on January 25, 2023, as follows:

1.　　　Postscript denies the allegations in this paragraph.

2.　　　Postscript denies the allegations in this paragraph.

3.　　　Postscript lacks information sufficient to form a belief as to the truth of the

allegations in this paragraph and therefore denies them.

4.　　　Postscript lacks information sufficient to form a belief as to the truth of the

allegations in this paragraph and therefore denies them.

5.　　　Postscript admits that the face of U.S. Patent No. 11,416,887 ("the '887 Patent");

U.S. Patent No. 11,416,897 ("the '897 Patent"); and U.S. Patent No. 11,553,074 ("the '074

Patent") list Attentive as the assignee and are attached to the Complaint as Exhibits 1–3,

respectively.  Postscript lacks information sufficient to form a belief as to the truth of the

remaining allegations in this paragraph and therefore denies them.

6.　　　Postscript denies the allegations in this paragraph.

7.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

8.    Postscript admits that, like Attentive, it offers an SMS marketing platform. Postscript denies the remaining allegations in this paragraph.

9.    Postscript denies the allegations in this paragraph.

## NATURE OF THE CASE

10.    Postscript admits that Plaintiff purports to bring claims in its Complaint under the patent laws of the United States.  Postscript denies the remaining allegations in this paragraph.

## THE PARTIES

11.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

12.    Postscript admits that the face of U.S. Patent No. 11,416,887, ("the '887 Patent"), U.S. Patent No. 11,416,897 ("the '897 Patent"), and U.S. Patent No. 11,553,074 ("the '074 Patent"), list Attentive as the assignee.  Postscript lacks information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies them.

13.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

14.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

15.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

16.    Postscript lacks information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies them.

17.     Postscript admits that it offers an SMS marketing platform that integrates with its customers' eCommerce platforms.  Postscript denies the remaining allegations in this paragraph.

18.     Admitted.

## JURISDICTION AND VENUE

19.     Postscript admits that the Complaint purports to bring an action arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

20.     Postscript admits that this Court has subject matter jurisdiction over this case.

21.     Postscript admits that it is a corporation organized and existing in Delaware and does not contest that this Court has personal jurisdiction over it for purposes of this action. Postscript denies that it has committed acts of patent infringement.  The remaining allegations in this paragraph state legal conclusions, which do not require an admission or denial.

22.     Postscript denies the allegations in this paragraph.

23.     Postscript does not contest that this Court has personal jurisdiction over it for purposes of this action.  Postscript admits that it conducts business in the State of Delaware. Postscript denies that it has committed acts of patent infringement.  The remaining allegations in this paragraph state legal conclusions, which do not require an admission or denial.

24.     Postscript does not contest that this Court has personal jurisdiction over it for purposes of this action.

25.     Postscript does not contest that venue is proper for purposes of this action.

26.     Postscript does not contest that venue is proper for purposes of this action. Postscript admits that it is incorporated in the State of Delaware.  Postscript denies that it has committed or will commit acts of patent infringement.  The remaining allegations in this paragraph state legal conclusions, which do not require an admission or denial.

27.     Postscript does not contest that venue is proper for purposes of this action. Postscript incorporates by reference its responses to Attentive's venue allegations above. Postscript lacks information sufficient to form a belief with respect to "other reasons that will be presented to the Court," and therefore denies it.

### PLAINTIFF'S PATENTED INNOVATIONS

28.     Postscript denies the allegations in this paragraph.

29.     Postscript denies the allegations in this paragraph.

30.     Postscript denies the allegations in this paragraph.

31.     Postscript admits that U.S. Patent No. 11,416,887, ("the '887 Patent"), U.S. Patent No. 11,416,897 ("the '897 Patent"), and U.S. Patent No. 11,553,074 ("the '074 Patent") state on their face that they are part of the same patent family and list Attentive as the assignee. Postscript lacks information sufficient to form a belief as to the truth of whether "Attentive owns by assignment the entire right, title, and interest in and to the Asserted Patents," and therefore denies that allegation.  Postscript denies the remaining allegations in this paragraph.

32.     Postscript admits that the face of U.S. Patent No. 11,416,887, ("the '887 Patent") lists its title as "Methods and Apparatus for Mobile Device Messaging- Based Communications Using Custom-Generated Deeplinks and Based on the Hyper Text Transfer Protocol (HTTP)," its filing date as February 10, 2022, and its issue date as August 16, 2022.  Postscript admits that pages 1-2 of the '887 Patent list a related Provisional Application No. 62/511,413, filed on May 26, 2017 and list it as a continuation of Application No. 17/569,265, filed on January 5, 2022, which is a continuation of Application No. 17/496,590, filed on October 7, 2021, which is a continuation of Application No. 15/986,569, filed on May 22, 2018.  Postscript also admits that

what purports to be a copy of the '887 Patent is attached to the Complaint as Exhibit 1. Postscript denies the remaining allegations of this paragraph.

33.     Postscript admits that the face of U.S. Patent No. 11,416,897 ("the '897 Patent") lists its title as "Methods and Apparatus for Mobile Device Messaging- Based Communications Using Custom-Generated Deeplinks and Based on the Hyper Text Transfer Protocol (HTTP)," its filing date as January 5, 2022, and its issue date as August 16, 2022.  Postscript admits that pages 1-2 of the '897 Patent list a related Provisional Application No. 62/511,413, filed on May 26, 2017, and list it as a continuation of Application No. 17/496,590, filed on October 7, 2021, which is a continuation of Application No. 15/986,569, filed on May 22, 2018.  Postscript also admits that what purports to be a copy of the '897 Patent is attached to the Complaint as Exhibit 2.  Postscript denies the remaining allegations of this paragraph.

34.     Postscript admits that the face of U.S. Patent No. 11,553,074 ("the '074 Patent") lists its title as "Methods And Apparatus For Dynamic Application Deeplinking At A Mobile Electronic Device," its filing date as October 7, 2021, and its issue date as January 10, 2023. Postscript admits that the face of the '074 Patent lists a related Provisional Application No. 62/511,413, filed on May 26, 2017, and lists it as a continuation of Application No. 15/986,569, filed on May 22, 2018.  Postscript also admits that what purports to be a copy of the '074 Patent is attached to the Complaint as Exhibit 3.  Postscript denies the remaining allegations of this paragraph.

35.     The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But if a response is required, Postscript denies them.

36.     Postscript denies the allegations in this paragraph.

37.     Postscript denies the allegations in this paragraph.

38.     Postscript denies the allegations in this paragraph.

39.     Postscript denies the allegations in this paragraph.

40.     Postscript admits that column 21 lines 40-61 of the '887 Patent refer to a non-transitory computer-readable medium storing code including instructions configured to cause a click-to-text server to "(1) automatically transition from [a] first application to [a] messaging application in response to the mobile device detecting a user interaction with a promotional message associated with the webpage" and "(2) automatically populate a custom message in the messaging application."  Postscript admits that column 22 lines 1-5 of the '887 Patent refer to "enroll[ing] the mobile device in a promotion associated with the promotional message based on receiving the custom message and without receiving any additional information from the mobile device."  Postscript denies the remaining allegations in this paragraph.

41.     Postscript denies the allegations in this paragraph.

42.     Postscript denies the allegations in this paragraph.

43.     Postscript denies the allegations in this paragraph.

44.     Postscript denies the allegations in this paragraph.

45.     Postscript denies the allegations in this paragraph.

46.     Postscript denies the allegations in this paragraph.

47.     Postscript denies the allegations in this paragraph.

48.     Postscript denies the allegations in this paragraph.

49.     Postscript denies the allegations in this paragraph.

50.     Postscript denies the allegations in this paragraph.

51.     Postscript denies the allegations in this paragraph.

52.     Postscript denies the allegations in this paragraph.

## ACCUSED PRODUCTS

53.     Postscript admits that it offers an SMS marketing platform that integrates with its customers' eCommerce platforms.  Postscript denies the remaining allegations of this paragraph.

