# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ATTENTIVE MOBILE INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 22-1163-CJB |
| | ) |
| 317 LABS, INC., d/b/a EMOTIVE, | ) |
| | ) |
| Defendant. | ) |

Jack B. Blumenfeld, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Christopher C. Campbell, Ryan A. Schmid, Jonathon Weinberg, Stephen Scaife, KING & SPALDING LLP, Washington, DC, Britton F. Davis, Brian Eutermoser, KING & SPALDING LLP, Denver, CO Attorneys for Plaintiff.

John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Richard Martinelli, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, NY; Jonathan Liu, Evan Brewer, ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, CA; Michael C. Chow, ORRICK, HERRINGTON & SUTCLIFFE LLP, Irvine, CA, Attorneys for Defendant.

| | |
|---|---|
| ATTENTIVE MOBILE INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 23-87-CJB |
| | ) |
| STODGE INC. d/b/a POSTSCRIPT, | ) |
| | ) |
| Defendant. | ) |

Jack B. Blumenfeld, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Christopher C. Campbell, Ryan A. Schmid, Jonathon Weinberg, Stephen Scaife, KING & SPALDING LLP, Washington, DC; Britton F. Davis, Brian Eutermoser, KING & SPALDING LLP, Denver, CO, Attorneys for Plaintiff.

David E. Moore, Bindu A. Palapura, Andrew L. Brown, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Gene Novikov, Hannah Jiamm, Raghav R. Krishnapriyan, Joyce C. Li, Bethany D. Bengfort, MORRISON FOERSTER, San Francisco, CA; Sara Doudar, MORRISON FOERSTER, Los Angeles, CA, Attorneys for Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

September 25, 2023
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

As announced at the hearing on July 14, 2023, IT IS HEREBY ORDERED that the portion of Defendant 317 Labs, Inc., d/b/a Emotive's ("Emotive") motion to dismiss (the "motion"), (Civil Action No. 22-1163-CJB, D.I. 9), which argues that Plaintiff Attentive Mobile, Inc.'s ("Plaintiff" or "Attentive Mobile") asserted United States Patent Nos. 11,416,887 (the "'887 patent") and United States Patent No. 11,416,897 (the "'897 patent") are directed to non-patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"), is DENIED, and that Defendant Stodge Inc. d/b/a Postscript ("Postscript")'s motion to dismiss, (Civil Action No. 23-87-CJB, D.I. 9), which argues that the '887 patent and the '897 patent, along with Plaintiff's United States Patent No. 11,553,074 (the "'074 patent"), are directed to ineligible subject matter pursuant to Section 101, is also DENIED.

Emotive's and Postscript's motions were fully briefed as of March 29, 2023, (Civil Action No. 23-87-CJB, D.I. 22), and the Court received further submissions regarding Section 101-related questions and supplemental authority on July 11, 2023, (Civil Action No. 22-1163-CJB, D.I. 50-51; Civil Action No. 23-87-CJB, D.I. 42-43). The Court carefully reviewed all submissions in connection with the Defendants' motions, heard oral argument, and applied the relevant legal standards for review of this type of Section 101-related motion at the pleading stage, which it has previously set out in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018).

2

The Court's Order is consistent with the bench ruling announced at the hearing on July 14, 2023, pertinent excerpts of which follow:

> I[ will] now move on to the second and third cases which are related.  Attentive Mobile, Inc. is the Plaintiff in both cases.  And in Civil Action 22-1163-CJB, the Defendant is 317 Labs, Inc., doing business as Emotive.  I[ will] refer to the Defendant there as Emotive and to the case as the Emotive case.  And in Civil Action Number 23-87-CJB, the Defendant is Stodge, Inc. doing business as Postscript.  I[ will] refer to that Defendant as Postscript and to the case as the Postscript case.
>
> In these cases, we have Defendants' Rule 12(b)(6) motions.  Most of, though not all of the motion[] in the Emotive case and the entirety of the motion in the Postscript case is premised on the ground that the operative Complaint should be dismissed on a Section 101 eligibility basis.  The Court will address only those Section 101 grounds for dismissal now and will deny the motions as they relate to Section 101 for the reasons I[ will] set out herein.
>
> Plaintiff asserts in its Complaint in the Emotive case that Defendant infringes at least independent [c]laim 1 of the ['887 patent] . . . and independent [c]laim 15 of [the '897 patent].[1]  In the Postscript case, Plaintiff asserts that Defendant infringes at least those two claims, as well as independent [c]laim 23 of the ['074 patent].[2]  The three asserted patents share the same title, same inventors and [a] nearly identical specification.
>
> In their briefing, both Defendants agree that the respective asserted independent claims call[ed] out [in the] respective Complaints are representative of each other and of all asserted claims for Section 101 purposes.  And so, they treated those claims interchangeably throughout their arguments in the briefs.
>
> For its part, Plaintiff took issue in its briefing with the idea that these three claims might be representative of all the claims in the patents for Section 101 purposes.[3]  But aside from the brief

