**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ATTENTIVE MOBILE INC., | ) | |
| | ) | |
| Plaintiff/Counter-defendant, | ) | |
| | ) | C.A. No. 23-87-CJB |
| v. | ) | |
| | ) | |
| STODGE INC. d/b/a POSTSCRIPT, | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**POSTSCRIPT'S OPPOSITION TO ATTENTIVE'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 11,709,660 UNDER 35 U.S.C. § 101**

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 1

III. LEGAL STANDARD .......... 4

IV. ARGUMENT .......... 4

A. The claims are patent eligible under Alice step one because they are directed to an improved system architecture .......... 5

1. The claims are directed to an improved system architecture .......... 5

2. Attentive's entire argument depends on conflating the claims with automations .......... 6

3. Attentive ignores the specific claimed improvements in computer capabilities .......... 9

B. The claims are patent eligible under Alice step two because they recite an unconventional combination of technical components that improves the system architecture of messaging platforms .......... 11

V. CONCLUSION .......... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................4

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....................4, 10

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)....................11

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....................10

*Fair Warning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)....................11

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)....................5

*People.ai, Inc. v. Clari Inc.*,
No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023)....................11

*Socket Mobile, Inc. v. Cognex Corp.*,
No. CV 17-156-VAC-MPT, 2017 WL 3575582 (D. Del. Aug. 18, 2017)....................7

*Sysmex Corp. v. Beckman Coulter, Inc.*,
No. 19-1642-JFB-CJB, 2022 WL 1808325 (D. Del. June 2, 2022)....................11

*V-Formation, Inc. v. Benetton Grp. SpA*,
401 F.3d 1307 (Fed. Cir. 2005)....................3

**Statutes**

35 U.S.C § 101....................12

**Other Authorities**

L. R. 7.1.3(c)(2)....................7

## I. INTRODUCTION

Postscript's '660 patent covers its highly successful Campaign Flows tool, which allows online brands to create SMS marketing campaigns that would previously have been impossible. Both the '660 patent and Campaign Flows were a significant advance over previous architectures, which were limited to flows of messages sent to *individual* subscribers once they performed some action, or to *single messages* sent at once to a group of subscribers. By contrast, the '660 patent claims creating *multi-message campaigns* in which subscribers are enrolled into a *segment* (or audience) that receives messages, with subsequent messages *retargeted* to certain subscribers based on monitoring events in the meantime. Those audiences are constructed by correlating data from both "API notifications" and "code-snippet notifications."

Attentive's entire motion is premised on ignoring (and indeed, carefully avoiding reference to) the claim limitations that set forth this specific solution to a problem that could *only* arise in the context of computing technology. It is only by mischaracterizing the '660 patent as claiming the idea of "messaging users in response to relevant events" that Attentive can dismiss the claims as "generic" and "conventional." But when it comes to the *actual* invention, Attentive has nothing to say. That is because its own internal documents show it recognized the invention of the '660 patent was missing from the prior art, demonstrating that it is anything but conventional. Summary judgment cannot be won by misconstruing the claims and ignoring countervailing facts. Attentive's motion should be denied.

## II. FACTUAL BACKGROUND

Understanding how the '660 patent differs from what came before requires understanding previous methods of sending marketing messages to users. Before the '660 patent, there were two types of marketing message workflows: blast campaigns and automations. PCSF ¶¶ 1, 9. Blast campaigns were a single message sent at a specific time to a specified segment of

customers. PCSF ¶ 2. "Segment" is a term used in the context of campaigns to refer to a *group* of subscribers that can be texted all at once – like all subscribers who have spent over $100 in a month. PCSF ¶ 3. Using a blast campaign, a merchant could schedule a message to be sent on November 25th to announce a Thanksgiving sale, with the audience being subscribers who had made purchases during the same event the previous year. Blast campaigns do not allow for sending a *flow* of multiple messages, or retargeting messages based on subsequent user events. PCSF ¶ 4. Automations (which Attentive also calls "journeys"), by contrast, were centered around *individual subscriber actions*, not segments. Ex. 1 ¶¶ 33, 50. An automation was a series of messages that would be sent to an individual subscriber once she took a particular action. PCSF ¶ 5. An example can be seen in the left-hand screenshot on page 8 of Attentive's brief: Once a particular user signed up for a newsletter, she would receive a message saying "Thanks for signing up!" Three days later, she would get a follow-up messaging saying, "Follow us on Social Media!" Notice that automations do not involve *segments* of users who receive messages at the same time: The timing is driven by when the subscriber triggers the automation. D.I. 471 at 8; *see also* PCSF ¶¶ 7, 9. Nor do they involve *retargeting* to a different segment of users, since the automation involves only one subscriber at a time. PCSF ¶ 8.

