IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STODGE, INC., d/b/a      )   Volume I
POSTSCRIPT,              )
                         )
        Plaintiff,       )   C.A. No. 23-87-CJB
                         )
v.                       )
                         )
ATTENTIVE MOBILE, INC.,)
                         )
        Defendant.       )

Monday, August 25, 2025
8:30 a.m.
Trial

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
    United States Magistrate Judge

APPEARANCES:

        McCARTER & ENGLISH, LLP
        BY:  DANIEL M. SILVER, ESQ.

                -and-

        MORRISON & FOERSTER, LLP
        BY:  TIMOTHY CHEN SAULSBURY, ESQ
        BY:  DARALYN DURIE, ESQ.
        BY:  HANNAH JIAM, ESQ.
        BY:  RAMSEY FISHER, ESQ.
        BY:  JOYCE LI, ESQ.

                        Counsel for the Plaintiff

APPEARANCES CONTINUED:

     MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
     BY:   MICHAEL J. FLYNN, ESQ.
     BY:   CAMERON CLARK, ESQ.

     -and-

     CAHILL, GORDON & REINDEL, LLP
     BY:   CHRIS CAMPBELL, ESQ.
     BY:   BRITTON F. DAVIS, ESQ.
     BY:   MATTHEW WOOD, ESQ.
     BY:   RAHUL SARKAR, ESQ.
     BY:   HALIMA NDAI, ESQ.

     -and-

     GIBSON, DUNN & CRUTCHER, LLP
     BY:   ELI BALSAM, ESQ.

                 Counsel for the Defendant


          ---------------------------


          COURT CLERK:   All rise.   The United States District Court for the District of Delaware is now in session.   The Honorable Christopher J. Burke presiding.

          THE COURT:   Please be seated, everybody.   Good morning.   All right.   I know we have with us counsel for both sides as well as our court reporter.   We thank our court reporter for her service today and through this trial. And as a result, let's go on the record, and as we do let me just say a few things for the record.   And the first is that we're here this morning in the matter of what is now Postscript -- Stodge doing business as Postscript versus

Attentive Mobile, Inc. That's civil action number 23-87-CJB here in our court. We're here today for our morning conference in advance of the jury trial which will begin today.

Before we go further, let's have counsel for each side identify themselves for the record. We'll start first with counsel for the plaintiff's side and we'll begin there with Delaware counsel. Mr. Silver.

MR. SILVER: Good morning, Your Honor. Dan Silver from McCarter & English on behalf of Postscript. And I'm joined at the counsel table by Tim Saulsbury and Daralyn Durie from Morrison & Foerster. We'll have a number of others coming in throughout the proceeding, Your Honor, but I just wanted to introduce you to who is sitting at the table for right now.

THE COURT: Okay. Thank you. We'll do the same for counsel for defendant's side, again beginning with Delaware counsel. Mr. Flynn.

MR. FLYNN: Good morning, Your Honor. Michael Flynn from Morris Nichols. I'm joined at counsel table by Matt Wood, Chris Campbell, and Britt Davis. And we as well will have some others joining us throughout the course of the trial.

THE COURT: Okay. Thank you. All right. The parties had a number of issues that they raised. As they

might know, it was difficult to get access to certain of the documents related to them.  We had to sign into a system that unfortunately didn't work out, so I haven't seen any of the documents, unfortunately, that were provided by the share file and imanage link that the parties sent.  Just in the future if in court we were to create accounts for electronic systems in order to get access to documents, that would be a great thing to get these ahead of time.  We did, however, get from Mr. Silver at least copies of a couple of documents, including the Attentive's proposed slides, so I was able to get those.

And so with that, let me turn to plaintiff's counsel first to ask what's the first issue we're going to raise this morning?

MR. SILVER:  Sure, Your Honor.  Dan Silver for Postscript.  My apologies for the file issue.  We tried a number of different ways.  I don't think the Court's doing anything wrong or we're doing anything wrong, I think there's some sort of outage in the share file system because no one's been able to create new accounts and we didn't know that until we saw Ms. Miller's e-mail this morning.  We will find a superior way to submit materials going forward.

THE COURT:  Okay.

MR. SILVER:  So Your Honor, the parties have discussed this morning, there is a claim construction issue

that we would like to raise first that we think will help streamline some of the issues the parties have with the demonstratives.  So if that's okay with Your Honor, Ms. Durie will address that.

THE COURT:  Okay.  Very well.  Ms. Durie.

MS. DURIE:  Thank you, Your Honor.  And Good morning.  I'm Daralyn Durie from the Morrison & Foerster.

So an *02 Micro* claim construction issue has a arisen regarding the meaning of "trigger condition."  And it is clear to us from Attentive's opening slides that they intend to argue that a trigger condition must determine when a message is sent.  Our position is that something can qualify as a trigger condition if it determines who a message is sent to.  We think that is consistent with Your Honor's ruling with respect to summary judgement, when Your Honor held that a message series can be scheduled for a time after the trigger condition is met.  That is --

THE COURT:  Ms. Durie.  I'm sorry.  Sounds like the parties have been discussing a claim construction dispute.  My guess is that somewhere then the parties would have written down in words the term at issue, "trigger condition," and their proposed constructions, but I don't have that.

MS. DURIE:  That is -- and I apologize for that. This issue has arisen at the last minute in the context of

our review of Attentive's opening slides.  Our proposed construction is "a condition that determines which end users are to receive a message."  We think that is consistent with the intrinsic record in the patent.  I don't know if Your Honor has a copy of the patent handy.  I'm happy to hand one up.

THE COURT:  I do.

MS. DURIE:  So if we take a look in the patent at column 2, and we begin at line 39.

THE COURT:  I think, again, Ms. Durie, I think what you're about to do is start talking about evidence, evidence that might substantiate a particular construction.  Unfortunately, the first step is going to be what are the parties' proposed claim constructions and what, so the Court can understand, what aspect of that terminology is in dispute.  It's hard for me to imagine.  I know the parties had meet and confers, must be, about this issue, otherwise at least within the last 24 to 48 hours.  I don't have that material.  I guess I'm going to have to hand write, maybe, out the proposed constructions to try to figure out what is the term -- you know, what is the kind of dispute in terms of the words.  So give me yours again.

MS. DURIE:  So the term at issue is "trigger condition," and our proposed construction is "a condition that determines which end users are to receive a message."

THE COURT:  "Condition that determines which end users" --

MS. DURIE:  "Are to receive a message."

THE COURT:  -- "are to receive a message."  And what do you perceive as Attentive's proposed construction?

MS. DURIE:  So Attentive appears to be taking the position that a trigger condition "must determine when a message is sent."  And obviously counsel will correct me if I have that wrong, but that is what we understand the substance of their position to be.

If it's helpful, I think we certainly could quickly work together to put something in writing for the Court that would lay out our respective proposed constructions and the citations to the intrinsic evidence that each side believes supports that construction, if that would be helpful.

THE COURT:  It certainly would be helpful.  It sounds like, at least from Postscript's perspective, is this an issue that will need to be resolved by the Court before we begin opening statements today?

MS. DURIE:  I do think it is implicated by a number of the opening statement slides, certainly in Attentive's presentation.  It appears that they intend to argue or to suggest in their early statement, and again, they'll correct me if I'm wrong, that what we are pointing

to as a trigger condition cannot be a trigger condition because it does not determine the timing of the message as opposed to the recipients to whom it will be sent.

THE COURT:  And we can ask them in a second, but I think this is like the second of the disputes you have on your opening demonstratives; is that right?

MS. DURIE:  That's correct.  The first.

THE COURT:  Maybe it's also implicated by the second part of the first.  So when you talked to them over the last 24 to 48 hours about these first issues, what did they say?  Did they confirm that their proposal was something like, you know, must determine when a message is sent?

MS. DURIE:  So I was not personally the person on the meet and confer last night, Your Honor.  My understanding is the answer to that question is yes, but I'm happy to defer to counsel with respect to what it is that they intend to argue.

THE COURT:  All right.  Why don't we at least try to figure out what is the dispute and then I'll turn back to you to tell me what evidence you think I should consider in your favor.

MS. DURIE:  Perfect.  Thank you.

THE COURT:  Okay.  All right.  Who is going to speak on this from defendant's side.

MR. WOOD:  Good morning, Your Honor.  I'm Mr. Wood on behalf of the defendant.

THE COURT:  So, Mr. Wood, Postscript tells me that their proposed construction for trigger condition is a condition determining which end users are to receive a message.  And they say you have a construction that is something like the trigger condition, you know, must determine when a message is sent; is that right?

MR. WOOD:  Well, Your Honor, you noted just a second ago that this was the first time you were hearing about this dispute and were receiving something in writing, not even in writing, orally with a proposed construction. Attentive is in the same boat.  As you see on page 1 of the disputes, the very first issue is the issue that this is being directed to.  Nowhere in there do I see the proposed construction that was just articulated by my colleague on the other side.  It was not raised during the meet and confer.  It wasn't put in the statement.  We did not understand that there were proposed constructions being submitted that would potentially be in dispute for the court to resolve.  So to the extent that this -- excuse me -- to the extent Postscript believes there's an *O2 Micro* issue here, we need to sit down and agree on proposed constructions to submit to the Court.  I don't believe that conversation between the parties has happened yet.  I think

we would need to have further conversations for the issue to be ripe for the Court to decide.

THE COURT:  Were you on the meet and confer?

MR. WOOD:  I was.

THE COURT:  So when this came up, what -- when they suggested there was some kind of dispute about the meaning of "trigger condition," what did you say?

MR. WOOD:  So, as you can see in this first dispute, the issue arose in the context of a radar icon that is being used in our slides.  The suggestion from opposing counsel was that something about the radar, how a radar system operates, implies a meaning of monitoring the trigger condition that would be different from the Court's construction of the "monitoring the trigger condition" limitation that Your Honor issued in the summary judgement ruling.  Our response to that was that we were not intending to impute any meaning one way or the other with respect to the "monitoring a trigger condition" limitation, we're intending to follow the Court's construction.  Using the radar icon was simply intended to be a useful reminder as sort a mnemonic device to help the jury understand on the slides that when something is up, we're talking about its relationship to whether it meets the "monitoring a trigger condition" as the Court has already construed it.  We're not intending to imply any sort of meaning by the use of a

particular icon, other than this is the limitation that we're talking about.

THE COURT:  But I think the stuff you just said now relates to a dispute between the parties about your use of this radar icon which in turn seems to relate to the word "monitoring" and whether or not the use of that icon contravenes the Court's claim construction with regard to the monitoring limitation.  I'm not sure how I see it's responsive to my question about the "trigger condition" limitation that there must be some relationship, I guess. But how does it?

MR. WOOD:  So my understanding the "monitoring a trigger condition" limitation is what opposing counsel is trying to put in to dispute again.  Our position is the Court has already issued a construction of the "monitoring a trigger condition" limitation that was in your recent summary judgement ruling from August 12th.  We don't intend to argue or submit evidence that in any way contradicts the Court's ruling.  And our intention in using the radar, radar icon is not intended to impute any sort of meaning other than we are trying to reference that trigger condition.

THE COURT:  Last, Mr. Wood, before I turn back to Postscript, I'm asking you about what Ms. Durie was talking about which relates to this assertion that there's some dispute about the word "trigger condition" and its

construction.  There's a suggestion that the parties have different meanings for that term.  Ms. Durie, at the very 11th hour, threw out some constructions.  From what you just said, essentially what I heard you saying was, Judge, I don't know a thing about it, I can't tell you a thing that would be helpful in resolving the dispute.  I don't know I heard the things she's saying.  There's nothing I could do that would be helpful to resolve this problem.  Is that what you are saying?

MR. WOOD:  Unfortunately it's the first time that I heard this proposed construction.  I haven't had the opportunity to confer with my client, confer with the rest of my team about whether or not we agreed to that proposed construction or what our proposed alternative would be, so I don't think there's an issue ripe for the Court.  And my point about the -- where the genesis in this dispute was with respect to the radar icon, the point I was trying to make is I don't think -- I don't think this dispute, to the extent there is one, is going to be implicated during the opening statements because our intention is not to say, as opposing counsel suggested, monitoring a trigger condition determines when the message is sent.  That's not something we're intending to say in opening statements.  That's not what we're intending to convey with our icon.  Whether or not that's consistent --

THE COURT: Do you think that's true? This position she's asserting as yours, that the term "trigger condition" has something to do with when a message is sent, must determine when a message is sent, is that even your position?

MR. WOOD: No, it's not. That's not our position.

THE COURT: Okay.

MR. WOOD: I think -- I think -- I wouldn't formulate, to the extent we were trying to propose a construction of this term, I don't believe I would formulate it quite that way. As I said, I would like some time to be able to confer with my client and with my colleagues to understand to the extent we need to propose an alternative construction, do that. I don't think that's implicated or going to be raised during the opening statements that -- in a way that would require this issue to be resolved right now.

THE COURT: Okay. Let me hear from Postscript's side.

MR. SILVER: Your Honor, Dan Silver. I wanted to address the meet and confer and the surprise aspect. I was on the meet and confers last night. This morning while Mr. Flynn and I waited in line, I said to him I think we ought to address the claim construction issue first. He

agreed.  When I shook hands with Mr. Wood this morning, I let him know that Mr. Flynn and I had agreed that we'd raise the issue.  So the suggestion that it's a surprise issue --

THE COURT:  I'm less concerned about the idea that this issues would be raised.  I'm more concerned about the substance of the discussion.  But it's clear that this is listed as an issue in the first and second boxes here for opening demonstratives.  That means that, you know, maybe days ago, certainly in the last 24 hours or more, there's been substantive discussion between the parties about the substance of the issue you're raising.  The other side is telling me we don't know what they're talking about.  Literally, they're saying there's some kind of claim they're proposing a construction.  We never heard it.  We don't think that's right.  But how could that be, if this was obviously discussed on the meet and confer that you were on?  So what was discussed there and why do you think we have a dispute is what I'm saying?

MR. SILVER:  Yeah.  So I think maybe we look at their slide 8, which is the first radar timer slide that will help crystalize the issue.  And I'll turn it back over to Ms. Durie in a minute, but just in terms of the meet and confer discussions we took issue with every slide that has this radar timer distinction and we discussed them on the meet and confer.  And referring to slide 9, they're

distinguishing how certain products work using the radar icon and certain products using the timer icon and -- excuse me, Your Honor. And so, you know, this issue was very much discussed on the meet and confer and the radar icon appears all throughout their slides because they're trying to liken our invention to this radar concept and distinguish it from the timer concept. So we absolutely discussed this issue.

THE COURT: Well, that -- I'm not sure that's the same issue. Maybe it is. The issue with the radar icon, that's the first part of the first box of your first objection. What is the nature of the objection? We don't agree that they should be able to use the radar icon because we think it contravenes your claim construction for "monitoring." Here's why we think that. Because you said blank in your construction and yet this radar icon means something else. I'm not sure -- I think you're alluding to it. But what is it? Why is it that you have that problem?

MR. SILVER: I'll let Ms. Durie take this up.

THE COURT: I don't understand necessarily how this relates to the trigger condition dispute. Seems like it relates to the monitoring condition dispute, but maybe it relates to both. And Ms. Durie, turn it back to you.

MS. DURIE: Thank you. And I want to be clear and my understanding is what is set forth in our position and objections that we sent over is what was discussed and

our concern was that the radar symbol was suggesting both that monitoring has to happen continually, which we think contravenes the Court's claim construction of monitoring.

THE COURT:  So let's stop there.  So I think what you're saying is, Judge, we think that the only way to understand the use of that symbol, that radar symbol is that it suggests a concept that relates to monitoring that it must be absolutely continuous.

MS. DURIE:  That is one of our concerns, yes.

THE COURT:  So I think that's a clear dispute. And whereas the other side is going to say, I think, no, it doesn't.  And that's certainly not what we're going to be arguing.  We know the Court's claim construction says, that's not what monitoring involves.  We're not going to say anything different than that.  It's just a helpful kind of picture, et cetera.  But that's the issue there, I think. Is that fair?

MS. DURIE:  That's fair.

THE COURT:  Then I think you're moving to issue two.

MS. DURIE:  Correct.  So then we said, in addition, the analogy depends on the construction of the term "trigger condition" that assumes a trigger condition is when a message is sent rather than whether or not a message is sent.  And that is because the radar analogy was being

used in comparison to a timer.  And it seemed to us that the argument that was implicitly being suggested was that what you have to be monitoring is time.  Now, to the extent that that is not an argument that Attentive intends to advance in the case, then maybe that would resolve our concern, but we had set forth here in our objections what I think is a very explicitly stated concern with respect to this *02 Micro* issue that to the extent it was not already resolved by the Court's prior order which held a message need not be sent the instant a trigger condition is satisfied, the Court should resolve that construction.

So as I noted, I'm happy -- we've provided our proposed construction to Attentive.  I'm happy to give it to them in writing, happy to meet and confer and confer with them to see whether they disagree with what we're proposing and set forth the citations to the intrinsic record that we couldn't fit in the box that we think support our proposed construction.  And maybe we could take it up at a later break to the extent that there's still a dispute between the parties.

THE COURT:  Okay.  All right.  So I'll hear any response to that from Attentive's side.

MS. DURIE:  If the Court wants me to go through the support in the specification, I'm more than happy to but it seems like you might prefer we meet and confer first.

THE COURT:  Yeah.  I think the issue here is less that maybe there are words in these boxes that suggest that at least one side or both thinks there's a dispute about something, and that dispute, was it preceded by substantive back and forth between the parties laying out the positions attempting to resolve it and reaching a point where they realize we cannot resolve it, we actually have a substantive dispute does not seem to me that second part happened, but cannot happen at this stage each of these mornings.  These boxes are not just for listing objections that have not been discussed substantively, only for disputes that have been discussed substantively.  I'm just giving you that guidance.  Let's see what Attentive has to say about what you said, Ms. Durie.  Thank you.

MR. WOOD:  Thank you, Your Honor.  I don't think there's a dispute that needs resolved at this point.  I just heard a second issue I also wasn't aware of that there's potentially an issue with the radarscope suggesting a continuous monitoring.  One, this is the first time I'm hearing that.  Two, I think we disagree with that.

THE COURT:  Mr. Wood, let me stop you there.  So let's do this.  One of the issues that had been raised is the second kind of issue that's in the first box of their first objections whether the parties have an *02 Micro* dispute about the meaning of the term "trigger condition."

I think you have said you never heard this -- you never heard the substance of their position before, you've never seen a proposed claim construction before.  We don't think we have a dispute necessarily.  We certainly haven't heard from them, look at this substantive aspect of the patent in column 8 or whatever.  You guys haven't come back to them with a response, et cetera.  So literally there have been no substantive discussions about this, nothing really to argue for me to be able to decide what both side's are saying.  Is that fair?

MR. WOOD:  I think that's right, Your Honor.

THE COURT:  Okay.  What we need to do is in the interval, we're going to, pretty soon, it's five of 9 now, because the proposed jury won't be ready until close to 9:30, I can go over past 9 for some minutes, but we don't have that luxury the rest of the days.  But between now and when jury selection is over, I suggest the sides delegate some portion of their team to talk with each other about whether or not they have an *02 Micro* dispute about "trigger condition," whether or not a proposed construction of "trigger condition" can be agreed to here and/or to discuss the substance of any dispute, so if there can be resolution of that, we'll know it by the time the jury selection is concluded.

That said, on the first piece, which is, you

know, they don't like the use of our radar icon because they think it contravenes the construction of the monitoring condition.  Even if I am trying to guess at what the issue might be here, I guess what Mr. Durie just said, which is I bet they think that that radar icon suggests you got to be continually monitor every minute to see if the trigger condition has been tripped.  So when you tell me, I don't even know what they're talking about, that makes me -- how can you say that?  Was there no substantive discussion about that on the meet and confer?

MR. WOOD:  I don't recall a discussion of the dispute concerning whether or not the radar is continuously monitoring.  I will say, as we went back and forth on a few different icons that could potentially denote monitoring, one of the reasons we settled on a radar scope was because, as you can see, the green bar sweeps in a periodic manner, it is not continuously monitoring a particular area at the time that the red dot at, you know, approximately 11 o'clock on the radar, you know, was pinged as being the one across and when it comes back around that dot is going to update.  So we don't believe it's continuous monitoring.  We were trying to give something that didn't give that suggestion on purpose.

THE COURT:  In any event, you're certainly not going to argue that to the jury?

MR. WOOD:  No.

THE COURT:  If the other side points out, hey look, that's deceiving, we're deceiving you a little bit because it makes it seems like you have to continuously monitor --

MR. WOOD:  Correct, Your Honor, absolutely.

THE COURT:  Lastly, Mr. Wood, are you saying that when the parties met and conferred like last night or yesterday like this issue about, hey, we don't like your radar icon.  How come?  Because we think it suggests continuous monitoring.  We disagree because we think it doesn't because the thing how this things sweeps occasionally across the screen.  You're saying nobody ever used those words with each other.

MR. WOOD:  No, Your Honor.

THE COURT:  I don't understand how that could have happened.  In any event, we are where we are.  What more do you want to add?

MR. WOOD:  I want to just say a brief comment on the "when" issue versus the "who" issue that seemed to be part of the dispute.  Again, we don't think that the radar monitor is explaining what happens after a red dot is identified, that it's saying, you know, as soon as you see a red dot, the AF15s need to be scrambled and it's just identifying a potential target that needs to be addressed.

I don't think that's implicated by this radarscope either.

THE COURT:  When I went through the dispute about what does it mean to monitor to see whether a trigger condition has been hit, to me -- I mean, the question I had was, does that even necessarily say anything about when you then must subsequently send a message.  Like how come the concept of, okay, we're monitoring however frequently we're supposed to do that, we see a trigger condition has been hit.  Okay, that's one thing.  When we send a message, why does that have anything to do with monitoring necessarily?

MR. WOOD:  I think that's right, Your Honor. What we're intending to convey here is there has to be some trigger event that sets a process into motion.  Once the red dot pings on the radar, something is going to happen, someone is going to call the pilot, someone is going to talk to their supervisor, someone is going to do something. We're not intending to convey necessarily exactly when those events need to happen, but they need to happen in simultaneously.  Our point is to differentiate the radarscope from the kitchen timer.  The kitchen timer is not set to anything.  Kitchen timer is set to ten minutes.  When the kitchen timer goes off, it's going to ring.  That is relevant to what Ms. Frederiksen said in her expert report and in her opinion that time can't be a trigger condition, it can't be an egg timer where you just set it to ten

minutes and at ten minutes the message is going to send out regardless of anything that happened in the in between. It's just, hey, send this message at 2 o'clock. There needs to be some intervening intelligent action that happened. That red dot needs to come up to show okay, this is someone who is going to get this message versus someone who is not. We're trying to convey here. We wanted to find an icon to put in as opposed to a kitchen timer just to be able to have a convenient way to identify those, those issues as we understand them to the jury. We're not intending to convey any sort of specific meaning by use of the radarscope other than we're talking about the monitoring limitation.

THE COURT: Okay. All right. Thank you. All right. So with regard to these issues, I'll say a couple things. First, I think there's a dispute between the parties. I think Postscript objects to the use of the radar icon in Attentive's opening slides because they think it contravenes the Court's claim construction with regard to the "monitoring" limitation, I think because they think that it can only suggest that monitoring must happen continuously as opposed to the Court's construction which allows it to occur periodically or in some manner other than continuous. And so with regard to that issue, I am going to overrule Postscript's objection for a couple reasons. One is I don't necessarily think that that's the only meaning that this

icon can suggest apart from the reasons Mr. Wood says. Also, radar, there's a human element to observing radar, some see for hours or days that the radar has triggered, has identified some issue, that indicates at least a punitive one had been provided continuously.  In any event, the Court's claim construction is what it is, Attentive acknowledges that, is not going to say over what anyone says to contravene that in terms of what it says.  And of course Postscript's got the ability, if they think for whatever reason Attentive does point to or suggest something that's outside the Court's claim construction, they can point that out, that the Court's construction is X, and that, you know, they think -- if the they think Attentive is suggesting Y, they can object.  So I'm sure they're not going to suggest that.  So I'm going to overrule that.

It's not even clear that there is a dispute about the meaning of the word "trigger condition," but the parties should use these hours to have representatives meet and confer on that issue so that by the end of jury selection they can inform me whether there is an *02 Micro* dispute about the meaning of the term, what the substance of that dispute is so that if I needed to I could resolve it.

I will say, based on Postscript's description of what they think are the proposed constructions, I'm not even sure I understand the dispute.  And so and in part that's

because I think I've gotten no information about it.  Not even sure the parties have substantively addressed it with each other.

Okay.  So that I think resolves those issues.  Got a couple more minutes that I can give you before we have to step out to get the jury selection process covered.  Let me just turn back to Postscript's counsel to ask what more we need to raise.

MR. SILVER:  So, Your Honor, Dan Silver.  We will undertake to do a better job in the meet and confer going forward bilaterally.  I promise we spent over three hours on the phone yesterday, so we covered a lot of material, but I understand we may have been talking past each other.

THE COURT:  Yeah.  I will say on these first two issues that you raised, it's not clear to me the parties had any substantive discussion here, so that is a real problem and does need to be addressed.  I appreciate your comments, so why don't we move on to the next issue.

MR. SILVER:  The next issue, Your Honor, is slide 11.  This is an issue that's raised in the parties' proposed final jury instructions.  And really what it boils down to is Your Honor's construction of the "monitoring the trigger condition" term.  There's a dispute between the parties as to whether Your Honor intended to construe that

entire limitation or just the "monitoring the trigger condition" portion, which is what Postscript had urged and Your Honor had indicated the Court was adopting.

THE COURT:  And can I just stop you.  It's clear what you just said -- Mr. Silver, that was clear to me that -- because of what's written here.  What isn't clear is the substance of that dispute.  What it is, why it is that this matters, why it is the other side says it matters, why you think it matters.  And I worry because I'm about to ask them that.  I know this description, it can't be a, you know, pages and pages.  But at a minimum what it has to do, I think, is say, and the reason why this matters is because when they want it to be the last part of the construction, see, what we think they're doing is X.  And they say, no, we're not doing that.  You know what I mean?  So I don't have a clue as to what that issue really is.  Do you understand it and what do you think?

MR. SILVER:  I do.  Essentially they're reading out the remaining part of the preliminary injunction which is a point of distinction over the prior art.  So if their view is correct, the remaining language there just disappears and that can't be right.  And that's an important issue in this case because of the prior art arguments that are going to be advanced.

THE COURT:  Okay.  And so if we're just looking

at slide 11, which I think has the term and my construction, right?

MR. SILVER:  Yes, Your Honor.

THE COURT:  So "monitoring the trigger condition in the message flow," and the construction, which was Postscript's proposed construction, is "tracking whether a trigger condition for a message has occurred through the continuous, repeated, and periodic detection of one or more of the events triggered candidates associated with the trigger condition."  So I'll say, first off, I understood, in the parties' dispute about this issue that we had prior to trial, that the whole focus was on essentially what does "monitoring" mean?  That's what -- is it continuous or is it something less than continuous or -- continuous is in the construction that's proposed by you.  I guess what was the word that was used by Attentive that Postscript believed essentially meant continuing in an instantaneous way, every single, et cetera?  Do you recall?

MR. SILVER:  I don't, Your Honor.

THE COURT:  Whatever that was, that was the dispute?

MR. SILVER:  Correct.

THE COURT:  They wanted something more and they lost on that issue and it's about what "monitoring" means.

MR. SILVER:  That's right, Your Honor.

THE COURT: Now you proposed a construction of a longer term. Attentive didn't dispute that if I disagree with them on the substance of what "monitoring" meant that there was some other aspect of the remaining construction that, you know, oh, you shouldn't construe this whole term, you should just construe monitoring. So having resolved the dispute in your favor, there bing no other dispute about what term should actually be construed, that's the thought process I had going into it.

Now, all that said, you think that there is some problem because Attentive plans to do what with the remainder?

MR. SILVER: Well, it just reads out the remainder of the limitation. So the entire limitation is "monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers." That latter concept is nowhere embodied in the construction, so if we're using the Court's construction to construe the entire limitation rather than a subset, we're eliminating a portion that's highly relevant to the prior art arguments that are going to be advanced.

THE COURT: Well, I guess like why would we think -- I mean, there are other words in the term, right? And if the construction focused on what "monitoring" means, I guess why would we think that the remainder of the words

in the term don't have any meaning?  Why would you think Attentive thinks that?  Like I think -- is what you're saying to me, Judge, we're worried that we think Attentive is going to tell the jury that as to this term, okay, what does "monitoring the trigger condition" mean?  It means what the Court says it does, but the words in response to the first subscriber being enrolled, it's like that's not in the claim.  That what you're worried about?

MR. SILVER:  I'm not just worried about it, Your Honor.  I know that because the parties submitted a dispute over the final jury instruction where they're proposing to construe the entire term with this construction.  And so they are reading out the remaining portion of the limitation.

THE COURT:  Right.  But you proposed this construction for this term too, right?

MR. SILVER:  For the "monitoring" portion of it.

THE COURT:  Right.  But I guess I'm -- this is what you wanted.  And I don't think you, in doing that, were suggesting necessarily that the remainder of the words have no meaning, were you?

MR. SILVER:  No.

THE COURT:  So it was okay -- it was okay -- I guess I'm not sure what you think they're doing that is different from what you did.

MR. SILVER:  I apologize, Your Honor, we were imprecise.  The focus of the parties' dispute at that time was on "monitoring the trigger condition," so that's what the claim construction dispute was.  I don't think we ever said erase these words at the end of the limitation and just replace it with this construction.  The construction that we proposed was to address the dispute between the parties on the monitoring of the trigger condition, not intended to read out the remainder of the limitation.

THE COURT:  Okay.  I think -- my only concern is in a second I'm going to ask them and I think what you're telling me is you think what they're going to mean to do and suggest is that in response part of what's in the claim has no meaning and it's like it's not there.  And they tell me this is the first time I'm hearing that, I don't know what you're talking about, I'm not going to do that, that would be bad, the parties haven't engaged on that, but you're saying that's what they plan to do; is that right?

MR. SILVER:  I wouldn't go that far, Your Honor. We exchanged proposed final jury instructions.  We had this dispute.  Candidly, I don't think it has been addressed at the level Your Honor is suggesting is required, and we're happy to have that discussion if Your Honor would like us to do.  So we would just ask that it be taken out of the opening slides, slide 11, until the Court is able to resolve

the issue.

THE COURT:  So essentially what they are doing here, the thing that you proposed, you know, so obviously incorrect because it so obviously suggests that the remainder of this claim term has no meaning and doesn't exist, that it should be taken out of their slides.  They're depicting what you proposed, right?

MR. SILVER:  If they were to highlight just the "monitoring the trigger condition," then I think it would be okay.  But to the extent they're suggesting that the construction at the bottom slide is co-extensive of the entire limitation, that's the problem.

THE COURT:  Okay.  All right.  Let me hear what Attentive has to say about this dispute.  Thank you.

MR. WOOD:  I think Your Honor got it exactly right from our perspective with respect to the -- Postscript won this issue.  You gave them exactly what they asked for.  You issued an order construing this term.  And our intent here is simply to follow what the Court's order was.

THE COURT:  But Mr. Wood, you know what the issue is now because we just talked about it, so I want you to be precise in addressing the specific problem Mr. Silver has raised.  You know the problem.  You know what it is, right?  So I think the question for you is, is Attentive going to suggest or contend that because the Court's

construction here, it really goes to the monitoring concept, right.  It doesn't go to the "in response to" concept.  Is Attentive planning to suggest the "in response to" concept has no meaning?

MR. WOOD:  That's not what's intended by this slide, Your Honor.  You can see the highlighting in the Court's construction.  We're highlighting in red the continuous, repeated, or periodic.  This issue was the subject of the parties' dispute and we're intending to communicate to the jury this is the Court's construction, this is how it should be applied.  That's the intent.

THE COURT:  You agree that really what this, what the phraseology that Postscript proposed, that the Court adopted and, also the issue the parties were arguing about previously, is really about what it means to be "monitoring the trigger condition"?

MR. WOOD:  Yeah, that's what I understand the highlighted area in red was the substantive dispute that the parties raised was resolved.  They wanted repeated and periodic in there, they won that issue, that's why those are in there.  That's what I understood the fight was about and that's what the focus of this slide is.

THE COURT:  Just for the record --  sorry to interrupt you.  Now I'm remembering, their proposal was continuous, repeated, or periodic.  Or periodic.  You wanted

only continuous.

MR. WOOD:  Right.

THE COURT:  If they had just said to us in these meet and confers, if they're worried essentially about putting up on the screen the very term we asked to be construed and the very proposal we made for its construction, you are going to somehow take the position or suggest to the jury that the concept of "in response to" dot, dot, dot has no meaning and no longer exists in the claim, you would have said, that's crazy, we're not going to do that, we don't think that's the case.  Maybe if they had said to you, you know, what -- just to be safe, maybe we should ask the Court to change the construction to "monitoring the trigger condition" or "monitoring" means blank, we would have been like find.  Is that what you're saying?

MR. WOOD:  I don't -- yeah, that -- that colloquy didn't occur in that way, so I hesitate to try to respond to that, you know, immediately in the moment.  What I would say, and this is what we intended to -- what we, I thought, communicated to our colleagues on the other side during the meet and confer, and as we stated in our, our portion of the response, you know, the Court put this language in there specifically in its order, said the Court construes the term, let's focus on the dispute.

THE COURT:  Mr. Wood, you know what the dispute is, right?  I need to know your position about the dispute.

MR. WOOD:  Our position is our intent is to -- our intent with this slide was to follow the Court's order. We put all the language in that the Court put in the order so we weren't accused of misrepresenting or going against the Court's claim construction order.  We are not intending some sort of --

THE COURT:  But again, the dispute as you now know it, and again I go, like bad job by at least them or maybe both sides in not having a substantive back and forth about what they now say the dispute is about this slide.

But the key question is, as they've now addressed it is, what about the rest of the claim term? You're not going to suggest it doesn't exist?

MR. WOOD:  No.  Our intent was simply to follow the Court's order.  And if the Court -- I guess, I'm sorry, I don't know how to say it other than that.

THE COURT:  And you agree, I think, that the "in response to" part really isn't addressed or captured by the construction that the Court proposed or that Postscript proposed and the Court adopted, is that right too?

MR. WOOD:  I think so, Your Honor.

THE COURT:  Thank you.  I appreciate that. Mr. Saulsbury.

MR. SAULSBURY:  I don't think there can be any suggestion that we didn't meet and confer on this particular issue because this precise dispute was conferred about extensively in the context of our jury instruction dispute.

THE COURT:  What did they say when you raised the issue with the jury instructions?

MR. SAULSBURY:  They said that because the way the Court's order came out, the Court was essentially substituting the language of its construction for that entire term.

THE COURT:  Who said that?  Who?

MR. SAULSBURY:  This was weeks ago, I believe. And I don't remember exactly who said that, but the point is their proposed jury instruction therefore doesn't have the rest of the limitation, says all this language of the Court's construction is a substitute for that entire phrase. The necessary consequence of that is it takes out express language of the claim.  That dispute was clearly dealt with.

