295

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE


STODGE, INC., d/b/a     )  Volume II
POSTSCRIPT,             )
                        )
        Plaintiff,      )  C.A. No. 23-87-CJB
                        )
v.                      )
                        )
ATTENTIVE MOBILE, INC.,)
                        )
        Defendant.      )



                    Tuesday, August 26, 2025
                    8:30 a.m.
                    Trial

                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
     United States Magistrate Judge



APPEARANCES:

        McCARTER & ENGLISH, LLP
        BY:  DANIEL M. SILVER, ESQ.

               -and-

        MORRISON & FOERSTER, LLP
        BY:  TIMOTHY CHEN SAULSBURY, ESQ
        BY:  DARALYN DURIE, ESQ.
        BY:  HANNAH JIAM, ESQ.
        BY:  RAMSEY FISHER, ESQ.
        BY:  JOYCE LI, ESQ.

                        Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
BY:   MICHAEL J. FLYNN, ESQ.
BY:   CAMERON CLARK, ESQ.

-and-

CAHILL, GORDON & REINDEL, LLP
BY:   CHRIS CAMPBELL, ESQ.
BY:   BRITTON F. DAVIS, ESQ.
BY:   MATTHEW WOOD, ESQ.
BY:   RAHUL SARKAR, ESQ.
BY:   HALIMA NDAI, ESQ.

-and-

GIBSON, DUNN & CRUTCHER, LLP
BY:   ELI BALSAM, ESQ.

                    Counsel for the Defendant


            ---------------------------


            COURT CLERK:  All right.  United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

            THE COURT:  Please be seated, everybody.  All right.  So with everyone present, let's go on the record.  And for the record, we're here today for day two of our trial, and particularly now for our status conference at 8:30 before the trial begins.

            The parties have presented me with two outstanding disputes relating to -- that they wanted to raise, and I've had a chance to review them, at least to

some degree early this morning.

I know I also did receive a letter from -- from Postscript, but I'll put that aside for now because at least the disputes relating to the trial that I need to resolve are most front in my mind.

Let me just go ahead and tell you what my inclinations are with regard to these disputes, based just solely on what I've read, and then the parties can tell me if they want to make any further argument that -- about that to change those inclinations, etc.  I think that may speed things up.

So the first issue is this StackCommerce issue, and I understand as a general matter that Postscript believes at least that Attentive wants to bring out evidence relating to the actions of at least Mr. Beller, perhaps, Mr. Turner.

The gist of the allegations and the evidence here, I think, relates to Postscript's former Motion in Limine Number 2, and as I understand it at a general level, at least Postscript is concerned that the evidence that Attentive wants to bring out is that, for example, Mr. Beller when he was working at Postscript, but also working at StackCommerce, but obtained information from Attentive about Attentive's products purportedly under false pretenses because he didn't disclose he worked at

Postscript.

And the fact he obtained this evidence is some evidence, perhaps that Postscript copied Attentive's products, and at least previously in the case was said to be evidence that Postscript infringed Attentive's patents.

And so this came up as part of Motion in Limine Number 2. In that motion, when asked to explain how it is that this StackCommerce evidence was relevant to the case, Attentive's sole position was, it's relevant to our claims of patent infringement, the infringement of our patents, relevant, for example, so willful infringement or copying of our product demonstrating that Postscript infringes our patents.

And so because at the pretrial conference at that point in the case, the Court believed that it had resolved Attentive's claims of patent infringement by granting summary judgement on it and ultimately the Court later confirmed that it did, I denied the motion in limine as moot, moot because the sole basis that Attentive was putting forward for putting the evidence in the case related to its claims of patent infringement, which were no longer in the case or at least soon would be clarified, were no longer in the case.

So my indication presently is that this evidence isn't relevant to claims or defenses that are currently at

issue in the case because there was a previous assertion of relevance because it was a patent infringement of Attentive's patents, which aren't a part of the case anymore.

Now, in the objections, the document that I received, Attentive, I think, suggested that Postscript opened the door to putting this evidence into the case affirmatively by comments that Postscript's counsel made in its opening statement to the effect that Attentive hadn't achieved success in the right way, and instead, was doing it the wrong way.

What I think Attentive means there is Postscript's assertion is in its opening statement that Attentive infringes Postscript's patents.  Now, of course, the first Postscript is saying is that its claims that Attentive infringes its patent, because it does, and that's what the whole thrust of Postscript's case here is in terms of its claims.

I don't see how, as a defense to the assertion that Attentive infringes Postscript's claims, evidence or argument that, well, Postscript, you infringed our patents or you copied our products as a defense to that.  And I don't see how Postscript's assertion of patent infringement by Attentive opens the door in some way to that.

I don't know, of course, but later testimony

will be, I mean, I guess, theoretically, if Mr. Beller got up on the stand and said, we never copied anybody's products, we respected everybody's ideas, and we never engaged in copying, that may give rise to some strong argument that maybe that opens the door.

And then lastly I would just say, while I don't think there is much or really any relevance that I can see as to this testimony that's been presented, I do think there is some concern about unfair prejudice to Postscript or jury confusion for reasons we've already talked about, which is the jury is going to be assessing whether or not Attentive infringes Postscript's patents or whether Postscript's patents are invalid.

But I think, basically, because both products are at issue here, of course we know Attentive is going to be talking about how it's an innovator, I think there is some risk that the jury, if the evidence is not properly maintained, could get the impression somehow that whether Postscript infringed Attentive's patents is somehow at issue and that would be the wrong impression.

And I think I need to put some guardrails on to make sure it doesn't get that impression, so I think the evidence is not particularly relevant or relevant at all, but I see it.  I think there is some risk of unfair prejudice and jury confusion.

So my inclination is to grant Postscript's request, and in the absence of further door-opening situation, to not permit Attentive to affirmatively bring out this type of evidence in the case.

The second issue was Postscript's request that I construe the term "trigger condition."  And there, let me tell you my inclination, which is that, at least as of the current time, I think I'm in agreement with Attentive, that I'm not sure that I've been convinced that I need to construe the term right at this moment, and I'm not certain that I will ever need to construe it.  I might.  And let me explain why.

I think Postscript has proposed a construction that has two components.  The first is that, "a trigger condition need not specify the time at which the message which it is associated was sent."

I don't think there's any disagreement between the parties about that point.  I think Attentive has told me, there's no disagreement.  And of course, typically, I would only construe a term if the parties disagreed about its meaning and there was an *02 Micro* dispute about it.

The second most portion of the construction is that a trigger condition "may specify which subscribers received the message to which it is associated."

Part of Postscript's assertion here is that it

believes a trigger condition could be "clicked but didn't buy."

Attentive has told me yes, it agrees, that can be a trigger condition.  I think Attentive, at least from what I read here, takes issue with the word "may" because I think what it's indicating is that, yeah, there can be a lot of things that are trigger conditions.  We think that Postscript is attempting to highlight one example among others in a way that -- and I agree -- would typically be antithetical to normal claim construction practices, which is why we don't kind of like to glamorize one example.  And so I'm not certain that even if I were to construe the term, that the second portion is appropriate.

I'm also not certain that the impulse for the second portion, you know, presumably would be that there's some dispute that has to be resolved, and I'm not sure there is a dispute, a click but didn't buy amounts to a trigger condition.

The last thing I would say is, in looking at Postscript's proposal, there's a lot of discussion about time, and timing and how -- something about time and timing is driving it in its proposed intrinsic evidence.  But it seems to not only be trying to bolster the words in its construction but also said do something to kind of convince me that this has something to do with a timing issue.

And I'll say, particularly the sentence in Postscript's proposal that says, "the implicit premise of Attentive's argument is that such criteria cannot be a claimed trigger condition because they can only determine who receives the message, not when they receive it."

And so Postscript is really only pointing to time as the trigger condition. I didn't understand that sentence. I'm not sure I understand what Postscript is saying, but my understanding is, I think, like for example, Attentive is arguing in the case that with regard to the monitoring condition, it doesn't monitor because it simply sets a particular time at which a further message is going to be sent and it gets sent.

I'm not sure how that argument has anything to do with a dispute about the word "trigger condition" or "monitoring." That seems like a noninfringement argument.

So anyway, those are my inclinations, and so I guess the last piece on that proposal is Attentive also said hey, look, we just got Postscript's intrinsic evidence after midnight because we don't think you have to construe this, but if you did, give us a chance to respond and, you know, take it up later, like, for example, maybe at the prayer conference, and have a chance to hear both things.

That seems like a fair process to me. I'm not sure there's a current dispute I have to resolve, if I had

to construe it at all.  The benefit of some time, a good response from Attentive, maybe they'll see if they agree with the other part of what Postscript has said and take it up at the prayer conference.

Okay.  So those are my inclinations as to those two issues that have been presented.

Let me ask counsel if they want to make additional argument and what they have to say about those.

Postscript?

MS. DURIE:  I think on the first issue, no, obviously.

And on the second issue, that's fine.  I think it would be helpful for us to know if Attentive were going to propose a construction, what it would be.  But we're happy to take it up at the prayer conference and see at that point whether it feels like there's a ripe dispute.

THE COURT:  Yeah, I think so -- what Postscript has done so far is it has proposed a construction, a two-part construction, and it has put forward some intrinsic evidence to support it.

My -- my idea or thought would be that I give Attentive a chance to simmer the proposing construction, if it wishes to.  Or if it was going to say something like, we don't think a construction is needed and then they -- it would need to tell me, you know, whether it disagrees with

Postscript's proposal and why because I would -- just like in a typical claim construction process, just saying something like the disputed plain and ordinary meaning doesn't help me understand whether the parties have a disagreement with the nature of the claim.

And then if there is any intrinsic evidence that Attentive wanted to cite, that it would provide it.

I think maybe Attentive would do that, say, by -- you know, before -- you know, by the first thing Wednesday morning, so that Wednesday afternoon or evening when we're going to the prayer conference, I have at least both sides' submissions and I can address further argument with them at the prayer conference if need be.  So that would kind of be my thought.

Let me ask Attentive's counsel if there's more they want to say as to these issues.

MR. WOOD:  Yeah, from --

THE COURT:  You can come -- you can come forward to the podium, Mr. Wood.

MR. WOOD:  Thank you, Your Honor.

From Attentive's perspective, we -- we understand your ruling and we -- we agree.  That is what we were trying to convey to Postscript yesterday, that we -- we think whether this evidence becomes relevant is going to depend on -- on what happens throughout the trial.

So we -- we understand your position, and that's where we are as well.  Appreciate it -- appreciate it, Your Honor.

THE COURT:  All right.  Mr. Davis.

MR. DAVIS:  On the claim construction issue, I -- I think that's a -- you've -- you've hit the nail right on the head, essentially.  And -- and as set out in our position statement, we think "click but did not buy" could be a trigger condition, if the system used it as a trigger condition.  And we're -- and there's a classic fact dispute here.  We don't believe our system uses that thing as a trigger condition.  It sets a timer, which we're saying is not a trigger condition under the positions they've taken.

THE COURT:  And Ms. Frederiksen is pointing to it as well.

MR. DAVIS:  In paragraph 940 of her rebuttal.

THE COURT:  I think you're saying, look, can "click but didn't buy" be a -- effect the trigger condition?  Sure.  But do -- do we use it as a trigger condition?  No.

MR. DAVIS:  That's exactly right.

THE COURT:  We -- we use something as the impetus to send our message, which is did a particular time occur.  Both sides agree that's a noninfringement argument.  We think that's noninfringement.

MR. DAVIS:  A hundred percent.

THE COURT:  Okay.  That's what I thought the status quo was.

Okay.  All right.  Anything further, Mr. Davis?

MR. DAVIS:  No, Your Honor.

THE COURT:  And are you -- are you good with that plan in terms of how you guys would respond about any more claim construction issues?

MR. DAVIS:  Absolutely.  Tomorrow before the 5:30 deadline is when you'd like it?

THE COURT:  Yeah.  So what I'd be ordering is that Attentive submit a responsive proposed claim construction for trigger condition, or if it was not proposing a construction, would it at least explain whether it disagreed with any aspects of Postscript's proposal.

And to the extent there was any intrinsic evidence or other evidence that Attentive would wish me to consider as part of this dispute, that it submit it just at the same time in which the parties wish -- by 5:30, in which they're submitting any other dispute.

I'll have that stuff, maybe I'll be able to look at both sides during the day.  One of the things I'll schedule for prayer conference is we'll have to construe this term.

Does that make sense?

MR. DAVIS:  It makes sense, Your Honor.  I think

our position will be that you don't need to construe it, and then we'll point out why their construction is wrong based on the intrinsic evidence, but we'll -- we'll get the materials.

THE COURT:  Okay.  Great.  So that -- I'm sorry.

Ms. Durie, do you have something further?

MS. DURIE:  No, that's fine.  On that issue, that's fine.

THE COURT:  Okay.  Then, thank you, Mr. Davis.

So on those two issues, my -- my inclination will become my ruling with regard to Issue Number 1, which is that at present I see no relevance to the stack evidence and do see it as having the potential to induce unfair prejudice to the jury and confusion.  So absence of further event, or order of the Court, neither side should affirmatively bring out that evidence in the case.

MS. DURIE:  May I just ask for a point of clarification on that?

You said, "absent further evidence."  I'd like to be clear that to the extent that Attentive thinks that there has been some door opening, that we address it with Your Honor outside the presence of the jury at sidebar, rather than just asking the question and forcing us to object in front of the jury.

THE COURT:  Okay.  That makes some sense to me.

Mr. Wood, do you have some disagreement with that?

MR. WOOD:  I think this was the crux of the dispute we had.  Our position is that because the -- they had asked to go first, and our response to that was that's typically what we would do if the motion in limine had been granted at the pretrial conference, it had been denied and, therefore, we believe it would be appropriate to object at the time the evidence was attempted to be rather than us have to affirmatively seek leave.  Whatever your guidance is on that, Your Honor.

THE COURT:  Yeah.  So I think it's appropriate, as Postscript is suggesting, that if we have an issue that has been joined and raised and the Court has made a determination that certain evidence should be excluded, absent some further event occurring that would somehow open the door, I think the party that thinks that a door has been opened because it knows that the evidence is such that you've already had a dispute in which the Court has said no, it knows it has to tread more carefully, you can't just have the evidence blurted out because it thinks maybe it's relevant.

And it makes sense with regard to that kind of situation, if it thought that, you know, now certain evidence is relevant, it would address the issue with the

Court and the other side at sidebar to get a ruling from the Court, to make sure everybody stays on the right side of the order and nobody violates it.

So I think Postscript's proposal is appropriate, and I'll make that part of my ruling here.  Okay.

MR. WOOD:  Understood, Your Honor.

THE COURT:  And, secondly, we'll deal with the trigger condition issue, as I said, about receiving the information from Attentive by 5:30 tomorrow, and absent any further event dealing with the issue at our prayer conference.

Okay.  Those, at least I think, were the issues that the parties thought I had to resolve before trial began.

Is there anything further in that regard I need to take up at this time from Postscript's side?

MS. DURIE:  No, Your Honor.

THE COURT:  And, Mr. Wood, on behalf of your side?

MR. WOOD:  No, Your Honor.

THE COURT:  Okay.  I know our jurors were filing in, so we'll go back and try to get everything ready, and we'll let you know when we're ready to begin our trial today.

The Court will stand in recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

THE COURT:  Please remain standing, everybody. We'll have the jury brought in.

(Jury enters.)

THE COURT:  All right.  Everyone, please be seated.

Ladies and gentlemen, welcome.  And today is day two of our trial.  When we last left, Postscript was in the midst of the direct examination.  So we'll have our witness called back to the stand and remain sworn.

Mr. Meyer, please be seated.

MR. FISHER:  Good morning, ladies and gentlemen. I realize I forgot to introduce myself yesterday.  I'm Ramsey Fisher.  I'm a lawyer for Postscript.  Thanks for your service.

DIRECT EXAMINATION (Continued)

BY MR. FISHER:

Q.    Mr. Meyer, thanks for being back here with us today.

Yesterday we were talking about Campaign Flows and how it works, and we were doing that up on the screen here.

What's the relationship between Campaign Flows and the patent that we were looking at at the beginning of our discussion?

A.      Campaign Flows is the product, and the patent describes, like, the underlying technology of that.

Q.      What was your involvement in putting the actual patent together?

A.      I had discussions about what we came up with, but I didn't write it or file it or anything like that.

Q.      And so who actually wrote it?

A.      I'm not sure exactly.  I'm assuming Postscript's lawyers.

Q.      And who did you have those discussions with?

A.      Again, Postscript's lawyers.  I don't remember the names off the top of my head.

Q.      Got it.  Let's -- let's take a look at the patent.

        MR. FISHER:  Mr. Glass, can we put up JX-1, and go to Column 32, Line 44.

        And this is in your notebooks, too, ladies and gentlemen.

        And I want to blow up that step, yeah, that says the word "monitoring" -- "monitoring the trigger condition." We saw this repeatedly in opening statements.

BY MR. FISHER:

Q.      Mr. Meyer, at a conceptual level, can you explain why

this step in the patent is important?

A.      So at a high level, you would want to keep track of who is receiving the messages within the Campaign Flow, so that's why this would be important.

Q.      Can you give us an example?

A.      Sure.

        So if you had a -- well, a segment of subscribers that were all of your subscribers, you would want to keep track of whether or not they were still a subscriber because you wouldn't want to send a message, for example, to somebody who unsubscribed.

Q.      And why would that be important, to keep track whether the people are still subscribers?

A.      I'm not a specialist in compliance, but my understanding is you're -- you're not allowed to send messages to people who have unsubscribed.

        MR. FISHER:  Can you take that down, Mr. Glass.

BY MR. FISHER:

Q.      Mr. Meyer, do you remember when Postscript launched Campaign Flows?

A.      I believe the date was October 13th, 2021.

Q.      And just to be clear, was that -- was that the sort of public release to the whole -- all of Postscript's customers?

A.      Yes, I believe that is true.

Q.    Okay.  Did you pitch the idea for Campaign Flows to Postscript?

A.    Yes, I did.

Q.    What was the initial reaction?

A.    It was a mixed reaction.  Yeah.

Q.    Why do you say that?

A.    Because Campaigns, at the time, was a very popular product with our merchants.  It was also the business's moneymaker.  It was the main source of revenue for the business.  And so I think rightfully the business was a little nervous that we would mess with anything that was making them most of their money and was a very popular product.

Q.    Why did you get the green light to go ahead and do it?

A.    I'm guessing we got the green light to do it because, ultimately, it gave our merchants better tooling to do the things that they were trying to do, specifically send those like more sophisticated marketing campaigns.  It was able to do this for not only big merchants, but also small shops had the ability to do this as well.  So I think the business saw the value in that.

And I think the business also probably saw the value that it could also make money for the business because if you created this tool that allowed you to send multiple

campaign messages and campaigns were already sending a lot

of message, it could increase the revenue of the business.

Q.      Are you proud of where Campaign Flows has ended up?

A.      Yeah, very proud.  I think we identified this gap in

opportunity in the market, and we didn't just -- you know,

not mess with a very popular product.  We listened to

feedback from our customers and came up with this really

cool innovative product.

MR. FISHER:  Pass the witness.

THE COURT:  All right.  Thank you.

Cross-examination?

MR. SARKAR:  May we approach the --

THE COURT:  I'm sorry.  Good morning,

Mr. Sarkar.  You said, can you approach the witness?

MR. SARKAR:  Yes.

THE COURT:  You may.

MR. SARKAR:  Good morning, ladies and gentlemen.

My name is Rahul Sarkar.  I represent Attentive in this

matter.

CROSS-EXAMINATION

BY MR. SARKAR:

Q.      Good morning Mr. Meyer.

A.      Good morning.

Q.      Mr. Meyer, let's talk a little bit about what you

claimed to have invented in the '660 Patent.

Now, Mr. Meyer, the only thing that you can say Postscript invented is a multi-message campaign that uses Shopify's and merchant website's events.  And that could retarget subsequent messages to a group of subscribers based off of those events or follow-up events; is that right?

A.     That sounds accurate.

Q.     Okay.  Let's go through those elements one by one, Mr. Meyer.

Now, Mr. Meyer, you did not invent multi-message campaigns, right?

A.     That's correct.

Q.     And you also did not invent collecting Shopify events from merchant websites, correct?

A.     Correct.

Q.     And you also did not invent targeting a group of subscribers with advertising messages; is that right?

A.     Correct.

Q.     So to sum up, Mr. Meyer, Postscript did not invent multi-message campaigns, it did not invent collecting Shopify events from merchant websites, and it did not invent targeting consumers through advertising messages; is that right?

A.     That is correct.

Q.     In fact, Mr. Meyer, you yourself can't think of a single idea that came from your brain with respect to the

invention of the '660 Patent.  Isn't that right?

A.      It was a number of years ago at this point.  And yes, it is extremely hard to identify one single idea that was not influenced by others for this exact thing.

Q.      Thank you, Mr. Meyer.

So sitting here, that is your testimony, that you can't think of exactly -- of a single idea that you yourself contributed to the '660 Patent?

A.      I can talk about the ideas and concepts that I was involved with in discussions and stuff like that, but like extracting an exact idea from someone's brain is extremely difficult to do, if not impossible.

Q.      But, Mr. Meyer, it's a yes-or-no question.  Sitting here, you can't think of a single idea that you yourself contributed to the '660 on patent?

A.      Again, I can talk about ideas that I did contribute to; I can't say that it was definitely mine without a question of doubt.

Q.      Let's talk about a few other ideas that existed around the time of the '660 Patent, Mr. Meyer.

Now, Mr. Meyer, you'd agree that campaigns as a marketing functionality also existed before Postscript's Campaign Flows product; is that right?

A.      Yes.

Q.      And you've agreed that they also existed before

Postscript's '660 Patent; is that right?

A.      Yes.

Q.      And so you'd agree that Postscript did not invent campaigns for the marketing functionality either; is that right?

A.      That's correct.

Q.      And, Mr. Meyer, the campaigns that existed before the Campaign Flows product and the '660 Patent, those campaigns were able to send marketing messages to a large group of subscribers; is that right?

A.      Yes.  My understanding is they were able to send a single message to a large group, yes.

Q.      And so it's fair to say that you agree that Postscript did not invent campaigns that sent marketing messages to a large group of subscribers either; is that right?

A.      We did not invent the ability to send a single message to large groups of subscribers, no.

Q.      So, Mr. Meyer, you saw drafts of the '660 Patent while it was being prosecuted; is that right?

A.      Probably, yes.

Q.      And I'd like, if you could, to turn to the tab marked DTX-619 in the binder that I handed to you, and just let me know when you're there.

A.      Okay.

Q.    And this document, this is the file history of the '660 Patent, right?

A.    I'm not sure exactly what it is, but yes, that looks like that's what it is.

MR. SARKAR:  I'd move to admit this document, that is the DTX-619.

THE COURT:  Any objection?

MR. FISHER:  No objection.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 619 was admitted into evidence.)

BY MR. SARKAR:

Q.    Mr. Meyer, turn, if you could, to page 622 of this document.  Just let me know when you're there.  I realize there is --

A.    Where do you find the page number?

Q.    It's on the top right of the -- each page.

A.    Okay.  Yes.

Q.    And, Mr. Meyer, the first signature on this page states, "Alexander Colin Meyer."  Right?

A.    Yes.

Q.    And that is you, Alexander Colin Meyer?

A.    Yes.

Q.    So that's your signature on this declaration that you submitted to the Patent Office; is that right?

A.    Yes.

Q.    And you see in this declaration, in the first bullet point it says that this application was made or authorized to be made by you.

So the application was submitted either by you or on your behalf; is that right?

A.    Yes.

Q.    And let me show you some correspondence that was sent by the examiner responsible for examining this patent application.

So turn, if you would, to page 494 of the same document.  Just let me know when you're there, Mr. Meyer.

A.    Yep.

Q.    And in paragraph 6 of this document -- well, right above that, right above the paragraph, it says that this was allowable subject matter; is that right?

A.    Yes.

Q.    And so on this page, the examiner is saying that the claims of the '660 Patent were allowed over his examination of the prior art; is that right?

A.    Yes, that was.

Q.    And then in paragraph 7, the examiner is discussing Postscript's information disclosure statement, or IDS; is that right?

A.    That's what it looks like, yeah.

Q.    And Mr. Meyer, an IDS, or information disclosure statement, is Postscript's disclosure of what it believed to be the prior art that was relevant to the application that became the '660 Patent; is that right?

A.    Sure, that sounds right.

Q.    And in this discussion of Postscript's information disclosure statement, Mr. Meyer, the examiner states that, "An applicant's duty of disclosure of material information is not satisfied by presenting the patent examiner with a mountain of largely irrelevant material."  Is that right?

A.    Yes, it does say that.

Q.    And then continuing on the same paragraph, the examiner writes that, "The patent application has a duty not just to disclose pertinent prior art references but also to make a disclosure in such a way as not to bury it, that is, bury the examiner within other disclosures of less relevant prior art."  Is that right?

A.    It does say that.

Q.    And, Mr. Meyer, Postscript submitted hundreds of references to the patent examiner.  Is that right?

A.    I don't know exactly how many.

Q.    Sure.  Let me help you clarify that.

      So turn, if you would, to page 478 of the same exhibit, and just let me know when you're there.

A.    Yes.

Q.   And so, Mr. Meyer, this is the same information disclosure statement, or IDS, that the examiner appears to have been talking about in the last page that we saw, right?

A.   Uh-huh.

Q.   Okay.  And, Mr. Meyer, you see that this information disclosure statement consists of ten pages, right?  And this is the first page of that ten?

A.   Yes.

Q.   And, you know, in the next nine pages of this, we'll see that, you know, these pages contain between 24 and 35 references apiece.  Does that sound right?

A.   I have no idea without referencing this.

Q.   Please feel free to look through the next nine pages.

A.   Okay.  Can you repeat the question?

Q.   In the ten pages that begin at page 478, we see between -- on each page between 24 and 30, references apiece; is that right?

A.   There's about 12 a page, I think.

Q.   Well, on the first page, on 478, Mr. Meyer, there's 24 references listed, right?

A.   Yes, that looks correct.

Q.   And then on the second page, Mr. Meyer, there's another 20 -- well, there's another around 24 pages listed?

A.   24, yes.

Q.   And so let's say that there's at least -- I mean, I

think you'd agree that there's at least 200 references that Postscript submitted as part of this information disclosure statement?

A.    I wouldn't be able to confirm the number off the top of my head without counting all of them.

Q.    We can go through the pages one by one.  So we saw that on the first page, there were 24 references, right?

A.    Yes.

Q.    On the second page, there were another 24 references?

A.    Yes.

Q.    So that's 48 references.

On the third page, there are 18 references; is that right?

A.    I think 14.

Q.    14 references.  Okay.  So now we're at 63 references?

A.    Okay.

Q.    Is that right?

A.    Sounds about right.

Q.    Then on the fourth page, there's another 14 references?

A.    Yes.

Q.    So now we are at around 82 references?

A.    I'll take your word for it.

Q.    And so, Mr. Meyer, instead of going through the rest of the pages, I'll grant you that, let's say, on average

there's 20 pages on each of the ten pages, right, to average out the ones that had 14 and the ones that have 24, the ones that have 30, and you agree that there's somewhere between 200 to 300 references listed on the idea that you submitted to the Patent Office?

A.    I would not be able to confirm that.  I think if I'm doing the math offhand, the first two pages list A, so that's 48.  And the third page goes to 63.  There are two foreign patent documents, that would make 65.  And then pages 4 through 10 or 9 is C, and that would be 70.  So 65 plus 70 would be 135.

Q.    And that is the list of references that you assert were the total number of references submitted?

A.    From looking at this document, that is the number that it looks like was disclosed.

Q.    Please open up JTX-1.  I believe that's the patent. The '660 Patent.

A.    Sorry.  This binder kind of fell apart.

Q.    It might be in your binder from my colleague, as well.

A.    Yeah.

Q.    And then you see the number of references cited on the face of the '660 Patent?

A.    Can you help me find it?

Q.    Sure.

So, Mr. Meyer -- Mr. Meyer, this looks like JTX-1, the '660 Patent; is that right?

A.    What are we looking at?

Q.    Mr. Meyer, what's shown on the screen -- apologies for the technical interruption.

What's shown on the screen is the cover page of the '660 Patent; is that right?

A.    Yes.

Q.    And then -- and then on the second page, shown here, we see the list of references cited; is that right?

A.    Yes.

Q.    And -- and you see on this -- on this page there are dozens of references cited on just this first page, right?

A.    There seem to be a number, yes.

Q.    And then on the third page, it continues, and it lists dozens more references on the next page; isn't that right?

A.    Sure.  I wouldn't be able to say exact number, but there are many.

Q.    And then on the fifth page, there's another set of dozens of publications presented -- recited on the face of the patent?

A.    It's a little bit hard to parse these, but sure. There are a few references on that page.

Q.    So let's go back to page 4, Mr. Meyer.  Or page 3.

Sorry, Mr. Meyer.

You see on this --

MR. SARKAR:  Next -- yeah, that one.  Page 3, please.

BY MR. SARKAR:

Q.    You see on this page that there are dozens of references cited on the face of the '660 Patent, right?

A.    Yes, there are a number.

Q.    And you understand that these -- that this set of dozens of references was submitted to the examiner by Postscript as prior art that was relevant to the examiner's determination of whether the '660 Patent is valid or invalid, right?

A.    I was not part of submitting it, but it does appear that these are references cited in the patent.  Yes.

Q.    Let's go to the next page, please.

And then on this page we see another set of dozens of references filed by the -- filed by Postscript to the patent examiner to aid the examiner's consideration of whether or not the '660 Patent was valid, right?

A.    Yeah.  Again, it's hard to parse how many, but there does seem to be a number.

Q.    And then let's go to the next page.

And here we see another -- another set of dozens of references that Postscript submitted to the examiner,

right?

A.      Yes.

Q.      And let's go to the next page.

        And then you see another set of references, and I believe this is the final set of references that was submitted to the examiner by Postscript; is that right?

A.      Yes.  It does seem to be publications that were cited, yes.

Q.      And do you happen to know how large the set of references was in terms of just the amount of paper that Postscript submitted to the Patent Office to have the examiner consider whether the '660 Patent was valid or invalid?

A.      I do not.

        MR. SARKAR:  Mr. Davis, could we put the printed prior art that these references consist of up on the table?

BY MR. SARKAR:

Q.      So, Mr. Meyer, do you see the stack of paper that we've produced on our counsel table?

A.      Yeah.  For the most part.

Q.      And I'll represent to you that this set of paper is what is recited on the face of the '660 Patent.

        Do you see that?

A.      Okay.  I'll have to take your word for it.

Q.      And the examiner who reviewed the '660 Patent to

determine its validity then, you'd agree, had to sift through this stack of paper to come to its conclusion that the '660 Patent was allowable over the prior art.

You'd agree with that?

A.    I'm not familiar with the process that the Patent Office goes through.

Q.    Well, Mr. Meyer, you know that the examiner reviews references.  In fact, you testified that the examiner reviewed the set of references that Postscript provided to it in order to determine that the '660 Patent was valid, right?

A.    Yes.

Q.    So you'd agree that if this is the full set of paper that the examiner was given by Postscript, the examiner would have had to sift through these references in order to determine that the '660 Patent was, in fact, valid, right?

A.    Okay.

Q.    Mr. Meyer, you were in charge of the -- actually, please turn, if you would, to page 495 of your -- of DTX-619.  So that is the file history of the '660 Patent.

Just let me know when you're there.

A.    Okay.

Q.    Mr. Meyer, as -- the second paragraph that's shown on this screen, the examiner is, again, discussing Postscript's information disclosure statement, right?

That's the sentence that reads, "Furthermore, regarding the IDS, it is desirable to -- to avoid the submission of long list of documents if it can avoided?

A.    Yes, that's what it says.

Q.    And you'd agree, Mr. Meyer, that this, at the very least, is a long list of documents that Postscript submitted to the examiner?

A.    I wouldn't be able to say how they determined what a long list is or what a short list is.

Q.    Fair enough, Mr. Meyer.

The examiner here, however, does say that the -- regarding the Postscript submission of its information disclosure statement, that it is desirable to eliminate clearly irrelevant and marginally pertinent cumulative information, right?

A.    It does say that, yes.

Q.    And that if the applicant does submit a long list of documents, the examiner asks that the applicant highlight those documents which have been specifically brought to the applicant's attention and are known to be of the most significance; is that right?

A.    It does say that, yes.

Q.    And the examiner then also says that, "It is the applicant's duty to particularly point out any relevant material amongst the references that it originally cited in

its disclosure statement"; is that right?

A.    It does say that, yes.

Q.    And then the examiner states that, "Under the condition noted above, namely the applicant's duty of disclosure, and that the applicant has a duty to avoid clearly irrelevant and marginally pertinent information, that the examiner did perform the cursory review of all the references that had been submitted up to that point."  Is that right?

A.    It does say that, yes.

Q.    And this, again, would be a representation of the references that it performed a cursory review of, right, Mr. Meyer?

A.    Yes.

      Can you define "cursory"?  I'm not sure what that means.

Q.    Sure, Mr. Meyer.  Cursory is a very quick review, basically.

A.    Okay.

Q.    And so with -- given that representation, Mr. Meyer, you'd agree that the examiner quickly reviewed this list of documents and came to its conclusion that the '660 Patent was valid, is that right, over the prior art?

A.    Again, I couldn't speak for how exactly they went about it, but it does say they performed a cursory review

and those are the documents.

Q.      Thank you, Mr. Meyer.

        And after the examiner communicated this duty to Postscript, Postscript submitted a narrowed list of 13 references; is that right?

A.      I'm not sure off the top of my head.

Q.      Sure.  Let me help clarify that.

        So turn, if you would, to page 609 of DTX-619.

A.      Okay.

Q.      And, Mr. Meyer, we see a new information disclosure statement here with just 13 references cited, right?

A.      That does seem to be accurate, yes.

Q.      And this list of 13 references are, from Postscript's perspective, the most relevant 13 prior art references from the original list that we see on this table; is that right?

A.      I would not be able to speak on behalf of Postscript.

Q.      So, Mr. Meyer, you testified earlier that you signed this information disclosure statement, right?

A.      As an inventor, yes.

Q.      So you submitted it on your behalf?

A.      I did not submit it.

Q.      Sorry, I'll -- I'll rephrase the question.

        So the information disclosure statement was submitted either by you or on your behalf; is that right?

A.      I'm not a filing attorney, but sure.  If that's how

it goes, yeah.

Q.    And, Mr. Meyer, you were employed by Postscript at the time that you made that signature, right?

A.    Yes, that is correct.

Q.    And those attorneys that worked for you were presumably employed also or retained by Postscript, right?

A.    I could not confirm, but I assume.

Q.    And given that assumption, Mr. Meyer, that the attorneys were working on behalf of Postscript, this list of 13 references that you or your attorneys provided to the Patent Office constituting the list of most relevant prior art was submitted on behalf of Postscript, right?

A.    I was not involved in the submitting.  But, yes, it looks like it was disclosed.

Q.    And, Mr. Meyer, on this list of 13 references, you see a couple of references to Attentive Journeys; is that right?

A.    Yes, looks like it.

Q.    Well, Mr. Meyer, on this list of 13 references, do you see any references at all to the source code that implements Attentive Journeys's product?

A.    No, I do not.

Q.    And on this list of 13 references that Postscript considered the most relevant for the examiner's determinations of the '660 Patent as valid, do you see any

references at all to Klaviyo?

A.     No, I do not.

Q.     Thank you, Mr. Meyer.

Now, Mr. Meyer, you managed the team at Postscript that built the Campaign Flows product; is that right?

A.     I was the product manager on that team, yes.

Q.     And so, Mr. Meyer, please turn to the document in your binder that's Tab DTX-198.

And just let me know when you have that open.

A.     Okay.

Q.     And please open, if you would, to the page marked DTX-198.00001.

(Reporter clarification.)

THE WITNESS:  Okay.

BY MR. SARKAR:

Q.     And on this page, in Row 2, it states that, "The goal of this document is to help our team get a deeper view of the competitive landscape and how we stack up in order to help reps avoid land mines and know how this lines up with our current product functionality and roadmap."  Is that right?

A.     Yes, that is what it says.

Q.     And then turn, if you would, Mr. Meyer, to page -- to page 2 of this document.

Let me know when you're there.

A.    Yes.

Q.    And this document lists a number of features that appear to be being compared to as -- as existing in Postscript products, in Attentive products, in Klaviyo products, and in a product called.  SMSBump; is that right?

A.    Yes, it appears to be a spreadsheet of features from those companies.

Q.    And then if you turn to page 6, Mr. Meyer, you see that this document is discussing, at Row 40, a feature called Campaigns; is that right?

A.    Yes.

MR. SARKAR:  Move to admit?

