612

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STODGE, INC., d/b/a      )   Volume III
POSTSCRIPT,              )
                         )
        Plaintiff,       )   C.A. No. 23-87-CJB
                         )
v.                       )
                         )
ATTENTIVE MOBILE, INC.,  )
                         )
        Defendant.       )

Wednesday, August 27, 2025
8:30 a.m.
Trial

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
    United States Magistrate Judge

APPEARANCES:

    McCARTER & ENGLISH, LLP
    BY:  DANIEL M. SILVER, ESQ.

            -and-

    MORRISON & FOERSTER, LLP
    BY:  TIMOTHY CHEN SAULSBURY, ESQ
    BY:  DARALYN DURIE, ESQ.
    BY:  HANNAH JIAM, ESQ.
    BY:  RAMSEY FISHER, ESQ.
    BY:  JOYCE LI, ESQ.

                    Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
BY:  MICHAEL J. FLYNN, ESQ.
BY:  CAMERON CLARK, ESQ.

-and-

CAHILL, GORDON & REINDEL, LLP
BY:  CHRIS CAMPBELL, ESQ.
BY:  BRITTON F. DAVIS, ESQ.
BY:  MATTHEW WOOD, ESQ.
BY:  RAHUL SARKAR, ESQ.
BY:  HALIMA NDAI, ESQ.
BY:  KATHERINE VESSELS, ESQ.

-and-

GIBSON, DUNN & CRUTCHER, LLP
BY:  ELI BALSAM, ESQ.

                    Counsel for the Defendant


                    ---------------------------


COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

THE COURT:  All right.  Please be seated, everybody.  And good morning.  So with that, let's go on the record and just say a few things for the record.  And the first is that we're here this morning for our pre-morning conference in the matter of Stodge Inc. d/b/a Postscript versus Attentive Mobile, here in our court and for day three of our trial.

So the parties had -- at the end of yesterday,

they had presented a dispute to me with regard to Attentive's request to use a document marked as DTX-86 to cross-examine Mr. Turner regarding the substance of a Y Combinator application which he had discussed during his direct testimony, which is DTX-85. I had argument at sidebar with the parties for 21 minutes, and then afterwards I asked the parties to each file one-page supplemental letters, which they did early this morning. I have had a chance to review those letters. So I'm prepared to give you my decision on that. I'll do that first. And then if we have time left, we'll talk about whatever other outstanding disputes that we have that the parties want me to hear.

The request to use the full text of the e-mail is based according to Federal Rule 608(b), and the assertion from Attentive is that the reason why they should be able to use it and cross-examine Mr. Turner about the full content of the e-mail is because they should be able to press certain of -- him on certain of the statements made in the Y Combinator application, because they believe those statements and their pressing of him would go to his truthfulness or credibility.

There were two arguments made as to why it is that they should be permitted to do this. The first was related to a portion of the application. It's on DTX-85 at page 6 of that exhibit, where Postscript, Mr. Turner, and

Mr. Beller filling out the application were asked who were your competitors and who might became competitors.

The answer goes on to list the most direct competitors that Postscript feels that they had at the time. Attentive is not listed. And the assertion is that because Mr. Turner was aware of Attentive, he should have known or knew that they were a competitor, and the fact that they didn't list Attentive on the application goes to his credibility or undermines his credibility.

I'll say that on this -- I don't think that this argument is strong. I'm not even sure truly how -- even if Attentive was a competitor at the time of Postscript, how -- the failure to list them here. I'm not saying, you know -- I'm sure Mr. Turner has reasons why he didn't list them. Maybe Attentive thinks they're not good reasons, etc. I'm not even sure how it really goes directly on the issue of credibility or truthfulness.

I mean, for example, maybe a more prototypical example of this, if it was asserted on behalf of Postscript that Mr. Turner lied or was untruthful about the amount of money that Postscript had earned at the time of the application and that you were going to be crossing him on the reality that, in fact, they earned much less -- and you can see how someone might have wanted to get into a program like this by maybe inflating the size of their company. I'm

not sure failure to list one entity as a competitor or direct competitor would even benefit Mr. Turner or how it gets to credibility or truthfulness directly, so I don't think the argument is strong in that regard.

I'll also say that, as it was noted by Postscript, the application's filled out, I think, on or before November 1st of 2018. The exhibit is talking about communications that Mr. Turner and Mr. Beller had with Attentive at least as of December or January, so after the application.

So it's, you know, again, not necessarily correct that even speak to Mr. Turner's mindset as of the date of the filing of the application. And so it's all to say, I don't find that argument and why it is that this -- that the leaving off of Attentive as a competitor is really persuasively related to the issue of credibility or truthfulness under Rule 608, so it's not a strong argument to me to use this document.

The other argument that Attentive made relates to a statement on page -- I think it's page 3 of the exhibit. That was a question that if accepted to Y Combinator, will you commit to working exclusively on this project for the next year, required, no school, no other jobs, and Mr. Turner and Mr. Beller said yes.

Here Attentive says, look, the e-mail indicates

that we think Mr. Turner was still working as of January 21st, 2019, for a company called StackSocial because why would he have an e-mail address for StackSocial if he wasn't working with them.  Again, who knows?  That may be true that he was working for StackSocial.  It may not be true.  I'm not talking about the truth or falsity of any such issue that exists at this time, but I can see why -- I can see that -- you know, that this could be some evidence that he was working for StackSocial, and I think it's not disputed that at least by late January the Y Combinator program had started, so I can see how Attentive might want to press Mr. Turner.  You said you were going to work exclusively for Postscript, but you were working for StackSocial at this time.  I think that could go to truthfulness or credibility to some degree.

That said, I don't see how, and it doesn't make sense to me why it is that the content of the e-mail, and particularly the content at the bottom of page 1 that goes to the evidence that I've excluded, would be necessary to make that attack.

And more particularly, as a reminder, you know, I've previously excluded evidence relating to the assertions of Mr. Turner or Mr. Beller, while working for StackSocial under assertedly false pretenses, got Attentive to send it certain materials, including information about its Two-Tap

products that Mr. Turner or Mr. Beller allegedly utilized in some way to infringe Attentive's patents. I've already gone through why it is I think that evidence is not relevant to the issues in the case, so we don't have allegations of infringement by Attentive.

We've already talked about how I think that evidence could raise issues of unfair prejudice and jury confusion under Rule 403 because the jury shouldn't be given the impression that the case is about whether or not Postscript infringes Attentive's patents.

So with that ruling in mind, I don't think that -- although that I think there is something to this argument in terms of being able to test Mr. Turner's credibility with regard to this question on page 3, I don't think Attentive needs the substance of the body of the e-mail to do that.

And so in that regard, I'll permit Attentive, if it needs to, to use the exhibit, but only the e-mail header indicating that as of January 21st, Mr. Turner had a StackSocial e-mail account that he was communicating with Attentive at the time, as was Mr. Beller who also had StackSocial e-mail accounts, but that the remainder of the e-mail should be redacted.

The last thing I'll say is, you know, look, can Attentive question, you know, Mr. Turner about the issue on

page 5, like he didn't list Attentive as a competitor?  That wasn't right.  Weren't they a competitor?  Yeah.  I'll give them some leeway to do that.  I note that, you know, again Attentive has said at times that it doesn't think Postscript was a real -- a significant competitor, at least as of later years, but, look, the issue of who competes and when and whether this was, you know, fully truthful, I'll allow them some leeway to get into that, but Attentive should be aware that anything that starts to get close to the line of the substance, you know, having a meeting with Attentive or Attentive provided this information or the substance of Mr. Turner or Mr. Beller, you know, having a meeting based on saying it was StackSocial and what did they get from that meeting, that kind of stuff is part of the material I've excluded.  And if Attentive is going to do that kind of questioning about the information on page 6, it should not get close to the line of bringing up or raising that excluded material.

So it's up to Attentive if they want to, you know, address what was in Mr. Turner's mind about Attentive's nature as a competitor on page 6.  They could do that, but can't get into the material I've excluded with their questions.  So I'll leave it to them to figure out how to walk that line appropriately with the Court's instructions.

Okay.  So that's the substance of my decision there.  I will make an indication of how to allocate the 21 minutes from yesterday.  We'll communicate that to the parties, because at least Attentive has the ability to use a portion of the e-mail in question.  It will likely be some kind of circumstance where each side gets some time allocated to them, but we'll give you a final count before we finish our preparation for the trial.

All right.  Mr. Wood, anything further on that issue?

MR. WOOD:  Sure.  If I could get some clarification, this is going to be relevant to some deposition testimony that we had designated for Mr. Beller.  Mr. Beller testified at his deposition that he took the meeting with Attentive in his capacity as an employee of StackCommerce because StackCommerce was interested in and -- in finding an SMS marketing partner that could help StackCommerce.  I think that goes to whether or not Attentive was a competitor in this space.

I also don't think it implicates the issues of this was for Postscript and you were trying to take information.  Mr. Beller says it's for Stack -- it's on behalf of StackCommerce, and there's not going to be any additional testimony played that challenges that assertion.

THE COURT:  I guess my initial reaction is I'm

not sure anything you just said strikes me as problematic in terms of my ruling.  Is that helpful?

MR. WOOD:  I believe so.  With that in mind, would it be -- would Your Honor be open to allowing us to keep the meeting invite unredacted in the e-mail and redact the portion where the materials were sent?  That seems to be the prejudicial portion, and just identify that on December 4th there was a meeting with Mr. Turner and Mr. Beller in their capacity as representatives of StackCommerce and Attentive.

THE COURT:  Just so we're clear, what portion of the e-mail are you talking about?

MR. WOOD:  So the last portion of DTX-86.2 begins on Tuesday, December 4th.  Alex Beller writes --

(Reporter clarification.)

MR. WOOD:  Alex Beller writes, "Randy, are we still on for this today?"

And then there's a meeting invitation to Attentive at StackCommerce, when, where, and the who is Randy at Attentive, Matthew at Attentive, and then Mr. Turner and Mr. Beller, so it would just go to corroborate what the testimony we just discussed would be, that there was a meeting between Mr. Turner and Mr. Beller in their capacity as StackCommerce employees.

THE COURT:  Okay.  Is there any objection to

that?

MS. DURIE:  There is, Your Honor, because they're going to try to use the fact that there was a meeting in order to then suggest that some information was transmitted.

What I think Your Honor sensibly has said is that the header says they weren't aware of Attentive; that's fine.  The testimony they designated is literally reading into the record in the form of a question the substance of the e-mail that the Court just excluded, and the -- the clear inference that they're seeking to draw is precisely what we want to discuss.

MR. WOOD:  And I -- if I may, Your Honor.

I understand that point.  That was why I stood up to get clarification on what we think would be appropriate testimony from Mr. Beller's deposition in light of Your Honor's ruling.  The portions where my colleague is referring to, where he goes into challenge, is Mr. Beller's assertion that it was not a meeting on behalf of StackCommerce.  Portions of the examination that went into was e-mail exchanged, did you receive these sales decks, what did you use those sales decks for.

All of that, I think in light of Your Honor's ruling, we would remove in those designations, and limit it simply to I believe there is a question where Mr. Beller

answers I took a meeting in 2018 with Attentive on behalf of Stack.

MS. DURIE:  So let me suggest, Your Honor, that we meet and confer because we got these designations in very late night.  We now have Your Honor's guidance.  I think we should meet and confer and see whether we can resolve this.

THE COURT:  Okay.  Of course this will relate as to this document, and by this document I mean DTX-86 in the cross-examination with Mr. Turner.  So okay.

MS. DURIE:  And then just with the Beller deposition designations.

THE COURT:  Oh, yes.

MS. DURIE:  We had a meet and confer with respect to that.

MR. WOOD:  Yeah.  As long as we are clear on what we're able to use and what we -- we'll have to redact very quickly to introduce something.

THE COURT:  Understood.

MS. DURIE:  I think for the cross-examination of Mr. Turner, it should be what Your Honor said previously. It should just be the e-mail header.

THE COURT:  And on that point, Ms. Durie, Mr. Woods simply additionally wants to include the content that -- and that content that indicates that on a particular day in December, Mr. Beller, on behalf of StackCommerce, had

a meeting with Attentive, without going into anything further substantively.

MS. DURIE:  Well, but I think that's precisely the issue, that you're going to use that to make the suggestion that information was submitted during that meeting.

Everything they're trying to include is our response and explanation as to what did not happen at that meeting, but -- but putting into the record that there was a meeting on December 4th is precisely trying to feed the narrative of a copying story.  That's the only reason they want to put it in that there was a meeting, and it's not germane.  Whether or not they had a meeting on December 4th is not germane to anything.  December 4th, I want to be clear, is before.

The ostensible relevance is that they had said that by January they were going to be working exclusively on for Y -- on Postscript for Y Combinator.  The fact that they took a meeting in December has no relevance to the accuracy of that representation.

THE COURT:  I think it's asserted to be relevant to the potential questions about the competitor issue.

MS. DURIE:  Well, but on that it's -- it's in December, it's after they had already been accepted into Y Combinator in November.  So it can't go to the accuracy of

whatever representation they made.  And at most, the representation would be -- they can ask him, as you said, did you consider Attentive to be a competitor, and they can get into the fact that he was aware of the existence of Attentive as of December, that's fine.  But the fact that there was a meeting has no bearing on that issue.

THE COURT:  Mr. Wood.

MR. WOOD:  I do think it goes to the -- the kind of underlying substantive point of the -- the state of the competition between Postscript and Attentive during -- during this time period.  There's been a lot of, you know, evidence that has been elicited so far in this trial from the fact witnesses about essentially who was chasing whom, who was -- who was ahead, who was winning in the marketplace, who was sending bottles of Dom to try to crush the other person, who had been doing this for -- for years ahead of time.  And I think this goes to what was -- what was Attentive's role in the industry at that time.

And I think the fact that StackCommerce, a former employee, viewed Attentive as enough of a viable option in SMS marketing to want to have a meeting with them is relevant for the jury to consider.  I also think there is -- you know, Y Combinator is a very prestigious incubator that a lot of tech companies try to get into.  We've heard testimony that fewer than 10% of applicants get in.  I think

this is somewhat similar to the issue we had that we addressed before trial even began with the PTO issue in the prior art.

The jury is going to consider, well, the PTO looked at it and said, heck, Postscript -- and thought they were innovative and thought they had something new, and they're going to be allowed to consider whether or not all the information was actually available to them.

Similarly, I think the jury is going to see the Y Combinator acceptance being in this very exclusive program for tech innovators.  They should be able to consider whether or not Attentive was actually a true viable competitor and had a similar product to what -- what Postscript was claiming was innovative when they were applying to Y Combinator, which goes to the question of -- that question in the application and whether or not Y Combinator had all the information when they decided, yes, you're really innovative and we want you in our program.

THE COURT:  Okay.  I guess, Ms. Durie, the issue of the parties, what they knew about each other -- understand I'm going to draw a line that we're not going to get into the substance of any meeting that occurred between StackSocial and -- and Attentive in this time period.  We're not going to get into the substance of what information was shared, the information described, for example, in this

e-mail. We're not going to get into any assertions or discussions about Mr. Turner or Mr. Beller taking that meeting under false pretenses, anything like that.

But the issue of just the fact that there had been talk, and a lot of talk, about the parties' status as competitors, when they were aware, what they knew about each other generally in the case, who was where, and what side they were at what time, why would the idea that, hey, did you know about these guys and were they competitors of yours, and how do you know, etc., that the fact that they also met with them, you know, was something that would augment it.

MS. DURIE: So, I don't -- to the extent that -- again, the relevant proffer that was made was with respect to the accuracy of the representations that were made in the Y Combinator application. And -- and the -- as to which they got into Y Combinator in November.

So the fact that they took a meeting a month later with Attentive says nothing about the accuracy of the representations that were made about who they considered to be their most significant competitors, especially in the absence of any inference as to what was discussed, whether there was even discussion about this particular product and what features it had or how significant it was.

All of the inferences that they are seeking to

draw come from an effort to poison the well with respect to the substance of that communication.

And what we just heard really was the argument -- a version of the argument that you're going to hear in front of the jury, which was they were following Attentive, they were trying to copy Attentive.  It's exactly what we heard from the chairman of their board at the very end of his redirect examination, they copied us.  This is in service of that narrative.

So if they want to cross-examine Mr. Turner, as Your Honor originally ruled, with respect to you were aware of the existence of Attentive at the time, that's fine. They can do that.

In fact, you knew that Attentive -- whatever they want to do, but the fact of the meeting -- that there was a meeting doesn't bear on what he knew about Attentive. It only bears on the fact that he knew that Attentive existed, and they can get into that with the e-mail header.

THE COURT:  Okay.  All right.  Anything further, Mr. Wood?

MR. WOOD:  Yes.

So one, as I said, I think the question is not just what Mr. Turner and Mr. Beller's knowledge of Attentive was at that -- at that point.  It also goes to the question of what Y Combinator knew about Attentive at that point when

they were choosing to accept somebody who was trying to break into this same space, versus the reality of what was going on in the marketplace at the time regardless of -- of any sort of nefarious suggestion that we're -- we agree we're not going to get into.

The other point I would make, Your Honor, just with respect to the relevance of who copied who, I mean, two of -- two of Attentive's products are asserted prior art in -- in this case, Your Honor.  So there's certainly no allegations of willful infringement or anything like that, but the question of whether or not the prior art disclosed this invention and that -- that was how Postscript came up with its own product, or whether it's vice versa, that Attentive saw Postscript's product and then later came out with a copycat, those are -- those are relevant issues in this case that the jury is currently weighing.

MS. DURIE:  That, I would say, Your Honor, is Randt speculation.  There is zero evidence in the record that anyone knew anything about Attentive Journeys and that is exactly the inference here, is trying to create a string of inferences to give rise to a copying story.

The fact that there was a meeting in December simply cannot bear on the accuracy of the representations that were made to Y Combinator in October and a program into which they were accepted in November.

THE COURT: Okay. Thank you. I think I have enough.

So the Court's original ruling was that -- that Attentive would be permitted to use the header of the e-mail, but not the body of the e-mail. So that was to be able to demonstrate that Mr. Turner and Mr. Beller associated with an e-mail address of StackSocial. And, also, it would indicate that they had some communication with Attentive in January.

I'll permit that, but I'm convinced by Postscript's arguments that -- that further permitting the reference to the body of the e-mail as to the meeting gets too close to the line of the content that I'm excluding, which is the substance of that e-mail, which we've already talked about. It gets to issues that are irrelevant and potentially unduly prejudicial and it's not -- it's not clear to me how -- that the -- the fact of the meeting, as opposed to the fact the parties were communicating as of January 2019, adds much to the knowledge of Attentive and its place in the ecosystem here regarding the substance -- you know, the substance of any questions about the competitor description in the Y Combinator application.

So I'll abide by my original ruling, only the header of the e-mail can be used and no questions about the meeting or its substance will be permitted.

MS. DURIE:  Thank you.

And then can I suggest we meet and confer with respect to the Beller deposition designations to implement that ruling?

THE COURT:  That sounds like a good idea.

All right.  We're right at 9 o'clock.  To the extent we have other issues about expert reports, etc., we'll have to either address them organically during trial or at our prayer conference.

MR. SAULSBURY:  And, Your Honor, I just have a suggestion for, I think, how we can proceed on that.  With respect to Postscript's issues, they relate to undisclosed invalidity theories.  We think this is primarily an issue for Dr. Polish and, therefore, something we won't have to address until later because he's not testifying right away.  However, it could potentially relate to Ms. Frederiksen if they attempt to cross her on the disclosing theories.

THE COURT:  Fair enough.  You might have to address it before or during Ms. Frederiksen's testimony.

MR. SAULSBURY:  That's all I was going to say. Thank you.

THE COURT:  So the Court will stand in recess. We'll give the parties a brief chance to prepare, and then we'll bring out the jury.  Okay.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

THE COURT:  All right.  Please be seated, everybody.  And the jury will be brought in.

COURT CLERK:  Please rise.

(Jury enters.)

THE COURT:  All right.  Good morning, ladies and gentlemen.  Please be seated.  Everyone can be seated.

Yesterday we were beginning cross-examination of Mr. Turner, so we'll have him recalled to the stand, remind him that he is sworn.

If Attentive has binders to hand out, you can do so now and begin.

MR. CAMPBELL:  May we approach, Your Honor?

THE COURT:  You may approach, yes.

Please begin whenever you're ready, Mr. Campbell.

MR. CAMPBELL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q.    Good morning, Mr. Turner.  We haven't met before.  My name is Chris Campbell.  I represent Attentive.  It's a real pleasure to meet you this morning.

A.      Good morning.

Q.      Let's start.  I want to remind the jury about Y Combinator.  That was an application that you filed with Y Combinator?

A.      Yes, the team filed that.

Q.      And that was filed when?

A.      Sorry.  I'm having trouble --

Q.      That was filed when?

A.      I'm not sure of the exact date.  I think they take applications in -- I think it was around September to October of 2018.  I'm not sure exactly when we filed.

Q.      Let's pull up -- and it's in your binder, DTX-86.  And this is -- we're going to just look at the very top portion of this exhibit.  This is an e-mail from you to Randy Kohn at Attentive Mobile.

        Do you see that?

A.      No.

        MS. JIAM:  Objection.

        THE WITNESS:  I'm on the e-mail from -- this is from Alex Beller.

        MR. CAMPBELL:  Thank you.

BY MR. CAMPBELL:

Q.      And you're on the email, you're copied on it?

        MR. CAMPBELL:  Let's pull that up.  Move to admit, Your Honor.

MS. JIAM:  Objection, Your Honor.  This document is not --

THE COURT:  Why don't counsel confer as to exactly what is going to be put on the screen.

MR. CAMPBELL:  Just the top portion.

Move to admit, Your Honor, the top portion.

THE COURT:  Okay.  Is there any objection?

MS. JIAM:  No objection to just the top portion.

MR. CAMPBELL:  Okay.

THE COURT:  Okay.  Counsel can confer and then it will be put up when you're ready.

MR. CAMPBELL:  Thank you.  I think we're in agreement, Your Honor.

THE COURT:  Okay.

MR. CAMPBELL:  Please publish the document to the jury.

THE COURT:  The exhibit as described is admitted.

(DTX Exhibit No. 86 was admitted into evidence.)

BY MR. CAMPBELL:

Q.    Okay.  So, Mr. Turner, you had said that you applied for a Y Combinator in the September/October 2018 time frame, right?

A.    I think it would have been roughly there.  Yeah.  Yeah.

Q.    Okay.  And this document is at the top.  It shows the header of the e-mail, and this is from Alex Beller at an e-mail, addressed Alex.Beller@StackSocial.com.

Do you see that?

A.    Yeah.

Q.    And this was sent on January 21, 2019, right?

A.    Uh-huh.

Q.    And it was sent to Randy Kohn whose e-mail address is Randy@AttentiveMobile.com; isn't that right?

A.    Yes.

Q.    And you are copied on this e-mail.  That's you, Adam Turner.  That's Adam.Turner@StackSocial.com.

Isn't that right?

A.    Yes.

Q.    Okay.  So at least in January -- and this is January 21st, 2019 -- you were still using your StackSocial e-mail account; isn't that right?

A.    Yep.  Alex and I were advising and consulting for them, which is typical in tech after you leave a job.  You don't want to leave them hanging, so you will advise or consult so that any projects that you were working on aren't, you know, dropped.

Q.    And this communication with Attentive in January of 2019 was after Postscript had been formed in late 2018; isn't that right?

A.      Sorry, Postscript had been?

Q.      Formed as a company in late 2018; isn't that right?

A.      I'm not sure exactly when we were incorporated, but, yeah, we were working as a company together.

Q.      And at that time, you had a Postscript e-mail address, right?

A.      Yeah, we --

              MS. JIAM:  Objection, Your Honor.  We think that we might be -- we do -- I think this is starting to turn to the line of what we discussed earlier.

              THE COURT:  The question being at the time as of late 2019, was he using a Postscript e-mail address?

              MS. JIAM:  Yes, Your Honor.

              THE COURT:  Let me speak with counsel at sidebar.

              (Sidebar discussion.)

              THE COURT:  All right.  So we're on the record.

              I understand the question was asking Mr. Turner about whether as of late 2018 he had a Postscript e-mail address.

              MS. DURIE:  Right.  So what is the relevance of that?  The suggestion that's being created was you were using a StackSocial e-mail address to communicate with Attentive even though you had a Postscript e-mail address. That is their whole sort of bad content narrative.  The fact

that he was using a Postscript e-mail address doesn't have anything to do with what he knew about Attentive as a competitor, which is the ostensible rationale for this line of inquiry.

THE COURT: Although I thought part of the rationale was at least the most compelling rationale for the allowance of the use of the header was to establish that as of January 2, 2019, the witness still was associated with and working for StackSocial at a time in which Postscript also was established. And so the idea was that, you know, he should only be working for Postscript. Postscript is a real company at the time, not StackSocial.

MS. DURIE: And I just answered that question and said, yes, we were wrapping up our consultancy with StackSocial. Whether he had a Postscript e-mail address doesn't have anything to do with whether he was working for StackSocial, which he just explained. He explained that he was wrapping up his consultancy for StackSocial.

THE COURT: Can I ask -- I think your concern is you're worried that further questions may start to suggest the idea where you were misleading.

MS. DURIE: And I think this is the point of this question, to suggest the use of the StackSocial e-mail address as opposed to Postscript e-mail address was misleading.

THE COURT: Because that's misleading. Client argument was tied up -- the argument relating to information that purportedly goes to copying, which was the material the Court had excluded.

Okay. So, Mr. Campbell, tell me why the question about -- did you have a Postscript e-mail as of October 2018 -- why that's relevant to the reason you want to use this, which is to try to show that his assertion about Y Combinator, that solely working for Postscript as of January 2019 may not be correct.

MR. CAMPBELL: That's exactly right, Your Honor. That's as far as we're going with this. We're not going to go any further, and it does create the inference that the answer on the Y Combinator application was not accurate. So I think it's a fair question.

THE COURT: In other words, you're saying, look, we're making it clear. Postscript started. They were a company in October 2018. He had a Postscript e-mail address in 2018, so he's working with them. And then he's got a StackSocial address in January of 2019, still working with them, while Postscript is a viable company, and you're saying he should only be working with Postscript.

MR. CAMPBELL: That's correct.

THE COURT: With the representation with Mr. Campbell, that's where they're going with it, not going

to go further into the area.  Ms. Durie is worried about the, I think, the fact that the witness had a Postscript e-mail address can relate to the line of question admitted is not objectionable, so I'll overrule the objection and permit the question.

MR. CAMPBELL:  Thank you, Your Honor.

THE COURT:  All right.  Please continue.

MR. CAMPBELL:  Thank you, Your Honor.

(End of sidebar discussion.)

THE COURT:  And would you like to restate the question?

MR. CAMPBELL:  I'll give an attempt.

THE COURT:  Okay.

BY MR. CAMPBELL:

Q.    So as of -- so let me go back.  Postscript was formed at the end of 2018; isn't that right?

A.    Yeah.  So we were working together as a company.  I'm not sure the exact incorporation date, but we were, yeah, definitely working together on Postscript.

Q.    And you had a Postscript e-mail address in 2018; isn't that right?

A.    I would say -- yeah, probably likely.

Q.    And then if we look at the header of the e-mail that's on the screen, this is an e-mail dated January 21, 2019, between Alex Beller, yourself, and Randy Kohn of

Attentive, but the e-mails that you and Alex Beller used are your StackSocial e-mails, even though you had a Postscript e-mail in January, in January 21st of 2019; isn't that right?

A.    Yeah.  So StackCommerce was in an active evaluation of e-mail and SMS tools, and so this would have been pretty normal.

Q.    And you had testified that, you know, some of your work for StackSocial was in the nature of advising and consulting.  What was that advising and consulting that you were doing?

MS. JIAM:  Objection, Your Honor.  We again think this is pertaining to what we discussed.

THE COURT:  I'll overrule the objection because I think so far I don't see it problematic.

THE WITNESS:  Sorry, can you say the question again?

MR. CAMPBELL:  I'll try again.

BY MR. CAMPBELL:

Q.    So you had testified that you were doing advising and consulting on behalf of StackCommerce.  I'm asking you what was the nature of the advising and consulting that you were doing?

A.    Yep.  So I worked for StackCommerce for about two and a half years prior.  I did a lot of different roles for

them, and like I mentioned, when you leave, you have a few projects up in the air.  And I signed a contract with them to make sure that they weren't left hanging on those projects.

Q.     Yesterday we talked about your Y Combinator application.  Prestigious to get into Y Combinator?

A.     Difficult, certainly.

Q.     Only about 2% of the applicants get into it?

A.     I think those are the numbers they publish, yeah.

Q.     Let's take a look at your Y Combinator application.

Please pull up DTX-85.

Did you interview for your application to Y Combinator?

A.     Yes, we interviewed.

Q.     When did you interview?

A.     That date, it would have been after we applied.  So if we applied in September and October, it was probably four to six weeks after we had applied, I'm guessing.

Q.     So November or December?

A.     Oh, I would probably say we were already in by November and December.  So we applied September, October. It would have been late October or early November.

Q.     Now, the Y Combinator application, that was an important moment for your company, Postscript?

A.     Getting in I would say was really good validation of

the work that we had done so far.

Q.    And it was your goal to get into Y Combinator, right?

A.    By applying, that was the goal.  I would say it was something that we had been interested in and at the same time the company was doing pretty well.  So we could see a couple different paths from there.

Q.    It was important to be accurate and honest in your Y Combinator application, fair?

A.    Certainly.

Q.    And you endeavored to give complete answers to the questions that were asked on the Y Combinator application; isn't that right?

A.    Yeah.

Q.    Okay.  Let's turn to page 2.

       And that is the portion where you give information about yourself, Adam Turner; isn't that right?

A.    Uh-huh, yeah.

Q.    And then you're talking about some of your accomplishments, including being at the Air Force Academy for a year; isn't that right?

A.    Yes.

Q.    Okay.  And then at the bottom there's a question, "If accepted to Y Combinator, you will commit to working exclusively on this project for the next year."

       And that is -- and that's a work required

question; isn't it?

A.    Yeah.

Q.    And then underneath that it says, "No school and no other jobs."

      Do you see that?

A.    Yeah.

Q.    And you answered yes to that question, right?

A.    Yes.

Q.    So you said when you filled out the Y Combinator application, and when you interviewed to be accepted into Y Combinator, that you represented to Y Combinator that you would commit to working exclusively on Postscript.  That was the project that you were applying for admission to Y Combinator, right?

A.    Yeah.  They want to make sure people not be attending school or have other jobs.

Q.    Let's turn now to the next page.  And there's a section on Mr. Beller.  Let's go back a page.  It starts at the preceding page.

      At the bottom of page 2, it starts with the same questions regarding Mr. Beller.

      Do you see that?

      So this is the portion where Mr. Beller begins to tell a little bit -- a little bit about himself, right?

A.    Sorry.  Which page are we on?

Q.    We're at the bottom of page 2.  The section --

A.    Oh, when it starts.  Yeah.

Q.    And then if you go to the top of page 3, we see that Mr. Beller has similar questions presented at the very bottom.  Again, it says, "If accepted to Y Combinator, will you commit to working exclusively on this project for the next year?"

      Again, a required question for the application, right?

A.    Yes.

Q.    And it says "no school or other jobs," right?

A.    Uh-huh.

Q.    And Mr. Beller responded, "yes," agreeing that he would commit to working exclusively on Postscript; isn't that right?

A.    Yeah.

Q.    Okay.  Mr. Beller is the president of Postscript, is he not?

A.    Yeah, president and cofounder.

Q.    All right.  Mr. Beller did not work exclusively for Postscript after being accepted into Y Combinator; isn't that right?

A.    Are you referring to the advising?

Q.    Yes.  I'm referring to the advising that you just told the jury about with regard to StackSocial.

You were doing advisory work for StackSocial in January of 2019; isn't that right?

A.    I believe we were finishing up some work with them as a part of that agreement, just to make sure those projects didn't get dropped.

I would say it's pretty normal for most YC members.  I would imagine that many of them have a similar agreement.

Q.    The Y Combinator officially kicked off at the beginning of 2019; isn't that right?

A.    Yeah.

Q.    But yet, even though it kicked off at the beginning of 2019 and you represented to Y Combinator that you would work exclusively on Postscript, you were still doing work for StackSocial in 2019 in January; isn't that right?

A.    Yeah.  They said don't have other jobs.  You know, we had left our jobs at that point.

MR. CAMPBELL:  Let's go back to DTX-86, please, Marco.  Just the top portion.

BY MR. CAMPBELL:

Q.    Okay.  So DTX-86 reflects that you had not left your other jobs, you were still doing work for StackSocial, even though you represented to Y Combinator that you would only and exclusively do work for Postscript; isn't that right?

A.    Yeah.  So, to be clear, I had worked there for two

and a half years and I resigned in October to -- to attend Y Combinator, and this was a part of a project that we were finishing up, having both worked there.

Q.   Now, let's turn to page 6 -- go back to DTX-85, page 6, please.

Okay.  In the middle there's a question, "Who are your competitors, and who might become your competitors?"

Do you see that?

A.   Yes.

Q.   And then that sentence concludes, or the question is, "Who do you fear most?"

Do you see that?

A.   Yeah.

Q.   And you listed Tatango, EZTexting, Mailchimp, Klaviyo, isn't that right, as the competitors and those who you fear most?

A.   Yeah.

Q.   You didn't mention Attentive, though, did you?

A.   No, I don't think we knew about them when we had applied.

Q.   But you certainly knew about Attentive in January of 2019; isn't that right?

A.   Yeah.

Q.   Is it possible that you didn't know about Attentive

when you applied because Attentive was just a small startup, like you, back in 2018?

A.    I'm not sure -- so we had launched in the Shopify app store and I had searched, you know, SMS to see what existed out there, and Attentive wasn't on the Shopify app store.

Q.    At some point in time, though, you became aware of Attentive, at least in January of 2019; isn't that right?

A.    Yeah.

Q.    And you didn't correct Y Combinator to let them know that, hey, there's another entity out there called Attentive who we might fear and be worried about?

A.    So we had started in January.  I'm sure we would have been talking to Y Combinator about Attentive in January.

Q.    Why would you have been talking to Y Combinator about Attentive in January?

A.    Oh, they had asked us about different competitors that we saw.

Q.    So you agree that in January you became aware of them?

A.    At least in January.

        MR. CAMPBELL:  All right.  Let's take that down please, Marco.

BY MR. CAMPBELL:

Q.    Let's talk a little bit about retargeting.  So we've heard a lot about that throughout the course of this trial

in regards to multi-message campaigns.  So you've got a first message and then a second message, and then you can have retargeting off of that second message.

You heard that testimony, right?

A.    I did, yeah.

Q.    Retargeting is not new; isn't that right?

A.    The idea of retargeting is not new, yeah.

Q.    Yeah.  Postscript did not invent sending retargeting messages to consumers.

You would agree with that, right?

A.    I would agree, yeah, Campaign Flows is -- you know, creating a set of messages, kind of like the Labor Day sample that I gave yesterday.  Schedule them ahead of time for Saturday, Sunday, and Monday, and it sends out to those subscribers and the message can change based on what they do.

Q.    So one of the features of Campaign Flows is that it has the ability to send retargeting messages to consumers, right?

A.    That is one of the features in Campaign Flows, yeah.

Q.    An old feature, right, that had been done many years prior to Campaign Flows, many years prior to Attentive Mobile, fair?

A.    Yeah, that specific one already existed.

Q.    And that technology existed before Postscript filed

its patent application in October 2022, right?

A.    Retargeting is a general term.  For example, the e-mails definitely existed before -- before Postscript, yeah.

Q.    Okay.  Let's move to Klaviyo.

You're familiar with Klaviyo, right?

A.    Yes.

Q.    Klaviyo is a competitor of Postscript, right?

A.    Yeah.

Q.    And they're predominantly in e-mail marketing, fair?

A.    Yes, that's mostly what they do.

Q.    Klaviyo was around when Postscript was formed?

A.    Yeah.

Q.    And you would agree with me that Postscript did not invent sending retargeting e-mails to consumers based on actions that the consumer has taken; isn't that fair?

A.    Yeah.  We don't do e-mail, just SMS.

Q.    All right.  Let's talk about some of these feature comparison spreadsheets.  Your lawyer brought these up.

So let's start with DTX-198.

Do you have that open, Mr. Turner?

