```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE



STODGE, INC., d/b/a     )  Volume IV
POSTSCRIPT,             )
                        )
        Plaintiff,      )  C.A. No. 23-87-CJB
                        )
v.                      )
                        )
ATTENTIVE MOBILE, INC.,)
                        )
        Defendant.      )



              Thursday, August 28, 2025
              8:30 a.m.
              Trial


              844 King Street
              Wilmington, Delaware



BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
    United States Magistrate Judge



APPEARANCES:


      McCARTER & ENGLISH, LLP
      BY:  DANIEL M. SILVER, ESQ.

            -and-

      MORRISON & FOERSTER, LLP
      BY:  TIMOTHY CHEN SAULSBURY, ESQ
      BY:  DARALYN DURIE, ESQ.
      BY:  HANNAH JIAM, ESQ.
      BY:  RAMSEY FISHER, ESQ.
      BY:  JOYCE LI, ESQ.

                    Counsel for the Plaintiff
```

APPEARANCES CONTINUED:

     MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
     BY:  MICHAEL J. FLYNN, ESQ.
     BY:  CAMERON CLARK, ESQ.

     -and-

     CAHILL, GORDON & REINDEL, LLP
     BY:  CHRIS CAMPBELL, ESQ.
     BY:  BRITTON F. DAVIS, ESQ.
     BY:  MATTHEW WOOD, ESQ.
     BY:  RAHUL SARKAR, ESQ.
     BY:  HALIMA NDAI, ESQ.
     BY:  KATHERINE VESSELS, ESQ.

     -and-

     GIBSON, DUNN & CRUTCHER, LLP
     BY:  ELI BALSAM, ESQ.

              Counsel for the Defendant

          ----------------------------

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

THE COURT:  All right.  Please be seated, everybody.  Good morning.  Parties are here and our court reporter.  We thank our court reporter as always.  With that said, let's go on the record.  And as we do, I'll say that we're here today for our morning conference in the matter of *Stodge Inc. d/b/a Postscript vs. Attentive Mobile, Inc.* It's civil action number 23-87-CJB here in our court.  We

have counsel with us.

What I'm going to plan to do, because I think I understand it is the thing I needed to discuss and potentially resolve now, are, I think, the disputes about the presentation.  I see there's an additional dispute by Attentive about an aspect of potentially Ms. Frederiksen's rebuttal presentation.  Probably have to try to get to that maybe at another stage, just in terms of timing.

What I'm going to try to do now in these next 25 minutes is try to make sure I fully understand the nature of the parties' arguments about these, like, I think, two buckets of disputes, and I think take a short break and think about it for a second and give you a decision before we start the trial day, will be my plan.  Okay?

All right.  So why don't we talk about the -- and I think the parties have given me hard copies, yep, of some of the stuff.  So why don't we talk about -- I've got Dr. Polish's report here in hard copy.  I think that's Exhibit DTX-5.

Do I have a hard copy of Dr. Polish's expert report as well, which was Exhibit 4?

MR. FLYNN:  We do, Your Honor.  It should be in the binders from yesterday's disputes.

THE COURT:  Okay.  Polish invalidity -- I've got Polish's invalidity report, and I've got an Exhibit 4 to

that report that we're talking about?

MR. FLYNN:  Yes.

THE COURT:  All right.  Mr. Saulsbury, please come forward.

Mr. Saulsbury, this is what I understood, I think.  On slides -- got disputes about Slides 14 and 57.  I think they relate to Limitations 1(c) and 1(l), maybe, of the invalidity -- I think at one point you say undisclosed "infringement" theory regarding --

MR. SAULSBURY:  Apologies.  It's a typo, yeah.

THE COURT:  So it's invalidity.

And I think you're saying two things.  Tell me if this is right:  One is we think Dr. Polish is going to point to this e-mail received as related to or satisfying the criteria of subscriber enrolled, but really I think -- like if we're talking about the language of 1(c), I think it starts at like -- just trying to get the part of Dr. Polish's invalidity report that talks about these things -- that starts at page 9 in his report.

We're talking about the concept of the message flow comprising recipient criteria defining a segment; is that right?

MR. SAULSBURY:  Slight -- slightly different and I can -- I can maybe just address it directly.  And, unfortunately, this isn't as joined as I would prefer it.

We didn't actually hear the stuff in the right-hand column until 4:00 a.m.

But our concern, which we expressed two nights ago and last night on hours of meet-and-confers, is that it appeared that Dr. Polish was offered -- was intending to offer the opinion that receipts of an e-mail was enrolling a subscriber.  There's an additional limitation of enrolling a subscriber, and we wanted to confirm that they were not going to do that.  We did not receive that --

THE COURT:  Where is the -- which limitation?

MR. SAULSBURY:  Certainly, Your Honor.  One second.

THE COURT:  Enrolling the subscriber.

MR. SAULSBURY:  It is 1(k).

THE COURT:  And just for -- I'm looking at the patent, which -- what's the first word of the element at issue?

MR. SAULSBURY:  Oh, certainly.  It's enrolling the first subscriber to the segment of subscribers.

THE COURT:  Okay.  1(k), "enrolled."  Got it.

MR. SAULSBURY:  Right.

So the problem was in the annotation to the figure, it points to e-mail received as subscriber enrolled, so naturally our concern was, oh, they're no longer relying on what -- what was disclosed in their invalidity

contentions for enrolling a subscriber.  They have a different theory for that now.

And we teed it up, both two nights ago and last night.  So we asked them to confirm, are you -- please confirm you're not going to run that theory, right, and if you are going to run that theory, please let us know where it is disclosed in the invalidity contentions.

The only thing we were pointed back to was this figure.  And what we said is this figure clearly does not have any sort of annotation or description in your invalidity contentions, saying that e-mail received is enrolling a subscriber.

Now, Your Honor, I think we can probably shortcut this in the following sense.  When I read their submission from 4:00 a.m. this morning, they don't appear to be arguing that he's -- he's going to do that, and so I -- I hope the path here is straightforward.

It says, "Attentive clearly discloses that" -- this is on page 2 of their submission in the right-hand column.

"Attentive disclosed the theory that e-mail received can be used as recipient criteria," and they clarify that they clearly disclosed that.

"In addition, Journeys also includes trigger conditions of e-mail received."

(Reporter clarification.)

MR. SAULSBURY:  I apologize.  And so if we're aligned -- and we hope this would be the ruling because we're concerned we're going to have new theories disclosed in the course of his -- his testimony.

If we're aligned that trigger condition isn't going to be -- or sorry.  If we're aligned that they're not going to rely on e-mails sent as satisfying enrolling subscribers, so contrary to what the annotation they provided is, then that's fine.  But we've been trying to meet and confer for two days and can't get a resolution on that.

THE COURT:  Okay.  So to summarize, tell me if this is right.  Your concern is that Dr. Polish is going to rely on e-mails received as an example of enrolling a first subscriber for Limitation 1(k).

MR. SAULSBURY:  That's right.

THE COURT:  You -- you read their response, potentially, to say that they need to rely on an e-mail received as a trigger condition.

MR. SAULSBURY:  That's right.

THE COURT:  Unobjectionable to you.

MR. SAULSBURY:  That's right.

THE COURT:  If that's the case, then maybe we don't have a dispute.  If it's not, if the e-mail received

is going to be relied on to satisfy the enrolling per subscriber limitation in 1(k), then I think we may have a dispute.

MR. SAULSBURY: That's right. And -- yes, that's right with respect to the first issue in this grouping. And then there's one additional dispute in this grouping.

THE COURT: Got it. Let's try to resolve that.

Also, just for nomenclature, we've been talking about undisclosed theory, undisclosed theory.

MR. SAULSBURY: Yes.

THE COURT: Yesterday, we had an example of an undisclosed invalidity theory, and by theory I would typically understand that to mean a new reference that is said to anticipate that it is a version of Campaign Composer that's undisclosed. And we've talked about how, for various reasons, including pursuant to Federal Rules of Civil Procedure 57, in violation of pretrial order you can't just at trial raise a new invalidity theory that has not previously been disclosed in the pretrial order.

This is not that. This is -- this is an invalidity theory that has been disclosed, which Attentive Journeys anticipates that there's obviousness. The assertion is it's an argument about how it is that that -- that that reference anticipates or renders obvious, that was

not disclosed.

Again, a possible objectionable thing.  I just want to differentiate from what we were talking about yesterday.

MR. SAULSBURY:  Oh, certainly.  What I -- what we were talking about yesterday we understand to be an invalidity ground, and this would be a theory, but I think we can -- we can just use those other semantics, and this is an invalidity argument or contention that they --

THE COURT:  A different kettle of fish.

MR. SAULSBURY:  Yeah.  That was not disclosed in their invalidity contentions.

THE COURT:  Yeah.  So I'm using theory to mean grounds and argument to mean -- you know, Attentive Journeys is the reference.  We know there's going to be an issue in the trial.  It's about how --

MR. SAULSBURY:  Right.

THE COURT:  Let me then -- on this e-mail received issue, let me hear from the other side so we can see if there's a dispute.

And, Mr. Sarkar, I know you were patiently standing there the whole time, and maybe you were trying to short-circuit something, but go ahead.

Are we going to have a dispute here or not, do you think?

MR. SARKAR: So I read the initial dispute as being about the Issue 1(c), which recites the words "recipient criteria." That is what they originally objected to and --

THE COURT: Yes. And I will say -- not to interrupt you, but Mr. Saulsbury has now focused on their concern about Limitation 1(k). That wasn't referenced in Postscript's portion of this. They referenced 1(c) and 1(l). That's the thing I looked at and prepared on. Or at least if it was, I didn't catch it.

And so I understand what you're saying there, but -- but what about the substance?

MR. SARKAR: The substance is in 1(c) the subscriber -- the segment of subscribers is defined in accordance with recipient criteria.

THE COURT: Hold on, Mr. Sarkar. I just -- I want to try to make sure we're focused.

I hear Mr. Saulsbury now as saying, look, if they're going to -- whatever it is that they're doing with this -- with this e-mail-received portion of this depiction --

MR. SARKAR: Yes.

THE COURT: -- if they're doing it in service of attempting to prove Limitations 1(c) or 1(l), that is not our concern.

MR. SARKAR:  Okay.

THE COURT:  Our concern is 1(k), and our concern is the limitation of enrolling the first subscriber.

MR. SARKAR:  I would say even in that case, if the objection is really to 1(k) and not 1(c) and 1(l), we have still disclosed that theory, number one, because in 1(c) we defined how the segment of subscribers is defined in accordance with recipient criteria.  We point to e-mail received as one of those recipient criteria.

THE COURT:  So is what your saying -- I'm just trying to frame this to understand is there a dispute.  Tell me if this is right.

You're saying, yeah, Judge, I think there is a dispute.

MR. SARKAR:  I think --

THE COURT:  Even though Mr. Saulsbury has now said he's focused on 1(k) and the limitations of enrolling the first subscriber, I think that is related to the dispute we may have been having in 1(c) or 1(l) because it's talking about who gets -- how do we enroll people or subscribers into this kind of first --

MR. SARKAR:  Yes.

THE COURT:  I'm just trying to use the 1(c) language.  This -- is it this -- the segment of subscribers who are going to receive the initial message?

MR. SARKAR:  Yes, that's exactly right.

THE COURT:  Okay.  And so you're going to say that somehow e-mail received is somehow related to how we do that, including as to 1(k), enrolling the first subscriber?

MR. SARKAR:  Yes.  So to be clear, I don't believe that there's a dispute about 1(c) and 1(l).  I don't think Postscript is arguing that either.  I do believe that there is a dispute with respect to 1(k), and I believe that we are entitled to use this exact image to argue that 1(k) does enrollment of subscriber, because --

THE COURT:  They didn't point to, I don't think they did, but I don't remember it, to Dr. Polish's slides as to 1(k).  In his slides as to 1(k), does he use this?

MR. SARKAR:  I don't believe we actually do, but we do use a source code for that limitation that implements this image.  So, you know, we can address that in the second dispute, which is actually related to that.

THE COURT:  Well, like, again, I'm just trying to figure out what I need to resolve and, you know, it's a moving target a bit, and I appreciate that on your end too, but if Mr. Saulsbury tells me we're only focused on 1(k), we don't like the use of this picture and the e-mail received icon to try to satisfy enrolling the first subscriber in 1(k), and Dr. Polish, when he gets to 1(k), he's not going to be talking about this depiction or e-mail received, then

maybe we don't have an issue.  Is that what you are saying?

MR. SARKAR:  Yeah, that's fair.  We don't have an issue with regard to this image, at all.  And we will be referring to the source code, but not --

THE COURT:  Is that the second bucket of disputes?

MR. SARKAR:  Yes, I believe it is, but they didn't point to 1(k) for that either.  Their dispute regarding that also --

THE COURT:  We haven't gotten there yet.  I am just asking, like, there's a second bucket in dispute about close -- oh, I'm sorry, it is about -- well, there's a second issue they raised in the first bucket?

MR. SARKAR:  Yes, that's right.

THE COURT:  I don't know if that's what you're talking about or what.

Let me just ask, Mr. Saulsbury, based on what Mr. Sarkar said, do you think we have an issue with regard to the use of depiction and the image about e-mail received with regard to Element 1(k), which I think we said was your concern?

MR. SAULSBURY:  I think we do.  I've been trying to close in on it through five different lawyers, and I don't think I've got a response, unfortunately.  It's not merely putting the thing up on a slide while he's talking

about 1(k).  I don't want him to say on the stand, even while he's talking about 1(c), that e-mail received, that's enrolling a subscriber, right, because then that's evidence in the record that satisfies 1(k).

THE COURT:  Am I right, is there or isn't there a connection between enrolling a first subscriber in 1(k) and the concepts discussed in 1(c) and 1(l), which is how we determine or define which people are going to get the initial message?

MR. SAULSBURY:  That's right, Your Honor.  There is a relationship, but that doesn't mean that they have a disclosed argument, that receiving an e-mail is satisfying the enrolment of the subscriber.  Instead, what they point to as enrolling a subscriber is something very different.

It is found at 110 of Exhibit 4, Polish's report.  And what they identified is "viewed a product" is what causes a subscriber to be enrolled.  That's why we don't want to lob in a different theory, that e-mail received --

THE COURT:  I understand that argument because you made it in your letter.  What I'm trying to figure out is, did this really one holistic dispute, which is the holistic dispute is one way or another, whether as to 1(c), 1(k), or 1(l), we think Attentive is attempting to use the concept that e-mail received as a way to prove up the

presence of a limitation that has to do with enrolling subscribers, enrolling subscribers lobbed into 1(k) or 1(c) or 1(l).

And if that's so, then the distinction between, well, we may not have an issue, it doesn't matter, I have to resolve the substance of it, I think you're saying it is the latter, you have to resolve --

MR. SAULSBURY:  It is the latter.  And let me just give one point of nuance going a level down.

It is related in the sense that 1(c) talks about the message flow comprising recipient criteria.  To be clear, we're not arguing that there's a problem with them pointing to e-mail as recipient criteria.  That's sort of incidental subscribing.

Our concern is that Dr. Polish is going to opine that e-mail received is satisfying the enrolling step, which comes later, as Your Honor has pointed out.

THE COURT:  If that was your concern, why --

MR. SAULSBURY:  We did, Your Honor -- we didn't identify the limitation, but what we said, I think pretty explicitly, Your Honor -- this was very clear during the meet-and-confer.  We met and conferred for over a half an hour on this.  What I said is, are you going to rely on this to prove up the enrolling limitations?

THE COURT:  So there's a differences between

enrolling a subscriber, an e-mail received amounting to recipient criteria versus e-mail received having something to do with enrolling the first subscriber?

MR. SAULSBURY:  That's right, Your Honor.

THE COURT:  What is the difference?

MR. SAULSBURY:  The difference is it can be a criteria considered upstream of enrolling, right.  But when it comes to enrolling, the only disclosed argument is that viewed a product is what causes the subscriber to be enrolled.  That's the only thing that they disclosed for Element 1(h).

MR. SAULSBURY:  And I think what is going on here is they have a problem with --

THE COURT:  You mean 1(k).

MR. SAULSBURY:  Thank you.

I think what's going on is they have a problem with that because it doesn't tie together with what they rely on for other elements.  That's why they're trying to lob in at this point e-mail received as satisfying the enrolling requirement.

THE COURT:  And I think the gist of your letter, although you were pointing to language in Element 1(l) of Dr. Polish's invalidity contentions, you say in the prose, there's language that says, in Journeys, dot, dot, dot, the subscriber will be enrolled in the segment of has viewed

products when the subscriber has viewed a product.

MR. SAULSBURY:  That's right, Your Honor.

THE COURT:  You think that's the only disclosure how someone is enrolled?

MR. SAULSBURY:  That's right.

THE COURT:  When the subscriber has viewed a product and we haven't seen a disclosure of a subscriber being enrolled by receiving an e-mail?

MR. SAULSBURY:  That's exactly right.  And I have been asking for it for two days.

THE COURT:  Okay.  Let's hear a response to that from the other side.

MR. SARKAR:  So I think Your Honor hit the nail on the head when you noted that the two limitations are extremely related to one another.

And as Mr. Davis has put up on the screen, we referred back to 1(c) at the end -- this is Exhibit G of Dr. Polish's expert report and that's page --

THE COURT:  You say what exhibit?

MR. SARKAR:  G.

THE COURT:  I thought Exhibit 4 was his invalidity contentions.

MR. SARKAR:  Yes.  So there are two -- so Exhibit G incorporates by reference the document discussed in Exhibit 4.  This is the source code that implements those

documents.

THE COURT:  I'm sorry, is this cited -- is this new information for me?  I'm just trying to figure out what you're talking about.

MR. SARKAR:  It is cited in the documents with respect to the flowstructuremapper.java source code file. But we don't actually have to consider the source code here. We do refer back in Limitation 1(k), back to Limitation 1(c), even in Exhibit 4 that you are currently looking at.

THE COURT:  But I guess on the substance, the assertion is, I think, I'm not saying this is correct, the assertion is you haven't in some way given sufficient notice that when it comes to the concept of enrolling a subscriber, you're going to be relying on the concept of e-mail received as it is depicted in this image that's at issue.

And if you were going to say, Judge, no, we have given them fair notice that our expert was going to rely on that concept of e-mail received as depicted in this image for the process of enrolling a subscriber, and the best place we do that in Dr. Polish's expert report where he sets out his invalidity arguments is blank, where would you point me to?

MR. SARKAR:  So this is on page 3 of our dispute chart.  We highlighted the portion that -- the e-mail received portion of the image that we're discussing, and in

the image itself, in the first bullet, it states, "Double down and target subscribers who are receiving e-mails but not opening them."

Then it says, "tip: This trigger is most effective" --

(Reporter clarification.)

MR. SARKAR:  "This trigger is most effective when paired with branching on e-mail opens or clicks."

But the most relevant part of the image is the first sentence, which I think speaks for itself.  It says that what is shown here is that the e-mail received event is about doubling down and targeting subscribers who are receiving e-mails.

THE COURT:  Again, link it to the particular substance of the dispute.  Judge, I know what they are saying is that we haven't sufficiently disclosed e-mail received as being related to the concept of enrolling the first subscriber as set out in Limitation 1(k).

MR. SARKAR:  I see.

THE COURT:  I'm now pointing you to this text in the image, and I'm going to explain to you why it is that the words there would fairly give rise to the understanding that e-mail received is meant to be related to and a part of the concept of enrolling the first subscriber.  Those words aren't present, so I want to understand the argument.

MR. SARKAR:  Yes.  So in Claim 1 of the '660 Patent, targeting and enrolling are synonymous with one another.  Ms. Frederiksen also gave testimony to that effect.  And when this sentence says, "target subscribers who are receiving e-mails," it talks about plural subscribers.  By definition, if you're enrolling many subscribers, you are enrolling one subscriber.

THE COURT:  Okay.  So tell me if this is right. What I'm saying, Judge, and what you're saying, in the image that -- the text at the top says, "we're going to target subscribers who are receiving e-mails."  That -- that prose would fairly let the other side know that what are we talking about?  We're talking about targeting subscribers who are receiving e-mails.

What does that mean?  It's about targeting them as the people who are going to be a part of the segment who is going to receive the initial message, and it's also going to be understood to be a part of the concept of who is going to be enrolled in for the purposes of 1(k) enrolling the first subscriber.

MR. SARKAR:  Exactly, Your Honor.

THE COURT:  Is that what you're arguing?

MR. SARKAR:  This is the key.

THE COURT:  Is that your argument?

MR. SARKAR:  Yes, and then I just say one more

thing.  We also have an obviousness -- oh, we cite back to Limitation 1(c) for that disclosure in Limitation 1(k) as well.

THE COURT:  In Limitation 1(k) -- is what you're saying now, look, Judge, this image -- or this image that we're fighting about, including the language at the top of it, is in 1(c)?

MR. SARKAR:  Yes.

THE COURT:  It may not be in 1(k), but in 1(k) we cite back to the content of 1(c)?

MR. SARKAR:  Yes, at page 110 of Exhibit 4.

THE COURT:  Of course they'll say, well see, that's so broad, how can we know?  But you're saying technically, that's right.

So bottom line, in 1(k), in his report, does he ever say anything like, hey, enrolling subscribers, the first subscriber has something to do with e-mail received?

MR. SARKAR:  Yes, he says --

THE COURT:  What page?

MR. SARKAR:  It's in the same portion that's shown on the screen.  110.  And he's saying that a POSITA would know that the disclosures -- would have known that a subscriber could be enrolled in the segment of subscribers --

(Reporter clarification.)

MR. SARKAR:  That a POSITA would know that a subscriber could be enrolled in the segment of subscribers who are to receive messages from the flow.

And he's referring back, clearly there, to the language of 1(c), recipient criteria, subscribers who are enrolling in the segment based on those recipient criteria.

THE COURT:  Okay.  All right.  Let me ask, because we only have a few minutes -- let me just ask you, at least to this issue, there was I think an additional issue maybe else -- so let's just ask Mr. Saulsbury if he wants to raise that.

MR. SAULSBURY:  I do, but it's the same issue, there's no disclosure.

THE COURT:  Is the issue there, Mr. Saulsbury -- and you can stay there just to make it easier.  I read the issue as essentially they want to cite "else" as a trigger condition.

MR. SAULSBURY:  That's right.

THE COURT:  We don't think they disclosed "else" as a trigger condition.

MR. SAULSBURY:  Exactly right.  And the last thing I'll say, in the right-hand column where they were supposed to explain where they disclosed, it wasn't identified where they disclosed it in the invalidity conventions, and we weren't told it was going to be a

problem.

THE COURT:  I think they have a line that says, look at the picture.  "Else" is listed -- you know, the document -- the picture is said to be talking about targeting subscribers and then -- and makes reference to triggers, and then you have, like, a picture, including the word "else" in a way that the parties all understand, like that's a trigger condition.  If that happens, then something.  Isn't that -- you could ask about that in depos and stuff.  I think that's the point.

MR. SAULSBURY:  I mean, I suppose.  But there's also -- but first of all, that was not what was explained in the meet-and-confers, but I'm happy to address this at this point.  There's all sorts of stuff in this figure, right.

THE COURT:  Is it fair to say, though -- can I ask, is it fair to say -- I mean, I -- my understanding has been, look, the trigger condition is often depicted as kind of like the thing that's in a box like this that if it happens, then something else happens.

MR. SAULSBURY:  I understand, Your Honor, but they had disclosed trigger conditions.  They had specifically identified disclosed trigger conditions, right, in the prose -- so I think we can understand that to mean those are -- these are trigger conditions we're relying on for our invalidity theory.  This is what you should shoot at

with respect to the invalidity theory.

THE COURT:  Mr. Sarkar, is there anything you want to say about the "else" issue?

MR. SARKAR:  I think it's clear from the --

THE COURT:  Did I accurately articulate your argument to be saying, look, did literally in his report did it say something like "and else could be a trigger condition too," maybe not, but, look, he included this figure, including the limitations talking about trigger conditions. It's depicted in the way the trigger conditions are depicted as the parties understand them.  It would certainly be helpful to be on notice that this is something that could be suggested -- could have asked additional questions about it at depo.  Is that what you're saying?

MR. SARKAR:  Yes.

THE COURT:  Okay.  So you agree --

MR. SARKAR:  Just one point I would add is Ms. Frederiksen actually refers back to Dr. Polish's discussion of precisely these figures and admits she incorporates them by reference in paragraph 27 of her rebuttal and says this is how Journeys works.  So there is no colorable --

(Reporter clarification.)

MR. SARKAR:  That there is no colorable dispute that Postscript did not have notice of these theories.

THE COURT: Okay. I'm going to overrule Postscript's objection with regard to the "else" issue for the reasons that I've articulated and that Mr. Sarkar has articulated in an attempt to move us forward. I think fair notice of course would be better than I think prose, but I think the depiction, for the reasons I've described, would have been sufficient enough to provide notice to Postscript that this could be an assertion. So I'll overrule the objection on that front.

We're right about 9 o'clock. I don't want to go much further.

Mr. Saulsbury, is there anything further you want to say about the enrolled -- the first subscriber issue and whether e-mail received was sufficiently disclosed as relating to that limitation?

MR. SAULSBURY: No, Your Honor.

THE COURT: Okay. Then I'm going to have to pause there. And I'm going to see if we've got our jury.

Yep. Everybody is here.

So I'm going to take a break. I'm going to consider that issue for a minute or two more. I'm going to come out. I'm going to give you a decision, if I can, about that, and then I believe we'll be able to get started with our trial day.

To the extent there are further disputes, we may

have to take those up as they come.

Okay.  The Court will stand in recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

THE COURT:  All right.  Please be seated.  All right.

Look, with regard to this issue -- and I know, one thing as a judge, it's like you have no clue what the people on the other side are dealing with, and judges just think that they do.  It's like, you know, that's a lot of hubris, so I know it's got to be hard in the evenings when you're trying to meet and confer on these issues with a thousand things to do.

I'm just saying the way this remaining dispute was teed up, it really didn't get to the substance, I think, of what ultimately became the issue in an understandable way.  It's hard for us because when preparing early in the morning, it's hard to do that.

So what I first hear now -- I think it's the first time that I really understood the dispute to be crystalized.

And, ultimately, I'm going to overrule the objection from Postscript as to the use of the e-mail received icon or its content or substance in some way as

being put forward to articulate something about how the limitation in, not just 1(c) or 1(l), but 1(k) could be met.

I'm going to do that because I do think at least Attentive has provided enough indication to me as to how this depiction was disclosed in Dr. Polish's expert report, how it was disclosed in a manner that would fairly provide notice that his view was that the e-mail received had to do with determining the subscribers who would be a part of the initial message run and what recipient criteria would be used for that process as it relates to 1(c) and 1(l), which I don't think is in dispute.

And with regard to 1(k), at least in my understanding, it does seem as if there is relation to the enrolling the first subscriber limitation and those portions of the limitations in 1(c) and 1(l).  To the extent there's a distinction there and there is something different about 1(k)'s limitation, that would mean to a party that it wouldn't have been sufficient to make the kind of disclosures that Dr. Polish made that Attentive has relied on.  That wasn't put forward that way in Postscript's raising of the issue.  I don't understand the distinction sufficiently to say, oh, well, even though this concept was raised fairly by Dr. Polish as to recipient criteria and the process of that initial message run being determined, it's different with regard to 1(k) in some way.

And so ultimately I'm going to overrule the objection there and I don't have a basis to preclude what I understand to be the anticipated testimony.

Okay.  With that said, we are ready to bring in our jury.  Any other disputes we'll have to resolve if they come up during the day, and I'll ask my courtroom deputy to do that.

COURT CLERK:  All rise.

(Jury enters.)

THE COURT:  All right.  Ladies and gentlemen, good morning.  Please be seated.  Thanks for your patience.