54.     Postscript admits that the images in this paragraph appear to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

55.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

56.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

57.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

58.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

59.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations of this paragraph.

60.     Postscript admits that the images and quote in this paragraph appear to be taken from a prior version of Postscript's website.  Postscript denies the remaining allegations of this paragraph.

61.     Postscript admits that the images in this paragraph appear to be taken from a prior version of Postscript's website.  Postscript denies the remaining allegations of this paragraph.

62.     Postscript admits that the images in this paragraph appear to be taken from a prior version of Postscript's website.  Postscript denies the remaining allegations of this paragraph.

63.     Postscript admits that the images in this paragraph appear to be taken from a prior version of Postscript's website.  Postscript denies the remaining allegations of this paragraph.

64.     Postscript admits that the image in this paragraph appears to be taken from a prior version of Postscript's website, and that Postscript's mobile popup creation interface includes a dynamic popup preview functionality.  Postscript denies the remaining allegations of this paragraph.

65.     Postscript admits that the images in this paragraph appear to be taken from a prior version of Postscript's website.  Postscript denies the remaining allegations of this paragraph.

66.     Postscript denies the allegations in this paragraph.

67.     Postscript denies the allegations in this paragraph.

68.     Postscript denies the allegations in this paragraph.

69.     Postscript denies the allegations in this paragraph.

70.     Postscript denies the allegations in this paragraph.

71.     Postscript denies the allegations in this paragraph.

72.     Postscript admits that it has published a case study of a Postscript customer, Nomatic, on its website.  Postscript denies the remaining allegations in this paragraph.

73.     Postscript admits that it has published a case study of a Postscript customer, Nomatic, on its website.  Postscript denies the remaining allegations in this paragraph.

74.     Postscript admits that the screenshots in this paragraph appear to reflect Postscript functionality.  Postscript denies the remaining allegations in this paragraph.

**FIRST CAUSE OF ACTION**
**(INFRINGEMENT OF THE '887 PATENT)**

75.     Postscript repeats and incorporates by reference its responses to the preceding paragraphs.

76.     Postscript denies the allegations in this paragraph.

77.     Postscript admits that this paragraph recites column 21 line 39 to column 22 line 5 of the '887 Patent, which is claim 1.

78.     Postscript denies the allegations in this paragraph.

79.     Postscript admits that its SMS marketing platform includes software applications. Postscript denies the remaining allegations in this paragraph.

80.     Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work.  Postscript otherwise denies the allegations in this paragraph.

81.     Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work.  Postscript denies the remaining allegations in this paragraph.

82.     Postscript denies that it owns, operates, and/or maintains a server capable of operating as a click-to-text on which the Accused Products operate located in Mountain View, CA, having an internet protocol ("IP") address of 34.111.8.32.

83.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its systems and servers receive information associated with users of its website and platform, but denies that its privacy policy is addressing information received in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

84.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other

functionalities use technologies, including cookies and pixel tags, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing technologies used in connection with the two-tap functionality addressed in the Complaint. Postscript denies the remaining allegations in this paragraph.

85.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and platform use cookies, and that cookies are sometimes transmitted to servers used by Postscript.  Postscript denies that the description of cookies quoted in this paragraph is addressing the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

86.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other functionalities use technologies, including cookies and pixel tags/web beacons, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing technologies used in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

87.     Postscript admits that its SMS marketing platform assists Postscript customers in sending SMS text messages.  Postscript denies the remaining allegations in this paragraph.

88.     Postscript denies the allegations in this paragraph.

89.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

90.     Postscript denies the allegations in this paragraph.

91.     Postscript denies the allegations in this paragraph.

92.     Postscript denies the allegations in this paragraph.

93.     Postscript denies the allegations in this paragraph.

94.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

95.     Postscript denies the allegations in this paragraph.

96.     Postscript admits that certain popups enabled by Postscript allow the user to launch their messaging application with a pre-populated message.  Postscript denies the remaining allegations in this paragraph.

97.     Postscript denies the allegations in this paragraph.

98.     Postscript denies the allegations in this paragraph.

99.      Postscript denies the allegations in this paragraph.

100.    Postscript admits that the images in this paragraph appear to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

101.    Postscript denies the allegations in this paragraph.

102.    Postscript denies the allegations in this paragraph.

103.    Postscript denies the allegations in this paragraph.

104.    Postscript denies the allegations in this paragraph.

105.    Postscript admits that it cited the '887 Patent in an Information Disclosure Statement submitted to the USPTO in connection with Application No. 17/552,615.  Postscript denies the remaining allegations in this paragraph.

106.    The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But to the extent an admission or denial is necessary, Postscript denies the allegations.

107.    Postscript admits that it was aware of the '887 Patent upon service of the complaint.  Postscript denies the remaining allegations in this paragraph.

108.    Postscript denies the allegations in this paragraph.

109.    Postscript denies the allegations in this paragraph.

110.    Postscript denies the allegations in this paragraph.

111.    Postscript admits that it was aware of the '887 Patent and the allegations in the complaint upon service of the complaint.  Postscript denies the remaining allegations in this paragraph.

112.    Postscript denies the allegations in this paragraph.

113.    Postscript denies the allegations in this paragraph.

114.    Postscript denies the allegations in this paragraph.

115.    Postscript denies the allegations in this paragraph.

116.    Postscript denies the allegations in this paragraph.

117.    Postscript denies the allegations in this paragraph.

118.    Postscript denies the allegations in this paragraph.

119.    The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But if a response is required, Postscript denies them.

120.    Postscript denies the allegations in this paragraph.

121.    Postscript denies the allegations in this paragraph.

122.    Postscript denies the allegations in this paragraph.

**SECOND CAUSE OF ACTION**
**(INFRINGEMENT OF THE '897 PATENT)**

123.    Postscript repeats and incorporates by reference its responses to the preceding paragraphs.

124.    Postscript denies the allegations in this paragraph.

125.    Postscript admits that this paragraph recites column 24 lines 39 to 60 of the '897 patent, which is claim 15.

126.    Postscript denies the allegations in this paragraph.

127.    Postscript admits that its SMS marketing platform includes software applications. Postscript denies the remaining allegations in this paragraph.

128.    Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work. Postscript otherwise denies the allegations in this paragraph.

129.    Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work.  Postscript denies the remaining allegations in this paragraph.

130.    Postscript denies that it owns, operates, and/or maintains a server capable of operating as a click-to-text on which the Accused Products operate located in Mountain View, CA, having an internet protocol ("IP") address of 34.111.8.32.

131.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its systems and servers receive information associated with users of its website and platform, but denies that its privacy policy is addressing information received in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

132.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other functionalities use technologies, including cookies and pixel tags, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing

technologies used in connection with the two-tap functionality addressed in the Complaint. Postscript denies the remaining allegations in this paragraph.

133.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and platform use cookies, and that cookies are sometimes transmitted to servers used by Postscript.  Postscript denies that the description of cookies quoted in this paragraph is addressing the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

134.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other functionalities use technologies, including cookies and pixel tags/web beacons, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing technologies used in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

135.    Postscript admits that its SMS marketing platform assists Postscript customers in sending SMS text messages.  Postscript denies the remaining allegations in this paragraph.