---

[1]   (Civil Action No. 22-1163-CJB, D.I. 1 at ¶¶ 72, 105)

[2]   (Civil Action No. 23-87-CJB, D.I. 1 at ¶¶ 76, 124, 173)

[3]   (Civil Action No. 22-1163-CJB, D.I. 16 at 7; Civil Action No. 23-87-CJB, D.I. 16 at 20)

mention [of] the content of a few dependent claims of the '887 patent in its answering brief in the Postscript case,[4] Plaintiff did[ not] really make a meaningful argument as to the distinctiveness of the dependent claims.

In any event, for ease of reference, the Court will focus on [c]laim 1 of the '887 patent in rendering its decision today. The Court need not trouble itself further with the question of whether this claim is representative of all the asserted claims in the case. That[ is] because since [] Defendant[s'] motion[s] rose and fell with [their] arguments about [the] three listed independent claims, and since the Court is concluding here that [c]laim 1 and those other two listed claims are not claims to an abstract idea, the Court is necessarily finding that the motions should be dismissed as to all asserted claims of the patents.

One other procedural note before I begin with the *Alice* two-step analysis. In the briefing at least, certain parties, particularly Emotive, appeared to cite to at least some materials that may not have been referenced in the Complaint in the case, or attached to the Complaint or integral to the Complaint.[5] To the extent they did so, . . . I cannot take such material into account in resolving the motion to dismiss, and so I will not do so here.

I[ will] now turn to the *Alice* analysis at step one. At this step, the two Defendants have similar, though slightly different articulations of the abstract idea that [c]laim 1 is purportedly directed to. Emotive framed its abstract idea a few different ways in the briefing, but the articulation that[ is] probably most faithful to its briefing is "providing a streamline[d] process to sign up for marketing promotions or services."[6] Postscript, for its part, asserts that the abstract idea at issue is "streamlining the process for a customer to enroll in a marketing promotion *by providing a pre-filled and pre-addressed request*."[7] In other words, Postscript's asserted abstract idea is a bit narrower than Emotive's is in that Postscript is allowing [that] the method of streamlining issue must be accomplished via the use of a pre-filled and pre-addressed

---

[4]   (Civil Action No. 23-87-CJB, D.I. 16 at 20)

[5]   (Civil Action No. 22-1163-CJB, D.I. 10 at 4, 9)

[6]   (*Id*. at 7)

[7]   (Civil Action No. 23-87-CJB, D.I. 10 at 8 (emphasis added))

4

request. But overall[,] the two asserted abstract ideas at issue are fairly similar.

For ease of reference today, the Court will utilize Postscript's abstract idea when discussing these issues and will assume, for the sake of argument, that both Defendants were pointing to that articulation as the concept that the claims are directed to. I note that in doing so, I[ a]m essentially doing Emotive a favor, because [its] proposed abstract idea is even broader than Postscript's. And so, it would suffer from even worse step one problems of the type I[ am] about to describe when analyzing the abstract idea that Postscript says [that the claim] is directed to.

So, the next question is: Is ["]streamlining [the] process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request["] an abstract idea? Here, there[ is] no dispute that it is. And in its briefing, Plaintiff essentially acknowledges that this "bare idea may be abstract[,]" but goes on to argue that [c]laim 1 is not, in fact, directed to that [idea].[8] Instead, Plaintiff argues that the claim is directed to a specific "improved mobile sign-up system that merely involves th[is] idea."[9]

With that understood, the Court next must assess whether [c]laim 1 is actually directed to the abstract idea at issue. To do that, we need to understand the claim and what it covers.