The '660 patent's innovation is a type of *campaign* but is distinct from both blast campaigns and automations in several ways. First, like blast campaigns, but unlike automations, it involves messages sent to "segments," or groups, of users. PCSF ¶¶ 2-3. Claim 11—which Attentive uses as representative—reflects this by specifying that the message flow "compris[es] recipient criteria defining a ***segment*** of subscribers to receive messages from the message flow" and that a subscriber is "enroll[ed] … to the ***segment*** of subscribers who are to receive messages from the message flow in response to the determination that the recipient criteria is satisfied."

PCSF ¶ 10. By contrast, an automation triggers a specific message flow immediately for each subscriber who takes a particular action. PCSF ¶ 5. Attentive itself recognizes this distinction between "campaigns," which use segments, and "triggered messages" like automations that do not. PCSF ¶ 9. So does the '660 patent: References cited on the face of the patent show the word "segment" refers to groups of subscribers that can be texted at once in a *campaign*, in contrast to event-driven automations. PCSF ¶ 3. Those references are intrinsic evidence. *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).

Second, unlike blast campaigns, the '660 patent covers multi-message campaigns, with subsequent messages *retargeted* to a different segment of subscribers based on subscriber events. Claim 11 requires "monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers; receiving one or more new subscriber events associated with the first subscriber; determining that the one or more new subscriber events meet the trigger condition in the message flow; and transmitting the at least one message in the message flow that is associated with the trigger condition to the first subscriber." PCSF ¶ 12. That distinguishes the invention from prior art blast campaigns that had no retargeting functionality. Ex. 1 ¶ 51.

Third, determining whether a subscriber meets the recipient criteria requires using data about the subscriber, and the '660 patent teaches combining data from two different sources: API notifications from application builder platforms (like Shopify, an online platform that allows merchants to build shops) and "code snippets" (small pieces of code embedded on the merchant's own site that would be run by the subscribers' browser and provide information when the subscribers took certain actions). PCSF ¶ 13. The '660 patent further explains *how* to accomplish this feat by correlating "user identifiers" associated with the API notifications with

the corresponding "subscriber identifiers used by the message management platform." PCSF ¶ 14. All this was much more technically complex than either a blast campaign or an automation. PCSF ¶ 15.

Putting these pieces together, the '660 patent enables a new paradigm Postscript dubbed a *campaign flow*. To build on the previous example, after the message about the Thanksgiving sale is sent out on November 25, a follow-up message can be sent on November 28 to the subset of subscribers who visited the merchant's website without purchasing a product, reminding them that the sale expires the following day. Here, the *trigger condition* used to retarget the follow-up message is visiting the merchant's website but not purchasing a product.

## III. LEGAL STANDARD

"[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). "Any fact … that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Id*. Summary judgment cannot be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV. ARGUMENT

Postscript's claims are patent eligible under both step one and step two of the *Alice* test. At *Alice* step one, the claimed invention provides significant technical improvements over conventional prior art systems. At *Alice* step two, the claims supply the inventive concept of sending and retargeting flows of messages using API notifications and code-snippet notifications.