THE COURT:  I don't think that's what they're going to say they intended to do.  You proposed the entire phrase and resulting construction.  So is what you're saying, we messed up.  You know what we should have done, we should have proposed "monitoring."

MR. SAULSBURY:  I think that's right, Your Honor.  There wasn't any confusion about the dispute

was, but you're right, it would have been better if we focused on "monitoring" and said we're construing that particular term, we don't have a dispute about the rest of the phrase.  I think when we met and conferred on the phrase, the only dispute was about "monitoring."

THE COURT:  Okay.  So on this issue, let me say a couple things.  One is, again, it's at least in the lead up to today, that is the last 24 hours or more, and this dispute being listed in the proposed disputes, it does not appear to me that the parties had substantive discussion about the dispute that was raised by Postscript here this morning, a substantive back and forth.  A we think this is your position.  No, it's not.  Yes, it is.  And that is really problematic and inefficient for all of us in the court.  Second, I think it's the case, just substantively, that the parties' prior claim construction dispute about this term was really focused on the concept of "monitoring."  I don't think that's in dispute.  Now, Postscript proposed the entire term to be construed and they proposed a construction which is on Attentive's slide, so it's not like Attentive is doing anything nefarious by putting up on a slide what Postscript proposed.

All that said, because I think it is clearly understood by both sides that the substance of the construction and the substance of the prior dispute is

really about the concept of "monitoring," the parties, I'm sure, can meet and confer briefly between now and when we get started with opening statements about the extent to which some shorter portion of the term instead of the words "monitoring" all the way to "subscribers" should be construed in that way, and let me know whether they've reached agreement on that.

MR. SAULSBURY: Certainly, Your Honor. Thank you.

THE COURT: Okay. It's 9:30. The proposed jury should be ready by 9:30. This is what I want you to think about. So we're going to do jury selection starting at 9:30. That, based on past experience, will take until like somewhere between 11:30 and 12:30 is my guess. And after that, you know, there will be kind of, depending on when we end, the jury may just end up having time for lunch and then we might get started. It just depends. But whenever we end jury selection, I think you all have to figure out what additional disputes, if any, that were listed in these disputes sent to me must be decided before opening statements begin, if any. And then, if there are such, I'll address them with the parties and I may not bring the jury out just because it's a waste of their time to sit here, but that time will be counted against either the loser or if there's no clear loser, against both sides at my discretion

until we resolve those disputes.  And then we'll begin the trial.  And then to the extent there are further disputes about exhibits, for example, that we weren't able to resolve, again the time counting procedure for the loser or otherwise the Court's discretion, we'll try and address those during the trial, okay?  Think about that.  Think about what you think is really necessary and we'll re-engage on that before we begin with opening statements, okay?

All right.  So with all that said, it's about 9:21 now.  We will take a short recess and our jury administrator will help us bring the jurors through.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The honorable Christopher J. Burke presiding.

THE COURT:  Please be seated, everybody.  Good morning.

All right.  Welcome, everyone.  My name is Judge Burke and I'm one of the judges here at our court, the U.S. District Court for the District of Delaware.  And along with the parties here in this case today, I want to first welcome you to our courthouse for the jury selection process for a trial that you'll be hearing this week.  I also want to say how profoundly I appreciate you being here and showing up

for jury service. As a judge on our court, I want to tell you, I don't think it's an overstatement to say how moving it is at times that we have a judicial system that allows parties to resolve disputes through the jury process. And the only way that that happens is if citizens of Delaware come forward and participate in this process today. It's an amazing part of our judicial system and our system of law, but it would only happen through the participation of folks like you. It's a real responsibility, and also I think a really awesome thing to be part of a jury, and I really appreciate, as I know the parties do, your being hear today to go through this process. Let me just --

In a moment I'm going to ask my staff to hand out a piece of paper to you that will have some comments that I'm going to read to you about a process that we call the voir dire process, a process that helps us select a jury. But just to give you -- you know, if you were like me, if I were called for jury service, you probably have a few big picture questions. One is how long will this process take. And so we're going to go through this voir dire process now and the end result of that process is that eight of you are going to be selected as jurors for this case and the process will probably take a couple hours. It should be finished by lunchtime. So we're getting started a little after about 9:45. And I'll describe a little bit

more about what the process will entail, but at the end of it the goal is to select eight people who will serve as the jury in the trial that's going to occur this week.

Okay. And so with that said, I'm going to ask my staff in a moment to hand out a copy of the voir dire to our prospective jurors. We didn't hand it out in the beginning only because I want to say other thing. For the people that get selected to be the jurors in this case, one of the first things I'm going to tell them when they get selected is we do not want you looking online or anywhere else to try to find information about the case. Okay. And I know a lot of you probably have your cell phones with you right now, so the only thing I'll say in advance from experience is in a second we're going to hand out this voir dire material to you. It will have the name of the case that we're talking about this week on it and more information about it. When we do that, and during the process of this voir dire process this morning, don't use your cell phones to look up any information about the case or parties or anything about them. So I'm asking you to do that off the top before we hand out this material.

Okay. With all that said, let me ask my staff to hand out the voir dire materials to our prospective jurors.

Okay. In terms of our prospective jurors,

everyone should have a copy of this document that's got the case name and the words "Voir Dire" on the front and everybody should have a pen.  Is there anybody who does not have either the document or a pen?  Raise your hand if that's the case.  Okay.  Great.

Now, before I begin, we're going to have my courtroom deputy swear in our prospective jurors.

(Prospective jurors sworn.)

THE COURT:  All right.  Please be seated.

All right.  Ladies and gentlemen, I'm going to read you the remarks here largely as they appear here which will provide more information about our trial this week.

This is a timed trial, which means that each side has 11 hours in which to present their case.  The presentation of evidence in this case is expected to be completed by this Thursday, August 28th or Friday, August 29th.  And then the parties will present their closing arguments.  After closing arguments, the jury will deliberate for as long as necessary until it reaches a unanimous verdict.  We expect to be completed with the case by Friday, August 29th, but because the jury, as I said, could deliberate as long as they need to, if necessary, and if the jury will need to come back next week to continue deliberations, we will not meet on Monday, September 1st because of the Labor Day holiday.  In that eventuality we

would come back for further deliberations on Tuesday, September 2nd.

All right. The schedule that I expect to keep over the days of evidence presentation will include a morning break of 15 minutes, a lunch break of at least a half an hour and an afternoon break of 15 minutes. Trial will start each day at 9:00 a.m. until the case is submitted to the jury for deliberations. The jury will be excused each day no later than 5:00 p.m.

Now, ladies and gentlemen, I'm going to ask you a series of questions which are numbered questions, okay? What I want to ask you to do is, you have your pens with you. So if I read a question, question one or two or whatever and your answer to that question is "yes," then I want you to circle the number associated with that question on your voir dire paper. If your answer to question is "no," then don't circle it, just leave it the way it is. Okay. All right.

So question no. 1 is, does the schedule I've just mentioned present a special problem to any of you?

Again, as I go through all these questions, if your answer to the question is "yes," circle the number associated with the question. If your answer to the question is "no," simply leave your page blank with regard to that numbered question.

All right.  Next, some information about the parties and their attorneys.

Next I'll tell you who the parties are and the attorneys in this case so you can tell me if you ever have had any prior dealings with any of them.

The plaintiff is Stodge, Inc., d/b/a Postscript. And I'll refer to it as "plaintiff" or "Postscript."  The defendant in this case is Attentive Mobile, Inc., which I may refer to as "defendant" or "Attentive."

Question no. 2, have you, anyone in your immediate family, or anyone close to you, heard of, had any dealings with, or been employed by Attentive or Postscript?

Question no. 3, do you possess any opinions about any of these companies that might make it difficult for you to be a fair and impartial juror in this case?

Question no. 4 -- and I should say that question no. 4 is going to be about the lawyers involved in the case. Some of those attorneys whose name I read are in the courtroom now.

And so for those counsel, I would just ask that if you're here when I read your name, just stand up and look at prospective jurors so they can see who's associated with the names I read.

So question no. 4, the lawyers and law firms involved in this case are Daniel Silver, Alexandra Joyce,

Maliheh Zare from the law firm McCarter & English, LLP; Daralyn Durie, Timothy Saulsbury, Hannah Jiam, Joyce Li, Ramsey Fisher, and Tannyr Pasvantis from the law firm Morrison Foerster; Raghav Krishnapriyan from the law firm Orrick Herrington & Sutcliffe, LLP; Michael Flynn and Cameron Clark from the law firm Morris, Nichols, Arsht & Tunnell, LLP; Christopher Campbell, Britton Davis, Rahul Sarkar, Matthew Wood, Halima Ndai, and Katherine Vessels from the law firm Cahill, Gordon & Reindel, LLP; and Eli Balsam from the law firm Gibson, Dunn & Crutcher, LLP.

Okay.  So question 4 is, have you, anyone in your immediate family, or anyone close to you, heard of, had any dealings with, or been employed by any of the law firms or people that I've just named?

Next some words about the witnesses.

I'm going to read a list of witnesses who may be called to testify during trial.  Please make a note if you know any of these people.

Question no. 5 is, the potential witnesses in this case are:  Alexander Beller, Joel Davidson, Barbara Frederiksen, Daniel Glazer, Jesse Greenberg, Amit Jhawar, Andrew Jones, David Kennedy, Douglas Kidder, Patrick Lew, Ethan Lo, Brian Long, Zachary Magdovitz, Michael Manheimer, Alexander Meyer, Eric Miao, Nat Polish, Dena Sauer, Brandon Simins, Ryan Tsang, Adam Turner, Colin Turner, and Sara

Varni.

So question 5 is, are you familiar with any of these potential witnesses?

As with the other questions, if the answer is "yes," you would circle no. 5.  If you're not familiar with any of these witnesses, then simply leave 5 uncircled.

Okay.  Question no. 6 is, do you know any of the other potential jurors that are in the room?

All right.  Next some information about the nature of this case.  I'll now tell you a little bit about this case and the parties' claims.  This is a patent case. Postscript has asserted claims against Attentive for patent infringement.  Attentive contends that Postscript's patent is invalid; that is, that the patent should not have been granted.  If you find that any of Postscript's asserted patent claims are infringed and are not invalid, then you'll be asked to determine the amount of damages, if any, that is appropriate to compensate Postscript for that infringement.

The technology in this case relates to mobile-signup and mobile-messaging products and platforms that enable business to interact with and connect with customers.

Okay.  So now some questions about the nature of the case.

Question 7, do you know anything about this

dispute other than what I've described?

Question 8, have you or has someone close to you ever had any experience with patents, patent law, patent licenses, a dispute about patent rights, or the United States Patent and Trademark Office?

Do you have strong opinions -- this is question 9.  Do you have strong opinions about patents, patent rights or the United States Patent and Trademark Office?

Question 10, is plaintiff or defendant starting off ahead in your mind for any reason?  Do you favor one side or the other right now for any reason even just a little bit?

Again, with all these questions if your answer is "yes," circle the number of the question.  If your answer is "no," then don't circle anything as to that question.

Question 11, have you ever been a plaintiff, a defendant, or a witness in a lawsuit?

Question 12, have you ever been employed by a company that has been a plaintiff or a defendant in a lawsuit where you had a role in that lawsuit?

Question 13, have you or has someone close to you ever worked on mobile-signup and mobile-messaging products and platforms or technology that enables business to use text messages for marketing?

Question 14, do you have any strong positive or

negative opinions about businesses that use text messages for marketing or about digital advertising marketing that might make it difficult for you to be a fair and impartial juror in this case?

Question 15, do you or someone close to you have education, special training, special knowledge or experience in any of the following areas:  Computer science or marketing technology?

Now a few words about following the Court's instructions.

One of your duties as jurors is to take the law as I instruct you, apply it to the facts, and decide which party should prevail on the issues presented.  It's my responsibility to decide which rules of law apply to the case and to instruct you on what legal principles to follow. In addition, because this is a patent case, I'll also provide you definitions on what certain terms of the patents mean.  These are called the Court's claim constructions. You're bound by your oath as jurors to follow the Court's instructions and it's claim constructions even if you personally disagree with them.

Now, question 16, would you be unable to follow my instructions in this case if you personally disagreed with the instructions provided by the Court?

And lastly, question 17, is there anything else,

including something you have remembered in connection with one of the earlier questions that you think may prevent you from rendering a fair and impartial verdict based solely upon the evidence and my instructions as to the law?

All right.  Okay.  Thank you, ladies and gentlemen.

So now what we're going to do is you all will have your voir dire there.  If you did not have any yes answers to any of the questions, then you'll have no circles next to any numbers.  If you did have yes answers to any of the questions, you'll have circles on your paper next to numbers you answered yes to.

What's going to happen next is that I and some of the participants in the case are going to go back to my jury room back in my chambers and then my staff is going to call up some of you to come back individually to come and talk with me and the lawyers potentially about any questions that you may have had yes answers to.  Okay.

Again, that process is probably going to take a couple hours.  And I expect it will be done by around lunchtime, maybe like 12:30  is a guess about that.  And so I ask for your patience as we go through this as we'll try to do it as efficiently as we possibly can.

Okay.  If, in the meantime if you need anything, there will be staff members that will be out, again going

back and forth, just raise your hand and let them know.

Okay.  All right.  So with all that said, unless there is anything further, we will take a recess and begin the voir dire process.

The Court stands in recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

(Proceeding in chambers.)

COURT CLERK:  This is Juror No. 3.

THE COURT:  Have a seat.  This is Mr. Herrington an road /ER.

THE COURT:  Good to be with you.  So tell me first, which numbered questions did you have a yes answer to?

JUROR NO. 3:  Number 11.

THE COURT:  Number 11.  Is that the only one?

JUROR NO. 3:  Yes.

THE COURT:  Number 11 is the one about have you ever been a plaintiff a defendant or a witness in a lawsuit. And tell me about why you said yes to that.

JUROR NO. 3:  I said yes because I was an expert witness in a bankruptcy case, the *State of Maryland v. Pleasure Pool*, and that was in Baltimore County Office of Administrative Hearings.

THE COURT:  So you were an expert witness in a

case called State of Maryland v. Pleasure Pool?

JUROR NO. 3:  Yes.

THE COURT:  And that case, was it in -- you may have said this, but was it in the state court system or was it an administrative proceeding?

JUROR NO. 3:  Administrative.

THE COURT:  And what was the administrative body?

JUROR NO. 5:  Office of administrative hearings.

THE COURT:  Is that like a state office in Maryland?

JUROR NO. 3:  It is in Hunt Valley, Maryland.

THE COURT:  Can you just tell me briefly, what was the case about and what was your role as an expert?

JUROR NO. 3:  Actually it was my wife and I.  We hired a contractor to do a pool and he went bankrupt on day eight of the process.  So as the state proceeded against him with the bankruptcy, they called my wife and I in and they asked me to be an expert witness.

THE COURT:  An expert witness in the case that you were involved in?

JUROR NO. 3:  Yes.

THE COURT:  All right.

JUROR NO. 3:  Reason being, I was in the construction industry and it related to construction.

THE COURT:  Okay.  And what kind of stuff did you testify about, just briefly?

JUROR NO. 3:  Basically the means and methods of them building the pool and verifying what was done and how it was done.

THE COURT:  Okay.  Anything about your experience in being involved in that legal case that in any way that you think would have any impact on your ability to serve as a juror here?

JUROR NO. 3:  No.

THE COURT:  Let me just ask if the lawyers have further questions.

MS. DURIE:  I'm curious, because it's an unusual situation.  Were you a claimant in the case as well as an expert or just called in as an expert?/

JUROR NO. 3:  I was just called in, but there's a process in Maryland, it's the Maryland Home Improvement Commission, so as a citizen, if somebody doesn't grant you the services they provide, you go to the Maryland Home Improvement Commission and fill out paperwork and through that process that's why I was there, so --

MS. DURIE:  And can you just tell us a little bit more about your background?  You said you had a background in the construction trades?

JUROR NO. 3:  Yeah.  I was vice president of a

construction company.  I have an education as a civil engineer.  And that's it.

MS. DURIE:  Thank you.

THE COURT:  All right.  Questions on defendants side?

MR. CAMPBELL:  Yeah.  I have one.  And I agree it's a little bit interesting.  We don't usually see something like this where you're involved in a case and then you serve as an expert.  Did you have to write your opinions down on paper during the course of the case and did you actually testify in the case and were you sworn in and qualified as an expert?

JUROR NO. 3:  I didn't have to write anything. I did have to swear, you know, that everything I said was honest.

MR. CAMPBELL:  Of course.  But when you were sworn in, were you qualified as an expert?

JUROR NO. 3:  I don't recall.

MR. CAMPBELL:  Okay.

JUROR NO. 3:  It was a while ago.

MR. CAMPBELL:  Thank you, Judge.

THE COURT:  Maybe my last question, which is how long ago was this, roughly?

JUROR NO. 3:  Roughly 15 years ago.  Give or take.

THE COURT:  Great.  All right.  Thank you, sir. I appreciate it.

(Juror No. 3 excused.)

THE COURT:  Okay.  I was going to say I don't know that I met everyone here before.  If I have, I may have forgotten.  So Mr. Durie and Mr. Silver of course I've talked to previously.  And ma'am, what is your name?

MS. HASUIKE:  My name is Reiko Hasuike.  I'm a jury consultant.

THE COURT:  Your last name is.

MS. HASUIKE:  Hasuike.

THE COURT:  Hasuike.

MS. HASUIKE:  H-A-S-U-I-K-E.

THE COURT:  Thank you.  Good morning to you. And of course Mr. Flynn and Mr. Campbell.  Could I have your name?

MS. COLANGELO:  Rachel Colangelo.  And I'm also a jury consultant.

THE COURT:  Ms. Colangelo, all right.  Hello and good morning to you.  All right.  All right.  Next up.

Oh, I'm sorry.  Is there any application for cause for plaintiffs?

MS. DURIE:  No.

THE COURT:  And for defendant?

MR. CAMPBELL:  No.

THE COURT:  And I agree, there's no reason to strike for cause.

COURT CLERK:  Juror No. 1 and Juror No. 2 did not have any yes answers.

THE COURT:  I assumed.  We'll see about 4.

(Juror No. 4 enters.)

THE COURT:  Hi.  How are you.  Come on in and have a seat.

THE COURT:  So you're Juror No. 4?

JUROR NO. 4:  Yes.

THE COURT:  Ms. Campbell?

JUROR NO. 4:  Yes.

THE COURT:  Tell me what questions did you have a yes answer to?

JUROR NO. 4:  The schedule one.

THE COURT:  Number 1?

JUROR NO. 4:  Yeah, number 1.

THE COURT:  Okay.  Is that the only one?

JUROR NO. 4:  14.

THE COURT:  1 and 14.  Okay.  So tell me why did you answer yes with regard to the schedule?

JUROR NO. 4:  It's my first week of FNP school and I have a ton of appointments with my daughter as well, and I don't have anyone to take over for me.

THE COURT:  So with regard to the first part,

you said it's your first week of FNP school.  What's FNP school.

JUROR NO. 4:  Family nurse practitioner.

THE COURT:  And can you tell us more about what's the training that you're going through about, how does it relate to the job?

JUROR NO. 4:  It's all online, but it's a lot of studying and I don't get wife here.  There's no wifi for me to do my homework on breaks and stuff.

THE COURT:  If you were selected to serve as a juror, obviously basically from 9 to 5 would be taken up during the day.  Would you be able to otherwise even make up this week of school or do it again or be able to -- sounds like you said the school is online.  Would you be able to review it at other times whether other times this week or --

JUROR NO. 4:  At nighttime.

THE COURT:  Okay.  Does it have to be completed by the end of this week?

JUROR NO. 4:  Yes, yeah.

THE COURT:  And how much work per day is it?

JUROR NO. 4:  It's the first week, so I completed a couple assignments already.  I probably have three or four left to do.

THE COURT:  Okay.  So possible to do it, but it would be challenging because you'd have to do it at night.

Got it.  And you mentioned secondly that you you've got a bunch of appointments for your daughter?

JUROR NO. 4:  Yeah.

THE COURT:  Can you tell me more about that? What kind of appointments?  Just trying to figure out if there's a way that you can serve even in light of what you're saying.

JUROR NO. 4:  Yeah.  I have to take her to band practice and diving practice Tuesday and Wednesday.

THE COURT:  Okay.  You said band practice and what other kind of practice?

JUROR NO. 4:  Diving.

THE COURT:  And when are those events?

JUROR NO. 4:  Band practice is 6:30 to 8:30, and diving on Wednesday is 5 to 6:45.

THE COURT:  Okay.  So on the former, we'll be finished every day by no later than 5.

JUROR NO. 4:  Okay.  Yeah, so that's not a --

THE COURT:  That's not really an issue.  But on Wednesday we'd probably go up to 5.  So the question is, would you be able to get someone to take her if you were selected?

JUROR NO. 4:  I can ask family, but I can't guarantee that.

THE COURT:  All right.  Let me ask the lawyers

if they have follow up questions for you.  I'll turn first to plaintiff'S counsel.

MS. DURIE:  I don't.

THE COURT:  And defendant's counsel?

MR. CAMPBELL:  No.

THE COURT:  Okay.  All right.  Thanks, Ms. -- we appreciate your candor.  I just asked you about question 1, but you said you had a yes answer to question 14 too?

JUROR NO. 4:  Oh, yeah.

THE COURT:  Let me ask you about that too. Question 14 was, do you have strong positive or negative opinions about businesses that use text messages or marketing or about digital advertising and marketing that might make it difficult for you to be a fair and impartial juror in the case?

JUROR NO. 4:  I can't stand getting advertising text messages.

THE COURT:  Okay.  And do you get a lot of them?

JUROR NO. 4:  Yes.

THE COURT:  Okay.  And now, the companies in this case, as I sold you, they're both involved in this world of text messaging and marketing.  May be the case that jurors with lots of issues in potential trials could have some experience with whatever the subject of the trial is, even one that they may not like or they may like or

whatever.  The key is going to be that when they go into the jury room and do their deliberations, they can't let anything other than what I tell them as part of what they should consider, which is the law and the facts in the case, they can't let anything else effect their decision-making process.  So if they didn't like companies who used text messages, and if that were the case, companies in that case were in that business, they couldn't hold it against one side or the other or really consider that dislike in making their decisions.  If I told you that you had to put that out of your mind, you could not consider whatever thoughts you have about text messaging in doing your deliberations, would you be able to follow that order?

JUROR NO. 4:  Yeah.

THE COURT:  Let me ask, about that subject, if plaintiff has anything.

MS. DURIE:  I don't have anything.

THE COURT:  Anything on defendant's side?

MR. CAMPBELL:  No questions.

THE COURT:  Okay.  All right.  Thanks.  Appreciate it.

(Juror excused.)

THE COURT:  Does plaintiff have any application?

MS. DURIE:  I would propose we let her off for hardship.  I think the combination of being in school and

how she's going to get her work done during breaks and having to figure out about what to do with her daughter on Wednesday, which sounds like we don't know whether she's going to be able to cover that, and given that I think we've got plenty of people in the pool, I would propose we let her off.

THE COURT:  All right.  Defendant's side?

MR. CAMPBELL:  We agree with that.

THE COURT:  All right.  I think I will agree that for those reasons she could be struck for cause.  I will say I think it is close, because I think it is possible that she could have been able to make accommodations.  But I'll also say, in addition to what Ms. Durie said, just observing the prospective juror's demeanor, she seemed kind of physically affected in a negative way about the prospect of serving.  I think that kind of puts it over the top.  So we will excuse for cause Juror No. 4.

COURT CLERK:  Next we'll have Juror No. 5.

(Juror No. 5 enters.)

THE COURT:  Hi, sir.  Good morning.  Have a seat.  So you're Juror No. 5 and that would mean you must be Mr. Rowland?

JUROR NO. 5:  That's correct.

THE COURT:  Did pronounce it right?  Rowland. And first let me just ask you to look, what numbered

questions did you have a yes answer to?

JUROR NO. 5:  Number 1 and number 12.

THE COURT:  Okay.  I'm going to ask you about both, but remind me if I forget to do that.  The number 1 is about does the schedule represent a special problem for you.  Tell me why you answered yes to the question.

JUROR NO. 5:  I own a couple businesses, a tug boat company and crew boat service.  It's a company with about 50 employees, but very lean at the top, so just it's a 24/7 business, just being here for a week will be a challenge, not insurmountable, but it will be a challenge.

THE COURT:  Understood.  On that front, I think you said it's about a 50-person business.  If you were selected to serve, presumably there must be times when either you're away on vacation or travel or otherwise.  I'm guessing you have some plan as to are who, at least during the day, would be able to manage the company and do you have that here?

JUROR NO. 5:  Yes.

THE COURT:  What would you do?

JUROR NO. 5:  There are some meetings this week that I'm going to have to reschedule them.  I'm treasurer of a non profit that has a board meeting on Wednesday, so --

THE COURT:  All right.  And then with regard to the question number 12, that's a question that asked have

you ever been employed by a company that's been a plaintiff or a defendant in a lawsuit where you had a role in that lawsuit.

JUROR NO. 5:  Right.

THE COURT:  Tell me about that.

JUROR NO. 5:  As the owner of these two businesses, we've been sued three times, I guess, in my tenure.  One employee was driving a truck -- a company truck and rear ended someone.  That case was settled by the insurance company.  Another was a plaintiff claimed our tug boat threw a tsunami like wake and injured them on their recreational boat.  That went to mediation and that was also settled.

THE COURT:  Okay.

JUROR NO. 5:  And then the third case was a passenger on one of our launches claimed to be injured in rough sea conditions.

THE COURT:  Okay.  And how did that resolve?

JUROR NO. 5:  Also settled but by the insurance company.  No one actually went to trial.

THE COURT:  Okay.  And were all three of these cases, were they in the state court?

JUROR NO. 5:  They never got to trial, so the car accident certainly was state court.  And the other two were not in federal.

THE COURT:  So at least the car accident case was filed in state court and it was settled.  The other two cases, was a lawsuit even every filed, if you can remember?

JUROR NO. 5:  I don't recall.

THE COURT:  Okay.  All right.  So you have some experience of being involved in a lawsuit?

JUROR NO. 5:  Yeah.

THE COURT:  In which someone was suing your company.  This is very different.  Now, in this case I would be telling you if you were selected as a juror you'd have to only consider the facts and the law that I provide to you. You can't let anything outside of those things kind of influence your decision, to put a thumb on the scale for one side or the other.  So wouldn't want it to be a case where someone who was previously involved in a suit as a defendant feels like, well, going into this case I don't care what the facts or the law is, I'm going to favor the plaintiff's side or the defendant's side whatever it is.

If I were to tell you you can only focus on the facts and the law here, is there anything about your prior experience with these cases that would cause you to not be able to do that or would you be able to focus on the facts and the law as I instruct you?

JUROR NO. 5:  I would be able to focus on the facts and the law, and I don't think necessarily that any of

those suits are relevant in any way here, but --

THE COURT: Okay.

JUROR NO. 5: But I did swear to answer the questions honestly.

THE COURT: You're doing the right thing. I'm just going to ask the lawyers if they have follow up questions for you.

MS. DURIE: Thank you. And I have one and I have to ask this since we represent the plaintiff. Does your experience in those cases and being the defendant, did that leave a negative taste in your mouth at all around lawsuits or the judicial system.

JUROR NO. 5: I do think it's a little easy to sue in the United States. If it's a small enough dollar amount, it will just be settled by the insurance company, but --

MS. DURIE: Do you feel like you've got some skepticism of lawsuits for that reason? I mean, do you think if you were a juror in this case you would start out being a little bit skeptical of the plaintiffs?

JUROR NO. 5: I don't.

MS. DURIE: Okay. Thank you.

THE COURT: And on defendant's side?

MR. CAMPBELL: No questions.

THE COURT: Okay. Mr. Rowland, again, just on

the first one again, I know it might not be easy because you have a big responsibility, but if you had to serve, if you were selected, you could do it?

JUROR NO. 5:  Yeah.

THE COURT:  You'd make arrangements to make it happen?

JUROR NO. 5:  Yeah.

THE COURT:  I appreciate your candor.  Thank you very much.  My staff will take you back.

JUROR NO. 5:  Thank you.

(Juror excused.)

THE COURT:  Okay.  Any applications from plaintiffs?

MS. DURIE:  No.

THE COURT:  And from defendant?

MR. CAMPBELL:  No.

THE COURT:  I agree.  There's no basis to strike the juror for cause, so Juror 5 will remain in the pool.

COURT CLERK:  Juror No. 6.

(Juror No. 6 enters.)

THE COURT:  Okay. Hi, ma'am.  Come on in.  Have a seat.  You're Juror No. 6?

JUROR NO. 6:  I am.

THE COURT:  So that means you're Ms. Workman?

JUROR NO. 6:  Yes.

THE COURT:  So the first question is, could you just tell me which questions, what numbers did you have a yes answer to?

JUROR NO. 6:  4.

THE COURT:  Is that the only one?

JUROR NO. 6:  Yes.

THE COURT:  All right.  So question 4 was about whether -- it listed the lawyers and law firms in the case and asked have you or anybody in your immediate family or anybody close to you ever heard of or had dealings with or been employed by any of these law firms or people and tell me why you said yes.

JUROR NO. 6:  I'm more of a maybe.  My nephew is a partner in Tunnell & Raysor.  I don't know if that's the same Tunnell, but I just thought it would be -- I should, you know, share that information.

THE COURT:  No.  That's great.  Thank you.  So Tunnell & Raysor is a law firm that your nephew is a partner in?

JUROR NO. 6:  Uh-huh.

THE COURT:  Okay.  And maybe I could just ask, because we have a lawyer -- there's a firm in this case named Morris, Nichols, Arsht & Tunnell.  Mr. Flynn works for that firm.  Are you familiar with this firm?  Is this a firm

that's based in Delaware?

MR. FLYNN:  I am not?

THE COURT:  Is this in Delaware?

JUROR NO. 6:  Sussex County.

THE COURT:  Sussex County.  I guess the only question is we just want to make sure jurors, there's nothing about any of their past experiences that would in any way cause them to be unable to follow my directions and my directions are in this case you only can focus on the facts that you hear in court and the law as I instructed.  I gathered, but I'll let you answer, is there anything about the fact that your nephew is a lawyer or works for this firm that you think would affect your ability to be a fair juror?

JUROR NO. 6:  No, not at all.

THE COURT:  Let me ask if the lawyers have any follow up questions.

MS. DURIE:  I don't, Your Honor.

THE COURT:  Defendants?

MR. CAMPBELL:  No questions.

THE COURT:  Thanks.  We appreciate it.

(Juror excused.)

THE COURT:  Okay.  Any applications on plaintiff's side?

MS. DURIE:  NO.

THE COURT:  Or on defendant's side?

MR. CAMPBELL:  No.

THE COURT:  I agree that there's no reason to strike the juror for cause, so Juror No. 6 will remain in our pool.

COURT CLERK:  Juror Nos. 7 and 8 did not have any yes answers, so we're going to Juror No. 9.

THE COURT:   Okay.

(Juror No. 9 enters.)

THE COURT:  Hi, sir.

JUROR NO. 9:  How are you?

THE COURT:  Have a seat.  You are Juror No. 9 I see, and that hopefully means you are Mr. Peeke.

JUROR NO. 9:  Peeke.

THE COURT:   Mr. Peeke, so first tell me what numbered questions did you have a yes answer to?

JUROR NO. 9:  The first one.

THE COURT:  Number 1.  Was there anything other than number 1?

JUROR NO. 9:  Yes.  14, 15 and 17.

THE COURT:   Okay.  14, 15 and 17.  Number 1 was the question about does the schedule present any special problem for you.  Tell me why you answered yes.

JUROR NO. 9:  I totally understand responsibilities.  I'm going to read the letter I wrote last night.

"I totally understand the responsibilities involved with my civic duty and I take them very seriously. I would love to be a juror for some other" --

(Reporter clarification.)

"Here's my dilemma.  My bride responded to my jury summons without discussing it with me.  She realizes how busy I am and took this upon herself.  She was attempting to alleviate some of my stress."

"I'm a regional sales representative.  My job is to be in the field daily to generate sales.  That is my sole responsibility and I take great pride in doing it well.  I also take tremendous pride in being a U.S. citizen and would thoroughly enjoy being a juror, but the only way I support my family is to be Attentive every day to my sales responsibilities.  If I am selected to be part of a jury trial I literally would not be able to do my job and not be able to sell and produce any income.  So I must appear because I need to be excused me from my jury selection."

"I will report to the jury room tomorrow, but please understand my dilemma.  I apologize that my wife responded to your summons to appear without first discussing this matter with me.  I certainly can have my superior, president of my company, author a letter that will affirm what I've stated above.  His name is Justin Zivatdin."

THE COURT:  Okay.  Thanks, Mr. Peeke.  Sounds

like you're a regional sales manager for a company?

JUROR NO. 9:  I am, sir.

THE COURT:  And what kind of work does the company do?

JUROR NO. 9:  Branding merchandise, things like this type of thing.

THE COURT:  That's a Masters shirt.

JUROR NO. 9:  Yes, it is.

THE COURT:  And you know, as you might expect, lots of jurors who are here today who might serve also have jobs that are important --

JUROR NO. 9:  Yes, sir.

THE COURT:  -- that are important to them.  So we're really trying to figure out -- we know it's not easy for almost anybody to serve.

JUROR NO. 9:  Of course.

THE COURT:  Because they'll be away from work from what we expect will be for five days.  So we're trying to see if it nevertheless is possible.

JUROR NO. 9:  Okay.

THE COURT:  There must be circumstances where you're not at work, like when you're on vacation or if there's some issue, or you have to be out of work, family member's illness or whatever it is.  In those circumstances how does work get by without you and is there some kind of

plan as to who can take over for you in those circumstances.

JUROR NO. 9:  I mean, you're not going believe this, Your Honor, but I pretty much work every day even if I'm away with my cell and my PC, I can work and I do.  So to answer your question, there's nobody that can fill in, that's just not conceivable in any way, shape, or form.

THE COURT:  Is the nature of your work such that if you got selected, you know, if you needed to do at least some work in a day that you could do it kind of after hours, after 5?

JUROR NO. 9:  I could, but the problem would be the promise that you respond, so on and so forth.  It's very very important in my business to respond promptly.  It would be very difficult for them to understand that.

THE COURT:  All right.  Let me ask you some questions about the other questions you had yes answers to. 14 --

JUROR NO. 9:  Yes, sir.

THE COURT:  -- was one of them.  That's the question about do you have any strong positive or negative opinions about businesses that use text messages for marketing or about digital advertising and marketing that might make it difficult for you to be a fair and impartial juror in the case.  Why did you say yes to that?

JUROR NO. 9:  I get inundated with messages from

different companies and I get totally fed up with them, quite frankly.

THE COURT:  Okay.

JUROR NO. 9:  That's about it.

THE COURT:  All right.  Now, it will be the case that in this case there are companies here who work in this field involving marketing text messages.

JUROR NO. 9:  Yes, sir.