THE COURT:  Is there any objection?

MR. FISHER:  Can you direct me to the number one more time?

MR. SARKAR:  198.

MR. FISHER:  Okay.  Your Honor, may I consult with counsel real quickly?

THE COURT:  Yes.

MR. FISHER:  No objection, Your Honor.

THE COURT:  All right.  So DTX-198 is admitted.

(DTX Exhibit No. 198 was admitted into evidence.)

BY MR. SARKAR:

Q.     Mr. Meyer, do you see a reference to Tab 2 on this document?  It's the tab entitled "Feature Compare"?

A.     Sorry, can you help me find that?

Q.     It's a tab entitled "Feature Compare."  And I believe -- it's the one shown on the screen.

A.     Okay.

Q.     And on this screen, Mr. Meyer, we see the -- a list of features that this document appears to be describing as existing within Postscript products, Attentive products, Klaviyo products, and SMSBump; is that right?

A.     Yes.

         MR. SARKAR:  And, Marco, could we go to the tab in which Row 58 is shown, please?

BY MR. SARKAR:

Q.     And then on this screen -- on the screen, Mr. Meyer, we see that the feature being compared to products that are owned by Postscript, Attentive, Klaviyo, and SMSBump is Campaign Flows, right?

A.     It does look to be a row.

Q.     And then in the Column D of the same row, it says that "Magic Composer, which is an Attentive product, supports multistep campaigns with exit rules but does not support advanced branching, including responses."  Isn't that right?

A.     That is what it says.

Q.    And then in Row 59, in a feature called subscriber response branching, this document says in Postscript's own words that this feature is not supported in Automation's[sic] Journey.  Sorry.  That this feature is supported in Attentive's Journeys product, but it's not supported in Attentive's Campaigns product, right?

A.    Yes, that is what it says.

Q.    And this feature, the description of this feature, Mr. Meyer, is creating conversational campaigns where the next message can be determined by how the subscriber responds, right?

A.    That is what it says, yes.

Q.    And so what this row is saying in Postscript's own words is that Attentive's Campaigns product cannot create conversational campaigns where the next message can be determined by how the subscriber responds, right?

A.    That row is -- my understanding, is talking about the specific feature of subscriber response branching and then it says that it's not supported --

            (Reporter clarification.)

            THE WITNESS:  Or it is supported automations.  Automations but not Campaigns.

BY MR. SARKAR:

Q.    So just to clarify that for the jury, Mr. Meyer, what this row is saying, that subscriber response branching

feature is supported on Attentive's Journeys product but is not supported on Attentive's Campaigns product, right?

A.     Yes, it's saying that feature is not.

Q.     Thank you, Mr. Meyer.  And then on Row 60, we have a reference to another feature called "nested branching."

Do you see that?

A.     Yes, I do.

Q.     And then in Row B we see that this feature, nested branching, is the ability to have multiple branches within a flow, so if a subscriber goes down Path 1, that path can have additional branches.

Do you see that?

A.     Yes, that is what it says.

Q.     And again, Column D in Postscript's own words, this document says that Journeys supported nested branching, but Attentive's Campaigns product did not, right?

A.     It says this supported on automations/Journeys, but not Campaigns.

Q.     Mr. Meyer, I'd like to now discuss a few dates that you used in the testimony that you gave earlier today.  So Mr. Meyer, you stated that Campaign Flows was released in October of 2021; is that right?

A.     Yes.  Publicly launched on October 13th, 2021.

Q.     But, Mr. Meyer, you'd agree that the date on which Campaign Flows was released doesn't describe what the filing

date of the '660 Patent is, right?

A.    It's not the same, no.

Q.    And you understand that if a product was released before that date -- that is, October 12th, 2022, the filing date of the '660 Patent -- and if that product disclosed every limitation that is claimed by the '660 Patent, then that product would invalidate the '660 Patent, right?

A.    Can you repeat that question?

Q.    Sure.

      Mr. Meyer, you understand that if a product existed and had been released publicly and that disclosed every limitation of the invention claimed in the '660 Patent, but was released before October 12th, 2022, that product would invalidate the '660 Patent, right?

A.    That is not my understanding.

Q.    Mr. Meyer, if that product was a product that was not made by Postscript, would it then invalidate the claims of the '660 Patent if it had been released before October 12th, 2022?

A.    Sorry, can you clarify that question?

Q.    Sure, Mr. Meyer.

      If an Attentive product had been released before October 12th, 2022, and disclosed every limitation of the claim -- every element that is claimed by the '660 Patent, then that product would render the '660 Patent invalid?

A.    I'm not a patent lawyer, but, yeah, so I wouldn't be able to say for sure.

Q.    Mr. Meyer, you began developing Campaign Flows around August 2021; is that right?

A.    I think that's pretty accurate, yes.

Q.    And so -- and you knew that Attentive already had a product on the market at the time called Journeys?

A.    Yeah.  I was familiar with it, yes.

Q.    And so if Attentive's Journeys product, the version that existed in that 2021 time frame, disclosed every limitation that is claimed by the '660 Patent, you'd agree that the '660 Patent couldn't be used to say that Attentive's Journeys does not render the '660 Patent invalid, right?

A.    I'm trying to follow.  Can you repeat that maybe in another way?

Q.    So, Mr. Meyer, you agree that Attentive's Journeys product was already on the market in August of 2021, right?

A.    Yes.

Q.    And that was before you even began developing the Campaign Flows product, right?

A.    Yes.

Q.    And the Campaign Flows product is what embodies all the claims of the '660 Patent; is that right?

A.    Yes, that is my understanding.

Q.      Thank you, Mr. Meyer.

        MR. SARKAR:  Pass the witness.

        THE COURT:  All right.  Thank you.  Any redirect, Mr. Fisher?

        MR. FISHER:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. FISHER:

Q.      Hello again, Mr. Meyer.

        MR. FISHER:  Mr. Glass, can you put up DTX-619, page 609?

BY MR. FISHER:

Q.      Mr. Meyer, do you remember Mr. Sarkar showing you this slide?

A.      Yes.

Q.      I want to talk about how we got here, and actually first, do you remember him saying that these are 13 references in this stack?

A.      Yes.

Q.      Okay.  Let's flip back two pages in the document to page 604.  Perfect.  And I want to just walk through this with you.  So the second paragraph here, starting with "applicant respectfully," do you see where it says in the second sentence, "Applicant has been forthcoming with the office"?

        Do you see that?

A.      Yes, I do.

Q.      Okay.  And then it says that "The applicant proactively amended their claims based on the disclosed art."

        Do you see that?

A.      Yes, I do.

Q.      And then it says, "The applicant also arranged an interview with the examiner to provide advanced notification of the IDS and references cited."

        Do you see that?

A.      Yes, I do.

Q.      And then it says, "The applicant also provided an explanation for the amendments."

        Do you see that?

A.      Yes, I do.

Q.      And it says, "The applicant invited the examiner to follow up with the applicant if additional information or detail were needed corresponding to either the response and amendment or the references cited in the IDS."

A.      Yes, that is what it says.

Q.      And then in the next paragraph, it says, "The applicant once more followed up with the examiner to understand what the examiner would find most helpful in reviewing the IDS filed with the prior office action response."

Do you see that?

A.     Yes, that is what it says.

Q.     Then it says, "In view of that discussion, applicant is filing a supplemental IDS herewith, that includes additional information regarding portions of the references."  And then if you go along a little further, it says, "Believed to be the most relevant out of the references that were previously submitted in the IDS."

Do you see that?

A.     Yes, I do.

Q.     Okay.  And then, "In view of the forgoing, reconsideration of all filed IDS is requested."

A.     Yes.

Q.     All right.  So let's go back to page 609, and I want to talk about these 13 references here.

So first, can you just tell the jury, what is the reference listed in that second row?

A.     It says, "Sanford M. SMS Marketing for Shopify Merchants, everything you need to get started."

Then it says, "Attentive SMS Strategies, June 21st, 2022, pages 2-3 online retrieved February 21, 2023, retrieved from the internet."

Then it gives a URL which looks to be Attentive's URL.

Q.     And then in the third row, does that reference also

have an Attentive URL?

A.    Yes, it looks like it does.

Q.    And what's the title of that reference?

A.    Attentive product spotlight, Volume 2.

Q.    And then in the fourth row, what's the title of that reference?

A.    That is "Discover a new marketing channel built for e-commerce and retail brands."

Q.    And does it say that it is an Attentive presentation?

A.    Yes, it does.

Q.    Okay.  And does it actually cite a specific slide in that presentation?

A.    It does, Slide 25.

Q.    And then in the fifth reference, what's the title of that reference?

A.    That says, "FAQs branching on segments."

Q.    Okay.  And is that referring to an Attentive Journeys product?

A.    Yes, it appears to be.

Q.    Okay.  Sixth reference, is that an Attentive reference?

A.    Yes, it is.

Q.    Seventh reference, is that an Attentive reference?

A.    Yes, it appears to be.

Q.    Eighth reference, is that an Attentive reference?

A.    Yes, it appears to be.

Q.    Ninth reference, is that an Attentive reference?

A.    Yes, it appears to be.

Q.    Tenth reference, is that an Attentive reference?

A.    Yes.

Q.    Eleventh reference, is that an Attentive reference?

A.    Yes, it appears to be.

Q.    Twelfth reference on the next page, is that an Attentive reference?

A.    Yes, it appears to be.

Q.    And then thirteenth reference, is that an Attentive reference?

A.    Yes.

Q.    Okay.  Now, you recall counsel asking you whether any of these 13 references included Attentive source code?

A.    Yes, I do recall that.

Q.    Do you know if Postscript had Attentive source code?

A.    I would assume not.

Q.    Okay.  And counsel also asked you about whether any of these references regarded Klaviyo.

       Do you remember that?

A.    Yes, I do.

Q.    Okay.  Let's turn to page 494 in this document, so DTX-494.  Let me know when you're there.

A.    Yep.

Q.    Okay.  So this is another communication with the Patent Office.

Do you see in the seventh paragraph there where it says, "Information Disclosure Statement"?

A.    Yes, I do.

Q.    Okay.  And this is the Patent Office communicating with the applicants about the prior information disclosure statement that they had submitted; is that right?

A.    Yes, that's what it appears to be saying.

Q.    Okay.  And then if we go on to the next page, page 495, paragraph starting with, "Furthermore..."

Do you see in the second sentence it says, "Eliminate clearly irrelevant and marginally pertinent cumulative information"?

Do you see that?

A.    I do see that.

Q.    All right.

MR. FISHER:  We can put that down, Mr. Glass.  Let's go to DTX-198, page ten.

BY MR. FISHER:

Q.    We were just talking about this spreadsheet that you were looking at on the screen, right, Mr. Meyer?

A.    Yes.

Q.    Okay.  And I believe counsel was asking you some questions about Rows 59 and 60.

MR. FISHER:  If you can go there, Mr. Glass.

MS. DURIE:  Which?

MR. FISHER:  DTX-198.  If you're in the native, goes to Row 59 and 60.  Perfect.

BY MR. FISHER:

Q.    "Subscriber response branching and nested branching." Do you remember him asking you some questions about subscriber response branching and nested branching?

A.    Yes.

Q.    Could you just explain what those are?

A.    Sure.

Those are additional features within Campaign Flows.  Subscriber response branching gave merchants the ability to set up their Campaign Flows so that if a subscriber responded to a message, they would be able to set it up so that they automatically receive the message depending on what they said.

And then nested branching, which is also a feature, additional feature to Campaign Flows that allowed a merchant to branch within a branch.  So if you had two branches, you could create another branching function within that, so you could have like a branch within a branch, if that makes sense.

Q.    So are these functions different from what we walked through yesterday with the Pete's Pets example?

A.      Yes, they would be different.

Q.      Do these have anything to do with the patent?

A.      Not specifically, no.

MR. FISHER:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Mr. Meyer.  You may step down.

All right.  Thank you.

I'll just ask counsel if they could remove any materials that are up on the witness stand, and we'll have Postscript call its next witness.

MS. DURIE:  Thank you, Your Honor.  Postscript calls Brian Long to the stand.

THE COURT:  We'll have our witness be sworn.

COURT CLERK:  Please stand.  Please raise your right hand.

BRIAN LONG, having been duly sworn, was examined and testified as follows:

THE CLERK:  Please state and spell your full name for the record.

THE WITNESS:  Brian Culbertson Long.  B-R-I-A-N, L-O-N-G.

MS. DURIE:  Thank you.

ADVERSE DIRECT EXAMINATION

BY MS. DURIE:

Q.      Mr. Long, good morning.  We've never met, but my name

Case 1:23-cv-00087-CJB    Document 836    Filed 12/03/25    Page 54 of 317 PageID #:
30270
Long - adverse direct                                    348

is Daralyn Durie.  I am one of the lawyers representing Postscript.  And we have some materials for you.

MS. DURIE:  Your Honor, may I approach?

THE COURT:  You may.

BY MS. DURIE:

Q.    Now, Mr. Long, you were one of the founders of Attentive, correct?

A.    Yes.

Q.    And that was back in 2016, I believe?

A.    Yes.  September 2016, yeah.

Q.    And you were the CEO of Attentive up until June, around June of 2023; is that right?

A.    Yes.

Q.    And you have remained involved, though, with Attentive as the chairman of the board, right?

A.    Yes.

Q.    So you currently serve in that capacity?

A.    That's right.

Q.    And just for the jury's benefit, we're calling you at this juncture in the proceedings at your request; is that right?

A.    I'm sorry?

Q.    We're calling you at this juncture, I understand you wanted to be called this morning; is that right?

A.    Oh, yes.

Q.     Now, you were here for the opening statements, right?

A.     Yes.

Q.     And you remember when Attentive's counsel in opening said that you had been waiting for this day because you believed that Attentive had been wrongly accused of patent infringement, right?

A.     Yes.

Q.     Now, Postscript asserted the '660 Patent against Attentive back in August of 2023, right?

A.     Yes.  I don't know the exact date, but if that's what you're saying, then yes.

Q.     And you were deposed in this case, right?

A.     I gave a deposition, yes.

Q.     Right.  And a deposition is an opportunity for each side to ask questions of the other side's witnesses and learn what they know, right?

A.     Yes.

Q.     And your deposition, that took place in April of 2024.  Does that sound about right?

A.     I don't remember the exact date, but that sounds like it could probably be right.

Q.     So that would have been around eight months after Postscript had notified Attentive that it believed that Attentive was infringing, right?

A.     Yes, that sounds -- in the ballpark, yeah.

Case 1:23-cv-00087-CJB   Document 836   Filed 12/03/25   Page 56 of 317 PageID #: 30272
Long - adverse direct
350

Q.     And at least as of the date of your deposition, you didn't know the subject matter of the Postscript '660 Patent, right?

A.     When I gave the deposition, was I very familiar with this patent?  No.

Q.     Okay.  Eight months after Postscript had told Attentive that it was infringing, you didn't really know the subject matter of the patent, correct?

A.     Yes, I was no longer a full-time employee of the company.

Q.     You were the chairman of the board?

A.     I was on the board, yes.

Q.     Okay.  Now, Postscript and Attentive are competitors, correct?

A.     Yes.

Q.     And competition tends to drive down price, fair?

A.     Yes.

Q.     Attentive was on the market first, right?

A.     Yes.

Q.     And Attentive generally charges, at a minimum, about 300 bucks a month?

A.     I don't know the current minimum pricing, but I think it's probably in that ballpark.  I think it's 299.

Q.     You've got a good memory.  And let's take a look.  If you can turn in your binder to PTX-551.

A.      Yep.

Q.      You see there is a PowerPoint presentation there, that is an Attentive presentation, "Discover a new marketing channel built for e-commerce and retail brands"?

A.      Yes.

            MS. DURIE:  We offer PTX-551.

            THE COURT:  Any objection?

            MS. VESSELS:  No objection.

            THE COURT:  Admitted.

            (PTX Exhibit No. 551 was admitted into evidence.)

            MS. DURIE:  And if we can please put up page 103, Mr. Glass.  551 at 103.

BY MS. DURIE:

Q.      You see there is a slide there, "Flexible Monthly Pricing"?

A.      Yes.

Q.      And Attentive's monthly price for small businesses is 299 a month, right?

A.      Yes, I remember making this.

Q.      Plus $0.02 a message?

A.      That's right.

Q.      Now, when Postscript launched, it had a much cheaper option, right?

A.      I don't -- I don't -- I don't know what the pricing

was at that time.

Q.    Well, let's take a look.  If you can turn in your binder to PTX-155.

You see that PTX-155 is an e-mail that you are on with other Attentive employees from March of 2021?

A.    Yes.

MS. DURIE:  We'd offer PTX-155.

THE COURT:  Is there any objection?

MS. VESSELS:  No objection.

THE COURT:  All right.  It's admitted.

(PTX Exhibit No. 155 was admitted into evidence.)

MS. DURIE:  And if we can please put this up on the screen.  Let's start with the message that begins with "Hannah Adam" in the middle of the page.

BY MS. DURIE:

Q.    Do you see there is an e-mail from an Attentive employee talking about -- it says it's not a full list, at the top of the blue text, "but here are a few things that we like about Postscript."

Do you see that?

A.    Yes.

Q.    And this is passing on feedback from a customer about their experience with Postscript, right?

A.    Yes.

Q.      And they identify a number of things that they like about Postscript.  One of them is cost, right?

A.      Yes, it's about cost.

Q.      It is so much cheaper, right?

A.      Yes, it appears that's what they're saying.

Q.      And if you go to the top of the e-mail, you were one of the recipients of this, you then forwarded it along to a number of other individual with a note, "Ways that Postscript is better," right?

A.      Uh-huh, yes.

Q.      Now, Postscript launched Campaign Flows in October of 2021, right?

A.      I don't know the date, but if that's the date that you've shown, then that would be the case.

Q.      Okay.  And when it launched, Postscript's Campaign Flows tool was yet another way that it stood out from the competition, right?

A.      I don't know.

Q.      Let's take a look.  If you could turn in your binder to PTX-181.

A.      Yep.

Q.      PTX-181 is a Google document from Jesse Greenberg to you with some notes.

        Do you see that?

A.      Yes.

Q.      And who was Jesse Greenberg?

A.      He was the VP of engineering at the time, I believe.

        MS. DURIE:  We offer PTX-181.

        THE COURT:  Is there any objection?

        MS. VESSELS:  No objection.

        THE COURT:  It's admitted.

        (PTX Exhibit No. 181 was admitted into evidence.)

        MS. DURIE:  Please publish it.

BY MS. DURIE:

Q.      So what we see here in the middle of the page, Mr. Greenberg --

        MS. DURIE:  If we can blow up that middle portion of the page, just go down a little bit.  So just the whole middle portion, starting from where you were, but down through where it says, "Open."  Perfect.

BY MS. DURIE:

Q.      So Mr. Greenberg is replying to a comment in a Google Doc, right?

A.      That's right, yeah.

Q.      And when there is a Google Doc and people make comments, you get an e-mail notification that there's been a comment, you get the substance of the comment, and then the little box that says "open" to let you go to the document, right?

A.      I don't think you always get an e-mail notification. I think that it's a user-based setting on a document basis.

Q.      Fair enough.  In this case you got one, right?

A.      I don't know if I got an e-mail notification in this case, but it appears I might have replied or commented.

Q.      Well, just to make sure we're on the same page, can we go up to the top and just blow up the top?

A.      It appears that -- yeah, I got an e-mail there. Sure.

Q.      Yeah.  There was e-mail notification to brian@attentivemobile.

        That's you, right, Brian?

A.      Yep.

Q.      Okay.  And the date of this is November 6th, 2021, right?

A.      Yes.

Q.      So pretty shortly after Postscript launched Campaign Flows, right?

A.      Yes.

Q.      And if we go down to the text, it says, "Sequential Campaigns add additional messages as Drip retargeting to as many campaigns as possible.  Postscript differentiates on this feature today.  Let's close the gap and drive more message volume."

        Now, "Postscript differentiates on this feature

today," that means Postscript is using this feature of retargeting in order to differentiate itself from the competition, right?

A.    What's the question?

Q.    That's what -- when it says, "Postscript differentiates on this feature," what that means is that Postscript is using this feature to differentiate itself from the competition.

A.    Yeah.  I see that in the note, but what -- what I say is that I worry that it is -- won't be used by our customers.

Q.    All right.  Well, let's say what you say.

      First of all --

A.    I'm just saying, just to be clear, that that's not what I said.  What I said was the response.

Q.    Right.  Mr. Greenberg said, "Postscript differentiates on this feature today.  Let's close the gap," right?  That's what Mr. Greenberg said?

A.    That's what he says, yes.

Q.    Right.

      He was your engineering guy, right?

A.    Yeah.  I think it's just confusing since we're getting a notification, but it's a common -- but it's a document written by someone else, not me.

Q.    And then you respond, right?

A.    Yes.

Q.    And you say, "One, this is cool," right?

A.    Yes.  I responded that it was -- was cool that we could send additional messages as we target.

Q.    Well, actually, you're -- you're talking about what Postscript is doing, right?  Postscript's Sequential Campaigns?

A.    I don't know if I'm speaking specifically about that, but...

Q.    So, wait.  Mr. Greenberg sent you a note saying, "Sequential Campaigns adds additional messages as Drip retargeting to as many campaigns as possible.  Postscript differentiates on this feature today.  Let's close the gap and drive more message volume."

      You respond, "This is cool," but you're not sure you were talking about Postscript?

A.    No, no.  I'm saying adding additional messaging to Sequential Campaigns is cool.  That's what I'm saying is cool.

Q.    Okay.  "This is cool, but I worry, one, it's, one, a big project," right?

A.    Yes.

Q.    So were you saying adding this functionality to Attentive, that was a big project?

A.    Yes.

Q.    Okay.  And you were worried it wouldn't be used by customers, and you were worried that it wouldn't be seen as differentiating, right?

A.    Yes.

Q.    And then Mr. Greenberg responded and said, "We can build something small to understand two or three better for 50-ish customers."

So Mr. Greenberg was saying, I get that it's a really big project to add this functionality, but let's start by building something small and see how it goes, right?

A.    Yes.

Q.    Okay.  And, in fact, that's what you did, right?

A.    Do you want me to say "yes" every time?

Q.    Well, assuming that it's true.  Sure.

A.    Yes.

Q.    Great.

Now, it was really important to you to do everything you could to compete against Postscript, right?

A.    I think we wanted to do everything possible to compete against anyone else in the market.  I wouldn't have considered them our -- our top competitor, but certainly we would try to make our product the best that it could possibly be for our customers in the marketplace.  We always want to make the best product.

Q.    You were also willing to spend a lot of money, if you needed to, in order to take customers away from Postscript, right?

A.    I think we were always willing to invest capital in, you know, anything from our product to our go-to-market, whatever it might be.

Q.    So if you needed to pay for something in order to compete with Postscript, you would have been willing to pay a lot to do it, right?

A.    I was willing -- can you say that again?

Q.    Sure.

       If you needed to pay for something, like a feature, in order to be able to compete more effectively with Postscript, you would have been willing to pay a lot to do that?

A.    As mentioned, we were willing to invest, you know, from the beginning of the company to build the best product possible, as well as to, you know, have a go-to-market and all that stuff.

Q.    Well, you were also willing, for example, to pay to give customers Dom Pérignon champagne if they agreed to switch from Postscript to Attentive, right?

A.    I think you're referencing maybe an e-mail that I sent at one point bringing up that idea.  I don't know if that's something we ever actually did, though.

Q.    Okay.  Let's take a look at PTX-99.  Can you turn in your binder to that?

PTX-99 is an e-mail string between yourself and David -- is it Mordzynski?

A.    Yes.

Q.    Who is Mr. Mordzynski?

A.    I believe he was an inside sales manager.  So he's on the sales team.

MS. DURIE:  We offer PTX-99.

THE COURT:  Any objection?

MS. VESSELS:  No objection.

THE COURT:  All right.  It's admitted.

(PTX Exhibit No. 99 was admitted into evidence.)

MS. DURIE:  Thank you.

And if we can start towards the bottom, about two-thirds of the way down, and just blow it up from there to the bottom.  So a little bit above there.  Friday, September 6th.  Just from there, down to the bottom.

BY MS. DURIE:

Q.    So first after all --

MS. DURIE:  Actually, if you can -- yeah.  There we go.

BY MS. DURIE:

Q.    So if we start from sort of in the middle there, Friday, September 6th, at 12:48.

First of all, start at bottom.  Sorry.

"Hello SDR team, we're making great progress on the Postscript list.  We've got one demo and close to a second.  We want to make a second push towards their top 50 accounts.  The goal is to transition five of their top customers by end of the month at a minimum."

Do you see that?

A.    Yes.

MS. DURIE:  And if we can actually scroll down a little bit, Mr. Glass.  Just keep looking.  Scroll down.

Next page.  It goes over to the next page.  There we go.

BY MS. DURIE:

Q.    The e-mail continues, "Send a Hightouch direct-to-mail to each of the top 50 accounts.  Make Postscript cry.  Let's crush them."

That was the e-mail for your sales guy, right?

A.    I see that, yeah.

MS. DURIE:  Okay.  And then if we go back up to the response from you, now back up in the e-mail, middle of the page.  Yeah.  There, down.  That's good.

BY MS. DURIE:

Q.    You say, "I also approve the sending of 50 bottles of Dom."

That's a reference to Dom Pérignon champagne?

Case 1:23-cv-00087-CJB    Document 836    Filed 12/03/25    Page 68 of 317 PageID #:
30284
Long - adverse direct                                                  362

A.    I would assume so, yes.

Q.    "With a note, 'Let's celebrate when you launch with Attentive and see texts as your number one revenue channel, shock and awe,'" right?

A.    Yes.

Q.    Okay.  And then you decided, maybe that wasn't good enough, right?

      Well, take a look at the e-mail that you then send immediately after, right above that.  And you say, "And we can offer September and October free," right?

      "I want to crush them right now," right?

A.    Yes.

Q.    And then you decided, actually, maybe September and October free wasn't good enough.  And if we look above, you say, "We're giving out 2019 completely for free if you transition from Postscript to Attentive in September," right?

A.    Yes.

      MS. DURIE:  And then if we go up to the top, and we blow that up.

BY MS. DURIE:

Q.    You say, "They should also get the Dom bottle, too."

      So, at this point, if you sign up and you switch, you get the rest of the year for free and you get the free bottle of Dom Pérignon champagne.

So back to my prior question:  You were willing to spend a lot of money in order to try to switch customers from Postscript to Attentive, fair?

A.    I think we -- we were always going to spend money to buy our customers, like any business would.

Q.    Not all businesses give out free champagne, though?

A.    I wish they did, but yes.

Q.    Okay.  And in 2020, you actually decided that even a free rest of the year wasn't enough, you were willing to give a full free year to customers, right?

Do you remember that?

A.    Yeah.  Yeah.  I mean in software it's pretty common for people to give out some sort of free time period in order to transition, but yes.

Q.    All right.  Well, you would agree, giving an entire year for free of a product that costs minimum 300 bucks a month, I mean that's not nothing?

A.    It's not nothing, but it's very common.

Q.    Okay.

A.    In the software world, extremely common.

Q.    And, in fact, during this time frame, Attentive's goal was to do everything it could to eliminate Postscript as a competitor, fair?

A.    I think our number one goal was to compete across the marketplace.  They were not our top competitor, but, you

know, they were -- they were certainly someone we competed against.

Q.      You were willing to aggressively price Postscript into bankruptcy if you needed to?

A.      I think we were willing to compete in any way that we could against any competitor.

Q.      Can you turn in your binder to PTX-111?

A.      Yes.

Q.      PTX-111 is an e-mail exchange between yourself and Brian Malkerson?

A.      Yes.

Q.      Who is Mr. Malkerson?

A.      He is the, I think, current CRO.

        MS. DURIE:  We offer PTX-111.

        THE COURT:  Any objection?

        MS. VESSELS:  No objection.

        THE COURT:  All right.  It's admitted.

        (PTX Exhibit No. 111 was admitted into evidence.)

        MS. DURIE:  So if we take a look at the top, and if you can pull up the e-mail there.  Perfect.

BY MS. DURIE:

Q.      E-mail from you, February 3rd, 2020, at 11:55 -- sorry.

        An e-mail from Brian Malkerson, February 3rd,

2020, "We can aggressively price Postscript into bankruptcy."

Do you see that?

A.    Yes, I see that.

Q.    And -- and your response was, "Sure," and then you went on, right?

A.    I said, "It's all margin so there's that, but more important we get the revenue," is what I said.

But, sure.  To be clear, I think all cases make up 6%.  But yeah -- I was just repeating what the context of that was.  Sorry there's a lot of emails.

(Reporter clarification.)

BY MS. DURIE:

Q.    So, again, fair to say Attentive was willing to spend a lot of money if it needed to in order to be able to compete with Postscript?

A.    Yes.  Companies were always spending money in order to compete with their competitors.  So we did that, too.

Q.    Well, aggressively trying to price your competitor into bankruptcy, that's not like normal mode competition, is it?

A.    I think that companies often compete on price.  I think earlier you brought up that they were also competing on price, right?

Q.    Just normal mode competition?

A.      Competing on price is normal mode competition, yes.

Q.      So trying to price your competitor into bankruptcy, that's normal mode competition to you?

A.      I think competing on price is normal.

Q.      All right.  Let's fast-forward to 2023.  That's the year that Mr. -- is it Jhawar?  Did I pronounce it okay?

I'm serious.  Jhawar, is that right, Jhawar, Mr. Jhawar?

A.      Are you asking me?

Q.      I am asking you, yeah.  You probably know how to pronounce his name better than I do.

A.      Yes.

Q.      My name is Durie.  I'm sensitive to people getting their names mispronounced, so I want to make sure I'm pronouncing it correctly.

2023 is the year Mr. Jhawar took over as CEO from you?

A.      June 2023.

Q.      2023, yeah.  And 2023 was a pretty rough year for Attentive; is that fair?

A.      Yes.

Q.      Okay.  Attentive was still losing customers to Postscript?

A.      I think we were always competing with lots of companies where, you know, they were moving between

providers.

Q.    Let's take a look in your binder at DTX-110. DTX-110.

Are you there?

A.    Yes.

Q.    And you see this is a Market and Competitive Intelligence Redub from June of 2023?

A.    Yes.

MS. DURIE:  We offer DTX-110.

THE COURT:  Any objection?

MS. VESSELS:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 110 was admitted into evidence.)

BY MS. DURIE:

Q.    And so if we take a look at page 14, we see here there's a chart that shows monthly net GNB versus competitors.  Now, what does GNB stand for?

A.    I don't know in this context.

Q.    If you take a look -- well, strike that.

A.    Sorry, I'm still trying to find it.  Oh, there it is. Okay.

Q.    Oh, I'm sorry.  It should be the last page of the document.

A.    Yeah, I got it.

Q.    Well, you see there's a chart here that shows for each month what the numbers are relative to each competitor, so how Attentive is doing versus each of its competitors?

A.    Yes.

Q.    And there's Klaviyo, Postscript, and then some others, right?

A.    Yeah, I see Klaviyo, Postscript, Yotpo, Wunderkind and others.

Q.    And when it's in red, that means Attentive is net losing business against that competitor, right?

A.    Yeah.  So every month we tracked how we're doing against different competitors, yeah.

Q.    So in May of 2023, Attentive had lost $800,000 net to Postscript, right?

A.    Yes.

Q.    Okay.  And when it's talking here about churn, that's what it's talking about.  Churn is basically when you're losing Attentive customers to competitors, right?

A.    That's right.

Q.    And that's right around -- oh, I'm sorry.  I misspoke.

      So actually, if we could go down, Mr. Glass, to March.

      In March of 2023, it's a million bucks, right? It's 800,000 in May.  It's a million in March?

A.    I'm sorry.

Q.    The net loss to Postscript, it was 800,000 in May of 2023?

A.    I can see the thing where it says Postscript .8, .2, .6, Wunderkind.  That one, yeah, so .8.

Q.    Yeah, .8 in May, and a million bucks net loss to Postscript in March of 2023, right?

A.    Yeah.  You can see it varies significantly from month to month, yeah.

Q.    And following on this is when Attentive decided to launch Magic Composer, right?

A.    I don't know.

Q.    You don't remember whether Attentive decided to launch Magic Composer in 2023?

A.    I don't know the exact date that that product was launched.  I don't think I was CEO at the time.  I don't know.

Q.    It was shortly after you left as CEO --

A.    Okay.  So I wasn't there at the company.

Q.    It was shortly after you stepped down as CEO in June of 2023?

A.    Okay.

Q.    Correct?

A.    I don't know.  I wasn't there.

Q.    Okay.  So you were the chair of the board of the

company and you had recently been CEO, but you have no idea when the accused functionality in this case was launched?

A.    That's correct.  I did not know when that particular thing you're talking about was launched.

Q.    Okay.  You didn't think that that was a thing you might want to figure out before you came in to testify in the case that you were dying to be able to testify in?

A.    I don't know about the dying to testify piece, but I would say I was -- at the time I was focused on the transition to Amit, which we had announced at the beginning of the year.  So that's where I was focused, and I was probably focused on some of our other big competitors, too.  And obviously lots and lots of other products and things.  So I honestly don't -- did not know when this product launched.  I wouldn't have known the name of the product at the time.

            MS. DURIE:  Pass the witness.  Thank you.

            THE COURT:  All right.  Thank you.

            Direct?

            MS. VESSELS:  Good morning, everyone in the jury.  I'm Katherine Vessels.  I am here representing Attentive.

                         DIRECT EXAMINATION

BY MS. VESSELS:

Q.    Mr. Long, let's go back and kind of get you

acquainted with the jury.  So tell us a little bit about yourself.

Where did you grow up?

A.    I grew up outside Philadelphia.

Q.    Do you still live here?

A.    So I live in California, but we also rent outside Philly because both my wife and her parents, they all still live outside Philly.  And we come back to take care of them, so we're here a lot.

Q.    And what is your understanding of what this case is about?

A.    My understanding is that Postscript is, you know, trying to get Attentive to pay them a lot of money for, you know, their patent, you know, that they say that Attentive infringes.

Q.    Okay.  And as a company founder of Attentive, what do you think of Postscript's accusations?

A.    Well, you know, I've worked within marketing technology for a long time and worked with these companies a long time.  I got the gray hair to prove it, and let's see, my first startup was in 2009, so been doing it for quite some time.  And, you know, this type of campaign builder, and Journey has been very common for a long time.

I remember going to Exact Target's conference.  It was something called Exact Target, who was one of the

first e-mail and SMS marketing platforms out there. They were acquired by Salesforce in 2012 or 2013 and then it became Salesforce Marketing Cloud, and Salesforce Marketing Cloud had a product that they rolled out in 2014 that was a journey builder that, you know, has this exact type of use and framework. So the idea that this is patented now doesn't make sense to me.

MS. VESSELS:  I'd like to pull up DDX-2.

BY MS. VESSELS:

Q.    Mr. Long, is this you in the picture in the red shirt?

A.    I did once look like that, yes. That is me in our -- in our window of our apartment in New York with Eric working at the start of the company in 2016.

Q.    All right. So you're here in 2016. Do you remember who Attentive's first customer was?

A.    Yes. I remember -- I remember that the room was very hot because the AC was never good, and I remember our first customer was BustedTees.com. Busted Tees is like t-shirts, which was a very small merchant.

Q.    And do you know when Attentive had landed Busted Tees?

A.    Yeah. So we started the company in September 2016, started building the tech, and then we signed this first customer, I want to say, in April 2017, something like that.

Q.    Okay.  So you're in this hot apartment.  You're sweating.  You've got this small company, Busted Tees.  When did you know that Attentive had really gotten traction?

A.    Yeah, I mean, look, I think that we launched Busted Tees and many other small merchants and saw success from them and then later that year, you know, we tried to obviously work with more and more companies, and we luckily got in touch with Sephora, who, you know, like my prior company had also been a retargeted --

(Reporter clarification.)

THE WITNESS:  Yeah.  So it's a company before this one.  It was called TapCommerce that did also more tech targeting, and we had worked with Busted Tees and a couple of these other companies, like Sephora.  So we start working with Sephora in -- I want to say they signed in the fall of 2017.  And with Sephora we started doing -- it was pretty cool.  It would be, you know, retargeting messages, replenishment messages, like, so, for instance, if you bought makeup at Sephora, we would know what type of makeup it was and that it would run out after 60 days, and after 60 days, we'd send a reminder to you saying, hey, you know, you bought that makeup.  Most people run out of that makeup 60 days later.  You know, here's a message to remind you if you wanted to buy it again, you could buy it again and actually buy it again within the text message.

BY MS. VESSELS:

Q.    And my colleague had mentioned that you were here for opening statements, right?

A.    I was, yes.

        MS. VESSELS:  Could we please pull up Slide 6 from our opening statements?