A.    Yes.

Q.    The first page at the top, it says, "Overview."

Do you see that?

A.    Yes.

Q.    All right.  It says, "The goal of this document is to help our team get a deeper view of the competitive landscape and how we stack up in order to help reps avoid land mines and know how this lines up with the current product functionality and roadmap?

(Reporter clarification.)

THE WITNESS:  Yeah, we want to make sure that we know everything about all the products and say the right thing.

BY MR. CAMPBELL:

Q.    And so what you're trying to do is understand how your product situate in the marketplace relative to your competitors' products, fair?

A.    Yeah, that's fair.

Q.    And it's important that you understand how your products situate compared to others in the marketplace in order to sell against those competitors, right?

A.    Yeah.  In order to, yeah, educated customers, make sure they know the differences between them.

Q.    And you have a big marketing department, fair?

A.    No, I would say we're on the smaller side in marketing.

Q.    Okay.  How many -- how many people on your marketing -- are in your marketing department?

A.    Marketing is probably, maybe like 10 people,

something like that.  I'm not sure the exact numbers, 8 to 12 is probably what I would say more confidently.

Q.     And the marketing department is there to help the salespeople perform their function, fair?

A.     Oh, do you mean product marketing?

Q.     Yes.

A.     Oh, yeah.  That might be like five people, or four.

Q.     I'm talking about sales now.

Your sales team relies on your marketing team in order to be able to sell effectively against your competitors; isn't that right?

A.     Yes.  Product marketing will create materials for the sales team to use.

Q.     And sales team, how large?

A.     Do you have a particular -- there's BDR, then there is sales, there's like people like --

(Reporter clarification.)

THE WITNESS:  I'm sorry.

BY MR. CAMPBELL:

Q.     All of it.

A.     All of it is probably 50 or 60 people.

Q.     Who runs your marketing department?

A.     That would be Mike Manheimer.

Q.     You trust Mike Manheimer, right?

A.     Yes, definitely.

Q.     Good at his job?

A.     Yes.  Yeah.

Q.     You wouldn't keep him if he was not good at his job; isn't that fair?

A.     Yes.

Q.     All right.  Let's turn now to page 8 of DTX-198.  At the very bottom, Row 57, there's an entry called Campaign Flows.

       Do you see that?  And we're on page 8 in the upper right-hand corner.

A.     We're on 198, page 8?

Q.     Correct.

A.     I might have a different one, but I'm happy to look at the screen.

       THE COURT:  Mr. Campbell, you may approach if you want to show the witness as well.

       THE WITNESS:  Oh.  The header is Campaign Flows there at the very bottom, yeah, sorry.

BY MR. CAMPBELL:

Q.     Yeah.  Let's turn now to page 10.  And what we have here is an Excel spreadsheet where the headers for Column A are feature, the header for Column B, it says "feature details."  It's not on the screen, but I'll represent that to you.

       Column C is Postscript and Column D is

Attentive.  I want to start with Row 58, and that's talking about Campaign Flows.  That is the Postscript product that is reflected in the '660 Patent, right?

A.     Yeah.

Q.     And with respect to Campaign Flows, the feature detail, this is Row 58, Column B, it says, "Creating campaign with multiple messages in a single UI workflow."

Do you see that?

A.     Yeah.

Q.     And then if you go over to Column D, it's talking about Magic Composer.

Do you see that?

A.     I do, yeah.

Q.     And so that's Attentive's product, and it says for Magic Composer, "does not support advanced branching, including responses"; isn't that right?

A.     Yeah.  So the example that I used yesterday was like --

Q.     I'm just asking you, Mr. Turner, I'm just asking you if that is what is said with regard to Magic Composer?  It was a yes-or-no question, that's what it says?

A.     Oh, yeah.

Q.     So the next row down is 59, and that's for subscriber response branching.  And it says, "Creating conversational campaigns where the next message can be determined by how

the subscriber responds."

          Do you see that?

A.     Yes.

Q.     And that's an entry that would have been approved by your marketing department, including Mr. Manheimer; isn't that right?

A.     Yes, these are the advanced features in Campaign Flows that would have been approved, like the sprinkles on the cake.

Q.     I'm glad you mentioned that, because I was going to ask you about that, advanced features.

A.     Uh-huh.

Q.     So what we have on the screen, there is not a single reference to advanced features, is there, sir?  That word, those two words, "advanced features" do not appear in those cells in Rows 58, 59, and 60 on the screen; isn't that right?

A.     Yeah, subscriber response branching is an add-on to Campaign Flows.

Q.     But you described them as advanced features yesterday, and you just did so again today.  I was going to ask you about them.  I'm glad you did, you said that.

          Those two words "advanced features," it doesn't say anything about that on these cells of the spreadsheet, right?

A.      Yep, I think I said "bells and whistles" yesterday.

Q.      Let's talk about those bells and whistles.

        The next row, 59, for feature details for Campaign Flows, it says, "Creating conversational campaigns where the next message can be determined by how the subscriber responds."

        Do you see that?

A.      Yeah.

Q.      Now, moving over to Column D, and this is Attentive again, it says that, "This feature is supported by automation Journeys, but not campaigns," right?

A.      Yep.

Q.      So what this is saying is Attentive's Campaign Composer does not create conversational campaigns where the next message can be determined by how the subscriber responds; isn't that right?

A.      Yeah.

Q.      Okay.  And the next row down is nested branching. And looking at the feature detail for that in Postscript's Campaign Flows, it says, "Ability to have multiple branches within a flow, so if a subscriber goes down path one, that path can have additional branches."

        Do you see that?

A.      Yeah, this was the branches inside of the branches.

Q.      Understood.

And then looking over in the Column D for Attentive, it says, "This is supported by Attentive's automation Journeys, but not campaigns."

Do you see that?

A.      Yes.

Q.      So what this is saying is that Attentive's Campaign Composer does not have the ability to have multiple branches within a flow, so if a subscriber goes down path one, that path can have additional branches; isn't that right?

A.      Yeah.

Q.      Okay.  Turn in your binder, if you would, sir, to DTX-100.

A.      Got it.

Q.      This is another one of these product feature comparators, and it's an Excel spreadsheet.  Do you recognize this as such, as a related document?  It was produced by Postscript in this case.

A.      Yes, it looks very similar.

        MR. CAMPBELL:  Move to admit, Your Honor.

        THE COURT:  Is there any objection?

        MS. JIAM:  No objection.

        THE COURT:  All right.  It's admitted.

        (DTX Exhibit No. 100 was admitted into evidence.)

BY MR. CAMPBELL:

Q.      So this one, a little bit different format but capturing a lot of the same information, fair?

A.      Yeah, looks like that.

Q.      And at the very top, you can see in Row 1, we've got the feature, feature details, and then it mentions Postscript again in Column C, Attentive in Column D, so I want to focus on those.

        Turn now, if you would please, to page 8.

        MR. CAMPBELL:  And let's start -- blow up, Marco, Row 61 and 62, at the bottom of page 8.

BY MR. CAMPBELL:

Q.      And in the interest of efficiency, I'm not going to go through all of these questions over again for the jury.

A.      Sure.

Q.      But I think what we have here, we can see in Row 61, the same feature detail, and then if you go over two columns, it's talking about Attentive and what Magic Composer does not have.

        And what it says in Column D, I think you'll agree with me, Magic Composer does not support advanced branching, including responses; isn't that right?

A.      Yes.  And I don't think that's covered in the '660 Patent.

Q.      Well, I'm sorry, are you a lawyer?

A.      No.

Q.    Okay.  So you said it's not covered in the '660 Patent.  You don't have any special training in law, do you?

A.    No, definitely not.

Q.    Okay.  And you're not a patent agent?

A.    Oh, no, sorry.  What I meant was Campaign Flows is the product that's covered in the '660 Patent, not the advanced branching.

Q.    Okay.  Thank you.  I just wanted to make sure we were clear on that.  I didn't know whether you were expressing an opinion about the '660 Patent.  You don't have any opinions whether or not something that is recited in the claims of a patent are within the patent or outside the patent, do you?

A.    No, sir.  I was trying to describe Campaign Flows as the product.

Q.    Okay, thank you.  I just wanted to be perfectly clear on that.

             Now let's go to the next page, 9, of DTX-100.

             MR. CAMPBELL:  And let's focus at the very top, the header Marco, where it says, "Feature down through Row 64," please.  If we can pull that up for Column D for Attentive.  There we go.

BY MR. CAMPBELL:

Q.    And again, these are similar entries to what we saw in the prior Exhibit DTX-198; isn't that fair?

A.    Subscriber response branching and necessary

continuing branching, yep, looking at Column 8.

Q.    And just very quickly, Row 63 talking about response branching, if you go over to Column D for Attentive, it says that Campaign -- campaigns, that's Attentive's Campaign Composer, it does not provide the feature of creating conversational campaigns where the next message can be determined by how the subscriber responds.

That's what this document is conveying there, right?

A.    Yeah.

Q.    And same thing, you know, next row down, 64, Column D, it's saying that -- saying Attentive's Campaign Composer does not have the ability to have multiple branches within a flow, and if a subscriber goes down one path, it can't have additional branches.  That's what that's saying, right?

A.    Yeah.

Q.    All right.  Now let's turn in your binder please -- there's one more of these.  I'll try to go quickly.  It's DTX-223.  DTX-223.

A.    Got it.

Q.    Another feature comparator, right?

A.    Yeah, very similar document.

MR. CAMPBELL:  Move to admit, Your Honor.

THE COURT:  Is there any objection?

MS. JIAM:  There is no objection.

THE COURT:  All right.  It's admitted.

(DTX Exhibit No. 223 was admitted into evidence.)

MR. CAMPBELL:  Let's publish that, please, Marco.

BY MR. CAMPBELL:

Q.    All right.  Let's start at the very top.  And what this says is there's an overview.

Do you see that?

A.    Yes.

Q.    All right.  "The goal of this document is to help Posties get a deeper view of the competitive landscape and how we stack up."  That's what you're saying, right?

A.    Yeah, Posties is what we call our employees, our team.

Q.    Thank you.  It is short for Postscript.  I was going to ask you about that.

A.    Yeah, it's the people on the team.

Q.    Right.  I had to think about it when I saw it for the first time as well.

A.    Yeah, I can see how it would be confusing.

Q.    "In order to help reps avoid land mines and know how this lines up with our current roadmap," that's what we're trying to do here in this document.  That's the objective, right?

A.    Yes.

Q.    "And the notes aimed a high-level overview on any differences or areas where assumptions were made often due to a lack of documentation from a competitor."  That's what one of the objectives is here, right?

A.    Yeah.

Q.    All right.  Let's turn now to page 9.  And again very similar entries.

MR. CAMPBELL:  I'm going to focus, if we could, please, Marco, on -- and we'll note at the top, we've got the feature in Column A; feature details, B; Postscript, C; and Attentive in D.  Let's focus on Rows 64 and 65, please.

BY MR. CAMPBELL:

Q.    All right.  Again, similar entries to what we saw before.  And what this is saying in Row 64 for the feature detail B, it's, again, "creating conversational campaigns where the next message can be determined by how the subscriber responds."

That's talking about Postscript's Campaign Flows, right?

A.    It's talking about, yeah, when someone replies like they have curly hair or straight hair, you can change the message based on that's what it's talking about.

Q.    And what this is saying, when you move over two columns, so we're in Column D, Row 64, this is saying that

Attentive's Campaign Composer does not have that feature; isn't that right?

A.      Yes.

Q.      And then Row 65.

Again, this is talking about the ability to have multiple branches.  And if you look over two columns, Column D, Row 65, it says "Campaign" -- and that's Attentive's Campaign Composer -- does not have that feature; isn't that right?

A.      Yes.  This isn't necessarily multiple branches; this is branches within branches.  Just to be super clear.

Q.      Thank you.

Let's go up to page 22 now, please, sir.

Okay.  So I want to focus on Rows 25 and 26, very similar entries.  I won't go through them, save the jury that.

But again, I just want to point you to the fact that, again, Postscript is distinguishing Attentive's Campaign Composer from features that exist in Postscript's Campaign Flows, which is embodied in the '660 Patent, right?

A.      Sorry.  Can you repeat the question?

Q.      Sure.

So you understand that the '660 Patent is a patent that covers the Postscript Campaign Flows, right?

A.      Yeah.

Q.      So what these two rows -- again, they're very similar to what we've seen previously -- what they're attempting to do is tell your marketing team, tell your sales team, how Campaign Flows differs from Attentive's Magic Composer or Campaign Composer; isn't that right?

A.      Yeah.  These are how the additional features on top of Campaign Flows differ from Attentive's product.

Q.      And again, there's no reference in any of this of additional features.

        We talked about that earlier, right?

A.      Just to make sure.  This is isn't a list -- this isn't a list of features that exist within Campaign Flows as kind of additional features or other subfeatures on top of Campaign Flows.

Q.      Important document within your organization, these three that we just looked at, fair?

A.      Yeah.  Well, the whole thing.  I would say the whole document is important.

Q.      Yeah.

        And it's important, because it's an important document, that the document itself be accurate; isn't that right?

A.      Yes, definitely.

Q.      And this is a living document, that is to say it gets updated; isn't that right?

A.      I'm not sure if this one did, but I would not be surprised if we had a version of this document or ones that you've shown us live as a living document inside Postscript.

Q.      Okay.  Well, let's take a look.  Turn to page 33.

        Okay.  So this is a frequent -- frequently-asked-questions section; isn't that right?

A.      Yeah.

Q.      Okay.  At the very bottom of Row 7, "How often will this be updated?"

        Do you see that?

A.      Yeah.

Q.      Okay.  Read Column B, please, sir, the entirety of it, into the record.

A.      "This is updated on an ad hoc basis as things change. If you see something that looks off, please let us know.  We aim to rereview quarterly."

Q.      So as I said previously, this is a living document in that you aim -- Postscript aims to update the document quarterly, fair?

A.      Yeah.  I'm not surprised at all, this is -- a lot of teams keeping it up-to-date.

Q.      Okay.  And then if we look at Row 4, it says, "How can I compare features with different" -- and I think that's saying names.

        Do you see that?

A.    How can I compare features with different N-A -- yeah, I'll assume -- I'll assume names.  I'm not sure what it is after that, though.  I'm not sure, but, yeah.

Do we have access to the...

Q.    Okay.  So it says right there in Cell B of Row 4, "One of the goals of this document was to help reduce confusion due to the same feature having a slightly different name on a competitor platform," right?

A.    Yes.

Q.    And then it says, "Attentive calls them Journeys," a little further down, right?

A.    Yeah.

Q.    So one of the things you're trying to do is make sure that your sales and marketing team are very aware that this document is trying to distinguish Postscript's Campaign Flows from Attentive's Journeys, and other names, such as Campaign Composer, Magic Composer, that Attentive uses; isn't that right?

A.    Yeah.  So we have Automations, they have Journeys, we have Campaign Flows, they have Campaign Composer.

MR. CAMPBELL:  You can take that document down, Marco.

BY MR. CAMPBELL:

Q.    Now, Mr. Turner, you believe in competition, don't you?

A.      Yes.

Q.      Competition is a good thing, right?

A.      Yes.

Q.      Postscript competes with Klaviyo, right?

A.      Yes.

Q.      Postscript competes with Attentive, right?

A.      Yes.

Q.      And Postscript tries to win customers from its competitors; isn't that right?

A.      Yes.

Q.      Let's take a look at DTX-419.

        MR. CAMPBELL:  And this has been admitted, so if you can publish it, please, Marco.

BY MR. CAMPBELL:

Q.      So this is the document that's a Slack thread.  You were here in the courtroom.

        Let's go to the page --

        MR. CAMPBELL:  Marco, next page.  Right there.

BY MR. CAMPBELL:

Q.      And this was a conversation that you were having with Mr. Glazer who testified yesterday; isn't that right?

A.      Yes.

Q.      Okay.  So at the very top, you know, you say that, "Mr. Glazer, I have a lead, not sure if they're qualified. Can you point me in the right direction?"

Do you see that?

A.    Yes.

Q.    And then you say, "They're asking if they should talk to someone on our team.  Looks like they use Attentive."

That's what you said, right?

A.    Yeah.

Q.    All right.  And then Mr. Glazer responds, "Wow.  We don't even have them in our Salesforce, which means we don't even know about them."

Do you see that?

A.    Yeah.

Q.    Okay.  Go down to the last two.  So the last two entries at the bottom.

Adam Turner, that's you.  You then write, "Random referral from a friend, no idea of size -- on the size, but I can ask."

You wrote that to Mr. Glazer, right?

A.    Yes.

Q.    And then Mr. Glazer wrote back, "Hmm.  No need since its Attentive steal, I'm guessing it's worth our time and traffic source is just off."

Again, that's his response to you?

A.    Yep.

Q.    So he's talking about stealing customers of Attentive; isn't that right?

A.      Yeah.  A steal in this case would mean any customer that's coming from a competitor.

Q.      And you're cool with that, right?

A.      Customers coming from competitors, yes.

Q.      No problem with that?

A.      No, no problem.

Q.      Yeah.  Nothing wrong with that, right?

A.      Nothing wrong with customers having the choice of what they want to use.

Q.      One way to compete, however, is on price, right?

A.      Yes.

Q.      And Postscript competes viciously on price; isn't that right?

A.      I would say we want to give our customers the best price.  For sure.

Q.      And you give your customers fantastic prices, don't you?

A.      Certainly for, yeah, small businesses, we try and make the best price and to keep our competitive pricing across the board.

Q.      And price is always a nice way to win over a competitor.  You'd agree with that, right?

A.      I prefer the product.  I prefer that they buy us because we have the best product and -- price is always a consideration, though.

Q.    Yeah.  There's no differentiation.  Let's say you're driving past the gas station and the cost of gasoline is $3 a gallon, but there's one, you know, a block away where it is 2.75.  Which one are you stopping at to get the gas?

A.    Got to get the 2.75.

Q.    Bingo, I agree with you.

A.    Yes.

Q.    So price is one way to compete?

A.    As long as it's top tier.  As long as it's top tier gas.

Q.    There you go.  I think we're in agreement there.

So speaking of tiers, Postscript has a starter tier, right?

A.    Yeah.  So I'm not sure we call it that exactly, but starter tier, yeah, small business tier.

Q.    Right.

Well, let's take a look at what you call it.

A.    Great.

Q.    So this is a page from your own -- you recognize this page, don't you, sir?

A.    I'm unfamiliar with our pricing page.

Do you know when this was taken, though?  Just so I can be super accurate.

Q.    Yeah.  It was taken yesterday?

A.    Okay.  Great.  Yeah.

(Reporter clarification.)

BY MR. CAMPBELL:

Q.      So yesterday, being August 26th, 2025.

Okay.  So let's talk about that.  So on the far -- you've got different tiers for your SMS Marketing customers; isn't that right?

A.      Yes, different packages.

Q.      And then on the far left you have "Starter," and then you've got "Growth," next to it, "Professional," and then "Enterprise."

That's how you bundle and package your different tiers, right?

A.      Yeah.

Q.      So your starter tier, let's talk about that.

You give that away for free, don't you?

A.      The platform fee is free, and we require a $30 a month minimum spend.  So $30 worth of SMS is included in that.

Q.      All right.  So you get $30 of minimum spend -- as long as you're spending 30 bucks, you get everything else on that starter tier for free, right?

A.      Yeah.  I think that's accurate.

Q.      And, in fact, what you get are different features for free.  You get Campaigns and Automations and unlimited Segments.  You get those for free if you spend 30 bucks;

isn't that right?

A.    I don't think internally we would say "for free," but they're -- they're kind of paying monthly to use the platform, and these are the things they get access to.

Q.    Well, zero dollars is free; isn't it?

A.    These customers will be spending $30 a month.

Q.    Minimum 30?

A.    They spend --

Q.    I'll give you that, but that's all they have to spend, right?

A.    Yes, uh-huh.

Q.    That's trying to entice customers, smaller customers, to join Postscript, fair?

A.    Yes, we want competitive pricing for even the smallest customers.

Q.    Okay.  And then right here it says, "Dedicated toll-free number."

      Do you see that?

A.    Yes.

Q.    And then they also get, as part of the features, "Subscriber acquisition tools with two opting keywords," right?

A.    Yeah.

Q.    And then they get a branded short link subdomain, right?

A.    Yeah.  I think these are some of the features, and they get access to, you know, also, Campaign Flows, Automations, and the whole category of products I showed on the screen yesterday.

Q.    Yeah.  The starter tier or any of these other tiers, there's not a single mention in here about retargeting, is there, sir?

A.    Retargeting?

Q.    Yeah.  Doesn't say you get retargeting, does it?

A.    Retargeting is a feature of Campaigns and Campaign Flows, but it's not -- just want to make sure.  It's not explicitly laid out on this page, from what I can tell.

Q.    So that's not a feature that you're publishing that, hey, new customers, come to Postscript and you'll get retargeting, which is what our '660 Patent is about.  You're not telling your customers that in this marketing document, are you, sir?

A.    Oh, not on the pricing page, because everybody gets access.  So that might be on, like, a feature page or somewhere else on the website.  But we're trying to kind of show them the different tiers and what's different across them.  Campaign Flows would be available across all of the tiers.

Q.    Many of your customers find themselves in the starter tier; isn't that right, sir?

A.    Yes, many of our customers do.

Q.    Smaller customers, mom-and-pop shops?

A.    Yeah.  I would say that.

Q.    And you're trying hard to get those mom-and-pop storefronts to sign up; isn't that right?

A.    We want them to be super educated to choose the best product.  We hope that we have the best product for them and -- yeah.

Q.    And because they're small, they don't have a lot of money to pay, they're getting access to Postscript for very little money, right?

A.    They are, you know, spending, yeah, $30 a month, and they get access to all the features.

Q.    And because you have so many mom-and-pop shops, each individually contribute relatively little in terms of Postscript's overall revenue; isn't that fair?

A.    Each individual shop contributes little.  All of them together, you know, make up a decent portion of our revenue base.

Q.    But, you know, you've been around for seven years, fair?

A.    Yeah.

Q.    And you're targeting, you know, a very low end, not in a pejorative way that -- you know, mom-and-pop shops are fantastic, but they're not paying nearly as much as a

professional tier, and certainly not as much as an

enterprise; isn't that right?

A.      Yeah, one of the things we're most proud of is being

able to service the lowest end and the highest end, for

sure.

Q.      Of course, but the lowest end is necessarily because

you're giving these services away for free with a $30

minimum monthly spend.  That's going to be one of the

reasons that your revenues are so much lower than those of

Attentive; isn't that right?

A.      No.  I wouldn't say that.

Q.      Well, it's fair to say that Attentive and Postscript

compete in different segments of the market.  You would

agree with that, right?

A.      I would say we overlap on a wide -- like, on a large

amount of segments in the market.

Q.      Okay.  But Postscript, you came up as a company, and

you still pride yourself with being a company who serves

mom-and-pop start-ups, small, medium business, fair?

A.      Yeah, being able to serve the smallest shops and the

largest shops, I see as a very difficult thing, and I'm

incredibly proud of that.

Q.      Of course you should be.  And Postscript has 18,000

customers; isn't that right?

A.      Yep, maybe more.

Q.    Yeah.  Maybe more.  So you could maybe even have 20,000.  You were in the courtroom.  Attentive only has 8,000, so you have over 10,000 more, but, yet, your revenues are much smaller.

Given that, isn't it fair to say that Postscript on the whole is targeting a different market segment than Attentive?

A.    No.  I would say, you know, we compete with Attentive.  We service the smaller stores which Attentive doesn't serve.  And we service the largest stores which Attentive does serve, so we overlap on those large stores.

Q.    And the smaller stores that you serve -- and you have a lot of those -- you don't make nearly the amount of money that you make with the larger stores who you serve; isn't that right, sir?

A.    I would agree with that on a single-store basis, yeah.

MR. CAMPBELL:  Pass the witness, Your Honor.

THE COURT:  Okay.  Thank you.  Redirect?

MS. JIAM:  Thank you, Your Honor.  Just a few short questions.

Mr. Glass, would you please turn -- pull up DTX-223.  Thank you.  You can just stay right there.

REDIRECT EXAMINATION

BY MS. JIAM:

Q.    Mr. Turner, you remember when you looked at, like, many versions of this feature compare spreadsheet and we walked through those features, talked about the add-ons.

Do you remember that?

A.    Yeah.

Q.    Mr. Turner, do you see on this Row 17 where it says last updated?

Do you see that?

A.    Yeah, I do.

Q.    Is this date, October 19th, 2023, is that after Postscript applied for the Campaign Flows patent?

A.    I believe so, yes.

Q.    And so with the features that you were discussing with Mr. Campbell, were those added after the Campaign Flows patent was filed?

A.    Those were features added after.  I would say, yeah, probably.

Q.    All right.

MS. JIAM:  No further questions.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Turner, you may step down.  Thank you.

And we'll ask counsel to remove, if there are any, any binders left.

And I'll call on Postscript to call its next witness.

MS. PASVANTIS:  Hi, my name is Tannyr Pasvantis. I am one of Postscript's attorneys, and we're going to play some deposition videos for you.  The first is going to be Jesse Greenberg.  We're going to hear from Jesse Greenberg who is currently the vice president of engineering at Attentive.

(The following is deposition video testimony of JESSE GREENBERG:)

Q.    What's your current position at Attentive?

A.    VP of engineering.

Q.    What's Magic Composer?

A.    Good product marketing on top of UI refresh.

Q.    Does it refer to a particular product?

A.    It's -- it refers to an UI refresh that allows you to create multiple campaign messages at one time, whereas the prior workflow required you to create one campaign message at a time.

Q.    What's the relationship between Magic Composer and Campaign Composer?

A.    Those two words are synonymous to me.

Q.    And what's the relationship between Magic Composer and Drip Campaigns?

A.    Those two, one was the original name of the internal product, and then the product marketing release name.

Q.    And Drip Campaigns was the -- was the original name

of the internal product?

A.    Yes.

Q.    And how about between Magic Composer and Contextual Campaigns?

A.    That was the 2.0 name for the Drip Campaigns.  And the 3.0 name became Magic Composer.  But they are all conceptually the same work stream.

Q.    Was Magic Composer difficult to develop?

A.    We had some struggles with it.

Q.    What sort of struggles?

A.    Just took us longer than it should have.  I don't remember the details.  I just remember it taking us longer than it should have.

Q.    How long did it take?

A.    I don't remember.

Q.    Do you have a ballpark?

A.    No, but I -- yeah, a lot of years ago, in my -- in my memory.

Q.    More than a year?

A.    I don't think so.  But if you came back and you were, like, I have docs that support this, it wouldn't be, like, you know.

Q.    Yeah.  And I'm not trying to pull a fast one.  I'm generally trying to -- in information-gathering mode here.

A.    I'll tell you the first implementation took us a

couple of weeks.  The subsequent implementation was more complicated, but I can't tell you the timeline and --

Q.    And the set of subscribers that received the memorandum is called a segment?

A.    The set of -- no.  The set of people who receive a message is the audience.  Your audience can be a segment of your total subscriber list.

Q.    Got it.  What's the difference between an audience and a segment?

A.    I guess nothing.  I guess, I -- like, semantically the same.  Just who your messages are going to.  I think if the audience is everybody, whereas a segment is a subset of your population.  But that's probably Attentive nomenclature and not reflective of anything specific.

Q.    And in this audience box, you can -- you can ensure that this message is sent to a subset of all of your subscribers, right?

A.    Yeah, that's correct.

Q.    And is it accurate to refer to that subset as a segment?

A.    Yes.

Q.    So I'm introducing as Exhibit 9 a page Bates labeled Postscript 38165.

Do you see that?

A.    Yes.

Q.    And what is this page?

A.    This is help center documentation for Shopify segment creation.

Q.    And if you go to the second page of the document, this list says, "Shopify events," things like "Order confirmed, Received, Received a refund, and Abandoned checkout events"?

A.    Well, that answered the question of is the order confirmed there.  So, yes.  Yes.

Q.    How does Attentive receive these events from Shopify?

A.    The customer needs to install the Shopify app, and then Shopify, we register a web hook with Shopify and Shopify sends those notes to us.

Q.    So Attentive basically receives a payload from Shopify that contains information about the Shopify event?

A.    Yes.

Q.    How does Attentive figure out that the Shopify event corresponds to the same subscriber as an event that comes through the Attentive tag, for example?

A.    So Attentive has an internal master object called the subscriber, and that subscriber has a phone number and e-mail and a relationship to something called a -- a visitor ID.  And we use -- basically on ingress into the Attentive platform, we use those external IDs, and now a much longer list, to map the external event to the internal identifier.

And then all internal Attentive systems rely on the internal Attentive identifier.

Q.    Could you flip back to Exhibit 8, which is the screenshots?

A.    Yep.

Q.    If you go to the screenshot at time stamp 1 minute and 37 seconds, there's an image of the UI displaying a campaign with two messages.

        Do you see that?

A.    37 seconds.  Yes.

Q.    And for each message underneath the message, there's a line that says "estimated recipients" followed by a number?

A.    Yes.

Q.    So, for example, for the first message, which says it's "Bonny Beauty's anniversary sale.  Get 15% off with code ANNIVERSARY," there are 193 estimated recipients?

A.    Yes.

Q.    How does Magic Composer calculate the estimated recipients?

A.    It's -- asks for a count of the size of the audience of subscribers who it's -- that set of attributes.  In this case, the attribute is -- purely is a subscriber of Bonny Beauty.  And then in real time, we calculate that count. And that's why it's estimated, because between now and when

this message is sent, it will actually calculate that audience size.  And then downstream of this calculation, fatigue happens.

Q.    And this image shows various options that a merchant can select for the second or third or fourth message in the Magic Composer campaign?

A.    Yes.

Q.    And that includes two options to retarget previous message recipients?

A.    Yes.

Q.    And if you turn to the next page, which has a time of 1 minute and 29 seconds, we see that the two options that a user can select are recipients who did not click on the previous message and recipients who clicked the previous message and did not purchase?

A.    Yes.

Q.    How does Magic Composer determine whether a recipient of the previous message has or has not clicked on it?

A.    It's just, like, a logical query, right.  So if you think about the logical expression, you are -- you want users who received a message and the idea of that message and users who have a click associated with that message ID, or you want logically users who have received that message and users who do not have a click associated with that message.  It's just an intersection for like an exclusion.

Q.    Is there a subscriber event data that indicates for a given subscriber whether the previous message has been clicked or has not be clicked?

A.    Magic Composer is not listening to those events to calculate this audience.

Q.    Is some other Attentive functionality listening to those events?

A.    So those events are written to the data lake, and then they're queried as part of executing this operation. But there's no state management -- there's no state maintaining who is in that audience.

Q.    And did you say "data link"?

A.    Data lake.

Q.    Data lake.  What is the data lake?

A.    It's combination of S3 and snowflake.  It's, like, where all the data gets stored.

Q.    So Attentive basically maintains a list of subscribers who received the previous message?

A.    No, they -- they do not.  What we maintain is a bajillion events.  And then in real time, we can ask questions of that billion events to create an audience.  But there is no real-time maintenance of, like, who got the message and who clicked.

Q.    Is there any difference in how Attentive then gets event data for Magic Composer versus Journeys?

A.    Yes.

Q.    What are the differences?

A.    So we have talked about how data flows in and goes into the data lake for use in segmentation so that the campaign's product can mask segmentation who the audience is, and it queries for it.  The -- basically there's a fork at the beginning of that process before it goes into the data lake where we duplicate the event, and one copy goes into the data lake and one copy goes into a stream that the Journeys engine listens to in real time.

Q.    And is the process that you described for event data flowing in and being duplicated, is that true of both event data from e-commerce integrations and event data from the Attentive tag?

A.    I'll answer your question a different way, which is, almost all events flow into something called the main event pipeline, which handles this.  And that includes events Attentive generates for itself, events from the Attentive tag, and events from many of our e-commerce solutions.

It's got in -- a little more nuances recently, but that's for the last five years, more or less, how that has worked.

Q.    And once it gets to the main event pipeline, is the process of using those events for Attentive Journeys different from that of using it for Magic Composer?

A.     So that pipeline towards the end of it forks.  And one of those forks goes into the segmentation systems, and one of those forks goes into the -- the Journeys systems. And then they do different things from there.

(Video concluded.)

MS. PASVANTIS:  Your Honor, at this time Postscript seeks to admit PTX-360.  We understand there are no objections.

THE COURT:  All right.  Is that correct, no objection?

MR. WOOD:  No objection.

THE COURT:  All right.  So it's admitted.

(PTX Exhibit No. 360 was admitted into evidence.)

MS. PASVANTIS:  And one further comment.  12 minutes and 25 seconds of that video should be allocated to Postscript and 1 minute and 44 seconds to Attentive.

THE COURT:  Okay.  The Court will allocate time, but we do recognize the parties' designations as we go.

MS. PASVANTIS:  You are now going to hear from Zachary Magdovitz, who was formerly a lead product manager at Attentive.

(The following is deposition video testimony of ZACHARY MAGDOVITZ:)

Q.     Do you have an opinion on whether retargeting options

are important to clients?

A.    Clients I've spoken to have mentioned it's important to them.

Q.    And do you know why the clients believe that retargeting is important to them?

A.    They have mentioned a belief that it drives ROI.

Q.    To your knowledge, does retargeting drive ROI?

A.    We've done experiments at a small scale showing that in certain cases it can.

Q.    So the treatment for 31 adopters is still referring to the treatment group that has access to Magic Composer, correct?

A.    Correct.  It's just larger compared to the previous slide.

Q.    So then the second bullet point says, "In aggregate across the four controls, average sends for the treatment cohort outperformed by plus 8.55% and average sends per subscriber outperformed by plus 9.19%."

          Do you see that?

A.    I do.

Q.    MC represents the cohorts of people who have access to Magic Composer, right?

A.    Correct.

Q.    And then non-MC would be those control cohorts who don't have access to Magic Composer, correct?

A.      It would be people who don't have access.  I don't know if it's simply the cohorts we were looking at before.

Q.      Okay.  And so this data reflects an increase in the total campaign sends and the sends per subscriber for the people who had access to Magic Composer, correct?

A.      Correct.  Both -- both increased.

(Video ended.)

MS. PASVANTIS:  Your Honor, the entirety of that deposition was designated by Postscript.

You are now going to hear from Brandon Simins, who was formerly the chief financial officer at Attentive.

(The following is deposition video testimony of BRANDON SIMINS:)

Q.      Is it accurate that you started at Attentive as a VP of finance in January 2020?

A.      That's correct.

Q.      And is it accurate that you were promoted to chief financial officer in January 2021?

A.      That's correct.

Q.      And do you see on this document how in 2022 Attentive's revenues were approximately $356 million and in 2023 approximately $461 million.

Do you see that?

A.      Yes.

Q.      Okay.  And is it accurate that the cost of revenue

for these two years was approximately half of the revenue?

A.    Approximately, yeah.

Q.    What is the Rule of 40?

A.    It's a metric that calculates the relationship between revenue growth and profit margin.

Q.    How does Attentive use the Rule 40?

A.    What is -- how do we use the Rule 40 metric?  Amongst software businesses, targeting a rule of 40 -- of 40 is viewed as a threshold metric for a company that is doing very well versus a company that has room for improvements. A hundred percent doesn't have any significance but 40% has real significance.

Q.    Understood.  So being over 40 is significant; is that what you're saying?

A.    Yes.  And you can see that the conditional formatting on the spreadsheet shows green cells when it's above 40 and red cells when it's below 40.

Q.    So being over 40 is a good thing; is that right?

A.    Very good thing.

Q.    And Attentive measures its performance against the Rule 40?

A.    All software companies have a Rule 40.

Q.    Okay.

            (Video ends.)

            MS. PASVANTIS:  Again, all the deposition

testimony for that video was designated by Postscripts.  And we would seek to admit PTX-317 into evidence, which was referenced in that video.  We understand there are no objections.

THE COURT:  All right.  Is that correct, there are no objections?

MR. DAVIS:  No objections.

THE COURT:  All right.  Then it's admitted as well.

MS. PASVANTIS:  Thank you.

(PTX Exhibit No. 317 was admitted into evidence.)

MS. LI:  My name is Joyce Li.  I am here on behalf of Postscript.  And as our next witness, we call Ms. Barbara Frederiksen.

THE COURT:  All right. Ms. Frederiksen, if you'll come forward and be sworn.

COURT CLERK:  Please state and spell your name for the record.

THE WITNESS:  Barbara Frederiksen, F-R-E-D-E-R-I-K-S-E-N.