I had to resolve a dispute with the parties related to testimony today and I have done that, and so we're going to get started now with our presentations for day four of trial.  To do that, I'll turn to Mr. Wood.

MR. WOOD:  Good morning, Your Honor.  Matthew Wood, again for Defendant Attentive.  Attentive calls at this time Mr. David Kennedy, who is Attentive's economics expert.

THE COURT:  All right.  Mr. Kennedy, please come forward and be sworn.

COURT CLERK:  Please raise your hand.  Please state and spell your name for the record.

THE WITNESS:  David Kennedy, D-A-V-I-D, K-E-N-N-E-D-Y.

DAVID KENNEDY, having been duly sworn, was examined and testified as follows:

THE COURT:  Good morning, sir.  I know you've been here.  You've probably seen how important it is to speak loud with our microphones, and I'll ask you to do that.  And I'll ask our questioner to do that as well.

All right.  Mr. Wood.

MR. WOOD:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WOOD:

Q.     Good morning, Mr. Kennedy.

A.     Good morning.

Q.     Would you please introduce yourself to the, jury and tell us a little bit about yourself?

A.     Sure.

My name is David Kennedy.  My wife and I live most of the year in a small town in southwest Montana with our four dogs.  We have six grown children and eight grandchildren.

Q.     What do you do for a living, Mr. Kennedy?

A.     I'm a managing director at J.S. Held, and I specialize in valuing patented technology and also negotiating patent license agreements between licensors and licensees.  And then I also specialize in determining damages in cases like this.

Q.    Just to clarify that last point, in addition to testifying in cases like this, you also negotiate patent licenses in real-world transactions?

A.    Yes, I do.

Q.    And what is your role in this case?

A.    So I'm here to determine a fair amount that the parties should agree to if the '660 Patent is found valid and infringed.

Q.    And did you prepare some slides for us to walk through your analysis that you've done in this case?

A.    I did, and they'll be on the screen as we go through some of the numbers.

Q.    Let's start off -- do you mind just telling us a little bit briefly about your educational background?

A.    Sure.

      I went to the University of Georgia, graduated in 1985, and started working as a CPA out of college.

Q.    How long have you been a CPA?

A.    Well, over 40 years.

Q.    So tell us a little bit about what kind of experience you have in valuing the use of patented technology.

A.    Sure.

      So I have helped people buy and sell patent portfolios.  I bought patent portfolios myself.  I know how to help and determine what the reasonable royalty should be,

and then I've also negotiated over 200 license agreements.

Q.    I see here on this slide a couple references to IAM. Can you tell us a little bit about what those indicate?

A.    Sure.

It's a worldwide organization.  It's called Intellectual Asset Management.  They provide data to intellectual property professionals, and they also have recognitions each year that they hand out to different patent professionals.

Q.    So, Mr. Kennedy, what's being depicted on this slide that you prepared?

A.    So these are some of the companies that I've sat on the other side of the table from and negotiated patent licenses.  I've done it for big companies, small companies, but I thought I would show a few of the ones that you might recognize that I've actually had to get to a final agreement in the real world.

Q.    So you've been on the opposite side of the table in negotiations with these companies; is that right?

A.    Yes, making the decision on behalf of either my company or my client's company.

Q.    And what about this slide that you put together, what's depicted here?

A.    So these are some of -- some of the clients I've worked with over the last 35 years, names you would

recognize.  Obviously you recognize the branches of the military.  I've been hired to help them determine royalty rates for technology they're using in national defence where they have to pay something for that.  And sometimes I end up in the court that specializes in determining what the government should have to pay to vendors to come up with those amounts.

And some of these other companies are companies that have hired me to help them.  For example, Ericsson hired me to determine what their overall portfolio rate should be for their 5G technology, and that's the rate they use today to license their portfolio around the world.

Q.    Mr. Kennedy, are you being compensated for your work in this case?

A.    Well, my company is.  My company bills for the number of hours I work and my staff work on this.

Q.    And is your -- you or your company's compensation dependent in any way on the outcome of this case?

A.    No, not at all.

MR. WOOD:  Your Honor, at this time Attentive Mobile offers Mr. David Kennedy as an expert in the negotiation of patent agreements and the calculation of patent damages.

THE COURT:  So noted.

BY MR. WOOD:

Q.      Mr. Kennedy, you were here yesterday when Postscript presented its own expert, Mr. Kidder, correct?

A.      Yes, correct.

Q.      And are you -- do you have opinions here about the -- the work and the calculations that Mr. Kidder reached in his analysis?

A.      Yes, I do.

Q.      So you were here when Mr. Kidder testified that, according to him, a reasonable royalty in this case would be around $17.5 million?

A.      Yes.

Q.      Do you agree with that analysis?

A.      No, I do not.

Q.      And why not?

A.      Well, Mr. Kidder and I used the same methodology or approach, the income approach, but I just disagree with the inputs that he used.

Q.      So what is the amount of the reasonable royalty that you believe is appropriate when you use the correct inputs?

A.      So it's a range of between 470,000 and $571,000.

Q.      That's -- that's quite a big difference from Mr. Kidder.  Can you talk to us a little bit about how you arrived at such a different number?

A.      Yeah, the best way to look at and completely understand the difference is Mr. Kidder used all Campaign

Composer messages, and that was 94.5% of all messages. That's what you heard from him yesterday.

And it's my understanding, based on Dr. Polish's technical opinion about what actually infringes, is that it can only be the messages within the Campaign Composer that have retargeting. And we heard testimony yesterday, and I've calculated that that is 2.5% of all messages. So that's the big difference between the two of us. We're using the same methodology.

Q.    Mr. Kidder, is it important to calculate a reasonable royalty based on the use that's being made of the invention?

A.    That's what I have done. So that's what the statute requires. This is the patent damages statute, is what I call it anyway. So a reasonable royalty for the use made of the invention. Not all revenue, but the amount of revenue where you're using the technology.

Q.    And is there a framework that the courts require experts to use to determine the reasonable royalty for the use made of the invention?

A.    Yes, it's called the hypothetical negotiation. We heard a little bit about that yesterday.

Q.    And are there rules that you're supposed to apply to the hypothetical negotiation?

A.    Yes. They're the three rules here:

The parties must reach an agreement. You can't

walk out.  So you can't just lay a big number down and say, take it or leave it.  You have to negotiate and get to something both people agree on.

Number two, you have access to all relevant information.  I think we heard that referred to as cards face up.  All of this data that's been produced in this lawsuit and expert opinions on infringement.

And then you also have to assume that the patents are valid and infringed.

Q.    Are there other factors that damages experts consider, in addition to the hypothetical negotiation?

A.    Yes, they're called the *Georgia-Pacific* factors named after a famous patent case where these factors were outlined, and there's 15 of them.

Q.    And did you find all 15 relevant to your considerations in this case?

A.    No.  You need to consider or make a decision about whether they're required or applicable, and I did that.  Out of the 15, I've identified these 7 factors that should be considered in the hypothetical negotiation.

Q.    And why did you find these seven factors to be particularly important?

A.    Well, they relate to, as you can see on No. 5, the commercial relationship.  You can see the profitability of the product in Factor 8.  11, the extent to which the

infringer has used it; and that's getting down to how many of those messages infringed, the extent of the use. And 13 is talking about apportionment, and that's where you need to apportion out noninfringing messages or noninfringing technology. And 15 is the hypothetical negotiation. That's what you do after you walk through the steps and do apply them to the case.

Q.    You were here yesterday when Mr. Kidder testified. Do you recall whether he thought all seven of these factors were relevant?

A.    I -- I was here, yes, and my -- what I recall is that he identified No. 5 and 13 as relevant.

Q.    Okay. So let's focus on those two.

      What is Factor 5?

A.    So that's talking about -- in this case, Postscript and Attentive are competitors. So in a licensing situation, if you're licensing to your competitor, you're probably not going to give them as good a deal. So that has upward pressure on the license -- on the royalty rate that Postscript would be willing to accept.

Q.    And what about the other factor that Mr. Kidder considered, what's -- what's Factor 13?

A.    So that's where you talk -- you're talking about this term called apportionment where you're supposed to carve out noninfringing revenue or products to make sure your royalty

base that you're applying a rate to only includes the infringing products.

Q.    And did you hear Mr. Kidder say in his evaluation of Factor 5 and the competition factor that we were just talking about, Factor 13, deals with apportionment that -- in his analysis, those essentially canceled each other out?

A.    Something to that effect, yes.

Q.    Mr. Kidder's apportionment number is 94.5%, which is about 38 times larger than the 2.5% number that you used. Does that math sound about right?

A.    Yes, that's right.

Q.    In your real-world experience, have you ever seen a competitor agree to a patent license that was 38 times larger than they would otherwise agree to just because they were negotiating with a competitor?

A.    No, never.

Q.    Let's talk a little bit more about this 2.5% number.

        You were here in court when Attentive's chief strategy officer, Mr. Miao, testified that that 2.5% number is actually all of the multi-messages that are sent in Attentive and not just the retargeting messages, which are a subset of that.  Do you recall that testimony?

A.    Yes, that's -- I do.

Q.    So 2.5% is all of the multi-messages and not just the multi-messages that use retargeting.

(Reporter clarification.)

BY MR. WOOD:

Q.    Why did you use that larger 2.5% number in your analysis?

A.    Well, I knew there might be some dispute about -- within the multi-messaging revenues, what might be infringing and what might not be.  So I've used a conservative amount, which is the whole amount.  Of course if it's only 1% of that, then that would be less than half of the number that I've calculated.

Q.    And can you remind us, at least in your understanding, how Mr. Kidder arrived at his 94.5% calculation?

A.    Sure.

He took all of the messages from Campaign Composer and included those as the benefit to Postscript -- I mean to Attentive, and included all those in the damages base.

Q.    And is this the largest difference, in your opinion, between your calculation and Mr. Kidder's calculation?

A.    It is.  Like I said, we took the same approach and so many of the inputs are -- are similar.  And I've done some things differently that we'll talk about, but the -- that's the biggest difference.

Q.    Okay.  Let's look at what is the next input that you

used to calculate the reasonable royalty.

A.    Well, I adopted, or used, Mr. Kidder's 9.19% increase from the test with a number of customers where they saw messages up by 9.19%.  I understand that that was testimony that wasn't all related to '660 technology -- '660 patented technology, but I don't have a way to mark that number down. So I've adopted it and given them the credit for all of the growth.  So that would actually make my number higher.

Q.    And what was the next step in your calculation?

A.    So that's to take the infringing percent of Attentive's messages.  We're calling them infringing, assuming infringement is found, that 2.5%, and multiply it by the 9.19%, and you end up with an increase in all Attentive messages of .23%.

Q.    And what did you do after that?

A.    So I took it -- this is a minor adjustment, but mathematically you need this to -- to accurately state the .23% increase.  So I compared that -- what that would mean is like going from 8 to 10.  So what is that 2% as a percentage of the 10 or the 8.

      So I've done that here and adjust it only slightly to .229%.

Q.    Okay.  And this is a step that Mr. Kidder took in his analysis?

A.    No.  He didn't -- he didn't make that adjustment.

Q.    Okay.  Can you talk to us about what the next step in your analysis was after that?

A.    Sure.

So we've calculated the .229% infringing portion of Attentive's messages, and then I multiply that by Attentive's U.S. profits from infringing, and that's $428.8 million, and that leads to Attentive's benefit that is associated with the infringing technology of $982,000.

Q.    And what do you do next after you arrive at that $982,000?

A.    So like Mr. Kidder, I understand you're going to sit down at the table and negotiate.  So you take that number and then you have to determine how the parties would split that number.

Q.    And what methodology did you use to determine that split?

A.    Well, I did it two ways.  I did it the way Mr. Kidder did it, using what he's called this Rule of 40.  And because that's how he referred to that as the rule of thumb, I wanted to use something else that I've used in real-world negotiations, it's more tied to Postscript's actual profits.  And so I used another methodology to calculate it based on their percentage of profits.  It's actually a higher number for Postscript.

Q.    Okay.  So let's look at the first of those two

calculations.

Q.    Can you walk us through how you did your analysis under the Rule of 40 method that Mr. Kidder used?

A.    Sure.

So we've got the benefit from the previous slide, $982,000, and then there's this growth in revenue from the infringing technology and I've applied that -- or added that to it.  And then like Mr. Kidder did, I subtracted this minimum that Attentive is entitled to under the Rule of 40, and that leads to a royalty of $470,000.

Q.    Okay.  And what about the second method, can you talk to us about how you -- what calculations are involved in your second method?

A.    So, as I mentioned, Postscript and Attentive are competitors, and I think that Postscript would be arguing for a greater share than this rule of thumb, 40%.  So I looked at what their margins are and they make -- on average, they were making about 58% gross margin at -- around the time of the hypothetical negotiation.

So I think that they would demand that, that they would say, well, we at least want to make our gross margin off of this benefit because of all the things we do to help bring that to market.  And so that comes up with a number of $571,000 as a reasonable royalty.

Q.    And that $571,000 that you calculated using your

preferred method is -- is over $100,000 more than the method Mr. Kidder used. Why -- Attentive was the one who hired you to be an expert in this case. Why would you present a number that causes Attentive to maybe have to pay even more money in the hypothetical negotiation than the methodology that Mr. Kidder used?

A.     Right.

       Well, as experts we're supposed to give our independent opinion, and I can't ignore my experience on how negotiations have gone and what they've been based on. And I don't ever base a negotiation on a rule of thumb. I want it tied to numbers. And it does happen to come up with a larger number.

Q.     Okay. So just to sum up, would you just sum up what your ultimate conclusions were with regard to what the results of the hypothetical negotiation would be?

A.     Sure.

       So I think at the end, after considering all the information, that they would agree on a royalty, either the 470,000 or 571,000 based on their profit split. And that's assuming that the patents are valid and infringed. If they're not, you don't even get to damages, so the damages would be zero.

Q.     That was the last question I was going to ask. Just to be clear, Attentive is not claiming that this is the

amount that would be appropriate in damages as far as you understand Attentive's position; is that right?

A.    Correct, yes.

Q.    This is based on the hypothetical negotiation with the assumptions you mentioned.  If the patent is found to be invalid or not infringed, as Attentive contends in this case, what would be the appropriate amount of damages in that case?

A.    Zero.

MR. WOOD:  Pass the witness, Your Honor.

THE COURT:  All right.  Thank you. Cross-examination?

CROSS-EXAMINATION

BY MR. SAULSBURY:

Q.    Good morning, Mr. Kennedy.  How are you?

A.    Morning.

Q.    Good to meet you.

A.    Good to meet you.

Q.    So I want to start by talking about the scope of messages that you calculated the damages on.

You make an assumption as an input to your analysis that 2.5% of messages sent by Attentive are infringing, right?

A.    That -- well, and that's the upper bound, no more than 2.5% are infringing, is my understanding.

Q.      That's right.  That's an assumption you make based on what you were told by Dr. Polish, right?

A.      That's correct.

Q.      Okay.  Now, you haven't done any independent analysis to determine what that percentage should be, right?

A.      No, I have not.

Q.      Right.

        And but you understand for Dr. Polish, that the 2.5% number is based on a table of messages sent that meet a particular retargeting criteria, right?

A.      I'm sorry.  Would you repeat that?

Q.      Certainly.

        You understand that the 2.5% figure that you got from Dr. Polish is based on a table that Attentive created that is specific to particular retargeting messages, right?

A.      Yeah, I guess that it could be characterized that way.  It was Attentive data.

Q.      It was Attentive's data that was specific to a particular type of retargeting message, right?

A.      I believe so, yes.

Q.      Right.

        Now, the reason you made the assumption about 2.5% is because it's important your damages analysis account for all infringing messages, right?

A.      Yes.

Q.    You don't want to leave out messages that aren't infringing because that would be improper, right?

A.    Correct.

Q.    Okay.  And you can agree that you as the damages expert have to assume infringement, right?

A.    Yes.

Q.    Okay.  But you're not assuming that Ms. Frederiksen is correct about what infringes, right?

A.    That's correct.

Q.    Okay.  You're relying on Dr. Polish to define the scope of what infringes?

A.    Correct.

Q.    Okay.  Now, you understand that Ms. Frederiksen said that Campaign Composer as a system infringes, right?

A.    I heard testimony about that yesterday, correct.

Q.    Right.  Not just certain messages, right?

A.    I believe that was her -- some of her testimony, yes.

Q.    Right.  We both heard it, right?

A.    Sure.

Q.    Okay.  But your damages opinion doesn't take that into account because you were relying on Dr. Polish's representations about what infringes, correct?

A.    That's correct.

Q.    Okay.  And in fact, the 2.5% number you used is based on just one of three drop-down menu options in Campaign

Composer, right?

A.      Yeah.  I'm not sure what the drop-down -- what drop-down you're referring to.

Q.      No problem.  We can help with that.

All right.  You were here when Ms. Frederiksen was talking about this drop-down menu of different retargeting options, right?

A.      Yes.

Q.      Okay.  Great.

And so you heard Ms. Frederiksen testify that although she was going to walk through a particular example in her analysis, that -- to illustrate infringement, each of these three retargeting criteria operated essentially the same way, right?

A.      Yeah, I heard her testimony, but I'm not a technical person, so I don't know exactly how to interpret what she said.

Q.      So I understand that with respect to, you know, details about source code and stuff.  I'm talking very high level, right.  We were both here when she testified that she was going to walk through one particular example, but all three of these retargeting criteria operate in essentially the same way.  You heard her say that, right?

A.      Yeah.  I just don't recall exactly what she said.  I'm not saying she didn't, but I just don't recall her exact

words.

Q.      Fair enough.

        MR. SAULSBURY:  And, Mr. Glass, that's actually okay.

BY MR. SAULSBURY:

Q.      So you're saying you don't -- you don't recall one way or another what Ms. Frederiksen said about this?

A.      Yeah, I remember her talking about it, but yeah, I don't know exactly how she said it, and I'm not saying that -- I'm not disagreeing with you.

Q.      Sure.  And I want to be clear about the data that you relied on with respect to the 2.5% number you got.  That was in a spreadsheet prepared by Attentive that was labeled ATT_947074, correct?

A.      Yeah, I don't know if that's the label number or not --

Q.      Certainly.

A.      -- off the top of my head.

Q.      I apologize.  I can help with that too.

        If you can open up your binder and turn to CX-27, that's your rebuttal report.  And I'd like to direct you to paragraph 89, which is on page 23.

A.      Which tab, I'm sorry?

Q.      Sure.  It's the tab that says CX-27.

A.      Got it.  And what page?

Q.     Page 23, that contains your paragraph 89.

A.     Okay, I'm there.

Q.     You said, "Attentive has reduced a monthly count of campaign messages which included "A retargeting aspect sent for the period of January '21 through October 2024."

            (Reporter clarification.)

            MR. SAULSBURY:  Sorry.

            "Retargeting aspect sent for the period of January '21 to October 2024."

BY MR. SAULSBURY:

Q.     And then you have a Footnote 94.  And then off of that footnote, you cite ATT_947074.  Do you see that?

A.     Yes.

Q.     Okay.  But that citation of yours was actually a mistake?

A.     I'd have to see the document to know.

Q.     Well, I can do better than that.  I'm going to give you the errata that you served on us.

A.     Okay.

Q.     Okay.

            MR. SAULSBURY:  So may I approach, Your Honor?

            THE COURT:  You may approach.

            MR. SAULSBURY:  Okay.

            THE WITNESS:  Thank you.

BY MR. SAULSBURY:

Q.      All right.  Mr. Kennedy, you recognize this as an errata to your report that you served on October 29th of 2024, right?

A.      Yes.

MR. SAULSBURY:  Okay.  Move to admit CX-28.

THE COURT:  Is there any objection?

MR. WOOD:  Your Honor, this is -- this is his expert report.  We've -- I don't believe it would be appropriate to admit this.

MR. SAULSBURY:  And, Your Honor, I withdraw that.  I'm going to move on just in the interest of time.

THE COURT:  The question was withdrawn, so the objection is moot.

BY MR. SAULSBURY:

Q.      Mr. Kennedy, we were talking about the mistake in your citation, right?

A.      Yes.

Q.      Take a look at paragraph 4 of your errata.

A.      Yes.

Q.      Do you see how it says --

(Reporter clarification.)

MR. SAULSBURY:  I apologize.

BY MR. SAULSBURY:

Q.      In the rebuttal report, you cited a document produced as ATT_947047, but we inadvertently transposed the final two

digits as ATT_0947074.  Do you see that?

A.    Yes.

Q.    Okay.  So we're on the same page so that the document that you relied on from Attentive that has those retargeting messages, that was produced at ATT_947047, right?

A.    Yes.

Q.    Okay.  And that's what you relied on for your 2.5%, right?

A.    Correct.

Q.    Okay.  Now, in your deposition, you couldn't explain what the difference was between the messages included in Dr. Polish's 2.5% and the rest of the campaign messages Attentive merchants sent, right?

A.    Yes, correct.

Q.    Okay.  And that's because you can't differentiate between infringing and noninfringing messages, right?

A.    That's right.

Q.    Okay.  And you also didn't do any analysis to determine whether the ability to send retargeting messages in a campaign resulted in an overall increase in messages sent, right?

A.    That's right.

Q.    Okay.  Why don't we switch gears a little bit because I'd like to talk now about your damages number, right.  The one that has the upper bound of $571,000.

Let's start by how you ended up at that number.

You first calculated Attentive's total US messaging revenue from July 2023 through June 2025, right?

A.    Yes.

Q.    And that total number is $562 million, right?

A.    Yes.

Q.    Okay.  And you performed a variety of calculations, including multiply by a royalty rate, you'd end up with a final lump sum, a reasonable royalty figure of $571,000, right?

A.    That's the total of what the, I guess, royalties would have been.

Q.    Sure.

So your final damages figure of $571,000 represents about a tenth of 1% of the number you started with, the $562 million number, right?

A.    Of their overall revenue?  Yes.

Q.    Right.

And to be clear, one-tenth of 1% is one one-thousandth of that number, is what you contend should be damages?

A.    Yes.  Well, my number is what I believe relates to the portion of that 500 million that could arguably have benefited from the technology.

Q.    Understood.  And I apologize.  I'm asking you for

math because you're a numbers guy.  That's one one-thousandth of the number, right?

A.      That sounds right, yes.

Q.      Okay.  And just to be clear, one moment -- now, Dr. Polish (sic), you're being paid $725 an hour for your work in this case, right?

        Your company is being paid $725 an hour for your work in this case, right?

A.      I think you have me confused with -- did you say Dr. Polish?

Q.      If I did, I apologize.  His rate is 725.  Your rate is $900 an hour, right?

A.      That's correct.

Q.      Thank you for clarifying.

        And overall for your work in this case, your company has billed Attentive over $500,000, right?

A.      I believe so, yes.

Q.      Okay.

A.      I don't do the billing, but I think it's a fair estimate.

Q.      Sure.

        And notwithstanding that, you think, despite all the evidence of infringement, Attentive should have to pay for damages only about the amount of money Attentive paid you to be an expert in this case?

A.    Yeah, they aren't connected in any way, but that's coincidental.

Q.    That's right.  Thank you.

          THE COURT:  All right.  Any redirect?

          MR. WOOD:  Very briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MR. WOOD:

Q.    Mr. Kennedy, were you here when Mr. Kidder testified that his rate in this case is about $700 an hour?

A.    Yes.

Q.    I don't think he got into it, but would it surprise you if his overall billing in this case was substantially lower than what your firm has billed for your expertise in this case?

A.    No.

Q.    Can we pull up PTX 6.25.

          This is the image we were looking at just a second ago with my colleague.  I believe the suggestion was that these are three messages that Ms. Frederiksen has asserted, three types of retargeted messages that Ms. Frederiksen has pointed to as potential retargeting messages.  Is that what you took away from that exchange?

A.    I think so.

Q.    If we look at these three, the first one says, "Did not click the previous message"; is that right?

A.    Yes.

Q.    And can you read the second one?

A.    "Recipients who did not open the previous message."

Q.    And the third one?

A.    "Recipients who clicked the previous message and did not purchase."

Q.    All three of those have a reference to a previous message?

A.    Yes.

Q.    Does that -- does that cause you to question at all your understanding that in order to be an infringing message there has to be more than one message sent?

A.    No.

Q.    And there was some suggestion that -- I think that you were told this is the number of infringing messages. You got your understanding from a technical perspective of the type of message that was accused of infringement from Dr. Polish; is that right?

A.    That's right.

Q.    And based on that, were you provided access to all of Attentive's messaging for your own independent review?

A.    Yes, from all of these messages, I determined the 2.5% number.

Q.    It didn't come from Dr. Polish?

A.    No, it comes from Attentive data.  And it's -- 2.5 is

about the mid point of the range of the percentage of

retargeting type messages, campaign messages as compared to

all messages.

Q.    Okay.  So you looked at the month-to-month and took

the average?

A.    Yes.

Q.    And that was the analysis of you and your company?

A.    Correct.

          MR. WOOD:  No further questions.

          THE COURT:  All right.  Thank you.  You may step

down.

          THE WITNESS:  Thank you, Your Honor.

          MR. SARKAR:  Defendant would like to call

Dr. Polish to the stand.

          THE COURT:  All right.  We'll have Dr. Polish

come up and be sworn.

          MR. SARKAR:  May we approach the witness?

          THE COURT:  You may.

          COURT CLERK:  Please raise your right hand.

Please state and spell your name for the record.

          THE WITNESS:  Nathaniel, N-A-T-H-A-N-I-E-L,

Polish, P-O-L-I-S-H.

          NATHANIEL POLISH, having been duly sworn, was

examined and testified as follows:

          THE WITNESS:  Good morning, sir.

DIRECT EXAMINATION

BY MR. SARKAR:

Q.      Good morning, Dr. Polish.

A.      Good morning.

Q.      Please introduce yourself to the jury.

A.      Sure.

My name is Nathaniel Polish, and I was hired by Attentive to provide opinions on infringement and invalidity in this case.

Q.      Please tell the jury a little bit about your background education and your work experience.

A.      Sure.

I have four degrees from Columbia University, including a PhD in computer science that I received in 1993. Out of high school I started a computer technology development firm initially called NPS Associates, and then changed to a somewhat better name of Deadalus Technology Group.  Deadalus was sort of the Greek God of inventing. And that company provides research and development outsource to a variety of mostly small companies --

(Reporter clarification.)

THE WITNESS:  Mostly small companies developing their early-stage products.  From time to time we create our own technology and spin off separate companies, which we sell, and I also through that company do some expert witness

work such as this.

BY MR. SARKAR:

Q.    And, Dr. Polish, are you a member of, like, any professional societies?

A.    Yes.  I'm a member of the IEEE, which is the Institute of Electrical and Electronics Engineers, and the ACM, which is the Association for Computing Machinery.

Q.    And would you consider yourself an expert in computer technology and web-based programming?

A.    Yes.

Q.    And have you served as an expert in the past in the fields of computer technology and web-based programming?

A.    Yes, I have.

        MR. SARKAR:  Your Honor, defendant respectfully proffers Dr. Polish as an expert in the field of computer technology and web-based programming.

        THE COURT:  So noted.

BY MR. SARKAR:

Q.    What does an engineering experience have to do with penguins?

A.    That's just an amusing project.  We've done hundreds and hundreds of projects over the decades.  One particularly notable one was a project we started in '94 and continued until 2018 where we developed technology used for tracking penguins in Antarctica.  We stick an RFID tag in the

penguins, and we have a scale which is deployed on the ice to get solar power and track penguins as they cross back and forth and weigh them, and this is a somewhat old photo of me debugging some software in a tent with penguins all around.

Q.      Thanks, Dr. Polish.

And I understand that you have some opinions regarding whether or not Attentive's Campaign Composer infringes the asserted claims of the '660 Patent, that is, 4, 6, 10, and 14?