136.    Postscript denies the allegations in this paragraph.

137.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

138.    Postscript denies the allegations in this paragraph.

139.    Postscript denies the allegations in this paragraph.

140.    Postscript denies the allegations in this paragraph.

141.    Postscript denies the allegations in this paragraph.

14

142.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

143.    Postscript denies the allegations in this paragraph.

144.    Postscript admits that certain popups enabled by Postscript allow the user to launch their messaging application with a pre-populated message.  Postscript denies the remaining allegations in this paragraph.

145.    Postscript denies the allegations in this paragraph.

146.    Postscript denies the allegations in this paragraph.

147.    Postscript denies the allegations in this paragraph.

148.    Postscript denies the allegations in this paragraph.

149.    Postscript admits that the images in this paragraph appear to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

150.    Postscript denies the allegations in this paragraph.

151.    Postscript denies the allegations in this paragraph.

152.    Postscript denies the allegations in this paragraph.

153.    Postscript denies the allegations in this paragraph.

154.    Postscript admits that it cited the '897 Patent in an Information Disclosure Statement submitted to the USPTO in connection with Application No. 17/552,615.  Postscript denies the remaining allegations in this paragraph.

155.    The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But to the extent an admission or denial is necessary, Postscript denies the allegations.

156.    Postscript admits that it was aware of the '897 Patent upon service of the complaint. Postscript denies the remaining allegations in this paragraph.

157.    Postscript denies the allegations in this paragraph.

158.    Postscript denies the allegations in this paragraph.

159.    Postscript denies the allegations in this paragraph.

160.    Postscript admits that it was aware of the '897 Patent and the allegations in the complaint upon service of the complaint.  Postscript denies the allegations in this paragraph.

161.    Postscript denies the allegations in this paragraph.

162.    Postscript denies the allegations in this paragraph.

163.    Postscript denies the allegations in this paragraph.

164.    Postscript denies the allegations in this paragraph.

165.    Postscript denies the allegations in this paragraph.

166.    Postscript denies the allegations in this paragraph.

167.    Postscript denies the allegations in this paragraph.

168.    The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But if a response is required, Postscript denies them.

169.    Postscript denies the allegations in this paragraph.

170.    Postscript denies the allegations in this paragraph.

171.    Postscript denies the allegations in this paragraph.

### THIRD CAUSE OF ACTION
### <u>(INFRINGEMENT OF THE '074 PATENT)</u>

172.    Postscript repeats and incorporates by reference its responses to the preceding paragraphs.

173.    Postscript denies the allegations in this paragraph.

16

174.    Postscript admits that this paragraph recites column 24, lines 18 to 60 of the '074 Patent, which is claim 23.

175.    Postscript denies the allegations in this paragraph.

176.    Postscript admits that its SMS marketing platform includes software applications. Postscript denies the remaining allegations in this paragraph.

177.    Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work.  Postscript otherwise denies the allegations in this paragraph.

178.    Postscript admits that it offers an SMS marketing platform that utilizes servers and computer processors to work.  Postscript denies the remaining allegations in this paragraph.

179.    Postscript denies that it owns, operates, and/or maintains a server capable of operating as a click-to-text on which the Accused Products operate located in Mountain View, CA, having an internet protocol ("IP") address of 34.111.8.32.

180.    Postscript denies the allegations in this paragraph.

181.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

182.    Postscript denies the allegations in this paragraph.

183.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its systems and servers receive information associated with users of its website and platform, but denies that its privacy policy is addressing information received in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

184.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other

functionalities use technologies, including cookies and pixel tags, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing technologies used in connection with the two-tap functionality addressed in the Complaint. Postscript denies the remaining allegations in this paragraph.

185.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and platform use cookies, and that cookies are sometimes transmitted to servers used by Postscript.  Postscript denies that the description of cookies quoted in this paragraph is addressing the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

186.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript admits that, per its privacy policy, its website and other functionalities use technologies, including cookies and pixel tags/web beacons, to collect information associated with users of its website and platform, but denies that its privacy policy is addressing technologies used in connection with the two-tap functionality addressed in the Complaint.  Postscript denies the remaining allegations in this paragraph.

187.    Postscript denies the allegations in this paragraph.

188.    Postscript denies the allegations in this paragraph.

189.    Postscript denies the allegations in this paragraph.

190.    Postscript denies the allegations in this paragraph.

191.    Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

192.    Postscript denies the allegations in this paragraph.

193.     Postscript denies the allegations in this paragraph.

194.     Postscript denies the allegations in this paragraph.

195.     Postscript denies the allegations in this paragraph.

196.     Postscript admits that the image in this paragraph appears to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

197.     Postscript denies the allegations in this paragraph.

198.     Postscript admits that certain popups enabled by Postscript allow the user to launch their messaging application with a pre-populated message.  Postscript denies the remaining allegations in this paragraph.

199.     Postscript denies the allegations in this paragraph.

200.     Postscript denies the allegations in this paragraph.

201.     Postscript admits that the images in this paragraph appear to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

202.     Postscript admits that the images in this paragraph appear to be taken from Postscript's website.  Postscript denies the remaining allegations in this paragraph.

203.     Postscript denies the allegations in this paragraph.

204.     Postscript denies the allegations in this paragraph.

205.     Postscript denies the allegations in this paragraph.

206.     Postscript denies the allegations in this paragraph.

207.     Postscript denies the allegations in this paragraph.

208.     The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But to the extent an admission or denial is necessary, Postscript denies the allegations.

209.     Postscript admits that it was aware of the '074 Patent upon service of the complaint.  Postscript denies the remaining allegations in this paragraph.

210.     Postscript denies the allegations in this paragraph.

211.     Postscript denies the allegations in this paragraph.

212.     Postscript denies the allegations in this paragraph.

213.     Postscript admits that it was aware of the '074 Patent and the allegations in the complaint upon service of the complaint.  Postscript denies the allegations in this paragraph.

214.     Postscript denies the allegations in this paragraph.

215.     Postscript denies the allegations in this paragraph.

216.     Postscript denies the allegations in this paragraph.

217.     Postscript denies the allegations in this paragraph.

218.     Postscript denies the allegations in this paragraph.

219.     Postscript denies the allegations in this paragraph.

220.     Postscript denies the allegations in this paragraph.

221.     The allegations in this paragraph state legal conclusions, which do not require an admission or denial.  But if a response is required, Postscript denies them.

222.     Postscript denies the allegations in this paragraph.

223.     Postscript denies the allegations in this paragraph.

224.     Postscript denies the allegations in this paragraph.

## **PRAYER FOR RELIEF**

Postscript denies that Attentive has a right to any of the relief it seeks in its prayer for relief.

## **DEMAND FOR JURY TRIAL**

Attentive's request for a jury trial includes no allegations and, therefore, requires no

response.

## DEFENSES

Postscript asserts the following defenses.  Postscript does not concede that it bears the burden of proof as to any of the defenses asserted.  Discovery is not yet complete and, therefore, Postscript has not yet collected and reviewed all of the information and materials that may be relevant to the matters and issues raised herein.  Accordingly, Postscript reserves the right to amend, modify, or expand these defenses and to take further positions as discovery proceeds in this case.

### FIRST DEFENSE
### (Invalidity of the '887 Patent)

The claims of the '887 Patent are invalid for failing to meet one or more of the statutory and decisional conditions for patentability under Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and 112.

### SECOND DEFENSE
### (Non-Infringement of the '887 Patent)

Postscript has not infringed any valid and enforceable claim of the '887 Patent directly or indirectly, by inducement or contributory infringement, literally, or by equivalents.