Claim 1 is a claim to a "non-transitory process[or-]readable medium storing code" that causes a "click-to-text server" to do the following[:] First, send to a client server an integration tag that is "configured to be served with a web[p]age" [h]osted by that client server[; t]he integration tag causes any mobile device that hosts that web[p]age via [a] first application to send user data to either the client server or the click-to-text server. Second, once the mobile device executes the integration [tag], the click[-to-text] server sends "a uniform resource identifier [or 'URI,' which is a type of link] to the mobile device[.]" This URI is described as "deeplink[ing] to a messaging application different from the first application"[; t]he claim goes on to explain that once the mobile device detects the user interacting with a "promotional message associated with the web[p]age" th[en] the URI causes the mobile

---

[8]     (Civil Action No. 23-87-CJB, D.I. 16 at 4)

[9]     (*Id.* at 4-5 (emphasis omitted); *see also* Civil Action No. 22-1163-CJB, D.I. 16 at 8)

device to "automatically transition from the first application to the messaging application" and "automatically populate a custom message in the messaging application that includes an address associated with the click[-to-text] server and a message [body] that includes an identifier associated with at least one of the web[p]age or the user data"[; t]he claim goes on to explain that once the mobile device detects that the user has hit the send button of the messaging [app], then the mobile device "sends the custom message to the click-to-text server[.]" Third, the click[-to-text] server receives the custom message. Fourth, the server then enrolls the mobile device in a promotion associated with the promotional message that the user accessed on the web[p]age.[10]

An embodiment of how this process works is seen in Figures 2A[-]C of the patents. Those figures depict a user's mobile phone wherein the user is looking at a web[p]age and clicking on a promotional link on the web[p]age. Once the user does so, the mobile device automatically transitions from the webpage to a messaging app. In the messaging app, the text message [appears] that[ has] been automatically populated with text asking the compan[y] to subscribe the user to the product [or] service and with the advertising company's phone number listed as the location where the message will be sent. And the figures demonstrate how by hitting the send button on the messaging app, the user can send a message [and] is then enrolled in or subscribed to the service.[11]

Understanding what[ is] claimed in [c]laim 1, we now have to determine what that claim is directed to. As I[ ha]ve explained earlier, the [United States Court of Appeals for the] Federal Circuit requires that the Court examine the patents, particularly the patent specification, to assess what is the focus of the claim or what is its character as a whole. Is the claim's focus or character as a whole simply about the general concept of "streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request" or is it about something more than that or different than that?

In engaging in the step one inquiry, here the Court is particularly mindful of the guidance from the Federal Circuit[ in] cases like *McRO, Inc. v[.] Bandai Namco Games America*.[12] In *McRO*, the

---

[10] ('887 patent, cols. 21:40-22:5)

[11] (*Id.*, FIGS. 2A-C; *id.*, cols. 7:30-8:13)

[12] 837 F.3d 1299 (Fed. Cir. 2016).

Federal Circuit instructed Courts to be careful to avoid oversimplifying claims by looking at them generally and failing to account for the specific requirements found therein.[13] In the Court's view, that is what Defendants have done by way of their assertions that the claims are only directed to the abstract idea at issue.

The Court comes to this conclusion because the patent specification tells us time and time again in many different ways that how[ever one] might articulate what [c]laim 1 is directed to, that concept needs to take into account the fact that the claim makes use of what the patent refers to as a custom-generated deeplinking process. More specifically, what[ is] key to the patent is that in response to a user clicking on a website's promotional advertising and using a first application, a URI generated by the claim's click-to-text server then deep[l]inks to a second messaging application[,] in which a custom enrollment message with data related to that user or the website that the user visited is automatically populated [in]to the messaging [app].[14]

[That] this concept is central to the focus of [c]laim 1 is evident from many parts of the patent[]. Of course, the concept is found in [the] text [of c]laim 1 itself[.][15] [B]ut it[ is] also highlighted consistently in various other parts of the patent as well.