**A. The claims are patent eligible under *Alice* step one because they are directed to an improved system architecture.**

**1. The claims are directed to an improved system architecture.**

As discussed above, the claims of the ’660 patent are directed to a new paradigm to send and retarget a flow of messages to *segments* of users, using data from two specified sources, in a way that differs from both prior art blast campaigns and automations. PCSF ¶ 16. Certain dependent claims, which Attentive ignores entirely, add further technical requirements, including, for example, that the API notifications are “webhook notifications” (a particular web development technique that allows real-time monitoring of the event data); or specifying that the “API payloads” include “key-value pairs” of a “user identifier” and “a phone number of a user” (so that the phone numbers can be used to match the users from the API payload data to the users from the code snippet data). PCSF ¶ 17. Given the specificity and novelty of these requirements, Attentive’s characterization of the claimed invention as being directed to the “idea of messaging users based on relevant events” is a bit like dismissing a Saturn V rocket as an implementation of the “idea of flying,” a practice dating back to the pterodactyls. D.I. 471 at 6.

None of these elements, much less their combination, follow from the idea of “messaging users based on relevant events.” They do not just “spell out what it means to apply [that idea] on a computer.” *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015). The proof is that while Attentive has been in the messaging-users-based-on-relevant-events business for some time, it recognized that existing solutions were unable to do what the ’660 patent eventually did. [REDACTED] PCSF ¶ 18. [REDACTED]



PCSF ¶ 19. In other words, Attentive could either have its merchants send a blast campaign or an automation, but not a campaign flow.

PCSF ¶ 20.

**2. Attentive's entire argument depends on conflating the claims with automations.**

Attentive's entire argument that the claims of the '660 patent were conventional is based on misreading the claims to cover *automations*—a series of messages sent to *a particular user* upon performance of a particular action, with no preceding step in which users are enrolled into a segment. Both the analogies Attentive invents for purposes of its brief and Attentive's comparisons to the Klaviyo reference that it harps on derive their force from this conflation. The fact that the claims are to a type of *campaign* (albeit distinct from the old blast campaigns) is apparent from the face of the tin: The '660 patent claims Postscript's *Campaign Flows* product. PCSF ¶ 21. Attentive acknowledges this by contending in a different summary judgment motion that a beta version of Campaign Flows is prior art. D.I. 483 at 1.

As an initial matter, throughout this case Attentive has never attempted to *show* the claims are to automations—it has simply assumed it, perhaps in an attempt to shield the flaws in its position from scrutiny. The relevant claim language barely gets a mention in its brief—for example, the key word "segments" is mentioned only incidentally in the course of quoting claim

elements that happen to contain it.[1] And despite being made aware very shortly after the assertion of the '660 patent of the claim limitations that preclude coverage of automations, Exs. 3, 4 (Response to Section 285 letter and Frederiksen Op. Rpt on 660 infringement); D.I. 200; D.I. 209, Attentive never asked the Court to construe them into a nullity, as its argument requires. Attentive should not be permitted to save its argument for why the claims cover automations for reply. *Socket Mobile, Inc. v. Cognex Corp*., No. CV 17-156-VAC-MPT, 2017 WL 3575582, at *5 (D. Del. Aug. 18, 2017) ("The Third Circuit has consistently held new arguments in reply briefs are prejudicial and unfair, because a party cannot respond. Positions asserted for the first time in a reply brief are deemed to be waived.); *see also* D. Del. L. R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief.")].

All of Attentive's arguments for conventionality depend on reading the claims to cover automations. Contrast Klaviyo Flows, Attentive's prize reference (D.I. 471 at 8, 11-12), with a screenshot from the '660 patent Attentive chooses *not* to include:

[1] Attentive repeatedly takes pains to tiptoe around the relevant claim language by suggesting that the claims require enrollment into a *message flow*, when they actually require enrollment into a *segment*. D.I. 471 at 13 ("When a customer meets that criterium [sic], he is 'enrolled' in the mechanic's advertising 'flow'") *id.* ("the claimed solution of 'enrolling' a recipient in a 'message flow'"); *id.* ("the user is 'enroll[ed]' in the flow"); *id.* at 17 ("'enrolling' the user in the flow"); *id.* ("The pharmacist too first 'enrolls' the customer in the flow").