THE COURT:  And you know, we expect, I think, that jurors, all jurors have some experience with these issues and they even have positive or negative feelings about them, but the goal is, and the thing that has to absolutely be the case is, if a juror starts deliberating it can't in any way be using or considering any kind of like negative feeling they might have about the business of one side or the other or both in their deliberations.  They are only supposed to focus on the facts and the law that are a part of the case as I instruct them.

Would you be able to do that?  Would you be able to put out of your mind kind of any negative thoughts you have one way or the other about this business area if I instructed you to do so as a juror.

JUROR NO. 9:  I'd do my best, but I think I would have prejudices against the text messages company.

THE COURT:  Okay.  Let me ask you -- question 15

asked if you had any education or special training or experience at either computer science or marketing technology.  Why did you say yes to that?

JUROR NO. 9:  Our firm, being a sales organization, is marketing each and every day and I'm very much involved in that.  What I send out to my clients.

THE COURT:  So on the other hand, you work in a field where you send marketing messages?

JUROR NO. 9:  Yes, sir.

THE COURT:  Is that right?

JUROR NO. 9:  Absolutely.

THE COURT:  What kind of messages do you send in your marketing, e-mail?

JUROR NO. 9:  As I said I represent firms that put out branded products, electronic chargers.  They're 700,000 different brand of merchandise products in the U.S., but what we do is I would send out a lot of e-mails with regard to that to solicit customers to see me and let me present my wares.

THE COURT:  All right.  Lastly, question 17 was is there anything else that you remembered that you think could prevent you from serving fairly and impartially.

JUROR NO. 9:  I think it just goes back to the constant text messages, receiving those.

THE COURT:  All right.  Let me ask if the

lawyers have follow up questions for you.  On the plaintiff's side?

MS. DURIE:  And I obviously don't want to intrude, but do you feel like it would be a financial hardship for you given that you said this is your job and this is sort of how you earn a living?  Do you feel like it would be a financial hardship for jury service?

JUROR NO. 9:  I'm not going to go broke, ma'am, but it would definitely set me back for sure.

MS. DURIE:  I appreciate that.  And on that sort of text messaging, given this is a case about companies that do text messaging, we're looking for the best jurors for each case.  Do you think there might be other cases where you would be better suited to being a juror?

JUROR NO. 9:  I would say no.  I think I'd be fairly -- I think I'd be fairly honest in both cases, whether it's text messaging or anything else.

MS. DURIE:  Okay.  Thank you.

JUROR NO. 9:  My pleasure.

THE COURT:  All right.  Defendant's counsel?

MR. CAMPBELL:  In terms of financial hardship, I mean, would you have the ability to reach out to some of your customers and prospective customers during breaks, at lunch, to try to keep those touches alive knowing that this is going to be a pretty short trial?  Is that something you

could do to, you know, just give them that touch that you could then let them know I'm out of pocket most of the day, I can get back to you the end of the day?

JUROR NO. 9:  I certainly could.  Would they be reasonable about it?  I don't know about that.  So that's my dilemma.  Some expect -- see, what we try and preach in my particular business is excellence in customer service and that's our motto.  And so if I'm not getting back to them promptly, I'm not doing that.

THE COURT:  Anything else?

MR. CAMPBELL:  Nothing further.

THE COURT:  Mr. Peeke, on that first question, one last question about it.  We need folks who can serve.  I know you've told us about your job issues, but if in the end of the day you were selected, would you do it?  Could we count on you to do it and make whatever calls you needed to make to be able to arrange things?

JUROR NO. 9:  What would be my alternative, sir?

THE COURT:  Well, I wouldn't be giving you one, but we need folks to show up every day.  Would you be able to do that?

JUROR NO. 9:  Yes, sir.

THE COURT:  All right.  And then lastly, just one other question about number 14, which was about receiving text messages and not liking how many you get.

Again, I want to make sure I know what your answer is and that it's clear.  Any feelings you have about other text messaging companies or text messages received in the past or negative inferences about companies that do that, you would have to put them aside and solely focus on this case.  I want to get your best answer.  Could you do that?  If I told you only focus on the facts that you hear in the trial and any kind of legal instructions I give you, those can be the only things you really can consider, could you follow those instructions or would you be letting outside thoughts about your maybe dislike about mobile text messaging intrude into the process?

JUROR NO. 9:  I think it would, because, Your Honor, I get probably 150 messages a day, e-mails and texts, and they just add to my angst.  And I don't know if I could, to be completely honest with you.

THE COURT:  Okay.  All right.  There's nothing further, Mr. Peeke.  Thank you.  My staff will show you back out.

JUROR NO. 9:  My pleasure.

(Juror excused.)

THE COURT:  Okay.

MS. DURIE:  I would ask that he be excused.

THE COURT:  Okay.  Mr. Campbell?

MR. CAMPBELL:  We would not ask that he be

excused.  I think we heard him say very clearly that, yes, he's in the people business and he needs to touch people. Many people do.  There's a lot of folks who are called to serve on the jury who are self employed and he said he can reach out overnight and it wouldn't be the situation where he wouldn't be able to put food on the table.  Sure, he would be put out during the day where he couldn't get in touch with his customers, but I don't think he couldn't reach out later or during breaks.  So for that reason, Judge, we think he should stay.

THE COURT:    Okay.  I'll ask plaintiff's counsel to explain their objection.

MS. DURIE:  Yeah.  Of course.  It's unusual in my experience to have someone go to the trouble of sending a letter in advance explaining the hardship, but he seemed quite adamant that he felt he wouldn't be sort of doing his job and was concerned about what the reaction of his customers would be.  I'm worried that that's going to be weighing on him during the course of the trial.  He also did say it would be a financial hardship.  And I think that coupled with the fact that the sort of intrusiveness he feels in getting text messages might -- I get that he said that he would try to be fair, but he also, I think very candidly, in your response to Your Honor's last question said that he wasn't sure if could be.  I think that

combination of those two things means it would be appropriate to excuse him. He seemed quite agitated and upset, I would say, when he first came in and was reading the letter that he had sent about the prospect of jury service.

THE COURT: Okay. So I'm ultimately going to excuse this juror for cause. I would not do so based solely on his responses about his work situation. I think, as Mr. Campbell noted, it probably is the case that although it wouldn't be easy and he may not like it, he could find a way to serve for this week. It's really the combination. Most significantly it's his answer to question 14. I asked him a few times, including again at the end, would he allow any preconceptions about mobile messaging companies to infect the process of his deliberations one way or the other. I do acknowledge and agree that both companies here are involved in that practice, but ultimately we need jurors who aren't going to be unduly influenced by stuff that doesn't have to do with the merits of the case. I'm not convinced based on his answers that he could do that. And I also agree with his overall demeanor was one that certainly suggested some hostility to the process of serving on this jury, which is not ideal and of itself it might not be enough, but I think in addition his answer to question 14 it is fair. We're going to strike Juror No. 9 for cause.

That brings us to --

COURT CLERK:  Juror No. 10.

(Juror No. 10 enters.)

THE COURT:  Hi, ma'am.  Come on in and have a seat.  Are you Juror No. 10?

JUROR NO. 10:  Yeah.

THE COURT:  Are you Ms. Lowry?

JUROR NO. 10:  Yeah.

THE COURT:  Okay.  Great.  Have a seat.  So first, can you just tell me what number questions you had a yes answer to.

JUROR NO. 10:  1 and 15.

THE COURT:  Okay.  So question one was the question about whether the schedule presents any kind of special problem.  Why did you answer yes?

JUROR NO. 10:  Because I have a two year old child so I have to take him to school every day and pick him up.  Also, I work full-time, so I don't know if I would be able to get off for this every day.  I got off today just because I gave them a head's up notice, but they said that they need me this week because school is starting back up.  So I don't know if I'd be able to come like every day.

THE COURT:  Okay.  With regard to your two year old, you said you take her to school.  Is it a her?

JUROR NO. 10:  No, it's a boy.

THE COURT:  Take him to school every day.  What time do you drop him off at school?

JUROR NO. 10:  Around like 7:30.

THE COURT:  Okay.  And so we won't be starting trial each day until 9 o'clock.

JUROR NO. 10:  Oh, okay.

THE COURT:  And even though we asked jurors to get here at like 8:45 or 8:30, is that right?

COURT CLERK:  8:45.

THE COURT:  Okay.  Does it sound like you'd be okay on that front?

JUROR NO. 10:  Yeah.

THE COURT:  And someone else picks up your son?

JUROR NO. 10:  No, I work with him.  So I go.

THE COURT:  Oh, he's at the school that you teach at?

JUROR NO. 10:  Yeah.

THE COURT:  And so how does he get home every day?

JUROR NO. 10:  I take him with me.

THE COURT:  What time does school end?

JUROR NO. 10:  I could pick him up 5, 5:30, but I get off work at 4:45 every day.

THE COURT:  So if you had to serve, we'd be dismissing the jury no later than five.

JUROR NO. 10:  Oh, okay.

THE COURT:  Would you be able to, if we said, look, we're going to be done at 5, would you be able to pick him up by whatever is the cutoff?  I have to pick up my kid too.  My cutoff time is always 6.  Is 5:30 yours?

JUROR NO. 10:  5:30 is mine, but I get a late fee.

THE COURT:  So the late fee kicks in at 5:30?

JUROR NO. 10:  Uh-huh.

THE COURT:  And you live in New Castle.  Would you be able to get from here to there by 5:30?

JUROR NO. 10:  Takes me 45 minutes, so it would be cutting it close.

THE COURT:  I guess on that front if you couldn't pick up, would there be someone --

JUROR NO. 10:  Yeah.  I'd have to see if my mom could get him.

THE COURT:  And is your mom the only person that you could call?

JUROR NO. 10:  Yeah.

THE COURT:  You don't know one way or the other whether she can do that or not?

JUROR NO. 10:  Yeah.

THE COURT:  Okay.  And in terms of work, I know a lot of folks out there have work commitments, it's not

easy, but if we were wondering, look, we need someone to be here every day, we just need to know that the person, if they were selected, would be able to make arrangements and tell their employer they have to be here at court.

JUROR NO. 10:  I mean, I could tell them.  It's just like they're on a tight schedule this week because a lot of staff are off.

THE COURT:  What kind of teaching do you do?

JUROR NO. 10:  At a childcare center.

THE COURT:  Okay.  And how many kids are you responsible for supervising?

JUROR NO. 10:  In my classroom 15.

THE COURT:  Are you the only teacher?

JUROR NO. 10:  No.  There's two of us.

THE COURT:  So if you had to be out for a week, like if you were on vacation or away, what happens.

JUROR NO. 10:  Either someone has to like substitute for me if they have enough people or they have to try to figure out where to move kids, like throughout the building, but sometimes they're not able to.

THE COURT:  Okay.  So what would happen is the one teacher would be responsible for all or the substitute.

JUROR NO. 10:  Or they'd try to get a substitute.  If they can't find a substitute, they'd try to scatter the kids around the building as best as possible.

THE COURT:  And what age are the kids?

JUROR NO. 10:  Six weeks is our youngest until five years old is our oldest.

THE COURT:  And then you answered yes about question 15.  Which was the one about --

JUROR NO. 10:  Yeah, that was just --

THE COURT:  -- special training or education in either computer science or marketing technology.

JUROR NO. 10:  Yeah.  My cousin does in Ohio, used to go to school for computer science, so that's just why I said that.

THE COURT:  Okay.  So your cousin went to school for computer science?

JUROR NO. 10:  Uh-huh.

THE COURT:  That was a college degree?

JUROR NO. 10:  Yeah.  In Cincinnati, Ohio.

THE COURT:  Is there anything about the fact that your cousin knows anything about computer science that --

JUROR NO. 10:  Oh, no.  I don't know anything about it.  I just circled it because it was the question.

THE COURT:  You did the right thing.  Let me ask if the lawyers have follow up questions for you.

Does plaintiff's counsel.

MS. DURIE:  I don't, no.

MR. CAMPBELL:  Just one question.  Would it be a financial hardship at all on you if you had to take off the entire week for work?

JUROR NO. 10.  Yeah, because I pay every week for childcare, so I'd be losing money.

MR. CAMPBELL:  So you get paid for working in the childcare field.

JUROR NO. 10:  Yeah.

MR. CAMPBELL:  I see.

JUROR NO. 10:  So I get paid by the hour to work there, but I have to pay every week for my child to go there.

MR. CAMPBELL:  I see.  Would there be any way for you to be able to make up that income?

JUROR NO. 10:  No.

THE COURT:  Any other questions?

MR. CAMPBELL:  No.  Thank you, Judge.

THE COURT:  One other question.  With your child, if you got picked and asked your mom, can you pick up my son every day, and she says no, is it possible -- we have to make sure we've got the jury secured.  We know it's going to be hard to serve.  We expect it to be a five-day trial. Is it possible that you'd be at home and saying, I can't come to the trial today because I have to go pick up my son or I have to leave early?  Is that a possibility that that

could happen, you think?

JUROR NO. 10:  Yeah.

THE COURT:  Okay.  Thank you, ma'am.  I appreciate your candor.  My staff will show you back.

JUROR NO. 10:  Okay.  Thank you.

(Juror excused.)

THE COURT:  Okay.  Application?

MS. DURIE:  I think we should let her go.  I mean, the combination of the childcare and the financial hardship.

THE COURT:  Mr. Campbell.

MR. CAMPBELL:  We agree.

THE COURT:  Okay.  Particularly because at least based on her answers it's not clear to me that she would be able to serve the entire day with regard to her childcare situation, I'll strike Juror No. 10 for cause.

COURT CLERK:  Juror No. 11.

(Juror No. 11 enters.)

THE COURT:  Hello.

JUROR NO. 11:  Good morning.

THE COURT:  Hi.  Have a seat.  All right.  So you're Juror No. 11?

JUROR NO. 11:  Yes.

THE COURT:  And you are Ms. Duszak.  First, what numbered questions did you have a yes answer to?

JUROR NO. 11:  1.

THE COURT:  Is that the only one?

JUROR NO. 11:  Yes.

THE COURT:  And that was the question about whether the schedule presents a special problem.  Tell me why you answered yes to that.

JUROR NO. 11:  My mother's wheelchair bound.  She has a caregiver.  Tomorrow is the first day of school for her caregiver's daughter, so she's not going to be there.  And the plan was for me to work from home from her house all day tomorrow and take care of her.

THE COURT:  Okay.

JUROR NO. 11:  I'm also preparing for a four-week trial that starts in four weeks.

THE COURT:  You say you're also preparing for a trial?

JUROR NO. 11:  Yes.

THE COURT:  That starts in four weeks?

JUROR NO. 11:  In Superior Court.

THE COURT:  Which must relate to your job because you're a paralegal?

JUROR NO. 11:  Yes.

THE COURT:  Okay.  So let me ask first about your home situation.  Sounds like the issue there is your mom's in a wheelchair.  She has a caregiver, but tomorrow

you know, Tuesday, the caregiver cannot be there?

JUROR NO. 11:  Yeah.

THE COURT:  And your plan was you're going to be home with your mom?

JUROR NO. 11:  And work from home.

THE COURT:  And work from home.  I guess the question is obviously it's not easy for anybody out here whether because of work or family challenges or otherwise to serve, but the line we're trying to figure out, even though it's not easy, is is this a person who could do it, find a way, make a call to make arrangements, either whether it comes to some form of work or somebody picking up a child. In this case, being with your mom throughout the day.  If you were selected to serve, would there be someone to step in for you?

JUROR NO. 11:  No.

THE COURT:  There's no one else that you could call?

JUROR NO. 11:  No.

THE COURT:  And does your mom need to have somebody with her?

JUROR NO. 11:  Yes.

THE COURT:  So essentially you're saying if you were selected you wouldn't be able to come because you would have to be there for her?

JUROR NO. 11:  Right.

THE COURT:  Okay.  And how long -- just sorry for asking these questions.  How long has your mom been in a wheelchair.

JUROR NO. 11:  She's poly supranuclear palsy, so she's wheelchair bound in that that's the only way she can get around.  The problem is she gets up and tries to walk, so she constantly falls, so she needs someone there all the time and this has been at least the past year that she's been pretty much wheelchair bound.

THE COURT:  And I guess in that time if there have ever been days when, for whatever reason, a caregiver was not able to be there, has there been any other solution?

JUROR NO. 11:  Yeah, my brother, but he's not available this week.

THE COURT:  And you have no other siblings?

JUROR NO. 11:  No.  I have no other siblings.

THE COURT:  And with regard to the last piece you mentioned, preparing for a trial as a paralegal in a couple weeks, sounds like you'd be working on that trial.  If you were working this week on the jury, obviously at least from 9 to 5, you wouldn't be able to be doing that.

JUROR NO. 11:  Right.

THE COURT:  On that front, would you be able to manage otherwise doing whatever you have to do after hours?

JUROR NO. 11:  I don't get paid for it if I work overtime.  I need special permission and I don't know that they would grant it because the client has to pay for it.

THE COURT:  Okay.  All right.  Let me ask if folks have follow up questions.

MS. DURIE:  I don't, Your Honor.

THE COURT:   On the defendant's side.

MR. CAMPBELL:  You know, just, I understand the situation.  I'm just wondering are there any other family members or friends who can help out?  Sounds like tomorrow is the big day.

JUROR NO. 11:  I mean, my mom's elderly, so all of her friends are elderly and she's a bigger woman, so yeah.

MR. CAMPBELL:  Thank you, Judge.

THE COURT:  All right.  That you, Ms. Duszak. Appreciate it.

MS. DURIE:  I think we have to excuse her for cause.

THE COURT:  Mr. Campbell?

MR. CAMPBELL:  We agree.

THE COURT:  I agree based on the answer she gave on her mom's situation and I pressed her, but I don't think there's a way for her to serve based on her answers.  So Juror No. 11 is struck for cause.

COURT CLERK:  Juror No. 12.

THE COURT:  By my count we have seven jurors in the prospective pool so far.

(Juror No. 12 enters.)

THE COURT:  Hi, sir.  Come in and have a seat. You're Juror No. 12?

JUROR NO. 12:  That's right.

THE COURT:  That means you're Mr. Simpson?

JUROR NO. 12:  Yes, sir.

THE COURT:  First, can you tell me what numbered questions did you have a yes answer to?

JUROR NO. 12:  Only number 13.

THE COURT:  That was the only one.  13, just for the record, is the question about have you or has someone close to you ever worked on mobile signup.

JUROR NO. 12:  I read that wrong.  I should have referred to my sheet.  Number 15.

THE COURT:   Take a quick look now.  Is that the only one?

JUROR NO. 12:  Yeah.  That is the only one, yeah.

THE COURT:  Number 15.  So that was the one that said, do you or someone close to you have education or special training or knowledge or experience in either computer science or marketing technology.  Why did you say

yes there?

JUROR NO. 11:  I took a handful of computer science courses during my time at university.

THE COURT:  And so where did you go to school?  Where were you at university?

JUROR NO. 11:  The university called St. Francis Xavier University.  It's in Nova Scotia.

THE COURT:  You had a few classes in computer science?

JUROR NO. 11:  Two or three.

THE COURT:  I'm guessing it was not your major.

JUROR NO. 11:  Introductory.  It was electorate, so --

THE COURT:  What do you remember about what the subject of those classes were?

JUROR NO. 11:  It was basically it was introduction to computer science.  101 and 102.  And then I think I might have taken a third one, but it eludes me.

THE COURT:  So they were how long ago was this?

JUROR NO. 11:  This would have been 2019.

THE COURT:  Got it.  The big thing we just want to make sure, and this is the case with all our jurors if they had some knowledge of computer science is just I'll be instructing that when you deliberate you have to focus all your attention and your deliberations just on the facts that

are presented to you in the trial and on the law that I described. So, for example, if there was something about computer science you happen to remember from these classes that didn't relate to or wasn't a part of something you heard in the trial, we would not want you to be like saying, well, I remember that, I'm going to use that fact in trying to decide this case. You are to just focus on what the facts are in the case. Would you be able to follow the law and the facts if I asked you to do so?

JUROR NO. 11:  Yeah.  Most definitely.

MS. DURIE:  No questions.

THE COURT:   And on defendant's side?

MR. CAMPBELL:  Today, what do you do?

JUROR NO. 11:  Right now?

MR. CAMPBELL:  Yes.

JUROR NO. 11:  For employment?

MR. CAMPBELL:  Yes.

JUROR NO. 11:  I'm not working.

MR. CAMPBELL:  Have you ever worked in the computer science field?

JUROR NO. 11:  No.

THE COURT:  All right.  Thank you, sir.

JUROR NO. 11:  Thank you very much, guys.

THE COURT:  Appreciate your candor.

(Juror excused.)

THE COURT:  Okay.  Any application?

MS. DURIE:  No concerns.

THE COURT:  And on defendant's side?

MR. CAMPBELL:  No.

THE COURT:  I agree.  So there were no objections for cause for counsel and I agree there is no basis to strike for cause, so Juror No. 12 will remain in the pool.

COURT CLERK:  Juror No. 13.

(Juror No. 13 enters.)

THE COURT:  Hi, sir.  Come on in.  Have a seat. All right.  So you're Juror No. 13, Mr. White?

JUROR NO. 13:  Yes.

THE COURT:  So my first question for you is which numbered questions did you have a yes answer to?

JUROR NO. 13:  13 and 15.

THE COURT:  Okay.  That was it?

JUROR NO. 13:  Yep.

THE COURT:  All right.  So number 13 was the question that asked have you or somebody close to you ever worked on mobile signup or mobile messaging products and platforms or technology that enables businesses to used text messages for marketing.  Why did you say yes to that?

JUROR NO. 13:  I work at J.P. Morgan Chase in car marketing.

THE COURT:  Okay.  And tell me like about the extent to which J.P. Morgan Chase uses, as far as you know, mobile signup or mobile messaging products in the business.

JUROR NO. 11:  So most of my experience is in portfolio, so customer facing, so we do do mobile messaging and then I'm familiar obviously with the other forms of marketing, direct mail, mail, e-mail, digital channels.

THE COURT:  Okay.  And is that kind of marketing something that you yourself in your job use or is it just -- what kind of work do you do for J.P. Morgan Chase?

JUROR NO. 11:  Me and my team do that.  So I'm more on the strategy side; however, I manage folks who are more closer to the execution side, handling keyboards, if you will.

THE COURT:  Okay. All right.  And follow up question there is, it's often the case that jurors have some knowledge or experience about facts that in some way might relate to the kind of case they're working on.  Not like there's anything wrong with that, but a key thing would be if a juror came in with some knowledge about a subject matter area that was different than or conflicted with some of the facts that were at play in the case that they heard, I'd be telling them you have to focus on the facts in the case in the trial, what the witnesses say, what the law has been, that has to be the base of you are deliberations.  The

idea would be you wouldn't bring in some prior knowledge that was different than or conflicted, that that would unduly impact your deliberations.  Would you be to follow my instructions to focus on the facts and the law even if you had some prior knowledge about these areas?

JUROR NO. 13:  Yes, sir.

THE COURT:  Okay.  And then question 15 was -- maybe this is related.  Do you or somebody you know have any special training or education or experience in either computer science or marketing technology.

JUROR NO. 13:  Marketing technology.

THE COURT:  Based on the same answers you just gave?

JUROR NO. 13:  Yes.

THE COURT:  All right.  The lawyers may have further follow up questions for you.

Plaintiff's counsel?

MS. DURIE:  Have you heard of Attentive as a provider of text messaging marketing services?

JUROR NO. 13:  I have not.

MS. DURIE:  What are the companies you're familiar with in that space?

JUROR NO. 13:  I honestly don't have any name off the top of my head.

MS. DURIE:  So do you know who is providing the

services that your team is using by name, like do you know the name of the company that's providing --

JUROR NO. 13:  I don't, no.

MS. DURIE:  Do you have a way to know whether either Attentive or Postscript is actually providing the services that your team is using?

JUROR NO. 13:  For Chase, no.  Potentially Postscript, because I have heard of them before, but --

MS. DURIE:  What have you heard about Postscript?

JUROR NO. 13:  Just that they are, what we would consider a vendor.

MS. DURIE:  Okay.  And when you say they're a vendor, they provide services to J.P. Morgan.

JUROR NO. 13:  Correct.

MS. DURIE:  Have you heard anything good, bad, indifferent?

JUROR NO. 13:  I have not.

MS. DURIE:  Okay.  Good.  Thank you.

Your Honor, I have no further questions.

THE COURT:  Let me ask defendants counsel if they have any questions.

MR. CAMPBELL:  When did you first hear about Postscript as a potential vendor of J.P. Morgan.

JUROR NO. 13:  I believe less than two years

ago.

MR. CAMPBELL:  Who told you about them?

JUROR NO. 13:  One of the product heads.

THE COURT:  What was the context of that discussion?

JUROR NO. 13:  Potentially I think maybe looking at engaging in some sort of marketing campaign.

MR. CAMPBELL:  Potentially engaging Postscript as a vendor to help J.P. Morgan in marketing?

JUROR NO. 13:  Yes.

MR. CAMPBELL:  Do you know whether or not J.P. Morgan did engage Postscript as a vendor in marketing?

JUROR NO. 13:  I know for this portfolio ask, we did not.

MR. CAMPBELL:  But there are possibly other portfolios at J.P. Morgan that use Postscript?

JUROR NO. 13:  There could be.

MR. CAMPBELL:  Okay.  Thanks, judge.

THE COURT:   Let me just follow up.  So that particular campaign that Postscript was a potential vendor turned out they were not selected?

JUROR NO. 13:  Correct, for the portfolio that I'm involved in, yes.

THE COURT:  Do you know for a fact whether they are currently a vendor for J.P. Morgan chase?

JUROR NO. 13:  They're not for the portfolio or the credit card product that I represent.  We have several brands, several partners.

THE COURT:  And as to other portfolios or aspects of the J.P. Morgan Chase business, do you know one way or the other whether Postscript provides services somewhere else?

JUROR NO. 13:  Not to my knowledge.

THE COURT:  Okay.  All right.  So -- and another thing, one way or the other, you know, whether it was positively in terms of towards Postscript or negatively, we just want to make sure that no juror comes into a case like with their thumb on the nail before they hear any evidence saying, oh, I'm not sure I like this part or I think I do like it and somehow they'd be starting out or any point during the process have like an extra edge.  Would you be giving, either positively or negatively, Postscript an extra edge --

JUROR NO. 13:  No.

THE COURT:  -- in this case?

JUROR NO. 13:  I would not.

THE COURT:  Okay.  All right.

MS. DURIE:  Your Honor, could I just ask one follow up question?

Do you know why Postscript wasn't selected for

the one --

JUROR NO. 13:  I do not.  I know for our portfolio most of the marketing that we do is not through text messaging channel.  There are some that have -- you know, most of our servicing messages may go through there, so things that have to be communicated via e-mail or text messages, so it's less likely, from a marketer's perspective, to use the text message channel.

MS. DURIE:  Okay.  Thanks.

MR. CAMPBELL:  One quick follow up.  So the gentleman with whom you had the conversation at J.P. Morgan suggesting Postscript may be a vendor, you don't know whether or not he eventually engaged Postscript as a vendor?

JUROR NO. 13:  I do not.

MR. CAMPBELL:  And is he above where you are?

JUROR NO. 13:  Yes.

MR. CAMPBELL:  Okay.  How far is he above?  Is it one, two, three?

JUROR NO. 13:  Probably two levels.  He would be managing director overseeing kind of the entire portfolio, so servicing, acquisitions, portfolio marketing.

MR. CAMPBELL:  If J.P. Morgan is a vendor -- excuse me.  If Postscript is a vendor of J.P. Morgan, would you find it difficult to assess the facts and --

JUROR NO. 13:  No.

THE COURT:  -- view them objectively, even if it would require finding favor on its behalf?

JUROR NO. 13:  I would not.

THE COURT:  Okay.  Appreciate it.  My staff will take you back.

(Juror No. 13 excused.)

THE COURT:  Okay.  Any applications for plaintiff?

MS. DURIE:  No.

THE COURT:  From defendant?

MR. CAMPBELL:  No.

THE COURT:  I agree.  There's no basis to strike the juror for cause, so Juror No. 13 will remain in the pool.

COURT CLERK:  Juror No. 14 did not have any yes answers, so we're going to do Juror No. 15.

THE COURT:  Okay.  So that brings us to ten jurors now who are still in the pool.

(Juror No. 15 enters.)

THE COURT:  Hi, ma'am.  Have a seat.

JUROR NO. 15:  Good morning, Your Honor.

THE COURT:  Good morning.  So you're Juror No. 15, which means you must be Ms. Jones.

JUROR NO. 15:  Yes.

THE COURT:  First, can I ask you what were the

numbered questions that you had a yes answer to?

JUROR NO. 15:  Just one.  The first one.

THE COURT:  None of the other ones?

JUROR NO. 15:  Correct.

THE COURT:  And the first one was about whether the schedule presents any special problems.  Why did you answer yes to that?

JUROR NO. 15:  There were two main reasons, one being a financial strain and child care.

THE COURT:  Okay.  Let's talk about the first one first.

JUROR NO. 15:  Sure.

THE COURT:  So looks like from the sheet I have says you're a victims services officer for the New Castle Police Department.

JUROR NO. 15:  I have since resigned from them and going through the process for juvenile probation.

THE COURT:  So you used to work for the New Castle County Police Department as victim services officer, since resigned, and now you're looking for another job and you are in the process of being hired by --

JUROR NO. 15:  Juvenile probation.

THE COURT:  Juvenile probation.  That's a state agency here in Delaware?

JUROR NO. 15:  Correct.

THE COURT:  Okay.  And is it that you've already got the job and you're just kind of going through the process to finalize things?

JUROR NO. 15:  Correct.

THE COURT:  All right.  When would you start working for them if you were officially hired or have you been hired?

JUROR NO. 15:  I do not have a start date as of now, so where the financial strain comes in at this present time is that I am not receiving any PTO at this time.  What I am doing for my employment is I am a small business owner.  So without the PTO, things of that nature, I have to take jobs as they come in right now because that's my sole source of income.  In the event something comes in, that would be very difficult for me to turn away because that's my only form of income at this time.

THE COURT:  What is the small business?

JUROR NO. 15:  I own Face Painting by Tyra.

THE COURT:  Face painting business.  We expect -- the jury could deliberate as long as they need, but we expect the trial will last for a week, from Monday to Friday.

JUROR NO. 15:  Understood.

THE COURT:  So if we were trying to get a sense of obviously that would mean that you couldn't do any face

painting work during the workday if you were selected?

JUROR NO. 15:  Correct.

THE COURT:  Do you have any sense of whether like -- do you know right now, well, that will cause me to looks X business that I have lined up?

JUROR NO. 15:  Correct.

THE COURT:  How much business?

JUROR NO. 15:  That's the concern.  I've been extremely busy with back to school kick-off events that are going during the week.  At this present time I do not have that, but that's how it works in my industry, things just kind of roll in and I take them as I can.

THE COURT:  So if you got a call later in the week for a job, obviously you wouldn't be able to take it.

JUROR NO. 15:  Correct.

THE COURT:  Do you think you could work around it, like could you do it in the evenings if you had to?

JUROR NO. 15:  No.  Most of my events are during the day.

THE COURT:  And you said the second piece was child care?

JUROR NO. 15:  Correct.

THE COURT:  Tell me about that.

JUROR NO. 15:  Yes.  I mean, I do appreciate I did receive the notice in adequate time to try to make those

arrangement.  However, with the time period of having to have the child care for this week potentially going into next week, because there's kind of that level of uncertainty of when this could end, my son actually starts school on Tuesday the 2nd, so I've be unable to find childcare for this entire week.  Plus I am responsible for his transportation going into next week for the school year, so --

THE COURT:  So your son is home with you?

JUROR NO. 15:  Correct.

THE COURT:  And if you had to be at trial this week, obviously you wouldn't be home, but -- how old is your son?

JUROR NO. 15:  11.

THE COURT:  So somebody needs to be with him.

JUROR NO. 15:  Yes.

THE COURT:  If you got the call that said we need you to serve, I'm just asking, not saying there is, couldn't you call somebody to say, could you stay with my son this week, et cetera?  And who do you call in those circumstances and stuff like that?

JUROR NO. 15:  Right.  Absolutely.  Like, for example, today my mother is over there right now, so I gave grandma a call to come in.  However, she is unable to fill that obligation for this week and maybe potentially have to

go into next week if that's what's needed.

THE COURT:  If she couldn't do it, which sounds like she can't, is there anybody else?

JUROR NO. 15:  No.

THE COURT:  So essentially if you got picked to serve as a juror you wouldn't be able to come because you have to stay at home with your son?

JUROR NO. 15:  Correct, yeah, the childcare is difficult.

THE COURT:  Okay.  Let me ask if there are follow up questions from the lawyers on the plaintiff's side.

MS. DURIE:  I just had one question because you were talking about going into next week.  Is your mom available this week and not the following Tuesday?

JUROR NO. 15:  She would not be able to do the entire duration of this week.  As far as next week, no, she would not be able to take him to and from school for the first day.  He's a car rider.

THE COURT:  Is there anyone else at school?

JUROR NO. 15:  Mom friend?  No.  He's starting a new school going into middle school, so I'm actually unsure kind of where the kids are at this point.

MS. DURIE:  Thank you.

THE COURT:  Defendant's counsel.

MR. CAMPBELL:  No questions.

THE COURT:  All right.  Thank you, Ms. Jones.

JUROR NO. 15:  Thank you all.

THE COURT:  Applications for plaintiff's side?

MS. DURIE:  I think she'd be a great juror, but it sounds like it's not going to work.

THE COURT:   Mr. Campbell?

MR. CAMPBELL:  We agree.

THE COURT:   I agree.  I don't think based on her answer I could keep her because I don't think she would show up each day, so Juror No. 15 is struck for cause.

COURT CLERK:  Juror No. 16 is next.

(Juror No. 16 enters.)

THE COURT:   Hi, sir.  Come on in.  Have a seat. All right.  Are you Mr. Kelso?

JUROR NO. 16:  I am.

THE COURT:   All right.  Which numbered questions did you have a yes answer to?

JUROR NO. 16:  Let's see.  Hang on a second. There's number 1.

THE COURT:  Okay.

JUROR NO. 16:  Number 6, number 12.  And that's it.

THE COURT:  Okay.  So number 1 was the question about does the schedule provide special difficulties.

JUROR NO. 16:  So I manage about 1.5 million in sales for my could annually and we have a $10 million a year company, so taking a week out of my schedule to do this is going to be detrimental to say the least.  I already had to reschedule two meetings day.

THE COURT:  And it looks you're in the landscaping business?

JUROR NO. 16:  I am.

THE COURT:  And so you manage sales.  What does that entail?

JUROR NO. 16:  Well, for instance, today I have a $50,000 job going on, complete rip out and installation of new plant material.  I also manage ongoing maintenance, which is about $950,000 a year in annual maintenance services, so I've got six crews underneath of me that are out there right now doing maintenance work.

THE COURT:  Sound like you manage folks.  It's not just sales, but you manage the work?

JUROR NO. 16:  Managing the whole thing, yeah.

THE COURT:  You're not on site, you manage that from an office?

JUROR NO. 16:  No, on site.  On site, yeah.