BY MS. VESSELS:

Q.    Do you remember this slide from Mr. Campbell's opening presentation?

A.    Yes, I do.

Q.    And is this a pretty accurate timeline of the development of these products?

A.    Yeah, so -- yeah, I mean, this is an accurate timeline.  I think we were working on a lot of this stuff even before this time period, but yes.

Q.    Okay.  So I think the jury is a little confused and might be wondering, why, if you did this technology first in 2019 on this timeline, why didn't you get a patent?

A.    Yeah, because it had been something that many companies, like everybody in marketing technology had been doing for a long time, this type of journey.  So it did not make any sense to get a patent for it, you know, so we did not.  But, you know, that was why.

Q.    Okay.  But your products were innovative and improved on existing products, right?

A.      Yeah.  We -- we -- we were, I think, one of the early companies to kind of enter the SMS marketing space for -- specifically going for e-commerce and retail companies. And, you know, I think probably what we did different that really led to our company taking off is it was really hard for people to sign up to get text messages from companies historically.  You know, they would either have to enter their phone number on a site, hit submit, and get a text message and reply to that text and say yes.  Or, you know, if you were in one of the stores and in a checkout that said text this number to join up, you'd have to take out your phone and go text it.

We built that technology that is called Two-Tap that allows people to sign off the mobile website in two taps.  You know, one tap to actually, you know, be on the site, going shopping online also or whatever.  You see something, hey, sign up and get 10% off, you click the button, and it would actually take the person to the text messaging application and refill the text message with the text to sign up.  And then all the person has to do is just hit "send," and then they're signed up.

So it makes things much, much easier for the consumer and that maybe the size of the -- the list of people that signed up to get text messages much bigger and, therefore, it had a much, much bigger effect on the end, you

know, success of the program because they could reach a lot more people, so that was a huge thing for us.

Q.    So Two-Tap was important to your customers -- can you talk more about why Two-Tap then was important for customers?

A.    Yeah, so just to be clear, right, if you got a list and it only has ten people on it, that's not going to do much for your business, so if you can make that list thousands of people or tens of thousands, something that's going to be something that really impacts the business.

So we had a huge focus on how could we help our customers to make their list bigger but in a way where consumers are signing up and saying I want to get this, right, so making it really great for both the consumer and the business, and that's what we did.  We built this technology that allowed these people to sign up in Two-Tap, and it was great, and companies did really well with it. And that was a big part of our success.

Q.    And so how important was Two-Tap to Attentive's success?

A.    Extremely important to our success as well as that of, like, all the merchants that use us and use us to this day, because, look, text messaging is not new, right.  Text messaging has been around for a long time.  One of our investors when we --

(Reporter interruption.)

BY MS. VESSELS:

Q.    It's good to be --

A.    I get excited, my apologies.  But I remember one of our investors at the time was like, why are you starting a text message marketing company?  I had a company that did that a decade ago and I sold it.  And I'm like, well, why would you start this now?  And the problem had been that it was really hard to get people to sign up to get messages, both to the consumer as well as legally.  There's like a bunch of, like, legal restrictions on who you could send text messages to.

So we worked really hard to try to figure out ways to make it easier for people to sign up.  And the Two-Tap solved that, made it a lot easier for people to sign up, and helped customers, yep, be able to text their consumers and make a lot more money doing it.  And that was like critical to our success, absolutely critical.

Q.    So would Attentive be here today without Two-Tap?

A.    I don't know if it would still be here.  It was a major factor in our success.

Q.    Would you attribute your success to retargeting?

A.    No, I would not.  I mean, we had a retargeting company before Attentive.  It was called TapCommerce.  We were one of the first mobile app retargeting companies.  So

I seeped in retargeting, but it was a, you know, a very small piece of the package for us in this business.

Q.    You said "very small."  Was it even 10% of the reason Attentive was successful?

A.    No, I would say it was -- I think -- you know retargeting, so retargeting technology is like, hey, if someone added something to their shopping cart that didn't buy it, I want to remind them that it's in their shopping cart.  That would be retargeting, right.  It's a very small percentage of people that actually qualify to be in that segment.

So it's not going to have, you know, a tremendous impact the same way that Wesgro, which is what Two-Tap does, that's a huge impact.

Q.    All right.  Mr. Long, I want to shift gears a little bit and talk about some of the things that you spoke with my colleague about before.

You were asked about whether you wanted to "crush Postscript."

Do you remember that?

A.    Yes.

Q.    Did you want to crush Postscript?

A.    I think we always wanted to win.  We wanted to make the best product in market.  So, you know, we were always trying to win, like I think most companies are.

Q.     And you were competing with Postscript?

A.     Yes, we competed with them along with many other companies.

Q.     Who was your biggest competitor?

A.     I think far and away, our biggest competitor was Klaviyo.

Q.     Okay.  And did you need Postscript's retargeting technology to win the competition?

A.     No.

Q.     Let's go back to PTX-111.

       Do you remember talking about this e-mail chain with my colleague?

A.     Yes.

Q.     What year is this e-mail chain from?

A.     2020.

       MS. VESSELS:  Can we pull up the opening slide with the timeline on it?

BY MS. VESELS:

Q.     What year did Postscript get this patent?

A.     Appears they filed in 2022.

Q.     And that e-mail chain was from 2020; is that correct?

A.     That's right.

       MS. VESSELS:  If we can pull up DTX-110.  And go down to the last page, page 14.

BY MS. VESSELS:

Q.    So you talked about this chart with my colleague as well; is that correct?

A.    Yes.

Q.    And you talked about how the numbers are in red, so you're losing business to Postscript, right?

A.    Yes.  Well, the numbers can be in red or green.  It changes.

Q.    Yep, but if the number for Postscript is red, that's them taking business from you, right?

A.    That's right.

Q.    That's not you targeting them, right?

A.    That's right.

Q.    And so if your goal was to put them into bankruptcy, wouldn't this be green for Postscript?

A.    Yeah, you would think that would be the case.  It's kind of comical.  Yeah.

          MS. VESSELS:  Pass the witness.

          MS. DURIE:  Just leave that up.  Can you just leave up?

          THE COURT:  All right.  Ms. Durie, redirect.

                    ADVERSE REDIRECT EXAMINATION

BY MS. DURIE:

Q.    So you were doing everything you could to compete with them as aggressively as possible, including free Dom Pérignon and free months of subscriptions, and still the net

of it is that Postscript was taking business away from you?

A.    I mean, if you look at this chart, you can see there are months where we're taking business from them, months where they're taking business from us.  So it's going back and forth.

Q.    It is.

A.    You've highlighted and picked one month to pick here, but you can see, I think as the jury can see, it changes month to month, and it changed across a number of competitors, so yeah, we competed against many companies.

Q.    Totally fair?

A.    Yep.

Q.    So if we take a look at the net of what's up here on the chart, the green .4 plus .2 plus .4 plus .2, that's 1.2 million total from Postscript to Attentive, right?

A.    Which numbers are you adding up?

Q.    The green ones under Postscript.  .2 .4 .2 .4, adds up to 1.2?

A.    I see .2 .4 .2 .4 and zero on the green, and then I see the red numbers as well.

Q.    Right, the green numbers add up to 1.2, right?

A.    In this time period that you picked, yes.

Q.    Okay.  Well, that I picked.  I mean, that's the chart in your document, right?

A.    Well, you picked the document that you wanted to

show --

Q.    Sure.

A.    -- the jury in order to tell your story.

Q.    Fair enough.

And in this time frame, late '22 through May of 2023, 1.2 million net from Postscript to Attentive, and 2.5 million net from Attentive to Postscript, right?

A.    Yes, it looks like in -- I don't know what the individual customers were, but there was a big change in May, yeah.

Q.    So back to my original question.

A.    May of '23, yeah.

Q.    Apologies.

Notwithstanding the champagne, notwithstanding the free months of subscription --

A.    Wasn't all that stuff back in like 2020, like three years before --

Q.    Sure.

A.    -- or something like that.

Q.    And you had been continuing to compete with Postscript aggressively, right?

A.    In the prior four years, yeah.

Q.    Okay.

A.    Yeah.

Q.    So after four years, aggressive competition, the net

of it was, you were still on net losing business to Postscript, right?

A.    I don't know that -- what this time period would look like if you picked a different time period.  Through the time period that you've picked here, it would seem net.  If you picked this big month in May and say that tracks throughout the chart, if I didn't include May in this and I just included April through the prior September, that wouldn't be the case, right.  So you're cherry-picking a bit, but yeah.

Q.    Okay.  And again, you don't know whether right after this was when Attentive decided --

A.    This didn't even make my radar.  It wouldn't have made my radar.

MS. DURIE:  No further questions.

THE COURT:  All right.

Anything further, Ms. Vessels?

REDIRECT-EXAMINATION

BY MS. VESSELS:

Q.    Mr. Long, we're talking a lot about documents.  Did you ever actually give any bottles of Dom Pérignon?

A.    I don't think we ever actually followed through and did that actual promotion, no.

Q.    So why did you say it?

A.    I think at the time we were passionate, we felt like

we were first, we were innovative, and other people were just copying us.  And that was frustrating to us, so I think we probably wanted to do everything we could to compete against them like we did anybody else.

Q.    And you had just talked about the chart in DTX-110, how, in total, it ends up being 1.2 million, right?

A.    Yeah, we just talked about the totals, yes.

Q.    Yes, okay.

      Do you have any idea what fraction of your revenues in 2022/2023 1.2 million was?

A.    In 2022?

Q.    Right.

A.    Relatively small fraction.

Q.    So you said it would have been under your radar, right.  So is it small enough that it would have been under your radar?

A.    Yeah, I mean, I think -- can you just state the question again?

Q.    Yeah, sorry.

      So you said it was a small fraction, right?

A.    Yes.

Q.    You've also -- my colleague has tried to indicate a number of times, you didn't even know about this going on. I'm asking you, is this because it was such a small fraction?

A.      Yes, yes.  So it was -- it was a very small fraction of our overall company revenue.

Q.      Okay.  And I just want to close up real quick.  Are you proud of what you did at Attentive?

A.      Yeah.  Look, I'm very proud of what the team has built.  I think it's had a huge impact for companies, everything from -- I mean, today, I think we have something like 78 to ten thousand customers.  Everything from tons and tons of mom-and-pops to, you know, large and bigger retail and e-commerce businesses that rely on us.

        I think we really made SMS something that is a huge driver of business for them and also something that consumers love.  I really like it when I go to a site or I'm with my wife and kids or something and we see something and we'll see Attentive's stuff out in the wild, and I think that's something I'm really proud of.

        And I'm really proud of the team for what they built.  I think it's had a huge positive impact.  I also, I mean, I came from Philly.  There's a ton of Philly companies, you know, sports teams, and going up to the Museum of Art, and all that stuff that will use us, so it's very fulfilling that they all use us.

Q.      So would the Brian Long from 2016 in the red T-shirt in the hot apartment, how would he feel about what you have done with Attentive?

A.      We would never have thought that we would have gotten this big.  I mean, we -- we were -- we were -- we just thought that it was something cool, we were building cool technology that our friends wanted and -- and thought it would be that.

We never thought it would be this big and -- and it's crazy that I'm -- I'm sitting here in a patent suit from, you know, someone who followed us and copied us.  So here we are.

MS. VESSELS:  Nothing further.

THE COURT:  Okay.  Thank you.

The witness may step down.

I think it's a good time for us to take our morning break.  So we'll take a 15-minute break.  It's 10:57 now.  We'll be back, ready to go, at 11:12.

With that, I'll ask my courtroom deputy to lead the jury out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated, everybody.

I just want to point out something real quick.  I think Mr. Long was the first witness that was -- who was called adversely, and pursuant to the Court's prior order, all sides were going to do all of its testimony.

Just pursuant to my prior order and request, if such a witness is going to testify, can you just give me a heads-up so I can -- to let me know in advance because we have a different process than normal for each witness.

MS. DURIE:  Will do.

MR. CAMPBELL:  And, Your Honor, we just want to clarify that Mr. Long is released because he had -- was called adversely and was put on just for direct.

MS. DURIE:  Yes.

THE COURT:  Sounds like there's no objection, so...

MR. CAMPBELL:  Thank you.

THE COURT:  All right.  See you back at -- well, the Court stands in recess.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Everyone remain standing.  We'll have our jury lead back in.

(Jury enters.)

THE COURT:  All right.  Everyone can be seated.

Before we begin, just a note for our jurors, and counsel, and witnesses.

Sometimes the acoustics in the courtroom make it a little hard for everyone to hear, especially for our court

reporter who is taking down testimony. I can't always see my court reporter because I have my big computer screen in front of me. So I've asked her if she ever can't hear a witness or counsel, just to let them know so they can be reminded to speak up and make sure that the jury is able to hear them as well.

Okay. All right. So with that said, let's continue, and I'll call on Postscript counsel to call the next witness.

MS. JIAM: Your Honor, Postscript will now call Dan Glazer, who is Postscript's chief sales officer.

THE COURT: All right. Have the witness approach the witness stand and be sworn.

MS. DURIE: May I approach, Your Honor?

THE COURT: You may approach, yes.

COURT CLERK: Please raise your right hand.

Please stand and spell your name for the record.

THE WITNESS: My name is Dan Glazer. D-A-N, G-L-A-Z-E-R.

DAN GLAZER, having been duly sworn, was examined and testified as follows:

COURT CLERK: Have a seat.

THE COURT: Please be seated. Direct examination.

DIRECT EXAMINATION

BY MS. JIAM:

Q.    Good morning.  Can you please introduce yourself to the jury?

A.    Yes.

Good morning.  My name is Dan Glazer.

Q.    And when did you join Postscript?

A.    So I have been at Postscript for four and a half years.  I joined in January of 2021.

Q.    And what were you doing just prior to working at Postscript?

A.    Prior to working at Postscript, I worked in technology at a logistics technology company called Flexport where I was the VP of sales at Flexport.

(Reporter clarification.)

BY MS. JIAM:

Q.    And why were you interested in joining Postscript?

A.    So it was 2020, I had been laid off at the beginning of the pandemic.  I had a couple months to think about what I wanted to do next as I was searching for my next role, and it was really important to me that I join a smaller company where I could make a big impact.

I really -- I wanted to work at a company I thought could be successful, and Postscript was getting a lot of traction in the market.  And think the most important thing to me was I wanted to work with really people that I

respected and that I felt like I could build a great company with.  And I was pleased when I got the Postscript offer. We had a lot of chemistry, and I was excited to be joining and help them build it out.

Q.     And what was your role at Postscript when you joined?

A.     When I joined, my title at the time was VP of sales.

Q.     And what were your responsibilities in that role?

A.     So my core responsibilities at the time I was hired was to build out the sales department.  There were two sales team members on the team, a saleswoman and a salesman, and I was hired to hire the sales team to define our go-to-market strategy, to help develop our sales strategy, certainly help close deals and win customers as part of developing that strategy.

Q.     Have you always worked in sales?

A.     I have worked in sales, specifically software sales for almost my entire career, since 2012.  Before that, I had my own small business and I was an event planner.

Q.     Do you enjoy sales?

A.     I do.

Q.     What about it?

A.     What do I enjoy about sales?  So my favorite part of my job is talking to customers.  In particular -- and what we do at Postscript, we serve a lot of small businesses where we're dealing with the founder of the company or the

business owner who started the business, and it's a lot of fun to hear their story, why they created the product they created, etc.

And I think that, you know, a lot of people think that sales is, you know, selling someone and convincing someone to buy something that they don't need or don't want. But really what sales is, is you talk to 100 people and you find the 10 or 20 that actually have a problem that your company or your product solves. And when you find that matches, it's a lot of fun to try to convince them that, yeah, your product can solve their problem and it's exciting to get a deal done and it's even more exciting when you actually see the success on the other side, right, when they actually do get to grow their business faster as a result of partnering with you. I think that's a really rewarding part of my job.

Q.    And what did you -- well, when did you transition from your role as VP of sales and partnerships into the role that you have now?

A.    I was promoted to the chief sales officer last year, I think Q2 of last year. Maybe Q1, earlier in the year.

Q.    And have your roles or responsibilities changed in that period of time?

A.    Not drastically. I would say that the business has gotten more complex and my team has gotten bigger. I now

manage the solutions engineering team, in addition to sales.

(Reporter clarification.)

THE WITNESS:  And, fundamentally, my -- my role is, in fact, leading the sales org at Postscript.

BY MS. JIAM:

Q.    And have you led the sales for your entire time at Postscript?

A.    Yes.

Q.    So you mentioned a little about talking to customers.

How often do you interact with potential merchants to sign with Postscript?

A.    A few times a week.  As often as I can, to be honest.

Q.    And in your work in sales for Postscript, have you developed an understanding as to why merchants pick Postscript?

A.    I would like to think so, yes.

Q.    And so if you had to finish the sentence, like merchants pick Postscript because, how would you finish that sentence?

A.    So there's -- there's three reasons why customers choose to work with Postscript.  The first is our people and our team.  We try to always deliver the most innovative and unique and personalized SMS marketing strategies to our clients.  Second, because -- probably the most important, actually, is the technology itself.  It's a platform that

has unique and differentiating features that we offer so that customers can grow their business the most.  And of course the value that we provide.

Q.    And so I'd like to kind of break this down a little bit.

So you mentioned three different ones, so let's talk about the first thing you had mentioned.

You said the merchants with Postscript, one reason is the team.

Can you expand a little bit about what you mean by that?

A.    Sure.

So we at Postscript have hired a lot of folks to our team that support customers that have been in e-commerce their entire careers.  A lot of them have been store owners themselves, so they've been a merchant on Shopify themselves, and we think that that gives us a lot of empathy for the problems, challenges that our customers face day to day and allows us to solve them in really innovative ways.

One of our cofounders always said we want to be the most customer centric team in software, period.  So that's something we strive for.

Q.    And I know you mentioned like customer centric, but like doesn't -- doesn't everyone say that?  Like doesn't everyone say we want to -- you know, we want to be customer

first, we want to be customer centric?

A.      Sure.  Yeah.  I think that every company I've worked at has -- yeah, that is part of their values or poster on the wall that talks about that.  But as a leader at Postscript, I'm really proud to say that I think we walk the talk better than anywhere I've personally worked, and that's something that we're really proud of.

Q.      And can you give me an example of what you mean by actually walking the talk?

A.      Sure.  Yeah.

        So there is a customer that we started with recently called the Beard Club.  They make beard care products, and this is a story about our team going above and beyond during their onboarding.

        So in this example, a lot of times what happens when we're selling Postscript is we're dealing with small companies, and so they make the decision to buy really quickly, right?  They'll meet our team, they'll see a demo, they will kind of fall in love and want to get started as quickly as they can.

        And so what often happens -- or sometimes happens is that during the onboarding process they come in with a lot of product feedback.  And in this case, the Beard Club came to us and say we know we just signed, but we were really hoping you had this feature, we really wanted to

integrate our loyalty and e-mail programs more deeply than what you all do.

And normally when that happens, the account team would go to the product team and the product team would say, oh, we'll try to get that on the roadmap.  They're a customer, so, you know, we've got a year to work with them and prove that we're good, and we'll get that on the roadmap eventually.

But in this case, our -- our team, there's a solution engineer on my team named James, who had been working with them, and he took the time to understand what they are actually trying do and realized, oh, this isn't that hard, and he spent his weekend coding up a solution for them that he was able to help them implement that solved their problem during onboarding.

And I think at most companies, like I said, that is a feature that gets put on the roadmap for the future, and we really encourage our teams to try to go above and beyond and solve whatever the customer is asking for.

Q.    And what, if anything, do you do to encourage your team to have this above-and-beyond mentality?

A.    Well, I think first as leaders we try to exemplify that when we interact with customers.  We also have a few tools internally.  We use Slack, which is a messaging tool, for us to have a company message board, and there's

channels -- and there's channels where you can shout out an employee, kind of give them a virtual pat on the back.  And so in this case, James' peers recognized him in that channel, and it's the kind of thing where they share what he did with the customer, and everyone goes in and gives a thumbs-up or a heart emoji or something like that, and then we as managers also have a tool called fringe points, and these are kind of like airline miles or credit card points where usually when someone goes above and beyond for a customer, we as managers can give someone 50 or a hundred points or something like that to recognize they did a really good job outside of the normal course of just doing their job.

Q.     And we discussed an example of a solutions engineer going above and beyond.  Do you have an example of a sales member going above and beyond and applying this mentality?

A.     Of a sales member specifically?  So, yeah, one example that comes to mind is there's something called Sewing Parts Online that makes sewing kits for hobbyists, and this is an example where we were able to get them up and running on Postscript in a matter of hours and, you know, less than a day in the most critical time period for their sales.

          And so I think this came up earlier that Black Friday/Cyber Monday in the e-commerce space is a really

critical sales weekend, and the weekend after Thanksgiving, when everyone runs sales and most consumers do their holiday shopping, so it's really important that merchants have their marketing strategy dialed in for that weekend.  And Sewing Parts Online was using another SMS vendor, and they had posted on social media that they were not able to send messages that weekend for one reason or another and our team saw that.

And typically we're not doing a lot of sales that weekend because usually the decision of who you're going to use has been made well in advance of that, but they were really stressed out and struggling.  And our team was able to get on the phone with them and onboard them to Postscript in a matter of an afternoon.  And typically that's a two-week process.

There's a lot of steps involved and people on our side to coordinate, and we were able to condense that down to just the afternoon, which was able to enable them to market through the weekend and effectively, like, saved their Black Friday/Cyber Monday weekend.

Q.   Was it important for Postscript that you land Sewing Parts Online as a customer?

A.   I mean, I think that every customer is important to us.  It wasn't a strategic logo or a high-spending account. I think the reason I like that example is it shows how

quickly our team jumped into action --jumped into action and does jump into action to help our customers' success.

Q.    Now, another thing that you mentioned, another reason why merchants pick Postscript is you mentioned the platform with the technology.  What do you mean by that?

A.    So when I say "the technology," that's what, you know, Postscript is, is software for our customers.  And specifically there's general plans that we need to make, and we really focus on highlighting all the unique and differentiated valuable things we offer in the market.

Q.    And are there any specific features you're thinking of that Postscript uses to differentiate itself in the market?

A.    Yeah.  Two that come to mind.  One is we have something called Onsite Opt-in which is our tool for helping clients grow their list compliantly and effectively.  And then, of course, Campaign Flows was something that was unique to Postscript and a really important part of our sales process.

            MS. JIAM:  Mr. Glass, if you could please pull up PDX-1 and -17.

BY MS. JIAM:

Q.    Do you remember when Mr. Saulsbury showed this slide during his opening presentation?

A.    Yes, I do.

Q.    So if we're talking about Campaign Flows, is Campaign Flows one of the features that drives sales for Postscript?

A.    Yes, Campaign Flows is one of the features that drives sales.

Q.    How so?

A.    So when we're going through a sales process, there's you know, almost always a demo where we show the technology, and what we like to do is we like to build a custom demo for that merchant, showing them how they might use Campaign Flows, so it's sort of the cornerstone of our demo in every sales process.  And we try to really personalize that to something that they might actually run themselves to really highlight just how big of an impact Postscript would make if they were a customer of ours.

Q.    And do you know whether Campaign Flows directly impacts a merchant's ability to make money?

A.    Yeah.  Yes, I do.

Q.    And how do you know that?

A.    So we -- we've run -- we run a lot of data to understand what is the impact of our products and our customers' marketing programs.  And one of the case studies that we published that we're well-versed in is giving back to Black Friday/Cyber Monday.  The traditional way that marketers would market the SMS on that weekend is they might send a message on Friday, a message on Saturday, maybe in

the morning, and then send another message on Monday and it would be a general, like, full-list blast.

And we had our data scientists look at businesses that were not using that basic strategy but maybe a little more personalization. In particular, using Campaign Flows on Saturdays is when we find it was really effective to send a general message in the morning, but then set up the Campaign Flows so you were sending a personalized message in the afternoon to someone who had already ordered, say thank you and give them an additional discount to order again. If someone hadn't ordered yet, you'd send them one message, and for others you might send a different message.

And we found that by sending two messages as opposed to one that were personalized like that, there was an over 80% likelihood that the subscriber interacted with the Black Friday/Cyber Monday marketing that weekend and just had a propensity to purchase after that, so it was incredibly effective.

Q.   And do you have any role in product development?

A.   As the sales leader and as my team, you know, spends all day talking to -- processing customers, we provide a lot of feedback to the product team. You know, we're sort of the voice of the customer, if you will, when they're trying to figure out what to build, and so that would be my role in product development is making sure we represent the customer

and voice all their feedback to the product team.

Q.    And what kind of information do you give to the product development team to make sure you're meeting customer needs?

A.    Certainly we would share both constructive and positive feedback to try and reinforce when we're doing something really well and we're -- keep investing, but then also if there's constructive feedback around a feature request or something not looking the way the customer would like, we pass that on as well.

Q.    And have you received customer feedback about Campaign Flows?

A.    Oh, yeah, absolutely.

Q.    And do you take that customer feedback about Campaign Flows?

A.    Yes, yeah.

Q.    I'd like to -- you to turn in your binder to PTX-344.
      Can you take a look at that?

A.    Yes.

Q.    Do you recognize this?

A.    I do.

Q.    What is it?

A.    This is a screenshot of Postscript's application in the Shopify app store with a review, five-star, perfect score, and there's some reviews here.

MS. JIAM:  I offer PTX-344.

THE COURT:  Any objection?

MR. WOOD:  No objection.

(PTX Exhibit No. 344 was admitted into evidence.)

BY MS. JIAM:

Q.    Do you know of any merchants who were -- Campaign Flows is a reason why that merchant joined?

A.    Why they joined and chose Postscript?

Q.    That's right.

MS. JIAM:  You don't have to blow that up.

THE WITNESS:  Yes, I do.

BY MS. JIAM:

Q.    Can you give us an example?

A.    Sure.  The example that goes for me is one of the biggest customers that we signed with Postscript is a company called Ruggable.  They make machine washable rugs. And they became a customer in the fall of 2022.  And it was the biggest customer that we had signed at the time, so I was really personally involved in the sales cycle.  And every year Ruggable runs this big anniversary sale, and I remember that they came to us specifically because they were working with a company called Klaviyo, and Klaviyo didn't offer the level of personalization to, you know, personalize their campaigns that they heard Postscript could offer.  And

so we built out a really detailed custom demo Campaign Flows that showcased how their anniversary sale that they'd just run might have been different if they were on Postscript and used their product and their sale link and their logo, etc., and, like, personalized this really detailed Campaign Flows for them.

And I was on a call and I remember their eyes lit up and they're like, "this is exactly what we're looking for" and they chose Postscript.

They were a customer a couple days later, and they're still a customer to this day and power users of the platform.

Q.    We talk about how Campaign Flows is viable to merchants.  Is Campaign Flows viable to customers as well?

A.    Yeah, absolutely.

Q.    How?

A.    So as I mentioned, it's the cornerstone of our demos. I think it's one of the most exciting, at least before we kind of get that aha moment with a customer, when they're seeing our technology for the first time, and so it certainly helps us sell more merchants to become Postscript customers.

Q.    And do Postscript's merchants send you more messages because of Campaign Flows?

A.    Yes.

Q.    Why?

A.    Why?  So there's a few reasons.  Thinking about that example, the case study I mentioned on Black Friday/Cyber Monday, that's something that we --

(Reporter clarification.)

THE WITNESS:  Oh, I'm sorry.  Getting too fast.

Can you repeat the question and I'll take it from the top?

BY MS. JIAM:

Q.    Yeah.  How do you know that Postscript's merchants send more messages because of Campaign Flows?

A.    So we know this because we have run a number of studies with our data science team to understand this.  And there's this metric that we track pretty religiously, the messages per subscriber.  And that's a metric of how much our customers are embracing the platform and how effectively they're using it to market to their customers.  And what we saw when we launched Campaign Flows was across the board the customers were using that functionality that their messages per subscriber increased.  And the reason customers are happy to send more messages is because they're personalized, and as I mentioned with the Black Friday/Cyber Monday case study, when you send more personalized messages, they drag more sales as well.

Q.    And do Postscript's merchants send more

single-message campaigns using Campaign Flows?

A.      Yes, I believe they do.

Q.      And is Campaign Flows a feature that's exclusive to Postscript today?

A.      Today it is not, no longer.

Q.      Do you know how long it was an exclusive feature for Postscript?

A.      I believe that we were selling it exclusively for about a year and a half.

Q.      And when Campaign Flows was still an exclusive feature of Postscript, was that something that helped Postscript stand out from the competition?

A.      Yes, absolutely.  Like I said, it was the -- it's the thing that we show customers in every demo.  And so it's still something that we demonstrate today, but we have the caveat that -- with saying, you know, this is the strategy that your team would help you come up with, but technically you can execute this on other platforms.

Q.      And what happened after Attentive launched Magic Composer, or as it's known now, Campaign Composer?

A.      Our sales conversations were much more competitive. We weren't able to -- our win rates weren't as great because we could no longer say that you can only do this with Postscript.

Q.      Now, I'd like to kind of take a step back as we wrap

up.  And I want to talk about your time at Postscript.

A.    Okay.

Q.    Are you proud about your work at Postscript?

A.    Yeah.  Yes.  Yes.

Q.    And what are you most proud of about your work at Postscript?

A.    I would say that I'm most proud of the team that we've built.  As I said, I've been at Postscript four and a half years.  I'm lucky that a lot of the folks that I hired when I first joined are still on the team.  And it's been incredibly rewarding to see them grow in their careers from junior salespeople to really experienced, accomplished sellers and customer advocates, and all the success that they brought our customers along the way.  That's really rewarding.

MS. JIAM:  No further questions.

I pass the witness.

THE COURT:  All right.  We'll have cross-examination.

MR. WOOD:  Your Honor, may we approach?

THE COURT:  You may approach.

MR. WOOD:  Good morning.  My name is Matthew Wood.  I'm an attorney for Attentive.  Thank you on behalf of Attentive and myself for your time this week.

CROSS-EXAMINATION

BY MR. WOOD:

Q.   Good morning, Mr. Glazer.  I don't believe you and I have met before.  It's very nice to meet you.

A.   Nice to meet you as well.  Good morning.

Q.   Earlier you were talking about the technology that you believe sets Postscript apart and is part of what customers value, correct?

A.   Yes.

Q.   And there were two features you mentioned, I believe; is that right?

A.   Yes, I believe there were two features.

Q.   One was Onsite Opt-in, correct?

A.   Correct.

Q.   And the other one was Campaign Flows, correct?

A.   Uh-huh.

Q.   Onsite Opt-in is not at issue in this case, is it?

A.   No.

Q.   The '660 Patent doesn't cover Onsite Opt-in?

A.   No, I don't believe it does.

Q.   Onsite Opt-in is a feature that helps Postscript's customers build their subscriber list, correct?

A.   Yes, that's correct.

Q.   Earlier you talked about a message -- excuse me, you talked about a metric that you track very closely called messages per subscriber; is that right?

A.    Yes, that's correct.

Q.    If you have zero subscribers, how many messages can you send out?

A.    Think about that -- are you asking from a technical perspective or from a market impact perspective?

Q.    Someone has to be subscribed before you send them a message, correct?

A.    Yes.

Q.    So if you have zero subscribers, you can send zero messages, correct?

A.    I don't believe we could -- I don't know who you would send a message to, correct, yeah.

Q.    If you have -- if you're sending messages at a rate of five messages per subscriber but you only have ten subscribers, you're only sending out 50 messages, correct?

A.    Yes.

Q.    And if you were sending out messages at a rate of five messages per subscriber, but you had a thousand subscribers, that would be 5,000 messages, correct?

A.    Yes, that would be 5,000.

Q.    But Onsite Opt-in or features that drive subscribers are not what's part of the '660 Patent, correct?

A.    No, that's not what's part of the '660 Patent.  I was just giving another example of, you know --

Q.    Sure.

A.      -- other aspects of a platform that are differentiated.

Q.      Okay.

                MR. WOOD:  Can we pull up PTX-344?

                THE WITNESS:  Okay.

BY MR. WOOD:

Q.      I believe this was the Shopify customer reviews that we were just looking at a second ago.

A.      Uh-huh.

Q.      Campaign Flows is the feature we're talking about in this case, right?  That's what you were just discussing, that is --

A.      Yep.

Q.      -- the feature that Attentive is being accused of having infringed?

A.      Yes, sir.

Q.      Do you know how many of these customer reviews mentioned Campaign Flows?

A.      I don't know specifically how many of -- there's almost 2,000, I think.  I think the thing at the top is a summary of where it mentions like our campaign capabilities and a few other things.

Q.      Okay.

                MR. WOOD:  Can we pull that up?

BY MR. WOOD:

Q.    And this is an AI-generated summary, correct?

A.    I assume so, but I'm not a 100% certain.

Q.    And AI would have looked through these messages and summarized what it was seeing as the most common comments being made and then put this up to make it easy for someone trying to get through all 2,000 of these to be able to look at; is that right?

A.    That's my assumption as well, yes.

Q.    You see the words "Campaign Flows" here?

A.    I do not see the word "flows," no.  I see "campaign capabilities," which I presume to be the breadth of our campaign capabilities.

Q.    You have more campaign capabilities than just Campaign Flows, correct?

A.    Yes, yeah.

Q.    Now I'm looking through this and I see on June 9th, 2022, from Jessie Story, a reference to, "I just launched my first flow campaign."

      Do you see that?

A.    I do.

Q.    I'm happy to be corrected, Mr. Glazer, but I don't see any other reviews on this page that mention Campaign Flows, do you?

A.    If you can give me a second to read it.  I don't -- this is the only mention of Campaign Flows in the sample of

reviews here of the 2,000.  I think this is the 133rd page of reviews.

Q.    Okay.  Let's look at that, if we go to the second page.

You just mentioned we're on page 133 of Postscript's reviews, correct?

A.    Correct.

Q.    You don't know what's on those first 132 pages, do you?

A.    I have not read those, no.

Q.    You don't know if Campaign Flows appears a single time on any one of those 132 pages?

A.    No, I don't know.  I just know that summary calls out the broad campaign capabilities.

Q.    Do you have any idea why Postscript's attorneys chose page 133 out of all these to show you?

A.    I don't, no.

MR. WOOD:  We can go ahead and take that down.

BY MR. WOOD:

Q.    You should have a second binder that was just handed up to you.  There should be a tab marked PTX-419.

A.    Yes, I'm there.

Q.    Okay.  This is a chain of Slack messages from January 2022 between yourself and Mr. Adam Turner, correct?

A.    Yes, that is what this is.

Q.    Mr. Turner is the founder and the CEO of Postscript?

A.    Yes, he is.

Q.    He's seated right here at counsel table?

A.    That's correct, yep.

Q.    All right.

MR. WOOD:  We'd like to admit DTX-419, Your Honor.

THE COURT:  All right.  Any objection?

MS. JIAM:  No objection.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 419 was admitted into evidence.)

BY MR. WOOD:

Q.    So the first Slack message on here is from January the 5th, 2022, at 8:47.  It's from Adam Turner to you saying, "I have a lead, not sure if they're qualified.  Can you point me in the right direction?"  And then he gives you an URL link --

A.    Uh-huh.

Q.    -- for rolflexpro.com; is that right?

A.    Yes.

Q.    And he says, "They're asking if they should talk to someone on our team.  Looks like they use Attentive."  Is that correct?

A.    That is correct, yes.

Q.     And you respond, "Well, we don't even have them in our Salesforce which means we don't even know about them."

A.     Uh-huh.

Q.     And skipping down to 1012, Adam Turner responds, "Random referral from a friend.  No idea on the size, but I can ask."  Is that right?

A.     That's correct, yes.

Q.     You respond back, "No need.  Since it's Attentive's deal, I'm guessing it's worth our time."  Correct?

A.     Yes, correct.

Q.     So in January 2022, you had no problem trying to steal customers from Attentive, correct?

A.     I mean, we operate in a competitive market and, yeah, we were trying to be the best solution for Shopify merchants, and I presume they're on Shopify, which is the main criteria for us to sell to them.

Q.     Okay.  He asked if you needed to look at the size of the customer, and you said, "No need, since it's Attentive's deal."  Correct?

A.     Yes.  At the time in particular, Attentive worked with businesses on average that were much larger than ours.  We served much smaller businesses, and then over time moved towards the larger businesses.  So it was my presumption that it would be a good client for us to work with.

Q.     This was -- this conversation happened ten months

before Postscript filed the patent application for the '660 Patent, correct?

A.      I think that's right, yes.

Q.      Okay.  Let's turn to PTX-501.

MR. WOOD:  Take that down, please.

BY MR. WOOD:

Q.      Mr. Glazer, this is Postscript's financials from November 2022 through September 2024, correct?

A.      Yes, that is correct.

MR. WOOD:  Your Honor, move to admit.