BARBARA FREDERIKSEN, having been duly sworn, was examined and testified as follows:

THE COURT:  All right, Ms. Li.

DIRECT EXAMINATION

BY MS. LI:

Q.    Can you please introduce yourself to the jury.

A.    My name is Barbara Frederiksen.

Q.    Why are you here to talk to the jury today?

A.    I'm here on behalf of Postscript to talk about infringement of the '660 Patent.

Q.    Before we get into your opinions, could you just give us a little bit of background about yourself?

A.    Sure.

I started programming about 51 years ago.

(Reporter clarification.)

THE WITNESS:  Sure.

I started programming about 51 years ago.  Have been continuously involved in software development since, including a variety of both online and banking systems for banks, telephone companies, insurance companies, manufacturing companies.

My experience also includes forensic analysis of computer software since roughly the mid-80s.  And that's -- these days, I primarily focus on that area.

BY MS. LI:

Q.    And I'm sorry, I am a little bit far away from you. Could you speak up a little bit?

A.    Sure.  I'll try to speak up a little louder.

THE COURT:  And I apologize, our microphones, I

wish they were even louder, yes.  So for both counsel and the witness, speak as loudly as you can, to make sure the jury is able to hear you.

MS. LI:  Your Honor, would I be able to approach and provide the Court and the witness with some binders?

THE COURT:  You may approach.

MS. LI:  Thank you.

BY MS. LI:

Q.    Now, you mentioned you got into computer forensics. How did you get into that?

A.    Early on in my career, I started a business because I had special training from IBM and later from Microsoft that was focused on really helping fix systems that weren't performing well.

And a lot of my clients were very big banks, telephone companies, insurance companies, so in the mid-80s when fraud was really becoming a problem and data theft was becoming a problem, those companies reached out to me because I knew their systems.  I helped them rewrite parts of them to help institute fraud detection so they could identify instances where it appeared something amiss was going on in their systems.

And also to help then put traps in the system basically to try to catch the individuals who were performing bad acts.

Q.     Now, you consult for lawsuits from time to time; is that right?

A.     I do, as well as internal investigations.

Q.     What sort of cases do you work on?

A.     It's really a wide variety.  I consult with intellectual properties cases, which would include patent, copyright, trade secret.  I consult in cases that involve large data software systems to try to understand what went wrong, who the responsible parties were.

       I sometimes consult in criminal matters that might relate to unauthorized use of the computer, data theft.

       (Reporter clarification.)

       THE WITNESS:  Even things like murders where there's some evidence of computer evidence about what someone was doing at a particular time.

       And then I also do consulting in some consumer liability cases where my role is basically to analyze data and answer questions like who, what, when, was there any coverup with respect to something.

BY MS. LI:

Q.     All right.  In that binder in front of you, could you please turn to the Tab PTX-592?

A.     Okay.

Q.     Okay.  Do you recognize that as your resume?

A.    Yes, I do.

MS. LI:  I offer PTX-592 into evidence.

THE COURT:  Any objection?

MR. DAVIS:  No, Your Honor.

THE COURT:  All right.  Admitted.

(PTX Exhibit No. 592 was admitted into evidence.)

MS. LI:  And now I offer Ms. Frederiksen as an expert in computer, internet, and mobile device imaging.

THE COURT:  So admitted.

BY MS. LI:

Q.    Now, Postscript is accusing Attentive's product of infringing in this case, right?  We've heard a lot about that?

A.    Yes.

Q.    That's the Magic Composer product?

A.    Right.  I would note it's been -- as we saw in Mr. Greenberg's testimony, that it's had various names over time.  So I'll try to stick with Magic Composer, but it's also been known as Campaign Composer and Drip Campaigns.

And that's not uncommon for software to change names over time.

Q.    And just to help orient us, how do you access Magic Composer?

A.    A customer of Magic Composer, or an Attentive

customers who is using Magic Composer, would go to the website, log in with their ID on the website, and then they get to a home screen where they can actually select from amongst Attentive's products to go through the Magic Composer product, and then from there they can connect with the product.

Q.     And have you actually used that product?

A.     In connection with this litigation I have and in my analysis.

Q.     Can you please turn to PTX-586 in your binder?

       (Reporter clarification.)

       THE WITNESS:  Got it.

BY MS. LI:

Q.     Do you recognize these as screenshots from the live Attentive platform?

A.     Yes, they are.

       MS. LI:  Move PTX-586 into evidence.

       THE COURT:  Any objection?

       MR. DAVIS:  No objection, Your Honor.

       THE COURT:  All right.  It's admitted.

       (PTX Exhibit No. 586 was admitted into evidence.)

BY MS. LI:

Q.     Did you prepare some slides to help guide us today?

A.     Yes, I thought it would be helpful to kind of walk

through that interface for the jury.

MS. LI:  All right.  Mr. Glass, can we please put up Ms. Frederiksen's slides.

BY MS. LI:

Q.    So what are -- what are we looking at here?

A.    This is the home page where you would land after you logged into the system.  And I've highlighted on the left-hand side the Campaign option.  So if you click that, that's how you enter into interacting with the Campaign software.

Q.    And then you can click "Create Campaign" there in the corner?

A.    Right.  So the next slide will show it.

Q.    Now, there's been testimony over the last couple of days about tools that existed before Postscript's invention.

Were you here for that?

A.    Yes.

Q.    And one of those things that we heard about were -- what's been referred to as blast campaigns.

Are you familiar with those?

A.    Yes.

Q.    And what are blast campaigns?

A.    A blast campaign is basically where you send a single, one-time message out to your audience, which is often all of your subscribers, but it might -- it might have

some limitations on it.

Q.    And when considering these existing tools for this case, did you look at any of Attentive's documents?

A.    I did, yes.

Q.    Let's pull up PTX-562, in evidence.

       Is this one of the documents you considered?

A.    Yes, it is.

Q.    Now, I want to take a closer look at the top here where it says, "Mission."  And I'll just read that out, in case it's hard for folks to see.

       "Attentive's Magic Composer changes our message composition paradigm from the Legacy single Campaign Composer into a new multi-message composition flow so that brands can more easily compose and send multiple high ROI messages."

       So, first off, for people that might not be familiar, what is ROI?

A.    That just means return on investment.  It's are you getting your money's worth with whatever you're doing.

Q.    And this is referring to Attentive's Legacy single Campaign Composer?

A.    That was a blast system that would allow you to create single message and send it out to subscribers.

Q.    What did Magic Composer add to that?

A.    Well, as it says here, you know, it's changing the

way that the composition works so that now there can be multiple messages in Campaign Flows.

Q.     Did it add anything else?

A.     Yeah.  It had -- it had several benefits.  You know, in addition to multiple messages, you had the ability to apply conditions associated with those messages so that you could target or retarget subsets of the customers who received a first message.  It also enhanced the ability to report across campaigns.

Q.     Was it also bringing in data from different sources?

A.     Yes.  It was bringing in data from both application sites like Shopify that support the merchant's website, as well as data from --

                (Reporter clarification.)

                THE WITNESS:  As well as data from the individual user's platform.

                So as you interact with a website -- so interactions would be captured from your laptop or your phone or whatever you were using to access the site so they could be reported as well.

BY MS. LI:

Q.     What did Postscript's patent add to a messaging campaign?

A.     Well, it's basically -- it's actually those same things.  The ability to set up a campaign that has multiple

messages and where you can -- once you enter a particular message flow, that's the fancy name for the campaign -- once you're in a flow, you can have successive messages that go to the same set or a subset of the subscribers who get entered -- enrolled in that flow.  And it also had the ability to draw -- or define the limitation of drawing data from both the user device and from the website's -- the -- I'm sorry, from the merchants' sites that are -- the sites that are providing the services to the merchants, like processing payments and processing refunds and processing shipping.  So those kind of events can come in through the merchant to the -- or through the pipeline of data directly to Attentive.

So it moves to fulfill those merchant criteria that are set up for the flow or for the individual user interactions --

(Reporter clarification.)

THE WITNESS:  -- that might be tested to determine whether a message should be sent.

MS. LI:  All right.  Mr. Glass, can we go back to Ms. Frederiksen's slide?

BY MS. LI:

Q.      Now I want to talk about the '660 Patent presence.

Before we get into the details of infringement, I'd like for you to give the jury some basic background of

kind of the players that are involved in the system.

You have Figure 1 up here.  Can you just walk us through this?

A.    Yes, this is the -- it's Figure 1 from the '660 Patent.  I felt it was a good starting place because it introduces some of the main players that we're going to be talking about with respect to the '660 Patent.

So let's start with the application operator, if we could.

And so in this example -- say that you have started up a -- you know, you start baking pet treats and all of your friends love them for their pets and all of a sudden people are asking you for these pet treats and that business grows and grows and grows until pretty soon you say, hey, I'm going to open -- I'm going to sell Pete's Pets -- I'm going to sell pet treats and maybe over time it expands to other products.

So you're that merchant who is wanting to have an e-commerce presence and to be able to reach out to your customers and tell them when you have sales or specials on things that they're buying.  And that's called application operator in the patent.

The next one is the application builder platform.  So maybe you don't know anything about building a website, but you know it's a good website to have for

your -- for your Pete's Pets Supply.

How do you go about doing that?  Well, there are application builder platforms -- Shopify is one example -- there are others -- who actually provide kind of a kit of tools that you assemble a website very, very quickly.  So you can assemble what your pages are going to look like, you can assemble the flow between the pages.

They can handle things like processing payments for you.  So if somebody wants to use a credit card or PayPal, that all gets handled on that back end by the application platform.

So when somebody comes to your site, they see Pete's Pets Supply and all of that flowing stuff happens largely from the application-building platform.

And then finally, we have the message-management platform.  So that would be a company like Postscript or Attentive.  And they provide help to your site in sending messages to your subscribers, you know, maybe those who have said, yes, I want to get your e-mails or, yes, I want to get your texts, and receiving back responses as well so that they can -- they can help you with managing that message operation that you are designing.

Q.    And then lastly, we have the users' devices down there.  What are those?

MR. DAVIS: Objection, Your Honor.  I'm not

seeing this is described in her report at paragraphs 34 and 37.

(Reporter clarification.)

THE COURT:  I'm sorry.  Mr. Davis, I can't hear you now.  Please speak up.

MR. DAVIS:  Yes.

I'm not seeing where this diagram or explanation is set forth in her report at paragraphs 34 through 37.  It references some Attentive screenshots, not this.

THE COURT:  So you're pointing me to paragraphs 34 to 37?

MS. LI:  Your Honor, we had a discussion about this last night, and there was no objection to these slides.  Actually, this was two nights ago.

But perhaps we should discuss at sidebar.

THE COURT:  All right.  Why don't I give -- we're at a point anyway where we are pretty close to taking our morning break, so why don't we use this as an opportunity to do that.

And with that, let me ask my courtroom deputy to lead our jury out.  We'll take a 15-minute break, and then we'll be right back here to resume.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  Okay.  Just a couple quick

housekeeping things.

I'll give counsel a chance to meet and confer about this issue. Just so you know, the next question I would have asked is, is it right there was no objection to this slide a couple days ago. But counsel can meet and confer and see if they can resolve the issue.

Secondly, just for the parties' benefit, and I'm having difficulty hearing what Ms. Frederiksen was saying. I wasn't having a hard time for any other witnesses. Now, the jury, I think, can hear. They're nodding, but maybe just the cadence of the voice and how quickly and maybe sometimes just because she's speaking to the jury, it's a little further away from her mic. We have a couple other options. You can explore that with counsel, but in any event, just ask if the witness can speak slowly and loudly.

And then if it is helpful for guidance, I have at least briefly looked at the objection that Attentive had on the monitoring issue, and I'm not precluding further argument, but I'll just say if the issue is that Ms. Frederiksen is going to testify on the same material that's in her expert report that she's going to say supports the idea that monitoring occurs in the accused product, but the nature of the objection is that literally after the report and just weeks before trial, I provided a construction of monitoring, one that wasn't the same as the

construction that Postscript is seeking, but she's going to testify to the same evidence and material that was in her report as to why it satisfies that limitation, I don't see an issue with that.

That said, I haven't heard from the parties. I'm just giving you guidance in case it can streamline things.

All right.  Let's make sure we get a 15-minute break.  So the jury left at 10:47.  So we'll come back at two or three minutes after the hour and proceed.

Okay.  The Court will stand in recess.  Thank you.

(A brief recess was taken.)

THE COURT:  All right.  Please be seated.

Argument has been resolved?

MS. LI:  Yes, it's been resolved.

THE COURT:  Okay.  Why don't you proceed?

BY MS. LI:

Q.    All right.  Before the break we were talking about the different players in the patent.  I'd like to focus a little bit on the message-management platform.

Is the message-management platform receiving information from the application-builder platform?

A.    Yes, it is.

Q.    What sort of information?

A.      Information like whether purchases have been completed or a customer has returned an item and refunded it.  It might include things like whether or not product has been shipped already, those kinds of events.  And also abandoned cart, which is kind of important.  You put something in a cart, you go to checkout, and then maybe you get distracted and you left it in the cart.  And so that's considered an abandoned cart.

Q.      And then we also talked about the user devices. Those are the customers', the end customers' devices?

A.      Yes, that would be your laptop or your tablet or your phone that you're using to interact with that website.

Q.      Is the message --

A.      The merchant's website.

Q.      Sorry.  Is the message-management platform also receiving information from the user devices?

A.      Yes, it is.  And we'll talk about how that happens, I'm sure, as we go along here, but messages are actually being sent from your cell phone to your computer as you interact with the website, reporting what you're doing.  So are you clicking on particular products on that site?  Are you scrolling through different pages on that site?  Those kind of events can be reported back as well.

Q.      All right.  So now I want to talk about your infringement opinion.

What is your understanding of how infringement works?

A.    I'm not a lawyer, but my understanding is that for infringement to be found, all of the discrete elements of a particular claim that you're evaluating need to be present in whatever system or device is being accused, so they all have to be there.

Q.    Does Magic Composer meet all the many elements of the asserted claims in this case?

A.    In my opinion it does, yes.

Q.    Are you going to walk through an example to show us?

A.    Yes.

Q.    That's just an example, right.  Are there other options in the system?

A.    Yeah, there are several different options in the system.  For instance, with the retargeting quotes that I believe practice all of the claimed elements of the '660 Patent, but I'm going to just walk through one particular example to keep this a little bit shorter.

Q.    And do those other options work similarly?

A.    They do, essentially, to retargeting, yes.  They depend sometimes on different data being provided, so, for instance, whether you click on a message or whether you took some other action.  So there's slightly different conditions, but they all operate in essentially the same

way, the condition being evaluated to determine whether the next message in the flow can be sent.

Q.    How did you come to your opinions about Magic Composer?

A.    I studied the evidence that was produced in this case, and there was quite a bit of that.  I had the opportunity to actually run the Magic Composer software, and I had the ability to review documents that describe Magic Composer that were produced by Attentive.  I had -- oh, and I reviewed the testimony that was given by Attentive's experts and, probably most compelling to me, I reviewed Attentive's source code, as well as I've been present in the court here to hear the testimony that was given during the hearing here.

And those are the ones that come most readily to mind that -- I mean, it was just a lot of material produced in this case.

Q.    And are you going to be talking about all of the claims in the '660 Patent today?

A.    No, only Claims 1, 4, 6, and 10 have been asserted. So -- but I will need to talk about Claim 1 and perhaps a little bit about Claim 11 as well, because 1, 4, and 6 are what are called dependent claims.  That means that they depend -- in this case, they depend from Claim 1, and so they add one more element to everything that's in Claim 1.

So to infringe Claim 4, for instance, you have to have all of the elements of 1 plus 4, and to do 6, you have to have all the elements of 1 plus 6.  And then the last claim depends from Claim 11, which is very, very similar to Claim 1.  So hopefully we can go through it more quickly -- Claim 1 more quickly, but you have to have elements of Claim 1 plus that last Claim 11 element.

MS. LI:  Mr. Glass, Slide 10.

BY MS. LI:

Q.    So I think you might have misspoke there.  I think you only talk about Claims 1, 4, 6 and 10.  Claim 14 is also asserted?

A.    I'm sorry, that was the one that depends from Claim 11, so we'll talk a little bit about Claim 11 as well, and then Claim 14 because all of the elements of 11 plus 14 have to be present for it to be found to be infringing.

Q.    Okay.  So these are the asserted claims 4, 6, 10, and 14?

A.    Yes.

Q.    What's the difference between Claims 1 and 11?

A.    Well, those two claims differ very little.  If you look at the patent, you see that all of the elements are exactly the same except the first three elements of Claim 1, claim a system, and then -- so the first line claims a system that's capable of performing the steps.  And it calls

out specifically a processor, that would be a computer, and the memory associated with that processor.  And Claim 11 is a method, so it's essentially a method that uses the software to perform the steps.

So it doesn't recite the processor and the storage, and it has the difference --

(Reporter clarification.)

THE WITNESS:  -- of the words "a system" versus a method in Claim 11.

BY MS. LI:

Q.    Now, I want to go back to what we heard in opening statements.  You were here for opening statements.

Attentive's lawyer said some things about your opinions, and we'll address all of those things.  But first I want to talk about what he didn't say.

He only identified one limitation in the --

(Reporter clarification.)

BY MS. LI:

Q.    Oh, I'm sorry.  He only identified one limitation in the '660 Patent claims that he said was missing from Magic Composer; is that right?

A.    That's what I recall from the opening, yes.

Q.    That was the monitoring the trigger condition limitation in Claim 1?

A.    Correct.

Q.      And Attentive has an expert in this case, too, Dr. Polish, right?

A.      That's correct, yes.  He's my counterpart with respect to we're addressing the technology.  I think there's other experts who address things like damages, but...

Q.      Did you review Dr. Polish's reports in this case?

A.      Yes, I did.

Q.      He disagreed with you on a few other elements of Claim 1?

A.      He did, yes.

MR. DAVIS:  Objection.  This is not in her report.

MS. LI:  Your Honor, this is just providing information about her review of his -- the final report which couldn't have been in her opening report, and she's just saying her understanding of the disputes to set the table.

THE COURT:  I'll overrule the objection for now, but if in substance we get into substantive testimony where it's asserted that the witness is going to be on the scope of her expert report, I'll allow Attentive to raise the issue.

BY MS. LI:

Q.      In the opening statement, Defendant's lawyer also made some comments about what you said about the prior art.

Do you remember that?

A.     I do.

Q.     Was that about your validity opinions in this case?

A.     The prior art would be related to the validity opinions, yes.

Q.     So we're just going to focus on infringement.

A.     Okay.

Q.     Let's look at Claim 1.  You've added these colors here.  Why have you done that?

A.     This just helps conceptualize how they group together a little bit.  So, for instance, the blue is the part that talks about the parts of the computer, whereas the purple on the bottom there talks about the way data comes into the system.  And so I colored them like this so that as we go through talking about these, you have a little reminder of which part we're talking about.

Q.     Let's start with the blue set here.  Can you walk us through what this set of elements is talking about?

A.     Yeah, this set is setting up the fact that there is a system in this case, a computer system that includes memory and a processor and that the memory stores the instructions that are going to -- and these are the instructions for the program basically, the things a programer would write, that are going to be executed.

              That's a fancy way of saying when the program

runs, to perform certain steps.  And the steps are in the other claim elements.  But this particular computer system has to be capable of causing a message-management platform to perform the steps that are spelled out in the rest of the claim elements.

Q.    Does Magic Composer meet these elements?

A.    In my opinion, it does, yes.

Q.    And do you know where Magic Composer's computer system is located?

A.    Yes.  Their documents indicate that they are located in the United States.

Q.    All right.  I want to go back to Claim 1.  Can we check off those elements here?

A.    We can check off the blue ones.  Yeah.  That is to say, Attentive uses a processor, and it runs a program that does steps.  We'll talk about the steps, in a minute, to perform this operation.

Q.    So let's get into those steps.  The first one has to do with presenting a user interface.  And it's a little bit long.  So I want to take it piece by piece.  So it starts presenting a user interface, configured to receive from an application operator a configuration of a message flow. What is that talking about?

A.    This is basically talking about the Attentive web pages in the case that will be described in here, that are

used by the merchant when they are setting up their message flow for the campaign. And so this just says there's a user interface. That's the web pages used by the application operator. That's our merchant, Pete's Pet Store, to configure this messages flow in that first part that's underlined.

Q.    And I think this one is actually Barb's Books; is that right?

A.    Yeah, that was from my testing.

Q.    So this is the user interface we see in Magic Composer?

A.    Yes, if you remember, we -- when you go into campaign -- when you go into the interface and click on that Campaigns button, this is the first screen that pops up where you can start to define that campaign.

Q.    The next part of the claim says, "The message flow comprising recipient criteria defining a segment of subscribers to receive messages from the message flow."

        Can you walk us through how that shows up in Magic Composer?

A.    Yeah, if you could go back to the previous slide just for a second.

        You see up in the upper right-hand corner "create campaign," when you click that, you can go forward. Now this is the next place you come, and this is where you

can set up the messages for your campaign.

So you see that this is sale of Barb's Books, is what I'm going to call this particular message, and in there are things below that -- where I can provide information about this message, so I can actually provide the text of the message, who it's going to and if I want to send it on a particular schedule.  Like I want to send the notice out that there's a sale coming up on Friday, on Monday, that's where I would put this information in.

Q.    And I see that it says "audience" here, and then there's a button to edit.  What happens when you press that button?

A.    Well, the audience is who the message is going to go to, and you can see the default here is all subscribers, but maybe I only want to send it to some subscribers, like people who have visited my website before or some other thing.

So I would click that edit button, then to go in and say who I am sending this message to.

Q.    And this is the screen that you would see when you click that edit button?

A.    Right.  The audience is now -- I'm going in to define a subset of my enrolled subscribers, and so here, I've picked one called engaged customers.  And you can see that in gray with the checkbox there, my audience is going to be

engaged customers.

Q.    And then you can actually see what the engaged customers' audience or segment is, right?

A.    Yeah, you can choose to view the conditions that you've set for that, for that audience.  And so here, for instance, the conditions for the audience I'm calling engaged subscribers are in the box, the recipient criteria at the bottom.  So these are going to be subscribers who have an order confirmed at least once and visited my product at least once.

Q.    And --

A.    Or one of the products at least.

Q.    Sorry.

       In the language of the claim, the audience would be the segment of subscribers, that's what you called "engaged customers" here?

A.    Yes.

Q.    And the recipient criteria, are those conditions that you're putting in to define that segment?

A.    Right.  At this point in time, you're the first message, so you are defining the recipient criteria for the message, but it is also the criteria for anyone entering that particular flow.  So if you don't meet this criteria, you won't go into the flow.

Q.    So if we go back to your message creation screen, can

you add a sent time and the text of the message here?

A.    Yes, you can schedule to be sent on a particular day if you choose to do so, and then you can actually put in the text of your message.  So maybe this is a Labor Day sale; a different flow might be for a Black Friday sale.  So just whatever message you want to appear as a part of this particular flow.

Q.    And then the last part of this element says, "at least one message in the message flow associated with a trigger condition."

      Does Magic Composer use trigger conditions?

A.    Yes, it does.

Q.    So I'd like to understand a little bit better.  Could you walk us through this flow?

A.    Sure.  So now I'm going to add a second message to my campaign.  And I'm going to go in -- you know, when I say "add message," then I get the screen to add the message.  And so here, again, I can define the audience for this second message, and I might choose to make that a subset of the first message, so I would click that edit button and now I'm going to retarget previous message recipients.

      So I'm only going to send this to the people I sent the first message to.  Remember I had some particular criteria for that first message.  This message can only go out to those people and only if they match the additional

criteria that I've selected here.

So you see there's a pop down, and I can choose recipients who did not click the previous message or recipients who clicked the previous message and did not purchase.

Q.    And those are the retargeting options you have here?

A.    Well, those are the ones that we have here.  You know, during some of my testing at an earlier point in time, there were other options on this list as well.  So recipients who did not open a previous message was an option that I saw before.

Q.    Did you also see an option to exclude people who had an open support ticket?

A.    Yes.

Q.    Let's go back to your example in the message flow. So you select your recipients who clicked the previous message but did not purchase.  Is that your trigger condition?

A.    That is the trigger condition for this second message in the flow, yes.  So it doesn't change the first message condition, but this is the conditions now that I'm adding to the second message.

Q.    All right.  I'd like to go back to opening statements for a moment.

We heard from Attentive's counsel that it is

your opinion that time can't be a trigger condition.  And he said you wrote that down.  Was he referring to your report in this case?

A.      That's correct.

Q.      So if you will please turn in your binder to -- there should be a tab for your rebuttal validity report at the back.

A.      There is.

Q.      Will you turn to paragraph 940?

A.      I'm sorry, paragraph?

Q.      940.

A.      940?

Q.      Paragraph 940.

A.      Okay.

Q.      Is that a part of your report that counsel was talking about?

A.      I believe it to be.  I think that's what he had on his slide.

Q.      And what are you talking about there?

A.      Well, I'm responding to something Dr. Polish said in this particular paragraph.  Where I say, "he identifies a trigger condition that is wait three days or wait four days."  And I'm pointing out that.

          MR. DAVIS:  Objection, Your Honor.  This is outside the scope of her infringement report.  This is

invalidity rebuttal.

THE COURT:  Okay.  So the nature of the objection is that this testimony relates to material offered with regard to invalidity, not infringement?

MR. DAVIS:  That's correct.

MS. LI:  Your Honor, this is about her opinion on the trigger condition element for infringement, which Attentive's counsel had brought up in opening statements as related to invalidity.  She's just responding to the allegation that was made there about what she has said about what a trigger condition means.

THE COURT:  Okay.  But with regard to the nature of the objections, well, this is an invalidity report, not an infringement report, how do you respond to that?

MS. LI:  Would it be possible to have a sidebar?

THE COURT:  Okay.  Counsel will come forward.

(Sidebar discussion.)

THE COURT:  Okay.  So Ms. Li.

MR. SAULSBURY:  Sorry.  I'm happy to address this.  Your Honor, this opinion she's offering is directly out of her infringement report and relates to infringement.  The question was addressing a suggestion made at opening that Ms. Frederiksen was being inconsistent in how she was applying this claim term across invalidity and infringement.

And so this is just allowing her, I think quite

fairly, to address that suggestion that she was being

inconsistent.  The opinion that she's offering here is her

infringement opinion.

THE COURT:  Okay.  And I guess with regard to --

I think what you're saying is that she is providing her view

about what a claim term means and does not mean?

MR. SAULSBURY:  That's right.  And in this case,

how it's meant for purposes of infringement.  But the

context of the question, which referenced what was said in

opening, was just to allow the witness to explain that she

is not being inconsistent in terms of how she explains the

meaning of this term, as Your Honor has indicated.

THE COURT:  And in her infringement report, I

presume there are paragraphs in which she speaks about the

term "trigger condition"?

MS. LI:  Yes.  That's right.

THE COURT:  Okay.  Mr. Davis, we had already

quite a lot of objections about outside the scope, but as to

this issue in -- if the witness is addressing the view about

what a claim term means, does -- isn't that an issue that's

of course relevant to infringement as well as invalidity?

MR. DAVIS:  Yes, Your Honor, but she has no

opinion with regard to how time could or could not be a

trigger condition in her infringement report.  She has no

opinion on that infringement.

THE COURT:  But won't, of course, the witness's understanding of the meaning of a claim term be equally important and should be the same with regard to both her infringement opinion and her invalidity opinion?

MR. DAVIS:  I a hundred percent agree.

THE COURT:  In terms of the issue of notice, I think beyond the scope really goes to the other side of notice of what this witness is going to say.  I mean it plainly is a claim construction or the meaning of a claim term in opinions in a report she received.  Don't you have notice of it?

MR. DAVIS:  Okay.

THE COURT:  Is that unfair?

Mr. DAVIS:  No, but her opinions need to be circumscribed by her report under Rule 26, so if you want to have us take a little broader view of that, I'm happy to concede to that, but I think this is outside the scope of her infringement report and therefore exceeds the scope of Rule 26, disclosed.

THE COURT:  Okay.  Mr. Saulsbury.

MR. DAVIS:  Didn't put any claim construction in the report, she applied the plain and ordinary meaning without differential qualifications.  It's a rebuttal opinion offered in response to the validity opinion that we had no chance to address.

THE COURT: Okay. Mr. Saulsbury, do you want to speak just briefly before I resolve this, to the issue of whether in her infringement report Ms. Frederiksen is talking about and speaking on the meaning of the term "trigger condition" in a way such that it can be argued this is reflective of what's said there?

MR. SAULSBURY: That's absolutely right, Your Honor. She is applying it to the structure in their product and describing how that structure meets the claim terms, she's therefore necessarily mapping out her understanding of the term. What's going on here is they are trying to suggest she's being inconsistent across invalidity and infringement. We assume they're therefore going to cross her on it. It's only fair she gets to explain how she understood this term and apply it so she can defend against this accusation that she's applying the meaning of the term inconsistently.

As Your Honor has noted, she, of course, has to apply it the same across infringement and invalidity.

THE COURT: Anything further?

MR. DAVIS: We're not saying she applied that incorrectly to the underlying facts. We agree that time cannot be a trigger condition, but in this case, she is applying it to an incorrect factual predicate, a timer in our system. And she doesn't address one way or another in

her infringement report as to that aspect.

THE COURT:  Okay.  I think the last point that Attentive's counsel made really is an issue that's factual dispute that can be addressed I think through cross-examination.

I think because this issue is one where the witness is talking about what she believes to be the meaning of a claim term, and because that issue is surely relevant to both infringement and validity, because I think it is the case, because I have seen it, that the witness talks about this claim term of course in her infringement report.

And also because, again, I think beyond the scope issue is really -- I meant to focus on lack of notice. The idea being it wouldn't be fair to a party like Attentive if for the first time an opinion was sprung on them that they hadn't seen or couldn't contemplate with regard to a witness.  That would really be where the construction of or beyond the scope objection has real force.

It's obviously not the case here because this particular issue is discussed even more specifically in her invalidity report.  So for all those reasons, I'm going to overrule the objection.

The only thing I'll say, though, of course Attentive is going to have its own expert witnesses, and it's going to have an expert witness, I understand, that's

going to speak both on the issue of infringement and validity and certainly the nature of the Court's rulings here, and the idea behind them are also going to apply to Attentive's benefit.

The last thing I'll say, again, of course it would be inappropriate for expert witnesses to truly speak beyond the scope of their report, but let's make sure for all parties, those objections are really focused on scope because otherwise a tremendous number of such objections truly not focused on the truth and fine nature of this process.  So that's the guidance I'd give the parties on this front.  I'll overrule the objection.

(End of sidebar discussion.)

THE COURT:  Okay.  Thank you.

So I've overruled the objection.

And, Ms. Li, you may want to rephrase -- rephrase the question.

MS. LI:  Yeah, I'll -- I'll do some refresh.

BY MS. LI:

Q.    So where we were before was you were looking at a paragraph in your report that had been referenced in opening, and you were explaining what that paragraph was about.

A.    Yeah.  Essentially in that paragraph, I'm sure you picked up that there was a disagreement about whether there

was a trigger condition or not or whether time alone could be a trigger condition.  And my position in that paragraph is that Claim 1 talks about using subscriber events as the trigger condition.

So I'm pointing out the time -- by itself time passing, that's not something I'm doing as a subscriber, it's not something I'm doing on the website.

So by itself, time cannot be a triggered event because the patent talks about subscriber events as being the trigger events that are the focus of that claim.

Q.   And let's go back to your walkthrough of Magic Composer.

Are you pointing to time here as the trigger condition?

A.   No.  What I'm pointing to on this particular message is the selection of recipients who click the previous message and did not purchase.  And so the trigger conditions embedded in that are you had to have clicked a previous message, the user, that's the event, and also that you haven't purchased anything at the time this message was being prepared to be sent.

Q.   So once you select your trigger condition, what next?

A.   Well, the trigger condition is used to determine whether a particular message in the flow should be sent that's associated to that condition.

Q.    So -- and then you can go back to this screen here and finish filling out your message?

A.    Right.  You could finish filling out what you want for that message.  So if it was going to be scheduled at a particular time, you can say when it was scheduled.

So, for instance -- in this instance, since you're checking to see if somebody could make a purchase, you would want to push that timing out a little bit into the future because otherwise the minute the guy clicked on the message, he'd be getting this popped up.  So it's just a logical motion of the message sending.  And then you're putting the actual text in the message, hey, the sale ends tomorrow, don't miss out.

Q.    And after that, you send out both of your messages, right?

A.    Well, yeah.  What I'm showing here is the first message, which the user will see when they enter the flow. And we talked about they need to meet the criteria of that message to be even in the flow.  And then the second message alongside it, that would go to a smaller set of recipients in this case because those who -- those who had clicked and hadn't purchased.

Q.    So that was quite a lot of information.  Do you have a slide to kind of help us understand the relationship between the recipient criteria and the trigger conditions?

A.      Yes.

Q.      That's the slide right here?

A.      Right.  That's correct.

Q.      And so what -- what happens here?

A.      Okay.  On the left-hand side, these are all the individuals who have consented to receiving your e-mails or SMS.  So they're -- they're the whole pool, you have all the subscribers for my bookshop.

        Now, I'm going to first define the recipient criteria for this particular flow, including its first message.  And so some of those subscribers will meet this criteria, and I've put them over the top.  And some don't, so they get left out of this particular flow.

        And then when I go to define Message 2, I'm also supplying the trigger conditions with that message, so what user events must have occurred for this message to happen.

        And so, again, some subset of my first message recipients are going to move over and be able to go to that message.  They won't all necessarily move in one lump like that because as they make their purchase, you know, they -- they get into one category.  If they haven't made a purchase, they stay in another category.  And at the time I evaluate who is going to get this message, they don't know who has made a purchase by then.

Q.      Right.  So can we check off the green element here?

A.    I believe we can, yes.

Q.    All right.  Let's go on to this next group.  And we'll start with this first one.

A.    Actually, can I point one thing out on that previous?

Q.    Yes.

A.    When you talk about recipient criteria, that particular term is used in the context of the people who are going to be recipients of the flow.  So it's associated with the first message, but you can think of recipient criteria as can the recipients of the flow.

And just to kind of clue you in because the language of the patent uses trigger conditions and you might get confused and think that all trigger conditions are recipient criteria, but it is only the trigger conditions on the first message that are recipients of that flow.

Q.    So going into the first element here, it requires subscribing to, on behalf of the application marketing operator, at least one application programming interface --

(Reporter clarification.)

BY MS. LI:

Q.    -- API, notification channel of an application builder platform.  That is a mouthful.

What is that talking about?

A.    Well, the message-management platform has to get some information from Shopify in that example.

So Shopify's application builder, message management, is Attentive or Postscript, whoever is managing those messages. And application-programming interface where two computer systems -- or even two components of the computer system talk to each other, they typically do so through the application-programming interface of one form or another.

There are many different forms they can take, but what application-programming interface is is it basically says if I'm receiving messages from you, these are the messages I'm going to respond to and this is the format I expect for you to talk to me in and this is the format I'm going to send the information back to you so that programers can write programs that aren't just in a magical language, they're -- they're actually structured data and structured queries going back and forth. So it's just a way of teeing up what the request is.

And like I said, there's a couple of different ways it can be done. So this particular claim element doesn't spell out any particular type of interface. It just says we're going to use that interface to get the information from the application builder to the message-management system.

Q.    And it's doing that on behalf of the application operators. That would be like Barb's Books?

A.      Right.  These are the specific data elements that I'm interested in in my store for tracking what my customers are doing.  So I've communicated that through my setup in the message flow, and events get reported from Shopify back to the message-management platform via an API.

Q.      And the second half of this talks about the application-builder platform being operational as a back-end component.  What is that about?

A.      Well, the application-builder platform, remember I used that to create my website and to process my payment and maybe even to cause the shipping of my goods, and so that's the back-end component.  Those are back-end services I'm using.  They're invisible to the user because you the user are just seeing my website and your shopping cart and those basic things.

        So this is basically saying that the application-builder platform is providing some of those back-end services, but it's under control of the application that I, the application operator, have built as my website.

Q.      Does Magic Composer meet this element?

A.      Yes, it does.

Q.      And going on to the next one, it requires then receiving a plurality of API notifications from the application builder.  And those are describing events associated with the users.

Does Magic Composer composer do that as well?