A.      Yes.

Q.      And what is your opinion?

A.      So my opinion is that -- is that those claims are not infringed.

Q.      Dr. Polish, please explain for the jury what Attentive needs to show in order to prove that a given claim is not infringed?

A.      So a given claim has multiple elements in it, and all that Attentive has to show to prove noninfringement is that a single element is missing.  If multiple elements are missing, all the better, but all you have to show is that a single element is not present in the accused products.

Q.      Dr. Polish, you've showed here that Elements 1(c), 1(l), 1(n), and 1(o) are missing; is that right?

A.      That's correct.

Q.      And at a high level, why are they missing?

A.      So all four of those elements involve a trigger condition.  I've highlighted that in yellow here.  So all of them involve some aspect of dealing with a trigger condition, and since there is no trigger condition within the Campaign Composer product, these four elements are not found in the product and, therefore, there is no infringement.

Q.      You said that there are no trigger conditions in the campaign product.  Why do you think that?

A.      Well, I've looked at the product, I've looked at the source code for the product, I've looked at all sorts of evidence, and my understanding of the product is that it has -- is that it sends messages based upon the passage of time and not based on -- and not based on a trigger where a trigger has to be some sort of user action that causes a message to be sent.

Q.      I see, Dr. Polish.  What about Claims 4, 6, and 10?

A.      So Claims 4, 6, and 10 are what are called dependent claims.  So they all start off with the system of Claim 1 and then add more to it.

        So, in effect, each of those claims includes everything in Claim 1 and then tacks on some additional stuff, so since I will show that Claim 1 doesn't infringe, Claims 4, 6, and 10 also can't infringe.

Q.      I see.

Let's turn back to Claim 1.

MR. SARKAR:  And we're looking at, Marco, the highlighted limitations on the screen.

BY MR. SARKAR:

Q.    And these are again the limitations that you argue are missing.  That's Claim Limitations 1(c), 1(l), 1(n), and 1(o); is that right?

A.    That's correct.

Q.    Can you describe for the jury how Campaign Composer works?

A.    Sure.  Well, this is a -- this is a screenshot from the user interface for Campaign Composer that allows a campaign author or a user to create a campaign.  And you can see from here that they can set up a campaign involving the audience, so sends to is text subscribers and excludes sunset subscribers.  You can set up when to send it, which provides a date and time and then what the message will be.

Q.    And, Dr. Polish, did you review any Postscript documents that lead you to believe that those limitations are missing from Campaign Composer?

A.    Yes.  I looked at a number of documents that I received from counsel that included documents from Postscript, including a spreadsheet that's partly reproduced here.

Q.    And, Dr. Polish, what does this spreadsheet say about

what's missing from Campaign Composer?

A.    Okay.  So just a little bit of background on this spreadsheet.  The columns are -- on the right there's Attentive, and then the next one is Postscript.  So this seems to be analysis of Postscript's products compared to Attentive's products.  And then on the rows are different features.

So the one that I've marked off in yellow here is something called subscriber response branching.  And it says in the Postscript column that Postscript has this and that Attentive does not have it, but then "(this is supported on Automation, slash, Journeys but not Campaigns)."

Q.    I see that, Dr. Polish.

And did you review the testimony that Alex Meyer gave in this courtroom?

A.    Yes.

Q.    And Alexander Meyer was the inventor of the '660 Patent?

A.    Yes.

Q.    And you heard him agree that this spreadsheet does say that Campaign Composer are missing these elements; is that right?

A.    Yes, I heard him say that.

Q.    Thank you, Dr. Polish.

Dr. Polish, let me turn your attention now back to Campaign Composer, and let's do it in a slightly different order.

Let's look at Element 1(l), which is the monitoring a trigger condition limitation.  You heard Ms. Frederiksen testify that Campaign Composer practices this element because it allows messages to be sent to recipients who clicked the previous message and did not make a purchase, right?

A.     Yes, I heard that.

Q.     Do you agree with her?

A.     No, I don't.

Q.     Why?

A.     So -- this user interface here is defining what the patent talks about as the recipient criteria, not a trigger.  So it's saying who is supposed to get a message, when it's time to send a message.  So this -- this interface for Campaign Composer lets you define what's called a segment, which is the group of people who would get a message, not -- but not when they get a message.  So that is not a trigger.

Q.     I see, Dr. Polish.

So what Ms. Frederiksen is pointing to simply describes who will get the message, but does not describe what will cause that message to be sent; is that right?

A.     That's correct.  This has -- this has nothing to do

with causing a message.  This just says when that message is caused to be sent, who will get it.

Q.     And, Dr. Polish, how do we know that these -- that these actions, namely clicking a message but failing to buy something, doesn't cause that message to be sent in Campaign Composer?

A.     Well, there's a number of ways that -- that we know it, including looking at source code and looking at the system.  But we also have heard testimony, I think it was one of the recorded depositions from the other day, that talked about that these messages are timed events unrelated to each other.

So individual messages are sent based upon trigger conditions -- based upon time, and particular people will receive those messages, but they're not related to each other.

Q.     And, Dr. Polish, did you see Ms. Frederiksen put up any source code that shows that that's not true?

A.     No.

Q.     And let's go to Claim Element 1(j).

Dr. Polish, why do you believe that Campaign Composer does not satisfy these elements highlighted, that is Claim Element 1(g) and 1(j?

Actually, we can -- sorry, Dr. Polish.

Is this the testimony that you were referring to

from Jesse Greenberg?

A.      Yes, it is.

Q.      And why does it support your opinion that Claim Elements 1 -- that Campaign Composer does not disclose trigger conditions?

A.      So -- and I remember him saying this in the recording.  The scenario that he was describing was one where there was a message that was cued up to be sent, based upon time, and that the time would come and it would be appropriate to send the message, and then it would discover that there was nobody in the segment to receive the message.

So the system would go about sending a message and then would essentially do nothing, but it would mark the message as having been sent within the system.  He referred to it as a bug.  I think it did the right thing.  It was just -- and they have -- and it still does this to this day apparently, but it's just a very inefficient way to run.

Q.      Now, Dr. Polish, you said that Mr. Greenberg called this a bug.  Aren't "bugs" anomalies?

A.      Well, bugs are suboptimal behaviors.  These are things that aren't -- that aren't quite right.

In this particular case, I think it's clear that if there's no recipients for a message, that probably is a waste of time to run through the code to see about sending a message.  So in that sense, I think he views it as a bug.

Q.    So in this case, Dr. Polish, the bug describes how the system works?

A.    Well, the fact of the bug and how he describes it proves out that, in fact, the thing that causes a message to be sent is the passage of time and not a particular user event that's going to be a trigger.

Q.    I see, Dr. Polish.

And what are you trying to show on this slide?

MR. SARKAR:  And so we're going to present some source code.  We are fine with keeping the courtroom unsealed, but we are going to submit these excerpts as sealed exhibits, if there's no objection from the other side.

MS. DURIE:  That's fine.  No objection.

THE COURT:  All right.  No objection.

MR. SARKAR:  So we're moving to admit the --page 94 of the source code exhibits.  It's DTX --

MR. DAVIS:  That's already been admitted.

THE COURT:  I understand the exhibit is already in evidence.

MS. DURIE:  It is.

BY MR. SARKAR:

Q.    And, Dr. Polish, what are you trying to show on this slide?

A.    So the notion that Campaign Composer calculates the

audience based on the event data of a subscriber when a Campaign message needs to be sent is -- is important to understanding the distinction between a recipient criteria and a -- and a trigger. I'm using the language really of the patent. That the Campaign Composer system actually doesn't know who is going to receive the message until the time has come to send the message. So it doesn't actually calculate the audience or the people who are going to be sent the message until the message needs to be sent.

So the notion that somebody doing something or failing to do something is causing a message to be sent isn't correct. What causes it is the passage of time, and then the system figures out who is eligible to receive that message.

Q.    And why is it your opinion that Campaign Composer also does not disclose Claim Element 1(n)?

A.    Well, again, there's no -- again, there's no trigger condition. So the idea -- the idea that is being conveyed in the patent here is that you're getting subscriber events coming in -- the system is trying to figure out whether they are a trigger and should, therefore, send a message. And since Campaign Composer doesn't do that, it doesn't have trigger conditions, so it doesn't determine if one or more new subscriber events meet the trigger condition.

Q.    I see, Dr. Polish.

MR. SARKAR:  And, Marco, could you please pull up the claim construction for the monitoring limitation?

BY MR. SARKAR:

Q.    And you heard Ms. Frederiksen describe the Court's construction for monitoring the trigger condition limitation?

A.    Yes.

Q.    And given that construction, does that change anything about your opinions that Claim 1 is not infringed by Campaign Composer?

A.    No, it doesn't change my opinions at all.

Q.    And why is that?

A.    Well, the Court's construction talks about -- let me just read it, "Tracking whether a trigger condition for a message has occurred through continuous, repeated, or periodic detection of one or more event-trigger candidates associated with a trigger condition."

So there are no trigger conditions.  The recipient criteria that are talked about in Campaign Composer are not continuously, repeatedly, or periodically compared to -- to the prospective audience.  The comparison only takes place when the timer goes off and it's then timed to see about sending a message.

Q.    I see, Dr. Polish.

And why is it your opinion, Dr. Polish, that

Campaign Composer ultimately does not satisfy Claim Element 1(o)?

A.     Well, again, the -- so this is -- this is actually transmitting the message in response to a trigger condition. And as we've seen, messages are transmitted based upon a timer.  So the timer goes off and the system looks at who the prospective recipients are and then sends a message. It's not in response to a trigger condition or a particular user event that it has received.

Q.     I see, Dr. Polish.

       And, finally, why do you believe that Campaign Composer does not infringe Claim Element 1(c)?

A.     So 1(c) is -- in this element, this is talking about a user interface and it's talking about allowing you to create recipient criteria and it's saying it's allowing you to create a trigger condition, but the Campaign Composer has a user interface that gives you the ability to have recipient criteria but no trigger condition.  There's no trigger condition as part of what Campaign Composer does.

Q.     And what are you trying to show on this slide?  I see you have both Claim 1 and Claim 11 up.

A.     Right.

       So claim -- we talked a moment ago about dependent claims.  These two claims are both independent claims, but, in fact, Claim 1 and Claim 11 are nearly the

same.  The language is identical through most of it, and I've compared side by side the four elements that I'm saying are missing and I'm just showing that the same ones that are missing in Claim 1 are also missing in Claim 11.

Q.    And, Dr. Polish, I see here that you've highlighted some differences between Claim 1 and Claim 11.  Can you elaborate?

A.    Sure.

So Claim 1 is a system where it's talking about a computer system, so it has -- it calls out a memory and a processor that runs code, and Claim 11 is talking about a computer-implemented method.  These are very similar sorts of things.  It's just one is talking about the physical objects on which this is running, and the other is talking about just the software that's running on it.

Q.    I see, Dr. Polish.

And what about Claim 14?

A.    Well, Claim 14 is the actual asserted claim here, and it is a dependent claim on Claim 11.  So it is just showing that since Claim 11 is not infringed, Claim 14 can't be infringed.  Claim 14 deals with webhooks and API notifications, but it doesn't really matter here because Claim 11 isn't infringed, so Claim 14 can't be infringed.

Q.    I see.

And so, Dr. Polish, in your opinion, none of the

asserted claims are infringed by Campaign Composer, right?

A.    That's correct.

Q.    Now let's turn, Dr. Polish, if you would, to your opinions regarding the invalidity of Claims 4, 6, 10, and 14.

And I understand that, you know, you've prepared some more demonstratives to support your opinion.

A.    Yes.

Q.    Before we get into the substance, Dr. Polish, do you have any patents yourself?

A.    Yes.  I think I have 12 patents issued and 2 or 3 in prosecution.

Q.    And you've testified as an expert in patent cases several times before?

A.    Yes.

Q.    And in those cases, did you ever see a patent invalidated?

A.    Yes, I have.

Q.    And how did that patent get invalided?

A.    Well, in that particular case, it was an issued patent, and I found some art that came from years before the patent was -- was issued, and it did exactly what was in the patent and I brought it into court and showed the jury that this -- that this prior art system did exactly what was in the patent.  And the jury found that it was invalid.

Q.     And, Dr. Polish, if a patent is invalidated by a jury, does that -- what does that say about -- about that patent?

A.     Well, it says that the Patent Office made a mistake in granting it.  It doesn't mean that anybody necessarily did anything wrong.  It just means that the Patent Office had limited time and scope to look for prior art and that the people who are -- who are -- the defendants in the case that are motivated to find prior art, more perhaps than the Patent Office, and they find it.

Q.     Is it the case that all patents that are invalidated were once issued by the Patent Office?

A.     Of course.  Otherwise they wouldn't be issued patents.

Q.     I see, Dr. Polish.

       Now, Dr. Polish, have you formulated an opinion as to whether the asserted claims, that is 4, 6, 10, and 14, of the '660 Patent are invalid?

A.     Yes.  My opinion is that -- that all four asserted claims are invalid.

Q.     And at a high level, Dr. Polish, why is that your opinion?

A.     Well, at a high level, the concepts in -- in the '660 Patent are not -- are not new and I have -- I have here several systems that predate the filing date of the '660

that do everything that's in the accused -- in the asserted claims of the '660.

Q.    And let's briefly --

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And I see here that one of the references that you have described as invalidating the '660 Patent is Journeys; is that right?

A.    That's right.

Q.    And at a high level, Dr. Polish, what are you trying to show on this slide about why Journeys invalidates the '660 Patent?

A.    So this is a diagram from Journeys and this is showing that, that Journeys has -- has branching that's based on triggers.  So this particular case is an abandoned shopping cart flow, which we've heard about before, where you start up at the top, adding something to a cart, then some time goes by, and if -- if you've made a purchase, which is a user action, then it exits the journey and does nothing, but if 20 minutes goes by and you haven't made a purchase, then it causes a message to be sent, a text message reminding you that you have something in the cart.

Q.    I see, Dr. Polish.

And in this image shown here, what is causing the text message to be sent?

A.    The action or in this case lack of action of the user.  So it's -- if a user purchases, then no message is sent, and if the user -- if the user doesn't purchase, then a message is sent.

Q.    Dr. Polish, at Step 2 I see a reference to waiting for 20 minutes.  Now, you'd agree that that's the passage of time, right?

A.    Yes, that's -- yes.

Q.    Why is that not a trigger condition in Journeys?

A.    Well, because the time there isn't the cause, it's -- it's the putting something in the cart and it's the purchasing if -- if you do -- putting in the cart and purchasing, then no message is sent.  If you put it in the cart and don't purchase, then a message is sent.

Q.    I see.

      So the actions of adding something to the cart and making a purchase or not making a purchase, those are what cause the message to be sent, not the wait for 20 minutes shown in Step 2?

A.    That's correct.

      MR. SARKAR:  Next slide, please.  Actually, let's go back to the last slide real quick.

BY MR. SARKAR:

Q.    And, Dr. Polish, what is the date of the document that you were describing here?

A.      This is from May 16th, 2021.

Q.      And when is the priority date of the '660 Patent?

A.      October 12th, 2022.

Q.      So this is about a year and six months or so before that date?

A.      That's right.

Q.      And you were here again to listen to the testimony of Alexander Meyer, the inventor of the '660 Patent?

A.      Yes.

Q.      And he testified that he hadn't even begun working on Campaign Flows, the product that contains the '660 patent, before August 2021?

A.      Yes.

Q.      And so this is six months even before that date, right?

A.      That's right.

Q.      Thank you, Dr. Polish.

        Dr. Polish, and this I understand is the Klaviyo Flows reference?

A.      On the left is the Klaviyo Flows reference, and on the right is Figure 8(b) of the '660 patent.

Q.      And why at a high level, the Klaviyo Flows, in your opinion, invalidates the '660 Patent?

A.      Well, at a high level it is doing everything it is describing in this '660 patent.  This -- this comparison is

showing the user interface for Klaviyo, which has -- which has triggers in it, it has -- it has branching, and then it has messages being sent.

So it's got -- it's got the elements of the '660, and you can see as it happens, the diagram from the patent is strikingly similar.  The blue part that I've highlighted is also showing trigger conditions and branching, or slip, they call it here, and then different flows depending on what the user does.

Q.    I see, Dr. Polish.

And could you go to DTX-603 in your binder, if you have that ready?

A.    Excuse me, you said 603?

Q.    Yes.

MS. DURIE:  I don't have that in my binder.

BY MR. SARKAR:

Q.    So, Dr. Polish, DTX-603 is a video that you're relying on to compare Klaviyo to the '660 Patent?

A.    Oh, yes.

Q.    So it wouldn't make sense for that to be in your binder.

I see, Dr. Polish?

MR. SARKAR:  Attentive moves to admit DTX-603, which is the video.

MS. DURIE:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 603 was admitted into evidence.)

BY MR. SARKAR:

Q.    Now, Dr. Polish, I see that you have up on the screen two branches marked in purple on the left for Klaviyo Flows and on the right for '660 Patent.  What are you trying to show with that?

A.    Okay.  So the branching in the Klaviyo case is -- is based on a conditional, based upon what a user is doing.  And if the person has -- has signed up, you get a welcome e-mail, and if the person hasn't signed up, then you just exit.

Q.    I see, Dr. Polish.

MR. SARKAR:  Can we go back a slide, Marco?

BY MR. SARKAR:

Q.    And, Dr. Polish, do you have DTX-595 in your binder?

A.    Yes.

Q.    And what is that -- did you rely on that document for your opinion that Journeys invalidates the '660 Patent?

A.    Yes, I did.

MR. SARKAR:  Let's move on, Marco.  Next slide, please.  And so -- next slide, please.

BY MR. SARKAR:

Q.    I see -- just -- I see that you grouped the first

three elements together with respect to why you believe Attentive Journeys' product invalidates the '660 Patent. Why did you do that?

A.    All right.  So we're going to go through each element of the claim, but these first three really just pertain to the fact that this is a computer program running on a computer.  So it's a system.  It's -- it's got memory.  It's got a processor that runs code.  So those are -- those are satisfied just by virtue of the fact that Journeys is a computer program running on a computer.

MR. SARKAR:  And let's -- next slide, please.

BY MR. SARKAR:

Q.    And I see here you have Limitation 1(c) highlighted.

A.    Yes.

Q.    What does this limitation --

MR. SARKAR:  Go to the next slide, Marco.

BY MR. SARKAR:

Q.    What does this limitation mean?

A.    So this, as I mentioned before, is kind of a big; limitation.  It's talking about a user interface.  So we've seen the user interface.  It involves being able to configure recipient criteria to define a segment of subscribers, to receive messages, and it involves creating trigger conditions.  So we have to have all three of those things to satisfy this element.

Q.    I see, Dr. Polish.

            And could you go to DTX-594 of your binder?
It's DTX-594.

            THE COURT:  I'm not sure that's in the binder.

            MS. DURIE:  It's not.

BY MR. SARKAR:

Q.    All right.  Dr. Polish, is what you're showing on the
screen an extract from a document that you relied upon for
your opinion?

A.    Yes, it is.

Q.    And what does this slide show about the user
interface in Journeys?

A.    Well, this is -- this is -- this is an introductory
document for Journeys, and it talks about how there's a UI.

Q.    I see.

            MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what does this slide show?

A.    So this is talking about how the UI allows you to
create what they call a dynamic segment.  So what this is,
is it allows the user to say who is going to be in the
segment, meaning who is going to be eligible, who is going
to be able to receive messages.  So that can be created
through this user interface, so therefore, it's creating
recipient criteria governing who is going to be in the

segment.

Q.    I see, Dr. Polish.

And what does this document say about the claim language that you're trying to match it up with?

A.    Well, this is, in fact, using essentially the same language, much of the same language that was in the claim. It's talking about segments, meaning groups of -- of users, and it is talking about it being dynamic, which is based upon message flows.

Q.    Do you have PTX-162 in your binder?

A.    I don't think so, no.

Q.    That's fine.

And this is a document that you have relied upon for your opinion that Attentive Journeys does not -- that Attentive Journeys' product invalidates the claims of the '660 Patent; is that right?

A.    Yes, it is.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what is -- what is shown on this slide?

A.    Right.  So this is the actual user interface involving dynamic segments, so it allows somebody constructing a journey to create these segments and create dynamic segments.

It also, you can see on the lower one, there are

dynamic segments, and there's manually uploaded segments. So that would be an example of you getting a static list of subscribers, but in the dynamic case, it's based upon getting updates from time to time about these particular users.

Q.    I see, Dr. Polish.

And you've reviewed Ms. Frederiksen's rebuttal report to your opening invalidity report; is that right?

A.    Yes.

Q.    Do you recall her saying that she thinks that Journeys does not have segments?

A.    Yes, she did say that.

Q.    Journeys actually has two, at least two different types of segments, right?

A.    Yeah.  I don't understand why she believes that Journeys doesn't have segments.  She has other opinions, but I think it's pretty clear that Journeys has segments.

Q.    And then at the bottom of that screen, you see a third segment which said, "connect a segment from Klaviyo"; is that right?

A.    Yes.

Q.    This would imply Klaviyo also has segments; is that right?

A.    Yes, it would imply Klaviyo has segments and that information can be brought from Klaviyo into Journeys to

define segments.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And I see what you have -- what are you trying to show?

MS. DURIE:  Objection, Your Honor.  This slide had been withdrawn during the meet and confer.

THE COURT:  All right.  Take down the slide while there's an objection.

MR. SARKAR:  You just overruled their objection with regard to 1(l) and 1(c), Your Honor.

THE COURT:  I'm sorry.  Why don't we go to sidebar.

(Discussion off the record.)

THE COURT:  Okay.  So there is no objection?

MS. DURIE:  It's withdrawn.

MR. SARKAR:  We're withdrawing the slide.

THE COURT:  I'm sorry.  Let me just finish.

There was no pending objection because the slide had been withdrawn and the objection has been withdrawn?

MS. DURIE:  Correct.

THE COURT:  Okay.  You may continue, Mr. Sarkar.

BY MR. SARKAR:

Q.    What are you trying to show with this slide, Dr. Polish?

And this applies to the Limitation 1(l).

let's --

A.     Can you show me the text of Limitation 1(l)?

Q.     Yeah.

MR. SARKAR:  Can you put up the text of Limitation 1(l), Marco?

BY MR. SARKAR:

Q.     All right.  Dr. Polish, what are you trying to show on this slide with respect to why the '660 Patent is invalidated in light of Journeys?

A.     So 1(c) requires this user interface that configures a message flow.  And, you know, I looked at an enormous amount of code concerning Journeys, and, you know, I'm not going to take you through all of it, but this is just to, you know, point her to a piece of code that is called, "Flow Structure Mapper."

So this is code that's handling the message flow and the presentation of the message flow.  So that's what this is.  This is just code that's behind the creation of that user interface.

Q.     And does this code say anything about trigger conditions as recited in Element 1(c)?

A.     No.  This is not about -- this is not about trigger conditions, this is about presentation of message flow.

MR. SARKAR:  Well, Marco, let's blow up the

source code that's shown on the left side of the screen, please.

THE WITNESS:  Okay.

BY MR. SARKAR:

Q.    Do you see now that this code says Journeys' trigger type right on top?

A.    Right.  So this -- so this piece of code -- so this piece of code here is processing triggers.  So triggers come in, and then it's decided what kind of trigger it is and doing different things depending upon what the trigger is.

So this is -- this is a piece of code that is -- it's actually dealing with the operational triggers.

Q.    I see, Dr. Polish.

Now, Ms. Frederiksen did not show a single piece of code from Campaign Composer that has the word "trigger" in it at all, did she?

A.    No, she didn't.  And Campaign Composer doesn't have triggers, so...

MR. SARKAR:  No.  Keep it there, Marco, please, with the blown-up source code.

BY MR. SARKAR:

Q.    Now, Dr. Polish, in the Journeys source code, they're actually called Journeys' triggers, right?

A.    Yes, that's -- that's how it's referred to in the code.

Q.    And it's fairly easy to see that this code actually uses the word "trigger," right?

A.    Yes.

Q.    And how many times do you see it just on the screen shown here?

A.    I don't -- it's got to be at least 20 times.

Q.    In the file that you're discussing, it -- the word "trigger" appears 20 times?

A.    I mean, if you ask me that, there's -- 1, 2 -- I guess I'm seeing four.  It's -- it's throughout this piece of code.

Q.    I see, Dr. Polish.

      And this source code is what is implementing the Journeys user interface; is that right?

A.    That's right.

      MR. SARKAR:  All right.  Let's take that off, Marco.

      Next slide, please.

BY MR. SARKAR:

Q.    And what does this source code show?

A.    So this is talking about segments.  So this is -- this is talking about how you would build a new segment based upon the events that are received and showing on the bottom you've got segment IDs, so -- and it's got -- and it's got selection properties.

So it's basically just talking about how you would build up a segment in response to user events coming in.

Q.    And this is at page 525 of the printed source code, DTX-308; is that right?

A.    Yes, I suppose so.

Q.    And this is where Journeys -- in the source code for Journeys, we see segments referenced; is that right?

A.    Yes.  To be clear, there's an enormous amount of source code, thousands and thousands of pages.  I'm presenting this as an example just to show that this feature is in the code.

MR. SARKAR:  Let's go back to the previous slide, Marco.

And then, please, blow up the portion of the source code that we were looking at earlier.

BY MR. SARKAR:

Q.    And, Dr. Polish, this source code, which is the flow mapper -- which is the flowstructuremapper.java file, occurs at pages 516 to 530 of the printed source code?

A.    Is that referring -- you're referring to the Bates numbers at the bottom?

Q.    Yes.  It's at 516 -- it starts at 516 and goes into 530.

Is that -- does that sound right?

A.      That sounds right.  That sounds right.  I don't think I have in front of me all the code.

Q.      That's fair enough, Dr. Polish.

MR. SARKAR:  We can take that part -- we can take that image off.

Next slide, please.

BY MR. SARKAR:

Q.      And so, Dr. Polish, with respect to Limitation Claim Element 1(c), is the evidence shown on this screen part of what you relied on for your supporting opinions that Journeys invalidates Element 1(c)?

A.      Yes, it is.

MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.      And, Dr. Polish, so your opinion is that Claim Element 1(c) is satisfied by Journeys, right?

A.      That's right.

MR. SARKAR:  And let's go to the next slide.

BY MR. SARKAR:

Q.      And we see that you are now opining about Claim Element 1(d), which is subscribing to -- there's a lot of words in this part of the claim, Dr. Polish.

What does this claim mean?

A.      So this claim is talking about an API, which is a way of connecting two programs.  It's talking about subscribing

or connecting the messaging program, in this case Journeys,

with the back-end program, say Shopify.

So this is saying that you're going to connect

through an API -- this back-end application with the

messaging application through an API.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what are you trying to show on this slide?

A.    So this is -- this is a Journeys document that's

describing what they're doing and it says, up on the left,

you have -- you know, it talks about third-party vendors,

such as Shopify, and that they have robust APIs and that

there is -- that they're integrating with them.

And again, on the page on the right, they're

also talking about integrating with -- with Shopify.  And on

the bottom of that page on the right, it's talking about

things that can be gotten through that API, which include

add to cart, checkout, purchase, things of that nature.

Q.    Got it, Dr. Polish.

MR. SARKAR:  May I approach the witness?

THE COURT:  You may.

BY MR. SARKAR:

Q.    Dr. Polish --

Dr. Polish, is the document that I just gave you

excerpted on this screen?

A.     Yes, it is.

MR. SARKAR:  Move to admit.

MS. DURIE:  No objection.

MR. SARKAR:  Next slide, please.

THE COURT:  And I'm sorry, for the record:  What is the exhibit number of the document --

MR. SARKAR:  I'm sorry.  DTX-593.

THE COURT:  Okay.  DTX-593, that is admitted without objection.

(DTX Exhibit No. 593 was admitted into evidence.)