### THIRD DEFENSE
### (Invalidity of the '897 Patent)

The claims of the '897 Patent are invalid for failing to meet one or more of the statutory and decisional conditions for patentability under Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and 112.

### FOURTH DEFENSE
### (Non-Infringement of the '897 Patent)

Postscript has not infringed any valid and enforceable claim of the '897 Patent directly or

indirectly, by inducement or contributory infringement, literally, or by equivalents.

## FIFTH DEFENSE
### (Invalidity of the '074 Patent)

The claims of the '074 Patent are invalid for failing to meet one or more of the statutory

and decisional conditions for patentability under Title 35 of the United States Code, including,

without limitation, §§ 101, 102, 103, and 112.

## SIXTH DEFENSE
### (Non-Infringement of the '074 Patent)

Postscript has not infringed any valid and enforceable claim of the '074 Patent directly or

indirectly, by inducement or contributory infringement, literally, or by equivalents.

## SEVENTH DEFENSE
### (No Willful Infringement)

Postscript has not willfully infringed, and is not willfully infringing, any valid and

enforceable claim of the patents-in-suit directly or indirectly, by inducement or contributory

infringement, literally, or by equivalents.  Attentive is not entitled to seek enhanced damages or

attorneys' fees for any such alleged willful infringement.

## TENTH DEFENSE
### (Failure to State a Claim)

Attentive's claims for alleged patent infringement fail to state a claim on which relief can

be granted, at least because each of the asserted claims is facially invalid under 35 U.S.C. § 101.

## ELEVENTH DEFENSE
### (Limitation on Damages/Marking)

Attentive's claims for damages are statutorily limited by 35 U.S.C. § 286 and 35 U.S.C. §

287, including by Attentive's failure to comply with the marking statute under 35 U.S.C. § 287.

For example, merely placing a list of patent numbers on a website without also marking the

protected product does not meet the requirements of the marking statute.

### TWELTFH DEFENSE
#### (No Exceptional Case)

Attentive has no basis to allege that this case is an exceptional case justifying an award of attorneys' fees to Attentive under 35 U.S.C. §§ 284 and 285.

### THIRTEENTH DEFENSE
#### (Limitation on Costs)

Plaintiffs are not entitled to costs, and their costs are limited under 35 U.S.C. § 288.

### FOURTEENTH DEFENSE
#### (No Equitable Relief)

On information and belief, Attentive is not entitled to equitable relief with respect to the Asserted Patents under any theory because Attentive has not suffered and will not suffer irreparable harm, is not without adequate remedy at law, the balance of hardships does not favor entry of an injunction, and/or public policy concerns weigh against any equitable relief.

### ADDITIONAL DEFENSES

Postscript's investigation of its defenses is ongoing, and Postscript expressly reserves the right to allege and assert any additional defenses under Rule 8 of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defense, at law or in equity, that may now exist or may in the future be available based upon discovery and further investigation in this case.

### POSTSCRIPT'S COUNTERCLAIMS

Defendant and Counterclaimant Stodge Inc. d/b/a Postscript ("Postscript") hereby complains against Plaintiff and Counterdefendant Attentive Mobile Inc. ("Attentive") as follows:

### NATURE OF THE ACTION AND COUNTERCLAIMS

Postscript brings claims under the patent laws of the United States against Attentive. *See*

35 U.S.C. § 1, *et seq.*  Attentive has infringed and continues to infringe a United States patent that Postscript owns: U.S. Patent No. 11,709,660 (the "'660 patent" or "Postscript's Asserted Patent," Ex. 1).  Postscript additionally seeks a declaration that the patents Attentive asserts—the '887 Patent, '897 Patent, and '074 Patent—are invalid and that Postscript does not infringe them.

## PARTIES

1.      Postscript is a corporation organized and existing under the laws of Delaware, with a principal place of business at 3370 North Hayden Road, Suite 123, Scottsdale, Arizona 85251.

2.      Postscript is the owner of all right, title, and interest in United States Patent No. 11,709,660 (the "'660 patent" or "Postscript's Asserted Patent").

3.      Upon information and belief, Attentive is a corporation organized and existing under the laws of Delaware, with its headquarters and principal place of business at 1500 South 1000 West, Logan, Utah 84321.

4.      Upon information and belief, Attentive is the owner by assignment of all right, title, and interest in the '887 Patent, the '897 Patent, and the '074 Patent (collectively, "the Asserted Patents").

## JURISDICTION AND VENUE

5.      This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under the patent laws of the United States, 35 U.S.C. §§ 1 and 271 *et seq.*

6.      This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.      This Court has personal jurisdiction over Plaintiffs because Plaintiffs invoked the jurisdiction of this Court by filing this action.

8.      Venue in this judicial district is proper over these Counterclaims pursuant to 28 U.S.C. § 1391(b) and (c), and by filing its Complaint in this district, Attentive has consented to venue in this Court for Postscript's counterclaims.

## BACKGROUND

9.      Postscript is a leader in Short Message Service ("SMS") marketing and has been helping online retailers design and operate SMS marketing programs for more than four years. Using Postscript's cutting-edge software platform, retailers can build an engaged subscriber list based on a variety of opt-in tools that Postscript offers.  These users can deliver personalized SMS messages to their subscriber list, thereby driving up revenue and customer satisfaction. Postscript's users can also manage any urgent customer messages through Postscript's user interface or a help page of their choosing.  These immediate, personalized interactions foster a sense of friendship among brands and their customers.

10.     Postscript's software platform supports merchants from all industries in building a larger, more loyal customer base.  Retailers can grow their subscriber list through Postscript's pop-ups, checkout collection, opt-in links, and keyword replies.  Due to these money-making, time-saving features, more than 10,000 online retailers trust Postscript's SMS revenue platform to plan their brand's SMS marketing strategy.

11.     Postscript's leadership and longevity in the industry has uniquely positioned it to observe unmet needs in the marketplace and come up with innovative solutions.  One of those solutions is Postscript's patented campaign flow technology.  The '660 patent describes and claims inventions related to this technology, which is embodied in the Postscript platform's groundbreaking Campaign Flows feature.

12.     Postscript announced the launch of the Campaign Flows feature on October 13, 2021, in anticipation of the Black Friday/Cyber Monday weekend.  This feature integrates with other systems and platforms to allow companies to create customized, dynamic, multi-message marketing campaigns.  Using Campaign Flows, companies can make use of granular criteria to automatically retarget messages in an SMS campaign to specific groups of customers, using information from a variety of sources—including customers' devices and third-party eCommerce platforms like Shopify.  When Campaign Flows was introduced into the marketplace, Postscript noted that it was a "feature [that] is only available on Postscript and is one [Postscript is] super proud of!"[1]

13.     Since its launch, Postscript's Campaign Flows feature has garnered industry accolades and been lauded by customers, many of whom cite Campaign Flows as one of Postscript's most beneficial features.  Recognizing its appeal to customers, Attentive quickly developed a copycat product—Magic Composer.  Like Postscript's Campaign Flows, Magic Composer uses Postscript's patented technology to allow for "automat[ion of] multi-step campaigns saving your brand time and money."[2]  Indeed, Attentive chose to advertise Magic Composer on its inaugural world tour as an innovation that allows for "automatic[] control" over the "texts someone gets based on the actions they take."[3]

A.     **Postscript's Asserted Patent**

14.     Postscript is the owner of all right, title, and interest in and to the '660 patent.  The '660 patent was filed on October 12, 2022, was issued by the United States Patent and Trademark

---

[1] https://postscript.io/blog/bfcm-powerup-event-recap
[2] https://twitter.com/attentiveHQ/status/1578388442525958145
[3] https://www.attentive.com/blog/2023-thread-world-tour-recap

Office ("USPTO") on July 25, 2023, and is entitled "Integrated Third-Party Application Builder Trigger For Message Flow."  A true and correct copy of the '660 patent is attached as Exhibit 1.