To start, just look at the patent's title. That title is "Methods and Apparatus[] for Mobile Device Messaging-Based Communications *Using Custom-Generated Deeplinks* and Based on the Hyper[T]ext Transfer Protocol [(]HTTP[)]."[16] The title makes clear that the patent's claims are not simply broadly about the concept of streamlining a customer's enrollment process by providing a pre-filled and pre-addressed request in any old way one wishes to. Instead, they[ are] about doing so in a *more particular way*, one that must make use of what the patent refers to in shorthand as ["C]ustom-[G]enerated [D]eep[l]inks.["]

Before going further, let[ us] understand what is deeplink[ing] or a deeplink associated with a URI. In [c]olumn 3, the specification

---

[13]   *Id.* at 1313.

[14]   (Civil Action No. 23-87-CJB, D.I. 16 at 6-7)

[15]   ('887 patent, col. 21:50-67)

[16]   (*Id*. at 1 (emphasis added))

7

describes deeplinking as a type of link used in mobile applications that allows the linking of one mobile application to another mobile application.[17] And it explains that deeplinking can use a URI that links to a mobile application or to a specific location within a mobile application.[18] So, in other words, using a URI [to] accomplish deeplinking is a method of using computer technology to automatically transition from one mobile [app] to another. I should also note that Defendants assert[,] and Plaintiff does not dispute[,] that the concept [of] deeplinking was known in the art at the time of the patents. Indeed, this seems to be indicated in [c]olumn 3 of the patent.[19]

Where else does the patent indicate that the concept of custom-generated deeplinking is central to what [c]laim 1 is about? Well, the [A]bstract tells us this. It prominently notes that the claims involve [in] response to user input[,] sending an HTT[P] response message, including the "URI of the second user interface and the purchase information to deeplink to the second user interface[] and to cause the second user interface to be rendered at the mobile device with the purchase information pre-populated in an input field [of a] text messag[e]."[20] This description makes up half of the [A]bstract's text.

The [S]ummary section of the patent also indicates the prominence of what[ is] called [] custom-generated deeplink[ing]. A good portion of its text, which runs for about 40 lines, are just about th[i]s same process of sending a URI [and] purchase information to deeplink to the second user interface and to cause a pre-populated text message, including user data or website data[,] to be generated.[21]

And if there was any doubt remaining about whether [c]laim 1 was directed to a concept that has to include some reference to custom-generated deeplink[ing], it [would be dispelled by looking to] the [B]ackground section of the patent at [c]olumn 1. There, the patentees are explaining what is the problem that the invention

---

[17]   (*Id.*, col. 3:15-17)

[18]   (*Id.*, col. 3:17-20)

[19]   (*Id.*, col. 3:20-23)

[20]   (*Id.*, Abstract)

[21]   (*Id.*, cols. 1:56-2:28)

8

hopes to solve and how it intends to do so. The patent notes that known computer methods allow a mobile device user to be able to open a vendor's app or vendor's website in order to select a product []or service, [via] which the user could provide payment information in order to complete a transaction. But the patents explain that with these known methods, the user often had to pause [his or her] previous activities such as viewing a website or reading an e[-]mail on the mobile device because the computer automatically redirected them to the vendor's app or website. When the user got there, signing up for the product or services often required lots of user input, such as many different clicks o[r] screen t[a]ps[,] in order to complete the transaction. The patent explains that this "time consuming and burdensome process results in many users leaving the purchase before the transaction is completed."[22] And Plaintiff's [C]omplaints also add that sometimes users would fail to complete these purchases, not just due to lost interest, but also due to too many mistyped numbers.[23] Accordingly, in the Background [s]ection of the patents, the patent[ee] concludes by stating that, "[a] need exists for methods and apparatus for *dynamic application deeplink[ing]* to transition from one user interface to another user interface at a mobile device for continu[ed] and improved user experience and engagement when interacting with the mobile device."[24]

So, sure, the claims certainly involve the concept of "streamlining [the] process for a customer to enroll in a marketing promotion by providing pre-filled and pre-addressed request[]." But as the Federal Circuit explained in *Enfish LLC v[.] Microsoft Corp.*, the step one inquiry "cannot simply ask whether the claims *involve* a patent[-in]eligible concept[,] because essentially every routinely patent[-]eligible claim" does so at some level.[25] For that reason, in *Enfish* the Federal Circuit cautioned District Courts not to "describ[e] the claims at such a high level of extraction" so that the description is "untethered from the language of the claims" in a

---

[22]    (*Id.*, col. 1:45-47)

[23]    (*See, e.g.*, Civil Action No. 22-1163-CJB, D.I. 1 at ¶ 31)

[24]    ('887 patent, col. 1:48-52 (emphasis added))

[25]    822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis in original).