Klaviyo UI (SOF ¶ 7, Ex. 3 (Rosensweig Decl.) at ¶ 6, http://tinyurl.com/yc272n29)




’660 patent (D.I. 489-1, Ex. 4 at Fig. 8A) (annotated)

Notice that in the Klaviyo product, the set of messages are launched immediately after “someone subscribers to Newsletter.” Attentive makes no attempt to point to any “enrolling” of the customer into a “segment of subscribers who are to receive messages from the message flow in response to the determination that the recipient criteria is satisfied”—the messages begin to be sent *to that one user* as soon as she subscribes, with no intermediate enrollment step. Nor is there any “monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers” and “transmitting the at least one message in the message flow that is associated with the trigger condition to the first subscriber.” In internal documents, Attentive admitted that Klaviyo Flows does not “allow marketers to define a sequence to follow-up logic and retargeted messages when configuring a campaign message send.” PCSF ¶ 22. Klaviyo, Attentive explained, “allow[s] their clients to passively trigger a journey like automated flow” upon a certain trigger but did not “allow their clients to schedule, or manually trigger a sequence of targeted SMS messaging on-demand.” PCSF ¶ 23. By contrast, the diagram in the ’660 patent shows that the flow begins with a *segment* defined by

recipient criteria (here, all subscribers who have not created orders), with the segment consisting of *786 subscribers*, all of whom will receive each message unless later removed through retargeting. This is one of *many* differences between Klaviyo Flows and the ’660 patent claims set forth by Postscript’s expert – differences Attentive does not even attempt to address, and which would preclude summary judgment even if Attentive had a response. Ex. 1 ¶¶ 98-102.

The same assumption that the claims are to a species of automations underlies Attentive’s analogies. Attentive refers to a merchant who, “[a]fter a customer makes a purchase,” starts “sending him periodic advertisements.” D.I. 471 at 6. Again, there is no *enrollment into a segment* here, or any transmitting subsequent messages based on whether “new subscriber events meet [a] trigger condition.” Likewise for the oil change example a few pages later (*id.* at 13): Attentive states that “[w]hen a customer meets that criterium [sic], he is ‘enrolled’ in the mechanic’s advertising ‘flow,’” ignoring that the claim requires him to be enrolled into a “segment of subscribers who are to receive messages from the message flow,” not immediately receive messages by being enrolled into *a flow*. D.I. 489-1, Ex. 4 (’660 patent at 34:17-20). Similarly, it points to “three months pass[ing]” as a “trigger condition,” ignoring that the *claimed* trigger conditions have to be based on *subscriber events*, not just the passage of time (“determining that the one or more new subscriber events meet the trigger condition in the message flow”). D.I. 471 at 13; D.I. 489-1, Ex. 4 (’660 patent at 34:26-27)

### 3. Attentive ignores the specific claimed improvements in computer capabilities.

Attentive’s reductionist reading of the claims as being directed only to “messaging users based on relevant events” also ignores the specific improvements in computer capabilities that are recited in them. That is why it fails to recognize that the ’660 patent covers “specific asserted improvement in computer capabilities” rather than “an ‘abstract idea’ for which

computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).

The specific improvements in computer capabilities recited in the claims are most clearly seen in the specific solutions the '660 patent provides for identifying the audience for a message through combining data from multiple sources. The difficulty of solving this problem, which Attentive attempts to minimize through facile analogies (D.I. 471 at 9), in fact stymied its engineers when they were building the accused Campaign Composer product, contradicting its assertions that such functionality was "routine" and "conventional." PCSF ¶ 24 [REDACTED] Seven different limitations of the claims explain in detail how the audience is built by correlating API notifications with the corresponding code-snippet notifications. Ex. D.I. 489-1, Ex. 4 ('660 patent at 33:44-34:15). The specification provides detailed instructions that further explain the technical implementation recited in the claims. *See, e.g.*, '660 patent at 7:49-8:40 (describing the operation and implementation of the "code snippet"), *id.* at 10:35-11:21 (describing the operation and implementation of the "API notification").