THE COURT:  Got it.  And so obviously almost everybody here has a job that is important to them and it's not easy for them if they got picked to serve, but what we

want to try to make sure is we know it's going to be hard for people, that people might have to make alternative arrangements.  We're trying to figure out can they do it if they were asked to serve.  Even though it's not easy, is there a way that they could have someone else either to the extent somebody is to oversee their work during the day or at nighttime, catch up on work, make calls, and make it possible to serve Monday through Friday?

JUROR NO. 16:  As far as managing the personnel, it could probably happen, but the face-to-face meetings with clients too, you know, serve in the furtherance of our business, they're my clients.  Nobody else in the company has the relationship with them.

THE COURT:  And to the extent you had meetings or would have meetings with clients this week, could you reschedule them if you needed to?

JUROR NO. 16:  Maybe.  So I work in Rehoboth Lewes area where the vast majority, I'd say about 90% of my clients are in their second home and this is the last week they're in town for the most part until Christmas, so -- it could work, but people don't like coming down from New York City just for a two-hour meeting with their landscaper, so --

THE COURT:  Okay.  All right.  And I guess the last question is, if you got picked, knowing these

difficulties that you're saying -- we've got to make sure folks would be here every day.  If you got picked, would you show up every day and be ready to work as a juror?

JUROR NO. 16:  Yeah.

THE COURT:  Okay.  Got it.  Number 6.  Question 6 that you also had a yes answer to is do you know any of the other potential jurors in the room.

JUROR NO. 16:  Yeah, Juror No. 13.  He and I worked together some years ago.  I don't know if he recognized me because I had a crew cut and no beard at that time, but I immediately looked up and when I heard his name get called and was like, oh, hey, that's Mike.  Good to see him.

THE COURT:  Where did you go work together?

JUROR NO. 16:  T.G.I. Friday's in Newark.

THE COURT:  How long ago was that?

JUROR NO. 16:  That was right before I moved down to the beach, so 14 years ago, 15 years ago.

THE COURT:  Okay.  All right.  And since that time, when you worked at T.G.I. Friday's 14 years ago, have you seen each other at all?

JUROR NO. 16:  No.  No.

THE COURT:  The big thing I think there is I'm going to tell the jurors when they deliberate that your vote is your own vote, has to be your decision.  And if you, you

know, if you agree or disagree with what somebody else has to say in the end, you have to be comfortable with your own decision. So we don't want jurors in any way because they know another juror would in some way, if the other juror thought that, you know, or course jurors can try to persuade each other. That's part of it. But we wouldn't want there to be anything about your knowledge with the other juror or prior friendship that would stop you from being able to make your own decision.

JUROR NO. 16: I'd be able to make my own decision.

THE COURT: And then number 12 is a question about have you ever been employed by a company that's been a plaintiff or a defendant in a lawsuit where you had a role in that lawsuit.

JUROR NO. 16: Yeah, I got in a pretty serious accident a couple years back with a civilian, I guess you would say. I don't know. So I got in a pretty bad accident. I was at fault. They sued the heck out of us. So yeah, I've been the defendant.

THE COURT: And was the accident something that happened through your work?

JUROR NO. 16: Yes, yes.

THE COURT: And can you just briefly tell us what happened?

JUROR NO. 16:  I was pulling to go through an intersection.  I had a stop sign.  They were coming down the highway.  There are -- they had know stop sign.  I lost sight of them or never got sight of them because of the corner post of the cab and I pulled out right in front of them and they T-boned me.

THE COURT:  So it was kind of a traffic accident?

JUROR NO. 16:  Yeah.

THE COURT:  And you were injured or were you injured at all or no?

JUROR NO. 16:  No.

THE COURT:  Okay.  And was the other person?

JUROR NO. 16:  Yeah, yeah, quite a bit, quite a bit.

THE COURT:  And how did the case resolve, do you know?

JUROR NO. 16:  We ended up settling.  Thank goodness the insurance company did their job.

THE COURT:  Okay.  I guess on that front, so you were a defendant in a case.  You know, we have one party here is the defendant and one party is the plaintiff. Again, I'm going to tell the jurors that they need to focus on the facts that they hear in the trial and on the law as I explain it to them.  We wouldn't want to have a juror who,

because they were a defendant in a prior case, somehow going into a case has a thumb on the scale in favor of the defendant or in favor of the plaintiff one way or the other.

Is there anything about your experience as being a party in this lawsuit that you think would in any way effect your ability to be fair and impartial or would you be able to put it out of your mind and focus on the case at hand?

JUROR NO. 16:  I mean, they're completely different things as far as I'm concerned, like can -- I mean, I got out of the truck and said, oh, my God, this is totally my fault, so that's one thing.  The fact that they're both corporations that are kind of duking it out, I don't give a shit -- I don't care.  I don't care.

THE COURT:  Your prior experience would not effect your decision?

JUROR NO. 16:  Prior experience about that, no. No.

THE COURT:  Okay.  Is there any other prior experience you have that would in any way effect your decision making on being a juror here other than what you hear about in this case?

JUROR NO. 16:  I mean, as far as I'm concerned all corporations are evil.  So that's my prior experience there.

THE COURT:  Okay.  And again, you know, maybe the lawyers will have additional questions, but whatever kind of preconceptions folks have going into a trial, the key for a juror is they can't let them unduly affect their ability to be fair and impartial, to look at the evidence and decide, based on that evidence and the law, who should win or loss.  Do you think some aspect about these negative opinions about corporations could affect your view of the evidence in this case?

JUROR NO. 16:  I mean, for what it's worth, at least it's two corporations going at each other.  I hope one of them loses.  All right.  I hope they're both spending a lot of money on you guys.

THE COURT:  All right.  Let me ask if the lawyers have follow up questions for you.  Plaintiff's counsel first.

MS. DURIE:  So, as you said, I represent a company.  They're the plaintiff.  I totally get it.  But do you think your views about companies would make you think sort of pocks on both your houses and they shouldn't be here and makes you just want of kind of be done and less likely to want to award money to a plaintiff that's a company in a lawsuit?

JUROR NO. 16:  Yeah, probably, yeah.  Because as far as I'm concerned they could have spent all the money

they're spending on you and taken better care of their employees.

MS. DURIE:  Got it.  So walking in you're sort have predisposition is going to be let's not give companies more money?

JUROR NO. 16:  Yeah, yeah.

MS. DURIE:  Thank you.  I appreciate the candor. Thanks.

MR. CAMPBELL:  The flip side of that is one company has to pay.  Does that influence your, you know, sort of partiality at all if you have to reach into another pocket and hand it to another knowing that's the case? You're not giving money to another company, you're taking money from one to give it to another, so given that, do you think you could be impartial?

JUROR NO. 16:  Both corporations, they should both be paying their employees better instead of spending money on you guys.

MR. CAMPBELL:  Thank you, Judge.

THE COURT:  All right.  Thank you, sir. Appreciate your candor.

JUROR NO. 16:  You got it.

THE COURT:  My staff will take you back.

(Juror excused.)

THE COURT:  All right.  Applications from

plaintiff?

MS. DURIE:  I have a challenge for cause based on that last set of responses.

THE COURT:  All right.  Defendant?

MR. CAMPBELL:  He seems somewhat volatile, Judge.

THE COURT:  I agree that I'm not sure whether any of the prior subject matter until we got to the "all corporations are evil" subject matter would in and of itself have been exclusionary.  But I agree that the nature of those answers and the way he gave them it would provide, I think, anybody with real question about whether this juror could follow the facts as opposed to being swayed by stuff that shouldn't be a part of the decision making process, so we'll strike Juror No. 16 for cause from the pool.

COURT CLERK:  Juror No. 17.

(Juror No. 17 enters.)

THE COURT:  Hi, sir.  Come on in.  Have a seat. So you're number 17?

JUROR NO. 17:  Yes.

THE COURT:  Is it Mr. Machulski?

JUROR NO. 17:  Yes.

THE COURT:  First question is what numbered questions did you have a yes answer to?

JUROR NO. 17:  Number 1.

THE COURT:  Is that the only one?

JUROR NO. 17:  Yes.

THE COURT:  Tell me why you answered yes to that question.

JUROR NO. 17:  I have a medical condition where I don't if I would be able to sit the time allotted in the courtroom.

THE COURT:  Okay.  Now, I would have to ask.  I hope you don't find it to be intrusive.  So can you tell me a little bit more about that?

JUROR NO. 17:  I have ulcerative colitis, frequent bathroom use.

THE COURT:  Okay.  And so the schedule that we would typically have here is we would get started say at 9 in the morning and probably go to about 10:30 or 11.  The jurors would typically be sitting, we'd have a break for about 15 minutes or so, 20 minutes, and then about the same period and then an hour for lunch.  Lunch break would be a half hour or more and same schedule in the afternoon.  Typically this involve jurors sitting about an hour and a half to two hours at different stretches.  We say to jurors if you need to, if you need to stand up for a period of time, stretch your legs, or be able just to stand in the jury box, et cetera, that's no problem.  You know, the question would be if the person's condition was such that,

well, it's not that, it's I have to take lots of breaks and I have to leave the courtroom for multiple times during the day, et cetera.  Well, that would start to get to a person cannot serve.  How do you think your ulcerative colitis would effect your ability to sit on a jury?

JUROR NO. 17:  Hard to say because it's actually impacted by stress and anxiety.

THE COURT:  Okay.  But what's an example, like in a typical day, if this acted up, what would you have to do?

JUROR NO. 17:  Just have --

THE COURT:  Leave --

JUROR NO. 17:  Yeah.

THE COURT:  -- to use the restroom?

JUROR NO. 17:  Yeah.

THE COURT:  Got it.  And in your experience, how likely is it that in a five-day period this would happen?  I'm sorry for the questions.  You understand why I'm asking.

JUROR NO. 17:  Yeah.  It's pretty likely.

THE COURT:  How long would you have to take breaks for if it happened?

JUROR NO. 17:  15, 20 minutes.

THE COURT:  Okay.  And I guess there, like, for example, if it was possible or likely that maybe one day in the trial, you know, there might be an unexpected time where

we weren't taking a break you needed to take a break for 15, 20 minutes we could accommodate.  If it was the kind of thing that likely might crop up multiple times a day and multiple days, that would be hard to do or impossible to do. Is it more the latter?

JUROR NO. 17:  The latter.

THE COURT:  Let me ask if the plaintiff's counsel has any questions.

MS. DURIE:  I don't have any questions.

THE COURT:   Defendants?

MR. CAMPBELL:  No questions.

THE COURT:   All right.  Thank you.

(Juror excused.)

THE COURT:   All right. Applications for cause from plaintiff?

MS. DURIE:  I think it's a close question.  It's a little bit hard for me to tell kind of how likely this really is to be a problem as opposed to isolated incidents. I defer to your Honor.  I don't have an application, but I think it's a close call.

MR. CAMPBELL:  Sounds like it's going to be a problem, Judge, particularly with the stress.  This can be a stressful environment for someone.  I can defer to Your Honor, but I tend to lean -- we tend to lean on letting him go.

COURT CLERK:  Judge, could I interject?  He did -- he was one of the jurors who brought in a doctor's note this morning.

THE COURT:  Okay.  Ms. Miller is noting that two jurors brought in doctor's notes.  I've also been told by our jury administrator that the nature of our notes were such that if the jurors had sent them in in advance they likely would have been excused from coming, but since these jurors just brought it with them it wasn't the case.  In light of that, and because it does sound like Mr. Machulski thinks it's likely that at multiple unexpected times he'd have to retreat from the courtroom, I don't see how he could serve, so I'm going to excuse him for cause.  So Juror No. 17 is excused for cause.

COURT CLERK:  Juror No. 20 is next.

THE COURT:  Okay.  So neither Juror No. 18 or 19 had any yes answers?

COURT CLERK:  Correct.

THE COURT:  All right.  So that brings us to 12 prospective jurors that are still in the pool.

(Juror No. 20 enters.)

THE COURT:  Hi.  Have a seat.

JUROR NO. 10:  Thank you.

THE COURT:  So are you Juror No. 20?

JUROR NO. 20:  Yes.

THE COURT:  And that means you are Ms. -- is it Drendall?

JUROR NO. 20:  Drendall.

THE COURT:  Okay.

JUROR NO. 20:  Thank you.

THE COURT:  Tell me what numbered questions did you have a yes answer to.

JUROR NO. 20:  It was 15.

THE COURT:  15.  Is that the only one?

JUROR NO. 20:  Yes.

THE COURT:  Okay.  So let's see.  Question 15 was the one about do you or somebody that you're close to have any education or special training or special knowledge or experience in either computer science or marketing technology.  Why did you answer yes to that?

JUROR NO. 20:  My husband has a certification in something computer science related.  I'm not 100% certain what that is.  But he works in a small business and he does their marketing e-mails and flyers.

THE COURT:  Okay.  So and so your husband works -- did you say he works for a small business?

JUROR NO. 20:  Yes.

THE COURT:  And he does marketing-related work for them?

JUROR NO. 20:  Yes.

THE COURT:  Including with flyers?

JUROR NO. 20:  Uh-huh.

THE COURT:  But he also has a certification in computer science?

JUROR NO. 20:  Something along those lines, yes.

THE COURT:  So maybe something he got not in school but as part of a training program?

JUROR NO. 20:  Yes, a training program, I think.

THE COURT:  Okay.  And it sounds like, but tell me if I'm wrong, you may not necessarily know exactly what about computer science this certification was about?

JUROR NO. 20:  I'm not 100% certain on the details of that.

THE COURT:  Okay.  And do you ever have conversations with him about what kind of marketing work he does at the company?

JUROR NO. 20:  Mostly it's just him having to correct something, like that's the kind of discussions we have where his boss needs him to change something.  Nothing like technical details along those lines.

THE COURT:  Okay.  This case is going to involve e-mail marketing, marketing ways to e-mails and related technology.  Does your husband work in e-mail or marketing type work?

JUROR NO. 20:  I know he'll send out e-mail

newsletters.  I don't know if that counts as marketing.

THE COURT:  Okay.  And do you know anything else about the nature of his work as it relates to e-mail?  Or also what could be relevant here is text messages.  Do you know if he works in text messaging?

JUROR NO. 20:  He does not.

THE COURT:  Okay.  Now, one of the instructions I'll give you is that even for folks of spouses who might work in some way in a related field, you can't talk to anybody, including your spouse, about your thoughts about the facts of the case as you learn them through the week.  You got to keep it to yourself and only at the end of the week when you're allowed to deliberate with the jury can you start talking to other people and only to them.  Do you think you'd have any problem adhering to that?

JUROR NO. 20:  No.

THE COURT:  Let me ask if any of the lawyers have questions for you.  On plaintiff's side?

MS. DURIE:  I don't.

THE COURT:  And on defendant's side?

MR. CAMPBELL:  No questions.

THE COURT:  All right.  Thank you.  My staff will show you back.

(Juror excused.)

THE COURT:  Okay.  So let me just ask if

there's any application or cause for plaintiff?

MS. DURIE:  No.

THE COURT:  And for defendant?

MR. CAMPBELL:  No.

THE COURT:  I agree there's no basis to strike for cause.  I may have misspoken.  Let me tell you what I have so far, make sure we are all on the same page.  These are the people that I think are still in the pool.  Juror No. 1, Juror No. 2, Juror No. 3, Juror No. 6.

MS. DURIE:  5.

THE COURT:  Oh, I missed five.  So 1, 2, 3, 5, 6, 7 and 8.  Okay.  So on the first page we've got 3, 4, 5, 6, 7 total from the first page.  Then on page 2, jurors 12, 13, 14 and 18.  So that's four more, so 11 as of the end of page 2.  Juror 19 also still in the pool.  That was 12.  Okay.  So I didn't misspeak.  And now Juror 20 is still in the pool.  So that is 13 that are still in the pool.  So we need one more prospective juror.

COURT CLERK:  Juror 21 does not have any yes answers.

THE COURT:  Okay.  So the 14 people who are not struck for cause and are still in the pool are again, Juror 1, Juror 2, Juror 3, Juror 5, Juror 6, Juror 7, Juror 8, Juror 12, Juror 13, Juror 14, Juror 18, Juror 19, Juror 20, and Juror 21.

Okay.  Any issue with those?  Okay.  All right. So as I said, we'll proceed.  As I said, we'll give you all a chance -- would you guys like to have just five minutes to talk amongst yourselves?

MS. DURIE:  We would really appreciate that.

THE COURT:  Okay.  So why don't we have the plaintiff's side stay in here.  Defendant's side, Mr. Flynn, I'll show you to my conference room and then we'll finish with the voir dire process.

Okay.  Thanks.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Please be seated, everybody.

Okay.  Ladies and gentlemen, thanks for your patience.  We're on schedule, so I would say we're in the home stretch here, but we have a little more work to do just to finish up the selection of our jurors for trial.

And so I'm going to turn it over to my courtroom deputy, Ms. Miller, to announce the numbers of folks who are going to be brought up and seated in our jury box.

COURT CLERK:  When I call your juror number, please come forward.  Juror No. 1, Juror No. 2, Juror No. 3, Juror No. 5, Juror No. 6, Juror No. 7, Juror No. 8, Juror No. 12, Juror No. 13, Juror No. 14, Juror No. 18, Juror No.

19, Juror No. 20, and Juror No. 21.

THE COURT: All right. So now we're going to have a process by which each side can exercise a limited number of peremptory challenges to prospective jurors that could serve on the jury. The courtroom deputy is going to help the parties with that process. This may take a few minutes, so just be patient. Thank you.

COURT CLERK: When I call your juror number you can head back into the gallery.

Juror No. 1, Juror No. 2, Juror No. 5, Juror No. 8, Juror No. 14, and Juror No. 18.

So now we're going to do some musical chairs. We're going to have you move down. And then Juror No. 5, I'm going to have you sit in last seat right here. Juror No. 12, I'm going to have you sit in this fourth seat here and I'm going to have you move down as well. 13, you're going to go right there. I should have explained it better. Thank you.

THE COURT: All right. Thank you. All right. With our eight jurors now selected and seated in their seats that they'll occupy for the jury service, I'm going to ask my courtroom deputy to swear in our jury for this trial.

COURT CLERK: Please rise and raise your right-hand.

(Jury sworn.)

THE COURT:  Please be seated.  Thank you. Thanks you for your services as jurors.

With our jury selected and sworn, that means that our main prospective jurors who were not selected before, I excuse you on behalf of both sides in the case and on behalf of our court.  Just as I thanked our jurors for their service, I want to thank all of you for being here today and being a part of this process because it could not have happened without all of you being here.

With that said, I will excuse all of the prospective jurors in the back who were not selected with the Court's thanks and I'll ask our CSO to help make sure they leave the courtroom.  Thank you.

All right.  Thank you.  So ladies and gentlemen of the jury, you should have with you two things; one, something called Preliminary Jury Instructions, and then a binder, looks like this, as well as juror notebooks.  So just to let you know what's going to happen now.  In a moment I'm going to read you these Preliminary Jury Instructions which are some initial instructions that are good for you to have before the trial starts.  And I'll be referencing this binder.  It's the juror notebook binder. This is going to take about, I would guess about 20 minutes or so, and then what we're going to do is break for lunch. And also Ms. Miller, who is my courtroom deputy, she's just

a great resource for you and she'll also be there to answer any logistical questions you have both today and throughout the trial and make sure you're good to go.  So you'll have time to do as well.  And then after lunch, after I maybe talk to the lawyers about some things to make sure we're ready to go this afternoon, we'll begin our trial.

Okay.  All right.  So first let me review these preliminary jury instructions with you.  And you all, again, have a copy so you can follow along if you wish.

So members of the jury, now that you've be sworn in, I have the following preliminary instructions for your guidance as jurors in this case.  These instructions are intended to introduce you to the case and the law that you will apply to the evidence that you will hear.  I'll give you more detailed instructions on the law at the end of the trial.  Also, because this is a patent trial, I'll give you some additional preliminary instructions regarding patents to assist you in discharging your duties as jurors.

You'll hear the evidence, decide what the facts are and then apply those facts to the law that I will give to you.  You and you alone will be the judges of the facts.  You will have to decide what happened.  I play no part in judging the facts.  My role is to be the judge of the law. I make whatever legal decisions have to be made during the course of the trial and I'll explain to you the legal

principles that must guide you in your decisions. You're bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them. All the instructions are important and you should consider them together as a whole. You must follow that law, whether you agree with it or not.

Perform these duties fairly. Don't let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way. Nothing that I may say or do is intended to indicate or should be taken by you as indicating what your verdict should be.

Evidence. I'll now give you an overview of who the parties are and what each contends.

So this is a patent case. The plaintiff is Stodge Inc., d/b/a Postscript, which I'll refer to as Postscript or plaintiff. The defendant is Attentive Mobile, Inc., which I'll refer to as Attentive or defendant. Postscript owns United States Patent No. 11,709,660, which refer to as the '660 Patent or the Postscript asserted patent. A copy of the Postscript asserted patent will be given to you.

Postscript contends that Attentive infringes Claims 4, 6, 10, and 14 of the Postscript asserted patent by making, using, selling, and offering for sale its Campaign

Composer, formally known as Magic Composer, feature in the United States. These claims may be referred to as the Postscript asserted claims. Postscript seeks damages for the infringement.

Attentive denies that it infringes any of the Postscript asserted claims and contends that the Postscript asserted claims are invalid.

At this time we're going to show a video prepared by the Federal Judicial Center called the "Patent Process: An Overview for Jurors." You're being provided a copy of the sample patent referenced in the video. And just so you know, in these juror notebooks you have you'll see a couple things in there which I'll talk about at the end of these instructions. One of these is the sample patent. This sample patent doesn't have anything to do with this case, it's just being used in the video by way of example. And also Postscript's asserted patent, the '660 Patent that will be at issue in this case.

All right. So at the conclusion of this video which is just going to run for approximately 17 minutes, I'll provide you with a few additional instructions.

So let's have our video played.

(Patent video played as follows.)

JUDGE FOGEL: Hello. I'm Jeremy Fogel. I've been a United States District Judge since 1998, and I'm now

the Director of the Federal Judicial Center.

As you probably know by now, this is a patent case, so you may be wondering, how can I sit in judgment on a case like this when I'm not entirely sure what a patent is?  We hope to answer that concern with this brief video, which will give you some of the background needed to do your job.

This case will involve some special issues that the Judge and lawyers will explain to you, but all patent cases involve some basics that you will learn about.

This video will discuss what patents are, why we have them, how people get them, and why there are disputes that require us to call in a jury like you.  We'll also show you what patents look like.

The United States Constitution gives Congress the power to pass laws relating to patents.  Article 1, Section 8, Clause 8 allows Congress to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

A patent, then, is an official grant by the United States Government that gives its owners certain rights to an invention.  Those include the right to stop others from making, using, selling, or offering for sale the invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor.  But because it takes an average of three years for the Patent and Trademark Office to act on the application, the effective life of a patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor.  In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge, or what we sometimes call the state of the art, by adding something new and useful to it.

A famous example is Thomas Edison's invention of a light bulb.  Harnessing electrical power for illumination transformed society and led to many other important break-throughs.  During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use.  It is this combination of something new and valuable to the public that justifies granting time-limited patent protection to the inventor.

A patent is in many ways like a deed to a piece of property.  It grants the owner the right to keep people off the property or to charge them a fee, like rent, for using it.  And just as a deed indicates boundaries defining

the landowner's property, a patent claim defines the patentee's domain.

The patent system works because the inventor is required to describe the invention in clear and specific terms so that the public knows what the boundaries of the invention are.  Once a patent is issued by the government, it becomes available for public inspection.  And that way, anyone who learns of a patent can read it and understand exactly what the inventor invented and the limits of the patent set forth in the claims.

Now that we understand what a patent is, let's take a closer look at term "invention."  An invention is a new way of solving a problem for a useful new machine, manufacture, or composition of matter.

The patent process begins in the mind of the inventor and, in particular, when the invention is formulated in the mind of the inventor.  Patent lawyers call this "conception."  This is when the idea occurs to the inventor clearly enough that he or she can write it down and explain it to someone.

To qualify for a patent, the invention needs to be new and useful.  Also, it must not be obvious to one of ordinary skill in the field.  If the inventor believes these requirements are met, he or she will prepare an application for filing with the Patent and Trademark Office, whose

headquarters are in Alexandria, Virginia, just outside of Washington, D.C.

The Patent and Trademark Office, often called the PTO, is the agency of the federal government whose job it is to examine patent applications to make sure they were in proper form and comply with the requirements of the law.

The inventor can prepare an application for filing with the PTO, but usually it is drafted by a patent attorney or a patent agent who specializes in what is called prosecuting patent applications. That is, the process by which they are evaluated.

The attorney or agent works with the inventor to be sure the invention is described and claimed in a way that complies with the law and the regulations of the PTO. Ninety-eight percent of patent applications are made online using the PTO's electronic filing system, although a few paper applications are still made.

When the PTO receives the inventor's application, it is first checked to see if it is complete and complies with all the PTO's application requirements. It then assigns the submission to a Patent Examiner, a staff person with a background in the field or art the invention falls within to evaluate the application and decide whether a patent can be granted.

You've been given a sample patent to refer to as you watch this video, so you already have a sense of what a patent looks like, but now let's take a closer look at the three main parts of a patent.

To begin with, there are some basic identifying information on the first page.  This material is highlighted in your handout.  On the upper right side of the page is the number assigned to the patent by the PTO and on the left side is a title that describes the invention and the names of the inventors and sometimes the company to whom they've assigned the patent.  Also on the left is the date when the patent application was filed, and back on the right, the date when the patent was issued.

There also is more detailed information on the first page, including a list of numbers following the caption "Field of Search."  These numbers identify previously issued patents the Examiner looked at or searched to make sure the applicant's claimed invention really is something new, not obvious, and thus patentable.

Also listed on the first page is what we call references.  That is, previous patents or articles that describe the technology or prior art known at the time the application was filed.  It may seem strange to you that we call this pre-existing technology prior art even though it has nothing to do with artists.

We use the word "art" in its historical sense to include inventions and other subject matter reasonably related to the claimed invention.  We also refer to the latest technology as state of the art, and we say of someone who can understand and apply the technology that he or she is skilled in the art.

The second major part of the patent is what we call the specification or written description.  As is the case in your sample, it is usually the longest part of the patent.  It includes an abstract, which is a brief summary of the invention.  A background section describes the nature of the problem the invention is supposed to solve.  One or more drawings, called figures, that illustrate various aspects of the application, and a detailed description of one or more embodiments of the invention.

An embodiment is a specific device or method that uses the invention, such as a particular form of light bulb.

The third and most important part of the patent is the claims.  These are the numbered paragraphs that appear at the end.  The claims are what give the public notice of the boundaries of the invention.  They're similar to the description of property you may have seen in a deed, referring to precise measurements taken on the ground.

The Judge will instruct you further on how any

technical or ambiguous terms in the patent claims should be understood.

Now that we've discussed the main parts of a patent, let's look at how the PTO processes patent applications, what we referred to earlier as prosecution of the patent application. This process begins when the inventor's application arrives at the PTO. There, it receives a filing date. Under the American Invents Act of 2011, filing dates will determine who is awarded the patent if there are competing valid applications.

In 2012, the PTO received nearly 600,000 patent applications and issued more than 270,000 patents.

After determining that the application is complete, the receiving branch also decides what field of technology an application relates to and assigns it to the appropriate examining group. In order to make that decision, the Patent Examiner usually looks at patents that have been issued previously in the same or closely related fields of art. The Examiner has computer databases that contain information used to accomplish this task.

Another part of the job is to decide if the inventor's description of the invention is complete and clear enough to meet the requirements for a patent, including the requirement that the description enables someone of ordinary skill in the field to actually make and

use it.

However, because the job of examining so many applications is challenging, the law requires the applicant to tell the Examiner whatever he or she knows about the prior art that might be important to the Examiner's decision on whether to allow the patent.  We call this the applicant's duty of candor.

One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the Examiner, either in the original application, or in other submissions called Information Disclosure Statements.  In this way, the decisions of the Examiner are based on both the information provided by the applicant and on the information the Examiner finds during his or her prior art search.

Sometimes the Examiner concludes that the application meets all the requirements we've discussed and allows the patent to issue at this first stage, but more frequently the Examiner will reject the application as deficient in some respect.  This decision will be communicated by the Examiner in what is called an Office Action, which is a preliminary notice to the applicant of what the Examiner finds insufficient or unpatentable.  For example, the Examiner may reject certain claims as being unpatentable because a journal article written and published

by another person prior to the effective filing date of the patent application disclosed what the applicant was currently claiming. At that point, the applicant prepares a written response, either agreeing or disagreeing with the Examiner.

An applicant who agrees with the Examiner can suggest amendments to the application designed to overcome the Examiner's rejection. Alternatively, an applicant who disagrees with the Examiner's Office Action can explain the reasons for the disagreement.

This exchange of Office Actions and responses goes on until the Examiner issues a Final Office Action, which may reject or allow some or all of the applicant's claims. The overall process is referred to as the prosecution history of the application.

The written incoming and outgoing correspondence between the PTO Examiner and the applicant is also called the file wrapper. In the past, these file wrappers were all in paper form as were the submitted applications. Now they are most often electronic and may occasionally be paper as well.

Most patent applications filed on or after November 29th, 2000 are published by the PTO 18 months after the inventor has filed his or her application so that the public may inspect it.

Once a final PTO Office Action has occurred and one or more claims have been allowed, the applicant is required to pay an issuance fee and the patent is printed. Then, on the date shown on the upper right-hand corner, the first page of the patent, it is issued by the PTO and the inventor receives all the rights of the patent. That date is highlighted on your sample.

Once a patent has issued, the inventor or the person or company the inventor has assigned a patent to can enforce the patent against anyone who uses the invention without permission. We call such unlawful use infringement, but the PTO and its Examiners have no jurisdiction over questions relating to infringement of patents. If there is a dispute about infringement, it is brought to the Court to decide.

Sometimes in a court case you are also asked to decide about validity. That is whether the patent should have been allowed at all by the PTO. A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art or whether other requirements of patentability have been met. In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked to consider such things when the patent has already been

reviewed by a Government Examiner.  There are several reasons for this.

First, there may be facts or arguments that the Examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.  In addition, there is of course the possibility that mistakes were made or important information overlooked.  Examiners have a lot of work to do and no process is perfect.

Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case.  The Judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent.

So it is your primary duty as jurors to resolve any factual disputes and in some cases, such as infringement and validity, to apply the law to those facts.  To prove infringement, the patentholder must persuade you by what is called a preponderance of the evidence relating to the facts of the case that the patent has been infringed.

To prove invalidity, the alleged infringer must

persuade you by what is called clear and convincing evidence that the patent is invalid.

The Judge in your case will explain these and other terms and provide additional specific instructions at the appropriate time.

Good luck with your task, and thank you for your service.

(End of video.)

All right.  Thank you.

All right.  So ladies and gentlemen, I have just a few more instructions that I want to read to you.  We're beginning again on page 5, the section 5 is the role of the claims section.

Now, the claims of a patent define the patent owner's rights under the law.  That is the claims define what the patent owners may exclude others from doing during the term of the patent.  The claims may be divided into a number of parts or steps, referred to as claim limitations. The claims in the patent serve two purposes.  First, they set the boundaries of the patented invention, what the patent covers.  And second, they provide notice to the public of what those boundaries are.  It is the claims of the patent that are infringed when patent infringement occurs.  The claims are at issue as well when the validity of a patent is challenged.

Now, in any legal action, facts must be proven by a required standard of evidence known as the burden of proof. In a patent case such as this, two different burdens of proof are used. The first is called preponderance of the evidence. The second is called clear and convincing evidence.

Now, Postscript contends that Attentive infringes the Postscript asserted patent. A party asserting patent infringement has the burden of proving infringement by a preponderance of the evidence. A preponderance of the evidence is evidence that, when considered in light of all the facts, leads you to believe that what that party claims is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of the scale, the evidence supporting infringement must make the scales tip somewhat toward the asserting parties' side. As.

I noted earlier, in addition to denying infringement, Attentive contends that the Postscript asserted patent is invalid. A party challenging validity of a patent has the burden of proving by clear and convincing evidence that the patent is invalid. Clear and convincing evidence means that it is highly probable that the facts sought to be proved by the evidence is true. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

Some of you may have heard the phrase proof beyond a reasonable doubt.  That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one.  You should therefore not consider it in this case.  You must make your decision based only on the evidence that you see and hear in the courtroom.

Don't let rumors or suspicions or anything else you have seen outside of court influence your decision in any way.  The evidence in this case includes only what the witnesses say while they are testifying under oath, including deposition testimony that will be replayed or read to you, the exhibits that I allow into evidence, and any facts that the parties agree to by stipulation.  Nothing else is evidence.

The following things are not evidence: Statements, arguments, questions, and objections by the lawyers, any testimony that I tell you to disregard, and anything you may see or hear about this case outside the courtroom.

During trial you'll be shown charts and animations to help illustrate the testimony of the witnesses.  These illustrative exhibits, sometimes called demonstrative exhibits, are not admitted into evidence and should not be considered as evidence.  My legal rulings are not evidence.  None of my comments or questions are

evidence.

Now, during the trial I may not let you hear the answers to some of the questions that the lawyers ask.  I also might rule that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may order you to disregard things that you saw or heard.  You must completely ignore all these things.  Do not speculate about what a witness might say or what an exhibit might show.  These things are not evidence, and you're bound by your oath not to let them influence your decision in any way.

Do not consider my rulings on whether you could hear certain testimony or see certain exhibits as any indication of my opinion of the case or of what your verdict should be.

There are two kinds of evidence; direct and circumstantial.

Direct evidence is direct proof of a fact such as the testimony of an eyewitness.  For example, if a witness testified that she saw it raining outside, that would be direct evidence that it was raining.

Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  For example, if somebody walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet

umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct or circumstantial evidence, but simply requires that you find facts from all the evidence in the case, both direct and circumstantial, and give it whatever weight you believe it deserves.

You are the sole judges of each witness's credibility. Credibility means whether a witness is worthy of belief. You may believe everything a witness says or only part of it or none. You should consider each witness's means of knowledge, strength of memory, opportunity to observe, how reasonable or unreasonable the testimony is, whether its consistent or inconsistent, its been contradicted, the witness's biases, prejudices, or interests, the witness's manor or demeanor on the witness stand, and all circumstances that, according to the evidence, could effect the credibility of the testimony.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What's more important is how believable the witnesses were and how much weight you think their testimony deserves. You may determine how much of any witness's testimony to accept or reject and choose to reject some parts of the witness's testimony while accepting other

parts.

You may hear witnesses testify through deposition testimony.  A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath and swears to tell the truth.  And then lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.  The deposition may also be recorded on videotape.  Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present in court to testify.

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person, but has been acquired by the expert through special study or experience.  When knowledge of technical subject matter may be helpful to the jury, an expert is permitted to state an opinion on those technical matters.  In weighing expert testimony you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I've previously mentioned for weighing testimony of any other witness.

Expert testimony should receive whatever weight

and credit you think appropriate given all the other evidence in the case.  You're free to accept or reject the testimony of experts just as with any other witness.