THE COURT:  Any objection?

MR. WOOD:  No.

MS. JIAM:  No objection.

THE COURT:  All right.  The document is admitted.

(PTX Exhibit No. 501 was admitted into evidence.)

BY MR. WOOD:

Q.      Mr. Glazer, Postscript loses on average over $2 million a month of net income, correct?

A.      I would say that that is a fair estimate, yeah.  Yes.

Q.      Okay.  Postscript was founded in 2018; is that right?

A.      Yes, 2018.

Q.      So by September 2024, Postscript would have been in business for over half a decade; is that right?

A.    That's correct, yes.

Q.    Okay.  And in September 2024, Postscript lost over $2.3 million in net income, correct?

A.    Yes.

Q.    And in August 2024, it was over 2 million, correct?

A.    Yes, that is correct.

Q.    July 2024, it was over 2 million, correct?

A.    Yes.  This is according to the financials, yes, that's correct.

Q.    Okay.  This spreadsheet was Postscript's net income for every month between November 2022 and September 2024, correct?

A.    Yes, that is what it appears to be.

Q.    Is there a single month in here where Postscript's net income was positive?

A.    You know, I do not see that.  I would say that's uncommon for a business like ours.

Q.    That wasn't my question.  In fact, over this time period, from November 2022 through September 2024, Postscript lost over $50 million in total; isn't that right?

A.    I would have to do the mental math really quickly, but I presume that that's correct.

Q.    Okay.  Attentive is accused of infringing Postscript's patent beginning in July of 2023; isn't that right?

A.      Yes.

        MR WOOD:  Can we pull that PTX back up?  Let's go to July 2023.  Scroll so we can see a couple months before and after that.

BY MR. WOOD:

Q.      So in May and June and, you know, into July, before the alleged infringement began, Postscript was losing between 2.6 and $3 million a month; isn't that right?

A.      Sorry.  What were the dates again?

Q.      May, June, and July of 2023.

A.      Yes, that's the -- yes, that's correct for that time frame.

Q.      And the three months after that, after the alleged infringement began, it's between 2.1 and $2.2 million, thereabout; is that right?

A.      Yes, that looks right.

Q.      So Postscript's net income increased by about 7- to $800,000 a month after the alleged infringement began, correct?

A.      I would think that that's mostly due to the analyst.

Q.      The months after the alleged infringement began, the numbers are between 7- and $800,000 higher than they are in the months before the alleged infringement began, correct?

A.      Yeah.  Those are higher.  It's typical that November is by far the best month, which is what is reflected here.

Q.    Well, let's look at that.

A.    Sure.

Q.    Let's look at November 2022, the November before the alleged infringement began.

A.    Uh-huh.

Q.    In that month, Postscript lost $1.8 million?

A.    Yes, that's correct.

Q.    Okay.  And November 2023, after the alleged infringement began, it was almost $900,000 higher; is that correct?

A.    That is right, yeah.

MR. WOOD:  Pass the witness, Your Honor.

Thank you.

THE COURT:  All right.  Thank you, Mr. Wood.

Ms. Jiam, redirect.

REDIRECT EXAMINATION

BY MS. JIAM:

Q.    Mr. Glazer, are you surprised Postscript is losing money every month?

A.    Am I surprised?  No.

Q.    Why not?

A.    It's fairly common for venture back startups that they're trying to build their product, and there's a lot to invest in R&D in particular that you run at a loss for a period of time while you're building a great product and

then hopefully, eventually, turn a profit and become a more stable business.

MS. JIAM:  No further questions.

THE COURT:  All right.  Thank you.

Mr. Glazer, you may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  I'll ask counsel to collect the witness binders.

And I'll ask Postscript to call its next witness.

MS. DURIE:  Thank you, Your Honor.

Postscript's next witness is Amit Jhawar.

And, Your Honor, we are calling Attentive's CEO adversely on an adverse direct.

THE COURT:  Okay.  Thank you.

MS. DURIE:  And, ladies and gentlemen of the jury, our next witness is Attentive's chief executive officer, Amit Jhawar.

COURT CLERK:  Please stand.

Please raise your right, please.

State and spell your name for the record.

THE WITNESS:  My name is Amit Jhawar.  A-M-I-T.  Last name, J-H-A-W-A-R.

AMIT JHAWAR, having been duly sworn, was examined and testified as follows:

MS. DURIE:  May we approach, Your Honor?

THE COURT:  You may approach.

ADVERSE DIRECT EXAMINATION

BY MS. DURIE:

Q.    Good afternoon.

And it's -- is it Jhawar?

A.    Yeah, Jhawar.

Q.    Got it.  Thank you.  That was very helpful.  I was mispronouncing it earlier.  I apologize.

Mr. Jhawar, we have not met before.  My name is Daralyn Durie.  I'm one of the lawyers representing Postscript.

Now, sir, you are currently the chief executive officer of Attentive; is that right?

A.    That's correct.

Q.    And you have actually been with Attentive since 2021; is that right?

A.    That's correct.

Q.    And you started out as president, and then you became the chief executive officer in around June of 2023; is that right?

A.    That's correct.

Q.    Now, up to this point in time, what is Attentive's total gross revenue as a company to date, just roughly?

A.    You want me to add all the years together?

Q.    Yeah, just ballpark.

A.    Probably $1.4 billion.

Q.    Okay.  Now, at the point in time when you joined the company in 2021, fair to say the company was flying pretty high?

A.    The company was successful, yes.

Q.    And at that point in time -- excuse me -- when you joined in 2021, the company was hoping to go public, right?

A.    That's right.

Q.    That is -- and it was -- so it was anticipating it would have what's called an initial public offering, right?

A.    Yeah.  We had hoped that would be a potential outcome for the business.

Q.    And but by 2023, that prospect was dimming; is that fair?

A.    Yeah.  Market dynamics had changed, so it was no longer seeing the same at the tail end of the COVID era.

So, yes.  It was much more difficult to go public in 2023.

Q.    Right.  And fair to say that in general in 2023, Attentive was facing a much more challenging market environment?

A.    I would say there were less new businesses and startups in 2023 than there were in '21, as an example.  So people were shopping less and there were less new customers

to land, yes.

Q.     You've got a binder of exhibits in front of you.  If I could ask you to turn to the one that is labeled PTX-215.

A.     Yes.

Q.     And you see this is an Attentive competitive intelligence document from H2 2023.

       That means the second half of 2023, right?

A.     I believe so, yes.

       MS. DURIE:  We offer PTX-215.

       THE COURT:  Is there any objection?

       MS. VESSELS:  No objection.

       THE COURT:  All right.  Document submitted.

       (PTX Exhibit No. 215 was admitted into evidence.)

       MS. DURIE:  And thank you, Mr. Glass.

       If we take a look at the first page.  And if we can just blow up that text so it's a little bit easier for the jury to read.  Just the whole thing.

BY MS. DURIE:

Q.     So this is talking about Attentive's competitive intelligence strategy for the second half of 2023, right?

A.     I believe so, yes.

Q.     And if we take a look at the executive summary, it says, "The company is currently facing the most intense competitive environment in its history with increased

competition and a potential for a further decline in GNB."

Let me just stop there.

What is GNB?

A.     GNB is a term we use internally.  It stands for gross net bookings.  So we take the accounts that we're winning and then subtract the volume that we're losing, so accounts that are leaving, and we look at the net of those two numbers.

Q.     And then it says, "To succeed and expand our market share, in the second half of the year and beyond, we must adopt a proactive approach.  This necessitates mind shift in the organization shifting from defensive to offensive, surprised to anticipate, and from passive to assertive."

Now, this was right when you were taking over as the CEO, right?

A.     Yeah.  On or around this time.

Q.     And one of the competitors that Attentive was dealing with during this time frame was Postscript, right?

A.     Postscript is a competitor of Attentive, yes.

Q.     And in 2023, there was a trend of Attentive losing business to Postscript, at least more often than Postscript was losing business to Attentive; is that fair?

A.     I don't know the exact numbers.

Q.     Let's take a look.  If we could look at DTX-110 in evidence.  And it's in your binder.

MS. DURIE:  If we can pull that up.

THE WITNESS:  DTX, yeah.  Yep.

BY MS. DURIE:

Q.     So this is a market and competitive intelligence readout from June of 2023, right?

A.     Yes.

Q.     And it says, "This provides a unified view of Attentive's market and competitive landscape," right?

A.     Yes.

MS. DURIE:  And if we can go down to the executive summary, Mr. Glass.  A little bit further down.

BY MS. DURIE:

Q.     So situating ourselves us here in June of 2023, "Macro headwinds remain challenging for businesses and consumers."

That what's you were talking about in terms of the broader landscape, right?

A.     That's right.

Q.     And then the third bullet, it says, "Klaviyo, Yotpo, and Postscript are making gains in SMS among Shopify merchants while Attentive is flat in 2023."

Do you see that?

A.     Yes, I do.

Q.     And is that consistent with your recollection of what was going on at the time?

A.      Yeah, I believe that's accurate.

Q.      And then if we look at the last bullet, it says, "For Attentive, competitor pressures continue," and then it talks about losing net GNB to competitor.

        Do you see that?

A.      I do.

        MS. DURIE:  And if week go, Mr. Glass, to page 14 of the document, and pull up the chart on page 14.

BY MS. DURIE:

Q.      We were looking at this, Mr. Jhawar, a moment ago. You were -- you were not in the room.

        But what we're seeing here under the Postscript column, if it's in the red, that means that Attentive was losing that much business a month to Postscript.  If it's in the green, it means that it was taking that much business away net from Postscript; is that right?

A.      That's correct.

Q.      And so if we look at March of 2023, for example, that was a million dollar loss in customers moving from Attentive to Postscript, right?

A.      Yeah.  This is the net number, right?

Q.      Right.

A.      So won 10 and lost 15.

Q.      Sure.

        So sitting here, when you take over as CEO in

June of 2023, right at this point in time, it's fair to say you're a new CEO, it's a tough competitive environment, the company's growth has stalled out a bit.

You were under a lot of pressure, fair?

A.    I didn't feel any undue pressure.  I mean, I want to win in the marketplace, so...

Q.    Fair enough.

But this was a -- this was a tough position to be coming into; is that fair?

A.    That's not the way I would have characterized it.  I would have said that I had a great opportunity with a company with several hundreds of millions dollars of cash, trying to build a business that had been very successful.  Actually, a category innovator.  We created the SMS industry for marketing as we see it today.

Q.    Fair enough.

Several hundreds of millions of dollars in cash in the bank at that time?

A.    Yes.

Q.    Okay.  Now, in 2023, merchants were really focused on savings, right?

A.    I think that there was a trend post '21 where that became more true, yes.

Q.    And Attentive -- it's not just Postscript.  Attentive wants to stop all of its customers from being successful in

SMS, right?

A.    Did you say "stop"?

Q.    Yeah.

A.    We want to stop our customers from being successful?

Q.    Yeah.

A.    I wanted my customers to be successful.

Q.    I'm sorry.  Competitors.  I apologize, Mr. Jhawar.

A.    Okay.

Q.    I apologize.  Let me try again.

A.    Yeah, please.

Q.    Attentive wants to stop all of its competitors from being successful in SMS?

A.    Yes, I would say that.

Q.    Okay.  Now, during this time frame in 2023, Attentive was monitoring what Postscript was doing, right?

A.    Monitoring all competitors, Postscript was.
         One of them.

Q.    So Attentive knew when Postscript had launched Campaign Flows, right?

A.    Yes, I'm sure we were aware.

Q.    If you could turn in your binder to PTX-179.

A.    Yes.

Q.    Are you there?

A.    Yes.

Q.    PTX-179 is an e-mail from Patrick Lew.  Who is he?

A.      Someone that worked on a marketing period.

Q.      And you see this is a biweekly competitive digest?

A.      Yes.

                (Reporter clarification.)

                MS. DURIE:  I'm sorry, a biweekly competitive digest.

                We offer PTX-179.

                THE COURT:  Is there any objection?

                MS. VESSELS:  No objection.

                THE COURT:  All right.  It's admitted.

                (PTX Exhibit No. 179 was admitted into evidence.)

BY MS. DURIE:

Q.      And if we take a look at the first page here, we see there are a number of highlights, and then under that there's some competitive news and the first competitor that is discussed is Postscript, right?

A.      Yes.

Q.      And if we look at this, there was a product launch event, why it's important, and you see there it says, "Campaign Flows Live"?

A.      Yes, the third bullet under the second bullet point.

Q.      Right.

A.      Yes.

Q.      And so that is a reference to the launch of

Postscript's Campaign Flows product, right?

A.      Yes.

Q.      And Attentive was aware that customers, some customers, were moving from Attentive to Postscript because of Campaign Flows, right?

A.      No, I would not say that's accurate.

Q.      All right.  Well, let's take a look.  If you could turn in your binder to PTX-571.

        Are you with me?

A.      Yes.

Q.      Now, if you look in the bottom right-hand corner, you see it says "Attentive," and then there's a series of numbers?

A.      Yes.

Q.      So I will represent to you that indicates this was a document that was produced in discovery in this case by Attentive.

A.      Okay.

Q.      And you see that this is a printout that looks like it is a printout that says "Why Postscript?"  Right.  So it's a printout of a Postscript document.

        Do you see that at the very bottom of the first page?

A.      I see it saying, "Why Postscript?"  I don't know what that represents.

Q.    And you see at the last -- if we turn to the last page, you see it says, "copyright 2023 Postscript"?

A.    Yes.

Q.    And if you look at the last couple of pages, do you see it's just in the form of, like, a printout from a website?

A.    Yes.

              MS. DURIE:  Okay.  We offer 571.

              THE COURT:  Is there any objection?

              MS. VESSELS:  Yes, Your Honor.  This is a hearsay document.

              MS. DURIE:  And offering it not for the truth, Your Honor, merely for state of knowledge.  Actually -- oh, good point.  Thank you.

              There was actually no objection to this document earlier in the PTO.

              THE COURT:  All right.  Can I ask Ms. Vessels, is that correct?

              MS. VESSELS:  Objection to the PTO?  There was no objection in the PTO.  Is that the --

              THE COURT:  Yes.

              MS. VESSELS:  Yes.

              THE COURT:  If that's the case here, that can't be an objection you can make here.  So since that's the case, I'll order the document be admitted.

                    (PTX Exhibit No. 571 was admitted into

evidence.)

                    MS. DURIE:  Very good.  So if we can move

forward to page 3, Mr. Glass, and if you can blow up that

blurb that's there in the middle.

BY MS. DURIE:

Q.     You see this is sort of a customer testimonial, if

you will, from BUBS Naturals?

A.     Yes.

Q.     Do you see that?

A.     Yes, sorry.

Q.     And this is a customer that is reporting that it had

switched from Attentive to Postscript.

          Do you see that?

A.     Yes.

                    MS. DURIE:  And if we can then go to page 6 and

page 7, Mr. Glass.

BY MS. DURIE:

Q.     You see there's a section there that is captioned,

"Jump-starting a real SMS strategy"?

A.     Yep.

Q.     And if you look at what this customer is saying,

they're talking about switching to Postscript in August of

2022, right?

A.     Yes.

Q.   And that's after Postscript had launched Campaign Flows, right?

A.   I don't recall the exact date of launching Campaign Flows.

Q.   Okay.  Do you remember that we were just looking at a document from October of 2021?

MS. DURIE:  Can we go back --

THE WITNESS:  Okay.

MS. DURIE:  -- Mr. Glass, to 179, just to anchor us on the time frame?  PTX-179 in evidence.

BY MS. DURIE:

Q.   Do you remember we were looking at this document from October --

A.   Yep.

Q.   -- of 2021 about the launch of Campaign Flows?

A.   Yes.

Q.   So let's go back now to 571, pages 6 and 7, PTX-571, pages 6 and 7.  So we're here.  They're talking about August of 2022.  That's after the launch of Postscript's Campaign Flows, before the launch of Attentive's Magic Composer, right?

A.   That's correct.

Q.   And this is a customer that has reported that it switched during that period of time, right?

A.   Yes.

MS. DURIE:  And if we can now go, Mr. Glass, to pages 9 and 10.

BY MS. DURIE:

Q.     There's a section here that talks about their experience, and you see there's a heading that says "segmenting strategically"?

A.     I do see that.

Q.     And it says, "Ferrera especially loves how Postscript's Campaign Flows builder enables the team at BUBS Naturals to target subscribers based on their previous behavior or their engagement with the Flow, e.g., clicked versus didn't click or bought versus didn't buy.  Now we have segmentation.  Now we have those touchpoints.  So we can be more thoughtful about the who, what, when."

So Attentive was aware, sir, in 2023, that Postscript and Postscript's customers were reporting that Postscript's Campaign Flows was helping out its customers, right?

A.     That's what this case study says.  I'd be curious if there was compensation given to this case study and to who it was given to, a company or individual.

Q.     You don't question that this is a customer that moved from Attentive to Postscript, do you?

A.     I do not question that.  But I question how and why they gave this testimonial.  Also a customer with 21,000

subscribers would be very small on Attentive.

Q.      That's right.  They'd be really small at Attentive.
They maybe wouldn't get a lot of personalized attention at
Attentive, right?

A.      That's correct, yes.

Q.      But one of the things they reported, they did get a
lot of personalized attention at Postscript?

A.      Sure.

Q.      Now, Attentive launched Magic Composer in 2023 in
March, right?

A.      Yes.

Q.      And Attentive believed at the time that Magic
Composer would help boost its revenues, right?

A.      Yes.

Q.      In fact, you had high hopes for Magic Composer at the
time, right?

A.      It was not built in the financial plans in any way.

Q.      That's not my question.  You personally had high
hopes for Magic Composer when it launched in 2023?

A.      We had hopes for all our products that we launched
because we invest time and money in building them.

Q.      Well, Attentive actually ran an experiment to filing
out whether Magic Composer would generate more revenue or
not, right?

A.      I believe so, yes.

Q.    Take a look in your binder at PTX-262.  Do you see it?

A.    I see an Automated Audiences link.

Q.    Perfect.  And this is a set of Attentive PowerPoint slides, right?

A.    This looks like Google slides to me.

Q.    With the Attentive logo?

A.    Yeah.

Q.    From March of 2023?

A.    This says October 23rd.  Maybe I'm on the wrong thing.

Q.    Sorry, I apologize.

A.    262 is October 2023.

Q.    Fair enough.

            MS. DURIE:  We offer 262.

            THE COURT:  All right.  Any objection?

            MS. VESSELS:  No objection.

            THE COURT:  All right.  It's admitted.

            (PTX Exhibit No. 262 was admitted into evidence.)

BY MS. DURIE:

Q.    I apologize.  I was looking at a different slide, I apologize.

            MS. DURIE:  And if we could please go to page 272, Mr. Glass, and just blow that up.

BY MS. DURIE:

Q.    Here we've got a product impact readout slide that is from March of 2023, right?

A.    That's correct.

Q.    And if we then go to page 293, little further on, we have here an agenda for a meeting on March 10th of 2023, right?

A.    That's what it looks like, yes.

Q.    And there was a readout about Magic Composer, right?

A.    Yes.

Q.    And it's talking about planned KPIs and success metrics.  Can you explain what a KPI is?

A.    KPI stands for, like, a key performance indicator, so we want to know how things are performing broadly.

Q.    And if we can turn to page 300, if you turn to Slide 300, you see here it's talking about delivered KPIs and success metrics.

        Do you see that?

A.    Do I see that?

Q.    And there's a TLDR, and I just learned this from my daughter, but that is "too long, don't read."  That's the summary, right?

A.    That's right.

Q.    When -- so when you look at adopters versus not adopters, it says, "The treatment outperforms three of the

four control groups."

Do you see that?

A.    I see that.

Q.    So it's talking about the treatment.  It's talking here about Magic Composer, right?

A.    I believe so, yes.

Q.    And it's showing an increase in total campaign sends, right?

A.    Yes.

Q.    And total campaign sends, that's referring to sending messages; is that right?

A.    Yes.

Q.    And when it says here DiD plus 8.55%, can you tell the jury what that means?

A.    I don't actually know what DiD stands for, but it looks like it's the top number minus the bottom number.

Q.    A lift or an increase of 8.55%, right?

A.    Yes.

Q.    And, actually, if you look up a little bit higher, it says, "Average sends" -- when it's giving the TLDR, "Average sends for the treatment cohort outperformed by 8.55%," right?

A.    Yes.

Q.    And then it also shows that average sends subs outperformed by 9.19%, right?

A.      Yes.

Q.      Three days later, Attentive launched Magic Composer; is that right?

A.      I don't recall the exact date, but --

Q.      Ballpark?

A.      Sure.

Q.      Okay.  And then it pitched the tool to customers, right?

A.      Yeah, our products are available for adoption.

Q.      Sir, if you could check out in your binder CX-001, CX, towards the back.

A.      Sure.  Yep, I'm here.

Q.      Okay.  And that's an Attentive PowerPoint presentation, "Discover a new marketing channel built for retail and e-commerce."

A.      Yeah.  Google Slides, but yes, effectively the same.

Q.      Okay.

         MS. DURIE:  We offer CX-001.

         THE COURT:  Is there any objection?

         MS. VESSELS:  No objection.

         THE COURT:  All right, it's admitted.

         (CX Exhibit No. 001 was admitted into evidence.)

BY MS. DURIE:

Q.      So this is a deck, we pulled up the first page, used by Attentive salespeople when talking to potential

customers.  Does that seem right?

A.     I could review it quickly and let you know.  My guess is yes.

Q.     Flip through.  You'll also see some notes there on the first page that -- that is talk track that looks like it's --

A.     Yeah.  Fair and reasonable that that's the case.

Q.     Okay.  And let's take a look at page 47.

So the slide here says, "Messaging, Campaign Composer, drive engagement with multi-touch campaigns."

So this is basically the deck that is being given to the Attentive salespeople for them to go out to their customers and say, hey, here's why Campaign Composer is great, right?

A.     Yes.

Q.     And it says, "Simplified setup, realtime retargeting, unified reporting, 10% average conversion rate lift."

So that's saying a 10% increase that Attentive is saying its customers can expect from using Campaign Composer, right?

A.     Yeah, looks like it's footnoted with 30 customers in 2023.

Q.     So, yeah.  You did a study.  You got on some data and you used that data to develop the sales and marketing campaign to go sell Campaign Composer, saying, hey, we think

it's going to do great things for your sales?

A.    Yeah, I think it's important to clarify here, this is one slide in a 110-slide deck, and it's near the middle of it, so it wasn't a marketing campaign around this alone. It's a marketing campaign around the Attentive platform inventing SMS as a category, inventing Two Touch.

Q.    I didn't mean to suggest otherwise.  There was a broad marketing campaign.  Part of it was pitching Campaign Composer?

A.    Yeah, just the natural sales notion different than a marketing campaign, but yes, it's a --

Q.    Now, you questioned whether Postscript had paid for that BUBS testimony.  You don't know whether they did or not, right?

A.    I do not.

Q.    You don't whether BUBS did that for free?

A.    I do not.

Q.    But Attentive does have a practice of paying customers in exchange for them providing favorable testimonies, right?

A.    We do not pay individuals ever.  That's important. We give credits against future spend.  And it doesn't have to be a favorable testimony, it's just on the facts.

Q.    You should have a copy of your deposition in your binder.  Can you turn to that tab?

A.    Oh, yeah, I see it.

Q.    Do you see that?

A.    Yep.

Q.    And it's printed four to a page, so if you're me, it's a little small.  But can you turn to page 111, 111 of the actual deposition?

A.    Yes.

Q.    And if you see beginning at line -- page 111, line 16.

A.    111, right?

Q.    Yeah, page 111.

A.    Yep.

Q.    Line 16.  You were asked, "Attentive has a practice of compensating Boomerang customers in exchange for them providing favorable testimony only, correct?"  And your answer was, "Providing case studies, yeah."

      That was your testimony, right?

A.    That's correct.

Q.    That was true?

A.    Yeah.

Q.    Of course.

A.    I believe what I just said, and this is very consistent.

            MS. DURIE:  Pass the witness.

            THE COURT:  Okay.  All right.  We'll have direct

examination.

Ms. Vessels, can I ask about how long you think you will have?

MS. VESSELS:  I was just going to say, if I could have -- sorry.  This is Katherine Vessels representing Attentive.

We met this morning, but I'm back.  I basically just want to have Mr. Jhawar kind of introduce himself, and then I think we can break there.

THE COURT:  If there's a stopping point that's good for you, we'll get that testimony and use that as our stopping point.

MS. VESSELS:  We'll just get him reintroduced real quick, and then we can probably go to lunch.

THE COURT:  Okay.

DIRECT EXAMINATION

BY MS. VESSELS:

Q.    So, Mr. Jhawar, can you tell the jury a little bit about yourself?

A.    Sure.

I was born about 50 miles outside of Chicago.  I grew up in a family that moved around a lot.  My dad was an engineer.  Now I live again outside of Chicago.  And I worked for Attentive for about four and a half years at this point.  And I am 44 years old.  I have a wife and kids.

Q.    Great.

And how did you first learn about Attentive? Actually, can you tell the jury how you first learned?

A.    Sure.  Yeah.  So one of my colleagues in my previous job worked with one of the leaders at Attentive, and she introduced me to Attentive.  I had spent a lot of time in mobile payments and the mobile shopping experience, like consumers broadly.

So I was really interested when I found an opportunity to move from the payment side with PayPal, OneTouch, Apple Pay, Amazon Pay were invented on the marketing side so you could get people to the right content because the payment side became a lot easier already.

Q.    And just to confirm, and then I think we can probably go to lunch, you are not -- what is your current position at Attentive?

A.    I'm CEO of Attentive.

MS. VESSELS:  Your Honor, after this I'm kind of diving into stuff, so why don't we take a break for lunch and come back?

THE COURT:  Okay.  We'll do that then.  It's a good time for our lunch break.  We'll take at least a half hour for our lunch.  I'll ask my courtroom deputy to lead our jury out for lunch.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  Okay.  Thank you.  Everyone may be seated.  And it's 12:28 now.  Let's have counsel back and our witness back by 12:58 in the courtroom, so be ready to go then.  The jury will be brought out after.

So with all that, the Court stands in recess. Thank you.

COURT CLERK:  All rise.

(Luncheon recess.)

COURT CLERK:  All rise.

THE COURT:  All right.  We'll have our jury brought in.

(Jury enters.)

THE COURT:  All right.  Everyone be seated. Thank you.  Welcome back, everyone.

All right.  We left off with Attentive's direct examination.

Ms. Vessel.

BY MS. VESSELS:

Q.    Mr. Jhawar, before we left lunch, we had talked about how you're the CEO, right?  Can you tell me about some of the products or services that Attentive offers?

A.    Yeah, so Attentive offers a mobile marketing platform.  The whole goal was, how do you stay in touch with consumers that are now shopping from a majority of their

transactions online? Because they can't see your product as they walk through the aisles of a store, so these brands expend money advertising to try to drive traffic to the site now wanting an ongoing relationship with that consumer. So we offer tools to allow that marketing relationship to continue over time.

The first of which is a pop-up, something 15% off, click here and you click there, we would automatically move you into the messaging app with a precomposed message saying -- text messages from Coach or Gap or Dick's Sporting Goods and you would tap one more time and that would send the message out to a preaddressed number that Attentive receives and records that sign in.

Once you have that sign up, then as customers come to the site, you can advertise different products to them, follow up on those products over time based on their behavior, that's the Journeys product and then you can say hey, we have a Labor Day sale. Come by and check out Dick's Sporting Goods, 20% off.

And then they have a lot of reporting on the back end, say, look, when you send these messages, these are the consumers that click, it cost you a thousand dollars to send the message but you generate $5,000 in revenue, so it was a good investment in money.

So you should keep using the platform and these

are the consumers that are buying more and these are consumers that are not clicking, maybe not engage as much. That's really the totality of the platform.

Q.     So you're sending out these blast messages, are you a telemarketing company, then?

A.     We are not a telemarketing company.  We provide a technology service, we don't have any consumers that are subscribed to Attentive, they're subscribed to Gap, they're subscribed to Coach, they're subscribed to Dick's Sporting Goods, so they will use our software when they have a message they want to broadcast and then they broadcast it out to people who are opted-in to the program.  There's very strict regulations of who you can message and who you cannot.  That's why you don't see a lot of spam messages on SMS or text messages, generally a very clean channel because there's a lot of regulation around it.

Q.     And so you had mentioned Journeys, I think you said.

       Can you talk some more about Journeys?

A.     Yeah.  Journeys is one of our flagship products.  It triggers based on the actions that someone or a group of people would take on the site.

       So if somebody comes to a site and browses soccer cleats, we know they have an interest in soccer cleats, right.  Why did they go to that category?  And we may follow up later and, say, look, these are the soccer

cleats on sale or these are the size of shoe you were looking at, they are now back in stock, come buy it.

So those are activated because of specific actions a consumer takes and then we use that information to specific -- direct messages that we think will get a reaction from them, that pushes them further into a purchase, right, to try and help them get towards a purchase.

Q.      And when did Attentive launch Journeys?

A.      Our Journeys product came out in 2021.

Q.      Does Attentive still offer Journeys today?

A.      Yeah, Journeys is a product that still several customers use.  We have -- Journeys is one product and then we have our Campaign Composer as a separate product.

Q.      Tell me more about Campaign Composer.

A.      So Campaign Composer was basically an idea that you could set up messages based on a timeline.  So for our Labor Day sale, for example, if you are Dick's Sporting Goods and there's a 20% off on day one, you wanted to make it easy so the marketer didn't have to come back and remember three days later, I need to log in to the Attentive platform and send another message.

If they know they want to send three messages for the Labor Day sale, one today, one on Friday, and one on the last day of the sale on Monday, they could do it all at

one time.

So it was just time based that, hey, simplify their lives, let me write the messages all at one time, and they will just go out.  Otherwise, what happens is -- the behavior of marketers is they wake up Saturday morning, they log in to the Attentive platform, and then they send the message.  And guess what, that's a pain for them because they're not really relaxing on the weekends, then.

The other part of that that is problematic, sometimes they forget, they sleep in.  So then we move that message.  And the way we make money and they make money is by using the product.  So if they could do it at a convenient time for them and then schedule a time to just send it when it was most relevant, it worked out for both parties.

And that's why we were excited about Campaign Composer coming out, it simplified their lives, and we would get the messages scheduled and everyone could be happy.

Q.    So you mentioned scheduling when you're going to send out advertisements and stuff like that, it kind of brings to my mind the Sears Christmas catalogs.

Did you get those when you were a kid?

A.    I did.

Q.    Or your family, I guess.

A.    Yes, I did.

Q.    Okay.  And it came around just in time for Christmas shopping, right?

So is -- is that what Campaign Composer does?

A.    The catalog could be like the first message you get, if you think about it that way.  So, hey, here are all the products that we are selling, come to the site.  That is what the catalog is.

I think the follow-up messages would be something like, here is a discount, that you might send later on.

Q.    For a Tonka truck that your kid circled in the catalog?

A.    That's exactly right.

Q.    And so that would be -- all right.  So Sears -- we're going to stick with the Sears theme.

So Sears sends you the catalog in September, your kid sit down -- or your kids sit down and they're circling all the different things they want, and then Campaign Composer allows you to send something three weeks later so when you go shopping you can buy it at a reduced rate; is that --

A.    Yeah.  Like you could schedule it at that time when you first send out the catalog or the first message.  So three weeks later, I'm going to send a 15% off coupon, right?

So you're thinking of what that campaign is going to be, it's done at one time.  Otherwise, it's sitting in your brain as an open loop as something you have to do.  We talked to marketers, what they said is I want to close as many of these open loops as possible.  You know, the guy who is selling sunglasses is telling me we need to get more advertisement on those.  The guy who is selling the Tonka truck is saying, hey, we have to sell the toys more.

I get all these conversations every day.  It's easier for me to just close these open to-dos at one time when I'm thinking about it so then I can move on to dealing with each and everybody who is trying to get my attention during the week.

Q.   So if it's about timing, I -- I personally like -- I get a text from the VA when it's time to refill my prescription, right?  Is -- is that also kind of the technology we're talking about?

A.   That could be one type of follow up, which is like, hey, it's been 30 days, the prescription is over, look for a refill.

Q.   Okay.  So how important is this feature that, hey, it's time for a refill, in Campaign Composer?

A.   Unfortunately, it wasn't adopted the way we expected. We thought this was going to be something that was used by the vast majority of our customers for lots of their

messages and what we found was when we actually implemented it and rolled it out, they were already stuck in their ways, so it wasn't actually used nearly as highly as we expected.

Q.     So if you had to guess, what percent of messages sent by Campaign Composer are sent with this retargeting feature?

A.     It's definitely much below 1% of our messages, retargeting through Campaign Composer.

Q.     So it's not even close to 10%?

A.     It is well, well below 10%.  And it's not even a feature I talk to customers about today.

Q.     So you had mentioned you kind of -- with Campaign Composer -- or yeah.  Campaign Composer, you get to close these loops and help the companies add revenue, right?

So can you just elaborate a little bit more about the value that Campaign Composer adds to the customer's businesses?

A.     Yeah.  So Campaign Composer basically is this idea of you are sending out an advertisement to customers that are interested in your brand.  So we all pick a brand we like, they now have a direct line of communication to you on a channel with low spam, which is the text message or SMS channel, so we know people will open these messages up and they're going to keep that inbox very clean, as opposed to e-mails where you get a lot spam messages and is a lot more crowded.

The value to the brand is multifold; one, they're letting you know of their new product.  Two, they can let you know they have sales.  Three, they can tell you about something coming back in stock.  So there's all these different value adds that they have.  And, ultimately, the brand is trying to get you to consider a product and ultimately purchase it and their ideal version would be after you purchase it, you became a referral source for them.  Other people ask you where you bought that or you like it so much you buy another one.  All right.

Bombas socks is one of our customers.  They sell nice socks, and if you like a pair, maybe you buy three pairs or five pairs, and other people ask where you got those socks, and then you -- you start recommending them at the gym or wherever else you go.  That's the ultimate goal here.  That's the value that gets created for the brand so they can grow their business using our technology.

Q.    And how does Attentive make money?

A.    So we charge a fee on every message that we send to the platform.  So if you think about it, we pay AT&T, T-Mobile, and Verizon, as the carriers, people who have the wireless phones, we have to pay them every time a message is sent, and then we charge a little bit on top of that as using our entire technology platform, the tracking, the pop-up, the customer support, and we hold all of that

together.

Q.    And does Attentive ever negotiate the fee that they charge businesses?

A.    Yeah, of course.  The standard-size discounts.  If you're a large customer, you get a lower rate than if you're a small customer.  So there's basically highness of scale for large customers.

            MS. VESSELS:  All right.  Marco, can you pull up CX-001.

BY MS. VESSELS:

Q.    Mr. Jhawar, do you know when this presentation is from?

A.    I do not.

Q.    I'll represent to you that this presentation was from August '22, 2022.

A.    Okay.

Q.    Do you remember when the '660 Patent issued?

A.    I do not remember the exact date, unfortunately.

            MS. VESSELS:  Marco, can you pull up the opening slides, number 6.  The timeline.

            Sorry.  The opening.  Yeah, that one.  Okay.

BY MS. VESSELS:

Q.    What is the date there for the '660 Patent?

A.    October 12th, 2022.

Q.    So the presentation in CX-001 was before the

'660 Patent issued, right?

A.    That's correct, yes.

        MS. VESSELS:  Marco, can you turn to PTX-571.

        And if you go to page 3 for me.  And kind of highlight the text there in the middle.

BY MS. VESSELS:

Q.    Mr. Jhawar, what is the headline of this case study?

A.    "BUBS Naturals sees more list growth in 30 days on Postscript than three years on Attentive."

Q.    And what is "list growth"?

A.    So list growth is the pop-up you see on the side.  So when you get somebody to click, they give you the phone number so they can add you to the program.  It's a very important part of a marketing program.

Q.    Is Magic Composer, or Campaign Composer, is that how you drive list growth?

A.    They are completely separate, completely different products.  They have nothing to do with growth.

Q.    And so what do you use to drive list growth?

A.    Attentive invented something called Two-Tap and we use Two-Tap with the explanation I gave you before, ways to that 15% coupon and click and you automatically receive your messaging app.

        That's how you drive those growths and that's critical because if you don't have people on your list,

there's no one to message, that's why you don't get the spam.  The spam you get is very limited because you have to have that audit trail of how somebody exactly signed up for your program.

MS. VESSELS:  Marco, can you go down to page 5 and 6, where it's talking about the case study.

Keep scrolling down.  Perfect.  Okay.