A.    Yes.  For instance, it reports things like a purchase was successfully consummated, that is to say, you know, I got your shopping cart, you gave me your payment information, I was able to process it, and everything is good.  Or maybe that it wasn't good, that there was some problem with the payment, it might report back that a -- that it didn't go through.  Or if I return something, it might report that the return had been processed successfully and might refund.

Q.    And this talks about an API payload.  Is that information contained in the payload?

A.    A payload is just the collection of information that's being sent back about an event.

Q.    And then we see this in the interface.  Does this connect up to the claims?

A.    Yeah.  In the interface, you know data can come when I'm selecting these things.  Like viewing a product doesn't come from the back-end application-builder software.  That comes from what's on my device.  But other things like order confirmation, receiving a refund, abandoning something at checkout, those come from the application-builder platform because it's the one processing that to know that it happened.

And so here we see that it's -- in this case,

it's Shopify.  You can see the little Shopify logo on the left-hand side in the box I've highlighted at the bottom.  And you can also see that I've selected "order confirmed" here.  That's the one that's highlighted -- or it's gray-lighted.

And it says, you know, order -- you know, you select order confirmed --

(Reporter clarification.)

THE WITNESS:  -- that information comes from Shopify.  The source is Shopify, and then it tells you what that means.  The number of times the subscribers received an order confirmation.

BY MS. LI:

Q.     The last element in this group talks about receiving notifications from a code snippet on the user device.

What is a code snippet?

A.     You can think of a code snippet as being a very small special purpose program.  And what happens when you visit a website, you know, the definition of the website gets downloaded to your device in your browser or application renders it for you so that you can see the website.

But at the same time, there may be information -- or other snippets of code that are being downloaded to your device, and some of them are just to do with mechanics of the website, like how you go from page to

page, but there can also be snippets of code that are reporting events that the user is doing on the website, and that's the snippets we're talking about here.

So when I click on a link for a product, that can be reported back to the message-management platform.  Or if I place that product in my cart, the fact that I chose to put that in my cart can be reported back.

So these little code snippets, think of them as data collectors and reporters, they collect data about a particular event and send it back.

Q.    Does Magic Composer receive notifications from the code snippets?

A.    Yes, it does.

Q.    Is that what Attentive called the Attentive tag?

A.    Yeah.  The Attentive tag is kind of a package or is a -- it's a tag that a user puts on their website that then when that web page is loaded, it causes these code snippets to be brought down to the browser, so if the user performs that action, the code snippet can detect the action and report it back.  But they're kind of collectively called the Attentive tag.

Q.    Could you turn to PTX-359 in your binder?

A.    I'm there.

Q.    Do you recognize that as a document by the Attentive tag?

A.     Yes, it's the user documentation that's provided by Attentive that describes the Attentive tag and what it can do and how a user would put it on their site.

Q.     So let's take a look.

         MS. LI:  Sorry.  Can we move PTX-359 into evidence?

         THE COURT:  Is there any objection?

         MR. DAVIS:  No objection.

         THE COURT:  All right.  It's admitted.

         (PTX Exhibit No. 359 was admitted into evidence.)

BY MS. LI:

Q.     All right.  So we have a snippet of that on the slide here.  What are we looking at here?

A.     This is the -- from the very top of this particular help page, and it's listing some of the things the tag can do for you.  So, for instance, it can capture behavioral data such as --

         (Reporter clarification.)

         THE WITNESS:  Behavioral data such as page views and purchases that I've highlighted.

BY MS. LI:

Q.     And the next part of this claim is about corresponding -- the code snippet being incorporated in an instance of the application operated at the user's computing

device.

Is that happening with the Attentive tag?

A.      Yes.   What happens when you have the tag on the web page and you go to that web page in your browser, you'll have -- code snippets are downloaded to your device, and they are essentially being incorporated into that browser session.  So as you interact with the web page, they're being known to do their job of reporting.  Now, you also could have code snippets in the app that you downloaded from the app store for a particular shop if it published an app.

Q.      The next part here says that the user computer device is associated with a corresponding subscriber with a subscriber identifier used by the message-management platform.

Does Magic Composer do that?

A.      Yes, it does.  For instance, we heard Mr. Greenberg talk about that in the deposition snippet that was played, that they associate these external IDs.  Like Shopify may have its own idea so when that comes in, they can associate it to that internal identifier that's used within the message-management platform.

Q.      And do we see the events from the Attentive tag in the Attentive Magic Composer interface?

A.      Yes, we do.

Q.      That's what's being shown here?

A.    This particular one, if the view of a product would have come from Attentive --

(Reporter clarification.)

THE WITNESS:  -- would have come from Attentive, as you can see by the fact that the source is identified as Attentive.

BY MS. LI:

Q.    All right.  Can we check off this group of pink elements?

A.    I think we've covered them all, yeah.

Q.    All right.  Let's go on to the next set.

Taking a look at the first one here, it requires identifying a plurality of user identifiers in a plurality of API payloads from the application-builder platform.

Is this what you were just talking about with the Shopify IDs?

A.    Yeah, these two claim elements are about how you go about associating an identifier you get from outside with the identifier you're going to use internally in the processing.

Q.    And after you identified, you have to correspond them, right?

A.    Well, that just basically means --

(Reporter clarification.)

THE WITNESS: Oh, I'm sorry.  I'm just saying

this is basically the mapping of the external identifier to the internal identifier, so I may get an identifier that's ABC from Shopify.  And my internal identifier for that human being is 123.  And so I'm mapping ABC to 123 so that I know it's the same person.

BY MS. LI:

Q.    And Magic Composer is doing that?

A.    Yes.

Q.    The last element here is about storing the subscriber events.  Both from the API notifications and the code snippet notifications, does Magic Composer do that?

A.    Yes, it does.

Q.    All right.  Can we check off this next group of elements?

A.    Yes.  Just to be clear, it stores the events both from the code snippet and from the API as required in the claim.

Q.    We'll go on to the blue group here.  And this one starts by saying, "Determining, based on those stored events associated with the first subscriber, that that subscriber satisfies the recipient criteria."

        Does Magic Composer do that?

A.    Yes.

Q.    And can you remind us, what are the recipient criteria that you were using in your example?

A.      In my example I used recipient -- I had selected recipient criteria for engaged customers.  These were the people who were going to be in this flow.  And so they had an order confirmed at least once over time and viewed the product at least once over all time.

Q.      And that was to define the segment for the first message; is that right?

A.      It is the segment for the first message but also would be the segment that is -- are the subscribers who can go in this flow, and so we know that because they're using that recipient criteria language I mentioned instead of just saying satisfies the trigger conditions.

Q.      So the next element here requires enrolling that subscriber to the segment of subscribers in response to determining that the criteria are met.

        Does Magic Composer do that?

A.      Yes, it does.  At the time that -- for instance, before a message is sent, it obviously has to figure out who to send them to so it runs a query against that data link that you heard Mr. Greenberg talk about to select the subscribers that are going to receive the message.  And then those are registered to an object that just basically means put in a data structure that is subsequently passed to the part of the system that actually sends the message.

Q.      All right.  So can we check off that blue group of

elements?

A.    Yes.

Q.    So now we're at the monitoring element.  This is the one that was talked about in opening.  And before we dive into that, can you just remind us what you identified as the trigger conditions in your example here?

A.    This example was for the second message, so the trigger condition for my second message is the recipients who opened the first message because now we're in the flow, and then they clicked on that previous message but did not purchase anything.

Q.    So the Court gave us a definition for monitoring the trigger condition; is that right?

A.    Correct, that came after my initial report that the Court has provided a definition for that.

MR. DAVIS:  Your Honor, I note an objection to these slides for the record.

THE COURT:  Okay.  Objection's noted for the record.  But no further argument on the issue?

MR. DAVIS:  If you're interested in hearing, I'm happy to provide further argument, but otherwise we can proceed.

THE COURT:  Okay.  I mean, it's up to Attentive, but assuming the objection's as I have previously described it and having previously indicated my ruling, I'll make that

ruling, of course, and so we note the objection, but it is overruled.

BY MS. LI:

Q.    So the Court's definition was -- is tracking whether a trigger condition for a message has occurred through the continuous, repeated, or periodic detection of one or more event trigger candidates associated with the trigger condition.  And the Court gave that definition after you issued your reports in this case, right?

A.    That is correct.

Q.    How, if at all, has the Court's definition changed your opinions on how this monitoring limitation is met?

A.    Well, when I saw this definition, I went back to see if it changed anything about my understanding of how the system worked or whether it met the limitations, and it did not change anything, in my opinion.  So I can further confirm it.

Q.    Okay.  So I want to start with the second half of this definition.  It talks about the continuous, repeated, or periodic detection of one or more event trigger candidates associated with a trigger condition.

       What are these event trigger candidates that are in Magic Composer?

A.    Well, event trigger candidates, that's just the events that happen that are candidates to be evaluated for

whether or not some particular trigger condition has been met.

Q.      And is Magic Composer detecting those event trigger candidates continuously, repeatedly, and periodically?

A.      Yes, it detects them as they are reported from Shopify or from the code snippets on the user device.  Those get reported to Attentive, and that is, the detection is that receipt of that data.

Q.      And then it also requires, the Court's definition, tracking whether a trigger condition for a message has occurred through this detection we just talked about.  Does Magic Composer do that?

A.      Yes.  The trigger condition is, you know, whatever the operator specifies which data elements are going to trigger a message and which user data is going to trigger a message, and so tracking whether the message occurred basically means just checking those events to see if they've occurred, we've received that event for this particular subscriber, and if so, you can trigger a message for that subscriber.

Q.      And you mentioned just a moment ago that your Magic Composer detects these events as they're coming in.  Is it doing that repeatedly, periodically?

A.      Certainly repeatedly as each one comes in, and it's because they're reported directly from Shopify as they occur

or from the user device as they occur.  I guess you could say that's also periodically but with the caveat that it only happens when they're happening, so I would say repeatedly is the best way to characterize that.

Q.   All right.  And you circled here the estimated recipients.

What does that represent?

A.   Well, on the -- on the campaign setup, as you define these, the message and its associated conditions, the system every time you go to that page, will try to estimate for you how many recipients there are going to be.  And so that's an instance of that trigger condition being checked.  But, of course, it also gets checked at the time you send a message because, for instance, if you got a message like, has the user purchased yet, if you checked it on Tuesday, you might have one or two people in there, and then on Wednesday you might have a dozen more because they responded to your first message by going and buying something.  And then by the time you sent this message on Friday, hopefully you'll have a lot more people in there who have checked a message or who have made a purchase, and so the ones who haven't are the ones who will receive this particular message in this condition.

Q.   And this is the setup screen, right?  So you're seeing that estimated recipients checked when you're setting up at the time?

A.      At the time you set it up and anytime you go back to that screen, assuming data is available, it will update that count.  You know, if no data is coming in, the count is going to be zero.  If you have data coming in, it will try to give you an estimate based on where you are right at that moment in time.

Q.      Even if the count is zero, that's still a count, right?  It's still checking?

A.      Yeah, estimating that zero people can meet that because in this case you haven't gotten to August 31st, 2025, so there's -- nobody who has received that first message yet.  So zero people could be here.  This is just an -- the zero here is just an artifact of when I captured this during the testing.

Q.      So I noticed that you've talked about -- it says zero here.  Why does it say zero here?

A.      Well, again, at this point in time, in my testing, this is -- the second message in the flow that was predicated on the first message, and I captured these screens before August 29th and my first message wasn't going out until August 29th, and so, of course, there could be nobody that received the message and done anything, so nobody met the criteria.

Q.      But have you seen documentation that actually shows a number other than zero for recipients?

A.      Yes.  We see that in Attentive's documentation that that gets updated.

Q.      Can you please turn to PTX-493 in your binder?

A.      493?

Q.      493.

A.      Okay.

Q.      Do you recognize that as one of Attentive's documents that you looked at?

A.      Yes.  This is another one of the educational documents.  This one is telling somebody how to select a target audience for their campaigns.

              MS. LI:  I'd move PTX-493 into evidence.

              THE COURT:  All right.  Any objection?

              MR. DAVIS:  Yes, Your Honor.  I don't -- I don't see this cited for this limitation in her report.

              MS. LI:  Your Honor, we can discuss further in sidebar, but I think she discusses the substance of loading the estimated recipients, and then she cites the screenshot from this particular document earlier in her report.

              THE COURT:  Is this an exhibit that was disclosed to which there was an objection?

              MS. LI:  There was no objection to this exhibit during the exchange process.

              THE COURT:  So pursuant to page 17 of the pretrial order, Mr. Davis, if there was no objection raised

as to the exhibit, Postscript disclosed it previously, how could it be an objection?

MR. DAVIS:  Objection to the scope of her testimony as to whether or not being outside the scope.  If this is the screenshot.

Then no objection.  Your Honor, that's referenced in her report.  I don't have a number.

THE COURT:  All right.  We'll consider the objection withdrawn.

MS. LI:  Okay.  Can we please put up PTX-493?

BY MS. LI:

Q.    So the item 5 here, when it says, "Once you're finished setting up your audience" --

(Reporter clarification.)

BY MS LI:

Q.    Your audience, click save.  When you're finished designing each message of your campaign, you can see the estimated recipients of each message.  Is this one of the figures you were talking about?

A.    This is an example of that recipient criteria being updated.  So on the left-hand side, it's actually showing message one.  You'll see there that initial last offer, that there's a -- Happy New Year coming up, and then in message two, retargeting the recipients of that blast, specifically those who haven't made a purchase yet.

You see on the left-hand side, the estimated recipients for your initial message was 4,506, and on the right-hand side, you see that the retargeting message had an estimated number of recipients of 2,316.

MS. LI:  Can we please go back to Ms. Frederiksen's slides?  Thank you.

BY MS. LI:

Q.     So the last part of this limitation says, "Monitoring the trigger condition in the message flow in response to the first subscriber being enrolled in the segment of subscribers."  Is that happening in Magic Composer?

A.     Yes, it is.

Q.     Now, I want to go back to -- oh, I'm sorry.  I noticed it says "pending" here in the estimated recipients for the second and then there's this little bubble that comes up.  Can you explain what the significance of that is?

A.     Yeah.  In this instance, when I was capturing it, it just said, "estimated recipients pending," instead of zero, so I clicked the little i alongside it to get information about what that message was about.

And it explained that the performance of the previous message is going to determine or is going to impact, you know, the estimate for the recipients here, so this is that condition again where I've got a message scheduled to send out on the 29th but it hasn't gone out

yet, so there's no base group of subscribers from which I can estimate who are going to get the next message in the flow.

Q.    Now, I want to go back through your image here.  Can you use this to help us understand your testimony just now?

A.    Sure.  If the segment of subscribers meeting the recipient criteria that I set up was the engaged customers, you recall that's the example I'm using, and so at any particular point in time, if there was data -- if I had customer data -- this is when I first set up the store so I didn't have any subscriber data in there yet -- this message one would have displayed the estimated recipients based on my criteria for engaged customers.  But because I didn't have any data at that point in time, we hadn't moved any people over into that segment yet.

Q.    Got it.  And then after message one sends, are you going to have subscribers that then meet the trigger condition if you're setting up message two in the trigger condition?

A.    Yeah, once I have tested the conditions that I set up for the flow and sent message one, I'll have a pool of subscribers I had sent that message to.  So that's the pool that will be evaluated in your events relating to those -- individuals will be events evaluated when I send a message two.

So I have captured these images at a different point in time.  After a message had been qualified and sent, then we would see some numbers in here.  But those subscribers who got message one will then be subject to the checking of the trigger conditions that are associated with message two to see if they should receive the second message.

Q.    And the checking can occur at different times, right?  So you could have two people and it displays two estimated recipients and then later that number could be different?

A.    The number can change as you go back and forth to the UI because it's making that selection estimation in real time.  So if I do it on Tuesday, it might be different than Wednesday and a different number than Thursday, but the final number, the final account is determined just before the message is sent.

So this one happened to be a timed message to go out on August 31st.  So on August 31st, I'm now going to check all those conditions, and this is the group I'm going to send it to.  So if somebody entered that group at a later point in time, I wouldn't come back and send that message because I've scheduled it to send at a certain date.

Q.    Now I want to go back to something else we heard in opening.

Attentive's counsel said that you were not going

to point to one line of code that says monitoring trigger conditions.

Did you see anything in the code that said, quote, "monitoring trigger conditions"?

A.    I do not recall seeing the word "monitoring" in the code.  I saw code that did monitor trigger conditions, that checked to see various conditions and set values according to whether or not they had happened.  It just didn't have the name "monitoring" associated with it.

Q.    And is that surprising, that it didn't say monitoring?

A.    Not at all.  The programer gets to call it something, whatever the programer wants to call them.  And you know, it's not surprising that a particular word doesn't appear in there.

Q.    Okay.  So can we check off this monitoring element?

A.    I believe we can, yes.

Q.    Okay.

MS. LI:  Your Honor, I think it would be a good stopping point now if we're able to break for lunch.

THE COURT:  I was planning to do that too.  How much more time do you have?

MS. LI:  Could go another ten minutes.

THE COURT:  Sure.  So let's -- I'll let you know when it's a good time to break for lunch.  I want to make

sure we get a good amount of testimony in before the lunch break, so you should proceed with your next topic.

MS. LI:  Okay.

BY MS. LI:

Q.   So let's go on to this next group of elements, then.

This first element in the group requires, "receiving one or more new subscriber events associated with the first subscriber."  What is that talking about?

A.   That, again, remember, the data flows that are coming in from user device and from the website, this is just saying, you're receiving new events.  So it's not a one-time thing, you're getting events, new events as time goes on.

Q.   And does Magic Composer do that?

A.   Yes, it does.

Q.   All right.  The next element requires, "determining that the one or more new subscriber events meet the trigger condition in the message flow."

A.   Can I clarify one point on the previous slide?

Q.   Yes.

A.   This also has the -- associated with the first subscriber, so you're receiving those events, and you're able to determine what subscriber they're associated to.

Q.   And the subscriber, can you tell us who the subscriber is?  Is it the end customer?

A.   That's the customer.

Q.    Okay.  So the next element is this determining element, "determining that one or more new subscriber events meets the trigger condition in the message flow."

Is Magic Composer doing that?

A.    Yes, it does.

Q.    And that's related to what we saw earlier with the trigger condition for message number two?

A.    That's one of the places, and then obviously before the message is sent, it's also determining which subscribers of the events, which of them -- which of them have event data that shows that they meet the conditions of that particular message.

Q.    Magic Composer is determining who meets the trigger conditions before the message goes out?

A.    Yes.

Q.    Okay.  That makes sense, because you need to know who you're going to send the message to before you send the message?

A.    It would be difficult to do it otherwise.

Q.    Now, the last element here is, "transmitting at least one message in the message flow that is associated with the trigger condition to the first subscriber."  What does that mean?

A.    Well, it's basically -- you know, I think I mentioned that once you've determined who your audience segment is,

it's registered in the system, it's stored in the object.

And then the next thing that happens is that after it gets past the portion of the system that actually sends the messages, and so this is actually transmitting the message now to the users' e-mail or device via text message when the user has met the trigger conditions.

Q.    And does Magic Composer meet this element?

A.    Yes, and again, this is, you know, associated with the first subscriber, you're sending it to a subscriber who is in that funnel and gone all the way through the conditions for that message you're on.

(Reporter clarification.)

THE WITNESS:  Gone all the way through the conditions.

BY MS. LI:

Q.    So can we check off this last group of elements in Claim 1?

A.    Yes.

Q.    Now, these are the actual asserted claims in this case, right, 4, 6, 10, and 14?

A.    Yes, these are those dependent claims I mentioned.

Q.    Okay.  Do you understand Dr. Polish to be disagreeing with your opinions about the additional elements in these claims?

A.    No, he doesn't -- I don't recall that he disagreed

about any of these specific claim elements.

Q. Okay. And these build on the claim elements of Claim 1 and Claim 11. You mentioned that earlier?

A. That's correct.

Q. They're called dependent claims?

A. Because they depend on that parent claim.

Q. So let's start with Claim 4.

So this is depending from the system of Claim 1 and it requires, "Wherein each API payload comprises a plurality of key value pairs."

Can you just remind us what an API payload is?

A. That's the data that's being sent from the application-builder platform in Shopify because I have subscribed to that API or interacted with that API to get the information.

Q. And what is a key value pair?

A. That's a fancy programer way of saying you identify data by essentially giving it a name and then the value, the name and the value. So first name, Barbara. Last name, Frederiksen. Phone number, and then the value of the phone number.

So it's just one way of formatting data that's sent. So this is saying that for Claim 4 to be satisfied, the application builder has to be sending the data using some form of key value pairing.

Q.   And then it specifically says that the key value pairs comprise a user identifier used by the application-builder platform and a phone number of a user of the application-builder platform.  What does that mean?

A.   Well, comprising means it has to at least include, basically.  So it includes the ID -- it has to include an identifier used by the application-builder platform because that's what gets mapped later to your internal log, and a phone number of the user of the application-builder platform, which could be one way you could accomplish that mapping by saying, oh, I know who this user is.  It uses the same phone number, same person.

Q.   Does Magic Composer meet the element of Claim 1?

A.   Yes.  The payload that's provided by the Shopify API does include the customer ID and the phone number.

Q.   And those are in key value pairs?

A.   Yes.  That's the format.  And they look very similar to the little snippet I have here, but the documentation for the Shopify API actually shows that there's even more information being sent.

Q.   So can we check off Claim 4?

A.   Yes.

Q.   So let's move on to Claim 6.

     Claim 6 also depends from Claim 1.  And it says, "Wherein a subscriber event described in an API notification

received from the application-builder platform."

I'm going to pause there for a second.

So the application platform -- builder platform, is that what you've be referring to as Shopify in your example?

A.    In my example, yes.

Q.    Okay.  And it's talking about an event received from that platform.  Can you just remind us what sort of events the message-management platform is getting from the application builder?

A.    Well, the examples we looked at included a confirmed order or a refund.  I would have to look at the screen to see what the other one was, but -- oh, and abandoned cart was the other one that were examples that I've shown you before.

Q.    And the claim requires these events to be related to the transaction performed at the back-end component that's operated by the application-builder platform.  So I think on the right here, these are the examples that you just mentioned?

A.    Right.  The order confirmation, a refund, an abandoned, and a checkout.  And those are for a particular subscriber, of course, because it's going to give a notification --

(Reporter clarification.)

THE WITNESS:  It would be meaningless to get a notification that somebody abandoned a shopping cart.  You want to know who.  So that ties back to "wherein the subscriber event" language is.

BY MS. LI:

Q.     And when it talks about the back-end component that's operated by the application builder, what is that?

A.     Well, again, we -- I explained, I think, that the back end functions for those things that are essentially invisible to the user, but it's the performance of processing the payment to make sure the payment goes through so the order can be fulfilled and then sending that verified order then on to shipping for processing a refund to the customer.  Or even processing their payment data.  I can -- you know, it would allow me to enter my Visa card and expiration date, and all the magic numbers, send it off, and come back and say, yes, that was successful or, no, it wasn't and report the results of that event back.

Q.     So does Magic Composer meet the element of Claim 6?

A.     Yes.

Q.     We'll go ahead and check that off.  Let's move on to Claim 10.  This again depends from Claim 1.  It requires, "The plurality of stored subscriber events associated with the first subscriber based on which the first subscriber is determined to satisfy the recipient criteria."

I'm going to pause there.

Can you remind us, again, what the recipient criteria was in your example?

A.    Yeah.  Those are the conditions that I have chosen in this case for message one that -- of an engaged customer. So this is a customer that has confirmed at least -- confirmed an order at least once over all time and has viewed products on my web page.

Q.    And Claim 10 is saying that the stored subscriber events based on which the subscriber is determined to satisfy those criteria, those events include events described in the API notifications associated with that subscriber.  So the API notifications, are those the ones coming from, for example, Shopify, the application builder?

A.    Right.  Those are the notifications that comes in the form of those payloads, so this is an event that's occurred and here's the information about it.

Q.    And do you see the events that the recipient criteria are being compared against, including events coming from the API applications and Magic Composer?

A.    Yes.

Q.    Is that why you circled "has order confirmed" here?

A.    I think I circled that because that was the part of the recipient criteria.

(Reporter clarification.)

THE WITNESS:  But I have seen this new in the Attentive system that they can provide, I think, you just -- if you go to the next screen, I think actually have an example for that.  So showing, again, that Shopify can provide order confirmation data to the message-management system.

BY MS. LI:

Q.    So that's coming from the Shopify API notification, the order confirmation?

A.    That's correct.  The order confirmed.  And not only does it have the Shopify logo, but it says explicitly that the source is Shopify.

Q.    And then you can use that event for your recipient criteria?

A.    Right.  I could say that, you know, has -- an individual had an order confirmed, and I think, you know, if the number is zero, the answer is no.  And if the number of times the subscriber received an order confirmation is one or greater, then I know the answer is yes.

Q.    Okay.  So let's check off that element.

And we'll go on to the last element, Claim 14. Claim 14 depends from Claim 11, not Claim 1.

Does that mean that we have to go through all of these elements again?

A.    Well, everything except the first line that's light

blue is identical to the elements that we've already talked about. So I don't think in the interest of moving things along we need to go through those.

I think I do need to point out that there are two differences here. The first is -- the very first line is a computer-implemented method comprising where in Claim 1 it was a system. And then it's missing those first two elements for the storage and the processor because -- or memory and processor because being a computer-implemented method, you have to have memory and a processor. So those -- those are the differences between Claim 1 and Claim 11.

And so Claim 11 itself has to be able to perform -- the software has to be able to perform this method.

Q.    And does Attentive use a computer-implemented method with Magic Composer?

A.    Yes, it does.

Q.    Okay. Let's look at the last element of Claim 14. It's the one in Claim 14 itself.

So that requires the method to have API notifications with webhook notifications.

What are webhook notifications?

A.    One type of API. And in order to make things easier and more efficient, instead of me asking you do you have an

event for me, and instead of you sitting back and saying, nope, you don't have one or you do, I can say, look, just tell me we have an event, here's the events I'm interested in and then a system with webhooks will automatically send you that event when it occurs so you don't have to do the back-and-forth dialogue.  It saves on computing time, and it saves on the network.  Just a little more efficient way of doing it.  But it's one type of API notification.

Q.    Does Magic Composer use webhook notifications?

A.    Yes, it does.  From the code, and we know that from Mr. Turner's testimony and we know that from their documentation or from Shopify's documentation about the webhook notifications.

Q.    This is the testimony you were referring to?

A.    Yes.  Sorry.  Yes.

Q.    That was what we heard just now?

A.    Well, they -- when he said unregister a webhook with Shopify, that means tell Shopify --

           (Reporter clarification.)

           THE WITNESS:  I tell Shopify that I want it to notify us about these events and webhook provides the data back.

BY MS. LI:

Q.    So -- oops, I did it preemptively.

           Can we check off Claim 14?

A.     We can.

Q.     All right.  So we touched on this at the top of your time on the stand, but to confirm:  Have you considered the noninfringement opinions of Attentive's expert, Dr. Polish?

A.     I have.

Q.     And he provided his opinions in a report in this case, right?

A.     Yes, we both prepared reports of our opinions.

Q.     And you reviewed his report?

A.     I did.

Q.     And having considered Dr. Polish's opinions and all the evidence you reviewed in this case, do you have any doubt as to whether Attentive infringes the asserted claims?

A.     No, I don't.  Based on my own analysis, it practices every element of the asserted claims, which I would understand to mean it infringes.

          MS. LI:  Thank you very much.  I pass the witness.

          THE COURT:  Okay.  Thank you.

          We're close to our typical time for lunch around 12:30.

          Mr. Davis, would you prefer I let you take lunch now?

          MR. DAVIS:  That would be wonderful, Your Honor.

          THE COURT:  So we're at about the time where we

would do that.  So we'll go ahead and break for lunch.  I'll have my courtroom deputy send out the jury, and we'll go from there.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  You may be seated.

Ms. Frederiksen, you may step down.

Yesterday, and I think during this examination, the breaks -- really keeping track, myself and my staff, about the jury's time.  We're trying to make sure, for example, we only take three breaks throughout the day, a morning, lunch, and afternoon.  We're really concerned -- we want to make sure that they're not in here for an unduly long period of time.  We're also keeping track when we break for lunch, is lunch even here, which it wasn't when I was being asked.

So counsel doesn't need to tell us when we're going to take breaks.  We'll keep track of time, and I will definitely -- if we're close to a point we're going to need it -- I don't want to interrupt your -- I'll give you a heads-up and say five minutes or so away, is there kind of like a module you want to get through, etc.  But otherwise, we'll let you know when it's time to take a break.

MR. SAULSBURY:  Sounds great.  Thank you.

THE COURT:  All right.  So it's about 12:25 now.

We'll take at least a half-hour break for lunch.  That will put us at coming back to the court, for counsel, at least 12:55, and we'll resume then.

Okay.  Court will stand in recess.

COURT CLERK:  All rise.

(Luncheon recess.)

COURT CLERK:  All rise.

THE COURT:  All right.  Everyone, please remain standing.  We'll have the jury brought in.

(Jury enters.)

THE COURT:  All right.  Please be seated, everybody.  We'll have Ms. Frederiksen brought back to the stand, reminding her she's still under oath, and then we'll begin cross-examination.

All right.  Do you have anything to hand up?  Please do.

MR. DAVIS:  Thank you.

                    CROSS-EXAMINATION

BY MR. DAVIS:

Q.    Good afternoon, Ms. Frederiksen.  My name is Britton Davis.  I'm an attorney for Attentive.  And we haven't met before, but thank you for being here.

A.    Good afternoon.  You're most welcome.

Q.    It's your opinion that the '660 Patent filled a significant gap in the prior art; isn't that right?

A.    Based on the evidence I have reviewed, that is my opinion, yes.

Q.    And you would agree, then, that the '660 Patent addresses the inability of merchants using prior art systems to create and execute multi-message campaigns in a unified flow, correct?

A.    That's correct, yes.

Q.    Yeah.  And that existing platforms allowed merchants to create single-message campaigns or limited automated messaging; is that right?

A.    That's correct.

Q.    And one of the things that the '660 Patent enabled was merchants to create multi-message campaigns where the performance of the campaign can be monitoring and tracked across a series of different messages creating conversational campaigns where the next message can be determined by how a subscriber responds, correct?

A.    That is disclosed in the '660 Patent, yes.

Q.    Is it explained in the '660 Patent as well?

A.    Not in the claims that were asserted here.  I have to confess I haven't spent a lot of time looking at the nonasserted claims.

Q.    So it's not disclosed in Claim 1?

A.    The conversational is not exclusively required by the elements of Claim 1.

Q.      But you would agree that follow-up messages can be tailored based on user --

            (Reporter clarification.)

BY MR. DAVIS:

Q.      User actions such as clicking a link or making a purchase?

A.      That's correct, yes, sir.

Q.      And then by allowing merchants to create, view and monitor for targeting messages, multi-message Campaign Flows, a multi-message Campaign Flows, the invention claimed in the '660 Patent makes it easier for merchants to exercise creativity, craft effective campaigns --

            (Reporter clarification.)

BY MR. DAVIS:

Q.      -- craft effective campaigns and send more and better targeted messages?

A.      So that was kind of long.  Since you're probably reading from my report, if you can refer me to a paragraph or just restate the question, speaking more slowly, that would be helpful to me.

Q.      Okay.  Why don't you turn to page 16 of your opening report.  Should be in the binder or paragraph 16, page 6.

A.      I'm sorry.  Which paragraph?

Q.      16.

A.      I thought you said page 16.

Q.    I'm sorry, page 6, paragraph 16.

A.    My apologies.

Q.    No problem.

A.    Okay.

Q.    The last sentence after Footnote 13, "By allowing merchants to create, view, monitor and retarget messages in a multi-message Campaign Flows, the invention claimed in the '660 Patent makes it easier for merchants to exercise creativity, craft effective campaigns and send more and better targeted messages"; is that right?

A.    Yes, that is supported by the evidence I've reviewed.

Q.    And at paragraph 17, you also said, "Finally, the patent allows for more precise customer targeting by user behavioral triggers, e.g., a customer abandoning a checkout to tailor follow-up communications.

            See that?

            (Reporter clarification.)

A.    By using behavioral triggers, what I heard him say -- maybe I didn't hear it right -- was by user behavioral triggers, but it actually says "using" here.

Q.    So the sentence that starts at paragraph 17 is -- and this is your report and your opinion, "Finally, the patent allows for more precise customer targeting by using behavioral triggers (e.g., customer abandoning a checkout) to tailor follow-up communications."

Did I read that correctly?

A.      Yes, you did.

Q.      Okay.  Now, you were up here and you testified for, I don't know, maybe an hour, hour and a half, and you didn't cite to the jury a single line of Attentive's source code, did you?

A.      I don't recall if I presented any source code in the presentation.  That's correct.

Q.      I was watching pretty closely.  You presented no source code from Attentive's product during your presentation, correct?

A.      I believe that to be correct, yes.

Q.      But you reviewed the source code?

A.      I did, yes.

Q.      And you -- instead you just presented screenshots of software that you ran and a couple marketing documentation, correct?

A.      We discussed --

                (Reporter clarification.)

                THE WITNESS:  The source code implementation methods that I was showing you, those screens, and I'm not going to presume that the jury necessarily would get specific value out of the source code.  I don't know their background, so I don't know if they read source code.

                THE COURT:  I'd like to just ask both counsel

and the witness to speak up and speak slower for the benefit of our court reporter.  Thank you.

BY MR. DAVIS:

Q.    So you didn't present source code because you didn't think it would be helpful; is that right?

A.    I may be asked to present source code on redirect, but during the beginning of my presentation, I thought there was enough material there just to introduce the jury to the claims and the evidence, some of the evidence that supports my opinions that I didn't need to -- feel the need to present it during my opening.

Q.    Okay.  And throughout your presentation, you asserted that every limitation of Claim 1, 4, 6, 10, 11 and 14 were practiced by Magic Composer, correct?

A.    That is my opinion, yes.

Q.    And you understand that in order to infringe, every single limitation of both the underlying independent claims and the dependent claims must be present, correct?

A.    That is correct, yes.

Q.    And if there is any single limitation missing in either the underlying independent claims, Claim 1 or 11, or the dependent claims, they cannot be infringed, correct?

A.    That would be correct, yes.

Q.    And you understand that Dr. Polish disagrees with your infringement opinion, right?

A.    I've read his report.  At least at the time he prepared that report, he disagreed.  Again, that was before the Court's instruction of monitoring, so I believe his opinions have changed as a result of that.

Q.    Well, we'll hear from Dr. Polish in a bit, but you understand, too, that the jury is entitled to believe Dr. Polish's testimony and disregard yours, correct?

A.    Of course, they will determine who they find more credible or which evidence they find more persuasive and make their finding of facts based on that.

Q.    You also, during your presentation, walked through a number of screenshots from PTX-586, I believe; is that right?

A.    Let me just refresh my recollection.  I didn't memorize these PTX numbers.  Yes, I did.

Q.    Thanks.  And this is page 2 of 586.  This is one of the screenshots you relied on in your opinion, correct?

A.    Yes, this is a screenshot where a user begins to define their campaign.

Q.    And up in the top right-hand corner, do you see "Legal only MoFo."  Do you see that?

A.    I see that.

Q.    That was the test account that Attentive made available to Postscript and its attorneys for you to review the operation of its Magic Composer system, correct?

A.    Correct.

Q.    And we have a sale at Barb's Books in these two, right, these top two messages?  That's what you walked through today, correct?

A.    I did, yes.

Q.    And there were no actual messages sent in those test campaigns for Barb's Books, correct?

A.    That is correct.

Q.    Okay.  That was just a mock-up that you made for your own purposes to explain to the jury, correct?

A.    That is incorrect.  These are actual screen captures that I captured as I interacted with their system.

Q.    So, I'm sorry, I'm not suggesting that you doctored the screenshots, but you created the Barb's Books campaign for your purposes to explain how the system worked to the jury, correct?

A.    Yes, I wanted to understand and be able to illustrate the way in which a person sets up a campaign, sets up selection criteria and sets up triggers.

Q.    But no message was either sent for the first message here, the sale at Barb's Books, correct, or the second message, correct?

A.    No, those were future-dated messages so no messages were sent as a result of that at the time I was capturing these images.

Q.      And I think you also testified that Magic Composer has been known by a number of different product names, correct?