BY MR. SARKAR:

Q.     And, Dr. Polish, what are you trying to show on this slide?

A.     So this is -- this is a piece of code.  Again, it's a small piece of a very large puzzle, but it's showing -- if you look at the first line I've highlighted, it's talking about creating a handle, order placed, and it has an external company ID and then a vendor.

So this is just showing this -- and at the top you see API perimeter.  So this is -- this is just some code that's handling the connection between the external system, such as Shopify, and the messaging system, such as Journeys.

Q.     I see.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And this, again, is the evidence -- some of the evidence that you're relying upon for your opinion that this limitation is met by Journeys; is that right?

A.    Yes.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    So we can -- it is your opinion, Dr. Polish, that Journeys satisfies Claim Element 1(d) as well?

A.    Yes, it is.

MR. SARKAR:  Let's -- the next slide.

BY MR. SARKAR:

Q.    And now we have this limitation, which pertains to receiving a plurality of API notifications.

At a high level, Dr. Polish, what does this limitation mean?

A.    So in the prior limitation we had established the API connection between the external entity and the messaging application, and this is just saying receiving a plurality of API notifications essentially over that API, comprising API payloads that include information describing events associated with plurality of users of the application platform.

So this is just saying, you made the connection in the previous element and then here you're actually using

the connection to receive events.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what are you trying to show with respect to Claim Element 1(e) on this slide?

A.    This is just -- this is just from the same batch of code that's talking about actually handling events that are sent over the API.  In this case, order placed.

Q.    And this is at page 273 of that source code; is that right?

A.    Yes, it seems like that's right.

MR. SARKAR:  And then next slide, please.

BY MR. SARKAR:

Q.    And this is, again -- what are you trying to show on this slide?

A.    This is just, you know, the evidence that I've shown here.  I looked at a ton of other stuff, but this is just what I've shown here today.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    So we can consider that it's your opinion that the '660 Patent is -- that Journeys also discloses Claim Element 1(e) of the '660 Patent; is that right?

A.    That's right.

Q.    And now we have a claim element called -- the Claim

Element 1(f).  There's an enormous amount of words on the screen, Dr. Polish.  What does this claim element mean?

A.    So this is talking about code snippet notifications describing events on a plurality of user-computing devices.

So what this is really saying is that there is a piece of code, which is loaded onto a user's mobile device.

So if you go to Shopify, there would be a website there that would have some code on it that would load onto your phone, and that that -- that code snippet would provide notifications to the messaging system corresponding to the subscriber identified within the imaging system.

So it's -- it's -- we've seen previously that you connect the two systems by an API, and this is another way to connect, which is this code snippet that is put on your individual device to -- to alert your behavior on that device.

Q.    And let's go to Claim Element 1(g) -- sorry.

MR. SARKAR:  Next slide.

BY MR. SARKAR:

Q.    What are you trying to show on this slide, Dr. Polish?

A.    So what I've just described is obviously from a complicated -- this is just a bunch of code that is involved in implementing that.  The results of code -- of the -- of

the code snippets can be triggers.  So this is also showing that these are -- these are triggers that would trigger Journeys to send messages.

So this is just a bunch of code segments here that I have pointed to as part of that process.

Q.   Dr. Polish, you heard Mr. Greenberg's testimony that the set of triggers.ts file and the events.ts file were used in Journeys; is that right?

A.   Yes.  I believe he was talking about the same file as this.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.   And is this another part of the source code that supports your opinion that this limitation is satisfied?

A.   Yes.  This is -- this is part of the -- it's labeled here "Event Handler."  It's -- it's looking at events that are coming in, and it's processing them.

Q.   And that is -- sorry.

MR. SARKAR:  Go back a slide.

BY MR. SARKAR:

Q.   And that's at pages 256 to 265, the source code; is that right?

A.   Yes.

Q.   And then let's go on.

So, Dr. Polish, we can consider -- so,

Dr. Polish, it's your opinion that Journeys discloses Claim Element 1(f) as well?

A.      Yes, it is.

Q.      And now we see you've highlighted Claim Element 1(g). What does this claim element require?

A.      So this is just saying that identifying a plurality of user identifier hosts in the API payloads from the application platform.  So it's just -- it's just you're getting messages, you're getting events sent over the API, and you're identifying users within the API.

Q.      And what does this slide show?

A.      So this is -- this is some code that's describing the payloads that are coming across the API.  And it includes -- if you look on the left side of it, it includes subscriber IDs and a bunch of other pieces of information that are sent over the API.

        MR. SARKAR:  Next slide, please.

        And next slide.

BY MR. SARKAR:

Q.      And so is it your opinion, then, that 1(g) is also disclosed by Attentive Journeys' product?

A.      Yes, it is.

Q.      All right.  And now we have Claim Element 1(h).  Is it also your opinion that this element is satisfied by Journeys?

A.    Yes, it is.

Q.    And what does this claim element require?

A.    So this is -- so you've got -- you've got the plurality of these identifiers coming over, and it's determining that they correspond to subscriber identifiers used by the messaging platform.

So there's this general problem of, say, Shopify has -- has IDs for a shopper and the messaging platform has its own IDs for the shopper and -- and this is talking about creating a correspondence between them.

Q.    I see.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what are you trying to show on this slide?

A.    Yeah, so this is -- this is a -- this is a document from Journeys that specifically talks about how that Shopify's customer -- that we get -- we, Journeys, gets Shopify customer's data that's used for bridging the digital ID in subscriber.

So, specifically, they're talking about making that correspondence between Shopify's identification and Journeys' identification.

Q.    I see.

And before we go further, Dr. Polish, 592 --

MR. SAULSBURY:  And also 594.

MR. SARKAR:  Yes.

THE COURT:  And counsel can meet and confer at counsel table.

MS. DURIE:  We have -- Your Honor, we have no objection to either document.

THE COURT:  All right.  And go ahead, Mr. Sarkar.

MR. SARKAR:  I'd just like to hand them to the --

THE COURT:  You may approach.

THE WITNESS:  Thank you.

BY MR. SARKAR:

Q.    And, Dr. Polish, you relied on these two documents for your opinion that Journeys discloses the user interface limitation, right?

A.    Yes.

MR. SARKAR:  Move to admit.

MS. DURIE:  No objection.

We should probably specify the exhibit numbers for the record.

MR. SARKAR:  It's DTX-592 and DTX-594.

MS. DURIE:  No objection.

THE COURT:  Those exhibits are admitted.

(DTX Exhibit Nos. 592 and 594 were admitted into evidence.)

MR. SARKAR:  Let's move on.

BY MR. SARKAR:

Q.    And, Dr. Polish, with respect to the user identifiers limitation, what is this slide supposed to show?

A.    Well, again, this is a large body of code.  But, in particular, I'm calling out this call-to-user match, and it's -- it's creating a match with -- with the user ID.

So there is a lot of code that does this, but this is just pointing out that this is in the Journeys code that's performing this function.

MR. SARKAR:  Next slide, please.

And next slide.

BY MR. SARKAR:

Q.    And what does Claim Element 1(i) mean to you?

A.    Right.

So this is -- this is saying that you're receiving these -- these events that can be over API notifications and code snippets, and you're storing them and you're associating them with a particular subscriber.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And what are you showing on this slide with respect to why you believe Claim Element 1(i) is satisfied by Journeys?

A.    Right.  So this is talking about how specifically for

Journeys' Shopify app that you're ingesting historical purchases and customer profile data.  So here again, you're -- you're receiving these events associated with particular customers and you're storing them.

Q.    And let's go to Claim Element -- sorry.

MR. SARKAR:  The next slide.

BY MR. SARKAR:

Q.    And is this source code that supports your opinion?

A.    Yeah.  This is some code that refers to a subsystem within Journeys called kinesis, which -- which receives events and messages over it and processes them.  And it's a very complex system that receives these things, categorizes them, and stores them, and this is just pointing out that this is where it's going on.

Q.    Dr. Polish, we've be discussing source code a lot about Journeys.  Why is it important to show source code?

A.    Well, so when you're evaluating these things as a consultant, you try to understand how a system works in detail.  And, ultimately -- I mean, source code isn't always available, but if it is available, it's important to look at it and base your conclusions on it.  It's obviously very difficult to communicate based on it because it's complex, but it's important that if it's available that you use it as a backstop to understand what's going on.

MR. SARKAR: Next slide, please.

Next slide.

So -- next slide, please.

BY MR. SARKAR:

Q.    And what does this claim element mean to you, Dr. Polish?

A.    So this is -- this is -- this is saying that based upon those events that have come in and been stored, that there is a determination that this subscriber satisfies a recipient condition.  So you've established early on a recipient criteria and then you're looking at events coming in, and here you're deciding that one of those events satisfies a recipient criteria and the person should be in a particular segment.

Q.    And then what does claim element --

MR. SARKAR:  Sorry.  Next slide.

BY MR. SARKAR:

Q.    This is source code that again supports your opinion at page 294?

A.    Yeah, very, very broadly.  It's just -- it's -- it's looking at subscriber IDs and it's -- it's deciding that somebody should be within a particular segment to the bottom segment ID, so it's deciding the particular subscriber that came in should be part of a particular segment.

Q.    I see.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And then now we have the enrolling limitation, Dr. Polish.  Why --

MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.    Why do you believe that Journeys satisfies this limitation?

A.    Sure.  Well, enrolling -- this is talking about just enrolling a subscriber in a segment.  So in the previous element you've -- you've determined that this person meets a specific recipient criteria, and know you're enrolling or putting the subscriber in the segment.

Q.    I see, Dr. Polish.

MR. SARKAR:  Next slide, please.

Next slide.

And one more, Marco.

BY MR. SARKAR:

Q.    And now we're at Claim Element 1(l), the monitoring, the trigger condition limitation.

MR. SARKAR:  Next slide.

BY MR. SARKAR:

Q.    Why is it your opinion that this limitation in particular is satisfied by Journeys?

A.    Okay.  So the element requires that you're monitoring the trigger condition in response to the subscriber being

enrolled in the segment.  So the subscriber is enrolled and now you need to be monitoring a trigger condition associated with that.  So this is just -- this is code that is from Journeys where it is actually watching triggers, where it's actually looking at triggers and looking to see whether those trigger conditions are being met.

Q.      And, Dr. Polish, we see the word -- the trigger workflows function up here in several parts of the source code recited for Journeys?

A.      Yes.

MR. SARKAR:  Next slide, please.

Next slide.

Next slide.

BY MR. SARKAR:

Q.      And let's go to Claim Element 1(m).

MR. SARKAR:  Oh, actually, Marco, can you pull up the claim construction again for 1(l), the monitoring limitation.

BY MR. SARKAR:

Q.      And does this claim construction alter your opinion that Journeys satisfies this limitation?

A.      No, not at all.  This is, in fact, what we saw Journeys doing.  Journeys is setting up a trigger condition to monitor for, and it's part of a workflow and it just monitors those trigger conditions.

Q.     Thank you, Dr. Polish.

MR. SARKAR:  And, actually, put that slide back up, Marco.

BY MR. SARKAR:

Q.     And do you believe that Journeys continuously monitors trigger conditions?

A.     Yes, I think it meets the definition of continuously. It's put into a workflow, and that condition is monitored so that whenever an event comes in, it's measured against its list of triggers.

Q.     And if it does something continuously, you'd also agree it does so repeatedly?

A.     Yes.

MR. SARKAR:  Okay.  Let's move on Marco.

Let's go on to the Limitation 1(m).

Next slide, please.

BY MR. SARKAR:

Q.     And why do you believe 1(m) is satisfied, the receiving one or more new subscriber events associated with the first subscriber?

A.     Well, because the whole thing we've seen is that you connect up with something like Shopify and events are going to occur, and so whenever somebody goes to Shopify to go do something in the context of which it's being connected to the messaging app, that -- that person's experience is going

to be shared over the API with Journeys.

Q.    And let's go to Claim Element 1(n).  This is the determining step.

What does this step require?

A.    So this requires that one or more of the -- and just to be clear, it says new subscriber events.  The "new" refers that it's a new event.  So you're getting -- an event comes in and then it -- and it's just come in as a new event, and it determines that it meets a trigger condition.

So that's -- that's -- in this workflow, it sees a message comes in, it compares it to the trigger conditions, and it says, yep, I got one.

MR. SARKAR:  Can we go back a few slides, Marco?

One more.

One more.

Yeah.  Just -- just the slide right before this. No, before -- yeah.

Just keep going.  The one right before this.

BY MR. SARKAR:

Q.    And we saw this trigger workflow function that's referenced here is what you're talking about with respect to the message flow with respect to each of Limitations 1(l), 1(m), 1(n), and 1(o); is that right?

A.    Yeah.  To be clear, it's a -- it's a small piece of it.  But, yeah, this is -- this is referring to that work

process.

Q.    And as the name implies, in triggers a workflow that goes through each of those steps; is that right?

A.    That's fair.

MR. SARKAR:  Can we go to 1(o), please, Marco?

That will be the last limitation.

BY MR. SARKAR:

Q.    And here, Dr. Polish, we have the transmitting limitation.  Is this satisfied simply by sending a message?

A.    Yes.  So what's happened before is that we've -- we've determined that one of these new messages comes in, meets the trigger condition, and now we're going to transmit a message.  So this is actually the transmitting of a message.

Q.    And Journeys transmits messages?

A.    Yes.

Q.    And how do you know that Journeys sends or transmits messages?

A.    Well, we've seen lots of examples of it.  You know, people talk about that's -- that's the point of it, and it sends lots of messages.

MR. SARKAR:  And Attentive moves to admit DTX-595 from Dr. Polish's previous testimony.

MS. DURIE:  No objection.

THE COURT:  Okay.  What exhibit is admitted?

MR. SARKAR:  DTX-595.

THE COURT:  No objection.  It's admitted.

(DTX Exhibit No. 595 was admitted into evidence.)

MR. SARKAR:  And we also move to admit DTX-179 and 117.

MS. DURIE:  No objection.

(Reporter clarification.)

MR. SARKAR:  DTX-179 and DTX -- I'm sorry.  And PTX-117.

THE COURT:  DTX-179, PTX-117.

MR. SARKAR:  117, yes.

THE COURT:  All right.  And are these exhibits that were previously shown?

MR. SARKAR:  Yes, they were.

THE COURT:  No objection --

MS. DURIE:  On the basis of that representation, no objection.

THE COURT:  In light of that, they're admitted.

(DTX Exhibit No. 179 was admitted into evidence.)

(PTX Exhibit No. 117 was admitted into evidence.)

BY MR. SARKAR:

Q.     And let's go on to Claim 10.

And, Dr. Polish, why is claim -- Claim 10 also satisfied by Attentive Journeys' product?

THE COURT:  Probably close to a time for a break, so if there's a module that perhaps you want to stop at, just let us know.

MR. SARKAR:  We can -- we can stop now.

THE COURT:  Good.  We'll pause there.  We'll use this as an opportunity to take our morning break.

With that, I'll ask my courtroom deputy to lead our jury out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  You may be seated. We'll come back and be ready to go at 13 after the hour, and we'll go from there.

The Court will stand in recess.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  Please remain standing, everybody.

(Jury enters.)

THE COURT:  All right.  Please be seated, everyone.

Continue with direct examination.

BY MR. SARKAR:

Q.    Before the break, Dr. Polish, we were discussing whether you believe that Attentive Journeys satisfies ever single element of Claim 1.

            Do you remember that?

A.    Yes.

Q.    And then that's what you've shown on this slide?

A.    Yes, that every element of Claim 1 has been satisfied by Journeys.

            MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And here we see Claim 4 of the '660 Patent.

            What is your opinion as to whether this claim is also satisfied by Attentive Journeys?

A.    This -- this is also satisfied.

Q.    And how do you know that?

A.    Well, because Claim 4 requires that each API payload include, essentially, user identifier and phone number.  And you can see in this description of code that I have here that it's describing what's coming over from the API and includes a subscriber ID and phone number, among other things.

Q.    I see, Dr. Polish.

            MR. SARKAR:  Next slide.

            Next slide.

BY MR. SARKAR:

Q.      And so what are you trying to show on this slide, Dr. Polish?

A.      That, in fact, Claim 4 is satisfied.  It satisfies everything in Claim 1 and everything in this additional element.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      And what about Claim 6, Dr. Polish?

A.      Right.  So this is just saying that the -- wherein the subscriber event described in the API notifications related to a transaction performed on the back-end component.  Yeah.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      And why -- what are you trying to show on this slide?

A.      Yeah.  So this is just a code fragment that's talking about an order being placed and related to an external company.  So this is just where it's handling the external company talking about order placed, which would satisfy a transaction being performed at the back end.

Q.      And that's at pages 273 and 274 of the source code?

A.      Yes.

MR. SARKAR:  Next slide, please.

Next slide.

BY MR. SARKAR:

Q.      So it's your opinion --

        MR. SARKAR:  Go back a slide.  Sorry, Marco.

BY MR. SARKAR:

Q.      It's your opinion that Attentive Journeys discloses every element of Claim 6 as well?

A.      Yes.

        MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      And I see here that you have -- you're showing Claim 10 of the '660 Patent?

A.      Yes.

        MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      And is it your opinion that Attentive Journeys discloses every element of Claim 10?

A.      Yes.  Claim 10 adds that there's -- that these events are effectively connecting a first subscriber with -- with a segment based on the API notification.

        So you can see that you're getting subscriber ID and you're getting segment ID, and so the system is using segment ID and it's seeing that it's part of it -- it's seeing that a particular subscriber is part of a particular segment.  So that would satisfy Claim 10.

Q.      And -- I see.

        And that's at page 294 of the produced source

code?

A.     Yes.

MR. SARKAR:  Next slide please.

Next slide.

Keep going, Marco.

BY MR. SARKAR:

Q.     And I see here that you have put Claims 11 and 14 on the screen.

Why did you do that?

A.     Well, so Claim 11 is -- is another independent claim, like Claim 1, and Claim 14 is a dependent claim, depending on Claim 11.  So I've shown them together because we have to deal with those.

Q.     And I see that you've color-coded some limitations on the left, which belong to Claim 1, and some on the right, which belong to Claim 11.

What are you trying to convey with that?

A.     So I think as we've seen before, Claim 1 and Claim 11 are nearly the same.  One is a system and one is a computer-implemented method.  The rest of the claimed -- the rest of the claim elements are identical between them.  So I've color-coded matching elements between Claim 1 and Claim 11.  So the things in Claim 1 that I found in Journeys would also be found in Claim 11, as well.

Q.     And I see that Claim 11 is a computer-implemented

method.  Claim 1 is a system, right?

A.    Yes.

Q.    Does that make a difference for your opinion about whether Attentive Journeys invalidates either claim?

A.    No.  Journeys is a computer program running on a -- on a computer server, and so it's both a system with memory and a processor and all that, and it's also a program.  So it's a computer-implemented method, as well.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And why is it your opinion that Attentive Journeys invalidates Claim 14?

A.    So Claim 14 is a dependent claim on Claim 11, and it adds that where the API notifications are implemented with a method called webhook notifications, just a particular way of implementing an API, and this is just showing that -- that Attentive Journeys will work with Shopify analytics webhook events.  So that would -- that would satisfy Claim 14.

Q.    I see, Dr. Polish.

      And that's at DTX-179?

A.    DTX-179, yeah.

Q.    And that's page 286 of DTX-179?

A.    Yes.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      And what are you attempting to convey on this slide?

A.      This is just -- this is just showing where the API is being processed particularly for -- for an order being placed.

Q.      And that's at pages 273 and 274 of Attentive's source code, that is DTX-308?

A.      Yes.

                MR. SARKAR:  Next slide, please.

                Next slide.

BY MR. SARKAR:

Q.      And so Attentive Journeys also invalidates Claim 14 of the '660 Patent, Dr. Polish?

A.      Correct.

                MR. SARKAR:  Next slide.

BY MR. SARKAR:

Q.      And so, Dr. Polish, in your opinion, Journeys invalidates Claim 1, Claim 4, Claim 6, Claim 10, Claim 11, and Claim 14, which depends from Claim 11; is that right?

A.      That's right.

Q.      Now, Dr. Polish, we have discussed the Attentive Journeys' source code throughout this presentation, right?

A.      Yes.

Q.      And we saw the word "trigger" appear all over that source code, right?

A.    Well, yes.  Trigger appears in the source code in many places.

Q.    Attentive Journeys released, you know, sometime -- several years before Magic Composer, right?

A.    Yes.

Q.    And Attentive Journeys was also released before the '660 Patent was developed?

A.    Yes.

Q.    And it was released before the '660 Patent was filed for?

A.    Yes.

Q.    And so, Dr. Polish, with respect to Magic Composer, why didn't you show the jury any source code that has triggers in Magic Composer?

A.    Well, Magic Composer doesn't have triggers.

Q.    So you weren't able to find any source code in Magic Composer that has triggers?

A.    No, Magic Composer does not have triggers.  It's just using time.  It's using -- it's using time to determine when to send a message.

            MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And I see here, Dr. Polish, you've got the word "obviousness" on the screen.

            What are you trying to convey with that?

A.    Well, so what we've been talking about is what's called anticipation, where every element of a given patent is found in a given piece of -- in a single piece of prior art.  Obviousness just refers to the -- even if the matching isn't perfect, if the deviation for matching is something that one of ordinary skill in the art at the time would have thought would be obvious, then -- then it can still invalidate under obviousness rather than anticipation.

Q.    And to clarify for the jury, you do believe regardless that the exact same -- that Journeys invalidates the '660 Patent because it discloses exactly the same limitations of the '660 Patent claims; is that right?

A.    Yes, absolutely.

          MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And I think the next reference you discussed for the jury was Klaviyo Flows; is that right?

A.    Yes.

Q.    Let's -- and I see here that we grouped, you know, Claim Elements 1(b) -- 1(a) and 1(b) again, Klaviyo Flows.

          Why does Klaviyo Flows meet these elements?

A.    Well, again, Klaviyo Flows is a system running on a computer.  So same reason as we saw for Journeys.

Q.    And, Dr. Polish, we've just gone through every element in exhaustive detail of Claim 1 of the '660 Patent

with respect to Attentive Journeys, right?

A.     Yes.

Q.     And so in the interest of time, I plan to move quite quickly through our discussion of Klaviyo Flows.

          Is that okay with you?

A.     Yes, I understand the limitations of time here.

          MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.     Dr. Polish, just --

          MR. SARKAR:  Let's go to the next slide, and hold it there.

BY MR. SARKAR:

Q.     Dr. Polish, what are you trying to show about why Klaviyo Flows meets 1(c) on this slide?

A.     So 1(c), as we saw before, just involves a user interface and recipient criteria and a trigger condition, and this is an example of the user interface from Klaviyo, which has those elements in it.

Q.     And you see the word "trigger" right on the top -- the top little square on the right; is that correct?

A.     That's correct.  It's -- the top blue square says "trigger."

          MR. SARKAR:  Next slide, please.

          Next slide.

          Actually, go back a slide.

BY MR. SARKAR:

Q.    And what are you trying to convey with this slide, Dr. Polish?

A.    So the information I'm using and presenting comes from a tutorial that was run using Klaviyo.  So somebody was actually using it and put it on YouTube so you could see someone interacting with it on a particular date.  And so this video was put up October 4th, 2021.

Q.    And that's about a year before the '660 Patent was filed; is that right?

A.    Yeah.  It's a few days more than a year.

MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And, again, we see "trigger" shown on this screen.

What are you trying to convey with that callout?

A.    Well, so this is -- this element here is -- is satisfying a -- that this is -- this is a trigger -- actually, this is a trigger when someone does a subscription.

Q.    And this is from DTX 603, the video of Lesson 4 at Klaviyo; is that right?

A.    Yes.

Q.    At 12 minutes, 55 seconds?

A.    Yes.  Yeah.

MR. SARKAR:  Let's go back a slide, Marco.

BY MR. SARKAR:

Q.    And is this also from the date that you mentioned that the Klaviyo was publicly available.  Is that also from DTX-603?

A.    Yes, it is.

MR. SARKAR:  Let's go down a slide, Marco.

One more.

BY MR. SARKAR:

Q.    And what are you attempting to show on this slide, Dr. Polish?

A.    This is just that within the flows that you can -- within a flow you can deal with triggers, you can deal with segments, and you can do your trigger based on metrics.

So it's -- it's just a -- it's summary of things you can put into the flow.

Q.    And DTX-603 is the video on which this -- the screenshot that you've taken up here; is that right?

A.    That's right.

MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.    And this shows a segment exists in Klaviyo Flows?

A.    Right.  So this box is showing that you can create -- that they've created a segment in this example, and it's people that have placed an order more than once over all time and the person is not suppressed for e-mail.

So that -- that's forming a segment of -- of users who are prospective people you might send a message to.

Q.    I see, Dr. Polish.

And this is from DTX-601, Lesson 2 at 9 minutes, 58 seconds; is that right?

A.    Yes.

MR. SARKAR:  And let's go on to the next slide.

BY MR. SARKAR:

Q.    And this shows, again, triggers and segments in Klaviyo Flows?

A.    Yes.  This is showing on this user interface being able to create segments, being able to create triggers.  In this particular case, the segment is -- has placed an order at least three times, over all time, and the trigger is -- subscribes to back in stock.

MR. SARKAR:  And keep going, Marco.

And so let's go to the next slide.

BY MR. SARKAR:

Q.    And why does Klaviyo meet this limitation --

MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.    Why does Klaviyo meet the subscribing on behalf of the application operation officer to an API limitation, Dr. Polish?

A.      Yeah.  So just very broadly, that limitation is about connecting with an API between an external vendor and messaging system, and this is talking here about automatically pulling information from outside tools, which is essentially that.

Q.      And is that DTX-601; is that right?

A.      Yes.

Q.      Lesson 2.

A.      Mm-hmm.

        MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      You've highlighted the word "API keys" here.  Why did you do that?

A.      Yeah.  This is just, again, supporting the idea that they're using APIs.  API keys are the, think of it like the password that allows you to make the connection, because if you just expose APIs without protection, anybody can access the information.

Q.      I see, Dr. Polish.

        MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.      So we can consider all of the elements of 1(d) met at Klaviyo Flows at this point?

A.      Yes.

        MR. SARKAR:  Next slide, please.  Next slide.

BY MR. SARKAR:

Q.     And why -- is it your opinion, Dr. Polish, that Klaviyo Flows meets the receiving of a plurality of API notifications limitation?

A.     All right.  So this is -- this is showing here the kinds of notifications that can be received, including checkout started, order placed, product ordered, fulfill orders, so those are all notifications you would get over an API from, say, Shopify to Klaviyo.

Q.     I see, Dr. Polish.

       And this is DTX-601, Lesson 2, at 3 minutes and 13 seconds?

A.     Yes.

       MR. SARKAR:  Go on to the next slide.

BY MR. SARKAR:

Q.     And then again, we've seen the same API keys that you were discussing with regard to 1(d), right?

A.     Yes, that's right.

Q.     And that's at DTX-601, Lesson 2, at 6 minutes, 53 seconds?

A.     Yes.

Q.     And, Dr. Polish, this is Claim Element 1(f), which is the receiving a plurality of code snippet notification limitations.

       MR. SARKAR:  Next slide.

BY MR. SARKAR:

Q.    And why, in your opinion, is this limitation satisfied by Klaviyo?

A.    Yeah, this one is very direct.  This is actually, Klaviyo is giving you a code snippet to incorporate a new website.  So they're literally saying, grab this piece of code, stick it in your website, and when the user goes to the website, you'll get this piece of code and you're off and running.

Q.    And that's at DTX-601, Lesson 2, at 2 minutes, 5 seconds; is that right?

A.    Yes.

            MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    What is the browse abandonment flow Klaviyo -- why did you point to that with respect to the Limitation 1(f)?

A.    So this is -- this is an example of a particular flow.  It's a cart abandonment flow, which I think we've seen before in the case so far, and so it was covered in the video and I'm highlighting the date of the video.