15.     Postscript has complied and continues to comply with the marking requirement of 35 U.S.C. § 287 by affixing the Campaign Flows feature in Postscript's application with the word "patent" and a link to the following URL:  https://postscript.io/patents.

16.     Both before the invention of the '660 patent and today, many merchants used third-party "application builder platforms" to build websites or smartphone applications to sell their products.  A common type of "application builder platform" is an "eCommerce platform," which helps merchants set up online stores and inventory management systems.  One popular example of an eCommerce platform is Shopify Inc.  An example of an online store built using Shopify is below:[4]



---

[4] https://www.shopify.com/plus/customers/allbirds

17.     To increase sales through their websites, merchants would often attempt to implement marketing campaigns using SMS or other types of messaging to current and prospective customers.  Crude messaging campaigns directed at mass audiences were both ineffective and annoying to customers.  Accordingly, to build an effective marketing campaign, merchants needed to be able to segment and target subsets of customers with a high degree of granularity (e.g., targeting only customers who had abandoned a previous checkout) as well as define criteria for when additional messaging would be sent out (e.g., if a customer did not click on previous messages in a particular period of time).

18.     Prior to the invention of the '660 patent, merchants were unable to do so effectively and efficiently for several reasons.  First, the data required for optimal customer segmentation was generated from multiple disparate sources, each with its own format and configuration requirements.  *See* Exhibit 1, '660 Patent, 1:15-17 ("Network communications to a mass audience can often be challenging as communications channels are often associated with their own requirements, protocols, formats, and limitations.").  While merchants had access to data gleaned from their customers' interaction with the merchants' own website or applications, the most useful types of data that the merchant might want to use to segment their customer base often was not in the possession of the merchant, since the merchant's transactions were handled by Shopify or another eCommerce platform.  And it was often not straightforward to associate transaction data generated by Shopify and information gleaned from a user's interactions with the merchant's app or website with the same customer or prospective customer because the user identifier generated by one source would not necessarily correspond to a user identifier generated by another source. This made creating dynamic segments that targeted customers using data from multiple sources

challenging, as merchants "may not be equipped with the technical specialty to deliver network communications in an effective manner."  See Exhibit 1, '660 Patent, 1:17-23.

19.     Second, even if a merchant were able to use some information provided by an eCommerce platform and/or the merchant's app or website to target messages to customers, there was no way to continuously monitor that information across a large number of users such that it could be used to automatically retarget messages in a multi-message campaign.

20.     For example, some prior art systems were integrated with eCommerce platforms to the extent that when a user made a particular type of transaction (e.g., submitted an order) you could send them a message responsive to that transaction.  The architecture of these systems limited receipt of the data and any responsive action to a single transaction made by a single user. This meant that merchants could only set up messages: (1) one at a time, a time consuming and often tedious task; (2) using data from a single transaction, which limited the merchant's ability to tailor its messages to be responsive to the full user journey across multiple transactions; and (3) to a single user, meaning that it could not be used to orchestrate large marketing campaigns across a broader target audience.

21.     Other prior art systems permitted what are known as "blast campaigns," which are messages that are sent out to a particular segment of customers that is defined using transactional data provided by the eCommerce platform and/or the merchant's app or website.  These systems permitted a single message to be sent out to a broader list of customers, but (because they could not continuously monitor transactional events) did not allow for automatic retargeting of successive messages based on user actions occurring subsequent to the first message.  Again, this meant that the merchant would have to set up messages one at a time and could not tailor or plan messages across the entire customer journey.

22.     As one example, a merchant might want to first send a marketing message to a segment of customers it deems "VIPs" (e.g., customers who have spent over X total amount of dollars from the merchant's store), then automatically send three different follow-up messages to: (1) VIP customers who clicked on the website link in the previous message, added the product to their shopping cart, but did not finalize the purchase; (2) VIP customers who clicked on the link but did not add the product to their shopping cart; and (3) VIP customers who did not click on the link.  Prior art solutions did not permit this.  Order data, cart data, and link activation data typically come from separate, incompatible sources (e.g., order data might come from an eCommerce platform, while cart and link activation data might come from the merchant's website).  Because prior art systems could not monitor and integrate transactional event data stemming from these sources continuously for a large set of users, no means existed to automatically retarget messages based on trigger conditions stemming from this data.

23.     Preexisting solutions also caused problems and frustration for customers.  Because it was burdensome (or even simply impossible) for merchants to target their customer base with the desired granularity, customers might fail to receive messages relevant to them (or receive messages that were not relevant).  These points of friction increased the risk of annoyance on the part of customers and low conversion rates on the part of merchants.  It also increased the costs to merchants, who would spend large amounts of money sending messages to customers who were not part of the desired target audience.

24.     The '660 patent overcomes these problems by creating a system and method that allows merchants to plan and execute messaging campaigns (known as "flows") using a steady stream of event data coming from both application builder platforms (including eCommerce platforms) and merchant websites or applications for a plurality of users (e.g., all of the recipients

of an original campaign message).  In particular, the '660 patent claims a single, integrated system and method that allows merchants to "buil[d] message flow plans (e.g., message campaigns and message automation)" such that merchants can "utilize a flow builder . . . to create and launch one or more message flow plans for carrying out different message series for different end users to the message flow plan based on trigger conditions of the message flow plan."  *See, e.g.*, Exhibit 1, '660 Patent, 2:26-38.  The message flow plan is created using event data generated "from a code snippet incorporated in an application of a user computing device," as well as "API notification channels of the application builder platform," which are aggregated and "associated with the user identifier used by the message management platform."  *Id.* at Abstract.  The '660 patent thus fills a previously existing need for an improved system architecture that ingests a continuous stream of event data from both eCommerce platforms and user computing devices accessing the merchant's website and/or application, and then permits its use by the merchant to determine a message flow that allows for different automated series of messages to be sent to a specific segment of users based on a variety of trigger conditions.

25.     The claimed invention in Postscript's Asserted Patent is necessarily rooted in computer technology and addresses fundamental computer technology problems with a computer-based solution—a system that is architected so as to be continuously integrated with both eCommerce platforms (or other application builder platforms) and merchant websites or applications, thereby allowing merchants to construct automated marketing message campaigns to identify particular customer segments and control message flows to individual customers based on a wider set of criteria (e.g., the user's actions after receiving the original campaign message) and a more complete set of data.  The claims of Postscript's Asserted Patent recite a concrete combination of steps that permit this improvement.  These steps include, for example: (1) setting

up a message flow that is directed toward a particular segment of customers, and associating at least one message in the flow with a trigger condition; (2) receiving event data from an application builder platform for a plurality of customers via the use of API payloads; (3) receiving event data from a plurality of user devices via the use of code-snippet notifications generated from code-snippets integrated into the retailer's online store; (4) matching user identifiers in the API payloads and code-snippet data with particular customers and creating a set of "subscriber events" for each customer; and (5) based on this set of "subscriber events," determining whether the customer satisfies the criteria to receive a message from the message flow. *See, e.g.*, Exhibit 1, '660 Patent, claim 11. The '660 patent's claims recite the structure and function of a new system that organizes and executes messaging campaign flows more effectively than previous systems.