9

way that "all but ensures the exceptions to [Section] 101 [swallow] the rule."[26]

In the Court's view, that[ is] what Defendants have done here. They[ have] identified an abstract concept that [c]laim 1 *involves*, not the concept that [c]laim 1 is *directed to*.

Another way to understand that this is what[ is] going on here is by realizing that there truly are many possible ways of streamlining the process for customer enrollment in a marketing promotion by providing the customer with a pre-filled and pre-addressed request[.] But [] the patents are surely not directed to or about all of them.

For example, Defendants discuss some of those possible ways in their briefing[, o]ne of which does[ not] even require the use of computer technology. On this [score,] Defendants note that for years magazines would include pre-populated forms with a mailing address, [a] pre-typed message stating that the sender wishes to subscribe to a magazine and pre[-]paid postage.[27] All the customer would have to do to subscribe is to send [back] that pre-filled, pre-addressed request.

And one can surely posit many other ways, even many other computerized ways[,] of streamlining a customer's enrollment process by providing the customer with a pre-filled and pre-addressed request that do[ not] involve the claim[ed] solution. Perhaps[] a company, for example, could send an e[-]mail to a customer that includes a pre-filled, pre-addressed enrollment form attached[,] such that all the customer needs to do is print out the attachment and send the form away in [the] U.S. mail to the company[.] [O]r a company could enable a user to download an app, and [the user] could click on a promotional request, which would generate a pop-up screen that the user saw that was pre-populated with the user's information. Or the user might click a promotional link on a web[p]age that takes the user to a request, and then a screen pops up that asks if the user would like their personal information auto-filled into the request.

---

[26] *Id*. at 1337; *see also TecSec, Inc. v. Abobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020).

[27] (Civil Action No. 23-87-CJB, D.I. 10 at 9; *see also* Civil Action No. 22-1163-CJB, D.I. 10 at 9)

In asserting that all [c]laim 1 is directed to is streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request, Defendants are essentially suggesting that the patent[ is] really directed to a general concept that would cover *any and all* of these solutions[,] or others. And, obviously, for the reasons the Court has set out previously, that[ is] just not so. The *particular way* that [c]laim 1 goes about providing a pre-filled and pre-addressed request[—] that is[,] by utilizing a process that obtains user data via integration tags embedded in websites and employing a URI that deep[l]inks from one mobile app to another message app, and where the message app[ is] automatically populated by a text message that contains user information or web[p]age information[— is] not an *afterthought* in the claim. Instead, it[ is] the *star*[] of the claim.[28]

Now, it is understandable why the Defendant [] might not want to include the concept of custom-generated deeplinking in its assertion about what [c]laim 1 is directed to, even though it seems like every part of the patent is telling us that that concept surely is a part of the patent's focus. After all, the more that the purported abstract idea sounds like it includes reference to a *particular type* of computer technology that generates a *particular type* of custom te[xt] message, the more that concept starts to sound like it[ is] not an abstract idea at all[—a]nd[] certainly, not a longstanding commercial practice that people have been engaging in for generations. Instead, th[at] concept w[ould] start to sound a lot more like a *particular real-world application* of an abstract idea.

The Court also notes that in their supplemental briefing, both Defendants cited *Customedia Technologies LLC v[.] Dish Network Corp.*[29] as the most analogous Federal Circuit case on point. Now, neither Defendant actually cited [] *Customedia* in their opening briefs, which is surprising considering Defendants now count the case as the most impactful case in support of their arguments. As a result of this, unfortunately, [] Plaintiff never got a chance to brief its thoughts about why that case was [not] on point. That said, though, the Court will address *Customedia* here.