This is a solution to a problem that arises only in the context of computers—the engineers of the 1930s were not trying to solve the problem of constructing an audience of subscribers using "code-snippet notifications" and "API notifications."[2] No traditional storefront and warehouse can observe and cross-correlate consumer behavior at the storefront and events taking place at the warehouse in real time to send large groups of customers tailored messages that take

---

[2] Even if some (non-campaign-related) prior art discussed this particular subset of the '660 patent's functionality, that does not make the patent conventional. *See Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional").

into account those events as they take place. Ex. 1 ¶¶ 37, 91. Just as the claims in *DDR Holdings* were patent-eligible because they solved the problem of "near-instantaneous transport between … locations" when a user clicks a link, *this* problem only arises when it is possible to instantly correlate events from a back-end system with a subscriber's computer. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014). Unlike *Electric Power Group* and Attentive's other cases, the claims here contain "limitations describing particular operations that allegedly differed from how prior art analyzers operated," and use computers more than "merely as a tool," but instead to solve problems that could not be solved without computers. *Sysmex Corp. v. Beckman Coulter, Inc.*, No. 19-1642-JFB-CJB, 2022 WL 1808325, at *5 & n.6 (D. Del. June 2, 2022), *report and recommendation adopted*, No. 19-1642-JFB-CJB, 2022 WL 2119109 (D. Del. June 13, 2022); *accord Fair Warning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (involving fraud—a problem external to computers); *People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794 at *9 (Fed. Cir. Apr. 7, 2023) (involving the age-old problem of sorting correspondence).

Attentive, in short, constructs its own claim that has little relation to what the '660 patent requires, and tries to demonstrate that it is directed to an abstract idea. That fails to demonstrate that the claim actually issued is abstract under *Alice* step one.

### B. The claims are patent eligible under *Alice* step two because they recite an unconventional combination of technical components that improves the system architecture of messaging platforms.

Because the claims of the '660 patent are not directed to an abstract idea and therefore patent eligible under *Alice* step one, the Court can stop there. But the '660 patent claims are also eligible under *Alice* step two because they do not just apply the idea to a generic computer—they recite specific technology, like API payloads and code-snippet notifications. PCSF ¶ 13.

Attentive's analysis at *Alice* step two suffers the same flaws as it did at *Alice* step one by

ignoring this implementation-specific detail, conflating the claims with automations, and assuming the claimed functionality is found in the prior art when that is a disputed factual question. Ex. 1 ¶¶ 37-39, 50, 91-105. It should be rejected for the same reasons.

## V. CONCLUSION

Attentive's motion for summary judgment of invalidity under 35 U.S.C § 101 relies on a combination of misreading the claims and hotly-disputed facts about what is generic, conventional, and present in the prior art. Attentive's motion should therefore be denied.

Dated: December 20, 2024

OF COUNSEL:

Timothy C. Saulsbury
Eric C. Wiener
Hannah Jiam
Joyce C. Li
MORRISON FOERSTER
425 Market Street
San Francisco, CA 94105-2482
Tel: (415) 268-7000
Tsaulsbury@mofo.com
HJiam@mofo.com
JoyceLi@mofo.com

Sara Doudar
MORRISON FOERSTER
707 Wilshire Boulevard
Los Angeles, CA, 90017
Tel: (213) 892-5200
SDoudar@mofo.com

Aditya V. Kamdar
MORRISON FOERSTER
2100 L Street, NW Suite 900
Washington, DC 20037-1679
Tel: (202) 887-1500
AKamdar@mofo.com

Raghav Krishnapriyan
ORRICK, HERRINGTON & SUTCLIFFE, LLP
405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700
rkrishnapriyan@orrick.com

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Defendant Stodge Inc. d/b/a Postscript*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that true and correct copies of foregoing document were caused to be served on December 20, 2024 on the following counsel in the manner indicated:

**VIA EMAIL:**

Jack B. Blumenfeld
Michael J. Flynn
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

Christopher C. Campbell
Jonathan Weinberg
SaiPranay Vellala
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
ccampbell@kslaw.com
jweinberg@kslaw.com
svellala@kslaw.com

Britton F. Davis
Brian Eutermoser
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
(720) 535-2300
bfdavis@kslaw.com
beutermoser@kslaw.com

Cori C. Steinmann
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
(512) 457-2000
csteinmann@kslaw.com

Rahul Sarkar
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Flr.
New York, NY 10036
(212) 556-2100
rsarkar@kslaw.com

*Attorneys for Plaintiff Attentive Mobile Inc.*

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)