Now, in this case you must decide things according to the instructions I will give you at the end of the trial.  Those instructions will repeat this summary and provide more detail.

You must decide, first, whether Postscript has proven by a preponderance of the evidence that Attentive has infringed one or more of the Postscript asserted claims.  Second, whether Attentive has proven, by clear and convincing evidence, that one or more of the Postscript asserted claims is invalid.  And third, if you decide that Postscript has proven that Attentive infringed a claim that is not shown to be invalid, what monetary damages Postscript has proven by a preponderance of the evidence that it is entitled to.

Now, a few words about conduct as jurors.  First, during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you've retired to the jury room at the end of the case to deliberate on your verdict you simply are not to talk about this case, not even amongst yourselves and not with family and friends.  If any lawyer, party or witness does not speak to you when you pass in the hall or ride the elevator or the

like, remember it's because they're not supposed to talk with you, nor you with them.  In this way any unwarranted and unnecessary suspicion about your fairness can be avoided.  If anyone should try to talk to you about this case, including a fellow juror, bring it to the Court's attention promptly.

Second, don't read or listen to anything touching on or relating to this case that is not admitted into evidence.  By that I mean, if there may be a newspaper article or radio or television report related to this case, do not read the article or watch or listen to the report.

Third, do not try to do any research or make any investigation about the case on your own.  Let me elaborate. During the course of the trial you must not conduct any independent research about the case, the matters in the case, and the individuals or entities involved in the case. In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs or any other electronic means.  It's important that you decide this case based solely on the evidence presented in the courtroom.  Please do not try to find out any other information from any other sources.  I know many of you use cell phones, smartphones, tablets or other electronic devices, notebooks, laptops, and other computers.  You must not talk to anyone at any time about this case or otherwise

use these or other electronic devices to communicate with anyone about the case, or, as I noted, to get information about the case, the parties, or any of the witnesses or lawyers involved in the case.  This includes your family and friends.  You may not communicate with anyone about the case our cell phone, through e-mail, text messages, Facebook, Snapchat, Instagram, Twitter, now known as X, or through any blog or website.  You may not use any similar technology or social media to get information about this case even if I have not specifically mentioned it here.

Finally, don't form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.  After you retire to deliberate, you may begin to discuss the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at its end.

To assist in your deliberations, as I noted before, you've been provided with a notebook that includes the following: A glossary of patent terms.  That's the first tab.  The sample patent mentioned in that video that we just saw.  That's the second tab.  A copy of the Postscript asserted patent.  That's the third tab.  Then there's a space for notes pages for that.  These materials have been jointly submitted by the parties and you should please refer

to these materials to assist you during the trial.

As I mentioned, you'll be given a notepad and a pen and if you wish you may take notes during the presentation of evidence, the summations of the attorneys at the conclusion of the evidence, and during my instructions to you on the law. Your notes are for your own personal use and are valuable if at all only as a way to refresh your memory. They are not to be read or given to anyone else, including your fellow jurors. Your notes are not to be used in place of the evidence.

The court reporter will transcribe the trial testimony, but you should not assume that the transcripts will be available for you for your review during your deliberations. Instead, as you listen to the testimony, keep in mind that you'll be relying on your memory when it comes time to deliberate and to render your verdict in this case.

If you do take notes, don't take them away from the court. At the end of each day leave your notes in the jury room. At the conclusion of the case, after you've reached a verdict, your notes will be collected and destroyed without review.

During the trial it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference which is also called a sidebar. If that happens,

please be patient.  We're not trying to keep important information from you.  These conferences are necessary for me to fulfill my responsibility to be sure that evidence is presented to you correctly under the law.  We will, of course, do what we can to keep the number and length of these conferences to a minimum.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.  If you'd like to stand or stretch or walk around the jury box while we're at sidebar, you should feel free to do so.

It says the trial will now begin, but as I mentioned, that's not true, because after I finish reading these we're going to take a break for lunch.  But trial begins soon.

But when it does begin, first, each side may make an opening statement outlining its case.  Opening statements are not evidence, they're only purpose is to help you understand what the evidence will be.

Next, the parties will present their evidence. For example, Postscript will present its case and evidence through witnesses, and counsel for Attentive may cross examine those witnesses.  Postscript will also present its evidence regarding the damages that it believes are warranted if you find that the Postscript asserted patent is infringed and not invalid.  Attentive will then have the

opportunity to present its response to Postscript's case.

After all the evidence has been presented, I'll give you instructions on the law and describe for you the matters you must resolve.

The lawyers will then offer closing arguments. The closing arguments are not evidence. Their purpose is to summarize and interpret the evidence for you and to tie the evidence to their story.

You'll then retire to the jury room to deliberate on your verdict.

You've heard me say this during the jury selection process. I want to again just outline the schedule I expect to maintain during the course of this trial.

As I mentioned previously, the presentation of evidence in this case is expected to be completed by Thursday or Friday of this week. The jury deliberations to follow. We'll normally begin the day at 9:00 a.m. They'll be at least one break every morning and at least one break every afternoon. There will also be a lunch break each day. And every day other than today we'll be able to order lunch for you. We do, in fact, have lunch for you. You'll be able to place your orders in the future.

The dates and times for our trial days will be as follows: Monday, August 25th. That's day 9:30 a.m. to 5

p.m.; Tuesday, August 26th, 9 a.m. to 5 p.m.; Wednesday, August 27th, 9 a.m. to 5 p.m.; Thursday, August 28th, 9 a.m. to 5 p.m.; and Friday, August 29th when the case is submitted to you for your deliberations.  At that point you'll be permitted to deliberate as late as you wish.

Please keep in mind that this is a timed trial. That means that I've allocated each party a maximum number of hours in which to present all portions of its case.  This allows me to assure you that we expect to be completed with the presentation of evidence by Friday, August 29th, at the latest.  Of course you can help me keep on schedule by being here promptly each morning and being ready to proceed at the end of each break.

One final word.  I told you when I intended to take breaks and how often I aim to take breaks, but if any of you need to take an additional break at any time, that's fine.  You just need to get my attention or my courtroom deputy's attention by waving or raising a hand or if need be standing.  So if you need a break for any reason at other times, please just get our attention.

Okay.  So ladies and gentlemen, it's just before 12:45.  You're probably hungry, so we have lunch here for you.  We're going to take a break now for lunch.  My courtroom deputy, in a moment, will escort you out, get you set up in and around the jury room and answer any questions

you have logistically and after lunch and after perhaps I may have to talk to the lawyers about some issues to make sure we're squared away to get things ready to go, at some point we'll start the trial this afternoon.

With all that said, let me ask my courtroom deputy to escort the jury out of the courtroom.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.  Let me tell you logistically what I'm thinking about in terms of our next stretch.  In just a second I'll ask you if you have anything to tell me about what's anticipated in terms of when we come back in terms of the parties' remaining disputes that have to be addressed before opening statements can begin or any agreements the parties have reached in the interval while we were doing jury selection.  After I get a sense from you briefly about what the state of affairs is there, what I can expect, generally we'll take a 30-minute lunch break so you all can get something to eat and stretch your legs and potentially prepare for what's coming next.  And then if need be, after that break is over, I come back on the bench.  If there are disputes that are unresolved that you think I need to resolve prior to the trial beginning, I'll address them and resolve them.  Time will be charged either to the losing side or to both sides at my

discretion for any of those disputes.

Let me also say one other thing to correct the record from something I addressed this morning with the parties.  One of the things we discussed this morning was the Court's construction of what we called the "monitoring" limitation and relatedly whether or not there was a further dispute between the parties about the term "trigger condition."  And when I was addressing that issue, including with Postscript, I suggested a couple times that the full limitation that I used in my claim construction, which just for the record begins with the word "monitoring" and ends with the word "subscribers," I suggested at least in two points that Postscript had asked me to construe that entire limitation, and so in using that full limitation as part of the process of providing my claim construction that I was acceding to their request.  I took a look back at the briefs and I think that's not correct.  So here's what I think did happen.  Unfortunately this happens a lot when claim construction issues are raised for the first time during summary judgement briefing.  The parties, both sides, don't often use the type of process that we do use during Markman to have really well set out what are the terms that each side proposes to be construed and what are their proposed constructions for those exact terms.  We usually use boxes in our claim construction briefs for that purpose, which

both sides set that out, and then they put what they believe the words that the other side believes are part of the terms to be construed, the words are too short or too long or whatever.  They address that.  And of course the side's dispute the actual constructions.  None of that happened here.  It was in the context summary judgement briefing, instead, as unfortunately what often happens is the parties addressed claim construction, just kind of did it organically in the text.  I think what happen was the full term, I think at one point Attentive, in its opening brief, called that the monitoring limitation and then it went on to address the dispute, but I think really a dispute about "monitoring."  And then Postscript's briefing, Postscript also addressed essentially that dispute about "monitoring," at times to the extent it never said the monitoring limitation as Attentive proposed it shouldn't construe all of that, but in talking about the issue it focused on the words "monitoring" or "monitoring the trigger condition."  Just wanted to put that on the record to say if I misspoke earlier, I apologize.

With all that said, anything each side wants to tell me just by way of what's ahead or what's been agreed to to give me a sense of what's going to happen when we come back?  I'll turn first to Postscript's counsel.

MR. SILVER:  Thank you, Your Honor.  Dan Silver

for Postscript.  The parties have done a fair amount of time conferring.  There are still some disputes.  Trying to piece together, from e-mail.  Those of us that are in the courtroom would appreciate the lunch hour to talk to the folks who are not in the courtroom to really get our arms around them, but I suspect there will be some disputes after lunch.

THE COURT:  Okay.  These would be disputes that must be resolved before opening statements begin?

MR. SILVER:  Certainly with regard to opening statements, yes, Your Honor.

THE COURT:  Let me ask Attentive's side to say anything that they wish to say.

MR. WOOD:  I think that's right.  We've been working throughout the jury selection process.  I think Your Honor's comment about focusing on the issues you need to resolve before opening statements is important for us to focus on and hopefully we can take a look at which ones need to be presented in that time.

THE COURT:  It's 12:50 now.  I'm going to give you 30 minutes for lunch, which will mean the parties should be prepared for me to take the bench at 1:20.  When I take the bench I'll to address any disputes that need to be resolved for openings to begin and counting the time as I've described it.  If the parties have a chance in the interim

to e-mail my law clerk, Ms. Crawford, about what those disputes are, I'd appreciate it if you do it.  You may not. Depends on when you can resolve.

Okay.  In any event, that will be our plan. With that, the Court will stand in recess.  Thank you.

COURT CLERK:  All rise.

(Luncheon recess.)

COURT CLERK:  All rise.

THE COURT:  All right.  Please be seated, everybody.

All right.  So let's see.  We're going back on the record here at 1:25 and let me call up Postscript's counsel to let me know, what is the first issue that we need to address?

MR. SAULSBURY:  Thank you, Your Honor.  We've been able to resolve most of the disputes.  The first issue to address is whether Attentive should be permitted to suggest that they specifically had patents on Two-Touch.

As we discussed --

THE COURT:  And I'm sorry, Mr. Saulsbury, are you talking about an issue that was teed up in one of the --

MR. SAULSBURY:  That's right.  Teed up by the opening slides that Attentive disclosed.

THE COURT:  Okay.  And I'm looking, for example, at Postscript's objections for day one.

MR. SAULSBURY:  That's right, Your Honor.

THE COURT:  And I've got -- got a copy of Attentive's slides with me.  Just help me by letting me know which box on which page I'm looking at.

MR. SAULSBURY:  Here we go.  So this is on page 3 of the issues that were submitted to the Court.  And the first slide, I believe on which this appears is Slide 77, which refers to Attentive's Two-Touch patents.  Those patents are now out of the case.  This Court granted summary judgement in honor of non-infringement and we don't think it's proper for them to refer to those patents in particular because it's irrelevant, it's -- it improperly creates a suggestion that we used their intellectual property in some way.  And in that we create some spiral effect.

THE COURT:  Okay.  And if from the other side, they say, Judge, look, are we going to be suggesting that Postscript infringes these patents?  No.  Are we going to be saying the word "patented" every other -- you know, we have patents, what about our patents?  No.

But, Judge, if occasionally in a document that's otherwise relevant, the word "patented" comes up, that's not so bad, it's not unduly prejudicial, especially if we're not making this argument and certainly the other side has the

ability to tell the jury that, of course, this isn't the case, what do you say to that?

MR. SAULSBURY:  So the response to that is, if it is incidental, the document is being used for some other purpose, nobody is calling attention to it.  I'm less concerned about that, but there's also the concern that the jury may, nevertheless, draw their attention to it in their deliberations.

So what we propose is that the parties propose redactions that would eliminate this notion that they have had Two-Touch patents.

The bigger concern that we have, Your Honor, is that we were told that with respect to their witness examinations, they were not going to be able to prevent their party witnesses from talking about their Two-Tap invention.  And that's a concern of ours, because we don't want this case devolving into a sideshow about their patents.  Those are already out of the case at this point.

THE COURT:  Okay.  All right.  Thank you.

Anything further, Mr. Saulsbury, on this issue?

MR. SAULSBURY:  What I would say in terms of resolving it this morning, is that, I think that if we could eliminate it from their opening slides, the manner that we proposed to them during the meet-and-confer and ensure that their witnesses will not be talking about their patented

Two-Touch technology, I think that can resolve it for purposes of today, Your Honor.

THE COURT: The only slide that that we're having an issue with this context is Slide 77?

MR. SAULSBURY: One second. That's right, with respect to opening slides, yes.

THE COURT: Okay. All right.

Anything further?

MR. SAULSBURY: No, Your Honor.

THE COURT: All right. Let me hear from Attentive's counsel.

MR. CAMPBELL: Thank you, Judge. Chris Campbell for Attentive.

It's not our intention at all to sit here and confuse the jury, but it's not our intent to focus repeatedly on the patents that have been awarded to Attentive. But it's a fact. It is technology that we came up with, it's technology that formed the basis, the formation of this company. It is our -- and I told you about this at the final pretrial conference -- it's our origin story, it is what this company is about, Two-Tap.

So the fact that there's passing reference, "Did you get patents on this?" Yes. We got patents. There's not going to be a suggestion --

THE COURT: I understand your point about, we

want to talk about our Two-Tap technology and this is part of our story and this is what we're developing, et cetera. Why does the word "patented" have to be added?

In other words, it -- Mr. Saulsbury, I think the one slide he's complaining about is Slide 77, why couldn't the word "patented" be redacted?  What does the fact that you have patents on it, how is that relevant to an issue in the case?

MR. CAMPBELL:  Very relevant, Judge, because it shows that we are an innovative company, we are a company who respects intellectual property, who pursues intellectual property.  There's not going to be any accusation that there's infringement by Postscript of these patents.

These are in our documents and they're incidental to the documents and we're not going to suggest it, we're not going to harp on it.  There might be a question, "Do you have patents on our Two-Tap technology"? Very quick, yes.

THE COURT:  If they're incidental -- I think that suggests incidentally, what, not particularly relevant to the claims or defenses at issue in the case?

MR. CAMPBELL:  The Two-Tap goes to damages, Judge, because that is where you start to form the damages base by having these sign-ups that Mr. Kidder is looking at.

THE COURT:  I'm sorry.  I'm not trying to

interrupt you, but Two-Tap is not the issue.  The issue is referring to Two-Tap as a patented technology or we've got patents on it, here are our patents.  That's the question I'm asking you.

MR. CAMPBELL:  Right.

THE COURT:  Put aside some reference to the Two-Tap and the company's work on it, but it's the patented issue particularly, isn't that incidental?

MR. CAMPBELL:  The patent is incidental on that.  That's why we're not going to focus, we're not going to repeatedly refer to that, but it is part of our origin story.  We went out, we, you know, innovated, we came up with this technology and we filed for a patent and we're just going to do it very quickly in passing.

On this Slide 77, there's -- we're going to talk about the first tap, second tap, but we're not going to deliberate on the fact that there was a patent issued.  Same thing in the testimony.  But to deny us the opportunity, to suggest that our company, too, is not innovative, I think, is prejudicial to Attentive because that deprives us of the ability to connect the innovation of Attentive with, you know, the fact that we went out there and were awarded patents.

Again, we're not going to, you know, focus on this issue, but it's in the documents, it's incidental and

we think we should, in fairness, be permitted to.

THE COURT:  I totally get your point that if, you know, someone testifies and there's a -- even if not intended, someone says, you know, patented technology or something like that, that spare reference, you know, shouldn't be -- I'm talking about stuff we can control and what's really relevant.

I hear you say look, we want people to know we're working on our own technology, we're innovative.  The other side says, yeah, they're saying that they're innovative or they're an innovative company or that they are a hardworking company that had it's own technology that they worked on.  Fine, fine.  It's the patented piece because it could potentially confuse them, like, is it Attentive's patents at issue?  That, I think, is the concern.

If they were to say, Judge, in reference to their innovation or their working in this field, they're innovative, we're not objecting to that, would you have an issue?

MR. CAMPBELL:  Well, I think a compromise would be that for Slide 77, we can take that out, but for testimony, I think it is fair because we're going to have, you know, the founders of the company, we are -- who are proud of what they built and it's not at issue in this case. And they could ask the question, "Are Attentive patents at

issue in this case?"  No.  They're not.  It's a simple response.

THE COURT:  And by the way, of course, we're not talking about them opening the door by questioning the concept that --

MR. CAMPBELL:  Yes.

THE COURT:  All right.  Anything further?

MR. CAMPBELL:  And then furthermore, what I think they want us to do is to go back and every document, no matter where it's mentioned incidentally, that's going to confuse the jury and we're going to have redactions all over the Attentive documents, you know, that --

THE COURT:  Are there many documents?

MR. CAMPBELL:  I don't know, Judge, but I know there's --

THE COURT:  And just to be clear, my question is going to be, are any of your documents that will make reference to the phrase "patented" or "patented technology," et cetera?

MR. CAMPBELL:  I don't know the answer to that. Again, we are not going to be focusing and blowing up and saying, here, you know, what does this mean and this document shows that there's patents.  That's not what we're going to be doing in this trial.

THE COURT:  Okay.

Anything further, Mr. Campbell?

MR. CAMPBELL:  No.

THE COURT:  Mr. Saulsbury, just briefly on that.

MR. SAULSBURY:  Yes, just briefly, Your Honor. I think you honed in on just the right thing.  From our perspective they can say that they are innovative, we don't even have a problem with them.  We don't even have a problem with them saying, in general, that they have patents. That's not the issue, we don't want confusion about their Two-Touch patents and whether they're at issue in this case.

THE COURT:  And I think -- Mr. Saulsbury, I think one issue here is this is something that could be corrected, it's known in advance, we've highlighted it, so I think your point is, their patented technology, that's not a legal case, that's a case issue.

Part of what Mr. Campbell is saying is, I don't know, we may have a lot of documents, I can't say, some of them might reference "patented technology."  I don't think he was suggesting if someone makes a reference to "patented technology," it would be a spare reference or it happens to be in a document but not called out, that that fact alone would be disqualifying.

I think you're talking about the repeated, consistent reference to it or reference in a way that can be avoided.  Is that right?

MR. SAULSBURY: Essentially, Your Honor. I think we should address cases that can be avoided, but I think that includes what they put on with their own witnesses. Just like in that ruling, their witnesses can be instructed not to elicit this when they're being examined by Attentive's lawyers.

With respect to the documents, we have specifically identified the documents that are at issue. It is a discrete set. It is on pages 4 and 5 of this submission that we put to the Court. And what we have proposed to Attentive is that we go ahead and propose redactions on their behalf. You send the proposed redacted copies, that's something that is in progress and we'll have to them shortly. But this is an addressable set, this isn't some big, unknown issue.

THE COURT: Okay. Anything further on this issue?

MR. SAULSBURY: No, not on this issue.

Thank you, Your Honor.

THE COURT: Mr. Campbell, anything further on it?

MR. CAMPBELL: I think redacting out -- we could live with 77 but to take stuff out have documents, Judge, I think that just gives the wrong impression that there's something untoward that's underneath that black box.

Everybody knows what redactions are --

THE COURT:  What about with regard to, you can prepare your directs, you can say to witnesses, look, the judge is concerned about the jury thinking maybe Attentive's patents are at issue here.  And I do think that's a potential concern.  You can advise them in advance when we're referencing our technology, don't reference that it's patented or we got patents on it.  Talk about, it is inventive or, you know, whatever else.  Just don't -- avoid that so there is not confusion.

How come that is not doable?

MR. CAMPBELL:  Well, I think there's someplace else we could go with it.  It's kind of that patented technology.  Yes.  There's patents at issue in this case. No.  It's that simple, our witnesses can say that.

THE COURT:  All right.  Anything further?

MR. CAMPBELL:  No.  Thank you, Judge.

THE COURT:  With regard to this issue, I'd say, a couple things.  One is, is that we'll have the word "patent" removed from Slide 77.  Attentive has already indicated it's going to make that concession.  I do have some concern that Postscript raised that the jury could, if it hears an undue amount about the fact that Attentive has patents or this is Attentive's -- its Two-Touch technology, Attentive's Two-Tap technology, that's patented

technology, so it could be unduly confusing here for the jury. The law in patent cases is difficult enough, and Postscript is right. This is not a case about -- no longer about Attentive's patents being infringed.

So what I would -- what I would say is -- now, on the other hand, I don't think that spare reference to "patented technology" or a few spare references that couldn't otherwise be corrected or happen to be out there are problematic. Again, as long as the thrust of Attentive's argument is not "Our patents are infringed."

But I think anywhere that we can eliminate or remove reference to Attentive's patents or the patent technology, I do think it's incidental to the case because I don't think it has true connection to the core of the claims or defenses at issue. So I think Attentive should do that and remove these references where they can.

What do I mean by that? I'm not necessarily saying Attentive has to look through its documents and redact any word that comes up there because I don't know how many are at issue, etc. But I do think it's fair to say that Attentive can prepare its witnesses in advance. So the guidance in my order would be in preparing its witnesses. The witnesses should not make reference to Attentive's patented technology, can use other words, like innovative, or as was said to avoid undue jury confusion.

Lastly, just reiterating, that if, despite this, a witness happens to say something, even though they were well prepared or a document happens to have the word in it -- that in and of itself is not necessarily going to be problematic. The spare reference, I don't think, would create undue concern, but Attentive should eliminate this word from Slide 77, should instruct its witnesses during prep not to use the word "patented" in this context.

Okay. So that's the first issue raised on this Two-Touch issue.

What's next?

MR. SAULSBURY: Thank you, Your Honor. The next issue is on page 2 of the submission to the Court, and this relates to slides 58 through 63 and Slide 65.

Now, we've be able to resolve the dispute with respect to most of these slides. These slides all relate to the suggestion that was actually made in their inequitable conduct defense that we dumped on the patent office. As Your Honor will recall, we filed a motion to strike their inequitable conduct defense, which was granted, and they were given leave to amend and they chose not to amend and bring this defense back in the case. Therefore, dumping is not relevant to any of the issues in the case.

The slides that remain in dispute are Slide 59. With Slide 59, I think we're okay with leaving it in so long

as Attentive agrees to delete "at the end of the examination" from the title because the suggestion here is that we just lobbed this all on at the end to make it impossible for the examiner to review the references. That's unfairly prejudicial. There's no indication that's what occurred, and that is a not an issue in this case when there's not an inequitable conduct defense.

THE COURT: Okay. Are you planning to point out in your case that certain pieces of prior art that are part of their invalidity case were before the patent office?

MR. SAULSBURY: We do intend to say that they were before the patent office. We are not intending to draw attention to how much time was spent or things of that nature.

THE COURT: Why are you doing that? What are you going to use it for?

MR. SAULSBURY: I think we're going to use it for -- to make sure that the standard thing that a patentee would note, which is these are examiners that were considered -- these were references that were considered by the patent office.

THE COURT: Because if the patent office considered it, maybe it's less likely that this reference or this reference used in combination with another would render the patent invalid. That's why you were making reference to

it; is that right?

MR. SAULSBURY:  That's right, Your Honor.  And to be clear, we're okay with most of the slides they have on this.  The three slides that remain are areas where they're suggesting that we did something untoward with respect to the examination process, and I think that is not appropriate.

THE COURT:  Just to be clear, you mentioned Slide 59.

MR. SAULSBURY:  Yes.

THE COURT:  And the issue -- that these references were sent at the end of the examination.

MR. SAULSBURY:  That's right.  If they were just to strike the language at the end of the examination, which is what we proposed in the meet-and-confer.  If they were to do that, that would resolve our concern.

THE COURT:  What are the other two slides or portions of them that are at issue?

MR. SAULSBURY:  Certainly.  The other two slides are slides 60 and 61.  And here, I mean, I think the issues exemplified by their highlighting and emphasis -- they are highlighting and emphasizing, for example, a reference to bearing, and there's a case citation to the *Golden Valley* case.  This is on Slide 60 at the bottom of the excerpt.

THE COURT:  Okay.

MR. SAULSBURY:  And then on slide 61, they're drawing attention to this language that says, "It's desirable to avoid the submission of a long list of documents if it can be avoided," and then they highlight this thing towards the end of the excerpt that says, "The examiner under the condition noted above performed" --

(Reporter clarification.)

MR. SAULSBURY:  Certainly.  Thank you for the reminder.

The examiner, yes, towards the end.  It says, "The examiner, under the condition noted above, performed a cursory review of the submitted references."

And the context here, Your Honor, is that with respect to the reference at issue, their Attentive Journeys, that was actually submitted in a document that highlighted the most relevant references.  And so there can't be any suggestion that somehow the examiner was not able to review that reference.

THE COURT:  So like the last sentence here says, "The examiner, under the condition noted above, performed a cursory review of the submitted references."  You object to that because you -- you think it unduly suggests that there was something wrong with the fact that such a large amount of -- what exactly -- what is wrong with that last sentence?

MR. SAULSBURY:  I don't think they should be

permitted to suggest to the jury that Postscript did something untoward, something improper during the examination.

THE COURT:  Okay.  But if -- but I think because you would like the jury to see that, like -- did Attentive Journeys -- is that like the prototypical piece of art that's referenced in the patent --

MR. SAULSBURY:  That's right.

THE COURT:  -- that's going to be an issue for them?

MR. SAULSBURY:  That's right, Your Honor.  The point is, with respect to the term "Attentive Journeys," this statement is not relevant, because the examiner requested that the most relevant references be submitted in a separate document.  This is part of the record in their inequitable conduct claim.

And it's undisputed that Postscript then submitted a specific set of references that was much narrower that included Attentive Journeys.

THE COURT:  Okay.  But I think if the issue is you want to point out that the reference was before the office, because you would like the inference that it was considered and in some way not found to be significant to patentability, if they want to put in facts that suggest, well, what was considered or what wasn't or how much was

there to consider, at least those kind of facts, why wouldn't that be a fair counterpoint to your pointing out that the thing was among the things that could be considered or was considered?

MR. SAULSBURY:  And the issue is just -- I think it presents a 403 issue in so far as they're suggesting that we did something improper.  Because the examiner, even Attentive, doesn't have a claim in this case that we did something improper that violated our duty of disclosure.  That's my concern with respect to how they're presenting this in their slides.  If the only thing they want to present is that the examiner had a large volume of references, right, and that may have impacted the review, I think that we can address, because there's also evidence that the examiner was presented with the most relevant references; right?  It's the untoward suggestion that we did something that violated our duties to the patent office that I think is just clearly out of this case, given that their inequitable conduct defense is out.

THE COURT:  Okay.  Let me hear from Attentive's counsel.

MR. DAVIS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Mr. Davis.

MR. DAVIS:  So I think you put your finger exactly on the issue is that Postscript is going to be

putting at issue that these references were before the patent office.  We're not trying to make some comparison that they did something inequitable or that violated their duty, but we do under *i4i v. Microsoft* believe that the circumstances of the prosecution are relevant to the jury's determination of validity.  Now, right there and on Slide 61, this is really a key point.  Under the condition noted above, right -- this is the last sentence there, which is what we highlighted in the previous slide 60 about the submission of a mountain of largely irrelevant material.  "The examiner performed a cursory review of the submitted material."  That is directly relevant to the jury's validity determination under *i4i v. Microsoft*.  Moreover, Mr. Saulsbury's concern is addressed on slides 62 and 63, which we know that Postscript provided a narrowed list, and then we addressed what was provided in that narrowed list.

THE COURT:  Can you just remind me.  So you were talking about slide 60 and 61.  Slide 61, this looks like it comes from a notice.  It's a communication from the examiner to Postscript's counsel; is that right?

MR. DAVIS:  Yes.

THE COURT:  And in it, just tell me the context.  They've highlighted, like, including the last paragraph.  I want you to point out your relevance material and then, look, I want you to know I performed a cursory review of the

submitted references.

MR. DAVIS:  That's right.

THE COURT:  That is -- that's a factual statement about what the examiner did vis-a-vis the references that had been presented previously.

MR. DAVIS:  That is correct, Your Honor.

THE COURT:  Okay.  And then from there there's some further slides in which you're going to say there was an updated sheet that included references to Attentive Journeys?

MR. DAVIS:  Yes.

THE COURT:  Okay.  Is Attentive Journeys like the prototypical example of a piece of art that maybe they're going to point to in the patent to say this was disclosed and it's a piece of art that's a part of your invalidity case?

MR. DAVIS:  There are three references. Journeys is one of the references, one of the things.  They disclosed certain aspects of it in the narrowed list.  We actually have that at Slide 63, but we note that they did not submit source code.  There was also no reference to Klaviyo Flows, which is one of our other key prior art references as well as our Sephora Replen product, which is another reference.  So we address their narrowed list. There's no intent to suggest that, and, frankly, if we

didn't raise that, they could come up and undercut us tremendously in rebuttal, saying we misrepresented, which we have no intent to do.

THE COURT:  Just looking at the particular slides, so I think we talked about 61.  And 60.  Now, I think you said you are not going to make the argument that they did something wrong or untoward or inequitable by way of, like, including, you know, the particular prior art at issue along with a lot of other prior art or there was wrongdoing in that direction.

MR. DAVIS:  Yes.

THE COURT:  But you want to factually point out that if the reference is mentioned in the back, there's a lot of other references.  Here's when they were put at issue, et cetera.

MR. DAVIS:  Yeah, and -- and the text on Slide 60 is the preceding paragraph to the text on Slide 61, or -- or the slide on 61 is very shortly after the text from Slide 60, and the key point is that at the bottom of Slide 61, the examiner notes "under the condition noted above," which is the text on Slide 60, "the submission of a mountain of largely irrelevant material."  So that context -- you can't fit it on one slide so that it's easy to see, but it's a continuation of the same discussion out of the notice of allowability.

THE COURT: Lastly, as to Slide 59, the idea that a lot of references were sent at the end of the examination, they say -- they're trying to suggest they snuck it in there.

MR. DAVIS: So if we -- so, first of all, that is actually factually accurate. The statement by the examiner is in the notice of allowability. At the end of the examination, they did dump 315 references right at the end. But we will remove it if that will resolve the objection.

THE COURT: You'll remove the phraseology that -- Slide 59 that says --

MR. DAVIS: At the end of the examination.

THE COURT: At the end of the examination. Otherwise, is the thing correct, they sent 315 references in total?

MR. DAVIS: I think it was 317, basically.

THE COURT: Okay. So that part can be removed you're saying, but the -- you're saying the other two slides at issue are factual communications between the examiner and Postscript, they relate to, like, the substance of what was and wasn't considered and provided context for future slides, and you are not going to, on top of this, be suggesting wrongdoing or inequitableness, etc.? You're focusing on facts.

MR. DAVIS:  That's right, Your Honor.

THE COURT:  Anything further, Mr. Davis?

MR. DAVIS:  That's it.

THE COURT:  Let me ask if there's anything further on this issue.  Mr. Saulsbury?

MR. SAULSBURY:  Just -- just very briefly, Your Honor.  The only thing I'll say is that with respect to 60 and 61, I think we'd be okay with it if they were to remove the highlighting and the emphasis and they could go up -- otherwise, delete the slides.

The problem with the highlighting is that if you look at the bottom of 60, for example, it talks about making disclosure in such a way as to not to bury it with other disclosures of less relevant prior art suggests that there's some intent to bury it and then it even cites the case on *Barrett*.  I think as a compromise, we're okay just getting rid of the emphasis and they can leave in the slides.

THE COURT:  Okay.  Mr. Davis, any response to that?

MR. DAVIS:  I mean, we're pointing out relevant aspects of the examiner's factual communications to Postscript.  I don't -- don't think we should be required to remove emphasis of the key aspect, which under *i4i vs. Microsoft* is the circumstances surrounding the examination as to references of prior art.  That is what we are

discussing here and it's directly relevant to the invalidity evaluation for the jury.

THE COURT: And as to *i4i*, just looking at it, which portion of it in particular do you think is relevant to this issue?

MR. DAVIS: I don't have the opinion cite in front of me, but it's about the fact that -- oh, yeah.

So 108 -- pages 108 through 112. And the overall aspect of it is that the circumstances of prosecution and whether a piece of art was before the examiner and how they are relevant. They don't change the burden, they don't switch the burden, but they are relevant to the jury's determination of whether or not the defendant has met its clear and convincing burden.

THE COURT: Tell me if this is right. Among other things, I think *i4i* says that, you know, the Federal Circuit recognized -- the Federal Circuit has recognized the common sense principle that on the one hand, new evidence supporting an invalidity defense could carry more weight in an infringement action than evidence previously considered by the PTO, but I think your point is, okay, but if the other side is going to make a point that evidence was previously considered under that kind of legal auspice, we should be able to factually provide additional context for what -- you know, exactly what was the circumstances. We

obviously can't speak to the intent of the examiner and what the examiner did, but the facts you are able to put together.

MR. DAVIS:  That is correct, Your Honor.

THE COURT:  All right.  Thank you.

All right.  So as to this issue, first, let me say -- I'll just speak to the specific slides first and then I'll give some guidance.

So I think Attentive has agreed to remove on Slide 59 the words "at the end of the examination," and so I think that resolves the dispute as to Slide 59.

As to Slide 60 and 61, I'm not going to require Attentive to remove any material.  I say this for a few reasons.  And -- and to the extent it can provide guidance otherwise to the parties, it's obviously the case in cases like *Microsoft* that -- that evidence previously considered by the PTO could be argued that -- could be argued to be a relevant fact with regard to a defense against an invalidity charge.

It does sound like Postscript is going to make reference to the fact that certain prior art that Attentive has as part of its invalidity case was before the patent office and listed in the patent.  I do think it's also fair, factually, for Attentive to counter that argument by providing additional relevant facts about the nature of how

that art was before the patent office vis-à-vis, for example, potentially a large amount of additional art that the patent office had to consider.

I don't think that unduly strays into territory of Attentive attempting to put at issue an inequitable conduct defense that it has -- no longer seeks to press because Attentive tells me they are not going to make the argument or suggest through their exhibits or witness's testimony that Postscript has done something inequitable by the amount of art they put before the patent office or something wrong, et cetera.

And lastly, I think just in terms of this emphasis issue, the parties should be given some leeway to be able to present slides which do, in this case Slides 60 and 61, relate to factual matters and communications about the amount of art at issue without it being micromanaged by the Court.