BY MS. VESSELS:

Q.     Mr. Jhawar, how many subscribers did BUBS Naturals have, according to this case study?

A.     It looks like 21,000 subscribers.

Q.     And where on the spectrum of Attentive's customers would that fall, at the high end or the low end?

A.     The very lowest end.

Q.     All right.  And my colleague really emphasized that BUBS left Attentive because BUBS didn't feel like it was getting personal attention from Attentive, right?

A.     That's correct.

Q.     Do you recall the technology that's at issue in this case?

A.     I do.

Q.     And what is the technology at issue?

A.     It's the '660 Patent that Postscript has around retargeting customers.

Q.     And does retargeting have anything to do with the

personal attention you give to your customers?

A.      Absolutely not.

Q.      So this wasn't about competing technology, right?

A.      It was not.

Q.      Okay.  So how do you feel about the allegations that Postscript is making about your company, that this was just you copying?

A.      It doesn't seem to be supported by the facts of the headlines, from my perspective.

Q.      And how important is retargeting to -- sorry. Scratch that.

        How important is the retargeting feature in Campaign Composer to Attentive's success?

A.      It's not very important at all.

Q.      What is most important?

A.      The fact that you could send out a message to a group of subscribers around the Labor Day sale at the beginning and everyone can receive a message, that is very important because that's the initial message that goes out that generates the most number of clicks.

Q.      And what technology is that?

A.      That would be our Campaign Composer or our campaigns product, broadly.

        (Reporter clarification.)

BY MS. VESSELS:

Q.    And does that have anything to do with the Two-Tap --
Two-Tap technology?

A.    Has nothing to do with Two-Tap technology.

        MS. VESSELS:  Thanks.

                ADVERSE REDIRECT EXAMINATION

BY MS. DURIE:

Q.    Mr. Jhawar, you said that Campaign Composer is not a
feature that you talked about much with customers today.

        Is that because you mostly talk to customers
about features where you're different from the competition?

A.    No, that's not true.

Q.    You don't focus on things that give you a competitive
advantage?

A.    We talk about the entire platform and the value of it
broadly, but it's not just the differentiator.

Q.    Fair enough.

        Today, sir, Campaign Composer is not a
differentiated feature, right?

A.    I would say it's not differentiated.

Q.    And that's because Postscript has it, too?

A.    It is a very standard feature in the industry.

Q.    Okay.  Well, if Campaign Composer is so unimportant,
as you just suggested, why don't just stop using it?

A.    Because it's -- it's not unimportant.  It's
undifferentiated is what we said originally, and I agree

with that.  It is undifferentiated.

It is a standard way to send a message to a large number of people, and that's how it's used.  That's how e-mail providers use this.  Text service providers use it.  Push service providers use this, and you get a push notification if you download an app.  We can go through a hundred different competitors here, and they all have very, very similar technology that uses this.

Q.   But asking you specifically about Campaign Composer, the accused functionality in this case, it's important enough to you that you've kept using it, right, throughout the course of this case?

A.   We do not believe we are infringing on the patents. We do not believe the patents are valid, so we continue to use it.  It takes work to retract something from your code base as well, so we did not think it was worth investing the technical resources to pull something out of the code base that we think is not infringing and not valid.

MS. DURIE:  Thanks.

Pass the witness.

THE COURT:  Thank you.  Is there any redirect?

MS. VESSELS:  Yes, Your Honor.  Very briefly.

REDIRECT EXAMINATION

BY MS. VESSELS:

Q.   Mr. Jhawar, you just said Campaign Composer was

standard in the industry; is that correct?

A.    That's correct.

Q.    And how long have campaigns been used in the industry?

A.    At least 25 years -- campaigns have been used.  If you think about it, e-mails were used to send out marketing and digital landscape.  All the way back to the origins of Amazon, they were using campaigns to message out to consumers what products they had for sale.  They've expanded from books into other categories.  The only way to let people know was to use campaigns.  So this has been a very, very standard technology in the industry for decades.

MS. VESSELS:  Thank you.  Nothing further.

THE COURT:  Okay.  Thank you.  The witness may step down.  Thank you.

All right.  Postscript will call the next witness.

MR. SAULSBURY:  Postscript calls as its next witness, Mr. Eric Miao.  He's the chief strategy officer for Attentive.  This is one of the witnesses that we're calling adverse.

THE COURT:  Okay.  We'll have the witness be sworn.

COURT CLERK:  Please raise your right hand.  Please state and spell your name for the record.

THE WITNESS:  First name Eric, E-R-I-C, last name Miao, M-I-A-O.

ERIC MIAO, having been duly sworn, was examined and testified as follows:

THE COURT:  You may begin.

ADVERSE DIRECT EXAMINATION

BY MR. SAULSBURY:

Q.    Good afternoon, Mr. Miao.

A.    Good afternoon.

Q.    Very good to see you again.

A.    Same.

Q.    Now you're not on the engineer side of Attentive, correct?

A.    That is correct.

Q.    And you've never been?

A.    No, but I've had engineers report to me.

Q.    Now, you've never written any code for Attentive?

A.    That is correct.

Q.    You're not familiar with the details of the development timeline for Magic Composer in terms of when the engineering work was done, correct?

A.    I would have known the timelines for when the work was done.

Q.    Let me put it this way, you're not familiar with the details of the development timeline for Drip in terms of

when the engineering work was done, right?

A.     Maybe not Drips but I would have known it was being developed.

Q.     Well, Mr. Miao, Drips is another name for the product that is also known as Magic Composer and Campaign Composer, correct?

A.     Yes.

Q.     And you recall that we deposed you in this case, correct?

A.     Yes.

Q.     If you could take a look at your deposition transcript.  It's in the binder in front of you, and I direct you to Volume 1 at page 219.

       Once you get there, let me know.  I'm specifically looking at lines 8 through 14.

       And when you were deposed, Mr. Miao, you were under oath just like you are today, right?

A.     Yes.

Q.     And you told the truth, right?

A.     Yes.

Q.     Okay.  And so in your deposition, you were asked: "You're not familiar with the details of the development timeline for Drip in terms of when the engineering work was done.

       "Answer:  I think that's fair to say, yeah.

That level of specificity -- specificity is not something that I have."

That's true, right?

A.      Yeah.  I think I would have to read back for some of the context, but that's what that says, yes.

Q.      Okay.  Now, you're familiar with the idea behind Magic Composer, right?

A.      Yes.

Q.      Okay.  The idea was to allow merchants to create a campaign with multiple messages as the workflow, right?

A.      That was one of the ideas, yes.

Q.      Okay.  And in fact, that was the idea behind the product, right?

A.      I'm not sure I would say that.

Q.      Okay.  Now, why don't we go to your deposition, then. If you could turn to page 195?

A.      Sure.

Q.      Also, Volume 1.  And I'm looking specifically at line 17 through 24.

            "QUESTION:  And the idea behind Campaign was that
            you could send a bunch of messages at once that
            would send on a certain timeline.
            "ANSWER:  In one workflow, that is right.
        (Reporter clarification.)
            "QUESTION:  In one workflow.  And that's what

Magic Composer was meant to address.

"ANSWER:  That's the -- yeah, that's the name we put on the workflow.  That's right."

Now, Campaign Composer had a few different names over time.  I think we've touched on this a little bit, right?

A.    Yes.

Q.    It started out as Dripping Campaigns?

A.    Yes.

Q.    It was also called at one point Sequential Campaigns, right?

A.    Yes.

Q.    And then Magic Composer?

A.    Yes.

Q.    All those names refer to the same Magic Composer product that we've be talking about in this case?

A.    Yes.

Q.    Okay.  Now, why don't you take a look at PTX-565 in your binder, please.  And just let me know once you get there, if you don't mind.

A.    I'm here.

Q.    Great.

Now, this is an Attentive presentation providing a product review of Sequential Campaigns, right?

A.    Yes.

Q.    And so this is just another name for Magic Composer as we've established, right?

A.    Yes.

Q.    Great.

MR. SAULSBURY:  I offer PTX-565 if there's no objections to this one.

THE COURT:  All right.  There's no objection, right?

MR. CAMPBELL:  No objection.

THE COURT:  All right.  It's admitted.

(PTX Exhibit No. 565 was admitted into evidence.)

MR. SAULSBURY:  And, Mr. Glass, if we can please put it up.

BY MR. SAULSBURY:

Q.    Here on page 1, this says that, "Sequential Campaigns was born out of the retargeting experiments and a known gap," right?

A.    Yes.  That's what it says.

Q.    Okay.  And I want to talk about this gap.  Let's take a look at PTX-170 in your binder.

MR. SAULSBURY:  Go ahead and take that down, Mr. Glass.

BY MR. SAULSBURY:

Q.    Do you recognize this as another Attentive

presentation?

A.    Yes.

MR. SAULSBURY:  Okay.  Now, let me go ahead and offer this one as well.  There's no objection.

THE COURT:  Any objection?

MR. CAMPBELL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 170 was admitted into evidence.)

BY MR. SAULSBURY:

Q.    Now, this presentation is summarizing research done by Attentive and specifically its product team, right?

A.    Product among others, yes.

Q.    Right.  And this research was on Sequential Campaigns, right?

A.    Yes.

Q.    Okay.

MR. SAULSBURY:  And, Mr. Glass, if you could please go to Slide 24.  This is at 170.24.

BY MR. SAULSBURY:

Q.    The gap that we were talking about looked like this, right?

A.    I'm sorry?

Q.    You see how at the top it says "Existing Structure," right?

A.      Yes.  Would you just point me to what page this is?

Q.      Oh, apologies.  It is Slide 24.  It should be page 24 of the exhibit.  I realize now that I said that to Mr. Glass, but I should have said it to you as well.  We're in PTX-170.

A.      Yep, I see it.

Q.      Great.  Okay.  So you see how at the top it says "Existing Structure," right?

A.      Yes.

Q.      Okay.  And what that means is Attentive is describing here the existing functionality that it had in its product, right?

A.      Yes.

Q.      Okay.  And the first line talks about Journeys, right?

A.      Yes.

Q.      And Journeys, that's Attentive's brand name for it's automations product, right?

A.      Yes.

Q.      Okay.  And that's the tool that sends messages that are based on triggers that relate to a user's actions, right?

A.      Yes.  It's showing we had trigger-based messages, yes.

Q.      And you also have campaigns, right.  That's the other

thing identified here?

A.    Yes.

Q.    And that's schedule-based messaging?

A.    Yes.

Q.    Right.  And this gap Attentive had, that created a problem, right?

A.    I would say from the products team's perspective in thinking through things, they may have thought there was an opportunity.  I don't know that they're saying there's a problem.

Q.    Okay.  Well, I think I can help with that.  Let's take a look at PTX-565, please, at page 5.  You should have a copy in the binder in front of you.

A.    Sure.  I see it.

Q.    Great.

      You recognize this as another Attentive presentation, correct?

A.    Yes.

Q.    Okay.  And I believe -- okay.  Great.  And we're taking a look at Slide 5.  Do you see how it says "problem" at the top, right?

A.    I see that it says that.

Q.    Okay.  And in describing the problem, what Attentive is saying is our clients' SMS marketing strategies rarely begin and end with a single message, right?

A.      That's what that says.

Q.      This is the problem?

A.      That is the thing that it says underneath "problem," yes.

Q.      Okay.  And it goes on to explain that Attentive, at this time, was artificially forcing its clients to send either a single batch-and-blast campaign or an automated Journey, right?

A.      Yeah, I think it's -- just to make sure I repeat back what I'm looking at.  It says, we had Campaign Composer where you could send something based on time.  It says we had a Journeys sequential triggered-based Journeys product where you could have a sequence of steps and messages that are triggered, yes.

Q.      Well, in describing campaign, it says it is a "single batch and blast," right?

A.      It does, but it would be possible to send two campaigns independently.

Q.      Right.  But the problem was that the feature of a campaign was to send a single blast like we saw in the opening presentation, right?

A.      That's right.

Q.      Okay.  And in fact, these two options here are the two options we saw in opening with respect to Pete's Pet Supply, right.  On the one hand, you could send a campaign;

on the other hand, you could use an automation, right?

A.      Yes.

Q.      Okay.  Now, if you look at the last paragraph of this slide and I think we might have -- okay, good.  It's still on the screen.  "This gap was a problem for users who wanted to find a sequence of follow-up messaging," right?

A.      That's the opinion shared by the product and design team, yes.

Q.      Attentive's product and design team, right?

A.      Yes.

Q.      Right.  And what they're describing here is retargeting, right?

A.      Not necessarily.

Q.      Retargeting is a way to address this gap, right?

A.      Retargeting is a subset of a sequence.

Q.      Right.

A.      I could send a sequence that's not retargeting.

Q.      Right.  But retargeting is a way to address this gap, right?

A.      It would be a minor case.

Q.      It is a -- it is therefore a way to bridge this gap, correct?

A.      It was a way to address part of that gap, yes.

Q.      Right, right.  And so the goal of Magic Composer was supposed to fill this gap?

A.     I think that's what this is saying.

Q.     Right.  So let's now go back to page 3 of this document.  This says that Attentive ran retargeting experiments.

A.     Yes.

Q.     And if you look at bullets A and B, the results found a lift in messages sent, right?

A.     Neither of those things is about message volume, no.

Q.     Well, I think I can help with this.  If you look at bullet A, it says there's a lift on the second message, talking about revenue per message, right?

A.     Yes.  That's saying the revenue for the second message showed an increase compared to the first message.

Q.     That's right.  And there's a lift of 176.36%, right?

A.     Yes, but the number of messages is not clear from this.

Q.     Sure.  Irrespective of the number of messages, the revenue went up, right?

A.     The revenue per message, yes.

Q.     Right.  And then under B, it also identified the lift on the second message of 400%, right?

A.     With a click-through rate, yes.

Q.     Right.  That's the lift that Attentive found in its experiments on retargeting, right?

A.     Yes.

Q.   Okay.  And I think we touched on this perhaps earlier in the trial, but in fact, I think Mr. Jhawar touched on this.  Sending more messages results in Attentive making more money, right?

A.   Yes.

Q.   Because Attentive charges the customers for each message that they send?

A.   Yes.

Q.   And the conclusion here, which we can see in the last bullet, is that there's a clear value prop.

Do you see that?

A.   Yes.

Q.   That means there's a clear value proposition, right?

A.   Yes.

Q.   And so retargeting is valuable to Attentive, right?

A.   Yes, I think that's what that said, but it's -- just to make sure I'm reading this correctly.  It's saying for relating multiple campaign messages, not retargeting.

Q.   Well, this was the result of Attentive's retargeting experiment.  You see that right at the top of the slide, right?

A.   Yes, I'm just saying, the conclusion that they drew seems to be not particular to retargeting.

Q.   It might apply in other circumstances as well, but it's also true of retargeting, right?

Case 1:23-cv-00087-CJB    Document 836    Filed 12/03/25    Page 177 of 317 PageID #:
30393
Miao - adverse direct                                            471

A.      Yes.

Q.      Right.  Now, I want to shift gears a little bit and talk about a slightly different subject.

        Attentive looked at Campaign Flows, Postscript's product while developing Magic Composer, correct?

A.      I think Campaign Flows came out while we were developing Magic Composer, yes.

Q.      So that --

A.      I think we showed earlier that we were aware of that, yes.

Q.      Okay.  And my question is a little bit more specific. Attentive looked at Campaign Flows while it was developing Magic Composer, right?  As part of its development process?

A.      Because it came out during that time, I think so, yes.

Q.      Okay.  And why don't we take a look at PTX-230, actually.  You should have it in your binder.

A.      Okay.  I see it.

Q.      You recognize this is a document from Attentive's Salesforce?

A.      Yes.

        MR. SAULSBURY:  We offer PTX-230, I believe it's unobjected to.

        THE COURT:  Any objection?

        MR. CAMPBELL:  No objection.

THE COURT: All right. It's admitted.

(PTX Exhibit No. 230 was admitted into evidence.)

MR. SAULSBURY: Why don't we go ahead and put it up then and blow up the pertinent portion at the top.

Great. There we go.

BY MR. SAULSBURY:

Q. Okay. So we see here that this is -- at the top, we can see that there's a status change date of April 25th, 2022, right?

A. Yes.

Q. Okay. And it's talking -- this is describing -- strike that, actually.

This Attentive's Salesforce record is describing feedback in the form of a client request, right? That's what we see here on the left?

A. Yes. This looks like a client who was using Drip Campaigns actively in April of 2022, giving feedback, yes.

Q. Right. And that client made a specific request to have -- or, sorry, to create but did not purchase as a retargeting segment for Drip Campaigns, right?

A. Yes.

Q. And on the left-hand side of the document, there is a section that says, "Competitor Documentation of Feature."

Do you see that?

A.   Yes.

Q.   It includes a link to Postscript's Campaign Flows?

A.   That's what it looks like, yes.

Q.   Okay.  And again, this is in April of 2022, right?

A.   Yes.

Q.   So in April of 2022, Attentive customers were asking for retargeting in Magic Composer, right?

A.   This is showing that in April of 2022, customers were using seemingly retargeting in Attentive.

Q.   Well, the specific request that's listed was to create a "did not purchase" as a retargeting segment for Drip Campaigns, right?

A.   In addition to the two options that we already had for retargeting in that time, yes.

Q.   Now, I want to shift gears once more.  You've been here all trial so far, right?

A.   Yes.

Q.   And you've be sitting at counsel's table with Attentive's lawyers, right?

A.   Yes.

Q.   Why don't we go to DDX-1.46.  This is Attentive's -- from Attentive's opening statements.

A.   That's not in this binder?

Q.   I'm sorry?

A.   That's not in this binder?

Q.    That's correct, yeah.  Mr. Glass is going to pull it up for us.

All right.  Great.

You recognize this slide from Attentive's opening statement?

A.    Yes, I do.

Q.    And you recall how there was a suggestion that Attentive gave Postscript's millions of lines of its computer code as part of this case, right?

A.    Yes.

Q.    Okay.  And specifically, the suggestion was that Attentive gave Postscript millions of lines of Magic Composer's computer program, right?

A.    Can you say that again?

Q.    Sure.

The suggestion was that Attentive had given Postscript millions of lines of -- sorry, Attentive's computer code for Magic Composer?

A.    I don't know if we were specific, that it was all about Magic Composer or if it included Journeys, which I think is what we referenced as the prior art that we had.

Q.    Fair enough.  Let's talk about that Journeys source code.  So let me just make sure we have a clear answer.

So there's a suggestion at least that Attentive gave Postscript millions of lines of code of its Journeys

product, right?

A.    I'm saying that I think we were not specific about exactly what was in the code.  I don't know exactly what code we gave.

Q.    Okay.  Let me see if I can help you.  Let's take a look at DDX-1.63.

You recognize this slide from Attentive's opening, right?

A.    Yes.

Q.    Okay.  And you see the -- it's labeled, "No Journeys source code."  Do you see that?

A.    Yes.

Q.    And the suggestion was made that Postscript did not disclose to the Patent Office during prosecution of the '660 Patent Attentive's source code for the Journeys product.  Do you recall that?

A.    I think we said that they didn't have the source code.  I don't know that we said that they didn't submit it also.  I think we said that, yes.  Yes, I think we said the Patent Office did not have the source code.

Q.    Right.  And the suggestion was that Postscript did not include Attentive's Journeys source code in Postscript's updated information disclosure statement to the Patent Office, right?

A.    Yes.

Q.   Now, Postscript didn't have Attentive's confidential source code when it was applying for the '660 Patent in front of the Patent Office, right?

A.   I am not exactly sure, but I suspect they did not.

Q.   Right.  And that's because Postscript's patent infringement claim in this case wasn't filed until after the '660 Patent issued, right?

A.   Sure.

Q.   Right.  And we weren't given your source code for your Journeys product until discovery in this case, right?

A.   That makes sense, yep.

Q.   Okay.  And so you'll agree with me that Postscript didn't have the ability to submit Attentive's confidential Journeys source code to the Patent Office during the application process, right?

A.   Seems fair.

Q.   Okay.

     MR. SAULSBURY:  I pass the witness.

     THE COURT:  All right.  We'll have what will be direct examination.

     MR. CAMPBELL:  Good afternoon, ladies and gentlemen.  Chris Campbell for Attentive Mobile.

     Approach the witness, Your Honor?

     THE COURT:  You may.

     THE WITNESS:  Do I have to close this binder?

THE COURT:  You can close it, yeah.  Just leave it on the stand.

THE WITNESS:  All right.

MR. CAMPBELL:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. CAMPBELL:

Q.    Before we introduce you to the jury, let's just do some housekeeping.

MR. CAMPBELL:  Marco, let's pull up PTX-230, please.

BY MR. CAMPBELL:

Q.    And this was a document that you were just shown by my colleague.

MR. CAMPBELL:  And, Marco, on the upper right-hand corner, can you please highlight the date of this Salesforce record?

BY MR. CAMPBELL:

Q.    It's April 25th, 2022, do you see that, Mr. Miao?

A.    Yes.

Q.    That was before Postscript filed for its patent, the '660 Patent, which was October of 2022; isn't that right?

A.    That's right.

MR. CAMPBELL:  And then if you can, Marco, go down to the details.  And that's on the right.

BY MR. CAMPBELL:

Q.    And this is talking about "clicked but didn't purchase" and "has not clicked."

What is this document conveying in that regard, Mr. Miao?

A.    This is saying that we had, at that time, been building a new Campaign Composer variously named all the things that we covered, I'll just say Campaign Composer. And it's saying that, at that time, it had retargeting options and that it had two options that you could choose from, one was that the person "clicked a message but hadn't purchased."  One is that they "did not click."

Q.    Let's just get this out of the way up front:  How important is the retargeting feature in Campaign Composer?

A.    It's not important at all.

Q.    And let's get this out of the way:  How often is the retargeting feature used in Campaign Composer of all the messages that are sent with Campaign Composer?

A.    It's like half of a percent, I think.

MR. CAMPBELL:  Marco, please pull up PTX-565.

BY MR. CAMPBELL:

Q.    Okay.  You were asked questions about this PowerPoint presentation.

MR. CAMPBELL:  And let's go to page 3 of the presentation.

BY MR. CAMPBELL:

Q.    Okay.  So this is the presentation you were asked about at the very top, "Retargeting experiments."

And you weren't asked this question in the first bullet point:  Back in the spring the Campaigns team ran two retargeting experiments across four clients.

You weren't asked about that, were you?

A.    No.

Q.    Is that a statistically significant amount of experiments to run to draw any conclusions with regard to retargeting?

A.    It would not be for us to conclude much beyond directionally that it could be interesting.

MR. CAMPBELL:  Marco, turn to page 5, please.

BY MR. CAMPBELL:

Q.    This "Problem" slide, you were asked about this.

What is this slide conveying?

A.    This slide is something that I think our design team, working with our product team, put together and sort of to repeat what I shared before, it's saying, you know, at this time -- I don't have the date of the slides in front of me, but whatever time it was, we had a Campaign Composer where you could send a message based on a time.  We had a Journeys product, where you could send a sequence of triggered messages that are based on other kinds of activity.  It's

saying maybe there's additional opportunity to do more than this, potentially a sequence of messages that might be campaigns.

Q.    And then at the bottom, it says there's -- "This leaves a significant product gap," and there's three numbered sentences there.

MR. CAMPBELL:  And the second one, Marco, highlight, please.

BY MR. CAMPBELL:

Q.    It says, "Be able to define the sequence of follow-up messaging."

Are those retargeting messages?

A.    It would almost never be a retargeting message, no.

Q.    Thank you.

MR. CAMPBELL:  Marco, turn to PTX-170.

And let's show the first page of that.  Thank you.

BY MR. CAMPBELL:

Q.    Another PowerPoint that you were shown -- and I'll represent to you, Mr. Miao, that this is a PowerPoint that --

MR. CAMPBELL:  Let's go to the first page.  It says 726 through 818.  And this is from August of 2021, based on the metadata.

Let's go to page --

BY MR. CAMPBELL:

Q.    And remind the jury, August of 2021, before or after the '660 Patent issued?  Or excuse me, was filed.

A.    That's a year and two months before it was issued.

Q.    Before it was filed?

A.    Before it was filed, I'm sorry.

          MR. CAMPBELL:  Turn to page 24.

BY MR. CAMPBELL:

Q.    Now, you were asked about this particular page.

          What is this page conveying, if you put yourself back in the August of 2021 time frame?

A.    Yeah.  So, again, this is recapping what Attentive had in August of 2021.  Like it says, for Journeys, that there is a trigger-based flow.  So the example would be -- I think we've covered before -- someone adds something to cart.  At that time, they might qualify for more messages, you could build a sequence of those messages.  There were other kinds of Journeys at that time.  And then it's saying you also have Campaigns.  Campaigns are not trigger-based, they are scheduled or time-based.

Q.    Is there anything about triggers mentioned on this slide?

A.    Yes, in relation to our Journeys product.

Q.    Is there anything mentioned about triggers in respect to Campaigns?

A.    No, there's not.

Q.    And schedule-based messages, when it's referring to Campaigns in August of 2021, is talking about time?

A.    Yes.

MR. CAMPBELL:  Marco, please pull up PTX-181.

THE WITNESS:  Is that in the new binder?

BY MR. CAMPBELL:

Q.    No.  It's not in your binder.

You were in the courtroom earlier today when Mr. Jhawar was asked about this document, PTX-181.  This was the Google document that was sent to Brian at Attentive, from Jesse Greenberg.

Would you have seen this document, Mr. Miao?

A.    Yes, I would have.

Q.    What -- what's this document referring to?

A.    This would have been a list of potential, you know, things that we are trying to organize to build our roadmap. So when it says "product prioritization," what that means is there's only so many people who we have to build things. This is us trying to list all the things you might build and, you know, share them for feedback.

MR. CAMPBELL:  Share the date at the top, please, Marco.

BY MR. CAMPBELL:

Q.    November of 2021, is that before Postscript filed for

its patent?

A.     Yes, by 11 months.

            MR. CAMPBELL:  Marco, pull up DTX-110.

BY MR. CAMPBELL:

Q.     This is another document that you were in the courtroom when there was testimony given.

            You've seen this document before, haven't you, Mr. Miao?

A.     Yes.

            MR. CAMPBELL:  Okay.  Let's go to the last page please, Marco.  That is DTX-110, page 14.

BY MR. CAMPBELL:

Q.     Okay.  So there was -- there were questions about, you know, winning and losing business and we were looking at Postscript.

            And if we look at the first two months, it says where red is meaning you lost business to Postscript, green means you took money from Postscript.

            In May of 2023, how much did we lose?

A.     To Postscript or just --

Q.     To Postscript.

A.     It says 0.8, $800,000.

Q.     And then in the preceding month, April 2023, we won some business from Postscript, right?

A.     Yeah.  It says we won 0.2, which is $200,000.

Q.      So let's look over, though.  We didn't -- nobody wanted to focus on, at least my colleagues did not want to focus on, a column that is the third one over.  It says, "Churn paying revenue."

What -- what is that column insofar --

MR. CAMPBELL:  There you go.  Highlight that column.

BY MR. CAMPBELL:

Q.      What is that column reflecting and why is that column important to this document?

A.      Yeah.  That -- that is the main thing that we would have been looking at in this document.  So what that's showing is how much revenue basically, paying revenue, annualized, are we losing.

So how I would kind of contextualize that would be if someone in an average year spent $100,000 and then they left in May, we would count that as minus $100,000, even though we didn't lose the whole amount at that time.

So what is it's showing is that, you know, in May the number is bigger than it was at the beginning of this period, which is September when it was, you know, 1.9 million.  It went up.

Q.      Okay.  And then if we look at the very top, May of 2023, how much was lost in churn paying?

A.      5.7 million.

Q.    Prior month, how much?

A.    6.5 million.

Q.    March of 2023, how much was lost?

A.    5.3 million.

Q.    So if we compare that to the Postscript column --

MR. CAMPBELL:  Let's go ahead and do that, Marco.

Keep what you have highlighted on the screen, if you can.  There you go.

BY MR. CAMPBELL:

Q.    How much was lost to Postscript in May of 2023?

A.    0.8.

Q.    April of 2023?

A.    We won .2.

Q.    March of 2023?

A.    We lost 12.

Q.    So are the net gains and losses to Postscript of consequence, like overall context of Attentive and the business they are trying to pursue and retain?

A.    Yeah.  If I just add these up on the churn paying side, it's 17-and-a-half million negative, I think, if I'm doing my math right.  On the Postscript side, it's minus 1.6.  So it's, you know, under 10%.

It would not have been the -- the major thing that we would have taken away.  What we would have, you

know, taken away from it, but we were losing customers to not Postscript.

MR. CAMPBELL:  Let's go to the opening slide, please.  Let's start with Slide 6.

BY MR. SAULSBURY:

Q.    Okay.  So we've got some products, some of which you're very familiar with.

You know about Sephora Replen?

A.    I do.

Q.    Know it well, don't you?

A.    Very well.

Q.    Yeah.  You were involved in that?

A.    The whole way through.

Q.    And when was that relationship with Sephora started?

A.    I think it would have been late 2017, I think.

Q.    What's the Replen again?

A.    So Sephora Replen was basically someone would buy like a moisturizer, Sephora would want to remind someone sometime later you're running low on moisturizer, you know, it's time to purchase.

Q.    And then we have the Journeys listed here.  That's May of 2021.  That's the source code we've used.  You've heard us say that in the courtroom.

When did Attentive actually start building Journeys?

A.    That would have been 2017, 2018.

Q.    So, much earlier?

A.    From the beginning of the company.

Q.    Okay.  And you're familiar with Klaviyo Flows, are you not?

A.    Very familiar.

Q.    And Klaviyo Flows has been around for a long time?

A.    Predates us.

Q.    Yeah.  Predates you, predates, importantly, October 12th, 2022, which is the filing of the Postscript patent, fair?

A.    Absolutely.

         MR. CAMPBELL:  Marco, let's go now to Slide 18.

BY MR. CAMPBELL:

Q.    Okay.  Just narrate for the jury over this slide to remind them what are Journeys?

A.    Yeah.  I know it can get confusing.  So basically Journeys are something where a thing happens, then something else happened.  So, you know, in the case that it's, you know, describing in this slide, what it's saying is if someone is browsing or shopping, what will happen is we will pay attention to that and monitor that.  And at some point later, based on that, we'll send them a follow-up message. And it's saying, you know, you can look at all kinds of different, you know, attributes about somebody to send them

that message, and it is just really covering the whole breadth of what Journeys can be which is a lot of different options.

Q.    Okay.  And the date of this particular document describing Journeys?

A.    May 16th, 2021.

Q.    Slide 19, please.  Okay.  Another slide from the opening, May 16, 2021.

Narrate what's happening, if you could, on the left, which is the flow with the various steps.  You can see they're numbered 1, 2, 3, 3A, 3B and 4.  Start at the top. Explain to the jury how you built this flow with Journeys?

A.    Sure.  So this is what a marketer would log in to Attentive and be building in Attentive.  And so the first thing that they would choose is, you know, what's going to commence this flow, why is it going to start, why is someone going to qualify for it at all?  And what it says there is it will start when someone "adds to cart."

The next thing it's going to say is, you know, we're going to wait some amount of time.  You can imagine as a consumer it would be kind of creepy and annoying immediately after you add to cart, you would get a text saying "what happened?"  So there's usually a wait time. That's what that's showing.  And the next thing it's saying is why should someone get this message or not get this

message.  And so what it's saying is it's hard to read from the screen, but what it says is "has made a purchase at least once since starting this journey."

In this example it makes sense if you're shopping and you add something to cart and then you buy it, you shouldn't get a message.  And so what you're seeing is there's nothing on the left side.  On the right side it's saying if you have not made a purchase, since you added to cart, we can assume that you have abandoned your cart and then we're going to send a follow-up message, what you see in green, and what you see in green is just describing the language of the text message.  So it says -- can't see it on the screen -- "It looks like you forgot something in your cart," you know, "complete your purchase."

Q.      Okay.  How did Journeys differ from campaigns?

A.      They're basically opposites.  So Journeys is if something happens, in this case "add to cart," then do something else.  And, you know, decide at some point who you're going to target.  Campaigns is pick a, you know, time you're going to send a message, pick who you're going to send that message to, and it's just going to go.

So in this example it's, you know, people have abandoned a cart.  They get a message.  The campaign, I don't have to do anything.  I'm just going to get the campaign.

                    MR. CAMPBELL:   In 2021, Marco, Slide 24.

BY MR. CAMPBELL:

Q.      Did Journeys have trigger conditions?

A.      Yes, it did.

Q.      Okay.  What kind of trigger conditions did Journeys

have?

A.      Yeah.  So what we're looking at here is just a list,

I think, of all of the different, you know, trigger types,

which is what's highlighted in blue.  These are things that

could --

Q.      And to interrupt you, this is from what?

A.      I'm sorry.

Q.      What do we have up here?  Is this the source code?

A.      This is, I think, the Journeys' source code from

around the time period that we're talking about.

Q.      Okay.  So what kind of triggers?

A.      Yeah.  So what this is saying is you could trigger

something or, you know, decide who to send the message to

based on all kinds have different events.  So I think that

there's -- 1, 2, 3 -- I think, 12 of them, and it could be

that you're viewing a product.  It could be that you're

adding to cart.  It could be that you're making a purchase.

Could be a variety of things related to your purchase, etc.

Q.      Did Journeys have segments in 2021?

A.      Yes, it did.

Q.      Okay.

                MR. CAMPBELL:  Slide 27, please.

BY MR. CAMPBELL:

Q.      Okay.  So date at the top is what?

A.      October 11th, 2021.

Q.      And that's before the filing date of the Postscript patent?

A.      Yes.

Q.      What are segments?

A.      I'm sorry?

Q.      What are segments?

A.      A segment is a shorthand for a group of people.  So a segment could be people who bought.  It could be people who looked at a certain thing.  It could be people based in a certain area.  Any group of people.

Q.      Go to the old-fashioned way of doing this, the document camera.  Okay.  So this was a slide, 25, that was used in my colleague's opening.  And I want to make sure that we have some important dates for the jury that are added to this slide and some important additional metrics for the jury to consider.

A.      Sure.

Q.      So when did Attentive first begin supporting customers on the Shopify app?

A.      I want to say our first customer who was on Shopify

launched in June of 2017.

Q.    June of 2017?

A.    I think so.

Q.    So that would be right here?

A.    Yeah.

Q.    Okay.  And I'm going to write that in.

Who was that first customer?

A.    It's a company called Sprayground who we still work with.  They sell backpacks.  I don't know.

Q.    Sprayground, were they one of the first customers of Attentive?

A.    I think they were the first customer.

Q.    And they're still with you today?

A.    Still with us today.  I still talk to them personally.

Q.    They seem like they're a satisfied customer?

A.    Yeah, they use us now for texts and for e-mail.

Q.    Okay.  So June of 2017, and we'll put that date right there.  That's before Postscript even existed, isn't it?

A.    Based on what I'm looking at, yes.

Q.    All right.  And now let's put some figures around what was happening early on.  When was the company founded?

A.    I think we officially are maybe September of 2016.  And we became, you know, Attentive proper in, I want to say, April of 2017.

Q.    So you're founded here, September of -- of 2016.

A.    Founded in 2016, September.

Q.    Thank you.  Correct that.

      Okay.  And let's talk about -- because I heard at opening something that caused me to scratch my head.  It said you were the 800-pound gorilla, I thought.  Did you hear that?

A.    I did.

Q.    Let's talk about how big you were relative to Postscript -- when Postscript launched.

      2017, how much revenue did Attentive bring?

A.    I think we made like $150,000 or so in 2017.

Q.    See the entire year you made $150,000 in revenue.

      Do I have that right?

A.    That's right.

Q.    Right to that point.  And that's right before Postscript launched?

A.    Based on what I'm seeing.

Q.    Yeah.  And then if we just add another month, let's think January 2018, how much revenue did Attentive make in January of 2018?

A.    I think we might have made like 70 or $80,000.

Q.    Okay.  Like 70 or $80,000.  Does that sound like an 800-pound gorilla to you right before Postscript?

A.    No, we were pretty small.

Q.    So, you know, thinking of a whale or a minnow, which were you at that point in time when Postscript was coming in the beginning?

A.    We would have been a minnow.

MR. CAMPBELL:  Your Honor, based on this testimony, I'd like to have this document marked because I'm going to want to use it in my closing as an exhibit.

THE COURT:  Are you asking it to be marked?

MR. CAMPBELL:  Yeah, I would have to like to have it marked -- admitted as an exhibit.

THE COURT:  Is there an exhibit?

MR. SAULSBURY:  Yes, Your Honor.  It's a demonstrative.  It's not evidence.

MR. CAMPBELL:  We can do that, but I don't want this to be -- they can take a picture of it.  I'm going to.

THE COURT:  It's a demonstrative exhibit.  I understand the need to mark it so we can identify.

MR. CAMPBELL:  We'll do that.  Work with counsel to mark it.  I just want to remind the jury about some of the facts and stats that we heard in opening that I don't think align.