A.      Based on the evidence I reviewed, that is correct, and the testimony of Mr. Greenberg as well.

Q.      And that's -- those are Campaign Composer, Sequential Campaigns?

A.      I think there's one more that's escaping me at the moment, but those were all discussed in either the documents or testimony of witnesses.

Q.      And were you here yesterday for Mr. Miao's testimony, correct?

A.      That is correct, yes.

            MR. DAVIS:  Can I have PTX-230, please?  Can I have the upper right corner of PTX-230?

BY MR. DAVIS:

Q.      And you heard from Mr. Magdovitz via deposition just before you testified.

            Do you remember that --  Attentive employee?

A.      Are you saying he was one of the video deponents?

Q.      Yeah.

A.      Yeah.

Q.      And the date here, status change for PTX-230, is April 25, 2022.

            Do you see that?

A.      I see that, yes.

Q.      And then down below in the Salesforce request, what is the specific request?

        And it says, "Create 'did not purchase' as a retargeting segment for Drip Campaigns or Magic Composer."

        Do you see that?

A.      I see that, yes.

Q.      And below that in the details, it says.  "Currently we only have two retargeting options when SMS-only clients use Drip Campaigns.  These are 'has clicked' and 'did not purchase' or 'has not clicked.'"

        Do you see that?

A.      Yes.

Q.      All right.  And below that it says, "E-Mail customers also have a 'did not open' option if previous message is e-mailed."

        Do you see that?

A.      I see that, yes.

Q.      And below that it says, "Clients would like additional option around 'did not purchase' as the 'has clicked' and 'did not purchase segment' is too narrow and excludes a decent percent of subscribers that received the campaign."

        Do you see that?

A.      I see that.

Q.      And I want to focus on the date at the top for a second.  April 25th, 2022 is --

MS. LI:  Objection, Your Honor.

MR. DAVIS:  -- almost six months --

THE COURT:  Sorry.  Go ahead.

BY MR. DAVIS:

Q.      -- six months before the filing date of Postscript's '660 Patent?

MS. LI:  Objection, Your Honor, this is a undisclosed invalidity theory.

THE COURT:  I'm sorry.  I couldn't hear the end.

MS. LI:  I'm sorry.  It's undisclosed invalidity theory, subject to the discussion about the motion in limine.

THE COURT:  So the objection is this testimony relates to an undisclosed invalidity theory?

MS. LI:  That's right.

THE COURT:  Okay.  I suppose that's an issue we have not discussed, but is that an issue that we need to discuss at this time at sidebar?

MR. SAULSBURY:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Let's meet at sidebar.

(Sidebar discussion.)

THE COURT:  Okay.  So let me try to understand the nature of the objection.

MR. SAULSBURY:  Certainly, Your Honor.  This relates to the motion in limine that we brought before the pretrial conference.  We were concerned that they were going to try to argue that prior versions of accused product render the patent invalid.  And we, therefore, filed that motion in limine.  They assured us that they were relying just on Journeys, not on prior versions of the accused product, but now we have a document up that's about a prior version of the accused product.  And they're highlighting the fact that this functionality existed at a prior date to establish their own undisclosed invalidity theory that was the subject of the MIL.

MR. DAVIS:  Mr. Saulsbury put that exhibit in the case, Your Honor, and walked through it.  He opened the door.

THE COURT:  Just before we get there, stepping back, so our accused product is Campaign Composer, and the document that's being looked at is a document that you're saying Mr. Saulsbury relates to a prior version of Campaign Composer that is not accused?

MR. SAULSBURY:  It is -- that is correct.  It is not accused, but this is precisely the subject of the MIL.  They don't have an invalidity theory.  They disclosed in this case that even a prior version of the accused product invalidates and they -- therefore, during the motion in

limine argument, they assured us they're relying on the general prior art, not a prior version.

THE COURT:  Not a prior version of Campaign Composer?

MR. SAULSBURY:  Whether it's called Magic Composer, Campaign Composer, Drip campaigns or what I heard from Mr. Britton was we put this at issue, we opened the door, we used this document.  We didn't use this document to put an undisclosed invalidity theory at issue, Your Honor.

THE COURT:  What is the document?  What is it?  Does anybody have a copy of it?

MR. DAVIS:  Should be in your binder.  I can go get you one.  It's 230.  PTX-230.  And it would be right there.

THE COURT:  Okay.  So I'm looking at PTX-230 and what page are we on.

MR. DAVIS:  Page 1, Your Honor.  There's only one page.

THE COURT:  Okay.  All right.  And particularly, there's a "detail" section?

MR. DAVIS:  That's correct.

THE COURT:  All right.  So -- and the particular portion that's being discussed is about how, I guess Campaign Composer, we have only two retargeting options at the time.  Okay.  Am I right so far?

MR. DAVIS: Yes.

THE COURT: Okay. And so this is a document that was admitted into evidence, right, through direct testimony. Who is the witness? Do you recall?

MR. SAULSBURY: Mr. Miao, I believe it was through adverse direct cross.

THE COURT: Okay. And what was the purpose of admitting it and why was it being used for Postscript?

MR. SAULSBURY: Right. It related to the development of Magic Composer and it related to features that weren't present at the time, but we talked nothing at all about invalidity of course as Mr. Miao is not an expert.

THE COURT: So other retargeting options that weren't available are the options that you're referencing?

MR. SAULSBURY: That's right, Your Honor.

THE COURT: Okay. And you did that to describe the history of the development of the accused product?

MR. SAULSBURY: That's right. That's right. And I'll also note that there's a last update date that postdates the date of the filing -- of the filing application. First of all, the invalidity theory wasn't disclosed and that was the subject of the MIL and additionally, the last date is clearly after the filing date.

THE COURT: So to Attentive's counsel, the

objections that Attentive's counsel is going -- you're using this and you're discussing this portion of the exhibit with Ms. Frederiksen because -- in furtherance of some type of undisclosed invalidity theory that you're going to argue.

I guess the first question is, is that what you're using this for or for some other purpose?

MR. DAVIS:  So two purposes.  One, if a product predates the patent, it's not infringing; and two, if the -- if it is present, then she's proved invalidity.

Now, we had a stipulation on this fact, I think, it's in pretrial order, that we would not use this with our experts and we were not going to bring it up, but Mr. Saulsbury kicked the door open and now we are able to use it with Ms. Frederiksen.

So the stipulation, I think we had a stipulation on this, not a MIL.

MR. BALSAM:  Paragraph 75, I believe, of the pretrial order.  Sorry, 74.  And that stipulation was --

THE COURT:  Hold on one second.

MR. BALSAM:  Yeah, sorry.  All right.  So we're going to paragraph 74 of the pretrial order.

MR. BALSOM:  Yeah, 74 of the --

THE COURT:  Okay.  So I'm on page 19 of the pretrial order, paragraph 74 says, Attentive's experts will not rely on Campaign Composer as prior art and -- but I

guess if in part what you're saying is that the point of the question is to inform an invalidity argument, and the invalidity argument was not disclosed as an invalidity argument that was in the case, regardless of the stipulation, how could you offer such an argument to the jury?  How could you offer undisclosed invalidity?

MR. DAVIS:  This goes to her credibility that she's talking about a theory that was -- product that was available before.  I mean, it's exactly what she's testifying infringes.

We did not offer this affirmatively, but we are rebutting evidence that they put in to the case.  We weren't going to touch this.  They offered it about our product which they accused of infringement.  This opened the door in an incredible way.

THE COURT:  But you can't open the door to the assertion of a theory they didn't disclose.  So I guess, is there any dispute that at the time it was not disclosed, the invalidity theory it is now discussing?

MR. SAULSBURY:  There's no dispute.  That's why --

THE COURT:  I'm asking Attentive's side.

MR. DAVIS:  No.  This came up through the trial process.  Like I said, it was plaintiff that opened the door.

THE COURT:  Right.  But opening the door to testimony, that is one thing, but then of course with regard to infringement/invalidity contentions, the argument isn't disclosed previously, it can't be a part of the trial.  It could be unfair to a case that's the premise of contention interrogatories.  You couldn't be permitted to argue it.

So I guess is there some other -- I mean, Mr. Flynn, I mean, can I just ask you:  Is there something I'm missing there?  I guess maybe separately, other than an argument that this testimony is somehow relevant to an invalidity argument that wasn't disclosed by Attentive, is there some other basis for which you think this relates to, for example, Ms. Frederiksen's infringement position?

MR. DAVIS:  I think it goes to her credibility -- from what I sense.  She didn't discuss this, didn't rely on it, didn't look at anything earlier than the filing date of the --

MR. BALSAM:  Just to elaborate a little bit, she groups together all the accused products after the issue date of the patent and says, those are the accused products, but did she look to see if the accused product in some version similar or not existed before the filing date.

That's a credibility issue about the thoroughness of her infringement analysis and whether she properly and accurately defined the accused products.

THE COURT: You're talking about -- you're saying she didn't look at products that were available before the trigger date for infringement?

MR. BALSAM: Correct.

THE COURT: What would those products have to do with an infringement argument of the patents that issue on that date?

MR. BALSAM: Would have led her down the road of, you know, did Attentive have a product before the issue date and is it a prior art? Is the patent invalid?

THE COURT: Would that -- because you say that's the prior art, isn't that the very thing we're discussing, is the prior art would be invalid?

MR. BALSAM: An expert is not a -- just a mouthpiece of attorneys.

So if an attorney says, hey, only look at post July 23rd, post July 23rd, 2023 accused products, and then she only looked at that.

THE COURT: Is that the date of the patent?

MR. BALSAM: Yeah.

THE COURT: Okay.

MR. BALSAM: So the expert puts on blinders and doesn't look at anything before, that's a credibility issue.

THE COURT: The thing I'm asking is, I'm not saying that evidence or information would exist prior to the

date of a patent being issued or the expert's failure to look at it couldn't be relevant to an infringement analysis or how thorough it was, I just have to have an understanding about how it's asserted to be relevant to the infringement analysis.

So she didn't look at this evidence of what prior version of the accused product looked like before the key date for infringement so that goes to her unpreparedness to talk about infringement after the date?

MR. BALSAM:  Yes.

THE COURT:  To make sure it's not a shadow in an invalidity argument and, I think, based on the answers here today, certainly was a part of the idea, which is not going to be permitted.  What is the argument about how the predate of the patent status of the accused product relates to her thoroughness as to the infringement analysis?

MR. BALSAM:  It relates to her credibility as an expert.  She's not supposed to be, you know, a mouthpiece of the attorneys.  So if the attorneys tell us, look --

THE COURT:  I know you keep saying that, but what does that mean, "the mouthpiece of the attorneys"?  How does that answer my questions?

MR. BALSOM:  The jury is entitled to weigh her credibility as an expert.  If she only looked at the post issue date of products and put blinders on as to the earlier

products, then that's a credibility issue.

THE COURT:  How would it go to credibility as to infringement analysis about what infringed the patent as of the date the patent is issued?

MR. BALSAM:  The jury could draw an inference that if she's putting on those blinders and only looking at the narrow set of products that, you know -- not an accusation, that counsel put in front of her, then they could draw the inference that the rest of her analysis is similarly put on a plate in front of her by the attorneys.

THE COURT:  Okay.  So based on what I've heard, let me say a couple things.  First, when asked for the bases for the use of the document, Attentive first said that it was being used in part in support of a validity argument that it wishes to make presumably about a prior version of the accused product that invalidates the patent claims.

I think it's undisputed such an argument was undisclosed in response to the other side's contentions as to what are the relevant invalidity arguments that have been made and also the pretrial order sets them out.  So the evidence couldn't be used for that purpose.

The only other assertion I have is that somehow questions about status of accused products prior to the date of patents issuance are somehow relevant to credibility. I've asked repeatedly about how that could be?  I frankly

just don't understand the answer.  I don't understand the substance of it and I don't understand how it goes to credibility as to infringement.

I'm not saying it's improper for an expert on infringement to be examined about information about accused products line, for example, before the date of the patents issuance.  The failure to do so in some context could be relevant to infringement.

I'm just saying, I've asked a number of times how it is and I haven't gotten an answer.  Based on all that, I don't have a basis to permit the question, so I'm going to have to sustain the objection and you'll have to move on to an additional line of questions.

MR. BALSOM:  Just a point of clarification.  Can we ask her, did you consider earlier versions of the product that predate the patent if that --

THE COURT:  I just need -- not at this time, because I haven't -- see, just to be even more specific, I mean, of course, could you ask if there was no potential harm from that, right, you know, maybe the answer could be, I don't know, sure.  Again, is there some basis?

But I think we've already established that at least an initial thrust reason to do so was to make an invalidity argument not disclosed.  There's an issue of prejudice there.

So at the present, no, unless it can be substantially articulated at some point in time.

MR. SILVER:  Your Honor, one question of clarification.  As we understand Your Honor has ruled and that is the law of the land.  They should not be asking and arguing this position in closing, unless they get advanced permission from Your Honor; is that correct?

THE COURT:  I think certainly based on my ruling, Attentive cannot make arguments of the patents disclosed.  That shouldn't even be coming up at this stage.  So that is correct.

But, now, I don't know what additional permutation you might have in terms of questioning or other testimony.  So I'm not making some kind of blanket statement about anything.  I'm just dealing about what I know to be the state of affairs at this time.  So beyond that, I wouldn't say.

MR. SILVER:  Thank you, Your Honor.

(Sidebar concludes.)

THE COURT:  All right.  The Court sustained the objection.  And we'll move on to additional questions.

Mr. Davis.

BY MR. DAVIS:

Q.    Ms. Frederiksen, your opinion regarding the Magic Composer is about how the product existed on or after

July 25, 2023, correct?

A.      That is correct, yes.

Q.      I want to talk a little bit about some of your demonstratives that you showed to the jury today.

MR. DAVIS:  Can I have Ms. Frederiksen's demonstrative, Slide 6 -- or 626.

BY MR. DAVIS:

Q.      Okay.  This is one of the slides you presented for at least one message in the message flow associated with a trigger condition, correct?

A.      Yes.

Q.      Okay.

MR. DAVIS:  And, Marco, can we have the right side of this blown up.

BY MR. DAVIS:

Q.      And the word "trigger condition" doesn't appear on this screenshot, correct?

You -- you circled recipients who clicked the previous message "purchase" and added the word "trigger condition," correct?

A.      I'm sorry.  I circled?

Could you just repeat your question, counsel?

Q.      Sure.

So the word "trigger condition" does not show up on this screenshot anywhere, correct?

A.      This specific word does not, but the trigger conditions are clearly being identified in the portion that are highlighted in yellow and boxed in green.

Q.      I'm sorry.  My question was -- it was fairly simple: The words "trigger condition" do not appear on this screenshot, correct?

A.      Not on the screenshot from the user interface itself. I've put a little bullet there to point you to what they are.

Q.      Right.

        So you've added the words "trigger condition." You've characterized what you think a trigger condition is, correct?

A.      In this specific example, yes.  This is just one example amongst many.  But with respect to this particular screen capture, that's what I'm identifying for the jury.

        (Reporter clarification.)

BY MR. DAVIS:

Q.      And let's walk through a few more examples.

        MR. DAVIS:  Marco, can I have Slide 21 from Ms. Frederiksen's demonstratives.

        Again, let's blow up the right side again.

BY MR. DAVIS:

Q.      And the word "trigger condition" doesn't appear anywhere on this screenshot, correct?

A.     The actual words "trigger condition," I don't see that there.  That's correct.

MR. DAVIS:  Okay.  Let's go to the next slide, please.

All right.  Let's blow this up as well.

BY MR. DAVIS:

Q.     And the words "trigger condition" or "monitoring a trigger condition" don't appear on this slide anywhere, correct?

A.     They do not appear on the slide at all whether as an annotation by me or something on the underlying screen image.

Q.     So there's no use of the word "trigger" or "trigger condition" or "monitoring a trigger condition" in the screenshot from Attentive's system, correct?

A.     That is correct.

MR. DAVIS:  Can I have Slide 23, Marco?

BY MR. DAVIS:

Q.     This looks like the same screenshot with different annotations, no -- no trigger condition or monitoring of trigger conditions from Attentive's product here, right?

A.     Again, I'm showing how on this particular screen how a user can get to the screen where they provide that information or customize the slides to provide that information, but the actual words "trigger condition" do not

appear here.

(Reporter clarification.)

BY MR. DAVIS:

Q.    And it's your opinion that those are trigger conditions.  They don't say they are trigger conditions, correct?

A.    It is clear from the source code that they are trigger conditions, because they are the conditions that are being evaluated with respect to subscriber events to cause an action to happen.

They don't have the word trigger condition on their screens.

Q.    I'm sorry.  You didn't present any source code to the jury in your presentation, did you?

A.    I did not -- during the opening presentation, that's correct.

MR. DAVIS:  Let's have the next slide, please, Marco.  Let's zoom in on this one.

BY MR. DAVIS:

Q.    There's no use of the word "monitoring" or "trigger condition" on this screenshot from Attentive's product, correct?

A.    No.  Again, this screenshot just defines what those conditions are, it doesn't call them by that specific name.

MR. DAVIS:  Next slide, please, Marco.

BY MR. DAVIS:

Q.      Another screenshot.  No use of the word "trigger condition" or "monitoring a trigger condition" here, correct?

A.      Again, this shows you some of the options you can select to choose a particular trigger condition, but it does not label those options specifically as trigger conditions.

Q.      It's -- it's your opinion that those are trigger conditions.  It's not set forth in the document, correct?

A.      It is absolutely my opinion that those are trigger conditions.  They are the conditions you select across the message being sent.

Q.      And you understand that Dr. Polish has reviewed the code and disagrees with you, correct?

A.      I understand that he disagrees with certain points with me and on other points it agrees that -- he agrees entirely with me.

        MR. DAVIS:  Let's go to the next slide, please.

BY MR. DAVIS:

Q.      And here again -- we saw this one already.

        MR. DAVIS:  Next slide please, Marco.

BY MR. DAVIS:

Q.      Okay.  And again, here on Slide 27, no use of the word "trigger condition," other than the one you added; is that right?

A.     Yes.  The annotations I added to direct the jury to see whether those trigger conditions exist in the product.

Q.     It doesn't -- it doesn't call them "trigger conditions" in the screenshot, right?

A.     It does not call them "trigger conditions" in the screenshot.

Q.     It says "audience" and "retarget," correct?

A.     Yes.

Q.     And it below that it says, "Estimated recipients, zero," correct?

A.     That is correct.  Recipients estimated for message two because message one had not been sent and the predicate condition is recipients who click the previous message and do not purchase.  So there could be no --

        (Reporter clarification.)

        THE WITNESS:  There could be no count at this point in time because there's no data to be counted at this point in time.

BY MR. DAVIS:

Q.     If we go through all of the screenshots you presented today, there's no use of the word "trigger condition" or "monitoring a trigger condition" in the screenshots from Attentive's products that you presented; is there?

A.     I do not believe that they specifically use the word "trigger condition" on their screens.  And I don't recall if

they used the word "monitoring" either.

Q.   Okay.  So you had also agreed and were asked on direct, that time alone cannot be a trigger condition, correct?

A.   Not a trigger condition as described in the claim because the claim requires or identifies triggering based on user events and the mere passage of time.

(Reporter clarification.)

THE WITNESS:  Mere passage of time is not a user event.

BY MR. DAVIS:

Q.   And so if the jury believes that Campaign Composer only uses time to send a message, then you would agree it would not infringe the '660 Patent, correct?

A.   If, in fact -- I'm not going to opine on what the jury believes or doesn't believe.  I'll leave that up to the jury.  But if, in fact, the product only used time and had no other conditions related to user events, then I would have to reevaluate that.  That's not the evidence that I saw.

Q.   But -- but based your statement in your rebuttal report where you were rebutting Dr. Polish's invalidity opinion with regard to Klaviyo Flows, that's at page 940 of your rebuttal report, or paragraph 940 of your rebuttal report, you said, "The trigger condition that Dr. Polish

identifies is simply the passage of time.  It is not dependent on the occurrence of any subscriber event, it therefore cannot be the claim's trigger condition," correct?

A.     But you're asking me something I said about Klaviyo and my answer was if it turned out that that was true, which I don't believe it is for the Magic Composer product, then -- if I could look at it and that was the only thing it did, then I would have to look at everything else it did to see is there anything here in the user event --

Q.     I'm sorry.  I asked you a yes-or-no question.  It was -- I want to do this again.

       The trigger condition that Dr. Polish identifies is simply the passage of time.  It is not dependent on the occurrence of any subscriber event.  It, therefore, cannot be the claimed trigger condition.  That's your opinion, correct?

A.     That was my opinion with respect to the Klaviyo art he cited, yes.

Q.     Okay.  And you understand that you have to apply the same interpretation of the claims for both infringement and invalidity, correct?

A.     Of course.

Q.     Okay.  So if that's your opinion with regard to the invalidity of the patent, that has to be your opinion for infringement as well, correct?

A.    Well, again, we're talking about infringement of a different system, so I want to look at everything it did to see if I found something else.

Q.    I'm sorry.  You have your --

A.    It would be my opinion -- it would be fine.  It would not be infringing.  Again, that's not what I found and you're hypothesizing that a system like that could exist.  I would want to look at the hypothetical system and see what exactly it did, whether I rendered an opinion whether it infringed or not.

Q.    So I think that was a yes.  It wouldn't infringe if it only used time.

        Now, you also reviewed Mr. Greenberg's testimony in forming your opinion, correct?

A.    I did, yes.

Q.    Okay.  And Mr. Greenberg's deposition is set out in your witness binder.  And I'd like to take you to -- let's see -- page 155.

A.    Of what, sir?  I don't see that.  I have Greenberg's deposition testimony in my binder here.  It may not have a tab.

        THE COURT:  You may approach if you wish to help the witness.

        THE WITNESS:  Oh, that would be more helpful.  Thank you so much.

BY MR. DAVIS:

Q.    Yep.

A.    I'm sorry, Counsel.  Would you give me that page direction again?

Q.    Okay.  So let's go to page 156, and we'll start at line 1.

A.    And that is 156 of the transcript as opposed to 156.

Q.    Okay.  And you're reviewing Mr. Greenberg's testimony, correct?

A.    Where he discusses the bug in his system, yes.

Q.    Yeah, that's right.  And in this discussion Mr. Greenberg is discussing a situation wherein Attentive's system, the second message could actually be sent before the first message was sent to zero subscribers.

       Do you see that?

A.    I see that, yes.

Q.    Okay.  And he was asked, even though under the scenario you just mentioned message two would actually go out before message one and the answer is because they are atomic events unrelated to each other.  That's message one. And message two, and the audience is calculated at the time of sending.

       You see that, right?

A.    I see that.

Q.    Messages are unrelated to one another.  That was his

testimony.

A.    I see that.

Q.    Mr. Greenberg was the VP of engineering for Attentive, correct?

A.    That's my recollection of his title.

Q.    And then further down the page at line 21, Mr. Greenberg was asked, page 156 of his testimony.  He was asked, is that still the case?  And he answers, that is how it's always worked.

        Do you see that?

A.    I see that.

Q.    You'd agree that if the second message can be sent before the first message, it cannot be triggered by the first message, right?

A.    I would agree that if there is a bug in their system where you could set up a flow that had a second message triggered by a first message and something went awry in some part of the system and it came out of order, that that bug in this instance would cause the behavior he describes. That doesn't change anything in my opinion about the fact that their system also supports the ability to create a set of conditions for a first message, use that as a qualifier and when it works, to send the second message that further qualifies that.

Q.    I mean, I'm sorry, if the second message can be sent

first, it can't depend on the first message, right?  It just can't?

A.    They depend on the selection criteria defined for the first message in the flow.  So if you have set up a conditional that says these are my conditions and then you are retargeting from that flow and saying I want to know as I showed that their UI allows you to define and I want to know who clicked on this message but hasn't purchased, necessarily that is a condition.

Now, if there's a bug that keeps it from working perfectly, I don't think that excuses the times that it does work.

My understanding is if you infringe something, you don't have to infringe it every time you run, but if you practice all the elements and you're infringing, that's what matters in determining whether a product infringes.

Q.    Yeah.  The fact that it's a bug doesn't mean that the system doesn't operate that way, correct?  Just because it's an undesired result doesn't mean that that's not how the system works, correct?

A.    Well, I don't know.  He says, you know, it's important to appreciate that we had a bug that let this happen so he doesn't go in and allow -- elaborate about what the system does when it's operating properly.  He's talking about a specific defect in the system here.

Q.    Down at line 6 through 8, though, he also says that the campaign message was executed to zero subscribers successfully.

Do you see that?

A.    I'm sorry you said lines 8 through 8?

Q.    Through 8.

A.    On that same page?

Q.    Yeah.  Talking about --

A.    Talking about the bug and so he says if this screenshot showed an example where a message was actually sent on the 9th and sent to customer who have clicked on, had to go to people who clicked on message one.  Then the message would execute zero subscribers which makes total sense because, again, he's basically saying it's a condition that I've set and because of this goofiness in my software, I tried to send another that was dependent on that, but the first message hadn't be sent then it would run without throwing an error but wouldn't go to anybody.  That's what he's saying here.

Q.    Actually, if you look at line 13 through 15, he's asked why, and he says because the messages are atomic events unrelated to each other -- he says it right there. And the audience is calculated at the time of sending.

Do you see that?

A.    That's not the point.

Q.      I'm sorry.  Do you see that testimony from Mr. Greenberg?

A.      I see it.

Q.      And I read it correctly?

A.      Because the atomic events -- because they are atomic events unrelated to each other and the audience is calculated at the time of sending.  I see that.

Q.      And you relied on Mr. Greenberg's testimony for your opinions today?

A.      He's not talking about the conditions for the various things here.  He just says that the two messages occur and they may have their own trigger conditions.  That is to say, they're --

Q.      I just asked you if you relied on Mr. Greenberg's testimony today?  Simple yes or no --

A.      It is -- I reviewed his testimony and relied on it and I also read what it didn't say.

Q.      Okay.  Let's talk a little bit about the test system that you used.  And we saw that at PTX-586 at 2, right, and it was called "Legal only MoFo," which is short for Morrison Foerster, Postscript's counsel, right?

A.      I believe that was the identifier that Attentive assigned for it when he created the example.

MR. DAVIS:  Marco, can I have DDX-4 at page 1, please.  Can we blow up the upper right corner here.

BY MR. DAVIS:

Q.    So you see where it says "Legal only MoFo" at the top?

A.    Yes, at the very top.

MR. DAVIS:  And let's back off, and can we go to the next slide, please.

BY MR. DAVIS:

Q.    Okay.  And so here we've got the two messages from the "Legal only MoFo" page.  These were set up in November of 2024.

See that?

MS. LI:  Objection, Your Honor.  Can we please have a sidebar?

THE COURT:  Okay.  We'll go to sidebar.

(Sidebar discussion.)

MR. SAULSBURY:  Your Honor, here is the issue. I'm sorry we have to even bring this, but counsel has now drawn attention to it several times that the account is "Legal only at MoFo."

THE COURT:  Can you do me a favor?  The exhibit number that she was looking at, can someone tell me the number?

MR. DAVIS:  PTX-586.

MR. SAULSBURY:  Certainly.

MR. DAVIS:  Page 2.

MR. SAULSBURY:  He is drawing attention to this a couple times, and even said that's a reference to the lawyers at the Morrison Foerster firm that represent the plaintiffs.  Here's the issue.  This isn't software that you can just go access publicly, like, gee, ma'am, they have this witness account and that's why it says "Legal only at MoFo" because they set it up for us.

He's trying to create the suggestion that this is the lawyer's work.  That's why he pointed to us and says this refers to MoFo, Morrison Foerster, the lawyers for the plaintiff, to try to create the suggestion the expert didn't render her own opinions.  That's unfair in the fact that they created this.  This isn't pertinent to any of the issues.

THE COURT:  I mean, this is just something if you want to clear up.  I'm not saying this is what Attentive's doing, but if it's something you want to clear up, can't you clear it up on redirect?  I mean, the circumstances generally -- I don't even know.  Did Ms. Li talk about this, like some of the substance of -- I mean, I gathered that in order for her to get access to the Attentive system, probably more restrictions in places?

MR. SAULSBURY:  That's absolutely right.

THE COURT:  And maybe some of them relate to the fact there was a MoFo logo on here.

MR. SAULSBURY:  That was actually created by Attentive.  They created our account that they gave us access to for discovery in the case.

THE COURT:  I guess my question is just if some of this -- but, look, this is kind of like a particular way in which you got access, you know.  It was through the case lawyers, like if you wanted to further explain what's being said so far, couldn't you just do that with her on redirect?

MR. DAVIS:  I suppose at this point we'll have to.  Just why are we even in this position where they're trying to create the suggestion she's relying on what the lawyers did.  They created the account.

I just want to make sure that they understand that this is the same account we're talking about.  I'm happy to --

MR. SAULSBURY:  You've asked that.

THE COURT:  Mr. Saulsbury, hold on.  Mr. Davis is speaking.

MR. SAULSBURY:  I'm sorry.

THE COURT:  One by one so we can have an orderly process.

Mr. Davis, is what you're saying, look, you're simply trying to focus on the fact that this is a particular account that you created pursuant to the way you got access to the documents?  Did you mention the logo?  Yes, but it

wasn't because you're trying to suggest any untoward -- and if you have further questions, you may be focusing on other aspects of the document; is that right.

MR. DAVIS:  That is absolutely correct.  I have no intention of focusing on that again.

THE COURT:  I don't see anything unduly prejudicial in terms of what counsel has done especially in light of what I see to be the further plan.  Certainly if Postscript's counsel thinks something to the contrary, it's the kind of thing that they could easily clear up through redirect examination questions, and that should be the approach here, at least so far, okay.  So that's overruled, the objection.

(End of sidebar discussion.)

THE COURT:  Back on the record.

I've overruled the objection.  And, Mr. Davis, just remind us where we are with your questioning.

BY MR. DAVIS:

Q.    Yeah, so we were looking at your test account.  And this is -- these are some other messages from your test account that I want to draw your attention to.  And these particular messages, were set up, you know, November 8th, 2024, and one was to send, we see here, Friday, November 8th, 2024, at 1:10 a.m.  Eastern.

Do you see that?

A.      I see that.

Q.      And over on the right it says "deliver," right?

A.      Yes, you've blown up the sections from the actual screen in the two boxes there.  I see that.

Q.      And the next message down, it says message 11/08/24 at 12:32.

                Do you see that?

A.      Yes.  For retargeting message.

Q.      For retargeting message of the first message, correct?

A.      Correct.

Q.      And it was sent November 10th, 2024, at 12:40 a.m. Eastern.  Do you see that?

A.      I see that, a few days later, yes.

Q.      And it also says "delivered," correct?

A.      I see that, yes.

Q.      Okay.  Let's go to DDX-4, which is the retargeting message screen, and I think we saw some of the screenshots like this in your presentation.

                And I'd like to call your attention to the message at the top, and the "sent on" date and the "delivered."

                MR. DAVIS:  And can we have Slide 5, please, Marco.

BY MR. DAVIS:

Q.    All right.  So we've blown up the message, the "sent on" and the "delivered."  Do you see that?

A.    I see that, yes.

Q.    So this is the message from November 8th, 2024, at 12:32, right.  The retarget message says, "sent to," the retarget message below.

      And then at the top right, it is blowing up the section in the middle there that says, "sent on" and it says, sent on Sunday, November 10th, 2024, at 12:40 a.m. Eastern.

      Do you see that?

A.    I see that.

Q.    So "sent on" and then down below in the campaign metrics, it says "deliver, zero."  Do you see that?

A.    I see that.

Q.    "Delivery complete" at 12:40 a.m. Eastern.  Do you see that?

A.    I see that.

Q.    The system sent zero messages to zero subscribers even though it was a retargeting message, didn't it, from your own system?

A.    We haven't reviewed what the conditions of this retarget is, so I would want to look at what the audience had been defined for because I don't recall as I sit here. That was a year and a half ago.

But I don't see anything surprising. If the retargeting was such that the target trigger criteria hadn't been met, the "sent" would be zero. This is in the same category of, you're going to report what you did. And if I sent it or if I evaluated it successfully and tried to send a message but there weren't any limitations that you gave me, then I sent it to zero people.

Q.    That's because it's a timer, when it hits the "sent on" time, it sends it, regardless of how many people were there; isn't that right?

A.    That's not correct, Counsel. I'm sorry. A retargeting message -- there would have been conditions that were applied in addition to the time that would have checked the time the message was being sent, so you're implying it's just sent blindly at time.

But if my recollection of this particular test is even remotely correct, there were retargeting criteria specified when the message was defined and those would have been responsible for the zero.

Q.    Okay.

MR. DAVIS:  No further questions.

THE COURT:  Okay. Thank you. We'll have redirect.

MS. LI:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. LI:

Q.     You recall that Mr. Davis asked if you had pointed the jury to any portion of Attentive's source code to further our opinion; is that correct?

A.     I do recall.

Q.     And you acknowledged that you hadn't presented the source code itself to the jury because you weren't sure if they would be interested in reading through all that.  But instead explain how it functions.

       So I'm holding up here this package.  Do you recognize this?

A.     That is the portions of the source code that we printed out in case I needed to take some portion of that and use it at a deposition or use it at testimony, that's only a tiny fraction of the source code that was provided, but it's a specific set that we were allowed to print. There were some limitations on how much we can print so we had to be surgical about it.

Q.     And did you review the code in this packet?

A.     Yes.

Q.     How much of it?

A.     All of it.  And considerably more that is not in the package, just to be clear.

Q.     And do you have a sense for how many lines of code you reviewed?

A.    As I sit here, I don't.  There were several very, very large bodies of code, because not only do you have the Magic Composer code, we had the Journeys code available to us as well.  So there was a large quantity but I don't, as I sit here, recall.

Q.    Probably several thousand lines?

A.    Oh, way more than that.

Q.    And did that code support your conclusions about how Magic Composer operates?

A.    Yes.

Q.    Okay.  So when we spoke earlier, do you recall testifying that you had seen code from Attentive that identifies the subscribers in a segment and then registers those subscribers in the system?

A.    Yes, that happens immediately before the message is sent, that particular piece of code.  So it's where the criteria -- you know, although Mr. Greenberg was saying that all of the data is stored in the data lake, that's a bunch of data for the various events that are recorded and then it's queried.

        "Queried" means that the amount of database query that can select specific data out of that and as a result of that, they select the data that are the compound criteria for all the parts of the -- you know, on the first message, its conditions -- while the second message -- the

first message is condition, plus the second message is condition or actually the fact that the first message that was sent gets recorded as a message --

(Reporter clarification.)

THE WITNESS:  Sends with a message ID in there and then they collect the data corresponding to the criteria for the second message and the first message, whichever message they're on and write that data to a data object.

It is then sent to the portion that uses that data to send the messages out to the appropriate subscribers.

MS. LI:  Mr. Glass, could we please put up the Bates ending in 96 from DTX-308 in evidence?

MR. DAVIS:  Objection, Your Honor.  This is outside the scope of cross.  I specifically asked her, that you did not present source code?  I did not ask her about the source code that she reviewed or do not have presented --

THE COURT:  Ms. Li?

MS. LI:  Your Honor, he called into question the credibility of the witness in providing her testimony to suggest that she hadn't actually reviewed the source code or she wasn't providing credible testimony that she hadn't shown code to the jury and this is responsive to that line of questioning.

THE COURT:  What exhibit?

MS. LI:  This is DTX-308 which is the Attentive source code that was admitted yesterday through, I believe, Mr. Miao.

THE COURT:  Okay.  So it's not --

MS. LI:  It's not in these binders and we actually don't have --

THE COURT:  Okay.  So I will -- I'll permit the questioning, but I'll also permit, if Attentive's counsel wishes, limited redirect on the subject if he wishes to use it as well.  I do think the subject of source code and its review generally is covered on direct and of course it's discussed briefly in cross for the reasons Attentive's counsel says.

So I'll permit the questioning, but again, in this unusual context permit limited redirect if Attentive's counsel wishes on at least this subject matter.

MS. LI:  Okay.

BY MS. LI:

Q.    Can we put up -- I'll put on the ELMO here, page 96 of DTX-308.

THE COURT:  I'm sorry, I think I said "redirect."  A portion of the cross.

Please continue.

MS. LI:  Okay.

THE WITNESS:  Counsel, would you mind showing me first, the top of the page?

MS. LI:  Yes.