Q.    And that is at DTX-599, Dr. Polish?

A.    Yes.

            MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.    And again, you've cited the same browse abandonment

tutorial at DTX-599, at 5 minutes, 59 seconds of that video; is that right, Dr. Polish?

A.      Yes, that's right.

Q.      And what are you trying to convey about why that tutorial video shows that Klaviyo satisfies Limitation 1(f)?

A.      So this, this is showing broadly that it's -- if you look at the metrics on the right, this is collecting information about received e-mail, placed order, ordered product, a bunch of different actions that a user can take on, say, a Shopify site.  That information is coming into Klaviyo via the API and is being counted up here.  So this is just showing that Klaviyo is receiving these things and keeping track.

          MR. SARKAR:  Next slide, please.

          Next slide.

BY MR. SARKAR:

Q.      And so we can, at this point, consider element -- Claim Elements 1(p) through 1(f) all satisfied by Klaviyo flows?

A.      Yes.

          MR. SARKAR:  And let's go to limitation 1(g).

BY MR. SARKAR:

Q.      And why in your opinion does Klaviyo flows disclose the identifying plurality, user identifier limitations?

A.      Again, this is -- this is keeping track here.  You

can -- you can see on the left you've got -- you've got products and details.  So it is keeping track of different users and what they've done.  So you can see on this panel that this was available to people on Klaviyo, and so it satisfies that claim limitation.

Q.    And I see you've got -- see that you have the word "profiles" highlighted on the bottom left.  What are you trying to convey with that?

A.    So those profiles are of different subscribers.  So you can drill into it with this interface.  So it's an indication that Klaviyo had received this information and has kept it.

Q.    I see.

        MR. SARKAR:  Next slide, please.

        And -- next slide, Marco.

BY MR. SARKAR:

Q.    And on this slide, Dr. Polish, why does this show that Klaviyo satisfies the determining a plurality of user identifiers limitation?

A.    Well, it would have to have done -- this is, again, connecting the user -- external user profiles and the internal user profiles, so it would have to have done that in order to keep track of people's profiles.

Q.    I see, Dr. Polish.

        And that's at DTX-603, Lesson 4, at 16 minutes

and 27 seconds; is that right?

A.     Yes.

          MR. SARKAR:  And let's go to the next slide.

BY MR. SARKAR:

Q.     And so at this point, we see that limitations 1(p)

through 1(h) have been satisfied; is that accurate?

A.     Yes.

          MR. SARKAR:  We're going to move to admit

DTX-599, which is the video.

          MR. SAULSBURY:  No objection.

          MR. SARKAR:  Okay.

          THE COURT:  So that is DTX-599?

          MR. SARKAR:  Correct.

          THE COURT:  All right.  Which is a video?

          MR. SARKAR:  Correct.

          THE COURT:  DTX-599 is admitted without

objection.

          (DTX Exhibit No. 599 was admitted into

evidence.)

          MR. SARKAR:  And let's go on to the next slide,

Marco.

BY MR. SARKAR:

Q.     And we see here again the same story for a first

subscriber that -- the subscriber, that limitation we

discussed in Attentive Journeys.  Do you see that?

A.      Yes.

Q.      And why does Klaviyo meet this limitation as well?

A.      Well, because it's receiving this information over -- over the APIs, over the code snippets, and it's collecting them and you can see that they're collected in here.

Q.      And that's DTX-603, Lesson 4, at 16 minutes 27 seconds?

A.      Yes.

                MR. SARKAR:  Next slide.

                And next slide, Marco.

BY MR. SARKAR:

Q.      And I see the same, determining that the stored subscriber events satisfies the recipient criteria limitation that we discussed for Attentive Journeys.

                Do you see that?

A.      Yes.

Q.      Why does Klaviyo satisfy this limitation?

A.      Well, you can see here that it's identifying, it's -- for subscribers, in this case, repeat buyers, so it's going to be looking at events that are coming in and figuring out that this person has placed an order more than once and it's not -- it's suppressed for e-mail.  So that's -- that's what's in the claim.  And you can see in the interface that it allows you to create that.

Q.      And that's at DTX-601, Lesson 2, at 9 minutes,

58 seconds?

A.      Yes.

MR. SARKAR:  Next slide.

Go to the next slide.

Oh, sorry.  Go back one.

And just one more slide, Marco, to 1(k).

BY MR. SARKAR:

Q.      And, Dr. Polish, I see that you have highlighted Claim Element 1(k) on this slide.  This is the enrolling the first subscriber, the segment of subscribers' limitation. What are you relying on for your opinion that this limitation is satisfied by Klaviyo?

A.      Well, this is just that you're putting somebody into the given segment.  So again, we saw before that it's looking at particular subscribers and deciding if it's part of the segment or not.

MR. SARKAR:  And let's go back one slide, Marco -- or two slides, Marco.

One more.

BY MR. SARKAR:

Q.      And so you're relying on exactly the same evidence that is in 1(j) that is PTX-601, Lesson 2, at 9 minutes 58 for also -- for your opinion that Klaviyo also discloses Claim Element 1(k), the enrolling limitation; is that right?

A.      That's right.

MR. SARKAR:  Let's go back down to 1(l), Marco.

And one more slide.

BY MR. SARKAR:

Q.    And, Dr. Polish, I see that you have put up, again, DTX 603, Lesson 4, at 12 minutes, 20 seconds.

Why does this demonstrate that Klaviyo monitors a trigger condition in response to the first subscriber being enrolled in the segment that we're concerned about?

A.    So what this is showing is that the subscriber is enrolled in this back-in-stock flow and has placed an order at least three times over all time.  And then it's monitoring this trigger, which is that something is back in stock.

So the user is going to be put into this segment, and then this trigger is going to be monitored when the item is back in stock.  Then they'll get a message.

Q.    I see, Dr. Polish.  And you remember the -- that the Court has construed the monitoring the trigger condition limitation, right?

A.    Yes.

MR. SARKAR:  Can we just pull that construction back up, Marco?

BY MR. SARKAR:

Q.    And so, Dr. Polish, why does Klaviyo monitor a trigger condition continuously?

A.      Well, it's continuously watching for the back-in-stock condition so it can satisfy this construction.

        MR. SARKAR:  And let's put the other slide back up, Marco.

BY MR. SARKAR:

Q.      And so now we're at a Limitation 1(m), and this is the receiving one or more subscriber events limitation.

        MR. SARKAR:  Let's go to the next slide.

BY MR. SARKAR:

Q.      And why does Klaviyo Flows satisfy this claim element as well?

A.      Well, the back-in-stock would be a subscriber event. Placing the order at least three -- oh, placing the order at least three times would be -- would be subscriber events.

Q.      And that's at DTX-603, Lesson 4, 12 minutes, 20 seconds; is that right?

A.      Yes.

        MR. SARKAR:  Let's go to the next slide.

        Sorry.  One more, Marco.

BY MR. SARKAR:

Q.      And so now we're at the determining step, which is Claim Element 1(n); is that right?

A.      Yes.

Q.      And why do you think that Klaviyo Flows determines that those subscriber events that we were just talking about

have met the trigger condition in the message flow?

A.    Well, that's what the flow is doing.  Yeah.  I mean, this is -- this is -- we're doing this very, very fast.  It's -- this message flow relies on -- this order has been placed at least three times and evaluates that.

Q.    I see.  And then let's go to Claim Element 1(o), and if that evaluation, that is, the order has been placed three times, does Klaviyo send a message?

A.    Yes, it does.

Q.    And so it meets Limitation 1(o)?

A.    Yes.

          MR. SARKAR:  Let's go to the next slide.

          Keep going, Marco.

BY MR. SARKAR:

Q.    And so at this point, Dr. Polish, your opinion is that every element of Claim 1 satisfies -- is satisfied by Klaviyo Flows; is that right?

A.    Yes.

Q.    Let's go on.

          And the same with Claim 4.  Do you believe that Klaviyo Flows also satisfies Claim 4?

A.    Yes.  It was information that suggested that there were phone numbers associated with different profiles.

          MR. SARKAR:  Let's go to the next slide, please.

          Next slide.

Sorry, yeah.  The slide right before.

BY MR. SARKAR:

Q.    And why do you believe that Klaviyo satisfies Claim 6?

A.    Well, because we know that they're connecting via API to an external third party such as Shopify.

Q.    And Shopify was exactly the same third-party API that Ms. Frederiksen pointed to for her assertion that Magic Composer connects to an API builder platform; is that right?

A.    That's right.  Shopify is a very common builder system.

Q.    I see.

        MR. SARKAR:  Next slide.

BY MR. SARKAR:

Q.    And so, Dr. Polish, is it also your opinion that Klaviyo Flows satisfies Claim 10?

A.    Yes.

Q.    Why?

A.    Because it's receiving these messages over the API. It's keeping track of them.  We saw that in the page that showed us how it was tracking metrics, that it was receiving these and stating them, which is what's required here.

        MR. SARKAR:  Let's go to Claim 11.

BY MR. SARKAR:

Q.    Yeah, and this, again, is the evidence that you

pointed to for the --

MR. SARKAR:  Let's just go on to the next slide, Marco.

BY MR. SARKAR:

Q.    Is it also your opinion that Klaviyo Flows satisfies Claim 11 of the '660 Patent?

A.    Yes.

MR. SARKAR:  Let's go to the next slide.  Sorry.  Let's go back to Claim 11.

BY MR. SARKAR:

Q.    Why do you believe that Klaviyo satisfies Claim 11 of the '660 Patent?

A.    Well, Claim 11, we saw, is really the same thing as Claim 1 in this circumstance, so there's matching elements between 1 and 11.

MR. SARKAR:  And let's go to the next slide.

BY MR. SARKAR:

Q.    And so it's your opinion, Dr. Polish, that Klaviyo Flows discloses every limitation of Claim 4, every limitation of Claim 6, every limitation of Claim 10, and every limitation of Claim 14; is that right?

A.    Yes.

Q.    And it was also your opinion that Journeys discloses every limitation of Claim 4, every one of Claim 6, of 10, and of 14 as well, right?

A.    Yes.

Q.    And Journeys was an Attentive product that existed before the '660 Patent, right?

A.    That's right.

Q.    And so, in your opinion, Attentive did -- did it first; is that right?

A.    Yes, that's certainly one way to put it.  Attentive did it -- did what was in the '660 before the '660.

Q.    And then do you also have an opinion about Claim 14 and why -- and whether it's invalidated by Klaviyo Flows?

A.    Yeah.  I mean, Claim 14 depends on Claim 11, which is invalidated by Klaviyo Flows, and there was also documentation in the Klaviyo system that they could use webhooks, so, therefore, it would invalidate Claim 14.

Q.    And so if Attentive Journeys meets every limitation of the asserted claims, and Klaviyo Flows also meets every limitation of the asserted claims, is it your opinion that there are at least two companies, Attentive and Klaviyo, that disclose every -- that had products that disclosed every limitation of the asserted claims several months before the '660 Patent priority date?

A.    Yes.

          MR. SARKAR:  Next slide, please.

BY MR. SARKAR:

Q.    And then here again, we see the reference to

obviousness.  What is your opinion about -- what are you trying to convey with this slide?

A.    Well, as before, I'm conveying that you don't have to -- doesn't have to be exact.  You can be close as long as it's -- the distance is something that can be bridged by someone of ordinary skill.

MR. SARKAR:  And let's put the Sephora Replen slide up real quickly.

BY MR. SARKAR:

Q.    And, Dr. Polish, were you in the room when Eric Miao was testifying regarding this flowchart?

A.    Yes.

Q.    And did you hear his testimony that Sephora Replen satisfies every limitation of the asserted claims of the '660 Patent?

A.    Yes, I was.

Q.    And do you agree with his testimony?

A.    Yes.

Q.    And so is it your opinion, then, Sephora Replen, for the reasons that Mr. Miao gave in his testimony, also anticipated every limitation?

MS. DURIE:  Your Honor, I have an objection.  It's outside scope.  It's an undisclosed opinion.  There's no reliance on Mr. Miao in Dr. Polish's opinions.

THE COURT:  All right.  Mr. Sarkar.

MR. SARKAR:  So I'll withdraw our reliance on Mr. Miao.

THE COURT:  Okay.  So the objection is moot as the question will be withdrawn.

MR. SARKAR:  Correct.

BY MR. SARKAR:

Q.     So, Dr. Polish, with respect to the flowchart that we see from Sephora Replen, do you see that on the screen?

A.     Yes.

Q.     Do you see whether there are multiple message sent in this flowchart?

A.     Yes, clearly there are.

Q.     And do you see that there's a user interface disclosed in this flowchart?

A.     Yes.

Q.     And is that -- where do you see that user interface?

A.     So it's talking about what Sephora is talking about on the left.  Towards the bottom, it talks about what Sephora is saying and -- right.  So this is clearly interfacing with the user.

Q.     I see.  And do you see any code snippets in this flowchart?

A.     Code snippets.  Well, I see it referring to using various APIs to get information.

Q.     That's right.  And those APIs are code snippets?

A.      Well, those APIs are using code snippets, yes.

Q.      I see, Dr. Polish.  And do you see any triggers in this flowchart?

A.      Yeah.  I mean, the things that are labeled -- I think the things that are labeled "T" are all triggers.  These are things that are being sent in and are resulting from a user that are resulting in behaviors.

Q.      So there's ten different triggers in this flowchart; is that right?

A.      I guess that's right, yes.

Q.      And are the users that you're talking about this flowchart was referring to a segment of subscribers?

A.      Yes.

Q.      And how do you know that the product here was monitoring these triggers, that Sephora Replen monitors triggers?

A.      Well, it's receiving -- it's showing that it's receiving texts.  So in order to receive the texts -- hang on a second.

Q.      Let me ask the question a different way, Dr. Polish.

        Do you see the fact that it checks whether these triggers are met or not?

        So has she texted buy and T2, has she texted buy, had an order ID, does not have a shipping address saved in T3?

A.     Could you ask that again?  I'm sorry.

Q.     Do you see the triggers marked T2 and T3 on your screen?

A.     Yes.

Q.     And so you see that the program is asking whether she, the user, has texted buy but there was an error, right?

A.     Yes.

Q.     So is that monitoring that trigger condition?

A.     It is -- that is monitoring.  There's not a lot of detail there as to how it's monitoring, but it's monitoring.

Q.     And then the same with T3, as in the system is asking, has she texted buy, does she have an order ID, and does she not have a shipping address saved; is that right?

A.     Yes.

Q.     And so based on your analysis of this flowchart, is it your opinion that Sephora Replen anticipates every single limitation of Claims 4, 6, 10, 11, and 14?

A.     Yes.

          MR. SARKAR:  No further questions -- I'm sorry.

          I pass the witness, Your Honor.

          THE COURT:  All right.  We'll have cross-examination.

          MS. DURIE:  Thank you.

                    CROSS-EXAMINATION

BY MS. DURIE:

Q.     Dr. Polish, good morning.

A.     Good morning.

Q.     It's nice to see you again.  It's been quite a while.

A.     Yes.

Q.     So I want to start by talking to you about your opinions with respect to infringement.

            And as an initial matter, just taking a step back, you agree that Postscript's product, Campaign Flows, embodies the claims of Postscript's patent, correct?

A.     I'm not sure that I've testified to that today.

Q.     Well, let's take a look.  You've got those two binders in front of you.  One of them has a tab that is CX-14.  And if you can please go to CX-14, and turn to page -- it's at 125 on the stamped version.  It's paragraph 355.

A.     Hang on one second.  CX?

Q.     CX-14.

A.     I see CX-15.

            THE COURT:  Counsel may approach to assist the witness, if you wish.

            MS. DURIE:  It's at the end of Volume 1.  At the very back of Volume 1.  CX-14.

            THE WITNESS:  Okay.  Thank you.

BY MS. DURIE:

Q.     So if you can please turn to paragraph 355 of your

invalidity report in this case.

Are you with me?

A.    Page which?

Q.    Paragraph 355.  It's on the page stamped 125.

A.    Okay.

Q.    You with me?

A.    Yes.

Q.    And you see that in your invalidity expert report in this case, you attached an exhibit that showed how each and every limitation of the asserted claims of the '660 Patent is disclosed by Postscript's Campaign Flows product.

Do you see that?

A.    Yes, I do.

Q.    So that means Postscript's Campaign Flows product would infringe the Postscript patent.

That's another way to think about it?

A.    Yes, I think that's right.

Q.    Okay.  Now, you've said that Magic Composer, the Attentive product, doesn't have a trigger condition and doesn't monitor a trigger condition, right?

A.    That's correct.

Q.    Now, you would agree that Magic Composer allows messages to be retargeted to a particular audience, right?

A.    Yes.

Q.    For example, a subset of customers who had clicked on

a first message but didn't purchase from the merchant's store?

A.      I'm sorry, let's back up a second.  Can you ask me the prior question?

Q.      Sure.

        You would agree that Magic Composer allows messages to be retargeted to a particular audience, like the subset of customers that clicked on the first message but didn't purchase from the merchant's store?

A.      Okay.  So for certain meanings of retargeted, certainly you can create a segment that is -- that meets those criteria, those would be a -- those would be a -- that would be a particular segment.

Q.      Do you agree, sir, that a customer can create a second message to send to an audience, such as the customer's subscription list, or retarget the subscribers that clicked on the message but did not purchase from the customer's store?

A.      Well, I would agree that you can create a segment that -- that has certain criteria, including those.

Q.      Okay.  Let's go to your -- do you agree with the question as phrased?

A.      Give me the question as phrased.

Q.      So let's go to your noninfringement report, sir.

A.      Okay.

Q.    It's CX-19 in your binder.

A.    Okay.

Q.    Are you with me?

A.    Just about.

Q.    CX-19.

A.    Okay.  I'm there.

Q.    And now let's go to the page stamped 158.  It's paragraph 386.

      You with me?

A.    This is a paragraph beginning, "distilling the source code"?

Q.    Correct.

A.    Okay.

Q.    And let me read to you the third sentence from your expert report.  "A customer can then create a second or third, etc., message to send to an audience, such as the customer's subscription list, or retarget the subscribers that clicked on the message but did not purchase from the customer's store."

      Those were your words, were they not?

A.    Yes.

Q.    Now, the way this works is that Attentive's first builds the recipients for the message, correct?

A.    First builds.  You're talking in Campaign Composer?

Q.    Correct.

A.      So, no.  No, I think --

Q.      Well, you've got your noninfringement report handy there, sir.

A.      Yeah.

Q.      Why don't you turn to paragraph 377.  It's on page 154.

A.      The noninfringement report.

Q.      It should be what you've got open right in front of you, CX 19.  You don't need to move anything around.

        Sir, it's the very document you got in front of you.

A.      Okay.  Which paragraph?

Q.      It is paragraph 377, on page 154.

        You with me?

A.      Yes.

Q.      So let me ask you this:  Did you write, sir, "Campaign Composer's workflow is split -- splits into four steps.  One, determine if there is a campaign that needs to be sent.  Two, build recipients for the campaign.  Three, register audience for the campaign message and" -- you wrote three, but it should be four -- "send the campaign to an audience"?

        Those were your words, sir, were they not?

A.      Yes, they were.

Q.      Okay.  Now let's look at the '660 Patent and what it

says about trigger conditions.

MS. DURIE:  If we could have PDX-847 on the screen, please.

BY MS. DURIE:

Q.    So do you recognize as what's up on the screen as Figure 8A from Postscript's patent?

A.    Yes, I believe so.

MS. DURIE:  And if we can go to PDX 8.9, Mr. Glass.

BY MS. DURIE:

Q.    I've reproduced Figure 8A on the left-hand side and some text from the patent on the right.

So what we see here on the left, sir, in Figure 8A is a section that has been highlighted.

Do you see that?

A.    On the left, yes.

Q.    Correct.

And that's 805.

Do you see that?  It is labeled 805.  It's highlighted.

A.    I see that, yep.

Q.    And if we look at the text of the patent at Column 23, it says, "Referring to Figure 8A, the graphical user interface may display target recipient criteria, 805, that allows the application operator to select the group of

end users to which messages may be sent."

So 805 there is within the graphical user interface and is displaying target recipient criteria, correct?

A.    Yes.

MS. DURIE:  Now, if we could go to PDX -- actually, leave up PDX-8.9, Mr. Glass.

BY MS. DURIE:

Q.    You see that in 805 there are two things labeled 809 and 810.

Do you see that?

A.    Yes.

Q.    Okay.  809 and 810.

MS. DURIE:  Let's take that down.

BY MS. DURIE:

Q.    And if we look at PDX-8.14 --

MS. DURIE:  Let's go to the next slide.

BY MS. DURIE:

Q.    We're now going to focus in on 809.

Now, again, there's text in the patent that discusses what 809 is, correct?

A.    Yes.

Q.    And it says there at the top, this is again pulled from Column 23, "In the example shown in Figure 8A, all end users of the particular application operator are selected as

the group of end users for the message flow plan 600 as the message trigger condition 809."

So 809 in Figure 8A is the message trigger condition, correct?

A.   Yes, according to the -- to the '660 in here, this -- this is a trigger condition.

Q.   Right.

And the message trigger condition 809 is set in Figure 8A to all subscribers, correct?

MS. DURIE:  And if we go to PDX-8.22, Mr. Glass. I think we have a slide that blows that out.

BY MS. DURIE:

Q.   It says, "all subscribers."  That is 809, the message trigger condition, correct?

A.   Yes.

MS. DURIE:  Now let's go back and take a look at 810, PDX-8.20, Mr. Glass.  Yeah, 8.20.

BY MS. DURIE:

Q.   So we now highlighted 810, that is under 809.

And 810, if we look at the patent specification and we keep reading, it says, "The target recipient criteria 805 may further include one or more exclusion trigger conditions 810 based on which one or more end users for the group selected in the target recipient criteria may be excluded temporarily from receiving messages or removed

permanently from the group."

Do you see that?

A.    Yes.

Q.    And so 810 is an exclusion trigger condition, correct?

A.    That's what they call it, yes.

Q.    Okay.  And if we see what it shows here -- it says here "exclude," and then you can enter or select a segment of recipients to be excluded?

A.    Yes.  That's what this is setting up.

Q.    So here, for example, it says, "Exclude subscribers messaged within the past 18 hours," correct?

A.    That's what it says, yes.

Q.    And so if you set that as your exclusion trigger condition, then subscribers who have gotten a message within the last 18 hours won't get another message, right?

A.    I think this is what this is setting up, yes.

Q.    Okay.  Now, under 809 and 810, there's another box.

MS. DURIE:  If we can go to PDX-8.11, Mr. Glass.

BY MS. DURIE:

Q.    There's another box there that we see, and it says, "plus trigger."

Do you see that?

A.    Yes.

Q.    And that's 811, right?

A.     Yes.

Q.     And it says, "Additional exclusion triggers may be included in and as the exclusion trigger condition 810," right?

A.     Right.

Q.     So that's saying in addition to excluding subscribers messaged within the past 18 hours, you can identify additional exclusion triggers, right?

A.     Yes.

        MS. DURIE:  Okay.  And then, Mr. Glass, if we can pull up 8.11 -- I'm sorry.

        Yeah, 8.18.  8.18.

BY MS. DURIE:

Q.     In the upper right-hand corner of Figure 8A, there's a little button that you can click that says, "Schedule or launch," right?

A.     Yes.

Q.     And if we look at the text of the patent, it says, "The application operator may save changes, 820," that's the little save changes button, "or may go ahead and schedule or launch the message flow plan to cause the message management platform to start executing the steps."

        And so that little button allows you to either launch the message or schedule the message, correct?

A.     Well, it's launch or schedule the flow plan.

Q.    Okay.  And that is what will result in the message then getting sent, right?

A.    Well, it will -- it will result in this flow plan being executed.  And if it's -- if it's called on to send a message, it will.

Q.    Correct.

Now, as we saw --

MS. DURIE:  And if we go back to 8.16, Mr. Glass.

BY MS. DURIE:

Q.    As we saw, if an exclusion trigger condition for a message is satisfied, that means they don't get the message, right?

A.    So my understanding of the exclusion trigger condition is that -- is that users who meet that would not get a message.

Q.    Right.  So that exclusion trigger condition, that determines who gets the message, right?

A.    Well, that's part of determining who gets the message and who doesn't.

Q.    Right.  The trigger condition all subscribers is one of the things that will determine who gets the message, right?

A.    Yes.

Q.    And the exclusion trigger excludes subscribers

messaged within the past 18 hours, or any other triggers that are set as exclusion triggers, will also factor into determining who gets the message, right?

A.    Yes.  These all operate together to figure out who gets messages.

Q.    Right.  And that exclusion trigger condition, that can't cause a message to be sent, right?

A.    Well, the trigger condition that initiates this is something else here, but this is -- this is part of what's -- this is part of what's limiting, it's essentially establishing who gets the message, not what causes the message.

Q.    So that, in fact, is my precise point.  And let's see now if you can answer my question.

The exclusion trigger condition can't cause a message to be sent because no message is sent to that subscriber, right?

A.    That -- checking that box and putting somebody into that list means that if something else causes a -- is trying to send a message, it will prevent that message from going out to that subscriber.  That's all that it means.

Q.    Right.  The exclusion trigger is defining the set of people who will or in this case will not receive the message?

A.    In this -- in this circumstance, where there's

something causing an event -- something causing a message to be sent, this will, in effect, sculpt the collection of people who are going to receive that message.

Q.    Right.

MS. DURIE:  Now if we can please go, Mr. Glass, to the witness's infringement slides, Slide 14.

Perfect.

BY MS. DURIE:

Q.    Now, you were asked some questions about this during your direct examination, and I believe you reference the fact that Mr. Meyer testified about this slide, right?

A.    Yes, I believe so.

Q.    Now, you didn't mean to suggest that Mr. Meyer had agreed that this was talking about monitoring trigger conditions, did you?

A.    What I think I said, and -- is that this spreadsheet indicates that Postscript was aware that Attentive's Campaign Composer did not do subscriber-response branching but that Journeys did.

Q.    Okay.  Subscriber-response branching, and I think you actually referenced that creating conversational campaigns where the next message can be determined by how the subscriber responds; is that right?

A.    Yes.

Q.    Okay.  Now, were you in court when Mr. Meyer and

Mr. Turner both talked about what that means?

A.    I was in court for at least some of it, but I think I read the transcripts.

Q.    So you're aware that Mr. Turner explained that when it's talking about the idea that the next message can be determined by how the subscriber responds, it's talking about a feature where a subscriber can text back a message like, "Will this work for me if I have curly hair?"  and can get a text message back in response to that query?

A.    Okay.

Q.    Okay?

      And that branching supporting nested branching, that's talking about branching within branching, right, that's what nested branching means?

A.    Yes.

Q.    You don't have an opinion in your report that nested branching is required by the claims, do you?

A.    Yeah.  I don't think I've said that.

Q.    Yeah, you don't have an opinion in your report that the ability to text back to a subscriber in response to a query, like, "Will this work for me if I have curly hair?" is required by the claims?

A.    I think that's correct.

Q.    Okay.  Now, you were present for Ms. Frederiksen's testimony yesterday, correct?

A.      Yes.

            MS. DURIE:  And if we can please put up

PDX-5.25.

            MR. GLASS:  PDX?

            MS. DURIE:  PDX 5.25.  Yeah, PDX.  Perfect.

            Nope.

            MR. SAULSBURY:  There it is.

            MS. DURIE:  There we go.  Exactly.  Perfect.

BY MS. DURIE:

Q.      So you were here for Ms. Frederiksen's testimony

about this, right?

A.      I was here for all of her testimony, so I -- I don't

remember this specific moment, but I was there for her

testimony, that's correct.

Q.      And you would agree that there are three different

retargeting criteria that are shown here?  Recipients who

did not click the previous message, recipients who did not

open the previous message, and recipients who clicked the

previous message and did not purchase, right?