26.     The inventions claimed and described in Postscript's Asserted Patent improve the operation of computer capabilities and computer networks. The invention provides merchants a system architecture that allows for continuous access to and integration of multiple disparate sources of data for a plurality of users at the same time (e.g., data from a user device or browser and data from an eCommerce platform). The claimed invention further allows for merchants to configure a series of messages that are automatically segmented and sent to different sets of customers based on trigger conditions monitored from this data. These are all aspects of the invention that improve the operation of computer capabilities specifically, as opposed to business practices in general. They also constitute a system architecture that—in being able to continuously monitor both events taking place on eCommerce platforms (via API integration) and events taking place on merchant websites and applications (via code snippets) for a plurality of users at the same time—was not routine or conventional as of the priority date. Designing and creating the patented architecture to do so required months of work on the part of Postscript engineers. Indeed, the prior

inability to do this as a technical matter prevented messaging systems from being able to configure and carry out the flexible and personalized mass marketing campaigns that Postscript—and, by copying from Postscript, Attentive—now offer.

27.     At a minimum, Postscript's Asserted Patent's claims are directed to specific solutions for specific issues with computer functionality.  The claims contain specific elements that teach how to achieve the desired, specific improvement to computer functionality.  The foregoing, as well as the patent itself, contain examples and limitations indicating that the invention is directed to a practical, computer-based problem, not an allegedly abstract idea or known business practice.

**B.     Attentive's Infringing Technology**

28.     Attentive infringes claims of Postscript's Asserted Patent by making, using, offering for sale, selling, and/or importing in the United States a software product that utilizes the claimed campaign flows technology.  For example, Attentive's software platform includes a feature called "Magic Composer" that permits users to create campaign flows in a "single, unified UI" using "built-in logic that retargets subscribers based on engagement and optimizes performance in real time."[5]  Magic Composer and its associated hardware and software (the "Accused Product") infringe at least claim 11 of the Asserted Patent.

29.     Claim 11 of the Asserted Patent recites:

A computer-implemented method, comprising:

receiving, from an application operator, a configuration of a message flow, the message

flow comprising recipient criteria defining a segment of subscribers to receive messages

---

[5] https://www.attentive.com/blog/attentive-product-spotlight-highlights-from-our-quarterly-roadmap-update

from the message flow, at least one message in the message flow associated with a trigger condition;

subscribing to, on behalf of the application operator, at least one application programming interface (API) notification channel of an application builder platform, the application builder platform operational as a backend component of an application controlled by the application operator;

receiving a plurality of API notifications from the application builder platform, the plurality of API notifications comprising respective API payloads that include information describing events associated with a plurality of users of the application builder platform;

receiving a plurality of code-snippet notifications describing events associated with a plurality of user computing devices, a code-snippet notification being received from a user computing device of the plurality of user computing devices via a corresponding code snippet incorporated in an instance of the application operated at the user computing device, the user computing device being associated with a corresponding subscriber with a corresponding subscriber identifier used by a message management platform;

identifying a plurality of user identifiers in the plurality of API payloads from the application builder platform;

determining that the plurality of user identifiers in the plurality of API payloads correspond to a plurality of subscriber identifiers used by the message management platform;

storing, for a first subscriber associated with a first subscriber identifier, subscriber events, the subscriber events comprising one or more events described in one or more API notifications associated with the first subscriber and one or more events described in one

or more code-snippet notifications from one of the user computing devices associated with the first subscriber identifier;

determining, based on a plurality of the stored subscriber events associated with the first subscriber, that the first subscriber satisfies the recipient criteria;

enrolling the first subscriber to the segment of subscribers who are to receive messages from the message flow in response to the determination that the recipient criteria is satisfied;

monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers;

receiving one or more new subscriber events associated with the first subscriber;

determining that the one or more new subscriber events meet the trigger condition in the message flow; and

transmitting the at least one message in the message flow that is associated with the trigger condition to the first subscriber.

30.    Upon information and belief, the Accused Product performs every step of the method recited in claim 11.

31.    The Accused Product employs a "computer-implemented method."

32.    Magic Composer is a software product that is accessed via a computer (e.g., a personal computer or "PC").

33.    The Accused Product also employs servers and other backend computers to implement the claimed functionality.

34.    The Accused Product "receiv[es], from an application operator, a configuration of a message flow, the message flow comprising recipient criteria defining a segment of subscribers

to receive messages from the message flow, at least one message in the message flow associated with a trigger condition."

35.     The Accused Product includes a user-interface ("UI") with which an application operator can "create multi-channel, multi-message campaigns."[6]  The UI permits the application operator to select recipient criteria defining a segment of subscribers to receive messages during the campaign:[7]

---

[6] https://www.attentive.com/blog/commerce-and-convenience-keynote
[7] https://www.youtube.com/watch?v=WG5WYOmrv7E





36.     At least one message in the message flow is associated with a trigger condition, including, for example, "logic that retargets subscribers based on engagement" and exclusion trigger conditions for excluding particular segments of subscribers from receiving the message:



37.     The Accused Product "subscrib[es] to, on behalf of the application operator, at least one application programming interface (API) notification channel of an application builder platform, the application builder platform operational as a backend component of an application controlled by the application operator."

38.     For example, the Accused Product provides for integration with various application builder platforms,[8] including, but not limited to, Shopify, an eCommerce platform that helps online retailers build and maintain "shops" on their websites.[9]   When the application operator opts to integrate the Accused Product with Shopify or another application builder platform, the Accused

---

[8] https://help.attentivemobile.com/hc/en-us/sections/360008458231-eCommerce-integrations
[9] https://help.attentivemobile.com/hc/en-us/articles/360041854231-Shopify

Product subscribes to that platform's API notification channels,[10] which permits the Accused Product to read and use the platform's data from the retailer's website or application.[11]

39.     The Accused Product "receiv[es] a plurality of API notifications from the application builder platform, the plurality of API notifications comprising respective API payloads that include information describing events associated with a plurality of users of the application builder platform."

40.     For example, the Accused Product receives API notifications from Shopify that includes information describing transactional events associated with users, such as confirmation of an order, issuance of a refund, or abandonment of a sale at checkout.[12]

41.     The Accused Product "receiv[es] a plurality of code-snippet notifications describing events associated with a plurality of user computing devices, a code-snippet notification being received from a user computing device of the plurality of user computing devices via a corresponding code snippet incorporated in an instance of the application operated at the user computing device, the user computing device being associated with a corresponding subscriber with a corresponding subscriber identifier used by a message management platform."

42.     For example, the Accused Product employs the "Attentive tag," a code-snippet that is installed on the retailer's website.[13]  The Attentive tag captures behavioral data and triggering events associated with a user of the website, such as what items the user views, purchases, or

---

[10] https://shopify.dev/docs/api/usage
[11] https://help.attentivemobile.com/hc/en-us/articles/360041854231-Shopify#h_01FHAWE24CDD4JG79TSGG8574A
[12] https://help.attentivemobile.com/hc/en-us/articles/360052420472; https://help.attentivemobile.com/hc/en-us/articles/4404640517908-Triggers-in-journeys#01FT4MKJRXZ7QH55AT40CX1VC6
[13] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag#add-the-attentive-tag-0-1

abandons.[14]   After the Attentive tag is installed, Attentive creates cookies to track and store the relevant analytics data, including by associating the user computing device with a corresponding Attentive subscriber identifier:

After you add the Attentive tag to your website, Attentive creates cookies to track and store analytics data to provide an optimized user experience. See below for a list of these cookies.