The representative claim in *Customedia* was to a data delivery system for providing automatic[] delivery of multimedia products. The claim did so by using a "remote [account] transaction server for providing multimedia data products [to an end] user" where[in]

---

[28]    (Civil Action No. 22-1163-CJB, D.I. 16 at 12)

[29]    951 F.3d 1359 (Fed. Cir. 2020).

at least one of those products was "specifically identified advertising data."[30] Additionally, the claim employed a "programmable local receiver unit" that received the data products[; the] unit had at least one "individually controlled and reserved advertising data storage section adapted specifically for storing the specific[ally identified advertising] data" that was "monitored and controlled by [the] remote [account] transaction server."[31] [At] step one, the Federal Circuit found that the claim was simply directed to "using a computer to deliver targeted advertising to a user[,]" which was an abstract idea.[32] Now, the patentee had argued[] otherwise[] that the claim was instead directed to an improvement in the data delivery system's ability to store advertising [data,] by dedicating a section of the computer's memory to such data.[33] But the *Customedia* Court disagreed[,] noting that "[t]he claimed invention [mere]ly improves the abstract concept of delivering targeted advertising using a computer only as a tool."[34] It came to this conclusion because the claim did not "enable computers to operate more quickly or efficiently, nor do they solve any technological problem."[35] In support of that key conclusion, the Court noted that the "specification is silent as to any specific structural or inventive improvements in computer functionality related to this claim[ed] system."[36] Instead, the Court said that the "only improvements identified in the specification are generic speed and efficiency improvements [inherent] in applying the use of a computer to [any] task[]."[37]

In the Court's view, however, [c]laim 1 [and] the patents-in-suit here are not on all fours with the representative claim in the patents at issue in *Customedia*. The Court has reviewed the representative '090 patent that was at issue in *Customedia*. That patent's title was

---

[30] *Id*. at 1361.

[31] *Id*.

[32] *Id*. at 1362.

[33] *Id*. at 1363.

[34] *Id*.

[35] *Id*. at 1365.

[36] *Id*.

[37] *Id*.

12

generic. It was "System For Data Management and On[-]Demand Rental [And] Purchase of Digital Data Products."[38] Its [A]bstract and other key portions of the patent did not seem to tout the unconventional nature of the claim's assertedly [imp]roved way to store advertising data.[39] Indeed, it appears the patent specification said little about why the assertedly important claimed step of reserving memory to ensure sufficient storage space for advertising data was significant or why it amounted to an improvement in computer functionality. In contrast[,] here, as the Court has explained, the patent specification focuses resolutely and repeatedly on the importance of using what it calls custom-generated deeplinking to improve the way that mobile electronic devices are able to enroll customers in promotions. And in [c]olumn[s] 1 [and 2], the patents do appear to indicate that this particular claimed arrangement[—]that is, the use of integration tags embedded in web[p]ages such that the tag returns user data to a server if a web[p]age is accessed, and then utilization of URIs that deeplink to a pre-filled text message that includes user data or website data, so long as the user clicks on an advertisement on the web[p]age[—]all amounts to improvement in the way [that] computer technology worked in the space. Column 1 indicates that prior to the invention, computerized mobile devices functioned in a different way to attempt to get customers to select [a] product [or] service. That is, they [re]direct[ed] the user to a vendor's application or a vendor's website in order to have them provide payment information through the use of many clicks.[40] Now, after the invention, according to [c]olumn 1, the device is functioning in a *new and improved and different way*, one that utilized the claimed custom-generated deeplinking process to allow users to sign up for promotions while minimizing user input.

Therefore, because [c]laim 1 is not directed to the abstract idea put forward by Defendants, the motions are denied at step one on that basis.[41]

---

[38]     United States Patent No. 8,719,090 at 1.

[39]     *Id.*

[40]     ('887 patent, col. 1:36-47)

[41]     *See also Nielsen Co. (US), LLC v. TVision Insights, Inc.*, Civil Action No. 21-1592-CJB, 2022 WL 3226318, at *4 (D. Del. Aug. 10, 2022); *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, 2019 WL 4466766, at *10 (D. Del. Sept. 18, 2019).

Although the Court could stop there, for the sake of complet[eness], it notes that even if it was somehow wrong about this step one conclusion, and even if [c]laim 1 could be said to have been directed to the abstract idea of ["]streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request[,"] the motions would still have been denied [at] step two.