I don't see anything in Slide 60 and 61 that unduly crosses the line to Attentive making the argument or claim that Postscript is guilty of inequitable conduct or guilty of wrongdoing by the nature of how much art they put before the patent office.

So, that's my ruling with regard to issue number two.

MS. DURIE:  We have an issue, Your Honor, with

respect to TCPA compliance.  I'll try to make very brief.

This was on page 4 of the submission that we made to Your Honor under Exhibits, and I'd like to discuss it with reference to an exemplary exhibit, 1 -- DTX-133.

THE COURT:  You said?

MS. DURIE:  DTX-133.

Maybe we could just put up DTX-133.05.

MR. WOOD:  Your Honor, if I may, I don't want to speak out of turn, but potentially short-circuit the issue.

We received Post -- excuse me -- Postscript's updated positions with respect to a number of issues as we were coming into court and didn't have an opportunity to address all of them with Postscript in an attempt to resolve it.

We don't intend to emphasize or call attention to any -- any argument that Postscript's products are not in compliance with the TCPA, so I just -- and -- I don't know if that completely resolves that.

MS. DURIE:  That's great.

There's been, for example, in the slide we were looking at, it says, "Litigation issue" -- this is talking about Postscripts.  It's an Attentive document.

"Litigation issues, X client had to pay out millions in damages."  That is an example of something that we think should be redacted.  We can propose redactions, but

that was the concern we had raised with regard to TCPA compliance. We don't want to get in to a sideshow about that either in testimony or in documents. But as long as they will redact those references, that's fine.

THE COURT: In order to get into this, I'll have to understand better what TCPA compliance is, why it's relevant, why it's related to the underlying docs. I don't recall that TCPA came up briefly.

It may well be that this isn't going to be disputed because it may be that, as they're saying, whatever reference Postscript is concerned about.

But, Ms. Durie, you think that's correct?

MS. DURIE: It is. And to be clear, it's not relevant to any issue in the case, but in an effort to -- and they said that it was relevant generally to the value of their technology for damages purposes. Their damages expert says nothing about it.

But in an effort to compromise, my proposal had been if they want to talk generally about the fact that their products are TCPA compliant, that's fine. What I don't want is documents or testimony suggesting that Postscript's products had some issue or that, you know, we had an ex client that had to pay out millions of dollars in damages. That doesn't have any issue -- any bearing on any issue in the case. It sounds like we have an agreement that

they're not going to go there.

THE COURT:  Okay.  Mr. Wood, do you believe the parties have an a agreement?

MR. WOOD:  I believe so.  In fact, I think with respect to this document in particular we sent proposed redactions this morning.  I understand there's been a lot of moving parts here, but we've -- we've intended to convey that we generally agree to that.  I think we'll have to look at specific exhibits as they come up throughout the day.

As you referenced before, with example to patents, there could be -- I think we're going to have to look at how much proposed redactions there are, if that becomes unduly burdensome.  The proposed redactions to this slide, I don't -- it's not going to come up during opening statements, so I think the parties can work through these issues without -- without needing to trouble the Court with it.

THE COURT:  Is this -- is this a document that's going to be presented?

MR. WOOD:  Not during the opening statements, Your Honor.

THE COURT:  Right.  I think it's on the list of exhibits, but an issue is that someone at Postscript had said it apparently needs to be addressed before openings, and so that's why we're doing it now.

MS. DURIE:  And I apologize.  I think we are done with opening issues and these are now witnesses that may come up today.  But I think for purposes of opening, we're done.

Does that sound right?

MR. SAULSBURY:  Yes.

The last issue for opening, Your Honor, you may recall --

THE COURT:  Hold on, Mr. Saulsbury.  One second.

Okay.  And the reason I'm saying that is because in an ideal world, we would bring the jury out to begin openings so we don't keep them unduly waiting.  And if there are objections to exhibits we weren't able to get to this morning, we'll have to deal with those at sidebar as necessary.

But as to this issue, it sounds like, Mr. Wood, they raised one exemplary exhibit, we're going to redact that box; is that right?

MR. WOOD:  Yes.  And I believe we've already sent proposed redactions to this specific exhibit.

So we've attempted to reach an agreement here. I think -- I think the parties have.

I respectfully request that though we are trying to agree to an issue that was raised, that we not be deducted the full time.  That we split the time for this

issue.

THE COURT: All right. On this TCPA issue, I'll understand, at least for now, as to the one exemplary document, it is moot because it's going to be redacted.

I'll assume we don't have further issues on this subject. If we do have them, the parties can raise them during trial, if need be.

Okay. But does Postscript need to tell me about another issue they think needs to be resolved before openings?

MR. SAULSBURY: Yes, and I hope this can be resolved briefly.

But the final issue relates to Stat Commerce. Your Honor will recall that this is a subject to a motion in limine. It was Postscript's Motion in Limine 2, where we explain that Attentive's narrative about how Mr. Beller, one of the cofounders of Postscript, his communications with Attentive on behalf of Stat Commerce in the 2018 time frame were entirely irrelevant to the issues.

There was a suggestion by Attentive that he was hiding his identity as a Postscript affiliate in order to get --

THE COURT: I'm sorry. Mr. Saulsbury, is this related to an issue that was raised in the submission the parties made?

MR. WOOD:  No, it's not, Your Honor.  It's not a slide and it's not in the chart that you received this morning.

MR. SAULSBURY:  So that's right, Your Honor. The only thing, briefly, is that in the parties' meet-and-confers since, there were concerns that Stat Commerce is going to come up.  If we can get agreement that it's not going to come up in the opening, then we can meet and confer further with respect to how it might address the rest of the trial.

MR. WOOD:  And it will not be in our opening statements.  Thank you.

THE COURT:  Sounds like that is resolved.

Is there anything that Attentive believes we need to address and raise before openings?

MR. WOOD:  Yes, Your Honor, just one issue.  And I think we can make this pretty brief.  Our concern is largely just presenting an issue that I think would more appropriately be raised later on as the evidence comes in.

If I could direct Your Honor to Postscript's opening slides, Slide 34.

THE COURT:  Okay.  I'll just note, I didn't get this far.  So whatever you're going to say is relatively new to me.

So Slide 34?

MR. WOOD: Yes. So Slide 34 is related to Slide 33 that comes before it. And we understand the intent of this is to have -- the check marks on Slide 34 to be indicating that Postscript expects evidence will come in from Ms. Frederiksen, that the limitations of Claim 4 of the '660, each one of them is met by the accused products.

We don't believe that Ms. Frederiksen can elicit evidence as to the monitoring the trigger condition limitation, because she did not testify, she did not provide an expert report applying the Court's new claim construction to that issue.

So when we get to that point in the evidence, we will object to Ms. Frederiksen's testimony as outside the scope to -- given where we are in the day and to speed this issue along, we are willing to agree to leave the slides as they are for right now in opening statements, but we wanted to flag the issue for the Court to make clear that we're intending to preserve that issue and not waive it.

THE COURT: So I'm sorry, the issue is that Ms. Frederiksen, this slide, this is Slide 34 of Postscript's opening?

MR. WOOD: Yes.

THE COURT: It's a box -- or it's a slide that appears like it's related to her testimony that she thinks, based on the evidence, she considered that defendant's

Case 1:23-cv-00087-CJB    Document 835    Filed 12/03/25    Page 190 of 294 PageID #:
30112
190

products infringed each of the claim limitations of Claim 1 of the '660 Patent?

MR. WOOD:  Yes.

THE COURT:  And you're particularly putting at issue the monitoring, the trigger condition limitation?

MR. WOOD:  Yes.

THE COURT:  And you're saying that you think you're going to have a position that if she attempts to present evidence about why it is that she thinks that Attentive infringes this limitation, you're going to object to that being beyond the scope of her expert report?

MR. WOOD:  Correct, Your Honor.

THE COURT:  Okay.  I guess, literally, you're saying that, you know, Postscript can say, no, we don't think that's right; and if you do that, we'll challenge it and we'll win.

You guys will say, well, we'll win.

So I guess, literally, it doesn't necessarily --

MR. WOOD:  Well, that's why I say, Your Honor, I think we're willing to go forward with the slides as they are, we just wanted to raise the issue so we can't be -- this is the first time it's come up in trial, the first time we had an opportunity to object to that assertion.  We wanted to avoid any suggestion that we had waived the issue by not raising it now.

THE COURT:  Is the argument going to be that -- well, the parties' expert reports, they were all finished by a particular time and deposition testimony was done by a particular time and then in the month or so before trial in addressing a summary judgement brief, I at the parties' request construed the monitoring term and I gathered the parties already have reached agreement on that monitoring -- the issue we've been having previously about what the monitoring term should be?

MR. WOOD:  I believe we have, Your Honor.

THE COURT:  By the way, do you know what it is?

MR. WOOD:  I believe the parties have reached agreement on, the construction being applied to "monitoring the trigger condition."  The first four words of the limitation.

THE COURT:  But you're going to take the position that because Ms. Frederiksen's expert report doesn't include my claim construction or her response to it since it was -- it came out, you know, a month before trial, she won't be able to testify about whether this limitation is met?

MR. WOOD:  Correct, Your Honor.  There was no attempt to submit any sort of supplemental report from Ms. Frederiksen to say, for example, I've reviewed the Court's new claim construction, I believe that it infringes,

even under this construction for these reasons or anything like that.  I believe Postscript will get up here and say that they believe Ms. Frederiksen's prior report is consistent with the Court's claim construction.

We have reasons why we think that's not true and there are portions that are inconsistent with the Court's claim construction.

As you said, I think the parties can probably join issue on this and present a little bit better when Ms. Frederiksen comes up at the appropriate time.

THE COURT:  Just out of curiosity, isn't your expert on non-infringement going to be addressing the same construction and the same limitation?

MR. WOOD:  Our expert does not have the burden to prove infringement, but yes, Your Honor.

THE COURT:  So, okay, I mean but -- okay.  Fair enough.  Thank you for raising it.  Let me see if the other side has any response.

MR. SAULSBURY:  Your Honor, it sounds like this issue doesn't relate to opening.  From our perspective, that's certainly the case.  And so what I'd propose is that we table it for now.  We can meet and confer with them further and see if we can come to agreement as it relates to parts of the case.

THE COURT:  Okay.  Sounds like an issue that

might come up potentially as to any of the other limitations, I don't know, maybe not, but yes, I think that's a fine idea and we can do that.

MR. SAULSBURY:  Thank you, Your Honor.

THE COURT:  All right.  So I understand we've resolved any issues that need to be resolved prior to openings.

Do the sides need any additional time to prepare their slides for openings or are they good to go?

On plaintiff's side?

MR. SAULSBURY:  No, Your Honor.

MR. WOOD:  No, Your Honor.

THE COURT:  Okay.  Great.

All right.  We'll take a short break, make sure our jury is ready and know that they're ready to go and we'll come out and begin with opening statements from Postscript's side, opening statements from defendant's side in the order the sides wish to make them and we'll go from there.

MR. SAULSBURY:  Thank you, Your Honor.

THE COURT:  With all that said, the Court will stand in recess.  Thanks, everybody.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please be seated.

Okay.  Let's go on the record.  So appreciate your patience.  So we were delayed because an issue has come up with regard to one of our eight sworn jurors.

So this relates to Juror Number 6, who was a juror who we did not individually question during the voir dire.  And this juror passed a note to one of my law clerks asking to speak to my courtroom deputy.  Did speak to my courtroom deputy just briefly, though, and I asked her to reflect the gist of what he said, and the juror approached her with some concerns about serving and said he would like to be dismissed.

And the juror said that he called his boss over the break and that his employer is very worried about his service the entire week and specifically mentioned an event that is taking place tomorrow that no one else can cover.

And the juror also said he would not be able to work after hours to compensate for this event.  And I think it may be fair to say that in the conversation, the juror seemed somewhat nervous about the issue.  So I have not spoken to the juror.

I was going to propose doing the following: That I speak with the juror, along with the court reporter, just to get some more information about whatever this concern is and to see whether it's a concern that really

rises to a real request to be excused, but.

And then to come out and convey what I've learned to the parties, give them a chance to talk or think about it and for the parties to let me know whether or not they wish to speak in my chambers with the court reporter, with the juror and ask further questions or whether or not the parties agree if the juror makes a request to be removed, that they be removed or what.

And depending on the what the parties wish to do, we can either have further questioning once counsel is involved or if there's good cause and the parties agree, there is a Rule 47 for dismissal, et cetera.

So that's my proposal on how we should handle this issue.

MS. DURIE:  That is agreeable.

THE COURT:  And defense?

MR. CAMPBELL:  That's agreeable, Your Honor.

THE COURT:  So then I'll ask for your patience further as we'll -- I'll speak to the juror and then I'll come out and convey what I've learned.  Okay.  The Court will stand in recess.  Thank you.

(A brief recess was taken.)

THE COURT:  Hi.  Come on in, sir.  Have a seat.

And so you were Juror No. 19?

JUROR NO. 6:  That's correct.

THE COURT:  Now you're Juror No. 6.  And it's Keith, is it Heitz?

JUROR NO. 6:  Yes, Heitz is right.

THE COURT:  So we had the voir dire process, I know you were sworn in as a juror.  But my assistant said that you approached her with some questions or concerns, in part because you called your boss over the break and she mentioned a work event tomorrow and something about that.

And so I just wanted to -- what I am going to do, is I just want to ask you some more questions to learn about the nature of your concern, because what we're trying to figure out is, you know, we had this whole process this morning to select the jury, and to get these jurors and let everyone -- we excused others.  And so, you know, of course it is very important that we have our eight jurors participate.

But I do want to be sensitive to the concern, so I just want to make sure that it is really an issue that you see or if it's something that is perhaps not an issue.

So tell me more about what your concern is.

JUROR NO. 6:  So I think just -- you know, this morning, I underestimated what being away -- out of the office unexpected for five days is going to be.  I do have a couple of events this week.  I work continuous improvement, so I lead large teams of people through improvement events.

THE COURT: And can I just ask, just to stop you. So you're a continuous improvement specialist?

JUROR NO. 6: That's correct.

THE COURT: And where do you work?

JUROR NO. 6: At Nemours.

THE COURT: Okay. And what kind of work do you do? Like, what do you do as your job?

JUROR NO. 6: I primarily facilitate teams through continuous improvement events. So, for example, I may work with a team -- like, I am working with a team that's launching a new building and I'm working on all their patient flows, and how they are managing patients and providing care throughout that new building.

THE COURT: So you help -- there are teams of people at Nemours --

JUROR NO. 6: That's correct.

THE COURT: It's Nemours. Right?

JUROR NO. 6: That's correct.

THE COURT: That have various patient-related responsibilities and your job as a manager -- as a continuous improvement specialist is to help them do their jobs better?

JUROR NO. 6: Help them design processes or help them fix processes that aren't working.

THE COURT: Got it. And now you don't --

obviously, for all of our folks who are selected as jurors, they aren't able to go to work and so the question becomes, if they raise an issue of, you know, a challenge with my work schedule is, can we manage that, you know, you're going to be away, but can someone else cover.

So it sounds like your boss referenced some event tomorrow.  Is that the main concern?

JUROR NO. 6:  Well, I have about five different meetings tomorrow, but several of them are to prep.  I have one event on Thursday, that's a full-day event.  But several of the meetings over the next -- tomorrow or the next few days are a prep for a week-long event next week.

And so I'm meeting with a lot of the providers and nurses and everybody this week to get everybody set for that event next week.

THE COURT:  If you couldn't do that because you had to serve on the jury, could someone else play that role?  You know, or could there be some other work-around?

JUROR NO. 6:  That's what my boss is asking me and that's what I don't have an answer to right now.  And some of these meetings are tomorrow in the morning.  So it's like, I don't know if I can get anybody to cover me between now and then.

THE COURT:  And say you couldn't get anybody to cover, you know, I mean, what would be the result?  I mean,

if it didn't happen, you know.

JUROR NO. 6:  If they couldn't cover me for those?

THE COURT:  Those meetings, yeah.

JUROR NO. 6:  I think for those, because they're orientations for some team members, we could probably still move forward.  But --

THE COURT:  I'm sorry.  Can you tell me one more time?  These meetings tomorrow are in preparation for something that's going to happen next week?

JUROR NO. 6:  Next week.

THE COURT:  And what is the thing that's going to happen next week?

JUROR NO. 6:  It's a full -- Tuesday through Friday, eight-hour-a-day event where we're getting all of the teams together, including hematology and oncology providers, nurses, everybody who supports the patient flow through a new building that we're opening to build all of their future state patient flows for that new center.

So it's something we've be planning for quite a while.  And I wouldn't be able to just reschedule these folks.

THE COURT:  Okay.  Now, this morning, obviously, you were aware you had these meetings yesterday.  You must have thought, I could do this.

JUROR NO. 6:  I thought -- yeah, I mean, I think I underestimated.  I thought I could probably move some things around and rearrange some things, but I just -- in communicating back and forth with my boss, I don't think I fully thought of the scope of everything I have to do this week, because that's just one of the things.  I do have a full-day event on Thursday that I have to lead as well.  That's an eight-hour event.  That one is focused on some of our nursing care and documentation in our nursing units.

THE COURT:  Okay.  Because obviously, you know, I think the trial is expected to last through Friday.

JUROR NO 6:  Yeah.

THE COURT:  So if you're serving as a juror, you know, it doesn't sound like there's a way around, like, doing this at night or communicating with people.  Either it happens during the workday, or it doesn't.

JUROR NO. 6:  That's correct, yeah.

THE COURT:  And I guess what you're saying is if you're not able to do it, it may either not get done or somebody else may cover.  Who knows?

JUROR NO. 6:  That's right.  As of right now, I don't know the answer to that.

THE COURT:  Okay.  And I guess, you know, one thing we want to -- it's tough because you've been sworn in now to serve, and we've let a lot of people go who could

have served.  And we don't want to lose you as a juror.  On the other hand, we don't want to have jurors who are so distracted by work-related concerns that they can't focus on their job.

If I were to say, look, I don't know that I have good cause to be able to excuse, you know, Mr. Heitz, you've been sworn in, I can't excuse you, you need to come back for the rest of the week, would that kind of -- would you be able to focus on the job at that point, which is being a juror and delivering a fair verdict?

JUROR NO. 6:  I would like to say yes.  I would have work on my mind, though, I'm not going to lie.  It's going to be on my mind, thinking about how I'm going to manage getting coverage, you know, being here all day and everything like that.

THE COURT:  Okay.  And hold on one second.

What I'm going to do is I'm going to try to convey this to the lawyers, and then they may have some more questions for you.  And if they do, I'll have you come back, and we'll sit in the same room, kind of like people did this morning.  And the lawyers will be in here, and they might ask questions of you to get more information just because sometimes they feel like what I say -- they understand what's going on, but sometimes they say -- they might want to ask some more questions.  So we could do that.

Let me just see if I have it all right.  So you are a continuous improvement specialist with a large hospital system.  That means you help various teams prepare for their work with regard to patient-related events through training.  Tomorrow you have five meetings scheduled that relate to an event that occurs next week.

JUROR NO. 6:  Some of them relate to next week.

THE COURT:  Some of them, not all of them.  Some of them do?

JUROR NO 6:  Uh-huh.

THE COURT:  And the event next week is a week-long or a nearly a week-long event, Tuesday to Friday, you said?

JUROR NO. 6:  That's correct.

That where you're helping different members of the hospital team build performance workflows for a new center.

JUROR NO. 6:  That's correct.

THE COURT:  And you're playing a large role in that?

JUROR NO. 6:  I'm the main facilitator, yeah.

THE COURT:  You're the main facilitator.  And additionally on Thursday you have a full-day event in which you -- and remind me about what that event is for?

JUROR NO. 6:  It's a focus on nursing

documentation with our -- with all our nursing units. It's an enterprise event, so I'm covering here as well as Florida.

THE COURT: And if the question is, is there someone else who can take your place as the main facilitator to prepare for this event next week or this full-day event on Thursday, your answer is I'm not sure?

JUROR NO. 6: That's right. That's what my boss is messaging me, and I'm like I don't know how -- it's tomorrow. I'd have to message co-workers and see if anybody could do it. I don't know.

THE COURT: And if required to miss it because you had to show up, would you attend court? If I said, look, I can't excuse you --

JUROR NO. 6: If you told me I had to, yeah, I would be here, absolutely.

THE COURT: But you are saying it could create some worry in your mind about work?

JUROR NO. 6: I do feel stressed about work now.

THE COURT: A little stressed.

JUROR NO. 6: Yes, sir.

THE COURT: Okay. All right. And so is your request -- are you asking to be excused?

JUROR NO. 6: If I may.

THE COURT: Okay. So you're asking to be

excused.

Okay.  All right.  Let me -- what I'm going to do is -- because we haven't started the trial yet obviously because we have to resolve this if we can.

JUROR NO. 6:  Yes.

THE COURT:  So I'm going to go out and convey the gist of this to the lawyers, get their feedback.  If they ask to speak with you, then we'll have you come back and ask some similar questions.

JUROR NO. 6:  Okay.

THE COURT:  And then we'll make a decision, let you know what that decision is.  And then if the decision is you have to stay, we'll continue on with the trial.  If the decision is you're going to be excused, we'll let you know that too.  Okay?

JUROR NO. 6:  Yes, sir.

THE COURT:  Sound good?

JUROR NO. 6:  Yeah.

THE COURT:  Appreciate it.

JUROR NO. 6:  Thank you.  I apologize.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please be seated, everybody.

All right.  So I spoke with the juror, and this is Juror No. 6, who originally was Juror No. 19, a juror

that we did not individually question.  And he said the following.  He is requesting to be excused from jury service.  He said that he works as a continuous improvement specialist for a health system.

Tomorrow, he says, he has five meetings, a number of which relate to a nearly week-long conference next week.  His role in his job is to help train team members at the place where he works, which is a large hospital system, to help make their work and events more productive.  He said that the meeting's tomorrow to prepare for this week-long conference next week, he is the facilitator in these meetings, that this conference next week or this event next week involves long-planned work to build performance flows for a new center that the hospital system is building.

He says, additionally, on Thursday of this week, he was scheduled to be the main facilitator at a full-day event relating to patient documentation.  He says that when asked if there was someone else at his work who could fill in or step in for him for these events, he said he couldn't think of someone at this stage.

His boss is concerned about that.  When asked, you know, if ordered to show as a juror would he do so, he said he would.  But I asked if he would be worried or concerned during that jury service about work or if he thought it would impact his thinking or work as a juror, he

said he was concerned it could.  And so that is the gist of what the juror conveyed.

And so what I'll say is maybe what I'll ask counsel is just to take a minute to talk amongst themselves and then talk with each other and to let me know if they either have some jointly agreed plan as to how to resolve the issue or if they -- one or the other or both wish to separately question the juror in my conference room.  If one or the other side or both asked to do so we can, absent some agreed-upon solution before.

So let me give the parties a chance to talk with each other and amongst themselves about that.  And then I'll take the bench shortly.  Okay.  We'll take a short recess.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Please be seated.

All right.  So my understanding is -- and I'll ask counsel -- that neither side has asked to ask any further questions of the juror, but the sides may differ on whether he should be struck for cause.

Ms. Durie.

MS. DURIE:  That's right, Your Honor.  I think I might have a different view about this.  If the juror came back and said he had learned new information, but it seems

like what happened is he was aware of his schedule.  He knew what was coming up.  He seemed to think it was fine based on not having circled that question in the questionnaire.  And I also didn't sense any discomfort from him when he was empaneled in the jury box.  If he had had a concern and it was inadvertent, he would have raised it at that point.

So it seems like what happened is he called back to his boss, and his boss was upset.  And I understand that, and I mainly empathize with the boss's position, but I at least always thought of hardship as being hardship for the juror, not sort of it's going to be inconvenient for the employer, because I think that is frequently the case when people are engaged in jury service.

And I do think that there is a somewhat tricky dynamic when jurors see other jurors leave, especially in this kind of circumstance, and that it could provoke a bit of a chain reaction.  I've actually had one case where we did let a juror go early, and then it provoked a request from someone a little bit later, saying, well, now I have a concern.

So I think my view is in view of the fact that there's not any new information that would give rise to a hardship, and I would suggest that we keep him.

THE COURT:  Okay.  All right.  We'll hear from defendant's side.

MR. CAMPBELL:  Yeah.  I think we do hear what the hardship is, Your Honor, it's scheduling and he neglected to the check the box and was apparently not paying attention when the question was asked.

I am not that good at sensing body language. The man was obviously in distress.  He goes back there and realizes the full weight of it, I've just been selected to serve on this jury, my schedule is busy, it's going to consume me all week.  I'm in the healthcare industry, I'm one of the leaders, I train people, and it dawned on him, I can't do this.

So had he checked the box, scheduling is an issue, based on the potential jurors who we interviewed, I think we would have come to the conclusion that we ought to let him go.  He is now going to be very distracted and he's concerned about his job, and we let others go for very similar reasons.

THE COURT:  Okay.  All right.  Thank you.

All right.  So appreciate counsel's arguments.

At this time, based on what's before me, I don't believe I have enough information to determine that there's a good cause to strike.  I say that for a few reasons.  One, it is the case that this juror was sworn here this morning as a part of our jury and the -- the issues that have been raised, at least so far, are work-related issues to be sure,

issues in which the juror would have had responsibilities this week, but so, too, with many jurors.

I do also agree that the issues that appear to be raised weren't new issues.  I think that at least it could have been perceived by the juror that they could have been managed.

And thirdly, when I asked if he would serve, the juror confirmed, of course, that he would.  And I think there was an indication that, you know, the juror will and views jury service as important.

Now, to be sure, he had some concern about his work schedule after talking to his employer, but I don't have an indication, at least for now, that that concern is of such a magnitude that it would prohibit him for serving fairly and impartially.

And for some of the other reasons by plaintiff's counsel, it's important to let the other jurors know that everyone has difficulty and is able to perform this service but it's not whether the employer -- it's a question of whether it can be managed.

So for all those reasons, I don't think it's risen to the level to suggest there's good cause to strike the juror.

What I'm going to do briefly, again, is just have the juror come back and convey to him that I have not

stricken him, that he will be required to participate in the jury, just to let him know that.  And then when we're ready, we'll have the jury come out and begin with opening statements.

Okay.  With all that said, the Court will stand in recess.  Thank you.

COURT CLERK:  All right.

(A brief recess was taken.)

THE COURT:  Okay. Hi, sir.  Come on in.

So ultimately -- and I've spoken to the lawyers -- I've decided not to excuse you and to have you continue --

JUROR NO. 6:  Okay.

THE COURT:  -- as a member of the jury and I know -- I certainly recognize the concerns you share, but I also know and I can tell from your -- you're also someone who understands the importance of this process and you're willing to serve as a juror, even through it may be difficult with work.  And, of course, that's important as it is for the other jurors, too.

So I just didn't feel like, based on the information I had, including, importantly, because we did swear you in, because these were situations that potentially could be managed, I didn't have good cause to excuse you.

So I appreciate your forthrightness and I

appreciate your service very much, you know, especially in these circumstances.

We'll ask you -- expect you to participate. We'll have you come out now -- we're going to come out and have the parties make opening statements to the jury. Okay.

So Sam will have you -- I'll have you go back just briefly and then you'll just come out with the rest of the jurors.

All right. If you have any logistical questions this week, Sam can help.

JUROR NO. 6: I will.

THE COURT: Thank you. I appreciate it.

(A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: All right. Everyone remain standing. We'll have our jury brought in and begin with opening statements.

(Jury enters.)

THE COURT: Please be seated, ladies and gentlemen of the jury and those in the courtroom.

All right. Ladies and gentlemen, we're going to begin our trial. The plaintiff, Postscript, will make an opening statement. And I'll turn to their counsel to do that.

MR. SAULSBURY: Thank you, Your Honor.

Good morning, ladies and gentlemen.  I am Tim Saulsbury, and along with my colleagues, I have the honor of representing Postscript, that is the plaintiff in this action.

On behalf of Postscript, I'm going to start by thanking you for your service.  I understand that for each of you it is an extraordinary sacrifice to be here.  And on behalf of Postscript, we are incredibly grateful for that sacrifice.  That's because as a patent owner, like Postscript, this place in a courtroom is the only place that we can stand on equal footing and have our case be heard.

Now, the jury system.  Our jury system is really unique in that in a civil trial like this, we are entitled to a jury.  That's actually something that is special about the American system of justice.  In fact, it is so core to our values that our founders put it right there in the Constitution, the right to a jury trial.

Now, this is a patent infringement case.  The reason we're here is because Postscript developed a fundamental advance in e-commerce technology and was awarded a patent on it, that patent is the '660 Patent.  This is a copy of it from the Patent Office and you have a copy in your binders.

Now, you'll hear the patent referred to throughout as just '660, that's the abbreviated patent

number for the patent in this case.

The defendant, Attentive Mobile, has taken our invention and used it for its own uses, without Postscript's permission.  The evidence will show that Attentive is using Postscript's invention on one of Attentive's core products, it's a tool called Magic Composer.  The evidence will further show that in the last two years alone, Magic Composer has made Attentive over $500 million.

Like the right to a jury trial, our founding fathers believed that patent rights were so important, so fundamental to our country's ability to compete, that they put it right in the Constitution.  It's in Article I, right at the beginning of Section 8.  And it says, "To promote the progress of science and the useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

And that's what a patent is.  It's the exclusive right to use your invention and to exclude others from using it without your permission.

As you heard during the patent video this morning, a patent is a property right.  It's no different than your rights to your home or to your car.  If you own or rent your home, you have rights to your house and your lot.  So someone who doesn't have permission to come into your home, they're a trespasser.  Similarly, if someone wants to

use your car, they can't just help themselves to it, right? You own that car, that's your property, so they need your permission.

Patents are no different. If you own a patent you have the rights to that invention described in the claims. If someone uses your invention without your permission, that's called infringement. Under our patent laws, you can't call the police for patent infringement like you would call the police on a trespasser. Instead, you have to take infringers to court like we're doing today and present your case to a jury. That's why we're here right now.

Now that I've previewed why we're here, I'd like to tell you a little bit more about my client, Postscript. And I expect that many of you haven't heard of Postscript before today, but Postscript is a small, scrappy startup based in Phoenix, Arizona.

It was founded by the gentleman sitting at the end of plaintiff's table, Mr. Adam Turner. He is the CEO of Postscript and he will be our first witness. Mr. Turner will explain that Postscript's founding mission solved problems for e-commerce merchants, those are people that are online selling things. And what he'll explain is that Postscript solves these problems by listening very carefully to their customers, understanding their pain points,

constantly innovating and bringing new technology to market.

Now, you might be wondering, what exactly does this mean, right?  Well, I suppose -- let's just suppose you're interested in opening an online store, right, perhaps this is a side hustle of yours.  This is how Postscript would help you.

Mr. Glass, if we could please -- thank you.

The example we have here is an online shop for pet supplies.  Maybe during COVID you got into crafting and maybe you were making collars for your dog, maybe your neighbors thought they were really cute, and maybe they wanted some, too.  And they expanded from collars to dog tags, and you know what, people with cats, people like me, we wanted to get in on it, too.  Before you knew it, you were a small business owner.  You were selling all sorts of things, pet supplies, treats, and so on, and you even opened up online to reach a broader audience.

Your online store might look something like this, Pete's Pet Supply.  That's amazing.  All of a sudden you're able to reach customers not just here in Wilmington, but across the country.  But how do you stay in contact with those customers; right?  How do you keep them engaged?  How do you keep them coming back to you for more?

That's where Postscript fits in.  One way Postscript does this is by allowing customers to sign up to

receive text messages from a source. And the way you would do that if you're a customer is you might go to a screen like this, you'd enter your phone number, and you would tap the button to sign me up and that would sign you up as a subscriber to receive messages from that particular store.

What we see here up on the screen, this is a feature that Postscript provides.

Now, let's see what that might look like from an e-commerce merchant's perspective. Well, if you've got a lot of people signing up, that's great, right, people care about your store. And you might have a whole bunch of subscribers, those are those folks represented over there on the right.

So what then can Pete do with all those subscribers? Before Postscript's invention, Pete had two primary options at his disposal. The first was called a campaign and the idea of a campaign is pretty simple. You basically blast out a message to a large group of people. So he might schedule a message to go out this Sunday, August 29th, right, in the afternoon at 2:30 p.m., to let people know about his Labor Day Sale, and it might say something like this, "Pawsome savings this weekend, get 20% off all puppy treats. Check us out at petespetshop.com." That's your campaign. That's what a campaign is. That's option number 1.

Now, the second tool at his disposal was something called an automation. Automations are, in some ways, the exact opposite of a campaign. Recall, you blast a campaign out to a large group. Automations, in contrast, allow Pete to automatically send messages to a particular subscriber based on that subscriber's activities with respect to the store.

And so let's say you're browsing on Pete's store -- let's say I'm browsing on Pete's store, right, and I put some things in the cart and I get distracted, right, maybe my kids need something, happens all the time. What might happen is Pete could set up an automation to automatically send me a text message and say, hey, you know what, still thinking about pet supplies? Don't forget the items in your cart. It's an automation that's based on my activity as a subscriber and forgetting to check out those items that are in my cart.

When I get that automation, I go back on the store, I see the things in my cart, and I check out, right? And then I might see the screen that says, "Thanks for your order."

The thing about automations is you can send a series of automations to the subscriber and so the next automation for the subscriber might be -- look something like this, "Your goodies will be here soon. Track your

order by clicking here."  That message is sent automatically based on the fact that I checked out.

And it continued from there, another automation might say, "Get ready, you're order is out for delivery." That's helpful, right?  I know the order is coming, I might figure out if I can leave work early that afternoon for the package.

Now, a flow of automations like this is sometimes called a journey and the idea here is that you have a journey that this particular subscriber is taking and as they go down that journey they receive a series of messages, automatic messages, based on their own journey.

So if you will remember one thing about automations, about Journeys, the thing to keep in mind is that everyone, they go on their own journey.  It's specific to one individual.  Those were the main options before Postscript's invention.

Now, the problem is that there was no good way to schedule a series of targeted messages to go out to groups of subscribers.  That wasn't available as a campaign, that wasn't available as an automation either.  Why did that matter?

Let's go back to our example of the Labor Day sale.  Right.  And so, at the start of the sale, before it begins, actually, Pete might want to send out this message.

Right.  "Pawsome savings this weekend."  It is letting everybody know that there's a sale upcoming this weekend.

And to be clear, you could do this before, that's essentially a campaign, the campaign we saw earlier.

But after you send that message, your subscribers are going to react to it in a variety of ways. Here's where the magic of Postscript's invention comes in.

With Campaign Flows, that's a product that embodies Postscript's invention, you can schedule a series of messages to go out to different groups of subscribers based on activities that they have taken.  And so one group of subscribers is going to be people who received the first message, they received a blue message about the sale, but they didn't place an order.

For those subscribers, what the invention allows you to do if you're Pete, is Pete can set up a message that will go out to that group of subscribers and only that group of subscribers on September 1st.  That's a Sunday.  Right? It's while the sale is still going and Sunday morning, you can let them know, you can remind them, "In case you missed it, we have a great sale this weekend.  Fetch it before it's gone."