THE COURT:  Okay.  So it will marked as a demonstrative exhibit.  The parties will figure out what the right number will be.  It will not be admitted into evidence.

MR. CAMPBELL:  Thank you.  All right.  Got the housekeeping out of the way.  Now let's get down to business.

BY MR. CAMPBELL:

Q.    Let's introduce yourself, please, to the ladies and gentlemen of the jury.  Go ahead.

A.    My name is Eric Miao.  I'm the chief strategy officer at Attentive.

Q.    When did you join Attentive?

A.    I joined in, I think, August of 2016.

Q.    Were you one of the first employees?

A.    I was.

Q.    Tell the jury a little bit about yourself.

A.    Sure.  So I'm from the Philadelphia area.  I grew up in Northeast Philly.  And, you know, single mom, normal kind of upbringing.  Went to school in New York.

Q.    Okay.  And where did you go to college?

A.    I went to NYU.

Q.    When did you graduate?

A.    In 2011.

Q.    What degree?

A.    I got a BA in history and politics.

Q.    Where do you live now?

A.    In Brooklyn.

Q.    Do you have a family?

A.      I do.  They're actually here all week.  I have a daughter who is 2, and I have a wife.  We've be married about ten years.

Q.      What did you do after you graduated from NYU?

A.      So I had be -- so I got a full ride to school.  One of the conditions of that full ride was I had a huge amount have work study I had to do, so I was working at the NYU gym for 30 hours a week.  And a friend of mine got an internship, I want to say our, senior year.  And told me about this internship that paid $15 an hour, which was twice as much as I made at the gym so I thought that was a really fantastic internship.  And then I went to work at this company full-time after I graduated.

Q.      What did you do after Pontiflex?

A.      Pontiflex is the company --

        (Reporter clarification.)

        THE WITNESS:  Yeah, Pontiflex is the company that I went to work at.  I stayed there for about a year and a half.  Afterwards I went to work at TapCommerce which is the company that Brian Long, who hired me in to Pontiflex, had started.

BY MR. CAMPBELL:

Q.      Were you one of the first employees at TapCommerce?

A.      I was.  I was the fifth or sixth employee.

Q.      How long did you work there?

A.     So I started in January of 2013.  We got purchased by Twitter in, I think, June of 2014.  So a year and a half.

Q.     And then you left Twitter with Brian to join Attentive?

A.     Yeah, to help start Attentive.

Q.     This was in opening.

       Do you recognize that person in the photograph?

A.     Yep.  That's me and Brian in his apartment.

Q.     When was this picture?

A.     I think this is August 2016.

Q.     Bring back good memories?

A.     Very good memories.

Q.     Are you proud of what you and Brian built?

A.     Unbelievably, you could not have told me coming up that I would have started a company like this.

Q.     The picture over your right shoulder, what is that?

A.     That's Ben Franklin.  That's a portrait of Ben Franklin that Brian has.

Q.     Why Ben Franklin?

A.     I think everyone from Philadelphia likes Ben Franklin.  He's, like, the best person we've ever produced.

Q.     What was the original name of the company?

A.     We were incorporated as Franklin, I think.

Q.     And eventually -- do you still have some Franklin swag from back in the day?

A.    Yeah, I have some pens and a hoodie.

Q.    What did you do when you first started working at Attentive?

A.    So I was our VP of client strategy.  My job basically was to manage all of our customers and so I oversaw that team, that team grew to be about 400 people, sort of at the time.

Q.    And today you're the chief strategy officer?

A.    That's right.

Q.    When did you switch to that role?

A.    I switched in January of 2023.

Q.    And what are your job responsibilities?

A.    Yeah.  So my responsibilities, basically, I kind of oversee and help guide our product strategy.  So as you've heard from a lot of people, it's a very competitive negotiation system, a lot of my responsibility is trying to figure out what new innovative things can we be building to stay ahead.

Q.    Okay.  So we're here on a patent infringement case and Magic Composer is accused of infringement.

      What is Magic Composer?

A.    Yeah.  So Magic Composer, we've covered, it had a bunch of different names, but it was basically a name that we gave to a UI refresh of our Campaigns product.  So just to kind of repeat some stuff that other people said.  We've

be always able to send campaigns.  So you pick the time you're going to send it, you pick, you know, who is going to get the message, you pick, you know, what does it say and do all of that.

Magic Composer was a simplified and streamlined way to do that same thing.

Q.    Why did Attentive build Magic Composer?

A.    Yeah, there were two primary reasons.  So the first one is what I just told you of, you know, choose when you're going to send a message, who is going to get that message, what it's going to say.  That was three steps.  I know it sounds like a small thing but there's actually a lot of drop-off across that.  You lose traffic.  You have to refer back to what you did previously.  We wanted to simplify that and put that in one screen to get less drop-off.  That was the first thing.

The second thing is we were building an e-mail product and so when we started the company, the only thing that we did was we helped the brands send text messages.  Our customers told us for a long time, it would be valuable if you helped us send text messages and e-mails, it would save us the difficulty of working in two different platforms.

What Magic Composer was going to help do is, you know, allow someone to build potentially multiple messages

at once so that you could send, you know, a text and an e-mail, you know, in the same simple workflow.

Q.    Talk about the dominant use case in the context of Black Friday.

A.    Yeah.  So you know, as you can imagine, businesses' campaigns largely are about things that the business is, you know, trying to generate sales from.  The major-use case would be one of two things.

One, I have a new product to sell so I have this thing that came out, whatever that might be; two, you know, customers prefer at sale.  So the dominant-use case for why you might send something like two messages would be, I'm going to send a message on Black Friday, I'm going to send a message on Cyber Monday, I just want to do both of those things at the same time.  That would be the normal-use case.

Q.    So to remind the jury, Campaign Composer, Magic Composer, same thing?

A.    Yes, same thing.

Q.    And so Magic Composer supports multi-messages, message campaigns?

A.    It does.

Q.    Are most of the messages sent via Magic Composer part of a multi-message campaign?

A.    No, not even close.

Q.    Talk about that, like what percentage actually are

multi-message campaign?

A.      Yeah, 97.5% of all the messages are just one message.
So 2.5% would be more than one message.

Q.      We haven't even gotten to the retargeting feature.
So of the multi-messages, you have the first, then you have
the second and that's 2.5% of all the messages sent using
Magic Composer.  First, second, 2.5%.  So how many of those
involve retargeting?

A.      So 20% of that small subset are retargeting.  So it's
a very, very small number.

Q.      About half a percent?

A.      It's about half a percent.

Q.      So given that only a tiny fraction of messages sent
Magic Composer into retargeting, is the retargeting feature
a primary driver of value in Campaign Composer?

A.      Not at all.

        MR. CAMPBELL:  Let's look at DTX-68.

BY MR. CAMPBELL:

Q.      All right.  And this, I believe, is a document that
was referred to and relied upon by Postscript.

        MR. CAMPBELL:  And we're going to move to
submission.

        THE COURT:  Is there any objection?

        MR. SAULSBURY:  No objection, Your Honor.

        THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 68 was admitted into evidence.)

BY MR. CAMPBELL:

Q.    All right.  Now, let's turn to page 303.

A.    Yep.  One second yep.

Q.    Bear with me, Mr. Miao.

        MR. CAMPBELL:  Page 297, please.

BY MR. CAMPBELL:

Q.    Okay.  First of all, you've seen this PowerPoint presentation?

A.    Yes, I have.

Q.    And it's about Magic Composer, right?

A.    Yes.

Q.    Okay.  Again, does -- there are various bullet points on this slide.  What's being described on this page?

A.    Yeah, this is a recap of what Magic Composer does, you know, what a description of Magic Composer is.

Q.    Okay.  I want to take -- and so there are four of them and I want to take these one at a time.

        So what is being described in the first bullet point?

A.    Yeah.  So that's a recap of what I was sharing earlier, basically.  So when Attentive first launched, we -- if you were going to compose a campaign, you had to do that in three different pages, so first you would choose when you were going to send it, then who it's going to go to, then

you're going to actually write the message out.  And that's what we were trying to condense.

We saw a lot of drop-off in that process.  What this is saying is, we're calling that the Legacy Flow so we took a three-page Legacy Flow, condensed that into a single-page UI as user interface.

Q.    Does the retargeting feature of Magic Composer have anything to do with consolidating three pages into one?

A.    No.

Q.    Second bullet points, it says, "Allow clients to create and schedule multiple texts and/or e-mail messages in a unified flow."

Does the retargeting feature of Campaign Composer have anything to do with allowing clients to create and schedule multiple text and/or e-mail messages in an unified flow?

A.    No, it does not.

Q.    Third bullet point, what does that say?

A.    That says, "Easily orchestrate between text," which would mean SMS, "and e-mail and create follow-up messages."

Q.    Does this feature have anything to do with retargeting?

A.    No, it does not.

Q.    And then there is a sub bullet under the third bullet point.  What does that say?

A.    That says, "With prebuilt retargeting segments based on engagement with messages earlier in the flow."

Q.    Does this have anything to do with retargeting?

A.    Yes, that is what we're talking about when we say "retargeting."

Q.    And that is the .5% of all multi-messages campaigns that you testified about earlier?

A.    Yes.

Q.    And there's a fourth bullet point at the bottom. What does that say?

A.    That says, "Also, enables rolled-up reporting across messages in the same strategies."

Q.    Does this have anything to do with retargeting?

A.    No, this is just saying if you send multiple messages, you can see stats on them.

Q.    How would you respond to a suggestion that there was a 9.19% increase in messages from Campaign Composer that was attributable solely to retargeting?

A.    I think that that is kind of silly.  I don't think that we saw that when we were doing testing, and I don't think we've ever seen anything close to that.

Q.    So if we look at an increase of 9.19% in messages, the retargeting feature accounts for how much?

A.    Yeah.  So in this test and maybe it's worth just describing sort of what -- any of these tests, stats, where

they're coming from.

Basically, what we would have done is we picked a group of companies and we gave them access to this new builder, Magic Composer and took a group of companies and we did not give them anything, what we would have done is a before-and-after.

So before anyone could access, that's the baseline; after, you can kind of see, did the group that got access to Magic Composer behave any differently to the set that did not?  That plus 90% is saying the group that had access to Magic Composer, you know, they sent more messages -- I think actually all of the groups sent more, but you know, relatively speaking, was there more of an increase that got Magic Composer?

When we look at that increase of how many actual messages that were sent, between the before and the after, you're talking about, like 11 million, something like that, total messages.  Retargeting was like 300,000, so 3%.  So of that 9% retargeting would have been 3%.

Q.    So if you multiple the 3% by 9%, what do you get?

A.    I get about a quarter of a percent.

Q.    About .27, nine times three --

A.    Yeah.

Q.    -- .27 %, does that sound about right?

A.    Yep.

Q.    Okay.  And there was a test performed.  Was that test, did it involve -- how many companies, as you recall?

A.    Yeah, I think it was like 30, 31 companies.

Q.    Okay.  Was there one company whose data predominated?

A.    Yeah, I mean, it was a very short test window.  So of all those retargeting messages, most companies sent zero.  So most companies send no retargeting messages.

      One company just so happened to send a bunch, so something like 80, 85% of all the retargeting messages was just one company.

Q.    So the 9.19% lift was due primarily to one company?

A.    Yeah, if we're just talking and zeroing in on one company, it was more or less.

Q.    What was the name of that company?

A.    A company called SHEFIT.

Q.    Did they eventually leave and come back to Attentive?

A.    I think that they did, yes.

Q.    And how do you know these percentages?  Did you actually look them up yourself?

A.    Yes, I was familiar with this at the time and I would have looked this stuff up.

Q.    Do you know how long retargeting or follow-up messages have been used in the marketing field?

A.    Since the beginning.  I mean, the first e-mail marketing companies came out in the mid-90s. I think that

the strategy of sending a message and then sending another message is 25-plus years old.

Q.    All right.  Let's go back to Journeys.

Did Klaviyo Flows have an influence on Attentive Journeys?

A.    Yeah.  So we would have been aware of everyone's kind of public products at the time and Klaviyo was one that would have influenced us.

Q.    Did Attentive file a patent on Journeys?

A.    No, it's not new.

Q.    So you didn't file a patent because it's been around for a long time?

A.    That's right.

Q.    What are some of the user interreactions with the website that would trigger a follow-up message in Journeys?

A.    Yeah, there's -- so there's basically -- call it like two website-based interactions and then one that's a person-based.  The first website one we've talked about a bunch, you know, which is I look at a product, I add a product to my cart, then I'm going to get a message about that later.

There's a second one which is more group-based, so that would be if I look at a product and it's out of stock and you look at a product and it's out of stock, neither of us is going to get a follow-up message

immediately.  But when it comes back in stock, we might both get a message in the second one.

And then the third would be if I do or do not do something myself.  So if I got a message and I clicked on it or I opened it or I did not open it, I might get a message based on that.

Q.    And, again, when did Attentive start building Journeys?

A.    2017, 2018.

Q.    Are there commit logs reflecting that?

A.    Yeah, there are.

Q.    All right.  Let's talk about Journeys and how it works.

MR. CAMPBELL:  Marco, please pull up DTX-598.  And I'm not sure.  Is this is in -- let's take it down for a moment.

BY MR. CAMPBELL:

Q.    Do you recognize this document?

A.    I do.

MR. CAMPBELL:  Okay.  Move to admit.

MR. SAULSBURY:  Just one moment, please.

I think we just need a moment to confer amongst counsel.

THE COURT:  All right.

MR. SAULSBURY:  We don't -- Your Honor, we

object on the basis that this wasn't among the exhibits that they disclosed for their witness today, so this violates the pretrial order.

MR. CAMPBELL:  It was an oversight, Your Honor. It's a document they have, they're well familiar.  It's a Journeys Flow.  I'm just going to have Mr. Miao walk through it.

THE COURT:  So the objection is that the exhibit was listed as a possible exhibit in the pretrial order writ large?

MR. CAMPBELL:  Yes.

THE COURT:  But in terms of disclosure --

MR. CAMPBELL:  Yes.  It was an oversight, Your Honor.

THE COURT:  To this witness?

MR. CAMPBELL:  Yes.  Apparently we did 597, instead of 598, Your Honor.

THE COURT:  All right.

MR. SAULSBURY:  And I have an additional objection, which is this is outside the scope of the initial disclosures that Attentive made with respect to Mr. Miao.

THE COURT:  All right.  Why don't we come to sidebar.

(Sidebar discussion.)

THE COURT:  Okay.  So with regard to the first

exhibit, what I'm really interested in I just want to be able to follow up along with the relevant pretrial order paragraphs to know what the pretrial order says. If X, then you can't use it. I just want to understand what is the relevant portion I should be looking at.

MR. SAULSBURY: You can pull it out.

THE COURT: And I think the final version of the pretrial -- the joint pretrial order was DI-763, for the record.

MR. SAULSBURY: This is paragraph 49 of the pretrial order, Your Honor.

THE COURT: All right. And particularly, paragraph 49 says -- so paragraph 49 says that it's -- this paragraph applies to any exhibits that the parties intend to use during direct examination of a live witness, including any witness called in rebuttal of the other party's witness.

So here we have a direct examination.

MR. SAULSBURY: That's right, Your Honor.

THE COURT: Because it's the initial examination of an Attentive employee.

MR. SAULSBURY: That's right, Your Honor.

THE COURT: And so the exhibit must be, it says, disclosed two calendar days before use.

And I think your objection from Saulsbury was that this was not among the exhibits that was disclosed for

use with this witness.

MR. SAULSBURY:  That's correct.

THE COURT:  I think you're saying that's not disputed as it was an oversight?

MR. CAMPBELL:  Correct.  This -- it's not controversial.  It's on their exhibit list.  I don't think they're going to otherwise object to this exhibit.  It was an oversight -- it was a clerical oversight by my staff.

THE COURT:  Is it the kind of document that you have other witnesses who may be able to testify about it?

MR. CAMPBELL:  No, this is it because they put our case in their --

THE COURT:  I'm sorry.

MR. CAMPBELL:  I don't have any other fact witnesses because they put our case in their case by calling our witnesses adversely, Your Honor.  So, no, I would not be able to call another fact witness to walk through this document.

THE COURT:  And can you tell me what is the nature of the document?

MR. CAMPBELL:  Nature of the document is it's showing -- I'm going to walk the witness through Journeys Flow, 598, the trigger conditions and support.

So this was shown in opening --

MR. WOOD:  I'm seeing that DTX-598 was disclosed

in a --

THE COURT:  So now I think what Attentive's counsel is saying is that they believe that this exhibit was disclosed for use with this witness, pursuant to the schedule.

MR. WOOD:  Yes, Your Honor.  This is an e-mail from our -- one of our lawyers, Halima Ndai at Sunday 7 o'clock pursuant to the disclosure schedule to Ms. Tannyr, who is on the trial team.  It includes a number of exhibits, including 598.

So, yeah.  Can you show it to me?

Okay.  I'm seeing this now and I trust your representation.  When we talked about it earlier sort of our -- at least my understanding of our conversation was that it wasn't disclosed because I was told that it was a typo.

Seeing this now, I'm not going to -- I'm not making the original objection.

THE COURT:  Okay.

MR. SAULSBURY:  Thank you for that clarification.

MR. CAMPBELL:  I would add I think the time should be charged against him.

THE COURT:  When one counsel is speaking, they'll speak and I'll address.  If you speak, I'll listen

to you.  We have an orderly process here to get through this.

The original objection is withdrawn.  So that's withdrawn at the end of this column.

I'll make a determination about how to award time for it, but let's deal with the substance of the objections first.

So plaintiff's initial objection has been withdrawn.

Is there a further objection?

MR. SAULSBURY:  There is, Your Honor.  It's on the basis that this exceeds Attentive's initial disclosures for the witness.  Mr. Miao was disclosed as the person most knowledgeable about Attentive's conception and reduction to practice design and development related to the asserted Attentive products -- patents, sorry.

The prosecution of the asserted Attentive patents, public demonstratives and so on and so on.  The point is he was disclosed as knowledgeable only about Attentive's asserted patents.  We gave some latitude with respect to issues he covered in his deposition in the parties meet-and-confer on this issue because we met and conferred about how we were concerned we were going to go outside the scope of his initial disclosure.  The net of that meet-and-confer was we were going to allow him to talk

about things of a nontechnical nature, but not things in the flowchart about how the prior art works. This is something more appropriate from Mr. Polish.

THE COURT: I understand the objection to be the initial disclosure of Mr. Miao was going to have knowledge about certain matter. Parties agreed at his deposition that he would talk about certain things beyond that, and Postscript is asserting that even the testimony here at issue goes beyond that.

Mr. Wood.

MR. WOOD: Respectfully, we don't believe that's correct. First off, when Mr. Saulsbury was reading to you from our initial disclosures, he inserted a very important word. He said that the initial disclosures were to the Attentive patents. That is not what they say, they just say asserted patents. Obviously Postscript's patent is an asserted patent. There is no definition in our initial disclosures and asserted patents to asserted Attentive patents. It just says asserted patents.

THE COURT: And the document at issue is a document that the testimony is going to be explain how a particular Attentive product -- Attentive Journeys, right?

MR. CAMPBELL: He built it, he was part it.

THE COURT: Relevant to the invalidity of the asserted Postscript patent.

MR. CAMPBELL:  That's correct, Your Honor.  Yes.

MR. WOOD:  He did add a word.  He was pointing me to where we defined the asserted patents as -- as the Attentive patents.  This is the first time seeing.

The other point we raised in the meet and confer -- and I apologize this was -- I thought the objection had been withdrawn as to all of their -- that's why I didn't raise it ahead of the jury coming in.

Our initial disclosure states, "We retain the right to rely on any witnesses that are disclosed in Postscript's initial disclosures for any purpose.

Mr. Miao is disclosed in Postscript's initial disclosures with respect to the functionality of the accused product, which is what he's about to talk about.  The employees --

THE COURT:  I'm sorry.  You said with respect to the functionality of the accused product?

MR. WOOD:  Yes.

THE COURT:  Is this stuff about the functionality of the accused product?  This document.  I thought it was about Journeys.

MR. WOOD:  He's disclosed regarding information -- I don't have their disclosure in front of me at the moment.  My recollection is he's disclosed for anything related to -- to Attentive and all of our employees

and officers are related -- are disclosed for information pertaining to Attentive's technology.

THE COURT:  So you're saying that Postscript's initial disclosure includes Mr. Miao?

MR. WOOD:  Yes.

THE COURT:  And the description of what he's said to be knowledgeable about includes subject matter that would include this document?

MR. WOOD:  Correct, Your Honor.

THE COURT:  All right.  So what is Postscript's response to that?  Let me just say to sum up where we are right now, I think this argument is the only argument right now that Attentive is making as to why Mr. Miao should be able to testify.  So it goes back to Postscript.

MR. SAULSBURY:  That's right, Your Honor.  And two things, one of them is with respect to the catch-all that Mr. Wood references they had in their initial disclosures, it's a catch-all for purposes of witnesses not expanding the scope of their initial disclosures with respect to witnesses they did identify.  Mr. Miao was identified on their initial disclosures, and the scope was clear.  And it was limited to the Attentive asserted patents.  So that's Point 1.  Point 2 is -- and I'm just taking a look at our disclosures.  Right.  So even if you were to accept that they could expand the scope of their

disclosures with our disclosures, which I don't think would be appropriate, I don't believe that this, this is -- Mr. Wood said that this is about Attentive's accused products.  This is not an Attentive-accused product.  It's prior art.

MR. WOOD:  Their disclosure is not simply Attentive's accused product.

MR. SAULSBURY:  That's what I understood you to say.

MR. WOOD:  And, Eric Miao, there's a whole series and the last one is information relating to plaintiff.  At that time it was plaintiff in the case.

THE COURT:  Your response to that?  To sum up, am I right to say that Attentive is arguing that its initial disclosures has a catch-all that says that anything -- anything in Postscript's initial disclosures with regard to a witness' knowledge is part of our disclosures?

MR. WOOD:  Correct, Your Honor.

THE COURT:  And now you're saying in Postscript's disclosure, Mr. Miao is listed as a knowledgeable witness including knowledge about this, anything relating to Attentive?

MR. WOOD:  Correct.

THE COURT:  Okay.  And any response to that?

MR. SAULSBURY:  Your Honor, I don't think their

catch-all gives you notice of anything. I don't think it's a function of initial disclosure.

THE COURT: Is there anything further, Mr. Wood?

MR. WOOD: The other argument I would make is I think this objection has been waived. When we initially came up here, I was relying on a piece of paper that Mr. Saulsbury had that didn't have the 598 on there. I'm now seeing that 598 was disclosed on Sunday. We had a meet and confer relating to the initial disclosure issue for Mr. Miao. We met and conferred on that. My understanding was all of those objections had been withdrawn, which is why you didn't receive a chart in the morning detailing that issue. So my understanding was that Postscript was not intending to stand on or raise any of those objections which would have been included 598. And I believe, consistent with the disclosure, if they were going to put that forward, it should have been put forward in the statement at the objection deadline and been in a letter to Your Honor by 5:30 this morning.

THE COURT: Anything?

MR. SAULSBURY: The reason we didn't raise this issue with the Court because we had a compromise in the scope of initial disclosure. We said he could supply it in a nontechnical capacity about Attentive's accused products. We were going to give them that latitude in the interest of

compromise.

MR. WOOD:  In recognition of that compromise, I indicated, for example, we wouldn't be asking him to go into detail about things like source code.  This is reflecting a flowchart that's just showing the operation.  Not showing detail.

THE COURT:  Can I ask?  Is it expected that Mr. Miao, beyond this document, will engage in much more discussion that's Journeys related?

MR. CAMPBELL:  No.  We're moving on after this in the interest of time.

THE COURT:  Let me end it here.  Look, I don't have perfect information from you, but in part because this is a relatively focused set of questions, I understand, about an individual document, in part because it's asserted that the scope of Attentive's initial disclosures would have included any reference to witnesses in Postscript's disclosures, Postscript did disclose Mr. Miao and disclosed him as knowledgeable about a broad subject matter area that could include this document.

For all those reasons and because I do think we're into a witness that seems like is said to have otherwise knowledge about the subject matter, I'm going to permit the questions and overrule the objection and go from there.  Okay.

MR. CAMPBELL:  Thank you, Your Honor.

(Sidebar discussion concluded.)

THE COURT:  Thanks, everybody for your patience. Why don't you go through this subject matter, and when you get to a stopping point after this, we'll give time for an afternoon break.

MR. CAMPBELL:  Where we left off, Marco, please pull up 598.

BY MR. CAMPBELL:

Q.    Open to 598 in your binder, Mr. Miao.

Do you recognize this document?

A.    Give me one second.  Yes, I do.

MR. CAMPBELL:  Move to admit.

MR. SAULSBURY:  On the basis of the colloquy, no objections, Your Honor.

THE COURT:  Okay.  So Postscript had raised a prior objection.  The Court has resolved it, and so I will admit the document.  DTX-598 is admitted.

(DTX Exhibit No. 598 was admitted into evidence.)

MR. CAMPBELL:  Thank you, Your Honor.

BY MR. CAMPBELL:

Q.    What is 598?

A.    This is showing our Journeys product.  It's sort of -- brings me a back a bit to when we were making it.

This is a journey that begins with an e-mail received.

Q.    It looks like a flowchart; is that right?

A.    Yeah, you can think about a journey as sort of going down a flowchart.

Q.    Is it fair to say that Journey is an automated flowchart?

A.    Yeah, basically.

Q.    Does it have trigger conditions in it?

A.    Yes, it does.

Q.    Okay.  What are those?

A.    Trigger conditions, so you'll have one to begin with, which we kind of talked about.  So in this case this would begin when an e-mail is received, so let me see.  Someone got an e-mail and, then you'll have subsequent trigger conditions, so then we're going to look and see, has someone received an e-mail more than three times in a period of time, in this case 30 days.  We have an additional trigger condition here of has someone opened an e-mail at least one time in the last 30 days?

Q.    Do the trigger conditions help with encouraging consumers to complete some sort of purchase or other action that they've taken?

A.    Yeah.  The whole point of Journeys basically is to kind of nurture someone through some process.  Again, we are talking about an abandoned cart.  The brand obviously wants

you to finish your purchase, and then in this case, you know, someone is getting an e-mail. And then you're trying to make it message them on another channel, in this case a text message.

Q.     What does, if we look at this, it says, "E-Mail received." What does that part of a flowchart mean?

A.     Yeah, so that means that Attentive is getting notified that someone has received an e-mail.

Q.     Can Journeys be used with SMS text messages as well as e-mail?

A.     Yes, it works for both text and e-mails.

Q.     Does Attentive uses Journeys today?

A.     We do, of course.

Q.     And there appears to be a couple of triggers in this flow. What are the two triggers?

A.     Yeah. So just to kind of to reiterate again. This first trigger would be us kind of evaluating. Have we seen someone get more than three e-mails. If someone hadn't, they would go to the right side. They wouldn't get a message. And it's basically a summary of that segment, that audience that we're monitoring.

Q.     Okay. And is the functionality that was in the version of terms that was released in October of 2021 reflected on the screen?

A.     Yes, this may have been even before that.

MR. CAMPBELL:  Thank you.

I think we're at a breaking point, Your Honor.

THE COURT:  Okay.  Very well.  Then why don't we take this time to stop for our afternoon break.  We'll take a 15-minute break, and we'll have the jury led out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right, everyone.  Please be seated, and we'll be back and ready to go at 3:06.  The Court stands in recess.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right, everyone.  Please remain standing.  The jury will be brought back in.

(Jury enters.)

THE COURT:  All right.  Please be seated.  All right.  Mr. Campbell.

MR. CAMPBELL:  Thank you, Your Honor.

BY MR. CAMPBELL:

Q.    Turn to your binder.  It's going to be DTX-053.

A.    Yep.

Q.    Have you seen this document before?

A.    I have.

Q.    What is it?

A.      This is a product specification for Sequential Campaigns.

MR. CAMPBELL:  Move to admit.

THE COURT:  All right.  Is there any objection?

MR. SAULSBURY:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 53 was admitted into evidence.)

BY MR. CAMPBELL:

Q.      For starters, I'm referring to the very top of the page.  What is the date of this document?

A.      August 9th, 2021.

Q.      And there's an e-mail.

        Do you see that?

A.      Yep.

Q.      Whose e-mail is that?

A.      That's Zach Magdovitz.  It's the product manager at Attentive.

Q.      Why does Journeys use segments for its campaigns?

A.      Journeys uses segments for a couple of reasons. Broadly speaking, we want to personalize the message so we wanted to, you know, make more sense to someone when they get it.  We want to send it at the right time for somebody. We want to send it in a way that is going to maximize its effectiveness, and so a lot of it is going to come down to personalization and performance reasons.

Q.    What are some of the benefits of using segments in Journeys?

A.    Yeah.  So, again, there's a couple of different reasons.  So just maybe to define segment again, segment is just a group of people.

One reason why you would use a segment in a journey is to begin a journey all at once for a group of people.  So you might say, once all these people qualify for this segment, this definition, then start a journey.  Another reason you might use it is to split out what happens on one side of a journey versus another.  So, you know, these people are going to get these kinds of messages, those people are going to get those kinds of messages.

Q.    Okay.  What happens when a subscriber enters a Journey segment?

A.    Yeah.  So there's a thing in Attentive, it's called "join a segment Journey," so very literal.  When a bunch of people qualify for a segment, they'll all join at the same time.  And so to give an example, maybe if you said, I want to make a segment of people who have clicked a message in some period of time, you can make that segment.  In a lot of cases, you might send out a campaign for your holiday sale, whatever it might be, a bunch of people are all going to click at the same time or in a very short amount of time, all those people that qualified to begin a journey together.

Q.      In terms of examples of product segmentation is a change in price?

A.      Yeah.  So that's sort of one way.  That would be the formal kind of joined a segment Journey.  That was one thing we have.  We have another thing that would be if you-all interact with a product, so maybe the example I gave previously is you just want to go back to.

If we both get a message that says, you know we have this new product, it's possible that, you know, a lot of people might get that message.  By the time we get it, we go to the page, the product goes sold out, right?  So we're disappointed we couldn't buy it.

The brand definitely wants to tell us when that product is back, because clearly we were interested in it, and so when they get it back, they want to tell us all. They want to tell us at the same time, though, so what they don't want to do is treat someone unfairly where you get it first and I get it last, because that's not fair to me.

And so you would treat all of those people as a group.  That could happen if the product also changed in, you know, price.  So if you and I both have a product in our cart and we were thinking about it, but maybe it's expensive, refrigerator, couch, whatever, if there's a sale and the price goes down, again, they're going to want to tell us all at the same time because it's fair.

Q.    When did Attentive Journeys first have product segmentation?

A.    So you could split a journey based on a segment, I want to say, in May or June of 2021.

Q.    Okay.  And that was before the filing date of Postscript's patent?

(Reporter clarification.)

Q.    Before the filing date of Postscript's patent?

A.    Yes, it was.

Q.    How are messages handled during quiet hours in Journeys?

A.    Yeah, so quiet hours is a -- maybe it takes a second to explain.  The idea is that, just like a real store has hours that it's opened and closed, an e-commerce store has hours that it's opened and closed.  Not necessarily for the stores' benefit, they are selling things 24/7 but for the customer's benefit.

And so something that is common is someone adds a product to their cart and they get a follow-up message shortly after.  If I'm shopping in the afternoon and I get my follow-up message in the afternoon, that's fine.  If I'm shopping at one in the morning, which happens a lot more often than you would think, and I fall asleep, I do not want to get a follow-up message at two in the morning, that would be very bad.  There's some finance reasons, but beyond that,

as a consumer, as a person, that's bad.

The idea of quiet hours is store closes, if people are doing things that are qualifying them for these messages, while it's closed, we'll wait for it to open the next day.  Basically, all of those people will then sort of get their message at that time together.

Q.    Is it important to send follow-up messages to customers at the same time?

A.    Yeah.  Again, like, sometimes you might want to do it in real time; but in other cases, you would absolutely want to treat everyone exactly the same.

Q.    Now, what's the principle difference between Magic Composer on the one hand and Journeys on the other?

A.    Yeah, so Journeys is something that requires these trigger conditions.  So something has to happen in order for me to, you know, qualify to enter into this flowchart.  And so it's trigger dependent.  Magic Composer which, you know, got renamed Campaign Composer, is sort of the opposite.  It's based on the time.

So I'm going to pick a time for message one, I'm going to pick a time for message two.  I don't, as the user, consumer, have to do anything myself to get into that.  It's just based on time.

Q.    Did Sequential Campaigns ever use any trigger conditions?

A.      No.

                MR. CAMPBELL:  Let's pull that document back up, Marco, that's 53.

BY MR. CAMPBELL:

Q.      So this product Sequential Campaigns that's on the screen, that never used trigger conditions?

A.      No.

Q.      Does Campaign Composer use any trigger conditions to send messages?

A.      No.

Q.      All right.  Do the messages that Campaign Composer sends to the user depend on the user's behaviors?

A.      No.

Q.      Does Campaign Composer monitor the behavior of the user in order to send messages?

A.      No.

Q.      Does it ever periodically monitor -- periodically monitor or continuously monitor?

A.      No, it's just used at the time as the marketer, then at that time, a message is going to go out.

Q.      What happens in Campaign Composer when the timer expires and nobody matches the criteria for a follow-up message?

A.      Yeah.  So it's an analogy would kind of be like, you know, you're driving a bus, you have to stop the bus even if

no one is going to get on or off.  If no one qualifies for that message at the time it's going to send, it still sends.  So it will send.  And, you know, in our product, in our UI, it will say "sent."  And it will just be delivered to nobody.  So it will have a zero for who gets it.

Q.    Okay.  Jesse Greenberg, he's the vice president of engineering at the time?

A.    He was.

Q.    Could Journeys send messages to multiple subscribers who had satisfied a set of triggers?

A.    Yes, it could.

Q.    All right.  We already looked at the different trigger conditions in the code.  Let's move now to PTX-162.  That should be in your binder.

A.    Yep, I see it.

Q.    Do you recognize this document?

A.    I do.

Q.    Okay.  It says, "Create a dynamic segment" at the top.

A.    Yes.

MR. CAMPBELL:  Move to admit.

THE COURT:  Any objection?

MR. SAULSBURY:  No objection.

THE COURT:  All right.  It's admitted.

(PTX Exhibit No. 162 was admitted into

evidence.)

BY MR. CAMPBELL:

Q.     What is this document showing?

A.     This is showing the segments that you could create from within our Journeys product.  So this is, you know, the list of segments basically that were possible to make, on how to make them, what the screens look like.

Q.     Okay.

MR. CAMPBELL:  Marco, now let's go to DTX-308 at page 512.

BY MR. CAMPBELL:

Q.     Do you recognize this?  Are you with me, Mr. Miao?

A.     Sorry, I see it.

Q.     Yeah.  Okay.  And staying with the issue of segments. Do you recognize this document?

A.     Yeah.  This is the code covering trigger conditions.

MR. CAMPBELL:  Move to admit.

THE COURT:  All right.  Any objection?

MR. SAULSBURY:  No objection.  Sorry, Your Honor.  Apologies, no objection.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 308 was admitted into evidence.)

BY MR. CAMPBELL:

Q.     Starting at line 2125, we talked about this a little

bit earlier.  So this has a bunch of trigger conditions shown, right?

A.      Yes.

Q.      Okay.  Do the trigger conditions happen through the two-trigger-event-type function shown at the top of the document?

MR. SAULSBURY:  Your Honor, objection.  This is outside the scope of the initial disclosures.

THE COURT:  Okay.  Mr. Campbell?

MR. CAMPBELL:  Your Honor, we're going to move on.  This is one question.

MR. SAULSBURY:  It clearly exceeds the scope of the parties' disclosures.

THE COURT:  I don't hear that being denied so in light of that, I'll sustain the objection.

MR. CAMPBELL:  I'll come back to this document later, Mr. Miao, with another witness.

Okay.  Let's go now and pull up Sephora Replen.

BY MR. CAMPBELL:

Q.      Before we go there, are you familiar with Sephora Replen.  You testified earlier you are, right?

A.      Yes, very familiar.

Q.      Why did you work with Sephora?

A.      So Attentive, you know, as a company that is just starting, you are happy to work with, you know, everybody.

So I think, like we've talked about previously how our first customer, a company called BustedTees, I'm still in contact with some of the people who worked there, you always appreciate your first customers and we've always worked with all kinds of customers.

Sephora is one of the most prestigious companies, period.  They are one of the most cutting-edge companies.  They are incredibly talented and advanced technology team and so as an early company, that's your dream customer is someone like that.