BY MS. LI:

Q.    Can you see that there?

A.    Yes, in a workflow that helps me to orient to the code.

Q.    And I want to direct you specifically to the line 207 here where it says, "Beginning to write qualified audience for on" --

MR. DAVIS:  Your Honor, we request that the courtroom be sealed if we're going to walk through code like this.

MS. LI:  Your Honor, this exhibit was admitted in open court yesterday.  And I believe portions of it has been put up on the screen several times.

THE COURT:  Is that correct, Mr. Davis?

MR. DAVIS:  Portions of it but I don't believe this portion was.  We're okay with the portions that were disclosed, but we have Postscript people in the courtroom.

THE COURT:  Hold up.  While we're discussing this, would you please take down the exhibit?

MS. LI:  Yes.

THE COURT:  Go ahead, Mr. Davis.

MR. DAVIS:  Certainly, Your Honor.  This is

highly confidential source code, we have Postscript employees and witnesses in the courtroom. And it's subject to a protective order in this case. And while we're okay with having it be displayed to the jury and the Court, we don't want outside parties in the courtroom to see it, aside from potentially the limited portions that were displayed previously.

MS. LI: Your Honor, this exhibit was moved into evidence yesterday without any indication of confidentiality and was never -- there was no request for sealing at that point.

MR. DAVIS: It was not published beyond a few very limited snippets. And so we believe the remainder of it is entitled to confidential treatment under the protective order.

THE COURT: So in light of what counsel said and in light of the particular sensitivity to source code, understandably, the parties may have of a confidential nature, I'll agree with Attentive's counsel that when this subject matter is being discussed, we'll need to seal the courtroom.

As I told the parties earlier, we want to cabin the time period in which we have the courtroom sealed.

Does it make sense to do this now or to save it for -- one way or the other, it would be helpful to do this

at one time in a condensed period of time.

MS. LI:  This is going to be very brief, so we could seal the courtroom now.

THE COURT:  And you don't expect any further discussion similar on source code subject matter later?

MR. DAVIS:  I mean, I'm expecting to cross her on the source code if they put it in.

THE COURT:  Okay.  Fair enough.

Are there other questions you'd like to ask?  In other words, if you have other questions and then there's questions about this source code and then there's going to be limited recross on the source code, we'd all want to do that at one time and put it towards the end.

Do you have other questions you want to ask other than related to this exhibit?

MS. LI:  Yes, Your Honor, that's fine.  I can move on to those and come back.

THE COURT:  We'll do that.  When it's time for the last questions related to source code, we'll have the courtroom sealed, unfortunately, I have to ask members of the public to leave at that point but not yet, and then we'll have recross on it.  Let me let you continue.

MS. LI:  Thank you, Your Honor.

BY MS. LI:

Q.    Do you recall Mr. Davis going through screenshots of

the Magic Composer user interface with you?

A.      Yes.

Q.      He was asking you whether the words "trigger condition" appears on the screenshots.

        Do you remember that?

A.      Whether the specific words appeared, yeah.

Q.      And you acknowledged that those words don't appear on the user interface, right?

A.      That's correct.

Q.      Does it surprise you that the words "trigger condition" don't appear on the user interface?

A.      No.  Because as I said, programers or coders are going to pick the terms that they find appealing and you have the same concept in the -- in even the same color called two different things.

        So it's not at all surprising to me that they didn't happen to use "trigger condition" because they would have had to explain to users what a trigger condition was instead --

        (Reporter clarification.)

        THE WITNESS:  They give a nice drop-down and you just pick the ones you want.

BY MS. LI:

Q.      Does the fact that the words "trigger condition" don't appear on the user interface affect your opinions?

A.      No.   It's not required in assessing whether a claim element is met that things be called the exact same thing between two products or two companies, that's not the way the system works.   You look at what the actual functionality in the claim element is and then you see if that's in the other system.

MS. LI:   At this time, Your Honor, I'd like to turn to the source code.

THE COURT:   Okay.   So at this time my courtroom deputy will ask any persons that are in the courtroom, not attorneys or members of the trial team from each side, to exit briefly while we have the courtroom sealed to discuss this matter and then immediately, once we're finished with that subject matter, we'll pause and have folks brought back in.   Our courtroom deputy can see to that.

Thank you.

MR. DAVIS:   Objection, Your Honor.   We're going to renew our objection to this as outside the scope of the cross and improper rehabilitation.

I did not ask her about the substance of the source code.   I only asked her if she presented it.

I acknowledge that she reviewed it.   All I did was ask if she presented any to the jury and she said, no, it would not be helpful.

I did not ask further questions, but I

acknowledged that she reviewed it all.

THE COURT:  Okay.  All right.  So the objection is, again, renewed.  Again, because in direct examination the subject of the witness's review of source code, amongst other materials, was raised and discussed.

And then the cross-examination, the subject of source code and the fact that specific lines weren't necessarily presented during the direct was raised by defendant counsel, Attentive's counsel.  The subject matter of source code was both a part of direct and cross.

It's subject matter that's pertinent to the witness's review, part of her expert testimony, and so I believe it's appropriate for it to be inquired into and to hear in light of the subject matter of cross.

That said, because the specifics of the source code are going to be shown for the first time, I believe it's one of those rare areas where additional recross should be permitted so both sides have free and fair opportunity to address this focused and limited testimony.

So with that said, I'll deny the renewed objection and continue with questioning by Postscript's counsel.

MS. LI:  Okay.  Thank you, Your Honor.

BY MS. LI:

Q.    I'm putting back up here the same file that we looked

at earlier.  It ends in, "In App Workflow" --

A.      Request handler.

Q.      -- "request handler."

Can you see that?

A.      I see it, yeah.

Q.      And I'm going to direct you to the lines here beginning at 207 and going down to 223.

At 207 it says, "Beginning to write qualified audience for -- "

Do you see that?

A.      Right.  And this is kind of in the middle of the function for handling the various steps, just to kind of contextualize it a little bit.  So in particular when you're handling the -- you've qualified the audience, that is to say you've already run a query to identify who --

(Reporter clarification.)

THE WITNESS:  -- the audience is or actually who are running a query to identify who the audience is based on various criteria that are stored in this data elements.

And then down at -- so at the beginning -- the line you first directed me to, 207.  You say, "I'm beginning to write the qualified audience for," and then that would be -- that "plus workflow indicated," whichever workflow this was.

MR. DAVIS: Objection, Your Honor.  I'm not sure

if this is cited in her report or where it's cited in her report.

THE COURT:  All right.  Why don't counsel confer for a minute.

MS. LI:  Okay.  Your Honor, in the interest of time, I think we can skip this and just move on.

THE COURT:  Okay.  All right.

Any further questions?

MS. LI:  No, I pass the witness.

MR. DAVIS:  Objection.  Move to strike, Your Honor.  It's not cited in the report.  It's improper.

THE COURT:  All right.  Ms. Li, any response to that?

MS. LI:  It is in -- so those particular lines are cited in Dr. Polish's rebuttal report, which Ms. Frederiksen reviewed and would be responsive to that.

THE COURT:  I guess the question would be if the substance of the testimony never really got started here and if we're not having any further questioning in light of the objection, how would it -- how would whatever testimony be permissible?

MS. LI:  I believe the only thing we've heard is the identification of the source code filed and then an explanation of the location with the lines.  There hasn't been any substance about the content of the code.

THE COURT:  Mr. Davis.

MR. DAVIS:  I'm sorry.  I didn't catch Your Honor's question.

THE COURT:  Oh, my question was:  If there was any substantive testimony that had been attempted by the nature of the source code, but the questioning was stopped at Postscript's counsel's decision.

And in response to your objection, my question was:  Why would it be permissible to allow the testimony to remain in the record pursuant to the objection.

Ms. Le's response was I haven't gotten to substance of the source code.  I just simply identified the source code and the lines.

Do you have any response to that?

MR. DAVIS:  If this source code goes back and there's no substance testimony about it, there shouldn't be reference to that.  We don't want to use it to support, you know, a post-trial briefing.

THE COURT:  Let me say this, then, I'm going to sustain the objection and strike any testimony about this particular page of this exhibit because it's not clear to me that there's been any substantive testimony provided and because of Postscript's counsel seceded an objection to stop questioning, so that's our status quo right now.

Ms. Li, do you wish to continue your redirect

examination?

MS. LI:  Thank you, Your Honor.  I have no further questions.

Although, I would note that I think at this time, given there wasn't any substantive testimony about the source code and the questions that were asked were stricken, it seems that there's no need for additional recross.

THE COURT:  Mr. Davis, I think that's right.  If I've stricken this testimony at your request, there will be no need for recross.

You agree?

MR. DAVIS:  No, there was testimony about what the substance of the code was.

THE COURT:  Which I just struck.  I granted your motion to strike the substance of any testimony about this document.

MR. DAVIS:  Okay.

THE COURT:  Having granted that, do you agree there would be no recross?

MR. DAVIS:  Absolutely, Your Honor.

THE COURT:  Okay.  So, again, the testimony beginning from when the courtroom was sealed was stricken.  There was no recross.

There's no further reason to keep the courtroom sealed, I'll ask my courtroom deputy to help us by going and

having -- opening our courtroom.

Ms. Frederiksen, your testimony for at least this portion is complete, so you may step down.

MR. FISHER:  Your Honor, at this time we call Doug Kidder.

THE COURT:  All right.  We'll have Mr. Kidder. Come forward and be sworn.

MR. SAULSBURY:  And may I approach with binders?

THE COURT:  You may.

MR. FISHER:  Doug Kidder is serving as an expert for Postscript in this case.

COURT CLERK:  Please stand and raise your right hand.  State and spell your name for the record.

THE WITNESS:  Douglas Kidder.  D-O-U-G-L-A-S, K-I-D-D-E-R.

DOUGLAS KIDDER, having been duly sworn, was examined and testified as follows:

THE COURT:  Mr. Kidder -- and for the witness's benefit and for counsel, just speak loudly and slowly for the jury and for all of us.  We'd appreciate it.

All right.

DIRECT EXAMINATION

BY MR. FISHER:

Q.    Good afternoon, Mr. Kidder.  Can you please introduce yourself to the jury?

A.      Sure.  My name is Doug Kidder.  I was born 63 years ago in Philadelphia; raised in Baltimore.  I've got two grown kids.  So at this point, it's me, my wife, and a fluffy white dog at home.

Q.      What do you do for a living?

A.      I'm a managing partner of a firm called OSKR and we do economic consulting, a lot of work calculating damages.

Q.      Can you tell the jury a little bit about your educational background?

A.      Yes.  I have an undergraduate degree from Amherst College and a master's degree from the University of California.

Q.      Do you have any teaching experience?

A.      Yes.  I taught a course on damages to the Golden Gate University School of Accounting.  I was teaching graduate students in accounting on how you do damages calculations.

Q.      And can you tell us a little bit about your work experience?

A.      Yes.  I've be doing business analysis similar to this for about 35 years as a consultant.  I've also owned my own businesses, I've been a member of boards, and managed businesses outside of consulting as well.

Q.      Have you been qualified to testify as an expert in other cases?

A.      Yes.

MR. FISHER:  Your Honor, at this time we'd offer Mr. Doug Kidder as an expert in damages.

THE COURT:  So noted.

BY MR. FISHER:

Q.    Mr. Kidder, what were you asked to do in this case?

A.    To calculate damages, the assumption that Attentive is found to infringe the '660 Patent.

Q.    So just to be clear, do you have any opinion about whether Attentive infringes Postscript's patent?

A.    No, I do not.  That's an assumption I make is that I'm not the technical expert.  I assume the patent is valid, and it's infringed.

Q.    Okay.  Did you prepared any slides to assist the jury in understanding your testimony here today?

A.    Yes, I did.

Q.    All right.  Let's take a look.  So, first, Mr. Kidder, can you just orient us all as to what your opinion is with respect to the damages that Attentive owes Postscript in this case?

A.    Sure.  So the top line here is the total Attentive revenue from messages through June 30th, 2025, and that was about $534.5 million.  In my opinion, the parties would have agreed on a royalty rate of 3.28% of that revenue leading to total damages to date of $17.6 million.

Q.    We're going to break this down here.  First you said

the parties would agree to a royalty rate.  How would Attentive and Postscript have gone about agreeing to a royalty rate?

A.    So the law gives us some guidance here and the guidance is we think about hypothetical negotiation, between Postscript and Attentive where Postscript is looking to get a reasonable royalty and Attentive is looking to get a license to the patent.

Q.    When would this hypothetical negotiation have occurred?

A.    July 25th, 2025, which is the day that the '660 Patent issued.  You can't infringe on a patent until it issues.

Q.    Do you make any assumptions when you're thinking about this hypothetical negotiation?

A.    Yes, you do.  There are really two assumptions here. The first of which I alluded to earlier which is that both parties would assume that the patent is valid and infringed. In other words, they're negotiating from a point of Attentive needing a license, Attentive agreeing that the patent is valid and agreeing that they infringed on it.  So there's this assumption of validity and infringement.  The second assumption that you have here is what we refer to as "cards face up."

In other words, Postscript knows everything

about Attentive's position and documents and thinking and

calculations and Attentive knows everything about

Postscript's position, thinking and calculations.  So they

come to the table, and they say, look, this is the situation

and we know everything about it.  We're not hiding anything.

Q.    And how would they have go about actually calculating

or thinking about this reasonable royalty?

A.    Well, in this case I think there are really two steps

to get to the royalty.  First, you calculate the increased

revenue, and then you think about, well, how do we split

that?  The increased revenue, the benefit to Attentive.  And

then you think about, well, Postscript doesn't get all that

benefit -- Attentive keeps some, Postscript keeps some, so

they split that.

Q.    Start with the first one regarding the increased

revenue.  And first, do you have an understanding of the

value associated with the technology in Postscript's patent?

A.    I believe so, yes.

Q.    How did you get that understanding?

A.    Well, listening in court and conversations with

Ms. Frederiksen.

Q.    So you've be here all week?

A.    Yes, I have.

Q.    Okay.  And what is your understanding of the value

associated with the technology in Postscript's patent?

A.    So it's my understanding that the technology allows for multi-message campaigns where the subsequent messages are tailored based on the responses from the subscribers to the first message.

Q.    Did you review any evidence that Attentive recognized the value associated with Postscript's invention?

A.    Yes, I did.

Q.    Can you briefly describe what evidence you reviewed?

A.    Internal Attentive documents, largely.

MR. FISHER:  Let's put up on the screen, Mr. Glass, PTX-562 which is already in evidence.  And is this one of the documents you reviewed?

A.    Yes, it is.

Q.    And what is your understanding of the problem Attentive recognized with the old way they had of sending campaign messages?

A.    Well, I'm not going through this again.  I know you've seen this before, but I just want to point out a couple things.  So they talk about the Legacy composed flow for its market to compose multi-message strategies one by one.  So single blast, single blast, single blast.  And that led to a lack of inspiration in creativity and particularly I want to draw your attention to over time likely expressed the average messages scheduled per session.  In other words, they didn't send as many messages.

MR. FISHER:  And, Mr. Glass, if we could put this piece down and blow up the part of the first box with the word "strategy" in it.  There we go.

BY MR. FISHER:

Q.    Mr. Kidder, what did Attentive describe as the strategy behind Magic Composer?

A.    Well, again, you've seen this.  I won't spend too long on it.  They're looking for brands to easily create multiple-message strategy.  And in theory at the end of this, it says that we believe we can increase the average number of messages scheduled per compose session which it subsequently increased message sending volume.

      Again, their theory is that with Magic Composer, they will have their merchants sending more messages.

Q.    Did Attentive test that theory?

A.    Yes, a few times.

      MR. FISHER:  Can we put up PTX-262 at page 300.

BY MR. FISHER:

Q.    All right.  Now the jury has seen this chart a couple times already.  How do you believe this slide should be understood?

A.    Well, I got a little bit here which is there is some question about what DiD stands for.  It means difference in difference.  So what they did is they did a test, and they said right here's some merchants not using Magic Composer

and here's some merchants using Magic Composer, and what they saw was that both of those groups sent more messages over time.  But the group using Magic Composer sent more.  So the "difference in difference" is just the differences between the increase for both of them.

And what it suggests is that the use of Magic Composer increased total message volume from those merchants by 9.19% on a send-per-active-subscriber basis.

Q.    Now, I just want to be clear about something.  We're talking about the increase in message volume.  Are we talking about just retargeted messages or messages more generally?

A.    No, what they're testing is messages more generally.  So you can imagine a situation where you have the ability to target messages more narrowly.  And that that would actually lead to your messages being sent.  So what they're testing here is whether or not there are more messages in total sent, not just whether they're retargeted messages, just in general, does this tool cause the merchants to send more messages.

Q.    And when did Attentive do this experiment?

A.    This was the last one they did -- excuse me -- and was in the first few months of 2023.

Q.    And how does that relate to the date of the hypothetical negotiation we were talking about?

A.      It's a few months before.

Q.      All right.  And so we've been talking about this 9.19% figure that's here on the screen.  What's the relationship between an increase in message volume and revenue?

A.      So messages are the basis for revenue for Attentive so if you increase messages -- revenues -- message revenue is going to increase proportionately.

Q.      So would that mean you'd have a 9.19% increase in messages, you'd have a 9.19% increase in messaging revenue?

A.      Not quite, no.

Q.      Why not?

A.      Well, because they're really -- there are two sources of messages, as you've heard, there are campaign messages, and there are journey messages.

Q.      And what percentage of Attentive's messages are sent using Magic Composer or campaign messages?

A.      It's about 95%.

Q.      How did you arrive at that number?

A.      Well, I looked at internal Attentive documents.

Q.      Let's take a look in your binder, not on the screen, at PTX-567.

A.      Yes.

Q.      Is this one of the documents you reviewed?

A.      Yes, it is.

MR. FISHER:  Your Honor, we offer it.

THE COURT:  Any objection?

MR. CAMPBELL:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(PTX Exhibit No. 567 was admitted into evidence.)

BY MR. FISHER:

Q.    How did this document inform your opinion about the percentage of messages that are sent using campaigns?

A.    So if you look at bullet point A there, it just says in July of 2021 campaign sends accounted for 94.1% of our total send volume.

Q.    Now, I think you said that the number you reached was closer to 94.5%.  How did you get to that number and not 94.1?

A.    Well, because you can see this is from July of 2021. So I reviewed actual counts of messages in the early part of 2023 to see whether this had changed, and I sort of had messages counts for campaign sends and journey sends.  94.5% of them were campaign sends.

MR. FISHER:  Mr. Glass, can we go back to the slides.

BY MR. FISHER:

Q.    So what increase in messaging revenue would Attentive expect from the 9.19% increase in messages sent by Magic

Composer?

A.      So overall message send, recollect there's that portion that's Journeys, that what you would see is you would get an increase that was 94.5% from 9.19% or an 8.69% increase in total message send, not just campaign messages but overall message send.

Q.      One moment.

        MR. FISHER:  Mr. Glass, can we go to the ELMO instead.  We're going to do it this way.  Thank you.

BY MR. FISHER:

Q.      So you just went through a lot of numbers there.  I just want to show the jury what you did.  Can you walk through that one more time?

A.      Sure.  So we know the increase in campaign messages sent because have Magic Composer, 9.19%.  We also know the campaign messages aren't all messages, so you multiply by the 94.5% and you get the 8.69% increase in the total number of messages sent, not just campaign messages, all messages for Attentive.

Q.      All right.  So that -- going back to the two steps you talked about earlier, that gives us the increased revenue; is that right?

A.      Yes.  That's the increase in message revenue for Attentive at 8.69%.

Q.      Okay.  And that's in percentages.  Is there a dollar

amount that you could attach to that?

A.     Well, if you look at that as a portion of the 534.5 million you saw in the first slide, you get to --

            (Reporter clarification.)

            THE WITNESS:  I'm sorry.  If you look at the first slide, I will try to slow down.  There was $534.5 million of revenue.  If you take 8.69% of that, you get to $46.4 million.

BY MR. FISHER:

Q.     So this is approximately equal to 46.4 million?

A.     Yes.

Q.     So that's the first step.  Let's talk now about this second step.

            How they go about splitting this up?  How would they do that in the hypothetical negotiation?

A.     I believe they would rely on the Rule of 40.

Q.     What is the Rule of 40?

A.     So the Rule of 40 -- I think, you heard some of this from the deposition testimony -- it's basically a rule of thumb that's used in valuating software companies, and it says that the sum of your growth plus your profit margin should be greater than or equal to 40 to be considered a good business and successful.

Q.     Is the Rule of 40 something Attentive came up with?

A.     No, it came out of, I think, the venture capital

world and widely used in Wall Street for a while.  And you heard that it's essentially every software company is aware of it.

Q.    And why did you think Attentive in particular would use the Rule of 40 here to split up that increase in revenue?

A.    Well, you see it in Attentive's documents.

Q.    Well, let's take a look at PTX-232 in your binder.

A.    Yes.

Q.    Is this one of the documents you reviewed?

A.    Yes, it is.

        MR. FISHER:  We offer it.

        THE COURT:  Is there any objection?

        MR. CAMPBELL:  No objection.

        THE COURT:  All right.  It's admitted.

        (PTX Exhibit No. 232 was admitted into evidence.)

        MR. FISHER:  And can we put up Slide 1, Mr. Glass.

BY MR. FISHER:

Q.    What is this document, Mr. Kidder?

A.    So this is a presentation that is given to an all-hands meeting at Attentive on March 20th, 2023.

Q.    And if we go to page 15, what does this document tell you about how Attentive would use the Rule of 40?

A.    Well, they say, "Executive off-site takeaways. Revenue organization, North Star."  North star like something you follow.  They've only got three, and the Rule of 40 is the second one there.  To me it indicates that Attentive is paying attention to the Rule of 40 to follow it.

Q.    So going back to the Rule of 40, then there were two numbers here.

        MR. FISHER:  Can we go back to the ELMO, Mr. Glass.  Thank you.

BY MR. FISHER:

Q.    The first number was growth, and we said that was 8.69% from earlier?

A.    Yes.

Q.    What would that second number be?

A.    It would be 69.1%.

Q.    Okay.  How did we get to 69.1%?

A.    Well, I looked at Attentive's financial statements and calculated their gross profit margin.

Q.    What's a "gross profit margin"?

A.    So the gross profit margin is the amount of money that they would keep from every additional dollar of revenue they received.

        So if they got one additional dollar of revenue, they would have to pay some costs but 69.1 cents of that

would have flowed into the bottom-line profits.

Q.    So take a look in your binder at PTX-434, 430 and 429.  Look up at me when you're done.

A.    Yes.

Q.    Are these documents you relied on in reaching your conclusion about Attentive's profit margin?

A.    Yes, they are the financials.

        MR. FISHER:  Your Honor, we offer specifically PTXs 434, 430 and 429.

        THE COURT:  Any objection?

        MR. CAMPBELL:  No objection.

        THE COURT:  All right.  They're admitted.

        (PTX Exhibit Nos. 429, 430, 434 was admitted into evidence.)

BY MR. FISHER:

Q.    So I think now we have both numbers.  Where does that leave us in terms of the Rule of 40?

A.    So you add the two together and you get to 77.8%, which is comfortably over the Rule of 40.  So on a marginal basis, this is very good business for Attentive.

Q.    So how would the parties then use the outcome of the Rule of 40 to thinking about splitting up the increase in revenue?

A.    Well, Attentive would keep the first, fourth and then they say, well, we need to meet the Rule of 40 so we're

keeping that.  And essentially it puts the additional 37.8% as excess growth and profit, it's over and above what they need to meet the Rule of 40.

Q.     So does that mean that Postscript would get a 37.8% royalty on messaging revenue?

A.     No, no, it does not.

Q.     How would you go about calculating the royalty to Postscript?

A.     So they would take it just as a portion of that 8.96% so they would take 37.8% of the 8.69%, to lead to the -- 3.28%.

Q.     Is this the end of Step 2 then, have we determined how they would split up the increase in revenue?

A.     No, we did not.  We still have to think about the hypothetical negotiations.  This is a series of calculations that are done essentially as an input and a starting point for the hypothetical negotiation.  It does not determine the outcome of a hypothetical negotiation.

Q.     What else would the parties consider at the hypothetical negotiation?

A.     Well, again, the law has given us some guidance on this.  They are what are called the Georgia-Pacific factors and there are a lot of words here and we're not going to have to go through all of them.

          I looked at each and every one of these factors

in coming to an opinion.  For the most part, most of them don't have an effect, they wouldn't increase or decrease the royalty rate from that starting point.  There are two here that would.

Q.    Which two?

A.    So Number 5, the commercial relationship between the licensor and the licensee and Number 13, the portion of the profit that should be credited to the patented invention.

Q.    Okay.  Let's start with Number 5.  How would the commercial relationship between the licensor and licensee -- and actually, first, who is the licensor in this negotiation?

A.    So, right, the licensor here is going to be Postscript.  Licensee is going to be Attentive.

Q.    And how would the commercial relationship between Postscript and Attentive affect the hypothetical negotiation?

A.    Well, we've heard evidence throughout this trial that they were competitors, that they had also competed with other companies but Postscript and Attentive clearly competed.  So we've got a situation here where Postscripts can -- asked to grant a license to a technology that it believes is important to a competitor.  So it's going to enable a competitor to compete more effectively with it.

As a result, Postscript is going to be in the

position of insisting, well, I want more than 3.28%, I don't think that's enough.  So that would tend to increase the amount, that's going to upward pressure on that 3.28%.

Q.    What would Attentive's side of the table say?

A.    So what Attentive would say is well, the growth that you're seeing there is attributable to things other than the patented invention.  It's due to a user interface change or perhaps it's due to integrating e-mail or something like that.  They're saying not all of that is due to the patented invention.

Q.    And do you have a sense for what Postscript's response at the hypothetical negotiation might be to that?

A.    Well, I think Postscript would push back on that, because we've seen that this patent, as I understand it, is a system patent.  So it covers everything, it covers the Magic Composer system.

And furthermore, if you look at the test that was run, and you look at how they described what they were testing, what the test came back and said was, you get a 9.19% increase for using Magic Composer.  And what they described to be testing is multi-message with follow up.  That's what they were looking at.

There was no suggestion in any of those documents that what they were testing was the change of the user interface.  So I think Postscript would push back and

say well, I don't think you should be entirely credible on that.

Q.    And where would the parties land?

A.    I believe they would kind of, you know, go back and forth, that Postscript would insist on a higher royalty and Attentive would insist on a lower royalty, but I think at the end, they just balance each other out and I think they would have to agree on 3.28%.

Q.    Okay.  So we've got 3.28%, it's going back to the two steps we were talking about earlier.  We've got our increased revenue, we've got 3.28% on the split.  How did you use this information to then calculate damages in this case?

A.    Well, so the 3.28%, now that we've thought through the hypothetical negotiations, in fact, the royalty and now it's a relatively mechanical exercise of applying it to the actual data.

Q.    Okay.  And you mentioned "data."  What data were you looking at?

A.    I was looking at Attentive's financial documents again.

Q.    Take a look at DTX-615, 616 and 617 in your binder.

A.    Yes.

Q.    Are those the financial statements that you were referring to?

A.      Yes.

MR. FISHER:  Your Honor, we offer DTX-615, DTX-616 and DTX-617

THE COURT:  Any objection?

MR. CAMPBELL:  No.

THE COURT:  They're admitted.

(DTX Exhibit Nos. 615, 616 and 617 were admitted into evidence.)

BY MR. FISHER:

Q.      And what conclusion did you reach based on your review of that financial data?

A.      So this is the number we saw earlier that -- this just gives you a little more detail but between July 25th of 2023, and June 30th of 2025, Attentive's US messaging revenue, by time, SMS, MMS and e-mail total $534.5 million.

Q.      Why do we stop at June 30th, 2025?

A.      Just because that was the last date for which Attentive financials were available to be given to me.

Q.      And why does it say "without carrier fees" here?

A.      So carrier fees are a pass-through, so it's a charge from, for example, AT&T, that AT&T charges Attentive, passes that straight through to the merchants.  Doesn't make any money on it.  It's actually counted in the revenue for Attentive, so I take --

(Reporter clarification.)

THE WITNESS:  But they don't make any money on it, so I've just taken it out, so these are just Attentive's revenues, the 534.5.

BY MR. FISHER:

Q.    So that's the revenues.  And how do we get to damages?

A.    Well, you multiply it by the 3.28% to get to the $17.6 million.

Q.    And does this 17.6 million include prejudgment interests?

A.    No, it does not.

Q.    Mr. Kidder, I'm about to sit down, but there were a lot of numbers here and a lot of steps.  Can you just walk the jury through one more time how you got to this final number?

A.    Sure.

This is -- the first slide with a little bit extra.  So it's $534.5 million in revenues and 3.28 royalty rate, getting you to $17.6 million.  And the additional messaging revenues from Postscript's amounted to about $46.4 million over this time frame.

So this is that split I was talking about, that Attentive made an additional $46.4 million in revenue and, I believe, they would have agreed in a hypothetical negotiation that Postscript would have gotten 17.6 million

of that.

MR. FISHER:  Thank you.  Pass the witness.

THE COURT:  All right.  Thank you.
Cross-examination, Mr. Campbell?

MR. CAMPBELL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q.    Good afternoon, Mr. Kidder.  Nice to meet you.

A.    Good afternoon.

Q.    This was a document that your counsel used and this was PDX-7.1, important document in your calculation, right?

A.    Yes, it is.

Q.    Okay.  And you sat through the entire trial, didn't you, Mr. Kidder?

A.    Yeah, up until now, yes.

Q.    All right.  And you heard multiple Attentive witnesses, including Mr. Miao tell you that Attentive's retargeting revenue is 2.5% when you look at all of the Campaign Composer revenue.  You heard that, right?

A.    Yes.  The characterization.

Q.    My question is:  Did you hear that?

A.    Well, your question actually supposed that what you said is what he said.  And I don't recall precisely how he characterized that 2.5%.  I do recall him saying 2.5%.

Q.    And then -- excuse me, not Mr. Miao -- actually, let

me clarify that.

Mr. Miao testified that retargeting revenue for Attentive was actually not 2.5% but .5%.  It was Mr. Kennedy, he's going to use the 2.5% number.  But Mr. Miao came up and testified that retargeting at Attentive only accounts for .5% of Campaign Composer revenue.  That's what he said.  You remember that, right?

A.    Again, I recall him using the 2.5% and I don't recall him saying .5%.  I don't actually recall precisely how he characterized them.

Q.    So you were listening carefully and you did not hear Mr. Miao say .5%?

A.    No, you misheard me.  I said I did hear him say both 2.5% and a half a percent.  I don't remember precisely how he characterized them.

Q.    And you're aware, sir, that if you sent a single message to a group of subscribers, that's a first message, that's not covered by the '660 Patent.  We can agree on that, right?

A.    I hesitate to make a technical judgment, but it's my understanding that if you send a single blast message, that that's not covered by the '660 Patent.

Q.    And then if you send a follow-up blast message, that, too, is not covered, to the exact same group of subscribers, that, too, is not covered by the '660 Patent, you understand

that, right?

A.    I feel like I'm wandering into technical distinctions here, because I think that the system is accused and I believe it may be that blast message is accused, but I don't mean to try to make a technical judgment here.

Q.    So the first message followed by a second message, we can agree that's a multi-message campaign, right?

A.    Again, I think there's probably a technical definition of what a multi-message campaign is.  I would agree that there are two and that seems more than one.

Q.    Right.

      And then that second one, it needs to be directed to a specific group of subscribers based on their actions.  That's retargeting.  You understand that for purposes of your analysis, don't you?

A.    Yeah, that's my understanding that this second message is tailored depending on the responses to the first message.

Q.    Okay.  So even though Mr. Miao said .5% of all of Campaign Composer revenue is retargeting, we'll use for purposes of this conversation the 2.5%.  We'll give you -- we'll use the larger number to convert.  Okay?

A.    So, Mr. Campbell, you -- you just characterized the 2.5% differently this time than you did the first time.  This -- this is why I'm having trouble grasping exactly what

that 2.5% is.

Q.    It's 2.5% of the revenues from Campaign Composer.

A.    And you -- I'm sorry.  Just to make sure I'm on the same page with you.

      2.5% of the revenues from Campaign Composer come from retargeted messages.

Q.    That's exactly right.  Thank you.

      So we're on the same page.

      And so if we take two and a half percent of this number right here -- let's go ahead and do some quick math -- that's $534.5 million.  And let's take 2.5% of that, that's 13.36 million.

      Do you see that?

A.    I agree with your calculator and your math.

Q.    There we go.  So if I cross that out, you get 13. And then we can multiply that by -- we'll take your 3.28%. So let's do the multiplication.

      What we get is rather than 17.6 million, 438,290.

      You saw me do the math on my calculator, right?

A.    Yeah, I trust you did that correctly.  And I learned how to use a percent key on my calculator now.

Q.    Excellent.  It's a great tool.

A.    I thought you would be off by factor of hundred.

Q.    I think I'm spot on.  You'll agree with me, you're

the money guy.

A.    I think that's right.

Q.    All right.  So if we just change one number and look at retargeting revenue using 2.5% as the number, what we do is we get 13 million, and that's the retargeting, assuming it's 2.5%.  Multiply that, keeping your 3.28, what we get is $438,000, right?

A.    Yes.  Two and a half percent of 13,362,500 is 438,290.

Q.    Okay.  All right.  Let's back up just a little bit. So you're a damages expert?

A.    Yes.

Q.    You've be qualified as one in the past.  You charge $750 an hour?

A.    Yes.

Q.    And you're here to give a number for Postscript, which you did, right?

A.    I was retained to calculate damages in this matter, yes.

Q.    And you're not a technical expert, right?

A.    That is correct.

Q.    And you talked about this hypothetical negotiation. So that is a form of a royalty in the form of a lump sum, right?

So excuse me, the form of a royalty that you are

looking for as a lump sum in the hypothetical negotiation, right?

A.    No, it's not.

Q.    Okay.  So this is a lump sum number, even your 17.6 million, right?

A.    Yeah, but it's the result of the running royalty that is applied over time.  It's just that the revenues to date amount to $534.5 million.  So I just showed the math in one fell swoop.

Q.    Okay.  I got it.  So we can drill in a little bit more into the numbers and how you got here.  I mean, this was a slide out of your report.

      You recognize this slide, right?

A.    Yeah.  This is the data site that I used to get to the 94.5%.

Q.    Right.

      And so you used that 94.5% and that's percent of messaging revenue from campaigns?

A.    Yes.

Q.    Okay.  But you don't say percent of retargeting revenue from campaigns, do you?

A.    No, that wasn't the number that I was calculating.

Q.    Right.  So we've got -- this is another royalty calculation that you did, right?

      You recognize this, correct?

A.    Yes, I do.  I simplified it for the explanation.

Q.    Right out of your report.

And this is how you get to the 3.28%, right?

A.    That's correct.

Q.    And if we do the math, that's how you get to the 17.5 million.  You take all of the revenue from Campaign Composer, you multiply it by the 3.28 and get 17, right?

A.    Not quite.  The 534.5 is total messaging revenue, not just from Campaign Composer.  But I factored out the other ones in the royalty rate.

Q.    Thank you.  Okay.

And then this sheet here, what we're going to do is something very similar.  We're going to take -- this was in your report -- and we're going to cross out percentage of messages in Campaigns.  We're taking the 94.5 and we're going to replace it with 2.5, to get the starting royalty rate point.  Rather than 3.28%, we get .7%.

So that's just using your own calculus, the formulas on the left.  These numbers I will represent to you add up to .07%.

Do you understand?

A.    Yeah.  I don't understand why you do it, but I expect your math works.

Q.    Okay.  And then when we do that, what you end up with when we substitute the .7% for the $534 million -- we can do

it this way, substitute the royalty rate, you get 374.

So on the one hand, if I correct your math, we have -- I'm just changing the accused Attentive revenue to reflect the testimony that you heard from Attentive.  And it's actually much higher than the testimony you heard from Mr. Miao, but we'll go with that for purposes of this conversation.  You end up with 438.

Using an alternative approach where we're going to change the royalty rate but keep the messaging revenue the same, we end up with $374,000 as the total damages due. So somewhere around $400,000, using these two different methods.

Do you understand that sir?

A.    Yeah.  I would object to your characterizing this as correcting my math.  This is applying a different methodology that I don't think has any support in the evidence to get different numbers.

Q.    Okay.  I understand that and the jury can decide who they believe, you or Mr. Kennedy.

You understand that, right?

A.    Absolutely.  But whenever you say "correcting your math," I sort of bristle.

Q.    So this is a document you relied on as part of your analysis; isn't that right, Mr. Kidder?

A.    I believe so.  I do remember seeing this.

What's -- PTX-68?