A.      Yes.

Q.      And you heard Ms. Frederiksen explain that she would

walk through one of them as an example to illustrate

infringement, but then in her opinion, they operate in

essentially the same way.  Did you hear her say that?

A.      That sounds right.  I don't remember specifically,

no.

Q.    But it's your opinion that the only messages that Ms. Frederiksen identified as meeting the transferring at least one message in the message flow that is associated with a trigger condition, that requirement in the claim, it's your opinion that the only messages that she identified were the messages associated with that last trigger condition; is that right?

A.    Are you asking me if I've expressed that opinion --

Q.    Yeah.

A.    -- testifying here today?

Q.    No.  Have you expressed that opinion in the expert report that you submitted?

A.    I don't recall specifically.

Q.    Let me just back up and just explain something.

So you wrote several expert reports in this case, right?

A.    Yes.

Q.    Those are the thick documents in the binder.  And those experts reports were provided to us so that we would know the entirety of your opinions, right?

A.    Yes.

Q.    And our experts did the same thing.  Our experts wrote expert reports and provided them to the other side so they would know the entirety of our expert's opinions,

right?

A.     Yes.

Q.     You should have CX-119 in front of you.  It's the same report that we have been looking at.  Turn to paragraph 432 of your expert report.

Now let me just ask, you've been here for the whole trial, right?

A.     Yes.

Q.     In town, in Wilmington?

A.     Yes.

Q.     Have you had a chance to reread your expert reports to prepare for your testimony today?

A.     I've read my expert reports.  I've read your witness's expert reports.  There's a lot of material there, and I've mostly been involved in preparing for presentations.

Q.     Okay.  Let's go to paragraph 432 of your expert report.

A.     Okay.

Q.     And you said, "All asserted claims of the '660 Patent require, among other things, transmitting at least one message in a message flow that is associated with a trigger condition to the first subscriber.

The only messages Ms. Frederiksen identifies as allegedly satisfying this requirement are those associated

with a single two-parts trigger condition.  Recipients 1, who clicked the previous message and did not purchase, and 2, who do not have an open support ticket."

Do you see that?

A.    Yes.

Q.    So your opinion was, the only messages Ms. Frederiksen had identified as infringing were the ones where the retargeting condition was, clicked the previous message and did not purchase?

A.    Yes.  I then cited to her report where I'm responding to it.

Q.    Now, you reviewed a spreadsheet that Attentive created that counted messages in campaigns with a certain kind of retargeting, right?  Do you remember that?

A.    Yes.

Q.    Now, I'm guessing the Bates number ATT_947047 probably doesn't run trippingly off your tongue, but let's take a look at paragraph 434 of the report you have in front of you.

A.    Okay.

Q.    Let me know, are you at paragraph 434?

A.    Yes.

Q.    So what you said in your expert report is that based our discussions with Dena Sauer at Attentive, that you understand that the document with the Bates number

ATT_0947407 -- that's what Attentive stamped it with -- reflects the total number of corresponding SMS, MMS, and e-mail messages sent by Attentive customers as part of any campaign that included retargeted messages sent to recipients who clicked the previous message and did not purchase.  Do you see that?

A.      Yes.

Q.      So you've got that document with that number, and in that document, Attentive provided you with information about the number of messages sent by recipients who had clicked the previous message and did not purchase.  That's one retargeting condition, correct?

A.      I think that's right.  I kind of want to see that -- that document, but --

Q.      Well, I'm relying on what you said about it.  That is what you said about it, right, that you were --

A.      That's what I said.

Q.      Right.  Okay.  And so then you then concluded -- you can look at paragraph 434 in your report, and follow along with me.  But you then concluded that that tab with information about that one retargeting condition included all messages sent as part of campaigns that you said, according to Ms. Frederiksen, were the only campaigns that satisfied all requirements of the patent, right?

                Last sentence?

A.      Yes, yes, that's right.

Q.      So let's go back to the demonstrative.  Let's go back to PDX 5.25.

So we can agree, all three of these things are, in fact, retargeting conditions, right?

A.      That's how they're labeled, yes.

Q.      And information that you pulled from the spreadsheet only related to one of them, the last one, right?

A.      Yeah, apparently total campaign message sends reflects the total number of messages sent to recipients who clicked the previous message and did not purchase.

Q.      Right.  So you provided information to Dr. Kennedy that he used in calculating damages that was 2.5%.

Do you remember that?

A.      Well, I remember that I -- that I -- I pointed Mr. Kennedy to the portion of the messages that were -- that were -- that were implicated in the patent.

Q.      Right.  And you determined that the messages that were implicated in the patent were only the messages with that last retargeting condition, clicked a previous message and did not purchase, and directed Mr. Kennedy on the data for just that one retargeting condition?

A.      Well, as I said in my report, that was based on what Ms. Frederiksen put in her report that I've cited to in here.

Q.      Right.  So what that means is if, for example, there was a campaign that had a first message that went out to all subscribers and then a second message that only went out to subscribers who didn't open the previous message, and let's say those were the two messages that went out in that campaign, that wasn't counted in your analysis, right?

A.      I think what was counted in my analysis was the messages that Ms. Frederiksen identified in her report as being -- as being infringing.

Q.      Well, actually, the ones that she identified in her report as being clicked the previous message and did not purchase as an example of infringement, right?

A.      Well, as I said in my report, that's what -- that's what I'm looking for in these spreadsheets.

Q.      Right.  And so all that testimony that we heard from Mr. Kennedy about the 2.5%, that was all based on the assumption that the only thing that was infringing was that one retargeting condition out of all of the retargeting conditions that Attentive uses?

A.      I don't recall what the specific numbers were, but that was -- that was what I pulled out of the sheet based upon what Ms. Frederiksen put on her report.

Q.      Would this be a convenient time for lunch?

                THE COURT:  Not quite.

                MS. DURIE:  That's fine.  I'm willing to switch

to a different topic, so...

THE COURT:  I'll give you a little heads-up.

MS. DURIE:  Sure.  That's great.  I appreciate that, Your Honor.

BY MS. DURIE:

Q.    So let's talk about validity.  You understand there is a presumption that a patent is valid, right?

A.    Yes.

Q.    And in order to rebut that presumption, you need clear and convincing evidence of invalidity?

A.    Yes.

Q.    And that's because if you're contending that a patent is invalid, you have to overcome the Patent Office and say what they did was wrong, right?

A.    Yes, that's one way to look at it.

Q.    Okay.  And so in your opinion and based on your expertise in testifying in these kinds of matters, you would agree that you have to have very, very clear evidence, very precise and clear evidence that the patent is invalid?

A.    You have to have strong evidence that the patent is invalid.  I will give you that.

Q.    Would you agree that you have to have very, very clear and very precise evidence?

A.    I'm not exactly sure what that means.  You need to be able to prove -- you need to prove by clear and convincing

evidence that the patent is invalid.

Q.    So let's go in your binder.  You should have CX-23.

A.    Okay.

Q.    And do you see that CX-23 is a copy of a transcript from a trial in another case where you were an expert?

A.    Yes, I see that.

            MR. SARKAR:  Objection.

            MS. DURIE:  It's impeachment.

            MR. SARKAR:  Improper impeachment.

            THE COURT:  I'm not sure the nature of the objection, so let me ask the nature of the objection, Mr. Sarkar.

            MR. SARKAR:  It's irrelevant and improper impeachment.  It's from a different case involving different facts, different parties, different technologies.  There's no connection between that case and this case --

            (Reporter clarification.)

            MR. SARKAR:  It can only prejudice the jury and do nothing else.

            MS. DURIE:  I haven't even asked my question yet.

            THE COURT:  All right.  Why don't we -- I'll overrule the objection for now until we see further.

            Let's go on.

BY MS. DURIE:

Q.    So, Dr. Polish, you testified as an expert in a case between Fresh Hub and Amazon, right?

A.    Yes.

Q.    But in that case, you were on the other side, right?

A.    On the other side, meaning --

Q.    Yeah, meaning you were representing the patent holder?

A.    I was -- I was working with Fresh Hub who was the plaintiff.

Q.    Right.  And you would agree -- and I'm going to direct your attention to page 1172.  It should have a nice blue tab sticky to help you get there more quickly.

        1171, 1172, are you there?

A.    Okay, yes.

Q.    1172, the answer that begins at line 9.

        So let me just ask -- read that to yourself.  That's the answer that you gave.  And look up when you're done.

A.    Okay.

Q.    Would you agree, sir, that you --

        MR. SARKAR:  Objection.  The part of the testimony that my colleague is about to cite misstates the legal standard and is not in the final jury instructions.

        THE COURT:  Ms. Durie.

        MS. DURIE:  It is the witness's understanding of

the standard that he applies to conduct an invalidity

analysis.  I'm not saying he's an expert on the law.

THE COURT:  Okay.  I'll overrule the objection.

I believe it's proper impeachment, but, of course, the

Court's instruction will --

MS. DURIE:  Of course, Your Honor.

BY MS. DURIE:

Q.      Dr. Polish, would you agree that you have to have

very, very clear evidence, very precise and clear evidence

that the patents are invalid?

A.      That's what I said in that case under those

circumstances.  That was -- that was a different time.  The

standard is the standard.

Q.      Indeed it is.  It's the same standard regardless of

which side you're on?

A.      That is certainly true.  This was -- this was

something that I said in a different context.  I don't

recall the precise context.  Yes, I was on the other side.

Q.      Okay.  I'd like you to turn now in your binder to

CX-15.  CX-15.  And before we get into that, you said in

your direct testimony that you had been involved in another

case in which I think you said you had found prior art that

the Patent Office had not found; is that right?

A.      I hadn't said that.  I had been involved in a case

where I found prior art that in -- that invalidated the

patent.  I don't remember if that was art the Patent Office had considered or not.  I didn't testify to that.

Q.    Different case, different patent, different art, not relevant to the question here, right?

A.    That was asked and answered entirely about whether it's -- whether patents can get invalidated and I said yes.

Q.    Okay.  Now, I directed you to CX-15, 1, 5.  This is one of the documents that you rely on in your expert report as a description of Attentive Journeys' product, correct?

A.    Yes, I think so.

            MS. DURIE:  We offer CX-15.

            THE COURT:  Is there any objection?

            MR. SARKAR:  No objection.

            THE COURT:  All right.  It's admitted.

            (CX Exhibit No. 15 was admitted into evidence.)

BY MS. DURIE:

Q.    Now, a journey sends messages to a given user triggered based on events related to that user, correct?

A.    It certainly can, yes.

Q.    Okay.  And, in fact, that is what a journey does.  It is a correct statement that a journey sends messages to a given user triggered based on events related to that user?

A.    That's roughly correct.  I don't know -- I don't know that the trigger has to be related to the user.  I mean, that's certainly the use of it.

Q.      Do you still have CX-19 handy?  That's your noninfringement report.

A.      Yes.

Q.      Why don't you go to paragraph 352.  Again, we've tried to put little stickies on them.

        You with me at paragraph 352?

A.      Yes.

Q.      And I'm going to read about four lines up from the bottom of that paragraph.

        "In contrast, a journey sends messages to a given user triggered based on events related to that user."

        That's what you wrote, sir; isn't it?

A.      Yes.

Q.      Okay.  And, for example, a user who has added a product to his or her shopping cart may be enrolled in a journey, and in response to not purchasing the product, he or she may receive a follow-up message, right?

A.      Yes.  That's what it says.

Q.      Okay.  Now, that article that I just asked you about that you had relied on in your expert report, the Patent Office also considered that article, didn't it?

A.      I don't recall whether this article was part of the documents given to the Patent Office.

Q.      Okay.  Let's take a look.

        MS. DURIE:  If we could put up, please,

Mr. Glass, JTX-1 at page 5.

So JTX-1, that's the patent.  We probably all know by now, that's the patent.  So JTX-1 at 5.

BY MS. DURIE:

Q.    And this is part of the listing of prior art that we see in the patent, right?

A.    Yes.  And as I recall, there's several hundred associated with this patent.

Q.    That's right.  Shopify -- I'm sorry.  Sorry.

Postscript submitted a large volume of prior art, right?  Lots and lots and lots of prior art that it thought might be relevant, right?

A.    It submitted lots and lots of prior art.

Q.    Okay.  And to be clear, in your expert report, you don't identify a single item of prior art that Postscript submitted that in your opinion it should not have submitted, correct?

A.    That wasn't an analysis that I did.

Q.    Okay.  So returning to the art that was submitted here.

MS. DURIE:  If we can blow up, Mr. Glass -- there we go.

BY MS. DURIE:

Q.    How PAWZ uses Attentive's Journeys to send triggered messages to subscribers, contributing to 4.6 million in SMS

revenue.

That is, in fact, Exhibit CX-15.

MS. DURIE:  And if we can now, Mr. Glass, please put up Exhibit CX-15.

BY MS. DURIE:

Q.     That is one of the references that you relied on in coming up with your opinions in this case, correct?

A.     I don't recall whether this is part of my materials considered or not, but yeah.

Q.     Okay.  Well, let's take a look.  You still got CX-14 in front of you.  That's your invalidity report.

A.     Yes.

Q.     And if you can go to paragraph 148.

A.     Okay.  Okay.

Q.     Take a look and read the first sentence of your report, just to yourself, and then see what you cite.

A.     Yes.  It appears I do cite to this reference.

Q.     Okay.  You cited this PAWZ reference for the proposition that Attentive's Journeys included functionality relating to sending triggered messages based on behavioral data, right?

A.     Yes.

Q.     And, obviously, the Patent Office had that article in front of it because it was cited on the face of the patent, right?

A.    Well, it was disclosed to the Patent Office.  What they did with it or not, I don't know.

Q.    Okay.  Well, remember the Patent Office after it got that big stack of material asked Postscript to resubmit a smaller set of references that it thought were the most relevant.

Do you remember that?

A.    Yes.

MS. DURIE:  Okay.  Let's take a look at DTX-619.495, Mr. Glass.  DTX 619-495.

BY MS. DURIE:

Q.    And so this is what the examiner had instructed Postscript to do, to eliminate marginally pertinent cumulative information, right, and to submit -- resubmit a smaller stack of things, right?

A.    Yes.

Q.    And Postscript did that, right?

A.    Yes.

Q.    Let's go to DTX-619.609 to 610.  This is the list of references that Postscript resubmitted in a smaller set of materials to the Patent Office, right?

A.    I believe so, yes.

Q.    And you see number 8 is, again, that same PAWZ article, how PAWZ uses Attentive's Journeys to send triggered messages to subscribers, right?

A.    Yes.

Q.    Okay.  Now, you are taking the position that Journeys anticipate -- and by the way, the examiner confirmed that he had reviewed those materials that Postscript had resubmitted, right, and signed off on them.

Do you remember that?

A.    I am aware that the examiner said that he had looked at those references.

Q.    Again?

A.    Yeah.

Q.    Now, you're taking a position that Journeys -- Attentive's Journeys anticipates Postscript's patent, right?

A.    Yes.

Q.    You said that with respect to Klaviyo, too, right?

A.    Yes.

Q.    Okay.  And then you sort of said that very briefly at the end about Sephora?

A.    That's right.

Q.    All right.  Now, for anticipation it's not enough that the prior art is close, is it?

A.    No.  That's why I referenced obviousness, as well.

Q.    We're going to get there, but let's stick with anticipation for the moment.  Okay.

Anticipation means that the prior art has to match up exactly with what's in the claim, right?

A.    I don't recall the exact words of what the patients, but it's got to be -- it's got to be very close.

Q.    Well, it's not just that it's got to be close, right?

You understand, don't you, that anticipation requires that each and every requirement of the claim is present in that one piece of prior art?

A.    Yes.

Q.    Okay.

THE COURT:  Ms. Durie, in the next five minutes, if you have a stopping point that works for you.

MS. DURIE:  This is a perfectly good stopping point.

THE COURT:  Okay.  We'll stop and take some lunch, and we'll have the jury led out for lunch.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  You may be seated. We'll come back at ten after 1:00.

MS. DURIE:  Thank you, Your Honor.

THE COURT:  Thank you.  The Court stands in recess.

COURT CLERK:  All rise.

(Luncheon recess.)

COURT CLERK:  All rise.

THE COURT:  All right, everyone.  Please remain

standing.

(Jury enters.)

THE COURT:  All right.  Please be seated, everybody.  We'll begin with the cross-examination.

MS. DURIE:  Thank you, Your Honor.

BY MS. DURIE:

Q.    And, Dr. Polish, welcome back.

MS. DURIE:  Mr. Glass, could we put up DDX-5.52, please.

BY MS. DURIE:

Q.    So this is the slide that you were asked about with respect to enrolling.

Do you remember that in your direct testimony?

A.    Yes.

Q.    Now, you talked to the jury about this enrolling limitation.  You didn't put up any actual evidence in front of the jury, did you?

When you -- so you put up this enrolling slide, you talked about it, but you didn't put up another slide with here's the evidence about enrolling, right?

A.    Well, I talked about what enrollment -- I talked about what enrollment was and that it's adding a subscriber to a segment.  So that was -- that was the explanation enough to what it was.

Q.    Right.

You talked about it, but just to be clear, you didn't put up a document, right?

A.     I talked -- I talked about what it was and why I was satisfied by it, but I did not -- I did not put a document up.

Q.     You didn't put source code up, right?

A.     I don't think I did, no.

Q.     Okay.  And, in fact, as you walked through all of these various requirements, there were lots of requirements where you didn't put up a document, right?

A.     There were -- there were -- sure.  There were ones I did not put up documents specifically about that particular element.

Q.     There were lots of ones where you didn't put up source code, right?

A.     I don't know about "lots."  There were several I didn't put up specific source code for.

Q.     Right.

       But you still think you were able to show enough information to reach a conclusion, right?

A.     Yes.

Q.     Now, since we're talking about source code, you made a reference to Ms. Frederiksen and source code.

       You don't dispute that she reviewed the source code, right?

A.    I believe she spent some amount of time looking at source code.

Q.    Okay.  Your observation was just that she had not put source code on slides to show the jury?

A.    Yes.

Q.    Okay.  Now, I want to turn briefly to the question of obviousness.

You are familiar with what are called secondary considerations of nonobviousness, right?

A.    As a general matter, yes.

Q.    And those are factors that can be relevant to whether an invention is obvious, right?

A.    Yes.  It depends on particular circumstances.  But, yes, those are factors that can be brought in to look at nonobviousness.

Q.    And one of those factors is whether there is copying by competitors, right?

A.    I believe that's one of the factors that can be considered, yes.

Q.    Right.

Because copying by competitors tends to show that an invention was not obvious, right?

A.    I think you're asking a question of law there.  I think copying generally goes to, you know, someone actually literally copying something as an indication that they

thought it was worth stealing.

Q.     Well, you concluded in this case that Attentive didn't copy, right?

A.     Yes, I believe I said that.

Q.     Okay.  Now, you relied on Attentive's lawyers to give you the information that you would need to arrive at your opinions, right?

A.     You mean in general?

Q.     Yeah.

A.     Yes.  They were -- they were the source of most of the documents and materials in this case.

Q.     Right.  They provided you with, by way of example, deposition transcripts, the transcripts of testimony that people had given in this case, right?

A.     Yes.

       MS. DURIE:  Now, Mr. Glass, let's put up PTX-181 in evidence.

BY MS. DURIE:

Q.     Now, we went over this document with Mr. Long and I don't recall, Dr. Polish, whether you were present for that testimony.  But this is an e-mail between Jesse Greenberg and Brian Long at Attentive talking about Sequential Campaigns.

       That's the Postscript feature as it was known at the time, right?

A.      Let me just reorient myself on this e-mail.

Q.      Sure.

A.      This is -- okay.  I don't remember this specifically, but it seems a plausible e-mail.

Q.      Okay.  So you see, as you sit here today, that it says, "Sequential Campaigns, add additional messages as Drip retargeting to as many campaigns as possible.  Postscript differentiates on this feature today.  Let's close the gap and drive more message volume."

        You're seeing this today, basically, for the first time, right?

A.      I don't remember whether I've ever seen it before, no.

Q.      Right.

        And isn't it true that, in fact, Attentive's lawyers didn't give you this document to review when you were coming up with an opinion that Attentive didn't copy Postscript?

A.      So, I don't know that I haven't seen -- that it wasn't in the materials considered.  There was an enormous amount of material put in front of me.

        I don't recall this e-mail --

Q.      Okay.

A.      -- from my work.

Q.      You should have CX-25 in your binder.  CX-25.

A.      Yes, I see it.

Q.      Okay.  If you turn to it, you'll see that it's Exhibit B to your invalidity report.  It is your materials considered.

Now, you with me?

A.      Yes.

Q.      It's only four pages long.  You can flip through it.

No reference there to this document, is there?

A.      Okay.

MS. DURIE:  Let's put up, Mr. Glass, PTX-230.

BY MS. DURIE:

Q.      I don't know, do you remember seeing this document during Mr. Miao's deposition?

This is from Salesforce.

MS. DURIE:  And if we can blow up, Mr. Glass, about a third of the way down, on the left-hand side, where it says, "Competitor of Postscript."

Above that.  A little bit above.  Left-hand side.  Yeah.  Exactly.

BY MS. DURIE:

Q.      See that, "Competitor documentation of feature, create a content Drip campaign."

Attentive's lawyers didn't give you this either to consider in coming up with your opinions as to whether or not Attentive copied Postscript?

A.      I don't think I've seen this document before.

Q.      Now, finally, sir, how much are you charging an hour?

A.      725 an hour.

Q.      And how many hours do you think you've spent on this case?

A.      Well, this case goes back a long time, as you know, and has morphed and changed.

        I -- I don't know, probably something on the order of 400 hours.

Q.      Okay.  And so even just like with respect to producing your invalidity report and your infringement report related to Postscript's patent -- they're like hundreds of pages long, right?

A.      Yes.

Q.      How much -- just ballpark, how much money do you think you and anyone helping you has billed Attentive in total for your work in this case relating to the Postscript patent?

A.      Relating to the '660 in particular?

Q.      Yeah, relating to the '660 Patent?

A.      As you know, the case has involved a lot of other patents.

Q.      I'm just asking for just this case.

A.      I don't know specific to the '660, I really just don't know.

Q.    So any ballpark guess for how much time you spent writing those hundreds of pages of reports?

A.    As I said, there's several hundred hours' worth of work that has gone into it.

Q.    Okay.  So 750 an hour, several hundred hours, what do you think would be fair, like 300?

A.    You mean like 300,000?

Q.    $300,000, does that seem fair?

A.    That's probably about right.

Q.    Okay.  Now, you know that Attentive is saying in this case that infringing Postscript's patent is only worth $500,000?

A.    Yeah, I was here for the damages testimony.

Q.    But they've paid you, let's say, ballpark, $300,000 to testify to an opinion that they don't owe anything?

A.    They've paid me to do my research in the case and that includes work I've done at trial.

        MS. DURIE:  Fair enough.  No further questions. Pass the witness.  Thank you, sir.

        THE COURT:  All right.  Any rebuttal?

        MR. SARKAR:  Yes, there is.

                    REDIRECT EXAMINATION

BY MR. SARKAR:

Q.    Dr. Polish, remember when Postscript asked you about Limitation 1(k), the enrolling first subscriber limitation?

A.      Yes.

Q.      Is the evidence that you relied upon for that identical to the evidence that you relied upon for Limitation 1(c), the user interface limitation?

A.      In the case of Journeys?

Q.      In the case of Journeys.

A.      Yes, I think so.

Q.      And that's because the source code that shows workflows in Journeys being triggered, complicates down, defines a segment of subscribers; is that right?

A.      Yeah, it's all part of this large body of code, and I was pointing to that code through various things.

Q.      And defining the criteria that gets people to be in a segment, also enrolls people down the line in that segment, right?

A.      When a message -- when an event comes in that pertains to a particular user, then they get enrolled in a segment.

Q.      Thank you, Dr. Polish.

        Dr. Polish, is there anything else -- that opposing counsel asked you change anything about your opinions in this case?

A.      No.

        MR. SARKAR:  Mr. Glass, would you mind putting up PDX-8.18.  I think I'll have to have Postscript's visual

person put that up, because we don't have that demonstrative.

MR. SAULSBURY:  Mr. Glass, go ahead.  If you don't mind.  Thank you.

MR. SARKAR:  And can we go to the figure -- yeah.  Yes, that's fine.

BY MR. SARKAR:

Q.   So Dr. Polish, this figure, talking about recipient criteria, right?

A.   Yes.

Q.   Now, the claims use the term "trigger condition" and uses the term "recipient criteria," right?

A.   Yes.

Q.   Those are two different things, right?

A.   Right, that's part of the point of the patent, is that there's recipient criteria to establish a segment and there's trigger conditions.

Q.   And do the figures of a patent describe what the invention is?

A.   No.  They're related to preferred embodiments and they help explain the invention.

Q.   Does Magic Composer work anything like the claims of the '660 Patent?

A.   No.

Q.   Dr. Polish, counsel for Postscript asked you a bunch

of questions about what the Patent Office -- knew the presumption of validity for the Patent Office, and what they had, you know -- whether it was right to assume that the Patent Office had made a mistake in this case; is that right?

A.    Yeah, she asked a number of questions around that.

Q.    Dr. Polish, did the Patent Office have access to the Journeys source code?

A.    No.

Q.    So the Patent Office wouldn't even have looked at the Journeys source code to make its determination that the '660 Patent was currently issued?

A.    That's right.  As far as I know the Patent Office did not have access to the source code and they generally don't look at the source code.

Q.    And were you here when Alexander Meyer, the inventor of the '660 Patent, testified that Klaviyo Flows was not identified by Postscript in the smaller list of 13 references that the patent examiner ultimately received?

A.    Yes.

Q.    And counsel for Postscript finally asked you about a document that discussed a conversation about Sequential Campaigns between Mr. Greenberg and Mr. Long at Attentive?

A.    Yes.

Q.    Did you see that the date on that document was

Quarter 1, 2022?

A.     I hadn't noticed that at that point.

MR. DAVIS:  It's PDX-230.

MR. SARKAR:  It's PDX -- that's PTX-230.

Yes.  Could you zoom in, Marco, on the status change date on the top right?

BY MR. SARKAR:

Q.     And that says April 25th, 2022, doesn't it?

A.     Yes.

Q.     And that's well before the priority date of the '660 Patent; isn't it?

A.     That's correct.

MR. SARKAR:  No further questions.

Attentive rests its case.

THE COURT:  Okay.  You may step down.

And, Counsel, please collect the binders.

MS. DURIE:  Of course.

MR. SAULSBURY:  Your Honor, a motion in view of the testimony in their case.

MS. DURIE:  Actually, I think they haven't rested.  Oh.  They did.

THE COURT:  You have a motion to make?

MR. SAULSBURY:  That's right, Your Honor.

THE COURT:  All right.  So ladies and gentlemen of the jury, there's a motion that I have to hear.  And so

my courtroom deputy will take you out for an initial break here, and I'll handle this, and we'll bring you back.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.

MR. SAULSBURY:  Great.  Thank you, Your Honor.

Postscript moves for judgment as a matter of law on a number of different grounds.  The first ground is with respect to invalidity.  No reasonable jury could find the asserted Claims 4, 6, 10 and 14 are invalid in view of the testimony.

First, with respect to the anticipation theories, anticipation, of course, requires the single prior art reference describe each and every element of the claimed invention.  There was not evidence elicited showing that any of the three grounds that were presented by Attentive meet each and every limitation of the claims.

Just to highlight a few.  There was not evidence sufficient -- there was not substantial evidence with respect to enrolling the first subscriber to the segment requirement.  And that cuts across all claims; in fact, each of these does.

There was also a lack of substantial evidence with respect to the presenting a user interface requirement, the enrolling the first subscriber requirement, the

monitoring the trigger condition requirement, the storing for a first subscriber requirement, the determining based on the plurality of stored subscriber events requirement.