- `_attn_` : This is a secure persistent cookie that contains the visitor ID and some page view and session details.
  - **Data stored:** analytics/identity data
  - **Required for:** encrypted long-term data for analytics/identity
  - **Size:** 170 bytes
  - **Expiration:** 400 days
- `__attentive_id` : This is a unique visitor identifier that gets tied to a subscriber in Attentive. It's used to attribute onsite events to the visitor and to govern display rules for Attentive sign-up units. This cookie doesn't expire unless the shopper clears their browser cache/cookies.
  - **Data stored:** visitor ID
  - **Required for:** fatiguing – attributing events to users
  - **Size:** 46 bytes
  - **Expiration:** 60 years or, if GDPR compliant, 390 days

The Accused Product then receives this information via code-snippet notifications provided by the Attentive tag.

43.    Upon information and belief, the Accused Product "identif[ies] a plurality of user identifiers in the plurality of API payloads from the application builder platform."

---

[14] *Id.*

44.     For example, the API payloads that the Accused Product receives from Shopify includes user identifiers to permit the Accused Product to use and analyze individual customer data.[15]

45.     Upon information and belief, the Accused Product "determin[es] that the plurality of user identifiers in the plurality of API payloads correspond to a plurality of subscriber identifiers used by the message management platform."

46.     For example, the Accused Product determines which subscriber identifiers correspond to the user identifiers in the Shopify API payloads so that the Shopify transactional information can be used to target specific sets of subscribers.[16]

47.     The Accused Product "stor[es], for a first subscriber associated with a first subscriber identifier, subscriber events, the subscriber events comprising one or more events described in one or more API notifications associated with the first subscriber and one or more events described in one or more code-snippet notifications from one of the user computing devices associated with the first subscriber identifier."

48.     For example, the Accused Product stores a variety of subscriber events, including: (1) "Shopify transactional event[s]," which are events described in one or more Shopify API notifications associated with a particular subscriber;[17]

---

[15] https://help.attentivemobile.com/hc/en-us/articles/360041854231-Shopify#prerequisites-0-0
[16] https://help.attentivemobile.com/hc/en-us/articles/360041854231-Shopify#prerequisites-0-0
[17] https://help.attentivemobile.com/hc/en-us/articles/360052420472



and (2) Attentive events, which are events that are captured from the subscriber's computing device and transmitted in code-snippet notifications by the "Attentive tag."[18]



49.    The Accused Product "determin[es], based on a plurality of the stored subscriber events associated with the first subscriber, that the first subscriber satisfies the recipient criteria."

---

[18] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag

50.     For example, the Accused Product permits the application operator to select recipient criteria defining a segment of subscribers to receive messages during the campaign.  This recipient criteria may include both Shopify transactional events and Attentive events.



51.     As one example, the recipient criteria may define a "VIP" segment of subscribers that includes both Shopify transactional events and Attentive events:[19]



52.     The application operator may then select one or more segments to be included in, or excluded from, particular messages in the campaign.  The Accused Product will determine

---

[19] https://www.attentive.com/blog/5-sms-marketing-segmentation-strategies-to-power-personalization

whether a particular subscriber should be sent a message by analyzing the stored subscriber events and determining whether the subscriber satisfies the recipient criteria associated with the segment selected for (or excluded from) that message.

53.     The Accused Product "enroll[s] the first subscriber to the segment of subscribers who are to receive messages from the message flow in response to the determination that the recipient criteria is satisfied."

54.     If the Accused Product determines that a particular subscriber satisfies the recipient criteria, then it will add that subscriber to the segment of subscribers scheduled to receive messages during the campaign.

55.     The Accused Product "monitor[s] the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers."

56.     For example, in response to a subscriber being enrolled in the segment of subscribers for a first message, the Accused Product will monitor whether a particular trigger condition occurs for that subscriber:



In this example, the trigger conditions are: (1) the subscriber clicked on a link in the first message but did not purchase the product; and (2) the user does not have an open support ticket.

57.    The Accused Product "receiv[es] one or more new subscriber events associated with the first subscriber."

58.    For example, the Accused Product will receive subscriber events associated with: (1) whether the subscriber clicked the link in the previous message; (2) whether the subscriber purchased the product associated with the link; and (3) whether the subscriber becomes part of an excluded segment (e.g., has an open support ticket).

59.    The Accused Product "determin[es] that the one or more new subscriber events meet the trigger condition in the message flow."

60.     The Accused Product will use the received subscriber events to determine whether the criteria defining the trigger conditions has been satisfied.  For example, the Accused Product will use the previously-described subscriber events to determine whether the subscriber belongs to the segment of recipients who clicked a link and did not purchase a product, and who do not have an open support ticket.

61.     The Accused Product "transmit[s] the at least one message in the message flow that is associated with the trigger condition to the first subscriber."

62.     If the Accused Product determines that the trigger conditions have been satisfied, the Accused Product will then send a subsequent message to the subscriber.

## COUNTERCLAIMS

### COUNTERCLAIM 1
### (Declaratory Judgment of Non-Infringement of the '887 Patent)

63.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

64.     In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '887 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and Plaintiffs with regard to infringement of the '887 Patent.

65.     Postscript has not been and is not now infringing, either directly or indirectly, by inducement, or contributorily, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '887 Patent.  By way of non-limiting example, Postscript cannot infringe at least asserted claim 1 of the '887 Patent at least because Postscript does not send a URI from any server to a mobile device and therefore cannot satisfy the claim limitation "define and send a

uniform resource identifier (URI) to the mobile device in response to the mobile device executing the integration tag."

66.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '887 Patent.

By this Counterclaim, Postscript seeks a judicial declaration and determination that Postscript does not infringe and has not directly or indirectly infringed, either literally or under the doctrine of equivalents, contributed to the infringement of, or induced the infringement of any valid claim of the '887 Patent, and is not liable for any alleged infringement of the '887 Patent.

## COUNTERCLAIM 2
### (Declaratory Judgment of Invalidity of the '887 Patent)

67.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

68.     In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '887 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and Plaintiffs with regard to infringement of the '887 Patent.

69.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '887 Patent.

70.     The claims of the '887 Patent are invalid for failing to meet one or more of the statutory and decisional conditions for patentability under Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and/or 112.  By way of non-limiting example, a

system in public use marketed by Branch Metrics, Inc. d/b/a Branch at least as early as July 5, 2016, anticipates and/or renders obvious at least asserted claim 1 of the '887 Patent for at least the detailed reasons stated in the Initial Invalidity Contentions, incorporated by reference herein.

71.      To resolve the legal and factual questions raised by Attentive and to afford relief from the uncertainty and controversy that Attentive's allegations have created, Postscript seeks a declaratory judgment that the '887 Patent is invalid.

## COUNTERCLAIM 3
### (Declaratory Judgment of Non-Infringement of the '897 Patent)

72.      Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

73.      In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '897 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and the Plaintiffs with regard to infringement of the '897 Patent.

74.      Postscript has not been and is not now infringing, either directly or indirectly, by inducement, or contributorily, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '897 Patent.  By way of non-limiting example, Postscript cannot infringe at least asserted claim 15 of the '897 Patent at least because Postscript does not create a custom text message populated based on user data and therefore cannot satisfy the claim limitation "means for causing . . . the second application to automatically populate a custom text message based on the user data."

75.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '897 Patent.

76.     By this Counterclaim, Postscript seeks a judicial declaration and determination that Postscript does not infringe and has not directly or indirectly infringed, either literally or under the doctrine of equivalents, contributed to the infringement of, or induced the infringement of any valid claim of the '897 Patent, and is not liable for any alleged infringement of the '897 Patent.