That[ is] because, for the reasons the Court has expressed, that abstract idea would[ not] fairly take into account other narrowing aspects of the claim, including at least[: F]irst, the claim's use of integration tags associated with a web[p]age to collect user data when a user loads the web[p]age via [a] first application. Second, the claim's click-to-text server creating and sending a URI to the mobile device in response to the device's execution of the integration tag. And, third, the fact that the URI deep[l]inks to a messaging application such that when the user interacts with a promotional message on a website, the URI causes the mobile device to transition from the website app to the messaging app.

The Court understands Defendants' arguments that each of these individual computer concepts, standing alone, were well known in the computer ar[ts] at the time. For example, the Court[ has] already explained how the patent suggests that the use of URIs with deep[l]inks w[as] known[.][42] [N]or [do] the patentees claim to have invented [] integration tags.[43] [] Plaintiff does not argue that the concept of pre-populated text messages in and of itself was not in use then[.] [A]nd websites were surely well known at the time.

But, of course, as the Federal Circuit told us in *BASCOM [Global Internet Servs., Inc. v. AT&T Mobility LLC]*[44] the inventive concept inquiry requires more than recognizing that each claim element by itself was known in the art. Instead, it allows that an inventive concept can be found in a non-conventional and non-generic arrangement of known conventional pieces.

In the Court's view, [] Defendants seem to ignore this instruction from *BASCOM*. Instead, they continually note that each additional claim element[—]such as the use of servers, or use of web[p]ages,

---

[42]   ('887 patent, cols. 3:14-23, 10:16-20)

[43]   (*Id.*, col. 11:61-65)

[44]   827 F.3d 1341, 1350 (Fed. Cir. 2016).

or the use of an integration tag, or the use of URI[s with] deep[l]inks to transition between applications were each, standing alone, well known at the time.[45] But *BASCOM's* point is that even claims that use many individual technological components that themselves were conventional can still be patent eligible if the particular *ordered combination* of those known elements are used in an unconventional way.

In their briefing, Defendants also b[a]ldly asserted [that] the particular ordered combination of technology set out in [c]laim 1[] [i]n fact[] amounted to the "ordinary use" of computers at the time or the "ordinary and expected way" computers were being used then.[46] But Defendants certainly do not point to any part of the record that demonstrates that this was so as to the entirety of the ordered combination, and they do not cite to any source for such a conclusion. Instead, they simply fall back on the notion that web[p]ages alone were "ordinary[,]" or that integration tags alone were ["]ord[inary"] or th[at] deep[l]inks alone were ["]ord[inary."] But that kind of argument is not enough because it does[ not] address the ordered combination of all those known technological steps that are set out in the claim.

Indeed, during oral argument today when I asked at least Emotive's counsel as to whether certain combinations or portions of the claimed solution amounted to the unconventional use of computer technology at the time of the patent, counsel at times noted that there may be uncertainty on those points in the record[,] stating that it may be "a little bit of a leap" to draw such conclusions from the record or that conventionality "has to be true."[47] Here, though, Defendants are asking the Court to grant a motion to dismiss based on the uncontroverted presence of a winning affirmative defense. And [yet] the record is unclear as to the[se] key points. [I]f the Court is asked to assume that something has to be true [as to a material matter], then the motion should not be granted.

Moreover, there are some portions of the record that do suggest that the ordered combination of steps in [c]laim 1 *did not* amount to the conventional use of computer technology. For one thing, as

---

[45] (Civil Action No. 23-87-CJB, D.I. 10 at 15; Civil Action No. 23-87-CJB, D.I. 22 at 4; *see also* Civil Action No. 22-1163-CJB, D.I. 10 at 3, 13)

[46] (Civil Action No. 23-87-CJB, D.I. 22 at 2, 8-9)

[47] (Civil Action No. 22-1163-CJB, D.I. 55 at 18, 64)

I[ have] noted, the patent provides some suggestion of this in [c]olumn 1's [B]ackground section[,] when it discusses how a need exists in the art for the use of "methods and apparatus for dynamic application deeplink[ing] to transition from one user interface to another user interface a[t] a mobile device[,]"[48] [b]ecause the typically used computerized process for computer promotion sign-up works in a different, less optimal way. And the Complaints also include some additional allegations about this topic of unconventional use of computer technology. Now, the Court wishes that those allegations had been more robust and that they had included more factual data [that] supported the idea that the claim's use of the particular ordered combination of steps amounted to the unconventional combination of otherwise known computerized processes.