As I said, there's also a different group of subscribers.  You can have some people who saw your original message and they reacted by placing an order.  Right.  They

took advantage of your sale.

For those subscribers, you don't want to send them that message we just saw, the reminder message. That wouldn't make any sense. Right. They saw your sale. They don't need the reminder.

Instead, what you might do, if you're Pete, is you want to schedule a message to go after the sale. This message is for September 2nd, the Tuesday after Labor Day. And it might say, "Thanks for being a part of the fun, stay tuned for more tail-wagging savings." And what Pete is doing here is he's thanking those customers who purchased for their patronage and he is also letting them know that more sales are coming down the line. That's how he's keeping them engaged.

Now, what we just saw here, this was the vision for Postscript's Campaign Flows invention.

And you're going to hear more about that vision from Mr. Alex. Alex, would you please stand up.

Mr. Meyer is the first named inventor on the '660 Patent. If you happened to take a look at the copy in your binder -- and you don't have to do it now, but at the very top of the first page, you will see, once you flip past the cover page, you'll see a list of inventors. And Mr. Meyer is listed right there at the top. He's the lead inventor of the '660 Patent. It's in the left-hand column.

And what we're going to hear from Mr. Meyer, when he testifies, is that none of what we just saw here, this ability to seamlessly send follow-up messages to groups, none of that was possible before his invention in the '660 Patent.

Now, you might be wondering, what did our customers think of this, the merchants?  Right.  What did they think of our invention and campaign flows?  The evidence will show that they loved it.  And that's because effective communications between merchants and their customers is all about sending the right messages to the right people at the right time.  That's incredibly valuable for our merchant customers.

Campaign flows allowed them to do this in a way that wasn't possible before.  And you'll hear that it's one of the primary reasons that merchants choose Postscript over other vendors.  You'll hear that from Mr. Dan Glazer.

Dan, if you wouldn't mind standing.

Thank you, Dan.

Mr. Glazer is Postscript's chief sales officer and you'll hear from him later in this case.

Now, back to Mr. Meyer, the inventor.  He and his Postscript colleagues had developed a new and highly useful tool.  They were excited about it.  And what they did is they filed an application with the United States Patent

and Trademark Office.

Now, the patent office issued a careful ten-month process of review. The patent office was presented with dozens upon dozens of prior art references. "Prior art" is the word we heard in the patent video, just describes what people had done before.

And the reason Postscript's submitted those references is because as a patent applicant, Postscript had the duty to submit to the patent office relevant material. We took that duty seriously. And the evidence will show that we even identified the most relevant prior art to the patent office.

After all of that, the patent office concluded that Postscript had invented a new and useful invention in campaign flows that satisfied all the requirements for patentability. And the patent office issued Postscript the '660 Patent, the patent asserted in this case.

Let me now tell you a little bit more about Attentive, the defendant in this matter.

Attentive is one of Postscript's competitors and Attentive is the incumbent in this field in which Postscript and Attentive compete. That means it's been around for much longer and it is bigger than Postscript. In the market in which Postscript competes, you can think of Attentive as an 800-pound gorilla.

And look, I want to be very clear about something, Attentive has been very successful. Remember, just last year alone, it made over $500 million from Magic Composer. That's over half a billion dollars in just two years. But the thing is, and we all know this, every one has got to play by the rules no matter how big you are. And we're here today because Attentive has refused to play by the rules.

To really understand how we got here, it's helpful to take a step back and look at the timeline. Our story here begins with Postscript's founding in 2018.

And to truly understand Postscript and the customers that it supports, it's helpful to understand about a service called "Shopify."

Shopify is what we call an e-commerce platform. What that really means is that if you want to get online and sell things, you can use a service like Shopify to create an online store and fulfill orders. Shopify makes this really easy to do. And Shopify is mostly used by smaller merchants.

That makes sense, because if you're a large store, right, if you're Macy's, Neiman Marcus, right, you have the resources to hire your own people to build your online store, and so you don't need to use the platform like Shopify.

Now, one thing Shopify does, is it allows its merchant customers to collect all sorts of data about what products are selling well, what products customers are interested in.  The thing is, many small businesses, they weren't making much use of this data, because they either didn't have the time or the tools to use that data effectively.  This is something that Mr. Turner observed.

And Mr. Turner thought, you know what, I can provide some value here.  What if I can help these merchants leverage that data that Shopify is providing to help them make more sales, right, and ultimately become more successful.  And that's what he did with Postscript.

And so Postscript decided to launch exclusively on Shopify in 2018, to help those small- and medium-sized businesses.  At the time that was a bold move.

What you'll hear from Mr. Turner is that when Postscript launched on Shopify in 2018, when it launched in the Shopify app store, there was nobody else offering comparable services there.

Now, where does Attentive fit into all of this?

Attentive was founded earlier in 2016.  Like I said, it was the incumbent and it took a fundamentally different approach than Postscript.  Rather than cater to the smaller businesses on Shopify, Attentive focused on the higher end of the market, serving customers like Samsung,

Neiman Marcus, The Gap and so on.

And that approach initially worked out very well for Attentive. By serving bigger customers, it could charge a lot more money. The evidence will show that if you wanted to work with Attentive, the minimum price they listed was $300 per month. That didn't work for your small mom-and-pop Shopify store.

In contrast, the evidence will show that more than half of Postscript's customers pay $30 a month. But over time, I think two things happened. Number one, Attentive was looking around the market. They were looking at what their competitors were doing, and I think they noticed a little bit of Postscript's success. And that worried them.

The other thing that I think that happened, item number 2, is that Attentive realized that it couldn't keep ignoring those smaller businesses, that wasn't working anymore.

And so in July of 2020, Attentive finally launched on the Shopify app store. And you'll hear that one of the reasons -- or, sorry, let me take one step back.

As it turns out, launching on the app store, that wasn't enough, it was too little, too late. The evidence will show that Attentive was losing out to Postscript in head-to-head deals. "Head to head" just means

a merchant was considering whether to go to Attentive or Postscript. In those deals, they were increasingly going to Postscript.

And you'll hear that one of the reasons for that was Postscript's superior technology. Technology like Postscript's patented campaign flows that it launched in 2021 and for which it applied for the '660 Patent in 2022. In fact, the evidence will show that campaign flows was the key differentiator for Postscript; and one of the main reasons customers chose Postscript over other vendors, vendors like Attentive that didn't offer comparable technology.

So look, Attentive, the incumbent, it was in a bad spot. It was still offering customers the old technology, campaigns and automations. Those customers, their customers weren't interested in that, though, right. The customers were interested in Postscript's invention, because as we saw earlier, it allowed them to send the right messages to the right people at the right time. Attentive had a real problem.

And look, you don't have to take my word for it. You see, we have a powerful tool in federal proceedings, which is that we're able to look behind the curtain and determine what the defendant in this matter, Attentive, was really thinking and saying at the time before this lawsuit

started, rather than after they were caught infringing.

And so this is one of Attentive's internal documents from before the lawsuit. It's got Attentive's logo right on the bottom right-hand corner and as we can see, Attentive itself is saying that it's got a problem, right. The title of the slide is "Problem."

And the problem is just the problem that we were talking about, right. As it explains in items 1 and 2 of this slide, the problem is that they were artificially forcing their clients to send the two old methods, right, the two options that Attentive had were sending a campaign, right, that's the blast campaign that's referenced in number one, or a sequential automated journey. That's those automations we were talking about.

And as Attentive observed, the problem with that is that it left a significant product gap for users, right. So how was Attentive going to fill this space?

As we all know, there's a right and a wrong way to go about things. In this case, Attentive did not do the right thing. Because what Attentive did, is it came out with a product that works just like Postscript's patented campaign flows. Instead of developing something new, Attentive took our patented technology and used our technology to compete against us, all without permission.

As we discussed earlier, a patent is a property

right, just like your right to your home.  As we heard in the patent video, Postscript gets the exclusive right to use its invention, and so you can think of this like Postscript's exclusive right to the '660 Patent.  It gets to decide whether others can use it and on what terms, just like you do with your home and your car.

And the reason we're here today, ladies and gentlemen, is because Attentive violated Postscript's exclusive property right by taking Postscript's invention for its own use without seeking permission.  That's infringement.

Now, as we also heard in the patent video, we as the plaintiff have the burden of proving infringement.  How are we going to do that?  Well, one thing that you're going to learn about me is I like cookies, and so to understand how we're going to go about proving infringement, we use an example of a hypothetical patent to a chocolate chip cookie.  And so in that hypothetical patent, you might imagine the patent reciting ingredients, flour, sugar, chocolate chips and butter.  And so to determine whether there's infringement, you have to compare the accused product to those patent claims and see if the accused product has all of those elements.

And so we've got our accused product on the right, we've got the patent claim on the left, and if we see

that our cookie that we're talking about, the accused cookie has flour, sugar, chocolate chips and butter.  It meets all the elements of the patent claim, and there is, therefore, infringement.  That's how infringement works.

Now to analyze Attentive's infringement, we hired one of the foremost experts in computer technology.  Her name is Ms. Barbara Frederiksen, and, Ms. Frederiksen, if you wouldn't mind standing up, please.  Thank you.

Ms. Frederiksen's background is pretty remarkable.  I'll let her tell most of the story, but just briefly, she finished high school at 16.  Two years later at 18, she graduated with her degree in computer programming.  From there she went straight into industry, working at companies like IBM, Hitachi and Microsoft.  She has over 50 years of experience in the computer industry.

For her analysis in this case, Ms. Frederiksen pored over the evidence relating to Attentive's accused Magic Composer.  She looked at the computer code that that product has.  She pored over thousands of lines of that computer code.  She also studied Attentive's own documentation relating to that product.  And she used the product itself.  And through all that analysis, now she'll explain, her conclusion from this is that Magic Composer meets each and every one of the requirements of the Postscript patent claims.  This is an example of one of

those claims. I know that there's a lot of text here, and we're certainly going to be getting into the details of it during the course of this trial. But what you will hear from Ms. Frederiksen is that the conclusion of all of her analysis is that each and ever single one of these claim requirements is met, and that means there's infringement. That's exactly what she found, and that is what she will show.

Now, what does Attentive say in response? It has a lot of excuses that you'd expect a big company like Attentive to bring to a case like this. First, it says it doesn't infringe. Now, we don't know exactly what it's going to say, but one thing I think they might say is, We don't monitor because we use a timer. You'll see here, and we'll get into details, but one of the requirements here is you have to monitor. That's why they're arguing, saying, we don't infringe because we don't monitor.

Here's what I want you to think about. Like I said earlier, I like cookies, right, and I think from a simple example we can tell that this argument just doesn't cash out, right? If I'm making cookies, one way I might monitor them, right, to see how they're doing is I might open the oven door, right? I might take a peek at them, monitor their progress, see how it's going. That's one way I could do it. That's how I usually do it.

But if I want them to come out well, right, I want them to be perfectly cooked, what I'll usually do is I'll take a kitchen timer.  If the recipe calls for them to bake for 12 minutes, I'll set that timer to 10 minutes. That way I don't have to keep opening the door, right? You're not supposed to do that, but after that ten-minute timer is up, I can start peeking at that point to make sure they are dialed in perfectly.

So the point here is there's a couple different ways that you can monitor, but just because you use a timer, that doesn't mean you're not monitoring.  That doesn't make any sense.

Now, like I said, we don't know exactly all the things they're going to say in terms of their excuses why they don't infringe.  Whatever they say, I promise you, we will address it.  Ms. Frederiksen will show you that each and every claim requirement is met and that Attentive, therefore, infringes.  So what does Attentive say next, right?

Well, what I think they're going to say is, look, even if we infringe, Postscript's patent is invalid. Right?  The patent office got it wrong when it said that Postscript had a new invention, should have never issued that patent and, you know what, Postscript's patent should be taken away.  It's no good.  That argument doesn't cash

out either, and I think we can see why.

As I said earlier, the patent went through a ten-month period of examination. The patent office carefully looked at the references. And as you'll see from the testimony in trial, their argument that the patent never should have issued simply doesn't cash out. And so those are the first two excuses.

Next, I think what they're going to say is, look, even if your patent is valid, even if it's infringed, you know what, we shouldn't have to pay damages, or at least we shouldn't have to pay very much. But as we're going to see, that argument doesn't cash out either.

And specifically, what we're going to see, as the testimony comes in, is that Attentive has hired a damages expert. His name is Mr. Kennedy. Mr. David Kennedy. And what Mr. Kennedy analyzed is Attentive's sales of Magic Composer, the accused infringing product. What the evidence in this case will show is that with Magic Composer Attentive made over $500 million in the last two years alone.

What Mr. Kennedy says is that fair compensation to Postscript for use of Postscript's patent, to make that $500 million should be $570,000. He says that's all Postscript should get. Right? And what he's essentially saying is you should assume that Postscript would have

accepted a payment of 1/1000 of the amount of money that Attentive made using Postscript's invention. Not 1/10 of it, not 1/100 of it, 1/1000. And I'm sorry, but that just makes no sense.

And, again, you don't have to take my word for it. You don't have to take my word that Postscript's invention was valuable because, again, here we're able to take a look behind the curtain and see what Attentive was saying internally, right, before this lawsuit started, before they hired Mr. Kennedy. And what we can see is that the evidence shows that before they launched their accused Magic Composer product, they wanted to understand for themselves, is this going to be worth releasing? How much better is this than the prior methods they had, campaigns and automations.

These are the results of Attentive's own internal tests. And what they showed is that Magic Composer, this product that used Postscript's invention, it resulted in a 9% increase in messages sent. Text messages sent by Attentive's merchants is how Attentive makes its money, right? So a 9% lift in message sends, that's incredible value to a company like Attentive.

So you have to ask yourselves, what's more believable here? Would Attentive's own tests demonstrated before this lawsuit, or what it's now saying to avoid paying

the price of its infringement?  What you'll hear before you go back to deliberate is that if you find Postscript's patent valid and infringed, Postscript as the patent owner is entitled to damages adequate to compensate for the infringement but in no less than a reasonable royalty.  That comes straight from the patent statute.

And we trust that after you hear all the evidence and consider it, you will know what amount of damages is appropriate and reasonable to compensate Postscript for Attentive's infringement, for Attentive's use of the '660 Patent without permission.

Now, I want to close with something that I touched on earlier.  Recall, there's nobody to call if your patent's infringed.

If we think that they're using our patent, our only recourse, the only place we can come in the world to get relief is a courtroom like this.  It's the only place we can stand on equal footing and get a fair shake against a company like Attentive, to ask that Attentive be made to do the right thing.  We are confident that after you see all of the evidence that you will conclude that Postscript has a valid patent that was infringed by Attentive and that Postscript is entitled to fair compensation.

Ladies and gentlemen of the jury, thank you for your attention.  We look forward to presenting the evidence

to you over the course of this week.  Thank you very much.

THE COURT:  All right.  Thank you, Mr. Saulsbury.

We'll now turn to defendant's counsel for defendant's opening statement.  Mr. Campbell.

MR. CAMPBELL:  Thank you, Judge.

Ladies and gentlemen of the jury, my name is Chris Campbell, and it's my real honor to appear before you today to explain the other side of the story.  There are two sides to every story, and when you've be wrongfully accused, as has my client Attentive Mobile, you wait for this day in court.  You relish this day in court.  We're happy to be here.  We've waited a long time to come to you to explain why we believe we don't infringe.

And what was lacking, I noted, in my colleague's presentation, there was no suggestion of what the issues are about in the patent.  I'm going to run you through those because as you saw in the patent video, there are claims at the very end, the claims themselves define the property right.  That's the metes and bounds of your house, and there are going to be some key limitations that we're going to bring you to that are going to suggest two things:  One, that Attentive did it first.  And the suggestion that we're the 800-pound gorilla, they started two years after us, so they are right behind us in 2018.  We were here in 2016.

These companies have been in this market for a very similar amount of time. So we did it first, and if you believe that -- and we believe the evidence is going to show that we did it first, and I'm going to run you through some of it -- that their patent is invalid. And then, secondly, we don't infringe, and we have documents from them where we pulled back the curtain and we were able to see admissions in these documents that very clearly reflect their internal writings, their diary entries. You can think of them as diary entries before this lawsuit started, and they are distinguishing our Attentive Journey products. So Attentive Journeys is prior to the patent, and then there is Campaign Composer or Magic Composer. They're the same product. That comes after the patent. So Journeys did it first. Their patent is invalid based on that and other prior art, and then Campaign Composer does not infringe. And we're going to show you exactly why.

So we realize this is a really big imposition of your time, and so we're going to try to be efficient in our presentations. We're on the clock, but we ask you, because they go first, that you keep an open mind. And we're going to have our chance to tell the side of the story -- and we know there are always two sides to every story.

So let me start by introducing you to my client who is at counsel table. He will be all week. His name is

Eric Miao. He's one of the cofounders from Attentive, Inc. He pleased to be here and he'll be testifying. You'll be hearing from Mr. Miao. As well in the gallery, we got the founder, Brian Long.

Please stand up, Brian.

Brian founded the company back in 2016. And next to him -- Brian is the chairman. Next to him is Amit Jhawar. He's the CEO of Attentive. And I've got my team behind me, and you're going to hear from a number of members from my team throughout this trial, so let's get to it.

And I'm going to try to give you some specifics that you didn't get in the opening presentation from my colleague.

Okay. So what we have here is where it all started. It all started in an apartment in New York City. This is Brian Long. You met Mr. Long right here in the gallery. This is his apartment back in 2016, and behind him is Mr. Eric Miao. And these guys are grinding away. They're young guys. They're building a software company, proud of that success, and they ought to be. So it was very modest beginnings.

And the company started out calling itself Franklin. Over Eric's right shoulder you can see a framed picture. That's Ben Franklin. The reason that they called the company Franklin initially is because both Brian and

Eric are from Philadelphia. And they eventually changed the name to Attentive because there was confusion that somebody named Franklin worked at the company. It was originally incorporated as Franklin.

So fast-forward to where we are today, founded in 2016. In 2025 we have over 8,000 customers. So it's be an uphill climb, but Attentive is getting there, it has arrived, and it's very proud of what it built. So the tech was built back in 2016, and the point of it was to help merchants connect with subscribers or that these are -- subscribers would be the consumers, like the jury members. So the merchants could grow their list and stay in touch with you.

So it's very clever technology. It's called "Two-Tap" and you all have encountered it. Attentive pioneered SMS marketing. It's when you go to a website of your favorite merchant, Sephora, and a pop-up comes up, and it's offering you a coupon in exchange for providing information and you opt in to subscribe. You're going to hear about that technology. Attentive came up with that.

So we did it first. And we're not ashamed to say that. When you have done something and you've be falsely accused, as we feel we have been -- we were the first there. This is the Wright brothers. You all know this. This is Kitty Hawk, North Carolina in 1903. They

were the first in flight.

So dates are going to be really important.  I'm glad you've got notepads.  So what I have shown here on the screen -- and you can see the Wright brothers there on the left -- is the Postscript patent to the far right.  It's October 12th, 2022.  That date matters.  What that date is, is the date that Postscript filed for its patent.  Anything before that that was available to the public invalidates their patent provided it meets the recipe.

My colleague's chocolate chip recipe, I'm going to give you a different way of looking at a patent, but it's very similar.  So if I have something that meets that chocolate chip recipe, the patent is invalid.  We're going to provide for you three products and you're going to hear about them and get into the flow of how they work and in some cases the source code to prove to you every one of those elements.  I mean, it's stretched across the screen.  There were so many elements when my colleague put up the claim.

But we didn't focus on any one limitation.  I'm going to focus you on what probably is the most important limitation in this case, Sephora Replen.  That's the Sephora company you're all familiar with, beauty cosmetic company.  That is Replen for replenish when you're out of facial cleanser or moisturizer, you get a follow-up text.  So

you've opted in.

And Mr. Miao was intimately involved working with Sephora, and he's going to talk to you about the Sephora Replen product and walk you through it.

Attentive Journeys, we're going to show you source code from May 16, 2021.  Attentive Journeys was actually launched back in the 2018 time period, but the source code we're going to show you for purposes of establishing all of the elements of the chocolate chip cookie recipe are going to be from 2021.  It's neither here nor there.  We need to beat them by one day.  We beat them with Attentive Journeys by one year and five months.

Another product out there that you're going to hear about is Klaviyo Flows.  Klaviyo is a competitor of Postscript and Attentive.  Klaviyo is primarily in the e-mail marketing space, whereas Attentive started in the SMS, and now all of the companies are doing both SMS texting and e-mail marketing.  But Klaviyo, you're going to hear about them as well.

So these products, as you see on the screen, I've got the dates up there.  They're essentially flowcharts that are developed that allow the merchants to build using the platform -- in this case on the far left, Attentive's product, and, again, this is from May of 2021, a year and five months before Postscript filed for its patent.  And

you're building out a flow that will allow for follow-up, for engagement. So you can see on the screen that -- it's kind of small, but you can read it. Let me help you out with my pointer right here, far left.

What it says there is "has made a purchase at least once since starting this journey." And if the consumer has made that purchase, then you end the journey. You don't bother him or her. But if they haven't made a purchase, you go down the other branch on the purple, and it says "else." And that else is a text message. It's that easy. This is not rocket science.

So Attentive did it back in 2021. Klaviyo Flows, very similar. They have in the middle this time delay. You say -- it says, "Wait three days" and then "Follow us on social media. Wait four days. Check out our best sellers."

So you're doing follow-up messages in Klaviyo Flows. You're building out the flow, keeping engagement with your merchants, the consumer or customers. And then, again, to the far right, we've got Sephora, 2019. Well, well before Postscript filed for its patent.

So what I want you to think about is a concept. And one of the important limitations that you're going to hear about and we're going to be debating this and you're going to hear a lot of testimony is monitoring trigger

conditions.  Okay.  So you can think about monitoring trigger conditions like a radarscope.  You know what they are.  It's -- ATC has them.  It's the thing that sweeps around.  They're in green.  They're pretty cool-looking, and you've got the blips.  And so, you know, they're not continuous.  They're sort of periodic.  They're repeated because when it sweeps, that blip is going to move somewhere else because that's where it's being swept by the radar, and it's going to tell you whether the aircraft are too close to one another, whether they're too low.

So the radarscope is what all the prior art did prior to Postscript's patent, the difference being monitoring the trigger conditions, that is a requirement.  That is part of the chocolate chip cookie recipe that is in the Postscript patent.  And that is in the prior art that we're going to show you.

The kitchen timer by contrast, that is what Campaign Composer does.  So there are two groups of products here on the screen.  I've got the prior art on the left, and you heard about this in the patent video.  The Journeys, Klaviyo Flows, Sephora Replen, all before Postscript's filing date.  Later on you get Campaign Composer, 2023.  Campaign Composer does not monitor trigger conditions.  All it does is it sets a timer.  We've seen this timers at your mom's house or your grandmom's house.  You've seen these.

Set the cookies for ten minutes. You don't know if they're done. You pull them out, and they're, like, mushy. They need another five minutes. That timer is not monitoring whether those cookies are done or not.

So the patent has parts. You heard it on the video. And this is the claim. So the cover page on the left, very long claim, a lot of words. In order to infringe, every single limitation has to be present. The one that is not there is monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers. So there are other limitations, but this is perhaps the easiest to wrap your head around.

The judge has done us a favor, and he's told us what this means. So monitoring the trigger condition, you can ignore the rest because -- I added it there for completeness, but just think after monitoring the trigger condition dot, dot, dot, below is what the judge, Judge Burke, has interpreted this term to mean, "tracking whether a trigger condition for a continuous message has occurred through the continuous, repeated or periodic detection of one or more of the event-trigger candidates associated with a trigger condition."

You're going to learn what that's about, but importantly, monitoring the trigger condition is exactly

what is shown below.  Judge Burke has told us that, he's going to instruct you about that at the end of our instructions.  So we've got the monitoring reflected in the upper right with the radarscope.

Okay.  '660 Patent, what does this mean in terms of monitoring the trigger condition?  On the left, cover page again.  On the right, I've shown you one of the figures.  It's in your book, and this is one of the figures, 8F, and you can see up here -- let me go back.  Excuse me.  This up here is a trigger condition.  Wait for order created split for one day.  So you're waiting for one day.  If there's A, option A, a billing address and a country code, you go down this path, send the text message.  B, none of the above, you send a text message under those conditions, so there are going to be two different messages based on what is happening here, wait for order created split for one day.

So on the left, these flow actions, the way these products work, is you drag and drop them in.  You just simply grab it.  There is an A/B split.  That's what we're seeing on the right with the purple.  Grab it with your mouse, drag it over, and it creates this split for you where you can then send a message or some other action.

So we've got Ms. Barbara Frederiksen.  You're going to hear from her, and we've got somebody who is going

to respond to Ms. Barbara Frederiksen.  He's in the courtroom, Dr. Nat Polish.

What's interesting is that Ms. Frederiksen really made your job easier.  She made it easier, and you're going to hear testimony about this.  She said at the very top, time cannot be a trigger condition.  That's going to be a really important concept.  So you can see the timer right here, and why do I say that's an important concept?  It's important because of infringement.  So you've got your timer right over here, and that's Campaign Composer, Magic Composer.  All it does is it creates the message flow, and after a certain amount of time, it sends it out, regardless of what anybody in that particular group has done.  So you're not monitoring anything.

All right.  So we've got -- so trigger condition cannot be timed.  Ms. Frederiksen, she's going to tell you -- got to tell you that.  She wrote it down on paper, signed it under oath.

Okay.  We've got the prior art now.  Let's talk about it a little bit more.  So this is the Attentive Journeys.  Attentive began building Journeys in 2018.  It was launched in 2019.  That's the source code.  It was actually launched before that, but the source code we're going to show you is going to reflect the date of 2021, and it's got the same flow and branches that you're going to see

throughout, keep it, hopefully, easier to follow with the color coding.  You've got the purple showing the branches and the various trigger conditions that can occur.

So Journeys again with the radarscope is monitoring trigger conditions.  What are Journeys?  It's a marketing term, and you can see right here, Journeys automatically sends messages to subscribers based on their behavior.  So, over at Postscript they didn't invent Journeys.  They didn't invent sending messages to consumers or subscribers based on their behavior.  Perhaps the most easy one to think about is an abandoned shopping cart.  We all have had those.  You go in, you browse on a merchant's website, and then low and behold, like a day or two later, it's like, hey, come back and complete your purchase.  You're getting the courage to complete that purchase.  They didn't invent that.  That's been around a long time.

In fact, you can see, May 16th, 2021.  So we're almost a year and six months prior in this publication alone from when Postscript filed for its patent.  All we have to be is one day before them.  We're a year and a half before them.

So you can see right here, monitoring.  This, again, you're going to see this evidence.  It's -- you've got trigger conditions, 3A, and it's saying "has made a purchase at least once since starting this Journey."  It's

right here.  You can see it, 3A.  And it says as well, "send text in response to trigger conditions."  That's 3B.  That's down here.

So, again, you're monitoring whether or not the consumer has made a purchase, and if they have not, they send a text message.  It's that easy.  It was a year and a half before they filed for their patent, and this document on the screen talks about cart abandonment.  The Journey is triggered when the customer adds an item to the cart.  The Journey waits 45 minutes.  The Journey branches.  So it's coming back to you to remind you, hey, you put something in there, would be great if you could complete the purchase.

Journeys has monitors throughout other documentation.  So June 1, 2021, a year and a half, year and five months before Postscript filed, "has viewed products, has added to cart, has made a purchase."  These are all trigger conditions that were available in Journeys.

Here's some more, monitoring, "has made a purchase" --  see it right here.  "Has made a purchase at least once since starting the Journey."  If they haven't, come on down, get the text message.  Send a cart abandonment message to subscribers who added a product to the cart, but not to subscribers who did not.

You heard my colleague talk about that in opening.  This is not a new concept.  It has been around for

years.  So what we have here on the left to sort of bring you back to some of the flows -- this is Attentive Journeys on the left, and this is Postscript's '660 Patent on the right.  And you can see.  You've got the target recipient criteria includes all subscribers, and then remove a subscriber if an order created.  And you heard it from my colleague, you don't want to bother them.  Why would you bother them if an order is created.

So you send a message, wait for split event, and, again, you've got an A and B.  That can be drug across through the flow actions.  So, again, you've got steps with actions that can be inserted into the flow, and these eventually can send a text message based on what the consumer is doing.

So the '660 Patent tells us what these triggers are.  Again, this is the Postscript patent.  "Check out, start event.  Customer created event, fulfillment created event, order created event, order delivered event, order fulfilled event."  It goes on.

So these are all of the trigger conditions that Postscript is going to tell you that they put into their patent.  But this is Attentive Journeys.  And this is from 2021.  And on the right we pulled out trigger conditions, "product view, add to cart, purchase, join marketing, order created, order fulfilled."  It goes on and on.  There are a

dozen of them, and this is in our source code.  They had the source code, and so they know that that is there.  But, yet, that's why we're happy to be here to tell our story.

So what does Ms. Frederiksen have to say in response to that?  She knows that we have trigger conditions in Journey, so she's got to come up with something.  She's got to say, oh, they got me on my back foot now, got to come up with something to respond to that.  So what she says is Attentive Journeys does not have segments, that is putting these subscribers into different segments, like "abandoned cart" or view the product," or something like that.  No, she's not right and you're going to get this evidence.

Attentive Journeys has segments -- we've got the document right there -- May of 2021, "create a document segment."  See it on the left, in the upper right, "Create a document segment."  So here is some of the actions for the segments, "join, the subscriber signed up date."  You have clicked, that's another potential segment of subscriber, they clicked on something and that's all they had to do. Purchase," if you purchase something, you could be put in a segment with the subscribers who purchase.  "View the product, add it to cart, visit the site."  These are all different segments.

So, you know, Ms. Frederiksen, I don't blame her, she had to come up with something.  She said we don't

have segments, we had segments.  So you're going to get that evidence.

Here's the source code.  The source code is -- this is going to be important for you to consider because it's not just marketing documentation, it's in our code.  October 11th, 2021, code, user identifier typeset and ID.  You've got a lot of -- you know, if you're not a coder, I'm not, it doesn't mean a lot, but you're going to have Mr. Polish explain this to you -- Dr. Polish.

Okay.  So we've got more segments in Journeys as well, branching on segments.  So you're going to get all of this information.

Let's pivot now to Klaviyo Flows.  Again, October 2021, this is a year before Postscript filed for its patent.  Has to be one day.  We're over a year right here.  So what Klaviyo did -- and, again, they're the leader in e-mail marketing -- is they put out there for the world YouTube videos.  You can watch them -- don't do it now, because we started this trial, but you could have before the trial.  Do it after the trial.  And -- they're still up there.

And what Klaviyo was doing as of October 4th, 2021, is telling people how to set up their accounts on their system and there are two lessons in particular, Lesson 2, Lesson 4, and we're going to show you those with

Dr. Polish.  He's going to walk you through those.

So Klaviyo Flows, what we have done on the left is grabbed some screen captures from these videos.  These videos are out there for the public and because they're out there for the public, they qualify as what's called "prior art" and you know what that is from the patent video.

So we've got branching in response to trigger condition.  This is a little bit hard to read.  "Has placed an order since starting this flow."

So you've got this branching based on whether the person is placing an order or not and that's what is going on over here.  Wait for order, create a split for one day.  You have A/B branching.

So you're going to get this evidence.  And, again, on the left is Klaviyo Flows, on the right is Postscript's patent.

What does -- what does Ms. Frederiksen say, she's on her back foot again, here we are, Klaviyo Flows does not have segments.  Well, she's wrong.  Klaviyo Flows does have segments.  You're going to see this video, Klaviyo Lesson 2, video at 9 minutes, 58 seconds.  It says it right there, list in segments.  The segments shown in this particular video are potential purchasers, repeat buyers, and VIP customers.  So VIP, at the bottom, placed an order is greater than five overall times.  So somebody who is very

much a repeat customer.  So Klaviyo Flows had segments.

So that's why we come to you and say Attentive, and others -- so the Attentive part of it is Attentive working with Sephora, Attentive and its Journeys product, and the other is Klaviyo.  And we did it before they did. They got their patent.

So you can see right here monitoring trigger conditions and having segments all occurred before Postscript files.  On the right-hand side, that is not what Campaign Composer does.  They just set a timer.  At the end of the timer, the timer goes off and a message is sent.

So let's talk about the difference between Journeys.  You heard about that radarscope, and Campaign Composer, sort of to sum it up, and in the middle we have the '660 Patent, and there's tension that this patent is being squeezed by both of these concepts.

So Journeys are triggered messages to consumers based on their behavior.  That's all they are.  "Abandoned cart."

Campaign Composer sends campaign messages to consumers only after a certain period of time has elapsed. Very different concepts.  So we need to look at the '660 Patent in context and see actually what is there.

So here's my chocolate chip cookie analog, it's a patent on a soccer ball.  We all know what that is, made

of leather, stitched, filled with compressed air, it's round.  Here's a football, made of leather, stitched, filled with compressed air, but it's an oblong.  So they're different, there's no infringement.

So we have to find only one limitation and if we have a feather more evidence -- the scale of justice, it's a preponderance of evidence, right, for finding whether or not there's infringement.  If we show you that we have a feather more evidence, then you have to rule in our favor and we are going to show you that you're going to have a lot more than a feather of evidence both in invalidity and non-infringement.

So, again, this is the limitation that we're all going to be focused on throughout the trial.

I didn't hear anything about the patents, the limitations, the claims.  I just saw this big claim and a bunch of green check marks suddenly appear with some conclusion without any backup evidence.  I'm giving you that evidence.  I'm giving you the roadmap that you are going to hear in this trial.

This document is going to be key in your deliberations, we believe.  The reason is because it's their document.  This is their diary entry.  This is before the litigation started and it is talking about campaign flows.  So there's a lot of names that sound the same.  They're

campaign flows, we are Magic Composer, Campaign Composer.

So this is a project of a feature comparison spreadsheet and we found this. We had to dig deep to go find this document as part of the documents they gave to us, but let's take a look at what this document says.

So Magic Composer is missing key features. Again, this is the product of ours that's accused. They say the -- in the left -- this is Row 58, campaign flows. They're talking about the features create a campaign with multiple messages in a single UI workflow.

What they do is in the columns they have Postscript to the right and then to the far right we have Attentive. Postscript supports that create a campaign with multiple messages. Here what they say is Magic Composer does not support advanced branching, including responses. That is what we call a smoking gun. That document right there is what they wrote on paper before this litigation started and, hence, the squeeze play that we have here.

Here, nested branching. So it says, "Ability to have multiple branches within a flow." So if a subscriber goes down one -- Path 1, that path would have additional branches.

And then you look over here, this is supported in Journeys but not campaigns. Campaigns is Magic Composer. That's Campaign Composer. Magic Composer does not provide

the ability to have multiple branches within a flow.  They admit it.  It's right there.  And if we don't do that, we do not infringe.

Finally, let's look at subscriber response, "Branching creates conversational campaigns with the next message can be determined by how the subscriber responds."