Q.    Did Sephora Replen include retargeting?

A.    Yes, it did.

Q.    Turn to DTX-596 in your binder.

A.    Okay.

Q.    Have you seen this document before?

A.    I have.

Q.    What is it?

A.    This is an early set of slides that we made covering the text program for Sephora.

MR. CAMPBELL:  Move to admit.

THE COURT:  All right.  Any objection?

MR. SAULSBURY:  No objection.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 596 was admitted into evidence.)

MR. CAMPBELL:  Okay.

BY MR. CAMPBELL:

Q.    Is there a date on the first slide?

A.    There is, February 26th, 2018.

Q.    Okay.  How did Sephora Replen work?

A.    The basic idea --

Q.    And let's turn to page 3, please.

A.    Oh, I'm sorry.

Q.    Go ahead, please, Mr. Miao.

A.    Yeah.  So the basic idea is kind of moving from left to right here.  What Sephora is going to do is something we've talked about a bunch of times.

The first step is you have to get people to join the program, and so what's happening in A1 and A2 is someone who is just signing up basically for Sephora's program.  And then the idea was that we would have to get maybe some kind of engagement from -- you know, the people who signed up on, what are the kinds of items they might want these alerts about?

Sephora sells a huge range of products.  And a lot of their customers buy a lot of different things from them.  So you can imagine you might not want replenishment from Sephora for everything.

And then what's happening, sort of the last thing, which is about the replenishment part of this, is the

restock flow.  That restock flow is the Replen program.  So that's, you know how someone actually would replen.

MR. CAMPBELL:  Let's turn to page 8, please.

BY MR. CAMPBELL:

Q.     What is page 8 reflecting?

A.     Page 8 is a kind of visual summary of what that restock flow is.

Q.     Okay.  And generally, can you explain how the restock flow works using a summary.

A.     Yeah.  So again, this is a little bit stylized, but what you're seeing happen is someone on the right would be the person, so you know, you or I.  We would say "restock." And the idea was that Sephora would then, based on that, look up a bunch of things to then reply back to you saying, you know, is this you, is this the product you want, are you willing to pay this much for it, is this where we should ship it, etc., and, you know, do you want to proceed with this purchase?

And then what's happening, which it's probably hard to see on the screen but the person on the right is replying "buy," like yes, I'd like to --

Q.     And is that the bubble on the far right?

A.     Yes, I can see it on my screen but it's hard to see up there.  But the person on the left, the very last message says, you know, "if you want to place your order, reply

buy."  That's the bottom left gray text on the first phone.

So then basically, this is like scrolling up, the person has replied "buy."  What Sephora store is saying, Great, thank you.  Your order is confirmed, if you have any questions just let us know.

Q.    Let's go down to DTX-597.  And that's in your binder.

A.    Yeah, I see that.

Q.    Have you seen this document before?

A.    I have.

Q.    What is it?

A.    This is the more technical product spec for the Sephora Replen program.

MR. CAMPBELL:  Move to admit.

THE COURT:  Any objection?

MR. SAULSBURY:  No, Your Honor.

THE COURT:  All right.  It admitted.

(DTX Exhibit No. 597 was admitted into evidence.)

MR. CAMPBELL:  Okay.  So I think we need to really blow up this document in order to be able to see it. And we're going to work our way down.

THE WITNESS:  Okay.

BY MR. CAMPBELL:

Q.    So let's start at the very top and there are some steps.

So let's start with Step 1 and Step 2.

What's happening in Step 1?

A.     Yeah.  So in Step 1, Sephora, when we were starting this, did not have many people, if any, subscribed to the program and so Sephora had to tell them, hey, we have a text program.  And so Step 1 is showing they might have put that announcement in their e-mail, they might have put that announcement on their website.  And so what it's showing, this, "Text Sephora to reorder.  Sign up now," that's showing the visual -- the sign-up unit that someone would have seen to then proceed to sign up.

Q.     Is the e-mail that is sent to the consumer a first message that is sent to the consumer?

A.     Yes.  You can think about it that way.

Q.     Okay.  What happens at Step 2?

A.     So Step 2 is a landing page.

So Attentive made a landing page.  Again, you can just think of that as something that's built by Attentive, but looks like and is branded to look like Sephora.  And what it's doing is it's saying, okay, this is where you actually sign up.  And so there's a checkbox saying, you know, yes, I want to do this.  And then there is a -- you know, some legal text, and then there's a phone number and someone would type in, you know, her phone number and then hit sign up.

Q.      Let's look at the next couple of steps, 3 and 4.

What's happening at Step 3?

A.      Yeah.  So Step 3 is a verification.  So she would have put in her phone number, Sephora would have then followed up and sent a code, in this case a 6-digit code, to that phone number and wants that person to type that in, something we're all probably very familiar with from a verification standpoint.

And then they would have gone to Step 4.

Q.      And Step 4 is a login page?

A.      Yeah.  So Step 4 is you're actually going to be logging in to your Sephora account in Step 4.  So Attentive would be redirecting you to Sephora to actually log in to Sephora.

Q.      Okay.  What's happening at Step 5?

A.      Yeah.  So Step 5 is we need to establish some kind of connection between Sephora and Attentive because Sephora is going to have a lot of information about this person that we're going to need to actually, you know, power this replenishment program.  And so in Step 5, Sephora is sending basically some information to Attentive now that the person has logged in.

Q.      There's a reference at Step 5 to APIs.

What is that reference?

A.      Yeah.  So an API is an application programming

interface.  Basically, it's -- you can think of it as a way to ask for information or to send information.

So in this case, Sephora is sending data to Attentive's APIs.  What that means practically is they're just taking some information, they're calling us up, and getting that information to us.

Q.     Are the APIs used to track users' behaviors?

A.     Yes.  So Sephora API's they have a huge amount -- they have several hundred different APIs and what Sephora, they do, among many things, is track a bunch of different user behaviors.

Q.     Why does Sephora Replen track user's behaviors using APIs?

A.     Yeah.  So there's a couple of different reasons and there's a bunch of different APIs that got used in this flow.

The first thing that Attentive is doing, what you're seeing here, is we are then getting some information from Sephora and a lot of that information was, like, you know, here's some stuff to use so that if you call us back, you have to give us, you know, this specific information, like a key almost.

What we're then doing is we're getting someone's purchase history.  So in this case, you know, if -- you know, if my mom or someone else signs up, we then need to go

ask Sephora, can -- can I get Eric's mom's purchase history so I know what she should be getting messages about, and then they would give that to us.

And then we'd go back to them and say, okay, here's all the products that you just gave us, can you tell us how long generally would be the cycle of use for those products so that we could then start doing a kind of counter between here's when that purchase happened, here's how much time it takes to actually use this product, does this person or does this person not qualify to get one of these reminder messages.

Q.    All right.  API calls like phone calls?

A.    Yeah, very similar idea.

MR. CAMPBELL:  All right.  Moving down in the flow, Marco, please.

BY MR. CAMPBELL:

Q.    What's happening next?

A.    Yeah.  So in this case -- you know, in this example, we are saying, okay, this person potentially is running low, right, they qualify based on some logic Sephora has about, you know, timing and if they bought something.  And so we're going to send a message and it's going to say, you know, running low on such and such brand and product, you know, whatever -- can't really see on my screen what this product is, whatever the mascara is, moisturizer, whatever it might

be, we've got you covered, text "buy" to reorder now.

Q.    And that's in the vertical with the green line, T1, and then next to that is T2, T3, T4?

A.    Yes.  So that's the message we're going to send, then the person has to do something.  And so what you're seeing in the green and red and yellow arrows is she's doing something.  So she might be replying "buy" and an order is being created.  She could reply "buy" and it could glitch out, there could be an error.  You know, she could reply back, "hello," some random thing.

It's just showing all the different cases that would happen based on, you know, how someone replied back.

Q.    So in the T1, T2, T3, T4, the "she" is doing something, that's the consumer.

Are those the triggers?

A.    That's exactly right.  She has to do something that's a trigger condition that's going to qualify for the next action to take place.

Q.    How does the user use the trigger in the first branch?

A.    Yeah.  So in the first branch she's replying "buy," and an order is successfully created.  So, you know, there were no glitches, there were no errors.  It is a successful, you know, process with Sephora and so it would proceed to the next thing.

MR. CAMPBELL: Okay. And the next thing, Marco, let's move down to that.

BY MR. CAMPBELL:

Q.    So texting "buy," will that trigger a second message?

A.    Yeah. So what would happen is we would need to get a couple more pieces of information from Sephora.

And so as you can see in the message -- and it might be easier to start in the message and work backwards.

We obviously want to send this thing to the right place and so to get a confirmation of where should we sent it, we're trying to save steps. We want to send her a messages that says, hey, is this where we would ship it, this address, text "yes."

To get that address, we have to actually post an order. So post "buy now" API, that's basically what's happening.

Q.    Let's show that. So let's go down to the next screen.

You text, "yes," and then what happens?

A.    Yeah. So I think you actually may want to flip -- go back to it because it's a confusing diagram.

So basically what's happening is she texts, "buy," we try to place that order. So this "buy now" API, that's going to give us the ability to then follow up and say "where are we sending it, get address." And that's the

information that we're going to then put into this next message that says, "Is this where we should ship this," which would then give us a chance to say, you know, "yes." "Yes, that's the right address."

MR. CAMPBELL: So, Marco, let's go back to where you were. I just want for us to take out T1, T2, T3 and T4. Easy to follow. Right.

THE WITNESS: Yeah. Perfect.

So if she texts "yes" back to that message, we would proceed moving down, which is where it starts to say get shipping groups API. That's going to happen after she replies "yes." So replying "yes" is the triggering condition to move to the next step.

BY MR. CAMPBELL:

Q.    Okay. So there's been two messages sent to the user, the first one asking whether her address is right and that was triggered by texting "buy"; is that right?

A.    That's right.

Q.    And the second one is asking the user whether a credit card will be charged?

A.    Yeah. So I think -- it's hard to see on this highlighted. I think it might need to go down a little bit.

MR. CAMPBELL: Go down one more.

THE WITNESS: Yeah. So I'll just focus the folks' attention to the left side because it will be a

little bit easier to see.

So if she replies "yes," which is that top left, you know, rectangular box, we are then going to go figure out, okay, she said this is the right address, but Sephora has a lot of different shipping options, so they might give you free shipping, two-day shipping, extra-expensive shipping, whatever the options are.

And so in this example, she is qualifying for free shipping, so that's the T7, you know, if she texts "yes."  And what's happening is Sephora is then going to send this kind of additional message so that she can approve, yes, that's the shipping that I want.

And so what you'll see in the next kind of rectangular box is where Sephora says, yeah, you qualify for, in this case, free shipping or free two-day shipping, text "yes" to choose that as your shipping option.  And you can see it sort of mirrors the flow you might go through online.

And so in this example she's going to text, "Yes, I do want free shipping," to move to the next section.

MR. CAMPBELL:  All right.  Let's move down to the next section, Marco, where it talks about -- let's expand back to the main document.  Let's go down a little bit further.

BY MR. CAMPBELL:

Q.     Where it's talking about "charge," "go the credit card."  Okay?

A.     Yeah, perfect.

So, you know, the last thing is Sephora wants to make sure that the final, you know, actual charge is something that the person is okay with.  She might not remember what this product cost, it could have changed its price.  So they obviously want to make sure that she can see that.

And then they also want to verify, you know, what should I be charging.  People's credit cards change, they get stolen or lost, people switch credit cards, whatever.

And so what we're doing after she texts "yes" is we are sending that information to Sephora and then we're getting that final order back from Sephora in that "get order" API, and that's going to contain the stuff we're trying to then put into the message.

So the order is going to -- the "order" API is going to tell us this is what the merchandise costs, $40. This is tax, $3.40.  So the thing costs $43.40.  This is the credit card we have on file, it's your standard credit card. 2222 is the end of it.  If you're good with all of this, text "yes" again move to the bottom, which is what she does.

And then we submit that order and she gets one

final confirmation message.

Q.    How many text messages did the consumer receive?

A.    Yeah.  So she got one saying "you're running low." She got one saying "is this where we should ship it."  She got one saying "you qualify for free shipping."  She got one saying "this is how much it costs," and we're getting her final confirmation.  And she had one saying, you know, great, it's on the way.  So five total.

Q.    And those messages were triggered by something the user did?

A.    Each of those is triggered.  And as you can see on the flowchart, a lot of different messages could have sent for lots of different cases.  All of those would have, you know, potentially sent to different cases based, again, on sort of what the trigger was.

Q.    Okay.  Could the software run in parallel for multiple users at a given time?

A.    Yeah, you could imagine a company like Sephora, a lot of people buy any individual product on any given day.  And thus they're going to qualify to get a Replen message at the same time.

Q.    So, again, this was a working product?

A.    Yeah.  This product totally worked.

Q.    Back in 2019?

A.    Yes, September 2019.

Q.    And you were involved in this product?

A.    I helped launch it from the beginning.

Q.    That's before the filing date of the Postscript patent?

A.    By three years.

Q.    Okay.  Let's talk about Klaviyo Flows.  What is Klaviyo Flows?

A.    Klaviyo Flows is -- Klaviyo's is a name for what Attentive called Journeys.  So Klaviyo Flows is the same kind of thing we've be talking about, potentially a sequence, usually a sequence of messages that are triggered by some logic where you can split things up based on the segments, more or less the same ideas as Attentive's Journeys product.

Q.    How did you come to know about Klaviyo Flows?

A.    Public.  It's very easy to find.

Q.    Okay.  Let's take a look at DTX-606.  Let's start with 600.  DTX-600.  These are videos.  So I'm -- you're not going to find that in your binder.

       Are you familiar with the videos for Klaviyo Flows?

A.    Yeah.  They have a bunch of the explainer videos.

       MR. CAMPBELL:  Okay.  Move to admit, Your Honor -- it's going to be DTX-600 through 606.

       THE COURT:  All right.  Any objection?

MR. SAULSBURY:  No, Your Honor.

THE COURT:  All right.  They're admitted.

(DTX Exhibit No. 600 through 606 were admitted into evidence.)

BY MR. CAMPBELL:

Q.     All right.  Let's pull up one of the series starting with DTX-606, Lesson 1.  Okay.  Is this one of the Klaviyo Flow videos that you're familiar with, Mr. Miao?

A.     Yep.  I think this is from, like, a YouTube series or something.

Q.     And do we have -- let's show DTX-601, Lesson 7.

All right.  Is this another one of the videos from Klaviyo Flows?

A.     Lesson 6?

Q.     This is Lesson 6, yes.

A.     Yep.

Q.     Okay.  Let's show Lesson 5.  Another one of the videos, Mr. Miao?

A.     Yep.

Q.     Lesson 4.  Another one of the videos?

A.     Yep.

Q.     Lesson 3?

A.     Yes.

Q.     Another one of the videos?

A.     It is.

Q.    Lesson 2, another one of the videos?

A.    It is.

Q.    And Lesson 1, another one of the Klaviyo Flows videos?

A.    Yep.

Q.    Were the Klaviyo Flows videos available to the public?

A.    Yes.

Q.    Then did you yourself happen to look at those videos?

A.    Yes.

Q.    And why did you do that?

A.    To be generally knowledgeable about the industry in the market.  A lot of our customers, you know, were on Shopify.  We would have wanted to know, you know, what's out there.

Q.    So you said Attentive Journeys was influenced by Klaviyo Flows.  How did Attentive use Klaviyo Flows to build up Journeys?

A.    Yeah.  So, I mean, a lot of companies had Journeys, just as a reminder.  And so Klaviyo would have been one of the newer companies that was out there.  And so we would have looked to them to just try and understand, you know, what's the minimum that we're going to need to be building to make sure that we're building something that is, you know, competitive with the market.

Q.    Triggering messages based on people -- what people were doing, did that exist before Klaviyo, Attentive and Postscript?

A.    Yeah, I mean, Salesforce had Salesforce Journey Builder, which came out in 2014 after they bought a company called ExactTarget, which they bought in 2013.  I think ExactTarget had Journeys in 2010.  I was sure that -- I mean, I only started working in 2011 so I'm sure that there's people that had it before them.

Q.    Why was Klaviyo Flows a source that you liked when developing Journeys?

A.    Yeah.  So Klaviyo just as background for folks, Klaviyo is an e-mail marketing company that are on Shopify. Shopify is an e-commerce solution so, like, the actual storefront that you go to, the website.  That's hosted on Shopify.  That's a Shopify website.  Klaviyo and Shopify together share the fact that most of their customers are small.  And so for Klaviyo to support those customers, it's impractical for them to do that with people.  They have, I think, at the time they would have had tens of thousands.  I think now they have a hundred-something thousand customers. So instead what they do is they have a really developed help site.  And so they all send their customers to their help site.  Hey, whatever your question is, it's answered on the help site.  So if we are trying to understand, you know

what's in the market, the Klaviyo help site is a reasonable, well-documented, you know, source, public source.

Q.    Was Klaviyo Flows able to send multiple messages based on triggers?

A.    Yes, of course.

Q.    Was Klaviyo Flows' ability to send multiple messages based on triggers, the inspiration behind Journeys' ability to likewise send multiple messages based on triggers?

A.    Yeah, we would have seen that as a minimum condition to hit, to build something.

Q.    Okay.  So let's wrap it up.  So overall, what is your response to the allegations that Attentive's Magic Composer infringes Postscript's patent?

A.    I don't think they're true.  Attentive had Journeys. Journeys are trigger-based messaging sequence that, you know, sends multiple messages in a sequence based on what somebody does.  That's something that we had for a long time.  It's something that other people had before us.  We did not invent it.  It's not new.  And so on the one hand -- I'm not a patent expert.  I'm not a patent lawyer, but we had the thing that sounds like is being described.

And then, Number 2, Magic Composer doesn't work like that whatsoever.  That's what Journeys does.  Magic Composer does something totally different, which is send this message at this time, send that message at that time,

don't monitor what's going on, just follow the rules.  So to me they don't seem related really at all.

MR. CAMPBELL:  Thank you, Mr. Miao.  Pass the witness.

THE COURT:  Okay.  Thank you.

Additional cross?

MR. SAULSBURY:  Yes.  Thank you.

ADVERSE REDIRECT EXAMINATION

BY MR. SAULSBURY:

Q.    Mr. Miao, do you recall Mr. Campbell asking you about the use of segments with Journeys?

A.    Yes.

Q.    Okay.  Now, a segment is just a group of subscribers, right?

A.    Yes.

Q.    And you said that if the subscribers joined the segment around the same time, they'd go on the journey together, right?

A.    Yes.

Q.    You gave the example of people joining a segment because they clicked a link in a campaign, right?

A.    Yes.

Q.    The reason you said around the same time rather than at the same time is because for each subscriber the journey starts when they join the segment?

A.     That might have been a slight lack of precision.  You can absolutely join at the exact same instance.

Q.     You can, but it's entirely dependent on when that person clicks the link, right?

A.     In that example that I gave, yes.  In other examples I gave, no.

Q.     Right.  It's -- a journey is dependent on the user's activity, right?

A.     In that example, yes.  In the product data example, no.  It's related to when the product changes, etc., and it changes at the exact same time for everybody.  And in that case, they would all enter at the identical time.

Q.     Well, something has to happen in order for me to go into the flowchart of a journey, right?

A.     Yes.

Q.     Okay.  And we're on the same page that something can be a subscriber joining a segment, right?

A.     Yes.

Q.     So the idea, as far as using segments with Journeys, is that joining a segment can be a trigger for a journey, right?

A.     Yes.

Q.     Great.  Now, a segment is something that you define ahead of time, right?

A.     Yes.

Q.    Okay.  Now, I'm going to switch gears.

I believe you said that Magic Composer is not important at all to Attentive's revenue, right?

A.    Retargeting is not.

Q.    Fair enough.  Well, Attentive's business model is that it makes more money as message volumes go up, right?

A.    Yes.

Q.    Because of this, Attentive's top-line revenue and message volume growth rate is the most important metric and the highest priority as a business, right?

A.    Can you just say that again?

Q.    Sure.  Because Attentive's business model -- or strike that.

Because Attentive makes more money as message volume goes up, top-line revenue for Attentive and message volume growth rate are the most important metrics and the highest priority for the business, right?

A.    Our highest priority is our customer success.  We would never do something that would lead to messages going up that we thought was bad for our customers.  So we definitely put our customers first.  Financially, you are right, that if our customers send more messages, we would make more money.

Q.    Why don't we take a look at DTX-53 in evidence and look at page 1.

MR. SAULSBURY:  Mr. Glass, if you wouldn't mind pulling it up.

BY MR. SAULSBURY:

Q.    You recognize this as the Attentive document that Mr. Campbell introduced with you?

A.    Yes.

Q.    Great.

MR. SAULSBURY:  And if we could, please, Mr. Glass, go to the paragraph that starts with, "Additionally, Attentive's business model," just blow up that entire paragraph.

BY MR. SAULSBURY:

Q.    And I'll represent to you that the bolding is Attentive's.  Do you see here that "Because of this fact, top-line revenue and message volume growth rate is the most important measure and our highest priority as a business," right?

A.    That's what whoever wrote this document says, yes.

Q.    Right.  Whoever at Attentive wrote this document, right?

A.    That's right.

Q.    Okay.  Now, do you recall the discussion with Mr. Campbell about whether Attentive was an 800-pound gorilla?

A.    Yes.

Q.    And there was a discussion of a couple different

annual revenue figures?

A.     Yes.

Q.     Okay.  Well, in 2024 alone, Attentive made $518 million, right?

A.     I take your word for it.

Q.     And that was annual recurring revenue, right?

A.     No.

Q.     Okay.

A.     It's usage based, primarily.

Q.     Sure.  We're on the same page.  So $500 million in usage-based revenue.  Let me switch gears once more.

        MR. SAULSBURY:  If I could please hand up -- if I could approach, Your Honor.

        THE COURT:  You may approach.

BY MR. SAULSBURY:

Q.     Now, Mr. Miao, I just handed you a document, that's PTX-562, that has a title "Product Priority Magic Composer." Do you see that?

A.     Yes, I do.

Q.     Okay.  And you see how the owner of the document, if you look in the legend at the top is -- it makes a reference to zmagdovitz@attentivemobile.com?

A.     Yes, I see that.

Q.     That's the same Mr. Magdovitz that you were talking about earlier?

A.      Yes.

Q.      Okay.

        MR. SAULSBURY:  I'd move to admit PTX-562.

        MR. CAMPBELL:  No objection.

        THE COURT:  It is admitted.

        (PTX Exhibit No. 562 was admitted into evidence.)

        MR. SAULSBURY:  Mr. Glass, you can actually take that down.

        Can I see the demonstrative, please?

BY MR. SAULSBURY:

Q.      All right.  Mr. Miao, do you recognize this as the demonstrative Mr. Campbell was showing you when he was asking you about the Shopify app store?

A.      Yes.

Q.      Okay.  And you were asked about a customer called Sprayground in the 2017 time frame, correct?

A.      Yes.

Q.      Okay.  The point that was made was that Sprayground was a customer who used Shopify services?

A.      Yes.

Q.      Okay.  Now, Attentive didn't launch on the Shopify app store until the summer of 2020, right?

A.      In the app store specifically, yes.

Q.      Right.  Okay.  And so this point on the timeline is

accurate, right?

A.     For the public version of the app in the app store, yes.

Q.     Right.  That's when you launched on the app store?

A.     Yes, that's when the app was in the app store.  That was not the only way our customers could get our app, but yes.

Q.     Actually, let me do this.

MR. SAULSBURY:  May I approach, Your Honor?

THE COURT:  You may approach.

MR. SAULSBURY:  Okay.

BY MR. SAULSBURY:

Q.     Mr. Miao, I've just handed you what's marked as PCX-13.

Do you recognize this as the Shopify app store page for Attentive?

A.     Yes.

MR. SAULSBURY:  Okay.  Move to admit.

THE COURT:  Is there any objection?

MR. CAMPBELL:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(PCX Exhibit No. 13 was admitted into evidence.)

BY MR. SAULSBURY:

Q.     If you could just turn to page 3 of the document, please.

A.     All right.

MR. SAULSBURY:  And, Mr. Glass, could you just blow -- yeah, exactly, perfect.  Thank you.

BY MR. SAULSBURY:

Q.     And so just direct your attention to the line that says, "launch," you see how it says July 2nd, 2020?

A.     Yes, that's the launch of the public Shopify.

Q.     Great.  So that's when it became available to the public?

A.     No, that's when it went into the Shopify app store.

Q.     Exactly, thank you.

A.     Which is not the main way our customers get it.

Q.     Right, but I'm talking about what's on this demonstrative.

A.     Yes.

Q.     Attentive launched on the Shopify app store in July of 2020, right?

A.     That's correct.

Q.     Thank you.

MR. SAULSBURY:  No further questions.

THE COURT:  All right.  Is there any redirect?

MR. CAMPBELL:  There is, Your Honor, briefly.

REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q.     Let's clear up any ambiguity for the jury, the

difference between the public and private Shopify app store.

So what is the public Shopify app store?

A.     Yeah, you can think about Shopify -- the same way there's an app store, you have an iPhone, there's an app store, you can download, Uber, Airbnb, etc. Shopify, for its merchants has an app store.  And the idea is, if you're looking for add-on features that Shopify may not offer, you know, themselves, in this case, it may be it's SMS Marketing, you might go into the app store and search, you know, "text message marketing" and you see an app.  That's basically the idea of the app store.

They take a commission the same way that the Android app store and the iPhone app store, Shopify app store takes a commission as well.

Q.     So the document that was presented to you says July 2nd, 2020, that's when Attentive launched in the public Shopify app store.  Is that the right date or is there an earlier date?

A.     That's when it went into that app store specifically.

Q.     Okay.  Were there other app stores that it went into?

A.     If you're a Shopify -- I don't know who has Android phones or not, but on Android, you can download an app from the Android app store or you can just install an app from lots of other different places.  Apple is a little bit different but I think Android and Shopify are a little more

similar so I'll use that analogy.

Attentive had an app that you could just get from us and use directly from us rather than an app store. It's called a private app.

Q.    Yeah.  And when was the first private app for Shopify available?

A.    That would have been, I think, June of 2019, maybe.

Q.    And then we are -- so June of 2019?

A.    I think so.

Q.    So let's put that on here.  So June of 2019.

A.    Yes, I think so.

Q.    And that's when Attentive was able to provide customers with the private app?

A.    That's right.  We would have been building it before that but I think that's when we actually started giving it to people.

Q.    And this is the private Shopify app?

A.    That's right.

Q.    But fair to say that all the way back in June of 2017 Attentive was supporting customers on the Shopify app?

A.    Yeah, the app store, the app store is more of what you can think of as like a distribution play.  So I think -- you know, I'm blanking on his name, J. Glazer, I think was the head of sales for Postscript that came up here.  I think he said when he started in January of 2021, they had two

sales people.  How did they get customers with two sales people?

They got customers because they had an app in the app store.  That's the basic idea.

Attentive just took a different approach.  We had a bigger sales team earlier and our sales team did direct outreach to people and that's how we got customers.  So it's just a difference in how we were trying to get customers more than anything, not who we supported.

Q.    Okay.  You were also asked some questions about this document.  This is the Magic Composer document, PTX-562.  In the middle, there's a problem statement.  Do you see that?

A.    Yes.

Q.    Okay.  It says, "Our Legacy Composer Flow irritatingly forced marketers to compose multi-message strategies one by one with no intelligent relationship between messages to enable use cases like rolled-up reporting or retargeting."

What is being conveyed by this portion of PTX-562?

A.    Yeah, it's basically saying our customers, as you could imagine, were sending -- you know, they might log in and go in and create a message and then go in and create another message in that same session.  They were obviously doing that for a long time.

The first Black Friday of Attentive, we had people logging in making their Black Friday message, making a Cyber Monday message.  They were doing that.

What it's saying is the workflow that we had where it was those three separate steps and then you'd have to, you know, start those three steps over again, it's what do we call it "irritating" to the marketers to go and have to do that.  And so that's basically what it's saying, is because they were doing it this way, it was a little bit suboptimal, it was irritating to them.

Q.     Did you consolidate three screens into one screen?

A.     Exactly.

Q.     Did that have anything to do with retargeting, consolidating three screens into one screen?

A.     No.

Q.     Okay.  Now, you were also asked questions about segments and it sounded like you were cut off a little bit in your answer.  So you said there is a product data segment?

A.     Yeah.

Q.     Expand on that for the jury.

A.     Yeah, so maybe there's a nuance -- I don't fully understand everything but maybe there's a nuance on whether things have to be simultaneous or not for how someone qualifies for a segment.  So I was trying to explain,

there's a range.  On the one hand, I can make a segment that people are only going to enter one at a time.  And that segment could be something like, you know, "has not clicked for 14 days."

And so you could imagine, it's pretty unlikely that people's clicks would be like at the exact right second for them to qualify for that segment, but the exact right moment.  So they might qualify on the same day, same minute, maybe not the same like millisecond.

There's another thing where it actually does happen completely simultaneously.  And so that would be if I've looked at a shirt and it's out of stock; you looked at a shirt, it's out of stock, it comes back in stock.  That's a thing that happens.  That's one thing that's happening.  And all of us who have looked at that shirt, we're all going to get collected at the same moment.  And so we're all going to join into that segment at the same time because the thing is not based on what we did only, it's, you know, we are a part of that segment.

And the last part is, and then the shirt is back, and so -- and then the shirt is back happens, obviously just one time and so we all join the segment and just one time.

Q.    So when the shirt is out of stock and all of those potential consumers are placed into that segment, that had

nothing to do with the consumer, they were just placed there?

A.     In the sense that they looked at it at some point but like the shirt coming back is that last step.

Q.     So the last step, when the shirt comes back in stock -- nothing the consumer did?

A.     Yeah, kind of completes the definition.

Q.     And you were also asked questions about top-line revenue, right?

A.     Yes.

Q.     Okay.  So let's talk very briefly about that.

        And how much of Attentive's revenue is derived from retargeting in Campaign Composer?

A.     I think it's like half of a percent.

        MR. CAMPBELL:  No further questions.

        THE COURT:  Okay.  Thank you.

        The witness can step down and I'll ask counsel to come forward to remove the binders.

        MS. JIAM:  We now call Adam Turner, who is Postscript's company founder and CEO, to the stand.

        THE COURT:  All right.  Come forward.

        MR. SAULSBURY:  May I approach, Your Honor, with binders?

        THE COURT:  You may.

        MR. SAULSBURY:  Thank you.

THE CLERK:  Please raise your right hand.

Please state and spell your name for the record.

THE WITNESS:  My name is Adam Turner.  A-D-A-M, T-U-R-N-E-R.

ADAM TURNER, having been duly sworn, was examined and testified as follows:

THE COURT:  Okay.

DIRECT EXAMINATION

BY MS. JIAM:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Can you please introduce yourself to the jury?

A.    Yes.  My name is Adam Turner and I am the cofounder and CEO of Postscript.

Q.    And at a high level, what is Postscript?

And I know we've be talking about it a little bit, so you can just keep it -- keep it short.

A.    Sure.

So Postscript is a platform that helps e-commerce merchants, people who sell things online, keep in touch with their customers through text message.

Q.    And from the perspective of an e-commerce merchant, what does Postscript do for it?

A.    Yeah.  So you've been hearing a lot about this, right?

We help our customers send the right message to the right person at the right time.  So, for example, if your order is going to be delivered, can send out a text message like that.  Or for a Labor Day Sale coming out this weekend, send out a text.

Q.    And can you give me a concrete example of a merchant that you know that uses Postscript and what that looks like?

A.    Yeah.  So I brought Old Bisbee Roasters with me, they're one of our very early customers.

(Reporter clarification.)

THE WITNESS:  And Old Bisbee Roasters is a company that's run by a man named Seth, and he's got a team with him, and they love finding farms around the world that are growing coffee and they roast them.  And originally Seth and his team were selling locally in busy Arizona and they used Postscript to help communicate with their worldwide customers as they moved into e-commerce, selling all over the country.

BY MS. JIAM:

Q.    And I would now just like to zoom out a bunch because we've be talking really in the weeds and I just want to talk about how we got here.

So let's talk, first, about your education after high school.

What did you do after high school?

A.      Yeah.  So after high school it had been a longtime goal of mine to become a pilot in the Air Force and so I had grown up with a friend of mine who was in a Navy family and they all went to the Naval Academy, and so I learned about the Air Force Academy.

So during high school, I applied and I received deferred acceptance into the Air Force Academy.  So I went to a year of community college after high school, and then I went into the Air Force Academy.

Q.      And did you ever end up flying fighter jets?

A.      I did not.

Q.      Why not?

A.      So before I got into the Academy, I received something called a pilot qualification.  It's a medical designation that says that you can fly.  And after I joined, unfortunately, they told me that -- after a series of medical tests and challenges with my eyesight, they told me I was no longer pilot-qualified during basic training.

Q.      How did you take that?

A.      It was really tough.  I had been working for a long time to -- to be a pilot to get into the Academy, and so it was tough.  I felt pretty lost.

Q.      And what did you do after you received that news?

A.      Yeah.  So like I mentioned, I was pretty lost.  So I talked with a few mentors that I had at the Academy, folks

who were officers, and I kind of said, hey, what should I do.  And they encouraged me to look at different paths available.

Q.    And so what path did you end up choosing?

A.    I ended up going to the University of Southern California.

Q.    And what did you study?

A.    I studied physics.

Q.    And how do you go from a physics degree to, like, starting your own software company?

A.    Yeah.  So during college I worked at a couple different startups, doing a lot of different things.  They thought me sales -- basic sales and marketing and business analytics and intelligence, and -- and I started learning how to code as well at those startups.  So I started picking up a few different skills that were important for starting a business.

Q.    And what did you do after working at those startups?

A.    Yeah.  So after that, I joined my brother in starting a company called Wiblits.

Q.    And around what time did you start Wiblits?

A.    This is around late 2015.

Q.    And what inspired you and Colin to build Wiblits together?

A.    So Colin and I grew up in a pretty entrepreneurial

household.  My dad had a lot of ideas that he was always trying and many of them were not successful, but just being around those ideas and that energy, I think really inspired us.  And he ended up having an idea that ended up working.

Q.    And what was the idea that ended up working?

A.    Sure.

So he was working in, you know, the very early internet and he was helping people get their degrees online.  So this was before -- you know, in the late '90s when you had to actually show up in person and get a degree, but there were plenty of people that couldn't show up and so he helped people get their degrees online.

Q.    And so turning back to Wiblits, what was Colin's vision for it?

A.    Yeah.  So Colin really wanted to create community through games.  It was a gaming platform that allowed, you know, people to create and play games with each other.  And one of the interesting use cases was being able to teach kids how to code so that they could make their own game and they could bring that back home with them and play with their parents at night.

Q.    And what was your role as Wiblits?

A.    Again, I did a lot of things.  I started out, you know, in marketing and growth, getting more people onto the platform, and then I also -- that's when I learned to code a

bit more and I coded the front-end platform.

Q.    And did people have to pay to use Wiblits?

A.    People didn't have to pay to use Wiblits.

Q.    So then how -- how did the company operate?

A.    Yeah.  So we wanted to eventually get to a scale where we could do advertising to pay for Wiblits, but until then we were just working off of savings from other companies that we had -- that we had worked at.  We kept it pretty small, pretty scrappy.  We worked out of a kitchen and didn't spend too much money.

Q.    And did people, in fact, use Wiblits?

A.    People did.  We had over 100,000 users of Wiblits.

Q.    And was Wiblits successful?

A.    I would not say that it was financially successful. You know, we didn't end up making money on it, but I would say that it was really important for, you know, learning how to build a business, learning how to get customers, and so for me I got a lot of fulfillment with what we did.

      And so not a financial success, but it was important for the journey.  Yeah.

Q.    And so what did you do after that?

A.    So after that, you know, we needed to pay the bills and so we, you know, split up and got different jobs.

Q.    And so when did you start working on Postscript?

A.    We started working on Postscript in March of 2018.

Q.    And did you start Postscript with your brother Colin again?

A.    I did, I started it with my brother.

Q.    And what led you and Colin to decide you wanted to start Postscript?

A.    Yeah.  So we were working on a few different ideas at the time.  We had kind of caught the bug at building software and we were excited about a few different things and we tried a few different things out.  They ended up not being successful.

And then a friend of mine who ran a Shopify store, I was out at lunch with him one day and he says, how come I can't text my customers.  So I thought, oh, that might be a nice idea to try out as well.

Q.    And so we've be talking, you know, throughout today about Shopify, the Shopify app store.

Can you explain a little bit what is the relationship between the Shopify store and the Shopify app store?

A.    Yeah.  So Shopify is the tool that people can use to sell things online.  It helps host your website, helps manage logistics and shipping and inventory management, and then you can add on different applications.

So, for example, if you need a tax tool to do taxes that year, you would add on the tax application from

the Shopify app store.  And in a similar fashion, you would add Postscript on the Shopify app store.