Q.    Yeah, PTX-68 is --

A.    I'm sorry.  Go ahead.

Q.    Yeah.  PTX-68 is one of the documents that you rely on in your report?

A.    I think that's probably right, yes.

Q.    Okay.  And this document, you heard Mr. Miao testify about it, right?  You were in court?

And what Mr. Miao said is there are four bullet points that are discussing Magic Composer.

Do you remember that?

A.    I don't specifically remember his -- what words he used, but yes.

Q.    Yeah.  The point being, you know, the first bullet point, what Mr. Miao said -- and if you don't recall, tell me.  But I was listening closely, I there with him.

He said the first bullet point was taking a three-page Legacy flow into single UI page.

Do you remember that testimony?

A.    I do.

Q.    Okay.  And Mr. Miao said that is what the inspiration was, it was taking a cumbersome and irritating screen where you had three different places you had to go to do these multi-message campaigns using SMS and text, and they consolidated it into a single page, single UI interface.

Do you remember that testimony?

A.    I do remember that testimony.

Q.    And again, Mr. Miao, he testified that he allows clients to create and schedule multiple text and/or e-mail messages in a unified flow.

You remember him talking about that, right?

A.    I believe so, yes.

Q.    And then down here, "Easily orchestrate flow" -- excuse me.

"Easily orchestrate between text and e-mail and create follow-up messages."

Follow-up messages, unless they are retargeting, simply follow-up batch and blast, those are not part of the '660.

You understand that, right?

A.    Again, you're asking me technical questions.  You already established I'm not a technical expert.

Q.    Fair enough.  Fair enough.

Mr. Miao did say, however, that there is a sub-three bullet point that then does talk about retargeting.

You remember him talking about that, right?

A.    I believe so, yes.

Q.    And that it also provides for rolled-up reporting across messages in the same strategies.

You remember him talking about that?

A.    Yeah, I think so.

Q.    Yeah.  And I -- hopefully you recall, but I believe he said that, you know, this feature of retargeting was not important and it was in inconsequential in the scheme of what they were trying to do with Magic Composer in sum and substance.

Do you remember that?

A.    Actually, I do remember that testimony.  Yes.

Q.    Okay.  All right.  So, Mr. Kidder, you are aware that during the hypothetical negotiation the parties have, as you said, all cards up on the table, right?

A.    Yes.

Q.    Not a fun way to play poker, you want to have some cards down.  That's not how it works in the hypothetical negotiation, right?

A.    Right.  You're playing boring poker.  Great way to put it.

Q.    Boring poker.  You know what -- who is going to win and who is going to lose.

And not only that, there's a -- a way of looking at this called the *Book of Wisdom*.  You know what the *Book of Wisdom* is, right, sir?

A.    Yes, I do.

Q.    Yeah.  That's where not only do you have the existing

cards on the table and they're face up, but you have all the future cards on the table.  Everybody is imbued with perfect information, they have it -- the cards are on the table, those today and even those tomorrow, right?

A.    No, I don't agree with that.  We can have a long discussion about the *Book of Wisdom*, but I think you've turned the *Book of Wisdom* into something I don't believe it should be used for.

Q.    Well, let's talk about some of the facts that I think we at least agree on, that would be known on the parties, during the hypothetical negotiation.

The parties would know during this hypothetical negotiation that there was a product called Sephora Replen that launched in 2019, right?

A.    I would assume so, yes.

Q.    And the parties would know during this hypothetical negotiation that there was a product called Attentive Journeys with source code dated May 16, 2021, right?

A.    Is that what the May 16 is?  I understand that was the date you put on Journeys.  I kind of thought that's when it launched, but maybe that's the source code.

Q.    That was the source code, and the parties would know the source code had launched May of 2021?

A.    I didn't pay particular attention to this, but you're saying the product Journeys launched May 16, 2021.

Q.      No.   I'm saying the source code we are using in this case is that date.  Journeys was launched far before that, I'm going to give you the benefit of the doubt and give a later date of May 16, 2021.  The parties would know the source code for the purposes of this hypothetical negotiation is dated May 16, 2021, right?

A.      I'm not quite sure what that means.  I don't mean to get you on the -- you're saying Journeys, May 16, 2021.

Q.      And the parties during the hypothetical negotiation would know that Klaviyo Flows released videos on YouTube on October 4th, 2021, right?

A.      Sure.

Q.      In addition, in the *Book of Wisdom*, the parties would be aware of this spreadsheet that we talked about throughout the course of this trial.  This, you recall is a Postscript document.  It's a marketing document that does feature comparison.  The parties would be aware of this, wouldn't they?

A.      I would assume they would be aware of whatever versions were available at the time.  And you're saying they would know about all of them into the future.  They'd know everything about the product development.  See, that's where I think the *Book of Wisdom* breaks down a little bit, but please go ahead.

Q.      Sir, it was not about product development.  This was

a document extant at the time of the hypothetical

negotiation?

A.    A version of it was, yes.  But my point is future

versions would reflect future product development for

Attentive, Klaviyo and other companies.

Q.    Yeah.  This version, sir, was available at the time

of the hypothetical negotiation?

A.    What's the date of this version?

Q.    We don't have the metadata, sir.

A.    Okay.

Q.    So you're going to disregard -- notwithstanding you

heard testimony in this courtroom from -- you heard it from

Mr. Turner, you heard it from others, that this is an

important document, a living document within Postscript and

you're going to discount it as part of the *Book of Wisdom*

and what the parties would have known?

A.    Sir, you're confusing two things here.  First of all,

that I do agree the parties have known about this.  The only

question is which version of it they would have known about.

Q.    Okay.  Thank you.  That's what I was trying to get

at.  They wouldn't know about it, but it would just be a

version issue to you?

A.    Yeah.  I think it would be a version that they would

know about.

Q.    And the parties at the hypothetical negotiation would

know that the -- in this case Attentive produced over a million lines of source code.  They would know that, right?

A.    I'm sorry, you're saying hypothetical negotiation?

Q.    In the "cards up on the table," *Book of Wisdom*, the parties would know that Attentive had produced over a million lines of source code.  They would know that, right?

A.    I, to be honest, I've never even thought about that in the context of a hypothetical negotiation, where, like, one party would bring all of their source code to the table. I've honestly never thought about that as a possibility.

Q.    All cards up, source code is part of the card; isn't it, Mr. Kidder?

A.    In the context of damages, it's not usually, no.  In the context of a fee negotiation, it's not usually, no.

Q.    In the context of a negotiation as to who has a position and where they sit in relevance to one another, source code might be important in a software case, wouldn't you agree with me?

A.    Well, except that we're assuming validity and infringement.  Why would you bring the source code when you're assuming infringement?

Q.    I understand, sir.  And I'm asking you about cards up.  And that's all I'm asking you about.  I understand your remit and your requirement to assume validity and infringement.  What I'm asking you is that with the cards

up, the parties have access to these facts.  That's all I'm asking you.  You would agree with that?

A.     So, again, this is outside of what I've ever seen as a damages expert.  How who walk in with the source code when validity and infringement are assumed.  I don't understand that, but I'm willing to go along with you for the sake of whatever argument you're trying to make.

THE COURT:  Mr. Campbell, we should probably take a break in the next five minutes.

MR. CAMPBELL:  Three.

THE COURT:  Okay.  Thank you.  Please continue.

MR. CAMPBELL:  Marco, let's pull up defendant's cross Exhibit 1, please.

BY MR. CAMPBELL:

Q.     And, Mr. Kidder, you looked at Postscript's financials as part of your analysis.  And I'm talking about the updated financials?

A.     Yes, I did.

MR. CAMPBELL:  Okay.  Move to admit, Your Honor.

THE COURT:  Which exhibit?

MR. CAMPBELL:  Defendants cross Exhibit 1. Mr. Kidder just said he looked at these as part of his analysis.

THE COURT:  Is this something I have before me?

MR. CAMPBELL:  No.  It's a defendant's cross

exhibit, Your Honor.

THE COURT:  But I did get both the direct and cross exhibits?

MR. CAMPBELL:  Yes.  This is from the updated financials.  I don't have a hard copy of it, Your Honor.

THE COURT:  The other side is aware?

MR. CAMPBELL:  Yes.

MR. FISHER:  We're not, but if you give us a moment to confer.

THE COURT:  Why don't you meet and confer.  Sure.

MR. CAMPBELL:  Your Honor, we can, if it's okay with the Court, take a break now.  We're going to get this document over to our colleagues.

THE COURT:  Okay.  Why don't we use this chance then to take our afternoon break and let counsel continue to meet and confer.  So we'll -- it's 3:12.  We'll take at least a 15-minute break for our jury, and we'll have our jury led out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.  We'll be back by 3:27.  The Court stands in recess.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Everyone, please remain standing.  The jury will be brought in.

(Jury enters.)

THE COURT:  All right.  Everybody, please be seated.  And we'll bring Mr. Kidder back up to the stand. He remains sworn.

And have the parties addressed the issue?

MR. FISHER:  In some ways, yes, Your Honor.  We don't have an objection to the document per se, but it is highly confidential information so the parties have agreed that the courtroom should be sealed if we're going to go into this.  And in terms of admitting it, if it's going to be admitted, it needs to be admitted under confidential conditions.  And I think we're in agreement on that.

MR. CAMPBELL:  We are.

THE COURT:  Okay.  And will we be discussing the substance of the document, meaning will you be putting up on the screen?  In other words, do we have to seal the courtroom?

MR. CAMPBELL:  Yes, we'll put it on the document camera.

THE COURT:  So we need to seal the courtroom at this stage.  This is the end of your cross.

MR. CAMPBELL:  This is wrapping it up, Your Honor.

THE COURT:  All right.  I'll ask my courtroom deputy to seal the courtroom and ask members of the public who are not part of the trial teams here to leave the courtroom briefly.

(Sealed.)

THE COURT:  So just formally you want to move the admission of this document?

MR. CAMPBELL:  Yes, Your Honor.  We would like to move the admission of DTX-621.

THE COURT:  I understand.  There's no objection subject to what's been said.

MR. FISHER:  That's right, Your Honor.

THE COURT:  All right.  The exhibit is admitted.

(DTX Exhibit No. 621 was admitted into evidence.)

MR. CAMPBELL:  May I approach, Your Honor.

THE COURT:  You may.

THE WITNESS:  Thank you.

BY MR. CAMPBELL:

Q.    Okay.  What I have here, Mr. Kidder, are the updated financials that you testified earlier about, and you had said that you had seen these as part of your damages analysis, correct?

A.    Well, I saw them recently when they were produced. You see the last month here is June 2025.

Q.      Right.  So it starts November of 2022 on page DTX-621.1.  And then it goes all the way through when I turn the page.  What we have is December '23 through March of '25 on DTX-621, page 2.  And then the last page finally shows the period of April '25 through June of '25.  Isn't that right?

A.      Yes.

Q.      And, again, sticking with the concept of the *Book of Wisdom*, the parties would be aware of the financial condition of Postscript as they were sitting down across the table from one another trying to negotiate a license; isn't that right?

A.      They would certainly know about it as of the date of the hypothetical negotiation, and then, again, there's a question of how far into the future and the relevance of that to the hypothetical negotiation.

Q.      And in June of 2025 -- and that's this past June -- Postscript lost $4.18 million; isn't that right?

A.      That is what this shows here.

Q.      And in May of 2025, Postscript lost $3.2 million; isn't that right?

A.      Yeah.

Q.      And in April of 2025, Postscript lost $3.3 million; isn't that right?

A.      That's what this is showing, yes.

Q.    And then every month that is reflected on DTX-621, that is, from November of 2022 through June of 2025 reflects a loss; isn't that right, sir?

A.    That sounds right doing a quick scan.  Yes.  There was one November where it was minus $76,000, but, yeah, I think they're all negative.

Q.    And, of course, November, that's during the holiday season.  I think we heard testimony that's the most profitable time, and if you can call that profitability, it's a negative number but, nonetheless, you lose less during that period of time, fair?

A.    Well, it is my understanding it's Black Friday/Cyber Monday and a lot of marketers send messages.

Q.    Okay. Right. Now, just to wrap it up.  If I use your damages analysis and I change one number to reflect retargeting revenue, the bottom-line number that we recalculate, I recalculated in front of the jury -- the number I recalculated in front of the jury changing one number is $438,000; isn't that right?

A.    Yes, we went through.  You changed one number in the equation.  The whole thing changes, yes.

                  MR. CAMPBELL:  Thank you.  I pass the witness.

                  THE COURT:  All right.  Thank you.  We'll have -- are you able now to unseal the courtroom?

                  MR. FISHER:  Yes, Your Honor.

THE COURT:  All right.  We'll ask the courtroom deputy to do that.

(Unsealed.)

MR. FISHER:  Okay to proceed, Your Honor?

THE COURT:  You may proceed.

REDIRECT EXAMINATION

BY MR. FISHER:

Q.    Mr. Kidder, I want to show you a couple of the demonstratives you saw on cross-examination.

MR. FISHER:  First, Mr. Glass, can we turn on the ELMO again?  Great.  Let's start with this one.

BY MR. FISHER:

Q.    Do you recall Mr. Campbell suggesting that we can't know the date that's associated with this document?

A.    He represented that they didn't have the metadata or something like that.

Q.    And because of that we don't know what the date is. Do you remember him saying that?

A.    That's what he represented, yeah.

MR. FISHER:  Mr. Glass, can we put up DTX-198? That's the document that's associated with this slide.

BY MR. FISHER:

Q.    Do you see that at the bottom of DTX-198?

MR. FISHER:  Go back to the ELMO for one second. Sure.

BY MR. FISHER:

Q.    Do you see at the bottom there it says DTX-198?

A.    Yes, I do.

Q.    Okay.  Great.

          MR. FISHER:  And now can we go to DTX-198, Mr. Glass.

BY MR. FISHER:

Q.    What's the date right next to last updated?

A.    6/17/24.

Q.    Great.

          MR. FISHER:  We can take that down.  Let's look at another demonstrative.

BY MR. FISHER:

Q.    Mr. Campbell showed you this too, right?

A.    Yes.

Q.    And I think what he suggested was that at the hypothetical negotiation the parties would know about Sephora Replen.

          Do you recall him asking that?

A.    I do.

Q.    And that they would know about Journeys.

          Do you recall him asking that?

A.    Yes.

Q.    And that they would know about Klaviyo Flows.

          Do you recall him asking that?

A.      Yes.

Q.      The parties would also know that the patent was valid, right?

A.      Yes.

Q.      And no one infringed?

A.      That's the assumption that's made at the hypothetical negotiation, yes, that's it's valid and infringed.

Q.      Oh, excuse me, and infringed?

A.      Yes.

Q.      Last slide here.

Mr. Campbell suggested that he if he changed one number in your calculation, the damages figure would go down to 438.29.

Do you agree with him changing that one number?

A.      No, I don't.

Q.      I mean, his math is right, his calculator is right but there's no reason to put 2.5% in there.  And that's not what the experiment was testing.  The experiment was seeing not just how many retargeting messages were sent which is what he was suggesting, it was testing how many overall messages were sent.

So if you add this new functionality, does it increase the total number of messages sent, not just the retargeted ones?

MR. FISHER:  Thank you, Mr. Kidder.

Nothing further.

THE COURT:  Mr. Kidder, you may step down.  And we'll ask counsel to remove the binders.

MS. DURIE:  Your Honor, Postscript rests its case.

THE COURT:  All right.  Thank you.

MR. DAVIS:  Your Honor, we have some motions we'd like to make.

THE COURT:  Okay.  Then why don't we do this, ladies and gentlemen.  I have to address some motions, some issues with the lawyers outside of your presence and so we're going to have my courtroom deputy bring you out to take essentially another break in the jury room and then when we finish our business here, we'll bring you back in and continue the day, okay?

All right.  We'll have the jury led out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.

And I'll turn to Attentive's counsel when they're ready to make any motions that they have.

MR. DAVIS:  Thank you, Your Honor.

I have a number of JMOL motions.  Do you wish to hear them orally now or are -- you suggested during the joint pretrial conference you might want written submissions

as well?

THE COURT:  I think -- I'm sorry.  My suggestion was that if it's possible -- and I know it isn't always, that in advance of the motions being made something written would be submitted, that would be great.  I know it's not always possible.  In this case, sounds like it was not, so you can simply make your motions orally now.

MR. DAVIS:  Excellent.  So the first motion Attentive would make on JMOL is that of no doctrine of equivalents infringement.  There was no testimony as to any equivalents during Ms. Frederiksen's testimony on infringement.  There was no discussion of any function, way or result or insubstantial difference raised at any of the limitations that she had presented an infringement opinion upon under the doctrine of equivalents and in particular, and I remember that she had an opinion in her report for the monitoring a trigger limitation.

Also, we are moving for JMOL of no infringement, generally.  Ms. Frederiksen's testimony was highly conclusory, she did not put in any source code to her testimony.  She referenced a series of screenshots that didn't use the word "trigger condition" anywhere.  She also conflated two separate limitations.  She pointed to the same evidence for the recipient criteria and the trigger condition limitation, which is improper as a matter of law.

*Becton, Dickinson vs. Tyco*, 616 F.3d 1249, pin cite 1254, Federal Circuit 2010, quoting in relevant part, "where a claim lists elements separately that clear," which it does here, "that clear indication of the claim language is that those elements are distinct components of the patented invention."

Also, *Engel vs. Lockformer*, L-O-C-K-F-O-R-M-E-R, 96 F.3d 1398, 1404 to 05. And that's Federal Circuit 1996. And a finding of a second portion and a return portion elements logically cannot be one in the same.

And whatever the meaning of "recipient criteria" and "trigger condition," Ms. Frederiksen cannot point to the same thing and she pointed to the "audience selection" functionality, I believe, for both. Plus, there's no legally sufficient evidence for a jury to find infringement of Claims 1, 4, 6, 10, 11 or 14.

She also did not -- she also failed to prove that Campaign Composer contained all the elements of the asserted dependent claims or the underlying independent claims. In particular -- may I have the document camera?

For Claim 1, there was no evidence presented for the subscribing to on behalf of limitation or the receiving a plurality of API notifications limitation. The storing for a first subscriber associated with a first subscriber identifier limitation, and no evidence of transmitting

the at least one message in the message flow.

And in particular on the last point, Your Honor, she relied on the test system which she admitted had not sent a message at all.  And I don't believe there was any other evidence presented supporting the transmission of a message.  That's a required step of both Claim 1 and Claim 11.

Claim 11 being a method step would certainly require not just the functionality but actual proof of the performance of every step in the method claim.

And for Claim 4, she pointed to a Shopify API, I believe, which was not in evidence to my knowledge.  So there would be no evidence supporting the additional limitations of Claim 4.

As we noted and preserved for the record, Ms. Frederiksen did not have an opinion in accordance with the claims, the Court's claim construction of monitoring a trigger condition and so we would move that she failed to present -- or should have been unable to present testimony on that.

And to the extent the Court ends up construing a trigger condition, there was no testimony regarding that.  And further, she presented no evidence that Campaign Composer actually uses the click but did not buy feature as a trigger condition, because no messages were sent in her

test system on which she relied entirely, there is no evidence in the record that Campaign Composer actually uses the click but not buy feature as a trigger condition.

As I elicited testimony, she noted that -- agreed that the message two would be sent before message one and in her test testimony, there was evidence of messages being triggered based on no recipients at all and simply based on time.

So we do not believe that there is sufficient evidence in the record for any reasonable jury to conclude that Attentive infringes any of the asserted claims of the '660 Patent.

We have a motion on damages for failure to properly apportion the limited infringing features out of the demand.  This is the same issue that was presented in the *Daubert* motion, but today we heard Mr. Kidder say that all of the revenue of the system should be counted, even though there's now affirmative unrebutted evidence in the record that only .5% of messages used the accused functionality.

He seemed to suggest that even the first blast message campaign could be subject to a royalty rate when the uncontroverted evidence in the record, including from the inventor, and Ms. Frederiksen require the sending of a retargeting message based on, I clicked but did not buy

feature.

And finally, Your Honor, we wanted to renew on 101, Step 1.  And we have a letter brief on file seeking your guidance on how to proceed.  We understood that Your Honor's denial of Step 1 originally to be determinative and preserve the issue for appeal, but we have put on evidence that the technology was conventional to this point and so to the extent Your Honor is interested in hearing about Step 2, we move that there is sufficient evidence in the record that the claims are conventional and abstract at Step 1 of the Alice test.

And our expert is prepared to testify about Step 2 or Step 1 on his testimony to follow shortly.

THE COURT:  So what I was going to ask about is, the parties filed those letters but at those points prior to now, mentioned Section 101 was an issue the Court needed to address before the trial.

Here's why I assumed that was happening, it's because, and we get into, if I need to at a later point, talk about it at the prayer conference, how it how we got here.  But the bottom line, it seemed like the parties' respective positions were as follows:

That Postscript's position was that based on what's on the report before that Attentive had waived it's 101 defense and Attentive's position was no, we didn't, but

101 is at issue, Judge.  You should decide post-trial both with regard to any back issues and certainly the ultimate legal issue.  So I said okay, so both sides are agreeing one way or the other, that 101 is not part of the verdict form or any part of, explicitly of the evidence presented.  I assumed like to the extent of course that at the trial stuff was said about issues we are going to try might possibly be relevant in the future and to the extent the defendant is right and the Court has to decide to it, the parties can point to it and present arguments if they need to.

But 101 is not an issue I need to make a decision about right now because they are polar opposite; is that right?

MR. DAVIS:  Well, we want to understand the Court's direction and if the Court's direction is, let's decide it later and if evidence comes in, it informs the Court's discussion, we're happy to proceed on that matter.

The issue is we're not aware of any case where Step 101 has been tried to a jury.  101 has been tried to a jury when the Court has resolved -- the claim at Step 1 and Step 1 is a legal matter for the Court only and so we believe it would be improper to proceed presenting Step 2 evidence to a jury when the Court hasn't reached a threshold determination and -- where the claims would be abstract.

THE COURT:  Again, I was prepared to, if we had

to, discuss this more at the prayer conference -- not to try to confuse you. I'll just tell you a couple of things in terms of my inclinations and what I was thinking is, first, to be candid, like it baffles me either side could have thought that I definitively resolved the Section 101 issue.

I just thought as about clearly as you can could say it in denying your motion for summary judgement, I was saying the Federal Circuit has said there was case law that indicates that even at Step 1, the Court has sometimes said, there can be disputed fact issues, I said that that there's just a factual dispute.

So it totally baffles me how one side could have thought the question was totally resolved. All that said, based on what I've seen, I haven't carefully reviewed all the materials from the parties, it's my inclination that I haven't seen enough to indicate that Attentive would have waived its defense.

Again, my thought was, well, we didn't see anything show up in a verdict form about like -- asking the jury to make an advisory factual decision about conventionality. I think we just assumed probably the parties agreed, I'll deal with this later. I didn't assume that you guys had dropped the defense. Of course you could put it, theoretically, I think you maybe dropped at least one other.

My guess was that was happening.  When I saw what really happened, again, that was confusing.  But my inclination right now is, I don't know that I've seen enough to suggest that Attentive's waived this defense and so what I think that would mean is, I would have to take it up post-trial in an appropriate form or fashion.  That's my inclination.  I don't know if that helps in terms of resolving the issue.

MR. DAVIS:  That does, Your Honor.  If we have time left outside the presence of the jury, would you like to hear additional evidence or do you want us to present the evidence during the trial time in front of the jury?

THE COURT:  I mean, my view is -- look, I mean, it's -- it's your time.  101, nor any factual questions related to it, are going to be put to the jury.  The verdict form, the parties have agreed on it and there is no dispute.  It doesn't get to that.

So you can do whatever you want with your time, and I'm sure it may be the case that in trying to prove or disprove aspects, say, of validity, there could be factual evidence that might later be cited to relate to a 101 issue, but my understanding would be that it outweighs what my inclination is that there would be a process by which any further evidence necessary to be presented, then make the ultimate legal determination at that point, again, if need

be.

MR. DAVIS:  Excellent, Your Honor.  That -- that sounds good to us.  We do think there has been evidence submitted on conventionality, but we're happy to take that up in post-trial briefing.

THE COURT:  Okay.  All right.  Thank you, Mr. Davis.

Let me turn to Postscript's counsel.

MR. SAULSBURY:  Thank you, Your Honor.

So with respect to doctrine of equivalents, that was a theory that was presented earlier in the case, but then we have decided to run with just literal infringement. And so I think DOE there's agreement on.

With respect to --

THE COURT:  Okay.  So can I just say there is no objection that the Court is being asked to grant judgment as a matter of law with respect to any position of Postscript's that Attentive infringes based on the doctrine of equivalents, the defendant -- the plaintiff does not object to the Court granting that motion.

MR. SAULSBURY:  Slightly different.

THE COURT:  Okay.

MR. SAULSBURY:  Slightly different.

And I apologize, let me frame it up differently.

We withdrew that infringement theory and did not

present it, therefore, at the charge conference we're intending to say it shouldn't be presented to the jury and I, therefore, don't think that this is an issue where JMOL is appropriate. Sort of similar, I think, to 101 when we get there.

THE COURT: Did you withdraw it in the sense that you communicated it to Attentive's side saying, we're withdrawing this -- this assertion of infringement, like Attentive has communicated to you that it was withdrawing certain validity positions?

MR. SAULSBURY: I don't believe so, Your Honor.

THE COURT: Okay. So then -- then coming into the case, I think the status quo was the plaintiff had claims of infringement, what kind of claims, claims to both direct infringement and doctrine of equivalents. And the way I'm thinking of it is, if we went into the trial that way, if we're standing here now and knowing that it's been presented on doctrine of equivalents, and it is not disputed, it seems to me the motion would be well taken in that regard.

Do you have anything to say in response?

MR. SAULSBURY: So I don't -- my understanding of the procedural mechanism here is that JMOL is not the right vehicle, but this is something that we can perhaps follow up on in a submission, but we -- we can take this

back and meet and confer with the other side.

THE COURT:  All right.  I'll ask the parties to further meet and confer on the issue.  It sounds like they have not previously; is that right, Mr. Davis?

MR. DAVIS:  That's right.  I'm unaware of any communications.  In fact, we were preparing to present on this just now.  So it would have been nice to know ahead of time if that was the case.

THE COURT:  Fair enough.  I think one way or the other, there is no question that the jury will not be presented with that -- will not be presented with any evidence on regarding the doctrine of equivalents, they won't be making any decision about doctor of equivalents, and that is not going to be a part of the case one way or the other.  But I'll ask the parties to meet and confer in an appropriate way to indicate that resolution.

MR. SAULSBURY:  Thank you, Your Honor.

With respect to direct infringement, we oppose.  There has been substantial evidence presented with respect to every claim elements of every asserted claim.  And -- and I think because of that the motion should be denied at that juncture.  I can address briefly some of the points made by Mr. Davis.  There was an assertion that there's an asserted method claim and no evidence was put forward that it was performed.  One thing that was mentioned, for example, is

there's no evidence that messages were actually transmitted.

As just one example, Attentive's own witness, Mr. Miao, testified to, you know, some portion of their very large number of messages actually being sent out with the retargeted messages, that was the 1.5% or so that Mr. -- Mr. Chris Campbell was referring to.

So there's certainly lots of evidence that messages are, in fact, transmitted and the method claim has, in fact, been performed. There's also reference to the Shopify API, ample evidence came in through both fact witnesses and Ms. Frederiksen's about how the Shopify API meets the pertinent limitations of the claims.

There was an assertion made that Ms. Frederiksen is identifying identical functionality as performing two different claim elements in a way that violates the case law that Mr. Davis identified. The -- from our perspective, the -- the evidence presented and -- and especially the testimony of Ms. Frederiksen shows that she was, in fact, identifying discrete functionalities as performing each of those claimed elements such that that argument does not hold water.

And then -- I think that that addresses each of the issues that they put forward on direct infringement, but the bottom line is there's substantial evidence that every element has been met.

THE COURT: I want to address just a couple of other things. There was no going into delegating the source code.

MR. SAULSBURY: Oh, certainly.

THE COURT: Or alternatively that the testimony was only about some hypothetical test system and not the real system, etc.

MR. SAULSBURY: Certainly.

So with respect to source code, first of all, there's no requirement that the jury be presented with source code. In fact, in almost all these cases they aren't because the jury generally can't parse source code. Instead what you do is you have an expert interpret the source code and give her opinions on how that demonstrates infringement. That's precisely what happened here, Ms. Frederiksen testified at the start of her examination that all of her opinions were informed by her review of not only documentation and her use of the product, but her analysis of the underlying source code.

And so --

THE COURT: And her descriptions about the claims were satisfied was, in part, described in understanding how the source code works.

MR. SAULSBURY: A hundred percent, Your Honor.

THE COURT: Okay.

MR. SAULSBURY:  And I apologize, I had lost track of the second thing.

THE COURT:  There was, I think, at times a suggestion that Ms. Frederiksen was using a system she created, as opposed to a real system.

MR. SAULSBURY:  Certainly.  And I understand that to be a suggestion that -- that because in the system she created, she wasn't actually sending messages out to, you know, people in the world, that -- that there wasn't infringement of the method claim.

THE COURT:  So that's, in part, why you were objecting to the other testimony in the record about messages being sent.

MR. SAULSBURY:  That's exactly right, Your Honor.  Ms. Frederiksen's analysis of the test shop that was provided to us by Attentive shows how the system works and, therefore, demonstrates infringement of the system claims.  Then with respect -- then with respect to the method claims, she's already shown that the system is configured to perform all the steps when executed.  And then there's this question of, okay, well, are messages actually transmitted in real life.

I think there's no dispute as to that because their own witnesses, including Mr. Miao, testified about retargeting messages being sent with the accused system that

Ms. Frederiksen opined otherwise meets the other elements of the claims.

THE COURT:  You want to discuss the motion as to damages?

MR. SAULSBURY:  Yeah.  So on apportionment, I agree there is overlap with the *Daubert* motion that was brought earlier.  And the evidence presented, including through Mr. Kidder, addressed really this issue.  He explained how the evidence in the record showed that the accused functionality -- when you add the accused functionality as an increment on top of the -- what would otherwise not accused, right, when you add the retargeting, that is what led to the 10% lift and that's why it's appropriate to count not just the retargeting messages but all the other messages that you end up -- that virtually ends up sending as a result of having that retargeting functionality available in the product.

And so I think that addresses the apportionment concern, similar to how it was addressed in the *Daubert* arguments.

And then finally on the 101, Your Honor.  So I don't know if we need to delve into all of the procedural history here, but -- so I will try to focus on what matters for this trial, for this jury trial.

And so they -- they noted that Dr. Polish may

testify on 101, that's inappropriate.  The parties submitted a pretrial order in which both parties withdrew 101, we did that on the basis -- the representation that they were going to take your order to the Federal Circuit.

THE COURT:  Yeah.  And I think unless there's something I'm missing, I think I addressed this issue, in part because of how the parties presented this, that the trial and the evidence and what's in the verdict form and the arguments will all be about issues of infringement and and validity.  I'm talking about prior art, I'm not about validity and damages.

Now, it may be the case later, assuming -- which is my inclination that there will be some evidence happened to be presented as to the stuff we are going to see at trial that may be used later for another purpose, but we're not dealing with Section 101 for this trial, not even to -- and this is the only way I've ever seen it done is -- have the jury make some, like, advisory factual findings about conventionality that might be used later by the judge. We're not even doing that because the parties didn't present the case that way, including the proposed verdict form.

I think it's saying that -- I know you may still have an issue or argument you may want to make about waiver, but I think it addresses what you're saying.

Am I wrong?

MR. SAULSBURY:  It largely does --

MR. SILVER:  May I consult with Mr. Saulsbury for a moment, Your Honor?

THE COURT:  Sure.

MR. SAULSBURY:  Sorry, Your Honor.

So that generally tracks, Your Honor.  This was my concern, right.  From our perspective it would be prejudicial if Dr. Polish starting logging in all this 101 evidence, right, and we would object to that, right.

We understand -- we totally get it if he's actually going to stay in the lanes of his prior art opinions.  We have no problem with that and we understand Your Honor's point that by happenstance those might overlap with evidence pertaining to 101.  If that's the way it's going to happen, we're okay with it.

THE COURT:  I presume his expert report, the metes and bounds of it, I guess there's not a 101 Section.

MR. SAULSBURY:  There is.

THE COURT:  Oh, there is one.  Conventionality related evidence in there.  Okay.  I mean, my thought here and inclination is, the testimony you offer, it's got to be relevant to invalidity.

MR. SAULSBURY:  Prior art based invalidity.

THE COURT:  Prior art based invalidity.  Yeah. I'm considering eligibility a different category.  And as

long as it is and as long as it's within the scope of his expert report in that regard, great, he can talk about it. It may well be that evidence could have overlapped with a conventionality analysis as to 101. That may be taken up later. And could it be pointed to? But the parties would have a chance to make a further record about conventionality for 101 purposes. So no one would be prejudiced if they didn't do it here. Do you know what I mean?

MR. SAULSBURY: I do know what you mean. And we generally agree with the following caveat that I'm going to make for the record. We don't have to resolve it now, I don't think. You know, Postscript did not believe that your order denying summary judgement was definitively 101. It was Attentive who believed that.

After they took the position that they believed that, they said we're going to take this to the Federal Circuit. We said, okay, on that basis. Then we understand we're not presenting to a jury. From our perspective, etc., it's no longer in the case because of that for the following reasons.

THE COURT: They've waived the right.

MR. SAULSBURY: They're waiving it, and if they were going to present that defense, we were entitled to present the subsidiary factual issues to a jury. But they decided to withdraw that defense and appeal to the Federal

Circuit.  And so we don't --

THE COURT:  So this is an issue that I think if that's going to be your position, that's an issue we should have raised like days ago, I would think.  "Judge, there were these letters about 101 where we were saying our position was waived and the other side was saying deal with it after trial, but wait a second, before we start this trial, Judge, so we're not prejudiced, we want to make sure we have an understanding about the final ruling because we have a right to present on 101-related facts or in the case in some way."  How would you not have done that?

MR. SAULSBURY:  Because they withdrew their defense and said they were going to appeal to the Federal Circuit.

THE COURT:  They don't agree that they did that.  You have a disagreement about that that you were talking about in those letters, correct?

MR. SAULSBURY:  I think the record is clear.

THE COURT:  Does Attentive agree with that position that you just laid out?

MR. SAULSBURY:  I don't think they agree now.

THE COURT:  No, and you believe, because of things that they said or did in the past that they can't take that position that they've essentially waived the right to do so.  That's the thing you talked about in your letters

filed before trial in this issue.

MR. SAULSBURY:  That's right because they told us they were going to appeal it.

THE COURT:  Right.  I'm saying that because those letters appeared to suggest that the parties had polar positions, one that it was waived or, two, this issue that should be dealt with exclusively post-trial, I saw that, and I said, okay, I understand why no one is standing up before this trial starts and says, "Judge, we need a decision from you on this 101 issue because we got to make sure we know." And I told the parties in advance if there's anything you need decided before we start, we need to address it, but you did not raise it, nor did they.  So I assume and I think understandably that one of the two of those positions was going to prevail.  Waived, so it's done, or still in, but it would be decided post-trial.  If there was to be any third path, like that would be on you to raise before the trial got started and say, look, we don't know about this.  We need to know the lay of the land and you didn't.  And so that's my suggestion.

MR. SAULSBURY:  And all I was going to say, I don't know if we're on a different page.  I mean, our positions is that it's waived, right, and that's why it was joined up that way.  I would just say in the interest of making use of the jury's time, I don't think that this issue

is one that we have to resolve now --

THE COURT:  Okay.

MR. SAULSBURY:  -- before we proceed with further testimony.

THE COURT:  Okay.  Understanding the position, okay.  All right.

Mr. Davis, is there anything further you wish to add?

MR. DAVIS:  I just want to respond on one point with regard to the noninfringement JMOL which I think was mischaracterized somewhat.  It's not just that the transmitting limitation of Claim 11 as a method claim needs to be shown to be performed and Ms. Frederiksen did not testify that there was a message sent.  So she failed to present evidence.  But it's that both claims, 1 and 11, require the transmitting the at least one message in the flow.  And there was no evidence put on of transmitting the at least one message.  So I think Mr. Saulsbury was mischaracterizing the argument in some sense.