And then with respect to Claim 4 specifically, there was not substantial evidence for the dependent limitation added by Claim 4 that each API payload comprised a plurality of key-value pairs.  The limitation continues but the point is there wasn't sufficient evidence with respect to the additional dependent limitation of Claim 4.

The same is true of the additional limitation provided by Claim 6.  That limitation begins -- this was subscriber event described in an API notification that continues.  Based on what was presented, there was not substantial evidence to meet that requirement either.

The same is true for dependent limitation added by Claim 10 that begins, "the plurality of the stored subscriber events associated with the first subscriber."  It continues but there was not substantial evidence to meet that requirement.

And then the same is also true of Claim 14, it's a dependent requirement that each of the plurality of API notifications is a webhook notification.

Additionally, with respect to Sephora Replen, Dr. Polish's testimony was entirely conclusory and he did not provide particularized testimony as to each limitation.

And that failure cannot be cured by reference to Mr. Miao's testimony as was attempted during Mr. Polish's direct.

Mr. Miao was not disclosed as an expert. He, therefore, cannot provide expert opinion on how the elements were met.

Additionally, with respect to obviousness, there's sort of a global issue. And let me set the table a little bit. There were two obviousness theories that were preserved with respect to the trial presentation, at least going into today. One was a combination based on -- based on Klaviyo, and a combination reference. The other obviousness theory was based on Journeys. And the Journeys obviousness theory was single-reference obviousness.

And just so that we have in the record, the Klaviyo combination reference was Sundaram, that was what was in the PTO.

Let me start with Klaviyo. And with respect to Klaviyo, there was no discussion of Sundaram at all, much less how that reference -- how a POSA would have been motivated to combine Sundaram with Klaviyo, much less how a POSA would find a reasonable expectation of success, those words did not come out of Dr. Polish's mouth.

And in fact, with respect to all the obviousness theories, the only testimony from Dr. Polish was about the standard for obviousness. There was no attempt to

articulate so that even the basic elements of obviousness, such as motivation to combine reasonable expectation of success were in the case of single-reference obviousness, motivation to modify.

And that's a good segue into the obviousness theory based on, based on Journeys.  That was a single-reference obviousness and just to sort of emphasize the point I made earlier, there was zero testimony from Dr. Polish about how one would modify Journeys, how one would be motivated to modify Journeys to fill any particular gaps in Journeys.  There's just no attempt to do that at all.

Again, the words "motivation to modify" didn't come out of his mouth.  He didn't identify any particular gaps he was filling with POSA knowledge.

And then with respect to Sephora finally, it wasn't entirely clear whether they're still running Sephora as an obviousness combination; but even if they were, there was zero particularized testimony there with respect to motivation to combine or motivation to modify, and Mr. Miao can't fill the gap.  He's a lay witness and the law is clear that lay witness can't address technical questions pertaining to whether one of ordinary skill in the art would be motivated to combine or modify references.  And the exemplary case cite is the *HVLP02 vs. Oxygen Frog* case.

Next up is infringement, Your Honor.  Postscript is entitled to judgment as a matter of law that Attentive infringes all asserted claims of the '660 Patent and a reasonable jury would not have a legally sufficient evidentiary basis to find otherwise because the evidence shows that each and every claim limitation is met.

Additional with respect to damages, there are a couple of issues.  So at a global level, Postscript is entitled to judgment as a matter of law, that damages cannot be limited to revenues from single-message campaigns, which Attentive's damages expert, Mr. Kennedy, calculated to represent 2.5% of U.S. revenue.

There's at least three reasons for this.  To provide some examples, Your Honor, first, the messages counted within the 2.5% were limited, as we understood from Dr. Polish's testimony to campaigns in which the message was sent to a single subscriber.  There were a couple other grounds that supported that basis, but I think we preserved the right with respect to that argument.

And then finally there's one last JMOL ground with respect to damages whereby Postscript is entitled to judgment as a matter of law.  Their royalty of 571,000 or less to compensate Postscript for Attentive's --

(Reporter clarification.)

MR. SAULSBURY:  Of 571,000 or less to compensate

Postscript for Attentive's infringement from July 2023 through June 2025 is not reasonable and would not have been accepted by Postscript in the hypothetical negotiation.

THE COURT:  Just one or two quick questions.

MR. SAULSBURY:  Absolutely.

THE COURT:  On obviousness for Sephora Replen, I don't even have that Sephora Replen listed in the pretrial order as part of an obviousness argument.

Does that seem right to you?

MR. SAULSBURY:  I think that's right, Your Honor.

THE COURT:  Okay.

MR. SAULSBURY:  Thank you.

THE COURT:  And then the other -- on Klaviyo plus *Sundaram*.

MR. SAULSBURY:  Yes, Your Honor.

THE COURT:  I expect the other side is going to say they're not pressing it.  In the end wouldn't that be resolved in whatever the standard they --

MR. SAULSBURY:  I believe so, Your Honor.

THE COURT:  So it's appropriate to grant judgment as to a matter of law as to that *Sundaram* combination issue as it relates to the doctrine of equivalents -- or it was not -- if the parties had worked out some other path such that those were simply withdrawn

from the case.  That would be the right way to go to.

MR. SAULSBURY:  I think that's right, Your Honor.

THE COURT:  And have the parties come up with some kind of plan?

MR. SAULSBURY:  No.

THE COURT:  All right.  Thank you.

MR. SAULSBURY:  Okay.  Sorry, just one brief clarification on *Sundaram*.  The slight distinction you said, they purported with Dr. Polish to run an obviousness theory with respect to Klaviyo Flows which was different than the DOE issue, but I am sitting down now.

THE COURT:  All right.  Mr. Davis.

MR. DAVIS:  Thank you.  So on their motion for no invalidity generally we, of course, oppose.  On anticipation, I heard Mr. Saulsbury mention the enrolling, the user interface, the monitoring, the storing, and the determining limitations for Claims 1 and 11.  There was significant evidence put in the record through testimony and source code and documentary evidence for each of those limitations against all of the primary references.  And the limitation 1(k) on redirect my colleague, Mr. Sarkar, even came up and elicited testimony from Dr. Polish that it was the same as limitation 1(c).

For Claims 4, 6, 10 and 14, those are all

related at least to the Shopify app, which was testified -- the integration with Shopify was testified to at length. And it's also what Ms. Frederiksen relied upon, and so there's ample evidence in the record to support those claims.

Dr. Polish did state that the Sephora Replen product met every limitation, that plus Mr. Miao's separate testimony should provide substantial basis in the record for a jury to conclude --

(Reporter clarification.)

MR. DAVIS:  -- for a reasonable jury to conclude that all the claim limitations are met.

On obviousness, Journeys is presented as a single-reference-obviousness theory.  And Dr. Polish testified that a POSA, or a person of ordinary skill in the art, could easily be able to modify the system to meet any claim limitations because there were no special requirements so that was easily within the skill in the art and would easily have addressed any modifications.

Further, I heard a lot of mention of motivation to combine, which, of course --

(Reporter clarification.)

MR. DAVIS:  -- which, of course, is no longer a requirement for obviousness.  And the Klaviyo we did not presented on *Sundaram*.  We did present evidence of a

single-reference-obviousness theory, so we think that's included within *Sundaram*, but we're not relying on *Sundaram*.

THE COURT:  So it's right to say that an obviousness theory based on Klaviyo plus *Sundaram* is not going to be pressed.  Like the doctrine of equivalents infringement issue on the Postscript side, I don't think it will be argued and presented to the jury.  I can consider the parties to be further meet and conferring on the appropriate way that those should be removed, but there's nothing I need to do prior to the conclusion of this trial.

MR. DAVIS:  Correct, Your Honor.  On infringement, we also oppose their JMOL of infringement. Dr. Polish testified at length, including using source code, that there were no trigger conditions at all that would allow the claim limitations of Claim 1 and Claim 11, therefore, providing substantial evidence in the record for the jury to conclude that there is no infringement because the Magic Composer lacks the requisite trigger conditions and, instead, using a time-based system to initiate sending a message.

On damages, there was testimony from Mr. Miao and others that actually the 2.5% used by Mr. Kennedy was based on all multi-message campaigns, which would be a superset that has more than simply the one example that Ms. Frederiksen pointed to in her report or even the

retargeting of -- the other two retargeting options that they are alleging are also meeting those limitations.  And Mr. Miao, in fact, testified that all retargeting messages -- that means any one of them -- is only .5% of the messages sent and that the 2.5% is actually all multi-message campaigns, which includes more than just retargeting messages of any type.  And so there's ample evidence for the jury to conclude that 2.5% is a conservative basis.

And that is -- oh, also, I would say that for the overall damages number, Mr. Kennedy said that using Mr. Kidder's analysis would be appropriate royalty base as 470,000 per year.  And Kennedy also said that 2.5% may be too high of a royalty based on Mr. Miao's testimony.  Thank you.

THE COURT:  All right.  Thank you.  Mr. Davis.

Let me say this with regard to the --

Mr. Saulsbury, do you want to add anything?

MR. SAULSBURY:  Just very briefly, Your Honor. I just want to clarify.  We heard that although *Sundaram* wasn't referenced, they can still run single-reference obviousness with respect to Klaviyo Flows.  They actually can't because in the pretrial order they disclosed their grounds of invalidity they were going to run.  This is on page 3 and with respect to Klaviyo, the only obviousness

theory that was disclosed was the combination of Klaviyo Flows and *Sundaram*.

THE COURT:  That seems correct to the extent that was said.  Obviously the pretrial order will control.

MR. SAULSBURY:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Well, let me just say with regard to the motion at issue and invoking the standard for motions -- for judgements of a matter of law that I discussed yesterday, first, with regard to the motion to the extent it relates to the previously proposed obviousness theory, relating to Klaviyo Flows in combination with *Sundaram*, I'll hold that portion of the motion in abeyance in the same way I did with regard to Attentive's motion for judgment as a matter of law as to Postscript's claims of infringement based on the doctrine of equivalents, in that I understand that as a practical matter in this trial, like with the prior claim of Postscript's here, Attentive will not press that defense in concluding of its case and its presentation to the jury or in the jury instructions.  And so I'll ask the parties to further meet and confer with that issue as well for an appropriate way to resolve the fact that those claims are not in the case or those arguments are not in the case any further.

Otherwise, with regard to the motion, in part, certainly for the reasons that Mr. Davis articulated with

regard to the evidence of record, in part because I don't understand that the parties are on limited time here because in many cases the motions, although well made, did not have argument in any detail about the substance of why it is that certain -- certain components of it should be valid, and in part because under Rule 50 certainly the parties will have the ability to renew a rule 50 motion after trial, I'm going to deny the remainder of the motion for those reasons and, therefore, resolve that issue.

Okay.  So it is now 1:50 -- 1:51.  I will be turning to Postscript next to ask if it has a rebuttal case on validity.  I suppose it does.  And so why don't we just take a short couple-minute break, and we'll make sure our jury is ready to go for that.  And then we can proceed.

All right.  So with that, the Court will stand in recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Our jury is ready to be brought back in.  Please remain standing.

(Jury enters.)

THE COURT:  All right.  Please be seated, everybody.

And so now for the last part of the presentation

of evidence, we turn to Postscript for any rebuttal case with regard to the issue of validity.

MS. LI:  Thank you, Your Honor.  We call Barbara Frederiksen.

THE COURT:  All right.  Ms. Frederiksen, come back to the stand.

All right.  The witness has been sworn and will remain sworn for her testimony.

Good afternoon.

THE WITNESS:  Good afternoon.

REBUTTAL DIRECT EXAMINATION

BY MS. LI:

Q.    Welcome back, Ms. Frederiksen.

A.    Thank you.

Q.    You were here for Mr. Polish's testimony on invalidity earlier; is that right?

A.    That is correct, yes.

Q.    Okay.  And you also reviewed his invalidity reports in this case?

A.    I did, yes.

Q.    And in his reports he identified three prior art systems.  He talked about them today.  Attentive Journeys, Attentive Sephora Replen and Klaviyo Flows, do any of those systems render the asserted patents invalid?

(Reporter clarification.)

A.      No, based on what I have seen in my analysis, no, they do not.

Q.      Why not?

A.      Well, they're missing some very central characteristics that the claims call for.

Q.      And I want the jury to kind of be able to take this down, so I'm going to go ahead and write down some notes here on the ELMO.

        Could you walk us through what those central differences are?

A.      Sure.  When you read the claims in light of the specification, you see, for instance, that the claims are directed to a multi-messaging flow system that can support the ability to retarget messages.  And the -- all three of the claimed art are flows that provide messages that go to an individual user to start their journey in a series of messages, but they don't go to a group of users.

Q.      Okay.  So I'm going to write down the first one here.  For the prior art, each subscriber is going on their individual journey; is that right?

A.      That's a good way to shorten that, yes.

Q.      All right.  Is there another difference that you wanted to discuss?

A.      Yeah.  Another thing that I think is important is that in the alleged prior art all of the timing with respect

to the messages is controlled by the user events.  So there's no opportunity in that art -- I mean, you can set a delay time from one message to the next, but nothing allows the merchants to actually control when the messages are delivered to the customer.  It's all dependent on when they happen to hit the trigger condition.

Q.     Would it be all right if I wrote down here "The subscriber controls when they receive messages"?

A.     Yes.

Q.     All right.  And is there a third difference that you wanted to talk about?

A.     Yeah.  Again, the description of the invention makes clear that one of its messages is retargeting and for retargeting to occur as it is described in some of the examples of the patent, the merchant has to be able to schedule when the second message happens.  So we use our Black Friday example or Labor Day example where you schedule the first message and you schedule subsequent messages in a way that makes sense to form a campaign, and the three products that were cited for prior art don't provide that capability.

Q.     All right.  So I'm going to take down that the merchant can't schedule a follow-up message.

A.     Follow up, yeah.  With respect to the date and time, yeah.

Q.    At a certain date a time?

MR. DAVIS:  Objection, Your Honor.  Outside the scope.  She expressly states that time cannot be a trigger condition.

MS. LI:  Your Honor, she's not testifying a time is a trigger condition.

THE COURT:  All right.  So I'll -- at this point, I'll overrule the objection until I get a better sense of exactly what the testimony is here.

MS. LI:  All right.  We can take the ELMO down.

BY MS. LI:

Q.    Now, I want to turn to the patent claims.  Did you analyze whether prior art systems included all the elements of Claim 1?

A.    I did, yes.

Q.    And you heard Dr. Polish's testimony earlier that all the elements in Claim 1 are identical to those in Claim 11, except for the elements up at the top, the preamble and the elements about the memory and processor?

A.    It's system versus method and the two computer claims that we talked about.

Q.    Do you agree with that?

A.    Yeah, I agree that the elements are all the same, except for that.

(Reporter clarification.)

BY MS. LI:

Q.      And do you have some slides identifying the elements that you think are missing from Claim 1?

A.      I do.

          MS. LI:  Could we, Mr. Glass, put up PDX-9.3.

BY MS. LI:

Q.      Is this identifying the elements that you think are missing from the Journeys prior art?

A.      Yes.

          MS. LI:  Okay.  Can we please go to PDX 9.4.

BY MS. LI:

Q.      And these are the elements you think are missing from the Klaviyo Flows prior art?

A.      That's correct.

Q.      Okay.  And can we please go to PDX-9.5.

          And these are the elements you think are missing from the Sephora Replen prior art?

A.      Yeah, it's a little bit longer list.

Q.      Why -- why are there so many more missing elements for Sephora?

A.      Well, Sephora doesn't use the back-end provider for its services.  It actually uses its own back-end code.

          So the claims that call for information that comes from the back-end provider via an API aren't met because they're not using a back-end provider, so you can't

get there from here.

Q.     And specifically you're talking about the information that's going from the application builder platform API?

A.     That's correct, yes.

MS. LI:  We can take this down.

And can we put up the patent, JTX-1.

BY MS. LI:

Q.     Now, I want to take a little bit of a closer look at some of the these claim elements.

This is the user interface element of Claim 1. This requires recipient criteria defining a segment of subscribers to receive messages from the message flow --

MS. LI:  And could we just highlight that, Mr. Glass.  It starts midway through the third line down.

Thank you.

BY MS. LI:

Q.     Did Journeys allow users to combine a segment of subscribers to receive messages in the message flow?

A.     No, not as segment of subscribers is used in this patent.

Q.     Why not?

A.     Well, the second a subscriber is -- what Dr. Polish has pointed to is, for instance, an enrollment e-mail, but the segment of subscribers that's being described here is recipient criteria for --

(Reporter clarification.)

THE WITNESS:  Recipient criteria for people who receive messages from a particular flow.

BY MS. LI:

Q.    And we just heard from Dr. Polish, he pointed to some documentation about segments in Journeys.

Do you remember that?

A.    I do.

Q.    And he pointed to something similar in Klaviyo Flows, too?

A.    That's correct.

Q.    Why aren't the segments that Dr. Polish pointed to evidence of defining a segment of subscribers to receive messages from the message flow as required by Claim 1?

A.    Well, with respect to the way this patent uses the term "segments," they're being defined by the recipient criteria for a particular flow.  And so the configuration is setting those conditions and they -- he seems to think that they can't be trigger conditions, that they have to be some other form of definition, but the patent specification is clear that the recipient criteria is a -- can be the result of at least using partially triggered conditions.

Q.    So you said that in the patent the segment has to be defined for people receiving messages from this particular flow, and we heard testimony that a segment is a group of

subscribers.

So are Attentive Journeys and Klaviyo Flows in the prior art, were they sending messages to a group of subscribers in the flow?

A.    They weren't sending -- they were starting individuals on a journey, but they weren't sending messages to the group of subscribers in the flow, so that's -- that seems to be ruled out by the art key cites -- the flow.

(Reporter clarification.)

BY MS. LI:

Q.    And do you have a way to help us understand maybe the difference, maybe an analogy or something?

A.    Well, I mean, it's kind of like giving somebody a map and say, go, hike this trail.  And so you hiked it on Monday, I hiked it on Wednesday, and somebody else hiked it on Thursday, and that's different from going in a group and hiking the trail or doing something as a group versus doing something one individual at a time based on, oh, I have a day off on Saturday, I'll go Saturday.

Q.    Now, you recall Mr. Miao testified a couple days ago. He said something to the effect of Journeys and Klaviyo Flows are the same thing.

Do you remember that?

A.    I remember him saying that.

Q.    And do you agree with that?

A.     Well, they're products from different companies, but they are essentially the same process.  They are both automations, so they are both directed to having some condition that can trigger a particular journey for a particular individual and then proceed along that journey at their own pace.

Q.     Now, I want to turn to a different set of elements, the storing, determining, and enrolling elements.

          MS. LI:  Mr. Glass, if we could please put those up.

BY MS. LI:

Q.     So these are also elements in Claim 1, right?

A.     That's correct.

Q.     Does Journeys -- or did Journeys store subscriber events and determine, based on those stored events, that the subscriber satisfied this recipient criteria?

A.     No.  As we heard Mr. Greenberg testify, that in Journeys it makes an evaluation of the event immediately. So that happens before the storing, not after the storing, that unlike the campaign or the Magic Composer where the data is stored and then later evaluated.

Q.     So does that mean Journeys also isn't enrolling subscribers into a segment?

A.     Well, yeah, they're not storing -- they're based on the stored information that the -- that the subscriber

satisfies the criteria, then they can't be enrolling it in response to a determination that the criteria is satisfied as it's called for in the claims in each of these.

Q.    So the determination happens and then the message flow starts, there's enrolling that happens after that?

A.    There's no enrolling -- yeah, that's correct.  Yes. They were very clear that that --

Q.    And do Klaviyo Flows and Sephora Replen work the same way?

A.    I realize that I just misspoke there.  They were clear that the enrolling didn't happen in the way called for in the claims.

Q.    Okay.

A.    So let me retract that statement because I made a mistake in there with all that.  They said, I don't always get them --

Q.    So did Klaviyo Flows and Sephora work the same way?

A.    Again, essentially based on all available data about them.  We don't have the source code for Klaviyo to look at, but based on the documentation and the fact they're both automation, I would expect -- I would expect Klaviyo to operate similar to Journeys.

Q.    And I realize I may have forgotten to ask about Sephora earlier.  But with respect to the user interface element we were just looking at, does Sephora work the same

Case 1:23-cv-00087-CJB    Document 838    Filed 12/03/25    Page 202 of 246 PageID #:
31049
Frederiksen rebuttal direct                                    1127

way as Klaviyo Flows and Journeys?

A.      Generally speaking, again, as best as we can tell. There's much less information about Sephora in terms of how it operates.  So we have to try to fill in gaps and, basically, it's automation and based on what -- on what you do have information on it, it appears to update in the same way.

THE COURT:  Just ask if the witness can speak a little louder and a little more slowly.

THE WITNESS:  Okay.

BY MS. LI:

Q.      And there's much less information because this is not information that Postscript has, right, information about Attentive's Sephora system and Klaviyo's system?

(Reporter clarification.)

THE WITNESS:  That's correct.  At least with respect to the documents that have been produced for the Attentive Sephora system, there seems to be much less information available.  And that's perhaps due to the passage of time, I don't know.

BY MS. LI:

Q.      And the same for Klaviyo Flows with respect to what Dr. Polish was pointing to in his report?

A.      Klaviyo is a product from a different company, so you wouldn't expect to have their source code or nearly as rich

information about the internals because they usually try to keep that as -- if not secret, at least proprietary information because it's sensitive.

Q.    Now recall that Dr. Polish also pointed to in Klaviyo Flows what he called a back-end stock flow and he said that back-end stock is a subscriber event.

Do you agree?

A.    I don't because back-end stock -- a subscriber doesn't put material back in stock.  The company puts something back in stock, but that's not a subscriber event and the decisions for the triggers, as claimed in the invention, are based on the subscriber events.  Those stored subscriber events we were just talking about.

Q.    And now just to finish up, I want to go back to something that we talked a little bit about yesterday.

So Dr. Polish also pointed to the word "trigger" in the Journeys code.  We saw that a bunch of times?

A.    True.

Q.    Does that tell you how the code functions, seeing the word trigger in there?

A.    It gives you a clue that there's some kind of condition checking, but it doesn't say that the code is using triggers in the same way as the patent or the same triggers.  You know, as I said before, a programer can call anything -- anything they want.  So just because you see a

particular word, you've got to dig deeper to what's going on there.

MS. LI:  Thank you.  I pass the witness.

THE COURT:  Okay.  All right.

Any cross-examination?

REBUTTAL CROSS-EXAMINATION

BY MR. DAVIS:

Q.    Good afternoon, Ms. Frederiksen.  Nice to speak with you again.

A.    Good afternoon.

Q.    So in your invalidity rebuttal, again, you didn't point to a single piece of code, did you?

A.    In my testimony?

Q.    Right now, you didn't show the jury one single piece of source code, did you?

A.    That's correct.

Q.    In fact, you didn't show the jury any single piece of evidence other than the patent itself, did you?

A.    I believe that's correct, yes.

Q.    The other thing is, for segments --

MR. DAVIS:  Can I have -- thank you.

BY MR. DAVIS:

Q.    One of the things that you mentioned regarding segments was in this enrolling the first subscriber to the segment of subscribers.  Do you see that?

A.    Yes.

Q.    And you said that wasn't present in the prior art?

A.    They weren't being enrolled to segments as segments used in this --

Q.    It says, "enrolling the first subscriber to the segment."  Do you see that?

A.    Who are to receive messages from the message flow in response to the determination that the recipient criteria is satisfied.

Q.    So the first subscriber is just one subscriber, correct?

A.    As used in the patent, here, yeah, it's to distinguish if there were actions that called out for multiple subscribers, they would have to designate them in some way.

Q.    And also, you saw Dr. Polish put this piece of source code to the screen, right, that says "segment ID," this is Journeys code, do you remember seeing that?

A.    No, let me reorient for a moment just to see which code this is.

        Yes, I recall that.

        MR. DAVIS:  No further questions.

        THE COURT:  All right.  Thank you.  Any --

        MS. LI:  No further questions, Your Honor.

        THE COURT:  All right.  Ms. Frederiksen, you may

step down.

MS. LI:  Oh, Postscript rests -- oh, no, apologies, we do not rest.  We call --

MR. SAULSBURY:  We have one last very short witness by deposition.

THE COURT:  Okay.  Go ahead.

MS. PASVANTIS:  We'd like to show you guys a deposition video of Timothy Brady, who was a former partner at Y Combinator.

(Video deposition testimony of TIMOTHY BRADY as follows:)

Q.    Do you recognize what has been previously marked as Exhibit 2?

A.    Yeah.  It is the printout of the Postscript application.

Q.    How can you tell?

A.    Well, I know these founders, Colin, Adam and Alex. And this is -- you know, I've read thousands of these. So...

Q.    So is this the same standard application form that Y Combinator used while you were there?

A.    That's right.  So the founders will fill out a form, and then the partners will get this printout.  It's not an exact one-to-one thing, but this is a printout of all the information.

Q.    If you could flip to page 3, which ends in the numbers 3228 on the bottom right.

A.    Yes.

Q.    Do you see the question that asks, "If accepted to YC," which is Y Combinator, "will you commit to working exclusively on this project for the next year?"

A.    Yes.

Q.    Does this question mean that applicants have to immediately leave any other jobs they have right when they get accepted into Y Combinator?

A.    No, it doesn't.  It largely means their intention.  A lot of the people that we interview are currently employed, and sometimes they use Y Combinator as a reason to leave. And so, if they don't get accepted, they don't leave.  And so we will find a lot of people still working.

In fact, unless they're graduating from college, most of the people that we deal with are still working, and many of them haven't gone through the process of telling -- of quitting yet or giving notice.

Q.    Does Y Combinator expect applicants to quit other jobs right when they get accepted into Y Combinator?

A.    That is the hope, but we also realize that if they haven't had the conversation and if they've worked at a place for a while, it's rarely that clean.

Q.    Looking underneath a question in a parenthetical, do

you see where it says, "No school, no other jobs"?

A.      That's correct.

Q.      What does that mean to Y Combinator?

A.      Essentially, we want them -- we want mentally them there and no time impediments to them working as hard as they can on the company that we're investing in.

Q.      Okay.  Now, let me give you a hypothetical.  If an applicant answered "yes" to this question, got into Y Combinator and was predominantly focused on the startup they applied with, but was still winding down some duties they had to their previous job for several months, would that still be considered working exclusively on the project they applied for?

A.      That is a pretty -- what you just described is very common.  And as long as in the interview process, we get comfort -- so if I look at this application and I say yeah -- and I see the word "yes," and then I see that this applicant is working, me and probably the other partner who is in the interview, would ask specification, right?  What does that mean?  Have you talked to your boss, right, and dive down.

        And so, you know, depending on that answer -- right, is kind of the answer to your question.  Like, are they going to be dedicated?  You know.  And if the answer is unacceptable, then we, you know, say apply again when you

don't have those commitments.  Or if it's reasonable in our estimation, then it's fine.

Q.     Do you have equity in Postscript?

A.     I assume I do.  Like, I -- yeah.  In one of -- it's divided into funds and I assume that one of those funds has -- has percentage in Postscript.

Q.     So you have equity in Postscript through your equity in Y Combinator; is that right?

A.     That's correct.

            (Video ended.)

            THE COURT:  Okay.  Ms. Li?

            MS. LI:  Postscript now rests.

            THE COURT:  Okay.  All right.  Thank you.

            Mr. Davis?

            MR. DAVIS:  Very brief motion to make.

            THE COURT:  Okay.  All right.  So, ladies and gentlemen of the jury, we're at the point now where the parties have all completed their presentation of evidence. If you remember, we said that would happen either Thursday or Friday, end of Thursday.

            I need to talk to the parties for a period of time now to address another motion and also to make sure -- just so you know, the next step, there's about two steps left.  The first step is, I will ultimately be giving you some final jury instructions that you'll be considering.

You're going to have copies of these, both of them, and your folders to have back in the jury room, but there's going to be a process where I can read them to you.