## COUNTERCLAIM 4
### (Declaratory Judgment of Invalidity of the '897 Patent)

77.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

78.     In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '897 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and Plaintiffs with regard to infringement of the '897 Patent.

79.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '897 Patent.

80.     The claims of the '897 Patent are invalid for failing to meet one or more of the statutory and decisional conditions for patentability under Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and/or 112.  By way of non-limiting example, Branch Metrics, Inc. d/b/a Branch, at least as early as July 5, 2016, anticipates and/or renders

obvious at least asserted claim 15 of the '897 Patent for at least the detailed reasons stated in the Initial Invalidity Contentions, incorporated by reference herein.

81.     To resolve the legal and factual questions raised by Attentive and to afford relief from the uncertainty and controversy that Attentive's allegations have created, Postscript seeks a declaratory judgment that the '897 Patent is invalid.

### COUNTERCLAIM 5
### (Declaratory Judgment of Non-Infringement of the '074 Patent)

82.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

83.     In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '074 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and the Plaintiffs with regard to infringement of the '074 Patent.

84.     Postscript has not been and is not now infringing, either directly or indirectly, by inducement, or contributorily, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '074 Patent.  By way of non-limiting example, Postscript cannot infringe at least asserted claim 1 of the '074 Patent at least because Postscript does not send a URI from any server to a mobile device and therefore cannot satisfy the claim limitation "receiving, from the at least one web server . . . a uniform resource identifier (URI) that deeplinks to and causes the mobile device to . . . "

85.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '074 Patent.

86.     By this Counterclaim, Postscript seeks a judicial declaration and determination that Postscript does not infringe and has not directly or indirectly infringed, either literally or under the doctrine of equivalents, contributed to the infringement of, or induced the infringement of any valid claim of the '074 Patent, and is not liable for any alleged infringement of the '074 Patent.

### COUNTERCLAIM 6
### (Declaratory Judgment of Invalidity of the '074 Patent)

87.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

88.     In their Complaint, Plaintiffs have expressly accused Postscript's SMS Marketing Platform and Postscript's other offerings and services that integrate with Postscript's SMS Marketing Platform of infringing the '074 Patent.  As a result of Plaintiffs' actions and statements, including the filing of the Complaint, an actual and justiciable controversy exists between Postscript and Plaintiffs with regard to infringement of the '074 Patent.

89.     A judicial declaration and determination is necessary and appropriate at this time given Plaintiffs' allegations and so that Postscript may ascertain its rights and duties with respect to the '074 Patent.

90.     The claims of the '074 Patent are invalid for failing to meet one or more of the statutory and decisional conditions for patentability under Title 35 of the United States Code, including, without limitation, §§ 101, 102, 103, and/or 112.  By way of non-limiting example, Branch Metrics, Inc. d/b/a Branch, at least as early as July 5, 2016, anticipates and/or renders obvious at least asserted claim 1 of the '074 Patent for at least the detailed reasons stated in the Initial Invalidity Contentions, incorporated by reference herein.

91.     To resolve the legal and factual questions raised by Attentive and to afford relief from the uncertainty and controversy that Attentive's allegations have created, Postscript seeks a declaratory judgment that the '074 Patent is invalid.

### COUNTERCLAIM 7
### (Infringement of the '660 Patent)

92.     Postscript incorporates each of the preceding paragraphs of its Counterclaims as if set forth fully herein.

93.     As detailed in the section titled "Attentive's Infringing Technology," *supra*, Attentive has infringed, infringes, and will continue to infringe one or more claims of the '660 patent, including at least claim 11, literally or under the doctrine of equivalents, under 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale in the United States the Accused Product.  Attentive has known of the '660 patent and its infringement at least as of August 24, 2023, when Postscript sent Attentive a letter notifying it of the '660 patent and its infringement.

94.     Additionally or in the alternative, Attentive actively induces and will continue to actively induce infringement of one or more claims of the '660 patent, including at least claim 11, under 35 U.S.C. § 271(b), by actively encouraging and instructing and continuing to actively encourage and instruct Attentive's customers and users to use the Accused Product to practice the claims in the manner described in the section titled "Attentive's Infringing Technology," *supra*. For example, as depicted in the cited Attentive public materials in that section, Attentive has created and maintained videos,[20] blog posts,[21] and help articles[22] that encourage and instruct

---

[20] https://www.youtube.com/watch?v=WG5WYOmrv7E
[21] https://www.attentive.com/blog/attentive-product-spotlight-highlights-from-our-quarterly-roadmap-update
[22] https://help.attentivemobile.com/hc/en-us/articles/4402571984916-Edit-Shopify-customer-data-segments

customers to use the Accused Product in an infringing manner.  Attentive has known of the '660 patent and its customers' infringement at least as of August 24, 2023, when Postscript sent Attentive a letter notifying it of the '660 patent and its infringement.

95.     Additionally or in the alternative, Attentive contributorily infringes and will continue to contributorily infringe one or more claims of the '660 patent, including at least claim 11, under 35 U.S.C. § 271(c) by offering to sell and/or selling within the United States the Accused Product.  As detailed in the section titled "Attentive's Infringing Technology," *supra*, Magic Composer is a tool that constitutes a separate and distinct product or offering marketed by Attentive, one that is not a staple article of commerce but instead that was specifically created to carry out the patented method.  As such, the Accused Product has no substantial non-infringing uses.

96.     As a result of Attentive's infringement of the '660 patent, Postscript has suffered damages and will continue to suffer damages, including damages awardable under 35 U.S.C. §§ 284 and 285.

97.     Attentive's infringing conduct has caused and is causing irreparable harm to Postscript for which Postscript has no adequate remedy at law, and such irreparable harm will continue unless and until Attentive is enjoined by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Postscript respectfully requests that the Court enter judgment in favor of Postscript and award the following relief:

A.      A judgment that Postscript has not infringed and does not infringe any valid and enforceable claim of the '887 Patent, the '897 Patent, or the '074 Patent;

B.      A judgment that the claims of the '887 Patent, the '897 Patent, or the '074 Patent

are invalid;

C.     A judgment that Attentive recover nothing from Postscript;

D.     Dismissal with prejudice of all claims in the Complaint against Postscript;

E.     A judgment that Attentive has been, and is currently, infringing Postscript's Asserted Patent.

F.     Award Postscript monetary relief sufficient to compensate Postscript for damages resulting from Attentive's infringement of Postscript's Asserted Patent, including lost profits and/or a reasonable royalty under 35 U.S.C. § 284, and that such monetary relief be awarded to Postscript with prejudgment and post-judgment interest;

G.     That Attentive, its officers, agents, servants, and employees, and those persons in active concert or participation with any of them, be enjoined from commercially manufacturing, using, marketing, offering for sale, selling, or importing Attentive's Accused Products or any other product that infringes, or induces or contributes to the infringement of Postscript's Asserted Patent, prior to the expiration date of the patent;

H.     Award Postscript enhanced damages, up to and including trebling of the damages awarded to Postscript;

I.     A finding that this is exceptional pursuant to 35 U.S.C. § 285 and an award to Postscript of its attorneys' fees and costs; and

J.     Any further necessary and proper relief as this Court may deem just and proper.

## **JURY DEMAND**

Postscript demands a jury trial on all issues and claims so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gene Novikov
Hannah Jiam
Raghav Krishnapriyan
Joyce C. Li
MORRISON FOERSTER
425 Market Street
San Francisco, CA 94105-2482
Tel: (415) 268-7000

Dated:  August 25, 2023
10985842 / 22870.00001

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Defendant Stodge Inc.*
*d/b/a Postscript*