Even still, though, there[ is] enough in the Complaints to at least indicate a plausible, factual dispute on that front. In part, the Court says so because the Complaint's allegations do state that the claim[ed] combination was not "well[-]understood, routine or conventional" at the time[,] "[c]onstitute[d] techn[ological] improvements over traditional mobile[-]sign[u]p and mobile messaging systems" and claim "an ordered combination of components [and] interactions in an unconventional manner."[49] And they do, at least at times, go on to allege that the invention's use of the technology at issue revolutionized the relevant field, which can be an indicator that [it] did so because [it] used computers in a new and different way from what was done before. Moreover, in at least the Postscript case, Plaintiff cited in [f]ootnotes 4 to 6 of the Complaint to certain articles that can also support this notion of unconventionality.[50] One such article, for example, stated that the patentee had explained that the problem with prior art computer solutions in this space was that "emails are [a] slower, more crowded and [] more cumbersome form of text[ing]. What's more, people today check and respond to texts at much higher volumes than emails."[51] The article notes that it is "not just the outdated email problem that Attentive's text-based

---

[48]   ('887 patent, col. 1:48-52)

[49]   (Civil Action No. 23-87-CJB, D.I. 1 at ¶¶ 36-37, 41, 51; *see also* Civil Action No. 22-1163-CJB, D.I. 1 at ¶¶ 31, 35)

[50]   (Civil Action No. 23-87-CJB, D.I. 1 at ¶¶ 51 nn.4-6)

[51]   Michael Scheiner, *Attentive Gets the Message Out*, crm.org (Feb. 27, 2020), https://crm.org/news/attentive-gets-the-message-out.

marketing method solves. Another major loss[-]point in the c[ustomer-]to[-]brand sign-up journey is the need to install [a] new application on one's phone. People don't really want to download an app anymore, notes Long[,"] the patentee's founder. That's where Attentive's two-tap sign-up solution comes in."[52] A second article discussed how the claimed two-tap opt-in solution was a "key differentiator" from what other competing platforms were doing technologically in this space.[53]

Lastly, as the Court[ has] noted today, the concern that drives the Section 101 inquiry is on[e of] preemption[—would] the claim, including its asserted inventive concepts [] tie up or preempt too much of all possible systems or methods for putting the abstract idea into practice[?] Here, as Plaintiff notes in its brief, while Defendants are correct that the abstract idea [of] using pre-filled enrollment requests [requires] use of the concept of receiving information about how to contact a customer, it is "not inherent that one must do so by having a click-to-text server transmit an integration tag to a client server[,] which embeds the tag into a web[p]age and serves the combination to a browser, which automatically executes the integration tag to return user data to [] the server."[54] And while the Defendant[s are] right that the abstract idea of using pre-filled enrollment requests necessarily requires [] the actual creation of such a request, it is not inherent that one must accomplish that goal by having a click[-to-text] server send a custom URI with a deeplink to the browser for the browser to associate [the] URI with [an] advertisement on the web[p]age, [for] the URI to deeplink to a messaging application and for the deeplink to cause the application to create a pre-filled request for the custom text message.[55]

In making these statements, in the Court's view, Plaintiff, at least in part, is making a preemption argument[.] [If] the particular claim[ed] combination is simply one particular way, among many, for "streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request," th[en] it may not[] preempt the relevant field.[56] And the

---

[52] *Id.*

[53] (Civil Action No. 23-87-CJB, D.I. 1 at ¶ 51 & n.5)

[54] (Civil Action No. 23-87-CJB, D.I. 16 at 15 (emphasis omitted))

[55] (*Id.* at 15-16)

17

extent to which [it would or] would not do so would amount to a factual dispute that would mitigate [against grant] of the motion[s at] step two.

So, for all those reasons, the Court will deny Defendants' motions on Section 101 grounds at step one. And it simply notes for the record that even if [the Court's] call as to step one had been wrong, the Court would have still otherwise on this record denied the motion[s at] step two.

---

[56]   (Civil Action No. 22-1163-CJB, D.I. 51 at 2)