Here -- this is the answer key, no, supported in Journeys but not campaigns.  What they're saying is Campaign Composer does not create conversational campaigns when the next message can be determined by how the subscriber responds.  You're going to get this and we're going to direct you right to it.  It was produced in native format, meaning Excel, but we're going to give you a hard copy and direct you exactly to the page, line, and row that you need to look for this document in your deliberations.

Okay.  So throughout discovery what we have to do is we ask one another for documents and we have to turn them over.  We can't hold them back.  There wasn't a document they didn't ask for.  We opened our file cabinet and it was massive.  And so Ms. Frederiksen, we gave her over a million lines of source code and in those million lines -- and you have to listen really closely when she testifies -- she is not going to point you to one line of code that says monitoring trigger conditions.  Monitoring trigger conditions.  Look for it.  Listen to it when she's

up here testifying.  So it's missing that and you should listen closely.

Similarly, what we're reflecting here is we gave them over a million pages of documents.  We didn't hold back anything.  They asked for it, we gave it to them.  That's why we're happy to be here, we're happy to tell our story.  We don't infringe.  Listen closely when she testifies.

She will not provide for you one document that says monitoring trigger conditions.  You stack those million pages up on top of one another, it's 328 feet tall.  Taller than the Statute of Liberty.  It is a tremendous amount of documentation that we turned over to them and they can't find one page in all of that.

So what does Ms. Frederiksen say in response to all of this, time is not a trigger condition.  And so, hence, we've got the timer.

And we know that -- you know, we'll take her at her word, time can't be a trigger condition, but everyone did it before the patent.  So what we have here is the time line again.  Attentive and others did it first and Campaign Composer doesn't infringe because time can't be a trigger condition.

What's interesting about the Attentive product is it even sends to -- to the subscribers when there are no subscribers there to send, hence it's just a timer.  If

there's -- at the end of the time if there are 500 people, if there are 5 people, if there are no people, that message sends.  So you're going to hear that testimony from Eric Miao.  You're going to here it from Jesse Greenberg, he's going to testify via deposition, you'll hear that.  And then Dr. Nathaniel Polish who is our technical expert who will respond to what Ms. Frederiksen is saying.

So you can liken it to going to the mailbox, you've got a letter, and you're dropping it into the mail but you forgot to write the recipient down.  That's what this is akin to.  So it sends even if no one receives.  It's just setting a timer.

So let's talk about invalidity.  You're going to here Mr. Miao and he's going to tell you that retargeting e-mails, they've been around 25-plus years.  It's not new. You know this, you get them all the time, your spam folders are overflowing with retargeting e-mails.  Attentive retargeting SMS texts as early as -- it was actually earlier than 2021, but that's the software we're going to show you.

So coming back to the time line and you can see where Attentive is founded and where they are today vis-à-vis Postscript and the '660 Patent.

Attentive has done a lot since Postscript filed for its patent.  I'm not talking about when it was awarded, I'm talking about when it was filed.  So, you know, that

gives them the benefit of even earlier in time.  It wasn't awarded until 2023.

So you heard the patent, this is the video, and I think this is really important for you to hear again, so I'm going to play it.  It's not too long.  And this is the part on patent invalidity.

Examiner's are human, they have a lot of work to do, and that is what this portion of the video is about.

(Video playing.)

JUDGE FOGEL:  Sometimes in a court case you are also asked to decide about validity, that is whether the patent should have been allowed at all by the PTO.  A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art or whether other requirements of patentability have been met.  In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked to consider such things when the patent has already been reviewed by a government examiner.  There are several reasons for this.

First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.  In

addition, there is, of course, the possibility that mistakes were made or important information overlooked. Examiner's have a lot of work to do and no process is perfect.

Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

(End of video.)

MR. CAMPBELL: Mistakes were made and important information overlooked. You heard it on the patent video and that's what happened here.

And let me show you this in your book, it's the patent. And if you look at that patent and you flip the first couple of pages, what you're going to see is a whole, you know, list after list of prior art. I'm just going to run through it right here.

It's -- all of this is in your book. It is a tremendous amount of information that Postscript gave to the examiner.

Patent examination is not easy. It's not easy at all, it takes time. And they're human, they make mistakes and that's what we are going to show you, that there was information that was overlooked and it was important information.

And so what we know, that there were some issues during the prosecution regarding the -- and these weren't -- you know, Postscript tried to give the patent office everything it had, but it was a lot of information and the examiner is saying, you've got to help me.  So the examiner says, "You gave me a mountain of largely irrelevant material."  And then the examiner at the bottom says, "You need to make a disclosure in a way not to bury it with another disclosure of less relevant prior art."

So the patent office is reminding Postscript of its duty and it's trying to, you know, satisfy its duty but it's hard for the examiner to ingest, to process that huge amount of information that they were given.

So the examiner came back and also said, "it's the applicant's duty to particularly point out any relevant material."

And at the very bottom, the examiner says -- you know, I heard my colleague say in his opening, "the patent office was really careful, they looked at it all."  The examiner is saying right here at the bottom, "I performed a cursory review of the submitted references."

So Postscript had to go back and tell the examiner, you know, what was the most important references. So they respond to the patent office and they say -- you know, they have a list that they believe to be the most

relevant of those that were previously submitted in the IDS.

So they come back and they give the examiner, it has 13 references. This is a form that you use, a government form, you can see the numbers right here listed and some of this stuff is Attentive, it's Attentive Journeys. But what they did not give the examiner was the Attentive source code, the Journeys source code and particularly those pages that I just showed you, trigger conditions and segments, we have those. They have those. And we're giving them to you. You're going to have those and you're going to be able to review those.

Another thing that they didn't give to the patent office in response was pointing out particularly that in the 13 references that are on the screen, Klaviyo Flows. There was some Klaviyo information that was provided earlier to the examiner but when the examiner says, "it's a mountainous pile of art, help me." And they didn't give, as part of the 13 references, to point out, hey, you know, examiner, I'd like you to focus on Klaviyo Flows.

And the same thing with Sephora Replen, they didn't give the patent office that. You're going to have that, we're going to explain to you why it's relevant. And why we believe that the evidence is going to show that the patent is invalid.

So again, I'm going to go back to this same

document and this is the product feature, the comparator sheet.  And this is the analog of what we discussed earlier.

So campaign flows, again, that's the Postscript product.  And then we've got two columns, Postscript and Attentive.  So what they're saying here is Journeys provides the ability to have multiple branches within a flow.  That's what Journeys has.  And because it has that, it invalidates the Postscript '660 Patent.

Here's another one, "Journeys creates conversational campaigns when the next message can be determined by how the subscriber responds."

That's an abandoned cart, that's just click but did not buy.  I visited a website.  That's what this is saying.  It's saying exactly that.  Again, this document was created before this litigation, before we were even thinking about presenting our case to you.  That's why we're so happy to be here.  We're trying to clear our name of what we believe to be an improper accusation.

So Journeys invalidates, we've seen some of these side-by-side comparisons.  We don't need to belabor them, but you can see the monitoring trigger conditions occurs as shown in purple and based on what the consumer is doing, you've got these branching and sending follow-up texts.

So again, Postscript did not provide Klaviyo to

the patent office.  This is the patent examiner and no --
you know, providing of this.  But we're going to give it to
you.  You're going to have it even though the patent office
did not.  And you're going to be able to assess and we
believe the evidence is going to show that every one of the
limitations and importantly, the monitoring, the trigger
condition limitation is going to be present and you're going
to be able to comfortably find that the Postscript patent is
invalid.

Again, here's more trigger conditions in the
Klaviyo Flows of YouTube videos.  It says "trigger" right
there on the right.  You can see it highlighted in purple,
"select a trigger, creator, first active, last active,"
these are all triggers.

So a little bit about Attentive, you met Brian
Long, you met Eric Miao, this is them.  They've come a long
way, proud of what they have built.

So Attentive, some of their customers shown on
the right, you have Crocs in the upper left.  You know these
brands, right.  There's Michaels, there's Dick's, Converse,
Neiman Marcus.  You know, you've encountered it, even though
it's kind of behind some of the messages you have received.

Today, Attentive has about a thousand employees.
They're based in New York City, global offices, San
Francisco, one sister company.  And, you know, a lot of

accolades, one of them is America's Greatest Workplaces for Women 2025.  Some more of the awards over the years that Attentive has won.  It's a good company.  People like working there.  They take care of their people.

Here's some of the local tri-state customers. We've got the Sixers, we have the Phillies, Urban Outfitters, The Vitamin Shoppe, all customers have turf. And one thing that Attentive has is sign-up.  And this is the Two-Tap process I described earlier, so it is -- it's where you're on your phone and you get the pop-up and you're given the coupon, two taps, it's that easy to sign up and that's what put Attentive on the map.

So you can see the timeline for Attentive founded, you know, in 2016, they came up with Two-Tap leading -- I mean, they transformed the category of SMS text marketing.  Before Attentive, it was very difficult.  There was a lot of friction involved in signing up.  You had to enter, you know, fat finger, like, trying not to fat-finger your phone number -- nine or ten digits.  So it was very difficult.

So they began building Journeys in 2018, launched it in 2021.  That's the source code, it was actually launched before that.  Campaign Composer came out in 2023 and today Attentive has a thousand customers.

So you're going to hear from Brian Long, he's

the founder and chairman. Amit Jhawar is the CEO. Eric, he's going to be here with us all week. He's the company founder of, along with Brian.

Dr. Nat Polish, he's here in the courtroom with us. That's Dr. Nat Polish. He's going to testify and he is going to tell you why the patents are both not infringed. And Dr. Polish has expertise in computer science and software and speaks a language that many of us don't.

David Kennedy. David, are you in the room? Here's Mr. David Kennedy. He's going to tell you -- he's our damages expert. He is going to respond to some of the allegations of infringement. So damages put zero. They're zero because we don't infringe. We don't owe them anything and we believe the evidence is going to lead you to that conclusion.

So there is a fundamental difference in the way in which Mr. Kidder and Mr. Kennedy are doing their calculus.

So Mr. Kidder, as a part of his calculus, he's looking at all the messages on the web that are sent using Campaign Composer. So he's carving out at the top -- there's a few that aren't, it's like Journeys, which is getting smaller, not Campaign Composer messages, so about 94 .5% of all personal messages in Campaign Composer. That's what he's starting with as his analysis but there's a

problem with that. There's a huge problem.

Campaign Composer will send a message on Black Friday. Okay. Of course marketers are getting inundated, everybody wants you to buy around the holidays. And so there's a group that's created, could be a thousand people in there. A week later, those same thousand people can get a message from Campaign Composer, regardless of anything they did. Those messages are not retargeting messages. That's what the '660 Patent is about, retargeting. Retargeting a consumer based on what they have done, an action they have taken.

I've gone in, I put something into my shopping cart and I've abandoned it. So what Mr. Kidder is doing is taking everything that Campaign Composer sends, even if it's not retargeting and therein lies sort of the tension between Mr. Kidder and Mr. Kennedy. The number of messages that are sent as multi-message campaigns are 2.5%. So this is retargeting. And you're actually going to hear from Mr. Miao, that it's actually less than 2.5%.

But for purposes of Mr. Kennedy's analysis, you're going to hear him tell you that monitoring the trigger condition and then doing something after that, that's the follow-up message, only 2.5%. So somewhere along the way, I don't know if Mr. Kidder just wasn't given this information or he's just ignoring this information but the

'660 Patent requires retargeting. So you can't sweep in ever single message that Campaign Composer sends. It defies logic, it makes no sense.

So ladies and gentlemen, I want to thank you for your attention to this matter. It's going to be hopefully not too long a week. We realize it is a big imposition on you and we just ask that you keep an open mind. And we believe the evidence, when you're done, is going to show that we don't infringe and that the patent is invalid.

Thank you very much for your time.

THE COURT: All right. Thank you, Mr. Campbell.

All right. I'll turn to plaintiff's counsel to call their first witness.

MR. FISHER: Your Honor, Postscript calls as its first witness, Alex Meyer.

Alex Meyer is the inventor of the '660 Patent in this case.

THE COURT: We'll have Mr. Meyer come forward and be sworn.

MR. FISHER: Your Honor, may I approach with binders?

ALEXANDER MEYER, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FISHER:

Q.   Good afternoon, Mr. Meyer.  Can you please introduce yourself to the jury?

A.   Hi, everyone.  My name is Alex Meyer.  I am a software developer, creator.  I have done this in a number of different capacities throughout my career as a software engineer, a product manager and an entrepreneur, business owner.

Q.   And we're going to talk about your work history in a moment but first, are you employed today?

A.   Yes, I am.

Q.   And are you taking time off of work to be here with us day?

A.   Technically not taking off time.  I'm currently on paternity leave, so I'm taking time from that.

Q.   And how old is the baby?

A.   She is four months old.

Q.   And where is your family day?

A.   They are in Traverse City, Michigan, on vacation.

Q.   Were you previously employed by Postscripts?

A.   Yes, I was.

Q.   When?

A.   I started in July 2021 and I ended in April of 2023.

Q.   What was your role while you were at Postscript?

A.   I was a product manager.

Q.   All right.  What is a product manager?

A.    The way I like to think about a product manager is they're like a quarterback on the team.  We help coordinate amongst the different members on our team, so like software engineers, designers, and we help plan and organize and decide what things we need to work on, what order we might work on them.

Another big thing that product managers do is we serve as the voice of our customers.  And what I am by that is that we have discussions with customers, we get feedback from them and we hear about their problems and then we bring those problems and feed that back to the team and help to try to make sure the team empathizes with them and understands the problems and, like, why we're working on things.

Q.    Is Postscript paying you to be here with us today?

A.    No.

Q.    Did they pay you for your time spent preparing to testify here day?

A.    Yes.

Q.    And give us a sense of what the rate was for that work.

A.    $300 an hour.

Q.    Do you have stock in Postscript, sir?

A.    I do.

Q.    And is that why you're here with us day?

A.      No, it is not.

Q.      What's the value of the shares you have in Postscript?

A.      At the time I acquiesced those shares, I believe it was probably somewhere between 30- and $60,000 worth.

Q.      Do you have stock in Attentive?

A.      Yes, I do.

Q.      How did you end up having stock in Attentive?

A.      I worked for a former employee called Privy.  After I left, they got acquired by Attentive and I got equity through that.

Q.      And what's the value of the equity you have in Attentive?

A.      At the time of the acquisition, it was about $180,000.

Q.      Is that why you're here with us day?

A.      No, it is not.

Q.      Why are you here with us day?

A.      I'm here because I care about the invention that we came up with, myself and my team.  We put a lot of hard work and blood, sweat, and tears into that, and I wanted to make sure that it's represented accurately in this case.

Q.      All right.  Let's talk about that invention.

        MR. FISHER:  Can we take a look at JTX-1.  This is the patent.

Take that down, Mr. Glass.

BY MR. FISHER:

Q.      Is this the patent covering your invention?

A.      Yes.

MR. FISHER:  All right.  We offer it,
Your Honor.

THE COURT:  Okay.  Any objection?

MR. SARKAR:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(JTX Exhibit No. 1 was admitted into evidence.)

MR. FISHER:  All right.  If we go to the first
page, Mr. Glass, and blow up the section there.

BY MR. FISHER:

Q.      Mr. Meyer, we saw in openings your name here first.
Can you tell us a little bit about the people listed
underneath you in that section labeled "Inventors"?

A.      Sure.  These were the other people that were on our
product development team.  So they might have roles like
software engineer or designer.

Q.      And at a high level, can you just describe the
invention that you and your team came up with?

A.      Sure.  At a high level, we invented the ability to
send multi-message campaigns that also then retargeted after
receiving the first message, allowed merchants to retarget
the subscribers within that campaign with a second message.

Q.      And prior to your invention, what were the main tools that businesses could use to message customers?

A.      Yeah.  So the main tools at the time were automations and campaigns.

Q.      Are you familiar with the tool called Attentive Journeys?

A.      I'm vaguely familiar with that.

Q.      All right.  Is that an automation tool or a campaign tool?

A.      My understanding is it's an automation tool.

Q.      What's an automation tool?

A.      So an automation, the way you can think about it goes -- it's based on activities that somebody does and receives a message as a result of that.

            MR. FISHER:  Okay.  Can we put up PDX-3.1.

BY MR. FISHER:

Q.      And, Mr. Meyer, do you remember this slide from Mr. Saulsbury's opening presentation?

A.      Yes, I do.

Q.      And is this slide consistent with your experience of how businesses use automation tools while you were a product manager at Postscript?

A.      Yes.

Q.      So we see here that there's three messages in this example.  Can you just walk us through what determines when

these messages go out to customers?

A.    Sure.  So the first one, this would be if the subscriber had gone to these websites, saw some products they were interested in, added it to their cart, and then later on abandoned it and didn't actually end up checking out, they could receive a message like this.

      The second one would be something where a subscriber might go on Pete's website and actually purchase something or place an order on his website, and then the message -- the second message would go out.

      The third one would be something where they placed an order and then UPS scanned your package on its way to your house, and then they would get a message based on that.

Q.    And do these messages go out automatically when these events that you just talked about occurred?

A.    Yes, they do.

Q.    Did you develop an understanding for why merchants, like Pete in this example, liked using automation tools?

A.    Sure.  So automations were great for businesses like Pete's because it allowed them to send highly targeted messages to subscribers based on, like, what they did.  So it often had -- would convert well.  So they would potentially purchase things because it was very targeted to them.

Q.      Were there limitations with the tool?

A.      Yeah.  So the main limitation with automations is that it requires somebody to actually do something.

Q.      So if no one does the thing, does anybody get a message?

A.      They would not, no.

Q.      So what control does someone like Pete have using automation over who gets a message and when they get a message?

A.      Pete would be able to, like, set up his automation and pick which types of actions or activities that he would want to trigger a message, but he -- and he would be able to write the custom message within that, as well.  But other than that, that's all he could do.

Q.      Okay.  That's automations, let's talk about the other tool you mentioned existed in the space campaigns.

        MR. FISHER:  Can we put up PDX-3.2?

BY MR. FISHER:

Q.      Do you remember seeing this slide, sir?

A.      Yes.

Q.      And does this slide accurately represent your understanding of how businesses used campaign tools while you were a project manager at Postscript?

A.      Yes, it does.

Q.      And how so?

A.    So this would be a very standard campaign that somebody like Pete's business would set up.  Something like a sale, encouraging people to purchase something on their website.  So they would customize this message and often send it to all their subscribers to encourage them to purchase.

Q.    So are campaigns sort of like a one-time blast message?

A.    Yeah.  I think you could probably think of it like that.

Q.    And could someone like Pete set up this campaign so that -- so that it sends follow-up messages to people who received the first message but then say didn't place an order?

A.    No.

Q.    And why not?

A.    It just didn't exist at the time.

Q.    What would you say is the core difference then between automations on one hand and campaigns on the other?

A.    So the main difference between the two was automations was based on the activities or actions that somebody took and then campaigns was merchant driven and so the merchant would decide who was getting a message and what that message would be.

Q.    Would you say there was a gap between the two tools?

A.      Yeah.  I think you could think of it as, like, a space between these two products that existed.  So marketers had the ability to highly specify individuals that they wanted to get messages based on what they did and they were able to send large groups of subscribers messages as well, but they were not able to do both where you would send large -- a large group of subscribers a message.  And then, also, based on what they did after receiving that message, get follow-up messages.

Q.      And how did your invention play into this?

A.      So, yeah, we -- that's what we invented.  We invented the ability to -- to send the initial message to a large group of folks or subscribers, and then based on the activities that they did after receiving that message, get follow-up messages based on those actions.

        MR. FISHER:  Let's put up PDX-3.3.

BY MR. FISHER:

Q.      Do you remember seeing this slide from opening?

A.      Yes.

Q.      And is this consistent with your understanding of how your invention differs from standard campaigns and automations?

A.      Yes, it does.

Q.      Can you just sort of briefly walk us through why?

A.      Sure.  So in this case -- again, this would be

something like a sale, marketers often use the term "flash sale," where they're, again, trying to target all of their customers or all of their subscribers with a message to encourage them to purchase something on their website.  And then they would be able to, after getting that message, set it up so that they could -- you know, he could customize something that would be based on did they place an order and they could get a custom message that way.  If they didn't place an order, they'd get a different custom message.

Q.     And could Pete set all of this up ahead of time in one go?

A.     Yes, he could.

Q.     Do you have a sense of why shops like Pete's would want to do this?

A.     Yeah.  So this was a pretty sophisticated marketing strategy that Pete and small businesses might not even know really existed before the tool existed.  It would give them the ability to make sure that they're targeting everybody to encourage people to purchase things on their website, but also then get follow-up messages that make sense to them.

So if they placed an order, they would get the right follow-up message and if they didn't place an order they might get, like, an encouragement to place an order on their website.

Q.     I think you said earlier that one of the jobs of a

product manager is to be the voice of the customer; is that right?

A.     Yeah.

Q.     Did you get the sense that customers were looking for this sort of functionality as an alternative to automations and campaigns?

A.     Yeah.  So at the time, through conversations with customers and observing how they were using our existing tools, it was obvious that they were trying to -- trying to do something more sophisticated and complicated like this, but were just not able to.

Q.     And what's the name of the product that you guys ultimately developed for Postscript?

A.     It's called Campaign Flows.

Q.     Let's look at Campaign Flows.

        MR. FISHER:  Can we put up PDX-3.4.

BY MR. FISHER:

Q.     And what are we seeing here, Mr. Meyer?

A.     This is the campaign's main page in the Postscript website.

Q.     So is this something that a merchant like Pete would see when they log in to Postscript's website?

A.     Yeah.  After logging in and clicking to go to the campaign's page, they would see this.

Q.     So if we wanted to rebuild this sort of flow that we

saw in Mr. Saulsbury's presentation, using the Pete's Pets example, can you walk us through how you would do that?

What's the first step?

A.    Sure.  So to do that they would click the button "Create a Campaign" over on the top right corner, and then "Create a Campaign Flow" on the left-hand side there.

Q.    Let's pause here for a second.

What's the difference if I clicked create Campaign Flow versus clicking standard Campaign?

A.    Campaign Flow would bring you to a Campaign Flows product, which gives you the ability to send those multi-message campaigns, configure branching for retargeting of a lot of different features.  The standard campaign was that single message, just simple campaign message.

Q.    Okay.  So we click Campaign Flow.

What's next?

A.    So after that, they would have to select their subscribers that they would want to target for this particular campaign flow.  In Pete's case I think he wanted to target all of his customers and subscribers, so he can select that segment of subscribers, clicking "Update" would save that segment.

Q.    Okay.  What's after that?

A.    After that, in Pete's example, I think he wanted to send an initial message to everybody telling them about

their sale that they had going on, so he could drag the message action on the left-hand side over to the right.  And then after doing that, customize the message to be whatever he wanted.

Q.    Let's pause here for a second.  The place where Pete dragged this message over, what's the name for that?

A.    It's typically referred to as a "User Interface."

Q.    And how did you guys go about thinking about designing this user interface?

A.    The way we were thinking about this was we wanted to make it really intuitive to our customers, so we were thinking about it as, like, a whiteboard.  So, like, if you draw -- it's kind of like if you were to plan this out on paper and draw it out, how it would come together and so that's kind of how we were thinking about putting it together.

Q.    So after you define what the message is going to say, this first message, what's the next step?

A.    So after customizing the first message, Pete could add a subscriber, wait for an event split.  So that's off on the side, the subscriber event split, he could drag that out onto the canvas on the right and then configure it there.

Q.    And let's pause here.

           What is a "subscriber event split"?

A.    So a subscriber event split is basically at this

point in the flow Pete could identify which event that he wanted to wait for.  And then so he could pick -- pick any of these different events, to wait around for all of the subscribers that received that first message at this point, and then he can customize the amount of time that he would have wanted to wait around for, and then based on what they did around that event can put them into different branches.

Q.    And what's the event that we saw in the Pete's example?

A.    It would be "Order Created."

Q.    And what's after that?

A.    He configured the wait times of -- for this case, I think he had a Labor Day Sale, so it would be four days.

Q.    Okay.  And let's pause there.

What is the wait time defined?

A.    That's just signaling how much time to wait to see if the subscribers who got the first message created an order. And if they didn't, they would go down the other branch.

Q.    Got it.

And so then what -- what's the next step that he does here in this flow?

A.    He would need to identify who would go in to Branch A.  In states he would want to have everybody who placed an order go into Branch A, so he might select something like total price is greater than zero, for

example.

Q.    And what would be some other examples of these branches that we looked at here, like can we rewind it just a little bit, Mr. Glass.

What are some of the other branches that people pick?

A.    The other types of events?

Q.    Yeah, right.

A.    There's lots of different types of events.  I don't know all of them offhand, but it could be an "order placed," a "shipping" type of event.  If you back up a little bit, you could show the full list, but I don't remember them offhand.

Q.    Got you.

Okay.  So we -- we do orders, it's got to be more than zero.  What happens after that?

A.    After that, he would want to set up his messages that depending on what somebody did in those four days would receive.  So you could add those messages to the flow.

Q.    So what -- who is getting the message here after A?

A.    So in Branch A, based on how he set it up, these would be -- everybody in this flow would receive the first message and then placed an order within those four days would receive this message.  So you could customize this to thank them for their order, for example.

Q.      And what happens after that?

A.      After that you could do the same thing in the other branch, so setting up a message in Branch B.  This would be anybody who didn't place an order within those four days, they would end up in Branch B.  So you could customize that message to be something encouraging them to purchase something on the website.

Q.      So we got our two messages for people who placed an order and people who didn't.  How do we schedule when those two messages are going to go out?

A.      He could do that by adding the "Delay Action" on the left-hand side.

Q.      And what's the delay action?

A.      That gave merchants like Pete the ability to wait for a particular time before sending that message.

Q.      How would he go about integrating that into this flow here?

A.      So he would drag that out onto the canvas over the message and then he would select a type of delay that he wanted to do, it could be for an amount of time or it could be a specific date and time.

        And so for Pete's example, I believe people in this branch would get it on the 2nd and so he could set that up.

Q.      Okay.  And does he do the same thing for the group of

people who are receiving Message B?

A.      Very similar.  He would do the same activity, just selecting a different time because I think -- or a different date because he wanted to send a reminder before the sale was over.

Q.      So at this point, then, has Pete instructed the flow that we saw Mr. Saulsbury go over in opening?

A.      Yes.

Q.      Okay.  Could he do more if he wanted to?

A.      For sure.  He could drag out many -- all of those different actions you see on the left-hand side, above messages, within those branches, which would create more branches.  He could kind of configure it really however he wanted.

Q.      I think my colleague over here mentioned one of these split events A/B.  What's split A/B and how is that different from a subscriber event?

A.      So split A/B is like -- in marketing we use A/B testing and so that's just kind of a way to split a group of subscribers into random groups.  They could configure that to be 50/50, so half the people go in Branch A, half the people go in Branch B, or they could configure it in different ways, however they wanted.

Q.      Going back to Pete.

A.      Yep.

Q.    When he's done setting up this flow, how does he get it out to his subscribers?

A.    He would first save his changes, that would save the flow, and then he could click the "Schedule" or "Launch" button, which would give him the ability to launch it right now, so that would just start the flow currently, or he could just schedule that campaign to go out in the future.

So for Pete's case, I think he wanted to schedule that to go out the 29th, so he could do that here.

Q.    And then once the messages go out, do you have a sense for how this all works.  How does it determine who gets what message after that?

A.    Sure.  So after he schedules and the -- that August 29th at 2:30 p.m. in this example happens, it just goes step-by-step.  So it gets all of his customers and subscribers at that period of time and then they get the first message.  After receiving the first message, it would wait for those subscribers to place an order for those four days.  If they didn't place an order in those four days, it would go down to Branch B, get a message on the 1st encouraging them to buy.  If they did place an order, they would go down to Branch A and then they would get the "Thank you" message on the 2nd.

Q.    And then after Pete sets this up, is he done or does he have to come back?

A.    He would be done, yeah.  That's it.

Q.    We talked a little bit about the user interface, I think is how you described this flow page here.

Was this easy to develop?

A.    It definitely wasn't easy.  It took a long time to make it look and work as seamless as it is appearing here. It's hard to lay things out like that, it's hard to configure things.  It took a lot of time and effort.

That's to say nothing about how difficult it is to then actually run the whole thing.  And so especially with campaign flows, you know, some of our merchants had millions of subscribers and so trying to keep track of all that and configure it and to do it in a way with all these complicated things was quite hard.

MR. Fisher:  Your Honor, I am at a breaking point.

THE COURT:  Okay.  I was going to say you have two more minutes, but that makes sense.

Thank you, Mr. Fisher.  And you can just sit there for one moment.

But, ladies and gentlemen of the jury, we're at a point right up at 5:00, so we're going to conclude for the day.  Thanks for your attention.

And just a reminder about the instructions I gave you, including the important one not to discuss with

anybody else the facts you learned today or your thoughts about them before you're deliberating later in the week.

We will thank you and excuse you and look forward to seeing you tomorrow morning for our start. We'll get started at 9:00 a.m.

With that said, Ms. Miller, you can lead out the jury.

COURT CLERK: All rise.

(Jury exits.)

THE COURT: All right. Please be seated, everybody.

MS. DURIE: Your Honor, there are two matters that I would like to put on the record from the opening, if I may.

THE COURT: Okay.

MS. DURIE: And the first pertains to counsel's discussion with respect to the slide that we had discussed earlier from the Information Disclosure Statement in the Prosecution History. I have it as Slide 60 in the printout and what counsel -- what I wrote down counsel said with respect to this slide is, "The examiner is telling Postscript that it gave the examiner a mountain of irrelevant material."

That is not what the IDS says. The IDS says, "An applicant's duty of disclosure of material information

is not satisfied by presenting the patent examiner with a mountain of largely irrelevant material," quoting from a case.  And then it says, "Patent applicant has a duty not just to disclose pertinent prior art references, but to make a disclosure in such a way as to not to bury it."

This is not accusing Postscript as having done that, it's saying the applicant has a duty not to do that and then the examiner then asks Postscript to provide the more limited submission with an explanation of relevance of those references.

I had understood based on the colloquy that we had before opening statement that Attentive was not going to argue that Postscript had done anything wrong with respect to its submission of the prior art references, but the assertion that the examiner is telling Postscript that it gave the examiner a mountain of irrelevant material is not only, I think, incorrect with respect to characterization of what the examiner said, but contrary to what I understood our agreement to be and it is an effort to reinject inequitable conduct into the case.

I have a similar concern with a second slide.  I have it as Slide 63, this is the slide at which counsel said that when Postscript provided that updated IDS did not provide the Journeys source code.  And counsel said, and again what I wrote down, we'll have the transcript, was,

"Source code, they had that.  They didn't give the source code to the patent office."

There is no evidence that Postscript had Attentive's source code in its possession and possibly could have provided that source code to the patent office.

So when we saw this slide, it's true, Postscript did not give the Journeys source code to the patent office. We didn't object to the slide because that is a true statement, but the assertion that we had the source code, and the obvious implication that we hid it from the patent office when we didn't provide it, is, again, just incorrect and, again, contrary to what I understood the agreement to be, which is that they would not be accusing Postscript of misconduct.

THE COURT:  Okay.  So noted.

MS. DURIE:  Thank you.

MR. CAMPBELL:  Judge, first of all, that's waived.  You have to make that objection during my opening. And I made it very clear that they did their job, they were trying to do their job, they gave the patent office 315 references.  And then I quoted from what was stated directly out of the information disclosure statement.  It was a quote.

And if there was a concern, Ms. Durie should have stood up and objected.  That's waived.

And then on the second one, it's the same issue, it's waived. I don't know exactly what I said, but the words are, "the patent office did not have the source code." The jury is going to get the source code. They're going to get the relevant pages. So I don't think there was anything I did.

In fact, I dialed it back and I said, they did what they were supposed to do, they gave the patent office a lot of art, and the patent office said, that's a lot of work for me. I can't get through all of this, help me.

And so I think, Judge, that this suggestion that I crossed some line is fabricated and I think it's overstated and it's waived.

MS. DURIE: So, Your Honor, on the waiver point. I was brought up not to interrupt opening statements or closing arguments, other than, absolutely in extremis. And that is what I tell people that I work with. And that is why I waited and I wanted to put it on the record and note, all I did was ask to put it on the record.

I do think it is -- violated the agreement we reached. I'm not asking for the Court to do anything at this juncture. If the suggestion is that when this happens in closing, I should be standing up and interrupting counsel's closing, that is what I will do, but that is not the decorum that I would hope that we would have in the

courtroom.

I would hope that instead we would not -- we would be able to just make agreements and stick with them without interrupting each other's presentations.

MR. CAMPBELL:  I tried a case last term in Ms. Durie's backyard with Judge Freeman and there was an accusation that somehow I had said something and the judge disagreed and -- but the judge said, first and foremost, you had an army of lawyers back here, you know the rules, you waived it.  You've got to make the argument right then and there to the Court so the Court can decide.

I have made the objection, Your Honor, in a closing in a trial down in the Western District with Judge Frank Whitney and it was sustained.  You have to stand up, it has to be done right then and there, they waived.

THE COURT: Okay.  All right.  Thank you.  Those comments are noted.  I'm not being asked to make any decision or to make any order.  And even if I were, the content of what's been stated in part depends on what the transcript actually says.  For example, and this may not be right, but I was listening pretty closely to Mr. Campbell's opening as it related to the reference about not providing the PTO with the source code.  I don't recall him saying that Postscript had the source code.  You might have, but we'll get the transcript, because I was thinking, you know,

I don't think he said that.  But he might have.  In any event, if I were making a decision, I would have to read the transcript and I didn't get a chance to do that.  And I have not been asked to do that, so I don't need to make a decision now.

So we'll note those comments for the record and if I'm asked at some point to provide some relief with the chance to review whatever comments are at issue, then I certainly can rule on it at that time.

MS. DURIE:  And I'm happy to do that, Your Honor.  I was writing it down as I heard it.  It's possible that I misheard it.  But Mr. Silver and I heard the same thing and we'll check the transcript and submit it to the Court.

THE COURT:  And that could be, too, for sure, if you followed on Realtime exactly what was said.

All right.  So I know the folks in the room have work to do, so I don't want to keep you much beyond our 5:00 p.m. endpoint.

The two things I would say is, I think my staff started to work with counsel to try to figure out a solution such that if the e-mail we get in the morning is going to have documents that are voluminous enough that they can't be transmitted by way of a simple e-mail, maybe have a ready-to-go solution that you have as to how we can access

them.  So we'll get follow up on that from you.

And the other piece, I would just reiterate, that what's very important for the disputes being addressed 8:30 is not just that a party identifies them, including in that chart, but that the parties are meeting and conferring, actually talking through the substance of their positions and ask the other side and say look, we're going to argue blank, what's your response to that?

And then says, well, our response is going to be blankety-blank, and this is the reason why we think that is no good.  And so that clearly did not happen with many of the disputes that were raised this morning.  That really needs to happen so disputes can be resolved in a timely fashion.

So I ask the parties just to keep that in mind. So figure out a nice medium for everyone, so we do that for the four remaining days when they're meeting and conferring.

With all that said and if there's nothing further, we'll end our court day and the Court will stand adjourned.  Thank you.

COURT CLERK:  All rise.

(Court adjourned at 5:07 p.m.)

--------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court