Q.      And so did you start building Postscript with the intention of making an application that could be downloaded on the Shopify app store?

A.      We did, yeah.

Q.      And in these early days, were you working on Postscript full time?

A.      We were not.  We were -- you know, I'd wake up very early in the morning and then I would code Postscript, and then I would go into work, you know, from 9:00 to 5:00, 9:00 to 6:00, and then I'd come back and code Postscript some more.  And then on the weekends, I would also work on Postscript.

Q.      And so when did you first get a sense that Postscript might be successful?

A.      Yeah.  I remember one of our early customers, they sent out their first campaign and they made $15,000 in five minutes and I got really excited because that seemed like a kind of early evidence that we were on the right track and I got really, really excited about it.

Q.      And you mentioned, right, that Postscript was on the app store.

        When did you launch it on the app store?

A.      We launched in September of 2018.

Q.    And when you launched, did you see any other applications on a Shopify app store?

A.    We had searched for SMS applications on the app store. I remember seeing one called SMSBump. Then I asked my friend, hey, have you -- have you tried this one. And he said, yeah, I tried it, it's not working. You know, they need to do something better out there.

Q.    And now, we touched on this at a very high level at the top of your testimony, but I'd like to dig in a little bit more.

So from the perspective of a Shopify merchant what does Postscript provide to them?

A.    Sure.

So we bring in the sales trends data and customer data from Shopify in to Postscript. This helps us send the right message at the right time to the right person, right? So if someone buys red shoes, then they might want to match that with a red shirt. So we bring that data in from Shopify so they can do that targeting.

Q.    And then after you launched on Shopify, what was the next big turning point for the company?

A.    I would say getting into Y Combinator.

Q.    And what is Y Combinator?

A.    Y Combinator is a startup accelerator. It's essentially a group of folks who have built their own

businesses before or are mentors for businesses and they help you get up and running your business.

Q.   And can any startup that wants to get into Y Combinator get in?

A.   No, you have to apply.

Q.   And do you have an idea of the percentage of applicants who actually make it into Y Combinator?

A.   They say it's about 1 to 2% of applicants get in.

Q.   Mr. Turner, if you could turn to DTX-85 in your binder.  Just take a quick look at that.

A.   Yep.

Q.   All right.  Do you recognize this document?

A.   I do, yeah.

Q.   And what is it?

A.   It looks like our application to Y Combinator.

        MS. JIAM:  Your Honor, I offer DTX-85.

        THE COURT:  All right.  Any objection?

        MR. CAMPBELL:  No objection.

        THE COURT:  All right.  It's admitted.

        (DTX Exhibit No. 85 was admitted into evidence.)

BY MS. JIAM:

Q.   Okay.  Now, it looks like this is, like, broken up into sections pertaining to each of the founders.  So if I could direct your attention to the second page and if you could just focus on the section with your name and then the

section underneath it.

Now, Mr. Turner, do you see the part where there's a question?  It says, "Please tell us in one or two sentences about the most impressive thing other than the startup that you built or achieved."

Do you see that?

A.    Yes.

Q.    And then under it, it says, "Number 1, out of 1,200 students in computer science, during my freshman year at the Air Force Academy, scored perfectly on the final exam and was questioned for cheating."

Do you see that?

A.    Yes.

Q.    Did you cheat your final exam?

A.    I absolutely did not.

Q.    Okay.  And did you score perfectly on the final exam?

A.    I did, yeah.

Q.    And how do you know that?

A.    I remember when you turned in the exam, it was for computer science, and so they graded it right there in front have you automatically.  And I remember they were able to tell me that I scored perfectly.

Q.    And this indicates that you were questioned for cheating.  So what was that about?

A.    Yeah.  So I remember I was one of the first people

out of the exam.  And I had just found out I had scored perfectly.  So when I told my roommate about it, he was like, oh, you must have cheated.  And I was, you know, kind of proud that he would think that because I had scored perfectly and left so early.

Q.   Now, let's just --

MS. JIAM:  You can take that down.  Thank you, Mr. Glass.

BY MS. JIAM:

Q.   Let's just turn back to Y Combinator.  So what did getting into Y Combinator mean for Postscript?

A.   I would say it was a great validation for the work that we had been doing up to that point, right?  We had had a failed startup before so it was a nice confidence boost for other people to recognize the work that we were doing.

MS. JIAM:  So, Mr. Glass, if you could please show PDX-2, the first slide.

BY MS. JIAM:

Q.   Do you recognize this photo?

A.   I do, yeah.

Q.   What is it?

A.   This is a photo of me and my cofounders.  Colin, my brother, is on the left, and Alex Beller is on the right.

Q.   And we've be seeing this, like, logo.  Is that the Shopify app logo?

A.    Yeah.

Q.    And around what time was this photo taken?

A.    This was during Y Combinator.  It was around February of 2019.  And Shopify had asked us to come to one of their locations and speak to some of their merchants to help educate them about SMS Marketing.

Q.    And do you remember how many merchants you spoke to during this event?

A.    It was probably 30 or 40.

Q.    And did any merchants sign up after the event?

A.    Yeah, I would say 10 or 15 of them signed up.

Q.    And who was involved and working on Postscript in this period of time in February 2019?

A.    It was just the three of us.

Q.    And who was writing the code for Postscript?

A.    Colin and I were both writing the code.

Q.    Is that all you did?

A.    It is not all we did.  We did, you know, a lot of different things.  We would bring on new customers.  We would do, you know, sales and marketing.  We did a lot of customer support.  So we were all -- all three of us were doing a lot of different things, yep.

Q.    And you mentioned customer support.  What does customer support looked like for you, Colin and Alex?

A.    Yeah, so we really cared about this.  And I had

hooked up something so that whenever a customer would write in to our customer support tool, it would ring all of our cell phones at once so that we could hop on a computer and start talking with the customer.

Q.    Did the three of you have to work out shifts to cover the night?

A.    We weren't smart enough to work out the shifts to cover the night.  It would just ring, and all three of us would just wake up in the middle of the night for the customer.

Q.    What was it like running Postscript during those days?

A.    It was -- it was challenging and also rewarding, right?  Because of, you know, that customer first experience of just getting on the phone with them and talking with them, we received those early reviews on the Shopify app store, and that got more customers to see Postscript and install it and use it.  And so we were getting more and more customers which was exciting and also it was the just the three of us so it was a little overwhelming.

Q.    During this period of time, were you aware of other SMS Marketing platforms?

A.    Yeah, I'd say we were aware of Attentive, again, SMSBump, another company called Emotive, and I think ChatKit was another.

Q.      And so these other companies, how did Postscript stand out from the competition?

A.      Yeah.  I would say that early on the integration with the Shopify app store was really helpful for merchants. There really weren't other folks that were so deeply integrated with those tools so that you could target, you know, the red shirt and the red shoes and also do a lot of other things, like I mentioned.  You know, like sending out a message when the order was going to be delivered, that all came from the deep integration with Shopify.

Q.      And why did you decide to focus on Shopify?

A.      So Shopify allows -- you know, it's for everyone. You can start your own business on it.  You can start your first business on it.  And then also some of the largest companies in the -- e-commerce companies in the US use Shopify, so we wanted to service everyone from those small companies to the largest.

Q.      And so if we're fast-forwarding to today, are those the types of customers that Postscript serves?

A.      Yep, we service all those customers.

Q.      All right.  Now, many of us aren't really familiar with actually what Postscript's platform looks like.  So I thought it would be helpful if you could just show the jury what it's like interacting with the Postscript platform.

        So what is the first thing that a merchant would

see if they log in to the Postscript platform?

MS. JIAM:  And, Mr. Glass, if you could just show us PDX-2, the second slide.

BY MS. JIAM:

Q.     So, Mr. Turner, what is this?

A.     Yes.  So this is the Postscript dashboard.  You've got some information.  It's what a person sees when they first log in.  You got some information here about how much revenue they've earned through using Postscript, how many people are subscribed to their store, and other metrics around message performance or how their SMS program is doing and maybe things that they can do to make their program better or things that might be missing.

Q.     And to the left of this image, there's, like, a bunch of categories.

       What are those?

A.     These are all the different categories of features that exist inside Postscript.

Q.     And if you're a small business that's interested in using Postscript, how much do you need to pay?

A.     Our minimum plan is $30 a month.

Q.     And do you have an understanding of the percentage of Postscript's customers that are paying under this minimum plan?

A.     Yes.

Q.    What is that?

A.    80% of our customers pay $50 or less.

Q.    And is there anything about Postscript that makes it especially suitable for small businesses?

A.    Yeah.  I would say that our goal is to get people up and running very quickly.  So folks can get up and running within 15 minutes of installing Postscript on the Shopify app store.  And also all of our tools are built to be easily used by anyone.  So like I mentioned, Seth from Old Bisbee Roasters, Seth has five people on his team.  He doesn't have an expert marketer on the team.  They're all, you know, coffee roasters, and they like doing that.  And so we try and make the product available and useful to the folks that that may not be their full-time job to be a marketer so we make things very easy for them to use.  And then under the hood, we take care of all the complexity for them.

Q.    And are there any specific features that you can think of that are especially helpful for small businesses?

A.    Yeah.  I would say that Campaign Flows is very helpful for small businesses.

        MS. JIAM:  And so, Mr. Glass, if you could go to Slide 3 of PDX-2.

BY MS. JIAM:

Q.    I know Mr. Miao earlier had shown a walk-through.  Is this the Campaign Flows feature we've be talking about all

day?

A.      Yes, this is Campaign Flows.

Q.      And why is the retargeting feature in Campaign Flows so useful to merchants?

A.      Yeah.  So I'll use the Labor Day example again.  So many merchants will want to send a message on Labor Day, maybe, you know, Saturday, Sunday and Monday.  And they want people who buy on Saturday, you know, to maybe not get a message on Sunday or get a "thank you" on Sunday.

So Campaign Flows helps a merchant schedule those messages ahead of time, and then the messages are able to change based on what a subscriber does.

Q.      And historically has Campaign Flows been a way for Postscript to stand out from the competitors?

A.      Yes, it has.

Q.      And has it been a way for Postscript to distinguish itself from Attentive?

A.      Yes, it has.

Q.      Is it a way for Postscript to distinguish itself from Attentive today?

A.      It is not.  Merchants see their Campaign Composer product as identical.

Q.      And just to get a sense of how instrumental Campaign Flows is to Postscript customers, do you have a sense of --

(Reporter clarification.)

Q.      Just to get a sense of how instrumental Campaign Flows is to Postscript customers, do you have a sense of the percentage of messages that are sent through Campaign Flows?

A.      I do.

Q.      What is that percentage?

A.      More than 60% of all messages that Postscript sends goes through Campaign Flows.

Q.      Is Campaign Flows important?

A.      It's very important, yes.

Q.      And earlier, did you hear -- you were sitting here, and did you hear Mr. Jhawar say that Campaign Flows and Campaign Composer are, you know, standard in the industry.

        Did you hear him talk about that?

A.      I heard him say that, yeah.

Q.      Is that correct?

A.      It is absolutely not correct.

        Before Campaign Flows there was simply no way to schedule multiple messages like in that Labor Day example and have those messages change based on what a subscriber does.

        MS. JIAM:  And now, Mr. Glass, could you please pull up DTX-198.  And I believe it's a -- yes.  Okay.

BY MS. JIAM:

Q.      Now, Mr. Turner, do you remember when Attentive's lawyer in his opening presentation, he showed like a

screenshot from this, and they called it the smoking gun.

Do you remember that?

A.    I do remember that, yeah.

Q.    This is a Postscript document, right?

A.    Yes, yeah.

Q.    Are you familiar with it?

A.    I've seen it a few times, yeah.

Q.    And what is it?

A.    This is a document that lays out all of our different features, and it talks about if those features exist on other platforms.

Q.    And I'd like to just kind of go through the features that have been discussed today.  So we see there's a feature, and then there's feature details.

MS. JIAM:  So if you can scroll a little bit down, Mr. Glass, where Campaign Flows is kind of that gray row is at the top.  Scroll back up a little bit.  Sorry.  Just the Campaign Flows.  All right.  Perfect.

BY MS. JIAM:

Q.    Okay.  So let's start with -- actually let's talk about subscriber response branching first.

Do you know what subscriber response branching is as a feature at Postscript?

A.    I do, yeah.

Q.    Okay.  What is it?

A.     It allows the messages in the Campaign Flows to change based on how a subscriber replies.  Right.  So a hair care company might ask, you know, do you have curly or straight hair?  And if the subscriber replies straight hair, then it puts them down a different message.

Q.     And do you see how -- next to this feature where there's Attentive, it says "No."

       Do you see that?

A.     Yes.

Q.     Okay.  Does the fact that there's a "no" in this box mean that Attentive's Campaign Composer does not have branching in general?

A.     No, these are all extra features on top of Campaign Flows.

Q.     And so let's look at the next one.  It is says "nested branching."  Do you see that?

A.     I do, yeah.

Q.     Can you explain to the jury, what is nested branching?

A.     Yeah, nested branching is a branch within a branch, right.  So again, it's a hyper-advanced feature in Campaign Flows that allows you to say, you know, "Do you have curly or straight hair?"  And if they reply straight hair, then you'll have another split where you can ask them a different question of, you know, "Is it oily or dry," and they can

answer another question.

So it's a more advanced version of branching where you can have branches inside of branches.

Q.    And do you see where it says -- on the Attentive column, it has a "no" in that box?

A.    I do.

Q.    Does the fact that there's a "no" in that box mean that Attentive's Campaign Composer feature doesn't have branching in general?

A.    It does not.  These are all advanced features that are on top of the core of flow building Campaign Flows innovation.

Q.    And let's go one more down to "Wait for order created."

Okay.  Do you know what this feature is?

A.    Yes.  So this is the ability to wait for a period of time and change the message based on if you know that someone created an order or did not create an order.

Q.    Okay.  And does the fact that there is a "no" under Attentive's column in this box mean that Attentive's Campaign Composer feature doesn't involve, you know, sending to a segment of subscribers a retargeted message?

A.    No, it doesn't.  Again, these are additional features on top of the Campaign Flows product.

Q.    And so let's just go back up a little bit to that

yellow box where it was Campaign Flows, generally.

You see where it says "limited" and then it says "Magic Composer," further down, "does not support advanced branching, including responses." Do you see that?

A.    I do.

Q.    What is "advanced branching, including responses"?

A.    Yeah, so advanced branching, including responses is that additional feature, the ability to change a message if someone says they have curly or straight hair. And I think of these features as kind of the bells and whistles on top of Campaign Flows. Right.

So if you have, for example, a cake and ice cream, these are like the sprinkles that could be put on both.

Q.    Now, in these red boxes, you see -- you know, both Attentive and Klaviyo, you see how it says "no," and for some of the answers it says, "this supported on automations/Journeys," right, or in the Klaviyo one, there's one that says, "this is supported in automation flows." Do you see that?

A.    I see that.

Q.    Okay. And do you remember when, you know, Mr. Campbell, he was kind of talking about these three and he's talking about, these features being supported in Attentive's Journeys feature?

A.      I remember, yes.

Q.      Okay.  Is Journeys a type of automation?

A.      Journeys is a type of automation, yes.

Q.      And also, do you see where it says here under Klaviyo, says, "this is supported in automation flows."  So do you understand that to refer to an automation?

A.      Yes.

Q.      And can you tell the jury just generally, how is Campaign Flows different from automations?

A.      Yes.  So I think we've heard a lot about this.  These are completely separate products.  I think they were mentioned that they are opposites.  Right.  So automations and Journeys, right, it's like the ice cream example, you can still sprinkle these extra features on top of this but it's still very different than cake.

        So Campaign Flows and automations are entirely different products used for entirely different use cases.

Q.      And even if Journeys or Klaviyo's automation flows has these features, would a merchant be able to replicate the functionalities of Campaign Flows by using Attentive's Journeys or Klaviyo's automation flows?

A.      No, I believe it would be impossible.

Q.      Why?

A.      Campaign Flows and Campaign Composer send messages to a group of people, multiple messages to a group of people.

And they are initiated by the merchant clicking "send" for the Labor Day sale.

Automations and Journeys are meant for a single subscriber and they're initiated by that subscriber doing something in particular.  So they are abandoning a cart or buying something in particular.  They're not sending to groups of subscribers, schedule that after.

Q.    And do you remember, you know, just switching gears a little bit.

MS. JIAM:  You can take this down, Mr. Glass. Thank you.

BY MS. JIAM:

Q.    Do you remember when Attentive's counsel, when your colleague, Mr. Glazer was on the stand, they showed that, you know, financial spreadsheet showing Postscript's revenues and profits and losses?

A.    I do, yeah.

Q.    Are you surprised that Postscript is losing money every month?

A.    I'm not surprised.  We're doing that purposely.

Q.    Why?

A.    We are investing money actively in technology and R&D, building our product.  It's similar to, you know, Amazon basically lost money for, you know, nine years.  This is a typical and normal strategy.

Q.      And switching gears again, do you remember when you were sitting here and Brian Long, he said he wasn't sure if Attentive ever sent out Dom to customers.

Do you remember that?

A.      Yes, I was here for that.

Q.      Do you know if Attentive did in fact send out Dom to merchants?

A.      I do, yes.

Q.      And how do you know that?

A.      They sent Dom to a lot of our customers.  This was something that was widely known throughout the industry, actually.

MS. JIAM:  And Mr. Glass, can you please pull up PTX-571, slides 9 and 10, the one we were looking at earlier with Ms. Durie and Mr. Jhawar.

BY MS. JIAM:

Q.      Now, you were sitting here and do you recall Mr. Jhawar saying he wasn't sure if Postscript paid or, I don't know, gave some kind of credit or something like that to BUBS Naturals for their testimony.  Do you remember that?

A.      Yes, I remember that.

Q.      Do you know the answer to that question?

A.      I do know the answer.

Q.      Okay.  And did Postscript pay or give credit or anything like that to BUBS Naturals for their testimony?

A.      No, we did not give any compensation or credits or any compensation at all to BUBS Naturals.

Q.      All right.  So we're wrapping up and I'd like to just take a step back a little bit and talk about our time here today and for the rest of the week.

        Are you proud of your work at Postscript?

A.      Yes, I'm very proud.

Q.      Okay.  And what are you most proud of about your work at Postscript?

A.      I would say that I'm most proud of our team.  They spend a lot of time doing hard work.  And a lot of them are so incredible, I feel really grateful ever day to be able to work alongside of them.

Q.      And are you going to be here throughout the rest of this trial?

A.      I will, yeah.

Q.      Why?

A.      This is a really important trial for us.  We are a smaller company than a lot of your competitors.  The team put a ton of work into this new innovation and we got it patented. And so I'm here representing the team and defending the patent.

        MS. JIAM:  All right.  No further questions.

        I'll pass the witness.

        THE COURT:  All right.  Cross-examination.

MR. CAMPBELL:  Your Honor, we would request to approach.  We think we need to address an issue with you.

THE COURT:  Okay.  All right.  We'll have a sidebar.

(Sidebar discussion.)

THE COURT:  Okay.  All right.  So Attentive has an issue to raise?

MR. WOOD:  Yes, Your Honor.  We believe this relates to the issue we spoke about this morning with respect to the StackCommerce issue and you had advised, you thought, based on the evidence so far that the evidence wasn't relevant and asked us to approach and seek leave before getting into information about StackCommerce and we believe the door has been opened on that issue.

Mr. Beller testified about Postscript's success via Y Combinator and being accepted into the Y Combinator qualification program.  He talked about how impressive that was and that a very small percentage of individual companies are accepted into that program and they placed into evidence DTX-85 which is the application that Postscript submitted.

THE COURT:  Sorry.

MS. JIAM:  It's right here.

THE COURT:  Okay.  Let me let you continue.

MR. WOOD:  Sure.  So we believe there are three material misrepresentations in the Y Combinator application

that go to -- to discredit and rebut the idea that Postscript was accepted into Y Combinator based on their technological process.

It also goes to just impeaching Mr. Turner's character truthfulness.  So I would direct you to DTX-85, page 2.  Says Adam Turner's question -- specific to Adam Turner, the very last one he's asking accepted to WC, will you commit to working exclusively on this project for the next year?

Clarifies that this is a required question and it means no school, no other jobs.

Mr. Turner answered, yes, below.

THE COURT:  Can I just stop you for a second? So just to recap in my mind.

MR. WOOD:  Yes.

THE COURT:  I understand that, I guess at least Mr. Beller used to work at a company called StackCommerce while he was working at Postscript and there was some qualification that while he was at StackCommerce, he asked or obtained information from Attentive and there was an allegation that whatever information that came from Attentive may have been utilized in such a way that Postscript's offerings assert he had likely infringed Attentive's patents.

And my ruling earlier was that because

Attentive's claims of patent infringement are no longer in the case, and because Attentive had previously argued that this information of Mr. Beller obtained from Attentive was solely relevant to infringement issues, couldn't move for this and it just wasn't relevant to the claims and defense at issue in the case.  That's setting the table.  That's what I mean.

I understand Mr. Turner, I guess, somehow may be involved in StackCommerce, too, or something, but don't really know many details?

MR. WOOD:  Correct.

THE COURT:  I'm not really following yet so far what this Y Combinator issue has to do with this.

MR. WOOD:  The preview, there's a specific e-mail that I understand is kind of the subject of this concern.  It is DTX-86.  It is -- it is the e-mail where Mr. Beller had communications with -- had communications with Attentive.

And it also indicates that Mr. Turner was on the initial meeting with Postscript and that he was part of this e-mail communication as well.  And this is relevant for a couple of reasons too --

THE COURT:  I'm sorry, we're calling this a StackCommerce issue.  Mr. Turner worked at StackCommerce?

MR. WOOD:  Yes, he did.  That's reflected in

this document.

THE COURT:  So you're saying there was some meeting between Mr. Turner, Mr. Beller when they were associated with StackCommerce and Attentive?

MR. WOOD:  Yes.

THE COURT:  Okay.

MR. WOOD:  This document shows that they were aware of Postscript.

THE COURT:  Excuse me.  It's hard because it's a fine line.  I want our court reporter to be able to hear so of course we're at sidebar so keep it in the middle range.

MR. WOOD:  This e-mail shows that Adam Turner and Alex Beller were both aware of Postscript in 2018.  It also shows that -- excuse me -- of Attentive in 2018.  It also shows that Alex Beller and Adam Turner are still using their StackCommerce e-mail addresses as late as January 2019.  That is relevant to the Y Combinator application, DTX-85, because both Adam Turner and Alex Beller committed in the Y Combinator application to work full-time for Postscript if they were accepted into the Y Combinator in combination or which began at the beginning of 2019, before this e-mail was created where they still have access to and are using their StackCommerce e-mail accounts.

MS. JIAM:  Sorry, Your Honor, I have one point that might just cut this all short.

The Y Combinator program didn't start until January of 2019. There's no evidence in the record that Adam Turner was still working with StackCommerce in January 2019, and so I don't really see how this application that says, if you're accepted, will you work exclusively.

This e-mail that they're showing, Adam Turner is cc'ed but he's not talking in any of these communications, certainly not after -- once January 2019 had started.

MR. WOOD: Your Honor, this e-mail was sent January 21, 2019, by Alex Beller to Adam Turner at his StackCommerce address. That's at least circumstantial evidence. Alex Beller also made the same commitment and is using his StackCommerce address.

THE COURT: So far I think what you're telling me, if this is right, is that why this is coming up is because I made a ruling about this StackCommerce-related evidence. So it's StackCommerce-related evidence because at least earlier it was understood to be evidence related to the allegation of copying of Attentive's products. It needed to be raised and you're raising this because this is an issue about a document that relates to Mr. Turner and Mr. Beller's comments now?

MR. WOOD: Correct. This e-mail is a communication with Attentive where Mr. Beller is asking Attentive for information that is eventually conveyed.

I think that was the substantive concern about the potential prejudice and whether that can be misleading. The purpose we're trying to introduce this document for is to show, one, the simple fact that they are communicating using their StackCommerce e-mail addresses when a time -- when they had represented and committed they would no longer be working for anybody else except Postscript.

THE COURT:  And you're saying in this Y Combinator application, Mr. Turner is saying -- he's -- Mr. Turner is saying that if he's accepted to Y Combinator, he will commit to working exclusively on this project for the next year?

You're saying it's a Postscript project?

MR. WOOD:  Yes.

THE COURT:  You're saying you want to introduce this e-mail because Y Combinator, I guess, started in January 2019?

MR. WOOD:  Correct, Judge.

THE COURT:  And you're say there is some evidence that Mr. Turner was still working for -- or still working for StackCommerce at this time.  And you're saying this information is false or incorrect and that's relevant you're saying, to his mention of truthful.

MR. WOOD:  It's relevant to truthfulness.  It's also relevant to the circumstances under which Y Combinator

accepted Postscript into the program which Postscript was taught had -- as an example of and evidence of their commercial success and was an innovative company.

THE COURT:  What is relevant?

MR. WOOD:  It's just going to the story of, you heard testimony -- you heard testimony and we've heard statements in opening statements that Postscript came in, was a very successful, very exciting company and Attentive was essentially kind of jealous of that success and was trying to do what they could to keep up with Postscript, such as using their patented technology.

This is going to combat and rebut the notion that Mr. Turner just testified about, that they were accepted to Y Combinator which was a testament to the success and the innovation of Postscript.  This is casting doubt on it.

THE COURT:  Why is it casting doubt?

MR. WOOD:  Because they were accepted into Y Combinator based on recommendations and commitments that ended up not being correct.

And there's a second --

THE COURT:  Because of this issue about --

MR. WOOD:  Because of that and one other one, so it -- this is a really important issue.

I'm wondering if we should just let the jury go.

THE COURT:  The jury is here until 5 o'clock.

This is an evidentiary issue.  We'll deal with it like we have all others and time will be counted.  I'll address it, but their time is being used too.

But in that regard, Mr. Wood, I'll ask you to try to conclude because I want to hear from the other side.

MR. WOOD:  Yes.  Apologies.

I'm looking for it right now so I can direct Your Honor to it.  The competitors -- there's a question in here where they're asked to identify their competitors.  It's on page 6 of the application.  Around the middle of the page, it says, "Who are your competitors?  Who might became competitors?  Who do you fear most?"

There are a number of companies listed in this application, Postscript is not one of them -- excuse me.  Attentive is not one of them.  This e-mail --

THE COURT:  What does this have to do with this document?

MR. WOOD:  This e-mail is a communication between Alex Beller and Adam Turner, who are part of the founders of Postscript who put together this application.  They're e-mailing in this e-mail communication with Randy Cohen of Attentive asking for sales decks and promotional sales material from Attentive.  So this shows that they were aware of Attentive -- or were aware of their business, what

they did, that they were operating in the same space, and yet made the decision not to include them in a question on the Y Combinator application that was calling for who their competitors were.

THE COURT:  Okay.  Let me here from Ms. Durie.

MS. DURIE:  If I may address this.  This last colloquy is a perfect example of the rabbit hole they're going to go down.  The Y Combinator application is from October.  This e-mail, its three months later in January. So the fact that in January they became aware of Attentive says nothing about the fact that they made some misrepresentation on the Y Combinator application when they listed -- the fact that in January they had an e-mail with Attentive says nothing about the truthfulness of the recommendations they made the prior October in the Y Combinator application where they were.

THE COURT:  So in response to Mr. Wood's assertion that this e-mail is relevant because it's in evidence that they're aware of and know of Attentive and that Attentive would be a competitor for Postscript, you're saying that's in January of 2019.  To the extent it's being offered to rebut a reference in this document, the document is months earlier?

MS. DURIE:  That's correct.  That's right.  And I mean, I think the fundamental sort of core issue is

nothing he said here -- I mean, this was the most benign and vanilla testimony.  We put in the application that they made.  I don't think anything has been suggested that has anything to do with copying patent infringement issues that were the reason this was being excluded and it would be an enormous timing and distraction to have to get into it because the allegations are wrong, but we're going to have to bring a bunch of witnesses to prove that.

THE COURT:  When you say "the allegations," the allegations about what happened at StackCommerce with respect to StackCommerce?

They're trying to create the suggestion that the Postscript employees did something nefarious by sending these e-mails on behalf of StackCommerce where they had been working as consultants and had been hired.

THE COURT:  So far, the initial assertion is as to what information they could use or raise does -- doesn't seem to have anything to do with those other allegations about copying, etc.

MS. DURIE:  I think this is why they're trying to put this in front of the jury because they want to use this as a way to make those other arguments and make that subject matter.

THE COURT:  And what's your response to the first -- second?

You addressed the second one, which related to this statement about competitors, but the first argument had to do with whether Mr. Turner was credible when he was saying he was going to work full time on this first Postscript project with regard to Y Combinator.

MS. DURIE:  So he made a commitment to Y that he would work full time.  He lived up to that commitment.  It started in January.  In January -- all this shows is that he's copied on an e-mail.  It doesn't show that he didn't devote full-time hours to Postscript.  Says nothing about that.

THE COURT:  Okay.

MS. DURIE:  He's at most wrapping up a consulting job.  It doesn't say about whether he fulfilled to commitment.

THE COURT:  Is there something else about the content of it that you are concerned about or is your major concern that if they're allowed to go beyond -- use this one document for the purpose of at least potentially suggesting that it wasn't correct to say he was only going to be working for Postscript.

MS. DURIE:  My concern is exactly what they want to get into is the exact subject they want to talk about.  The fact that they asking for the sales deck with pricing and guide to developers and the free 30-day trial.  This is

the substantive StackCommerce evidence that we have been arguing about and the Court excluded.  They're trying to use this e-mail to put in that there was a request for this information from Attentive.  That's the StackCommerce evidence.

THE COURT:  Okay.  Mr. Wood, what do you say that about?  What if we just redacted this?

MR. WOOD:  So I think that's relevant to the question of knowledge of Attentive because this is the information they received.  That same deck is -- can go to the information about how Attentive does their business. When they see this information, it should cause them to be aware of the fact they're asking for this information.  It shows that they're aware.

THE COURT:  This is part of the second argument.

MR. WOOD:  Nothing about the competitors.

THE COURT:  What do you say about Ms. Durie's assertion that, well, if this is asserted to be a statement, if this e-mail is in January of 2019, it's why the document was written months earlier, though, so the time was not that far off.  The initial meeting was in 2017.  If the representation that the Y Combinator application was made in October, that's not too far off.  I think there's at least an inference can be drawn from the jury that if you're setting up a meeting in December you very well have to have

known about these people ahead of time.  It's possible that they heard about them on December 3rd and reached out on December 4th.  It's also possible they thought about them for a while, and that's why they were asked to go find a company that does this stuff.  They reached out to Attentive.

The other point I would make is the application, the representation is the application happened in October.  The incubator started in January.  So they put in this application.  The application's pending.  At some point in that time, it's accepted, and they start the incubator.  And during that time, if they didn't know before, they certainly know by December 4th that one of the questions that they answered is actually not true because they now have information about a very relevant competitor.

To the extent they didn't have it, they certainly have it before the incubator begins and I think we are allowed to ask, did you update Y Combinator?  Did you amend your application?

I guess it seems so tangential, this one piece of this one document, whether you updated it, updated the information.  Isn't that really tangential to the issues at play in the case.

MR. WOOD:  I don't think so, Your Honor.  One, I mean, Adam Turner is a corporate representative, and the CEO

of Postscript.  I think we should be able to inquiry into his character for truthfulness.

I also think there was --

THE COURT:  And per what rule, talking about Rule 608?

MR. WOOD:  Yes.

THE COURT:  I see that we -- here's what I think we should do.  We are now very close to 5:00.  Okay.  And I don't want to keep the jury after 5:00.  And because we're at the end of the day, what I think I'll do is ask the parties to -- and I'll talk about the formatting of this in just a second -- to ask them to supplement their arguments here so I can have a chance to consider it more thoughtfully, maybe by a one-page submission, and I can make a call before we begin testimony, before I use any more time for the parties and the jury.

Does that make sense?

MS. DURIE:  Yes, thank you.

THE COURT:  Okay.  Let's do that.

(Sidebar discussion concluded.)

All right.  Ladies and gentlemen of the jury, the sidebar we had seemed to take us right up to 5:00.

Okay.  So I wanted to make sure to take us to the that point to end our trial day today.  And before I let you go, I'll just remind you, as always, about your

instructions I gave you and the importance of not discussing the contents of the trial or what you learned about any other person until you begin deliberations at the end of this week.

Ask you to be here at 8:45 again tomorrow, and we'll begin at 9:00.  Okay.  And we appreciate your patience and hard work as always.  And with all that said, I'll ask my courtroom deputy to lead you out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.

MS. DURIE:  There is one other issue that I would just like to raise with Your Honor if I may.

THE COURT:  Sure.  Just hold on one second.

All right.  Just to -- with regard to the dispute at issue there, what I'll ask each side to do, obviously the sides, to the extent they have any, will be submitting by 5:30 this morning their -- any issues that I need to resolve at our 8:30 meeting.

I think just as a practical matter it's probably better for you to give you more time.  A lot going on.  Why don't I say by that same time I'll ask each side to submit a letter of no more than one single-spaced page that provides any further argument about the extent to which Attentive should or should not be able to use the

StackCommerce-related document that we were discussing in their cross-examination of Mr. Turner.  And I'll consider that and address it with you tomorrow morning at 8:30 to resolve it so that we can move forward from there on in.  Okay.

MS. DURIE:  I would like to add one other candidate to the list of such short briefs to go in.  There were two undisclosed invalidity theories that were raised during Mr. Miao's testimony.  One has to do with this idea of quiet hours.  The other has to do with idea of a product-change event triggering an event.

Neither of those are disclosed in the invalidity contentions, and we think that -- and we're happy to put in simultaneous briefing or whatever would work best for Your Honor, but we think that Attentive should be required to identify where they believe that has been disclosed, because it has not been and we think that if to the extent we are correct it has not be disclosed that testimony should be stricken and there should be instructions they are not to make that argument to the jury.

THE COURT:  Is this something that the other side is hearing you say for the first time, Ms. Durie?

MR. WOOD:  This is.

MS. DURIE:  It just happened during Mr. Miao's testimony so we have not met and conferred, and I'm happy if

the suggestion is that we do a meet and confer.

THE COURT:  Absolutely.

MS. DURIE:  But I wanted to let Your Honor know because if you think this is an issue we're going to need to tee up with you, I think it might be helpful for us, after we've met and conferred, to make submissions to Your Honor on the subject.

THE COURT:  Mr. Wood, what I think I hear you saying, no, we have not met and conferred, this is the first we're hearing it.  I don't even know if the testimony asserted by is, in fact, to be related to some type of invalidity theory.  If it's not, maybe it's not.  I don't know.  Parties haven't had a chance to discuss it at all.  And I don't have any idea whether it rises to the level where I need anything other than the type of indication that it still remains an issue that I would get in the parties' list of objections in the morning.

So I'll just ask the parties to put it on their list to meet and confer about tonight.  If it is one that is still unresolved in some way, they can put it on that list of issues.  I don't know that I need additional briefing beyond that at this stage.  Call for it in the form of those one-page briefs with regard to the substantive issue we discussed today.

So that's how we'll leave that.

Any further logistical issues on Postscript's side?

MR. SILVER:  Your Honor, did you want those one-page letters on the docket or just submitted with the 5:30 e-mail?

THE COURT:  That's a good question.  Why don't we submit those on the docket, I think.  They're a little more formal.  They do relate to an issue that was raised during trial time so I think it probably makes sense to have them submitted on the docket, but we'll do it by the 5:30 cutoff, okay.

MR. SILVER:  Understood.  Thank, you, Your Honor.

THE COURT:  Okay.  Anything logistical on Attentive's side?

MR. WOOD:  Two things, Your Honor.  First, I'd just -- I'll raise it as a reminder because I didn't hear it listed in your things you wanted by 5:30.  I understand that Attentive owes you a responsive letter with regard to the claim construction issue that was raised by 5:30?

THE COURT:  Yes.  Sorry.  I thought that was already -- yes.

MR. WOOD:  I just wanted to make sure.

THE COURT:  But we won't address that in substance.  You're going to be meeting and conferring with

them as well because, who knows, I may not need to -- the parties may agree I need to or may not need to construe a term but, yes, your submission due by 5:30.

MR. WOOD:  I also wanted to point out that Mr. Turner is currently testifying and he's been passed as a witness and has been under cross-examination so didn't really -- given the discussion we had at sidebar, we ask that he be instructed not to discuss his testimony with counsel.  Directed not to discuss his testimony, that's correct.

MS. DURIE:  That's correct.

THE COURT:  Okay.  All right.  So all that said, wish everybody a good evening, and we'll see you tomorrow, 8:30.  The Court will stand adjourned.

COURT CLERK:  All rise.

(Court adjourned at 5:04 p.m.)

---------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court