That claim limitation requires transmitting in order to meet the claim limitation.  It doesn't just require the ability which, in fact, we have evidence in the record contrary that the system can transmit zero messages in the message flow.  So I do not believe the system meets that limitation for that reason, and so while there was no

evidence of a message actually being transmitted, the system, we don't think, meets the limitation because it will transmit zero messages.

THE COURT:  Okay.  And, Mr. Davis, are you in agreement that I need to make no further decision or say anything further about the 101 issue at this time?

MR. DAVIS:  We understand what you said.  I don't believe we need to hear any more.  We think evidence of conventionality and from Your Honor's earlier 101 jurisprudence, obviousness and anticipation are very close to conventionality in many ways, and we think that our legitimate testimony on 102 and 103 will easily be applicable to conventionality under 101.

THE COURT:  But I think you agree that the testimony offered throughout the rest of the trial, the arguments made will all be about solely that the issues that are at play in the case that the jury will decide we'll have a connection to them or will be argued as to those issues.  You won't be asking about eligibility to the jury, evidence that is not related at all to the issues.  Is that right?

MR. DAVIS:  That's right, Your Honor.  If you wish to hear additional evidence post-trial or out of the presence of the jury, we're fine at that time, but that would be up to you.

THE COURT:  Okay.  Understood.

Is there anything further, Mr. Saulsbury.

MR. SAULSBURY:  Yes, Your Honor, just briefly.  A point about the transmitting requirement.  With respect to the system claims, Mr. Burton referred to evidence that there are cases in which no messages are sent out.

(Reporter clarification.)

MR. SAULSBURY:  He referred to testimony about a circumstance in which no messages are sent out.  It was the bug situation that Mr. Greenberg testified to in his deposition clip.  This is a CRM claim.  It needs to have code that can perform the recited steps, right?

So as long as there's code that, when executed -- and literally the claim says "when executed" -- so as long as there's code that's when executed to perform the step of transmitting, the pertinent message that's sufficient and Ms. Frederiksen, when being cross-examined about the bug, said, yeah, I understand that there is a bug condition, but there are other conditions in which it does send the message so it works.  So that's the CRM theory claim.

And, again, with respect to the method claim, sure, in cases in which the bug trips, right, maybe a message isn't sent and the final limitation of transmitting isn't met and that's a quantum issue maybe, but we're not counting the bugs.  We're only counting the messages sent in

our damages case.  So there's no quantum issue.  I believe that addresses the whole thing, Your Honor.

THE COURT:  All right.  Thank you, Counsel.

All right.  So let me just address -- I'm sorry, Mr. Davis.

MR. DAVIS:  Really briefly, Your Honor, the last point Mr. Saulsbury makes goes directly into the damages JMOL.  They are not counting messages sent using the accused technology.  They're counting all messages sent, which is improper.  And we also think that the claims require there to be at least one message, not just merely maybe one at some point.  And her test -- Ms. Frederiksen's test system never sent a message, the testimony that she opined.

THE COURT:  All right.  Thank you.

All right.  So let me just briefly tell you how I'll address the motions that have been made.

First off, just note for the record that the standard for judgment as a matter of law is that it may be entered against a nonmovant, the Court finds that a reasonable juror could not have a reasonably sufficient evidentiary basis to find for the party on an issue.  It's covered by Federal Rule of Civil Procedure 50(a)(1).  The Courts have said if the JMOL is appropriate only if viewing the evidence in the light most favorable on the nonmovant and giving it the advantage of every fair and reasonable

inference.

There is insufficient evidence from which a jury can reasonably find liability with respect to the multiple motions. First with regard to the motion for judgment as a matter of law with regard to an allegation of infringement based on the doctrine of equivalents. There is -- as we discussed and agreed, I'll hold that motion in abeyance and the parties will further meet and confer on the appropriate way to essentially remove the issue of infringement based on the doctrine of equivalents from the case.

There is no dispute that the plaintiff is not going to be presenting that theory, that that theory will be presented to the jury and no evidence will be presented on it. And so really it's a question as to whether it's appropriate to grant judgment as a matter of law in effect simply to, I suppose, recognize that the issue or the theory in the case is pressed or some other thing, but the parties can further meet and confer about that and hopefully come to a joint resolution and advise me as soon as they do or as soon as they think I need to make any further decision.

Secondly, with regard to the Section 101 issue, I say that based on my reading of prior correspondence that I believe the parties are asserting essentially -- and no one said anything different prior to the start of trial -- the parties had divergent positions on whether Section 101

would remain in the case, but how it could diligently be resolved, that the issues were at polar opposites, that Postscript's position was that Attentive had waived its right to have the Court resolve that issue fully because of communications Attentive made prior to trial and that Attentive's position was that it hadn't and that the Court solely should resolve the issue of Section 101 with regard to any factual disputes and ultimately as a legal matter.

Obviously the parties were not with the proposed verdict form when they put it together intending to put forward Section 101-related issues to the jury and they will not based on the discussions we've had.  I've also told you that my inclination based on what I've read is, although, again, I'm not sure I understand Attentive's position at one point that the Section 101 issue was definitively resolved or how even that would be possible to have that understanding based on my summary judgement ruling, ultimately my inclination is not to find any such defense waived and, thus, that would mean that ultimately at some later point, if necessary, if the parties pressed it, need to resolve the Section 101 issue finally myself.

But in any event, because of agreement of the parties that I need not do anything further, make any further decision at this moment with regard to the Section 101 issue, I'm not going to grant the judgment as a matter

of law for the reasons I said.

Lastly, with regard to the motion or judgment as a matter of law as to no infringement here, it's direct infringement.  For all the reasons that Postscript's counsel said, which I incorporate by reference into my decision.  In addition, in light of relevant pretrial rulings that the Court made of certain of the related issues raised by the motion and in addition to with regard to testimony at trial, including the testimony of plaintiff's infringement expert, Ms. Frederiksen, including her testimony that she took into account in a significant way the source code of defendant's product, assessing the infringement issue, but also her testimony in which she walked through one by one each of the claim limitations in the case and offered evidence from her perspective as to why it is Attentive's accused product met those limitations that for all those reasons the judgment as a matter of law is not appropriate.  So I'm going to deny at this time a judgment as a matter of law of that issue pursuant to 50(a)(1) subject to Attentive's right to raise the motion at this trial.

And my ruling, although I focused there on direct infringement just as the same with regard to damages in light of the comments and argument made by the Postscript's counsel.  I believe it's standard for judgment as a matter of law has not be met as to damages in light of

the testimony in the case, including the testimony of

Postscript's damages expert, Mr. Kidder.  So the evidence as

to those issues, direct infringement and damages, has not

met the JMOL standard giving Postscript the benefit and

advantage of every fair and reasonable inference, I can't

find that there's insufficient evidence for the jury to find

liabilities for damages on those issues.  Really I think

these are disputes that should be put to the jury and the

jury will come to some conclusion after hearing all sides of

the case.

All right.  So with that said, I've resolved the

motion -- motions to the extent I need to at this point.

Mr. Wood, is there anything further?

MR. WOOD:  I just -- as a housekeeping matter,

before the jury came in, we have been -- at the beginning of

our case is going to include deposition testimony that was

impacted by your ruling earlier today to the StackCommerce

issue.  We've be working to negotiate that issue, and I just

wanted to confirm that we have agreement and that Postscript

is comfortable with the videos and cuts that have been sent

before the jury comes in so we are not wasting their time.

MR. SAULSBURY:  You're asking us?

MR. WOOD:  Asking for an opportunity to meet and

confer.

THE COURT:  I thought you said the parties

agreed.

MR. WOOD:  I believe there's agreement, but I wanted to request a minute to confer before we proceed.

THE COURT:  All right.  I'll give you a minute to confer and figure out if you've got that squared away. We'll take a short break and let the jury know that we're going to be getting about a half hour of further testimony today.  And that said, the Court will stand in a brief recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please remain standing, everyone.

(Jury enters.)

THE COURT:  All right.  Please be seated.

All right.  We're going to turn to Attentive's counsel as they begin their responsive presentation.

Mr. Wood.

MR. WOOD:  Thank you, Your Honor.

Attentive calls by deposition, Mr. Jesse Greenberg, Attentive's former vice president of engineering.

THE COURT:  Okay.

(Video deposition testimony played of MR. JESSE GREENBERG as follows:)

Q.    Good morning.  Let me start by asking you, how long

have you been with Attentive now?

A.    I joined in September of 2018.  Coming up on six years.

Q.    So what's your current position at Attentive?

A.    VP of engineering.

          (Stopped video.)

          (Video played.)

Q.    Good morning.  Let me start by asking you, how long have you been with Attentive now?

A.    I joined in September of 2018, so coming up --

Q.    So about six years?

A.    Six years.

Q.    What's your current position at Attentive?

A.    VP of engineering.

Q.    At a high level, what are your duties as VP of engineering?

A.    I am responsible for broad swaths of the engineering team, focused mostly on product development side of the house.

Q.    What's the difference between a campaign and a journey?

A.    Attentive nomenclature, a campaign is a point-in-time message where the audience is calculated in real time, and a journey is an event-triggered message where the event drives the message.  Campaigns -- yeah, I'll stop there.

Q.    And is a campaign always sent out at a single point in time?

A.    The -- the distinction is more around which is the entity that drives the interaction.  The journey -- the entity is the subscriber, so it does things and messages happen.  In a campaign, the entity is the campaign message so a campaign message happens and the messages flow from the campaign entity.  It's possible that you can have a campaign message that is sent to no subscribers because the entity is the campaign, and the campaign is like, it's time to send the campaign, do the campaign thing.

Q.    Can a campaign include multiple messages?

A.    That is a complicated question.  We have to debate the definition of campaign and message.  But what I would say an extraction is that the concept of a campaign message, what remains atomic.  There is no relationship ever between any campaign messages and that they can -- even if there are, they are grouped as a structure, that there are no dependency between them.

Q.    I think I understand.  So you're saying that there's no dependency between multiple messages that make up a campaign?

A.    Correct.

Q.    So prior to Magic Composer, Attentive's customers could create a campaign with a single message that would be

blasted to all of the recipients at the same time, right?

A.     Yes.

Q.     And prior to Magic Composer, Attentive's customers could create a journey where the sent time was triggered automatically by a customer's behavior on the website?

A.     Among other triggers, yes.

Q.     How would you describe the customer response to Magic Composer?

A.     I would describe the experience as nonmemorable, personally.

Q.     How many engineers worked on the first version of Magic Composer?  Again, ballpark?

A.     Just one.  We told one engineer she had two weeks to build it, and I think it took her three.

Q.     What were the reasons considered for not developing Magic Composer?

A.     It was unclear that it was a real pain point for customers and it would help them solve their needs.

Q.     I'd like to ask you about a campaign where a merchant retargets the second message to just recipients who did not click on the previous message option as the audience.

          With me so far?

A.     Yes.

Q.     So the time before the first message in the campaign is set out -- sent out, what would the estimated recipient

number for the second message show?

A.    Zero.

Q.    And then after the first -- sorry.  Go ahead.

A.    And it's important to appreciate that we had a bug that let this happen.  So if the -- if this screenshot showed an example where message two actually sent on the 9th, and it's sent to customers who had to have clicked on -- had to go to people who clicked on message one, that campaign message would execute to zero subscribers successfully.

Q.    Got it.

      Even though the scenario you just mentioned, message two would actually go out before message one?

A.    Because they are atomic events unrelated to each other.  And the audience is calculated at the time of the sending.  So when it says hey, who's gotten message one, run the whole process and say, well, I have no subscribers.

Q.    Is that still the case?

A.    That's how it's always worked.

Q.    And then in the scenario we were just talking about -- well, the scenario showing -- so not the scenario you just mentioned where message two is set to November 9th but a campaign in which the merchant retargets the second message to recipients who didn't click on the previous message.

With me so far?

A.    Yes.

Q.    So after the first message is sent out, but before the second message is sent out, the estimated recipients for the second message would no longer be zero but be some positive number?

A.    So the segment you were sending to is people who didn't click message one.  The audience, when you got to the screen, would say 193 because all 193 members of your audience would not have clicked message one.

Maybe that's not true.  It would say zero because no one's gotten it and not clicked, which is probably the requirement.  So it would say zero because no one got it and then in the instance where it got sent, it would basically go to 193.  And then as clicks happened, it would -- like if you -- as you refresh the screen, it would drift down.

Again, there's no materialization that calculation happens in real time.  So if you don't visit the screen, we don't know the size of this audience.

Q.    If you still have the source code handy, could you turn to page 290 of the source code.

A.    Is that in a really big pile?  Do you have a really big pile or you don't have a big pile like I have?

Q.    Sorry, what's that?

A.      Can you tell me what the file was named?

Q.      Yeah.  It's named setoftriggers.ts?

A.      Okay, yep.

Q.      So source code ending in Bates number 290, setoftriggers.ts, that is a piece of a front-end code?

A.      Yes.

Q.      Is it used with Magic Composer?

A.      This is code from the Attentive tag, so it is used to generate events.  Those event are used by Magic Composer.

Q.      And this code can also generate events that can be used by Journeys?

A.      Yes.

Q.      Is that process of matching the identifier from the e-commerce integration to the Attentive internal identifier the same for Magic Composer and Journeys?

A.      Yes.  It happens upstream of that and downstream of the code that we're looking at.

                (Video end.)

                THE COURT:  Mr. Wood.

                MR. WOOD:  Thank you, Your Honor.

                Attentive calls by deposition, Mr. Zachary Magdovitz, Attentive's former product manager.

                (Video deposition testimony of ZACHARY MAGDOVITZ as follows:)

Q.      What is you are current role at Attentive?

A.    I'm a product manager.

Q.    And how long have you been a product manager at Attentive?

A.    Just about three and a half years, three years, four months, I believe.

Q.    Have you ever had any other role at Attentive other than product manager?

A.    Not outside the department.

Q.    What is your educational background?

A.    I graduated from high school and college.

Q.    What was your college degree in?

A.    Government.

Q.    Where did you go to college?

A.    Cornell University.

Q.    Let's start with the first one.  What was the idea behind Magic Composer?

A.    When I joined our campaigns, composer was very rudimentary.  Sent one message at a time.  The Magic Composer project was just a visual redesign to allow people to send multiple messages more easily.

Q.    You said that the idea was to allow users to send multiple messages more easily.  How did Magic Composer do that?

A.    We took what was previously across three screens that the user had to go through to send a single message, and we

collapsed it into a single screen and then added a button which said "add another message," which is ostensibly doing it again.

Q.    And what was the content of the three previous screens?  What would the user do on each screen?

A.    The exact same content that was in the new screen, it was just you name the message, you choose a segment, you choose the time that it's scheduled to go out, you put in the content of the message and then you confirm.

Q.    And unlike the -- previously, the user could do that all on one screen; is that right?

A.    Uh-huh, yes.

Q.    It is also correct to say that the prior campaigns product did not allow follow-up messages to also include optional prebuilt retargeting segments based on engagement?

A.    No.

Q.    Why is that inaccurate?

A.    You -- Attentive, since before I joined the company, has had the capability to build segments that target specific subscribers including subscribers who have taken specific actions.  We just -- similar to the overall reskin here, made it easier, fewer clicks to get there.

Q.    And how is it that -- or how did Magic Composer cause fewer clicks to get there?

A.    So previous to me joining, I believe, you know, for a

very long time at Attentive -- but I don't know when exactly it was built -- in the -- you could go to the segments tab and create a segment that had parameters relating to the subscribers taking specific actions.

And then as a step in the campaigns workflow, the old campaigns workflow, you could invoke that segment and send a message to that segment.  What we did as part of Magic Composer was just show it without you having to create it in the other tab by default.

Q.    I think we can pause on this exhibit and then let us move to our next exhibit, which is the document bearing Bates number ATTENTIVE_ 200010288.

COUNSEL:  Is that Exhibit 2?

COUNSEL:  It should be Exhibit 2, yes.

BY COUNSEL:

Q.    Okay.  Take a moment to briefly review this document and let me know when you're ready.

A.    I'm sorry.

Q.    Do you see the line that says "author" at the top of the files?

A.    Yes.

Q.    "Mail to zmagdovitz@attentivemobile.com," is that your e-mail address?

A.    That is my corporate e-mail address.

Q.    What is a product spec document?

A.    A product spec document is a document prepared by a product manager outlining the requirements to be built by engineers.

Q.    Have you ever written a product spec document?

A.    Yes.

Q.    Do you have any reason to believe that you did not author this document?

A.    No.

Q.    But it's your testimony that you don't have any data from after it was released to the general audience to show whether or not Magic Composer increased message send?

A.    No.  We do have data.  It's hard to conclusively say that the message volume increased because of the Magic Composer specifically.

Q.    So the message volume did increase, but you can't tell whether it was because of Magic Composer specifically; is that right?

A.    Yes.

Q.    All right.  Let's go on to the next exhibit.

Okay.  It should be there now.  It's document marked as Exhibit 5 labeled ATTENTIVE_ P0001402.

A.    Yes, I see it.

Q.    It says after Number 4, "Retargeting options are very important to our clients in a Drip campaign interface and the premade options save our users time."

Do you know why retargeting options are very important to clients?

A.    Retargeting is a strategy that marketers have used for decades, they're familiar with then, and I think drives performance.

(Video End.)

THE COURT:  Mr.  Wood?

MR. WOOD:  Thank you, Your Honor.  Attentive calls by deposition, Mr. Alex Beller, Postscript's company founder and president video.

(Video deposition testimony of ALEX BELLER as follows:)

Q.    Good morning, Mr. Beller.

A.    Morning.

Q.    Can you state your full name on the record?

A.    Alexander Beller.

Q.    And who your employer?

A.    Postscript.

Q.    What is your title at Postscript?

A.    I'm a cofounder and president.

Q.    Can you give me an overview of how Postscript got started?

A.    It -- it started before I joined.

Q.    Exhibit 6 has starting Bates Postscript 00037096. Exhibit 6 is another -- it appears to be a Salesforce record

of another e-mail thread; is that correct?

A.     That's correct.

Q.     And this is a conversation between Brain McBroom at B Fresh Gear, it looks like, and with someone named Simon Nagy; is that fair?

A.     I see Simon Nagy.  Can you point me toward where you're seeing the other person?

Q.     First is just the very top of the first page.

A.     Oh, yes.  I see that.

Q.     Mr. McBroom appears to be a prospective customer, right?

A.     That's correct.

Q.     Okay.  So looking back at the document, about halfway down that page that I just referenced, there's an e-mail from Brian to Simon.

        In the last paragraphs of that e-mail he says, "I just spoke with Attentive, they are intuitive but not cheap.  The thing that they offer that I like most is that you don't have to manually enter in your phone number.  You click, 'Sign up for texts,' and it bounces you into a text browser with the number and message autopopulated and you just hit send and, boom, you're signed up."

        And then he says, "Do you all offer this type of feature," right?

A.     I do see that.

Q.    And he's describing Attentive's Two-Tap functionality, right?

A.    I believe so, yes.

Q.    Exhibit -- I think we're on 7.  It has starting Bates Postscript 00037430.

This is another series of e-mails from Salesforce; is that right?

A.    That's correct.

Q.    I want to start with the e-mail on page 9 of the exhibit, which has Bates number ending in 37438.  And there's an e-mail at the top of the page dated September 16th, 2022, from zacharywasserman@Bombas.com.

Do you see that?

A.    I do see that.

Q.    Mr. Wasserman sends an e-mail to a Kara at Postscripts.

Who is that, Karin Morin?

A.    Kara Morin is a customer success manager.

Q.    What is the job of a customer success manager?

A.    Works with existing customers, helps them find success on the platform with SMS.  An account manager of sorts.

Q.    Mr. Wasserman's e-mail to Ms. Morin says, "We are in the midst of migrating to Attentive."  And then it says, "Generally, I've heard they're the industry leader, mainly

due to the Two-Tap Opt-in."

            Do you see that?

A.    I do see that.

Q.    This is a prospective customer who views Attentive as the industry leader because of the Two-Tap Opt-in feature, right?

A.    I think this is a customer who has heard that Attentive, as he says, is the industry leader, mainly due to the Two-Tap Opt-in.

Q.    Let's go back to the sixth page of the exhibit, Bates number ending in 37435.

            And there's a response in the middle of the page from you to Mr. Wasserman, right?

A.    Yes, I see this e-mail from me to Mr. Wasserman.

Q.    And the first paragraph you say, "Attentive seems like a safe pick," right?

A.    I do say that.

Q.    And the third paragraph, you say, "Attentive has became the incumbent in the space."

            Do you see that?

A.    I do see that.

Q.    Let's mark as Exhibit 16 a document with starting Bates Postscript 00003226.

            Do you recognize Exhibit 16 as the Y Combinator application Postscript submitted in the second half of 2018?

A.     Yes.

Q.     To the extent -- to the extent you didn't write portions of it, you certainly reviewed that to make sure it was accurate, right?

A.     I don't recall doing so, but I think it's a safe assumption that I read it through.

Q.     Sitting here day, are you aware of any inaccuracies in this document?

A.     Would you repeat the question for me?

Q.     Sitting here today, are you aware of any inaccuracies in the Y Combinator application?

A.     Sitting here today, I'm not aware of any inaccuracies in the application.

Q.     In preparing this application, did you or your company founders research companies that offered products that would potentially compete with Postscript?

A.     I don't recall if there was research or if, you know, some of these competitors that we reference are just because of, you know, common knowledge from us at the time.

Q.     And when you say "competitors that we reference," you're referring to page 6, which has Bates number ending in 3231?

A.     Correct.

Q.     And there's a question in the bottom half of that page that says, "Who are your competitors and who might

become competitors," right?

A.      Correct.

Q.      And in response, you listed the Tatanga, EZTexting, Mailchimp and Klaviyo, right?

A.      Those four, along with Retention Rocket, are specific examples it seems like we listed at the time.

Q.      You didn't list Attentive, right?

A.      That's correct.

Q.      Were you aware of Attentive at that time?

A.      I -- I don't recall whether or not I was at the time.

Q.      If you were, would you have listed them?

A.      I'm -- I'm -- I don't recall whether or not I was familiar with Attentive at the time.  How I read this -- I also don't really recall writing, you know, these paragraphs specifically, but -- or what I was thinking at the time. But reading these paragraphs, I think I'm trying to give -- or I think we were trying to give, you know, examples and more the categories that I'm talking about here than listing every specific potential competitor that there might be, hence, the parentheses and such.

Q.      Let's mark as Exhibit 17 a document starting Bates ATTENTIVE_ P0011104.

        Exhibit 17 is an e-mail thread, most recent of which appears to be dated January 21st, 2019, and it's from you to Randy Kohn at Attentive.

Do you see that?

A.     I do.

Q.     And by that point, you were working part time as a consultant for StackCommerce, right?

A.     Yeah.  By that date I was -- correct.  I was no longer full time at StackCommerce.

Q.     And you had been part time for several months by then, right?

A.     Correct.

Q.     Let me have you turn to the third page of Exhibit 16.

A.     Yes, I'm there.

Q.     And there's a question in the middle of that page that says, "If accepted to YC," meaning Y Combinator, "will you be committed to working exclusively on this project for the next year?"

And then in parentheses it says, "No school, no other jobs."

And your answer is "Yes," right?

A.     I do see that, yes.

Q.     Well, the word "exclusively" isn't clear enough, there's a parenthetical that says, "no other jobs," right?

Do you see that?

A.     I do see that.

Q.     Doesn't that mean no other jobs?

A.     I wouldn't -- I wouldn't presuppose to speak for the

Y Combinator partners to write the application.

Q.    Well, you wrote "yes," even though you continued to work in some capacity for StackCommerce, at least according to your testimony today, right?

A.    I, for, you know, part of 2019 continued to hand things off and be available to StackCommerce.  I don't recall how much I was or wasn't working.  It's been a long time.  I believe it was relatively minimal and that -- but the -- but I also believe that -- I'll speak for me -- fulfilled the spirit of what this question was asking.

            (Video end.)

            MR. WOOD:  Your Honor, Attentive moves the admission of DTX-076, which was presented in the deposition of Mr. Beller as Exhibit 7.

            THE COURT:  All right.  Is there any objection?

            MR. SAULSBURY:  No, Your Honor.

            THE COURT:  All right.  That's admitted.

            (DTX Exhibit No. 076 was admitted into evidence.)

            THE COURT:  Mr. Wood, do you have a further depositions?

            MR. WOOD:  That's our last deposition.  We'll be moving on to a rather lengthy live witness.

            THE COURT:  Okay.  In light of that and in light of the fact that we're close to the 5 o'clock end time,

we'll conclude our trial today for the jury.

So, ladies and gentlemen of the jury, again, thank you for your patience today.  We look forward to bringing you back tomorrow for day four.  Please make sure to arrive as close to 8:45 to help us make sure we get started at 9:00.  That, in turn, makes sure you maximize your time with regard to the time we're here this week.

And, otherwise, I just reiterate some instructions to you, including the importance of not discussing the matters you've heard during the testimony at trial with anyone else until your deliberations have begun.

And have a good evening.  We'll have the courtroom deputy lead you out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated, everybody.

Why don't we take 15, 20 minutes just to allow folks to gather themselves, get the materials together, and we'll begin our prayer conference around 5:15.  We'll come out and make sure you're ready before we do.

With that, the Court will stand in recess.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please be seated.

Thanks to our court reporter for being here and staying late.  Thank you to the parties, again.

Just briefly, before we get to the substance, I'm going to take a chance at least while we're near the end of trial, we're not quite there, just to say I appreciate that you all are working very hard, not only you all but you have a team of people and folks I've seen here working hard at all hours.  I appreciate the efforts that you all put into making this process as efficient as possible.  And also appreciate the way that the parties' counsel have treated each other with professionalism and respect, to the Court and staff.

Additionally, appreciate the way that -- I know in a lot of context, including, for example, the final jury instructions and the verdict form, it is clear the parties worked together to see that they could reach agreement and they were able to reach a lot of agreement, which is certainly helpful and efficient for the Court.

So it's been a well-tried case, and I appreciate the parties' efforts in all those regards.  I just want you to know that, and at least on my behalf it is a pleasure to work with good counsel on interesting matters.  I really appreciate that in the District of Delaware.  I just want you to know that.

All right.  So let me see if I can say a few things that hopefully will streamline matters a bit, and then we can talk about what we need to talk about from there.

So with regard to the proposed final jury instructions and proposed verdict, we've, of course, taken a look at -- there were, I think, only two -- with regard to the proposed final jury instructions, there were, I think, only two disputed areas in those instructions at the point in which they were sent to us.

Other than those disputed areas, I'll just say that I've reviewed the instructions.  With regard to the area and the remaining instructions in which the parties agreed on the language, I did not see anything that jumped out to me as problematic.

I will note that -- we'll be asking the parties to work to prepare a final version of the proposed -- the final jury instructions and verdict form once we get to that -- once we get that final version done and ready to go, removing the footnotes and things like that, the actual things that can be handed to the jury.

And I'd just ask that at whatever point -- and I think it will likely be at some point tomorrow where we need to have those final versions that the parties bring, at least 15 copies of both the verdict form and the final jury

instructions so we can use those to hand out to the jurors and that we have them with the Court when we need to.

I'll also note that I think at a minimum there are going to be some things that, even though they weren't disputed previously, are going to need to be removed from the proposed final jury instructions to get to the final ones. Like, for example, there are a couple of pages in the final jury instructions that make reference to the doctrine of equivalents.

There are also -- and you should just be thinking about this and talking to each other because you may know better than I do, but there are a couple of pages, like on 12 and 13, related to the use of interrogatories or to the reading of stipulated packets. It may be the case that you all know that actually we're not going to be doing that, so if you do know that there's a particular instruction here that relates to something that isn't actually anticipated to happen anymore, you can jointly agree. Just remove it.

But if for whatever reason I get to reading the final instructions and there is something like interrogatories and it turns out no one used them, I'll probably just say something like that, but best if you can remove them in advance. Okay.

So with regard to the two disputed areas that

were in the instructions when they came to me most recently, one was on page 22 related to the construction of claim terms. At the time, the only disputed issue was the monitoring of the "trigger condition" term. The parties, I think, have resolved that amongst themselves, and so I believe it's the case that there isn't a dispute and that essentially Postscript's proposal, which was that the term be understood to be monitoring a trigger condition, is the way it's going to read.

So I think that part's going to resolve. I know we'll talk in a second about whether there is another construction the Court needs to make, and that's trigger condition and what that's going to be.

And then, lastly, there was a dispute on page 27 with regard to Postscript's proposal that the Court invoke the patent presumed to be valid. On that, can I just say I think if I were to use Attentive, which would not have that proposal, or Postscript's, I don't think either way it would be, like, error.

Of course, it's the case -- the law that a patent is presumed valid. Also, of course, the case, the presumption is what gives rise to the clear and convincing evidence that the asserted validity has to meet, although that standard is also reflected in Attentive's proposal.

So while -- while I don't see either as

incorrect or seriously problematic in the long term, in the end when this comes up, and what I'm going to do here is I'm simply going to go with Attentive's proposal.  And I do that only because I know when the judge is reciting instructions, you know, it is possible on the margins, the jurors could -- you know, certainly they're going to be listening to what I say.  And I guess it could be said that if you both invoke the presumption and then repeat the clear and convincing evidence standard, it is as if the Court is saying the same thing twice in a different way and maybe there could be some misconception.  I'm doing that because I'm trying to prevent undue thoughts, of course.  So my decision there would be to remove Attentive's proposal and go to Postscript's.

Put a pin in trigger condition dispute.  Let's just say I've reviewed the proposed verdict form.

I didn't see any issues with the jointly agreed-upon verdict form with the exception that I think there may be a reference to doctrine of equivalents in Question 1, which would have to be removed.

But other than removing that language, the remainder is agreed upon, and I didn't see any issues with it.  So having said all that -- oh, and then just one other issue.

In terms of the outstanding disputes that were presented to me this morning, the only set of disputes that

I didn't resolve because I didn't need to yet were the disputes about Mr. -- Dr. Polish, his planned presentation, and Postscript's objections with regard to those.

I'm going to ask the parties to further meet and confer about that issue, especially including Attentive having -- I'm sorry -- Postscript having made some detailed articulation of its position. I think it was difficult for me this morning on Attentive's side. Postscript had said, look, we don't think -- oh, we think that this content relates to undisclosed invalidity theories. Let me explain why that is, and let me point to portions of these slides that tell you why we think that is, that have been cited by the other side, and really on Attentive's side there was almost nothing except that they cross-examined so there wasn't an engagement with the substance of the argument about why it is that this was improper. It's difficult for me to actually engage myself and resolve the issue.

Now we have the benefit of at least another 12 hours or so. I'll ask the parties to further meet and confer on those issues to resubmit, if it's still disputed, these proposed kind of disputes with a more fulsome explanation of both side's position, keeping in mind, of course, the guidance I've already provided today about invalidity issue and disclosure.

So with all that said, I think everything I've

said kind of brings us up to what I understand to be the main additional disputed issue that we had discussed today, which is trigger condition, but I may be wrong about that. And so let me pause before getting to that to ask if there's any other matter I've overlooked or any other clarification the parties need with regard to what's going before?

Mr. Saulsbury.

MR. SAULSBURY:  Certainly, Your Honor.  So, actually, I think we've reached a compromise on the claim construction issue.

THE COURT:  Super.

MR. SAULSBURY:  And so I don't think we need to address that.  I think, based on how testimony has come in, we don't believe there's a dispute of the claim construction nature that the Court has to address now.

THE COURT:  With regard to the trigger condition?

MR. SAULSBURY:  That's correct, Your Honor.

And the only other thing I'll say is, we will conform the verdict form with respect to DOE.  We'll meet and confer with Attentive to further conform the jury instructions and verdict form based on how the evidence comes in, right.  Just because there's, you know, here's the invalidity and it depends on how the evidence comes in.

THE COURT:  Sure.  Yeah, I get that.  Yeah, I

get it.

You know, that's a good point, which is that, of course, I'm talking about what has happened so far, and I don't know that it's the case that I know, or even that the parties know, that based on what's happened so far, there are any further requests to alter the content of the instructions.

But as Mr. Saulsbury says, of course, we still have some chunk of trial left, including validity-related issues. I'm not precluding the parties from reraising some issue about including X or taking out Y.

MR. SAULSBURY: Thank you, Your Honor.

The only additional point is Your Honor noted additional issues from this morning that we didn't get to, and Your Honor pointed out the objections to Polish's demonstratives.

There was one other issue that we didn't get to, and it was the first issue in the submission, I believe, and it is the undisclosed theory with respect to -- it's an undisclosed invalidity theory with respect to products coming back in stock and that overlaps with Dr. Polish.

THE COURT: Oh, yeah. I mean, I was considering these together in my instructions. Like on that one, too, it was like, you know, what's the response, you know.

I see that Attentive cited to particular

portions of its contentions in which they're asserting that something was disclosed and I -- I see Postscript go into some detail in explaining why they think that content didn't disclose X. I didn't have any kind of, like, response to that. So I think it's the same problem as to that. I'm not saying that's being tabled. I know that's still potentially on the table.

MR. SAULSBURY: Okay. Thank you, Your Honor.

THE COURT: All right. Mr. Wood, based on all that being said, anything you need to clarify or like to add?

MR. WOOD: No. I agree with Mr. Saulsbury. I think, based on the state of where we are right now and what we can know about where we're going to be, I think we're in agreement and understanding that we'll -- as things continue to develop, we may have a couple issues come up, but I think we're -- we're in agreement right now.

THE COURT: Okay. Great. All right.

Well, with that said then, and if there's nothing further, then you all, again, have work to do and sleep to get. We'll then end our prayer conference now. We'll reengage with you on the mechanics of final jury instructions and the verdict form before those go final.

And, Mr. Flynn.

MR. FLYNN: Just logistically, Your Honor.

Tomorrow at the close of evidence, do you plan to do the -- read the jury instructions and then have closing after that?

THE COURT: Yeah.

MR. FLYNN: I worry about kind of bumping up against the 5 o'clock deadline in the middle of a closing.

THE COURT: Yeah. I know what you're saying, and we've be thinking about this.

I think on the one hand, we want to maximize the jury's time. So I think it is the case, Ms. Miller is going to tell you that --

MR. FLYNN: I think there's --

THE COURT: -- Postscript has 3 hours and 17 minutes left, and Attentive has got 3 hours and 9 minutes left. Both have about the same amount of time. So that's, you know, between 6 and 6 and a half hours in total, including closings. And in a good day, we've done it today -- well, maybe not today, but we got close today, but yesterday was certainly -- you can get in more than 6 and a half hours in a full day.

But of course, I'm not charging time to read final jury instructions. So what I think is going to happen is this, I think you'll use all your time, except what you want to save for closing. It will be, like, mid-afternoon probably. I don't want to waste the jury's time by losing a number of hours.

So I think my inclination is -- my thought is that what I would do then is what I had said before, I'll read them -- we'll make sure the final jury instructions are finished, and I will read them up to the deliberation section, which is going to take an hour, maybe.  50 minutes, an hour.

But then if what turns out to be that we're not going to have enough time to get one or both closings done -- you know, in an ideal world we have both closings back to back and then a rebuttal close.

So probably what will happen is we'll do almost all the final jury instructions, up to deliberations.  And then, assuming we're relatively close to the end of the trial day, we could come back in the morning and do closings and then do the last few instructions.  That way, they'll have the case still pretty decently early in the morning, and they'll have Friday.

Does that make sense?

MR. FLYNN:  Yes.

THE COURT:  Mr. Saulsbury?

MR. SAULSBURY:  Thank you, Your Honor.

THE COURT:  Okay.  That will be the plan now.  But for some reason, like, we got done super -- you should be prepared, at least, to be able to close with, like, some logistical time, just in case, like, things go way quicker

maybe. People drop things or, all of a sudden, besides what you're going to save for closing, we're done at lunch, you know what I mean.

Like in that world, I would probably -- I'd want to do final jury instructions and give you some time to, you know, try to make some changes and alterations to your closings. But in that world, we would do closings before the end of the day.

Again, I don't think it's likely, based on how much time you still have left substantively, so I don't know what you're going to leave for closing. But I don't want you to think it's an impossibility, if that makes sense.

You know what I mean?

MR. FLYNN: Yeah. Great, Your Honor.

THE COURT: With that said, everybody, have a good night. The Court will stand adjourned.

COURT CLERK: All rise.

(Court adjourned at 5:34 p.m.)

----------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter

U.S. District Court