And so once we're ready for it, the next step will be for me to read the final jury instructions to you all the way up to near the end, there's a tiny piece that I won't.

And then the next step after that is that each side is going to be able to give closing arguments and then when they're finished with closing arguments, I have a couple of other instructions for you about your deliberations. And so I want to make sure that we're ready to at least provide with you with final jury instructions.

So that is what we are going to take care of right now, so we're going to give you another break and you guys can hang out for a bit. My goal is, I think it will be the case that, at least before the end of day, we'll have final instructions ready and be able to give you the bulk of those instructions before you leave today.

I expect what will happen is, because the closing arguments, they're important to the lawyers, they want to try to bring together all of the evidence for you and tell you what they think it means. And they may need some time to work on that, including to digest what happened today, I think likely what will happen is, even if I am able

to give you the bulk of the final jury instructions before you leave today, what we would like to do is first thing tomorrow morning is have the attorneys provide closing arguments and then you'll be deliberating.

So with all of that said, let me ask my courtroom deputy to lead you out for another break.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated.

Mr. Davis.

MR. DAVIS:  Thank you, Your Honor.  Real quickly, I'd like to renew our JMOLs for the same basis as we raised originally.  And also add a JMOL of invalidity over Journeys for Claims 11 and 14.

Ms. Frederiksen had no testimony regarding Claims 11 and 14 regarding Journeys.  She has no theory regarding rebuttal opinion in her report regarding Journeys for Claims 11 and 14.  And all that's in the record now is the unrebutted testimony of Dr. Polish that the Claims 11 and 14 are invalid over Journeys.  Thank you.

THE COURT:  All right.  Any response?

MR. SAULSBURY:  Yes, Your Honor.  So we oppose. There was evidence from Ms. Frederiksen with respect to each of the claim limitations at issue in Claim 11.

As we heard from both Dr. Polish and

Ms. Frederiksen several times throughout their testimony, the elements, other than the thing at the top that says a "method for" are identical as between 1 and 11, so the evidence is all there and therefore is substantial evidence.

THE COURT:  Mr. Saulsbury, there's a relationship between this motion and the objection that's been presented to me this morning; is that right?

MR. SAULSBURY:  That's right, Your Honor.

THE COURT:  All right.  And if there's nothing further -- so I will -- again, pending the standard for judgment as a matter of law that I discussed earlier, in light of the argument and the substantive argument Mr. Saulsbury made and also again with the reality that, as I understand, there's not that much time to present significant argument on the issue, I will deny the motion for judgment as a matter of law at this stage, preserving the right pursuant to Rule 50 for the parties to re-raise it at the end of trial.

All right.  So Counsel, I guess it's 2:25.  What we'd like to do is to try to make sure we have a final version of the final jury instructions that is acceptable to the Court and the parties, that we can then use to provide the bulk of the final jury instructions to the jury today before they leave as we discussed last night at the prayer conference.

Because in doing that, it will take me at least 40 minutes to an hour to read those and because it will take us a little time administratively to make all that happen, if it happens, finish that sometime between 4 and 5 and it won't make any sense for us to start closings then.  I want to give you all, both sides, time to prepare those closings, including taking the information you heard today.  I think it will be particularly important for the jurors to help each side bring together all the evidence in their view.

So the plan will be, if we can get final instructions up to the deliberations section before we leave today and then start with closings tomorrow morning, closings from Postscript and then from Attentive and then any rebuttal closings.

And then I'll read the final portion of the jury instructions and we'll begin deliberations.

With regard to the final jury instructions, do the parties anticipate having any issues or is it simply a matter of meeting and conferring to make sure that they can send us a both final electronic version that's jointly agreed upon.

MR. SILVER:  Good afternoon, Your Honor, Dan Silver on behalf of Postscript.

We've gone back and forth on both the verdict form and final jury instructions.  We believe we've reached

agreement on the final versions. We can file those on the docket. If Your Honor would like, we can also submit Word copies to chambers. We're having 15 copies of each printed now.

THE COURT: Okay. All right. Great. That would be great.

And I guess it's, again, a little before 2:30 now. When do you think, Mr. Silver, we'll be in a position to come back and start?

MR. SILVER: The copies are being printed in the building, so we should have them shortly and we can get them filed and get the Word copies, I would think, in the next 15 or 20 minutes.

THE COURT: Okay. All right. Why don't we -- when we're ready and able with final versions, I'll take a quick look at them as well, of course. We'll bring the jury out and proceed as planned. And then after I read the bulk of them, we'll end our day before 5 o'clock.

With all that said, the Court will stand in recess.

COURT CLERK: All rise.

(A brief recess was taken.)

COURT CLERK: All rise.

THE COURT: All right, everybody. Please remain standing. We'll have the jury brought in.

(Jury enters.)

THE COURT:  All right.  Please be seated.

All right.  Thanks again, ladies and gentlemen of the jury.  I'm going to ask my courtroom deputy to hand out to each of you a copy of our final jury instructions and a copy of our final verdict form.

All right.  In just a moment I'm going to read you most of the final jury instructions that you have in front of you.  Everything except the last section, Section 8, which is called deliberation and verdict.  That part I'll read to you tomorrow after each side presents their closing arguments.

Just logistically, too, so you know, each of you now have a copy of this verdict form and final jury instruction.  You can keep it with your juror notebook and your juror materials and at the end of the day, if you just want to leave those materials, as you have been, in the jury room.  And then tomorrow morning when you come back, again, you'll be able to take up each of your copies as the parties provide closing.

All right.  Here's the test.  All week I've been telling our lawyers and the witnesses, asking them to speak slowly and speak loudly.  My staff says, Judge, you're like the worst offender, you talk super fast.  So I'm going to try to not speak too quickly and provide you with these

final jury instructions.

All right.  We'll begin on page 1 with the general instructions.

So members of the jury, now it's time for me to instruct you about the law that you must follow in deciding this case.  Each of you has been provided a copy of these instructions.  You may read along as I deliver them, if you prefer.  I'll start by explaining your duties and the general rules that apply in every civil action.  Then, I'll explain some rules that you must use in evaluating particular testimony and evidence.  Then, I'll explain the positions of the parties and the law that you will apply in this case.  And last, I'll explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.  So please listen carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during deliberations.  You will also have a verdict form which will list the questions that you must answer to decide this case.  You have two main duties as jurors.  The first is to decide what the facts are from the evidence that you saw and heard in court.  Deciding what the facts are is your job, not mine.  And nothing that I've said or done during this trial was meant to influence your decision about the

facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof, which party should prevail on any given issue.  It's my job to instruct you about the law and you're bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes any instructions I gave you before and during the trial and these instructions.

All the instructions are important and you should consider them together as a whole.  Perform these duties fairly.  Do not guess or speculate and don't let any bias or prejudice you may feel toward one side or the other influence your decision in any way.

You may have taken notes during trial to assist your memory.  As I instructed you at the beginning of the case, you should use caution in consulting your notes. There is a tendency to attach undue importance to matters that have been written down.  Some testimony that's considered unimportant at the time presented and, therefore, not written down takes on greater importance later in trial in light of all the evidence presented.  Therefore, your notes are only a tool to aid your own individual memory and you should not compare notes with other jurors in

determining the content of any testimony or in evaluating the importance of any evidence.  Your notes are not evidence and are not a complete outline of the proceedings or a list of the highlights of the trial.  Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors or suspicions or anything else that you may have seen or heard outside of court influence your decision in any way.  The evidence in this case only includes what the witnesses said while they were testifying under oath, including any deposition testimony that has been played or read to you.  The exhibits that I allowed into evidence and any stipulations to which the parties have agreed.

The attorneys showed you certain slides, charts, and graphics to illustrate testimony from the witnesses. Those are sometimes called demonstratives.  The purpose of those demonstratives was to summarize or otherwise help you understand certain evidence in the case.  Unless I've specifically admitted them into evidence, those demonstratives are not evidence themselves even if they refer to, identify, or summarize evidence.  Nothing else is evidence.

The following things are not evidence:

Statements, arguments and questions by the lawyers, objections by the lawyers, any testimony I've told you to disregard, and anything you may have seen or heard about this case outside the courtroom.

The arguments of the lawyers are offered solely as an aid to help you assess the evidence presented at the trial.  If I sustained an objection during the trial, then you should ignore the question that was asked.  If I overruled an objection, you should treat the answer to the question like any other.  Whether sustained or overruled, the objections themselves that the lawyers made should be ignored.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence, but those objections are not evidence themselves. Do not consider the fact that I sustained or denied an objection as any indication of my opinion of the case or of what your verdict should be.

A further word about statements and arguments of counsel.  The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law.  An attorney may argue all reasonable conclusions from evidence in the record.  What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant and you are instructed to disregard any personal opinion that an attorney has

offered during opening or closing statements, or at any other time during the course of the trial.

If you remember the evidence differently from the others, then you should rely on your own recollection. If you were instructed that an item of evidence was received for a limited purpose, you must follow that instruction. If I ordered testimony or exhibits stricken from the record and instructed you to disregard such testimony or exhibit, then you should not consider any such stricken or excluded testimony or exhibit.

Do not speculate about what a witness might have said or what an exhibit might have shown. You are to make your decision based only on the evidence as I've defined it here and nothing else.

During the preliminary instructions, I told you about direct evidence and circumstantial evidence. I'll now remind you what each means. Direct evidence is evidence like the testimony of an eye witness, which if you believe it, directly proves a fact. If a witness testified that she saw it raining outside, then that would be direct evidence that it was raining.

Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be

circumstantial evidence from which you could conclude that it was raining.  It's your job to decide how much weight to give the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other.

You should consider all the evidence, both direct and circumstantial and give it whatever weight you believe it deserves.  You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, then you're free to reach that conclusion.

You are the sole judges of each witness's credibility.  Credibility means whether a witness is worthy of belief.  You may believe everything a witness says or a part of it or none of it.  You should consider each witness's means of knowledge, strength of memory, opportunity to observe, how reasonable or unreasonable the testimony is, whether it's consistent or inconsistent, whether it's be contradicted, the witness's biases, prejudices or interests.  The witness's manner or demeanor on the witness stand and all circumstances that according to the evidence could affect the credibility of the testimony.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was any evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something or failed to say or do something that was different from the testimony he gave at the trial.  You have the right to distrust such witness's testimony and other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood.  And that may depend upon whether it concerns an important fact or an unimportant detail.

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession or business.  This skill or knowledge is not common to the average person, but has been acquired by the expert through special study or experience.  In weighing expert testimony, you may consider the expert's qualifications, the reasons

for the expert's opinions and the reliability of the information supporting the expert's opinions as well as the factors I've previously mentioned for weighing the testimony of any other witness.  Expert testimony should receive whatever weight and credit you think appropriate given all the other evidence in the case.  You're free to accept or reject the testimony of experts just as with any other witness.

Deposition testimony is out-of-court testimony given under oath and is entitled to the same consideration you would give it had the witness personally appeared in court.  During this trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition.  If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony.  You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

Do not weigh the evidence based only on the number of witnesses who testified.  Instead, consider how credible each witness was and how much weight you think their testimony deserves.

During the course of the trial, you've seen many exhibits and many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury

room during your deliberations.  There are other exhibits, including charts and animations presented by attorneys and witnesses, that were offered to help illustrate the testimony of the various witnesses.  These illustrative exhibits, which as I mentioned, are sometimes called demonstrative exhibits, will not be in the jury room and have not been admitted as evidence.  They are not evidence, and they should not be considered as evidence.  Rather the underlying testimony of the witness that you heard when you saw the demonstrative exhibits is the evidence.

Now, in any legal action facts must be proven by a required standard of evidence known as the burden of proof.  In a patent case such as this, there are two different burdens of proof that are used.  The first is called preponderance of the evidence.  The second is called clear and convincing evidence.  I told you about these two standards of proof during my preliminary instructions to you and I'll now remind you what they mean.

This is a civil case in which Postscript is the owner of a patent, which we're referring to as the Postscript-asserted patent, that it alleges Attentive infringes.  A party asserting patent infringement has the burden of proving infringement, whether that infringement was willful and the amount of monetary damages by a preponderance of the evidence.  That means the party

asserting infringement has to produce evidence that when considered in light of all the facts, leads you to believe that what that party claims is more likely true than not.

To put it differently, if you were to put the parties' evidence on opposite sides of the scale, the evidence supporting the claims of the party asserting infringement must make the scales tip somewhat on its side. If the scale should remain equal or tip in favor of the alleged patent infringer, then you must find for the alleged patent infringer.

As I noted earlier, Attentive contends that the Postscript-asserted patent is invalid.  A party challenging the validity of the patent has the burden of proving by clear and convincing evidence that the asserted claims are invalid.

Clear and convincing evidence means that it's highly probable that the facts sought to be proved by the evidence is true.  Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence needed to prove infringement.

Those of you who are familiar with criminal cases may have heard the term "proof beyond a reasonable doubt."  That is a stricter standard of proof that applies only in criminal cases.  It does not apply in a civil case such as this, and you should, therefore, put it out of your

mind.

Now some instructions about the parties and their contentions.  I'll now review for you the subject matter of this case, who the parties are and what each of them contends.  Again, this is a patent case.

Postscript alleges patent infringement against Attentive.  You've heard evidence regarding the Postscript-asserted patent in this case.  Postscript contends that Attentive infringes Claims 4, 6, 10 and 14 of the United States Patent No. 11,709,660, again, otherwise known as the Postscript-asserted patent by making, using, selling and offering for sale Attentive's Campaign Composer formally known as Magic Composer.

In this case we refer to these asserted claims together as the Postscript-asserted claims.  Postscript seeks damages for the alleged infringement.  Attentive denies that it infringes any of the Postscript-asserted claims.  And it contends that the Postscript-asserted claims are invalid.

Now, let me provide a summary of the patent issues.  You must decide the following issues in this case according to the instructions that I give you.  First, whether Postscript has proven by a preponderance of the evidence that Attentive infringes one or more of the Postscript-asserted claims.  Second, whether Attentive has

proven by clear and convincing evidence that one or more of the Postscript-asserted claims are invalid.  And, third, if you decide that any Postscript-asserted claim is infringed and not invalid, what monetary damages Postscript has proven by a preponderance of the evidence that its entitled to.

Next, let me provide you with some instructions about patents.

Before you can decide the issues in this case, you will need to understand the role of patent claims.  The patent claims are the numbered sentences at the end of each patent.  The claims are important, because it's the words of the claims that define what the patent covers.  Only the claims of a patent can be infringed, not the other portions of the patent.

The claims are intended to define in words the boundaries of the invention.  The figures and text in the rest of the patent provide a description and more examples of the invention and provide a context for the claims, but it's the claims that define the breadth of the patent's coverage.

Each claim may cover more or less than another claim.  Therefore, what a patent covers depends in turn on what each of its claims covers.  Each of the claims must be considered individually.  Each claim is made up of claim elements, also referred to as claim limitations.  A claim

element or claim limitation is another word for a requirement of a claim.  For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs to the tabletop.  The tabletop, legs and glue are each a separate limitation of the claim.  A patent claim is infringed only if an accused product includes each and every element in that patent claim.

The beginning portion also known as the preamble of a claim often uses the word "comprising."  The word "comprising," when used in the preamble means including but not limited to, or containing but not limited to.  So when "comprising" is used in the preamble, if you decide that an accused product included all of the requirements of that claim, then the claim is infringed.  That's true even if the accused product contains additional elements.

Now, there are two types of patent claims, independent claims and dependent claims.

An independent claim sets forth all of the requirements that must be met in order to be covered by that claim, thus, it's not necessary to look at any other claim to determine what an independent claim covers.  In this case all of the Postscript-asserted claims are dependent claims. A dependent claim does not itself recite all of the requirements of the claim, but refers to another claim for

some of its requirements.  In this way the claim depends on another claim.

A dependent claim incorporates all of the requirements of the claims to which it refers.  The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim to which it refers.

A product that meets all of the requirements of both a dependent claim and the claim to which it refers is covered by the dependent claim.

Before deciding if there is any infringement of the asserted claims, you'll first need to understand what each claim covers.  The law says that it's my role to define the terms of the claims and it's your duty to apply my definitions.  You must accept my definitions of these words in the claims as being correct.  It's your job to take these definitions and apply them to the issues that you're deciding, including the issues of infringement and validity.

You must ignore any different interpretation that you may either believe is true or different interpretations referenced by the witnesses or by the attorneys.

The following claim term has the following construction.  That is, the claim term "monitoring the

trigger condition," which is found in the '660 Patent in Claims 1 and 11, has a construction that I've provided which is the following, "tracking whether a trigger condition for a message has occurred through the continuous, repeated or periodic detection of one or more event trigger candidates associated with the trigger condition."

You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. Again, these issues are yours to decide.

For any claim term that I have not provided a definition, you should use that term's ordinary meaning within the context of the patent in which the claim term is used.

Next, some instructions about infringement.

I'll now instruct you how to decide whether or not a patent owner has proven that an alleged infringer has infringed an asserted patent. Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another. As I stated earlier, Postscript alleges that Attentive infringes the Postscript-asserted claims.

To prove direct infringement of the asserted claims in this case, the patent owner must prove, by a

preponderance of the evidence, that is, that it is more likely than not, that the alleged infringer made, used, sold or offered for sale within the United States a product or process that meets all of the requirements of a claim without the patent owner's permission during the time the asserted patents were in force.

You must compare the product or process with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

You must determine separately for each asserted claim, whether or not there's infringement.  For dependent claims, if you find that a claim to which a dependent claim refers is not infringed, then there cannot be infringement of that dependent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the accused product or process meets the additional requirements of any claims that depend from the independent claim in order to determine whether those dependent claims have also be infringed.

A dependent claim includes all the requirements of the claims to which it refers plus additional requirements of its own.

Next, some instructions on invalidity.

I'll now instruct you on the rules that you must

follow in deciding whether or not an alleged infringer has proven that any of the asserted claims in this case are invalid. To prove that any claim of a patent is invalid, the alleged infringer must persuade you by clear and convincing evidence. That is, you must be left with the clear conviction that the claim is invalid.

I previously told you that infringement must be assessed on a claim-by-claim basis. That is also true for invalidity. Invalidity must be determined on a claim-by-claim basis.

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention at the time the invention was made. You must determine the level of ordinary skill in the field of the invention. You must consider and assess this factor before reaching your conclusion in this case. In deciding what the level of ordinary skill is, you should consider all the evidence introduced at trial, including, but not limited to, the levels of education and experience of the inventor, and other persons actively working in the field, the types of problems encountered in the field, prior art solutions to those problems, rapidity with which innovations are made and the sophistication of the technology. It's up to you to decide the knowledge and perspective of a person of ordinary

skill in the art in the field of the invention at the time the invention was made.

Now, in order for someone to be entitled to a patent, the invention must actually be new and not obvious over what came before, which is referred to as the prior art.

Prior art is considered in determining whether the asserted claims are anticipated or obvious.  To be prior art, the item or reference, must have been publicly known, publicly used, published or patented before the priority date of the asserted claim against which it is evaluating. An alleged infringer has the burden to prove something is prior art by clear and convincing evidence.

Regardless of whether particular prior art references were considered by the patent examiner during the prosecution of the application that matured into the '660 Patent, Attentive must prove invalidity by clear and convincing evidence.  This burden of proof on Attentive never changes regardless of whether or not the patent examiner considered the reference.

Where Attentive is relying on prior art that was not considered by the patent examiner during examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the patent examiner did consider.  If you decide it is different

and more relevant, you may weigh that prior art more heavily when considering whether Attentive has carried its clear and convincing burden of proving invalidity.

An invention must be new to be entitled to patent protection under the U.S. patent laws.  To prove the anticipation, an alleged infringer must prove that it's highly probable that the claimed invention is not new.  If a product or process has been previously invented and disclosed to the public, then it is not new, and, therefore, the claimed invention is said to be anticipated by the prior art.

Anticipation is like infringement.  You'll be asked to determine whether one prior art reference included each and every element of an asserted claim.  For anticipation, each and every element in the claim must be present in a single prior art reference and arranged or combined in the same way as recited in the claim.  You may not combine two or more prior art references to find anticipation.

In determining whether every one of the elements of the claimed inventions found in the prior art device, you should take into account what a person of ordinary skill in the art would have understood from his or her review of the particular prior art device.

Even though an invention may not have been

identically disclosed or described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must not have been obvious to a person of ordinary skill in the field of technology of the patent at the time of the invention.

An alleged infringer may establish that a patent claim is invalid by proving, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the invention.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made.  The scope and content of the prior art, any differences between the prior art and the claimed invention, and if present, so-called "objective evidence" or "secondary considerations," which I will describe shortly.

Do not use hindsight.  Consider only what was known at the time of the invention.  Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks in prior art.  In considering whether a claimed invention is obvious, you should consider whether at the time of the

claimed invention, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in a way the claimed invention does, taking into account such factors as:

First, whether the claimed invention was merely the predictable result of using prior art elements according to their known functions.

Second, whether the claimed invention provides an obvious solution to a known problem in the relevant field.

Third, whether the prior art teaches or suggests the desirability of combining elements claimed in the invention.

Fourth, whether the prior art teaches away from combining elements in the claimed invention.

And fifth, whether it would have been obvious to try the combination of elements, such as when there's a design incentive or market pressures to solve the problem and/or a finite number of identified predictable solutions.

To find it rendered the claimed invention obvious, you must find that the prior art provided a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.  In determining whether the claimed inventions obvious, you should take into

account any objective evidence, sometimes called "secondary considerations," that may shed light on whether or not the claimed invention is obvious, such as, whether the claimed invention was commercially successful as a result of the merits of the claimed invention, rather than the result of design leads or market pressure, advertising or similar activities, whether the claimed invention satisfied a long-felt need, whether others had tried and failed to make the claimed invention, whether others invented the claimed invention at roughly the same time, whether others copied the claimed invention, whether there were changes or related technologies or market needs contemporaneous with the claimed invention, whether the claimed invention achieved unexpected results, whether others in the field praised the claimed invention, whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention, whether others sought or obtained rights to the patent from the patent holder, and whether the inventor proceeded contrary to accepted wisdom in the field.

In determining whether the claimed invention was obvious, consider each claim separately, but understand that if a dependent claim is obvious, then the claims from which it depends are necessarily obvious as well.

Next, some instructions on damages.

If you find that any valid claim asserted in this case is infringed, then you must consider what amount of damages to award to patent owner. I'll now instruct you about the measure of damages.

Now, my instructing you on damages, I'm not suggesting which party should win the case on any issue.

The damages you award must be adequate to compensate the patent owner for the infringement. They are not meant to punish the infringer. Your damages award, if you reach this issue, should put the patent owner in approximately the same financial position that it would have been in had the infringement not occurred.

The patent owner has the burden to establish the amount of its damages by a preponderance of the evidence. While the patent owner is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible or damages that are based on guesswork. There are different types of damages that a patent owner may be entitled to recover.

In this case, Postscript seeks a reasonable royalty. A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and that the patent owner would have

accepted just before infringement began.

A reasonable royalty is the minimum amount of damages that a patent owner can receive for an infringement.

The -- you must be careful to ensure that any damages award is no more and no less than the value of the patented invention.  I'll give more detailed instructions regarding damages shortly, note, however, that a patent owner is entitled to recover no less than a reasonable royalty for each infringing act.

If you find that a patent claim is infringed and not invalid, then the patent holder is entitled to at least a reasonable royalty to compensate it for that infringement.  Postscripts seeking damages in the amount of a reasonable royalty.

A royalty is a payment made to a patent owner in exchange for the right to make, use or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.

In consideration of this hypothetical negotiation, you should focus on what the expectations of the patent owner and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed the asserted patents were valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation; and not simply a royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty, only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation just prior to the first infringement.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

First, the royalties received by the patent owner for the licensing of the patent-in-suit proving or tending to prove an established royalty.

Second, the rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

Third, the nature and scope of the license as

exclusive or nonexclusive or as restricted or nonrestricted in terms of territory; or with respect to whom the manufactured product may be sold.

Fourth, the licensor has established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that anomaly.

Fifth, the commercial relationship between the licensor and the licensee, such as whether they're competitors in the same territory, in the same line of business or whether they're an inventor and promotor.

Sixth, the effect of selling the patented specialty in promoting sales of other products of the licensing, the existing value of the invention to the licensor as a generator of sales of his nonpatented items and the extent of such derivative or convoyed sales.

Seventh, the duration of the patents and the term of the license.

Eight, the established profitability of the product made in the patents, its commercial success and its current popularity.

Nine, the utility and advantages of the patent had property over the old modes or devices, if any, that had been used for working out similar results.

Tenth, the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention.

11th, the extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

12th, the portion of the profit or of the selling price that may be customary in the particular business or a comparable business to allow for the use of the invention or analogous inventions.

13, the portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturer process, business risks or significant features or improvements added by the infringer.

14, the opinion and testimony of qualified experts.

And 15, the amount that a licensor, such as the patent owner, and the licensee, such as the infringer, would have agreed upon at the time the infringement began if both have been reasonably and voluntarily trying to reach an agreement, that is the amount which a prudent licensee, who desired as a business proposition, to obtain a license to manufacture and sell a particular article embodying the

patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patent owner who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors, which, in your mind, would have increased or decreased the royalty, the alleged infringer would have been going to pay and the patent owner would have been willing to accept acting as normally prudent business people.

The amount you find as damages must be based on the value attributable to the patent had technology.  As distinct from other unpatented features of the accused product or other factors, such as, marketing or advertising or a defendant's size or market position.  In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology.  In other words, the royalty base must be closely tied to the invention.  It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate.

Similarly, it's not appropriate to select a

royalty base that's too low and then adjust it upward by applying a higher royalty rate.  Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflects the value attributable to the patented invention alone.

Damages are not based on a hindsight evaluation of what happened but on what the parties to the hypothetical license negotiations would have agreed upon.  Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiations.  You may also consider information the parties would have received or estimated during the hypothetical negotiation which may, under certain circumstances, include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, and profits earned by the infringer.

All right.  So ladies and gentlemen, that brings us up to the very last portion of the instructions which relate to your deliberation and the verdict.  That's the portion I'm going to read to you tomorrow morning after the parties have finished with their closing arguments.

With that said, and as I noted, because the parties need to prepare those closing arguments and because we can't finish with those closing arguments today.  So what

I'm going to do is end our trial day just a bit early, get an early start on the way home.

I'll just ask that as with the last few days, that if you arrive at the courthouse tomorrow by 8:45, we'll begin again at nine o'clock. And as I mentioned, what we'll do is the parties will provide their closing statements, first Postscript and then Attentive, and then if Postscript has any additional rebuttal closing.

And then after that's finished, I'll read the final jury instructions regarding deliberations and verdict and then you'll be able to begin your deliberations which I expect will happen sometime mid-morning. Okay.

With all that said and with a reminder to continue to abide by the instructions I've given you in this trial, I'll ask my courtroom deputy to lead the jury out as we end our trial today.

COURT CLERK: All rise.

(Jury exits.)

THE COURT: All right. Counsel, unless there's anything further, you may be seated, I'll look forward to, for once, I think, not seeing you at 8:30 a.m. tomorrow. If something comes up, you can e-mail us but we are hoping --

MR. SILVER: So, Your Honor, in that regard, can we just appear by 9 o'clock?

THE COURT: Yes, that will be status quo, we'll

just be prepared to go on at 9.  Unless for whatever reason we hear from somebody beforehand, but let's hope we don't and hopefully get to sleep, have a good dinner, and wish you all a good night.  And the Court will stand in recess. Thank you.

                    COURT CLERK:  All rise.

                    (Court adjourned at 3:52 p.m.)


            ----------------------------------


            I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.


                              /s/ Stacy M. Ingram, RPR
                              Official Court Reporter
                                 U.S. District Court