1172

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE



STODGE, INC., d/b/a     )  Volume V
POSTSCRIPT,             )
                        )
       Plaintiff,       )  C.A. No. 23-87-CJB
                        )
v.                      )
                        )
ATTENTIVE MOBILE, INC.,)
                        )
       Defendant.       )



             Friday, August 29, 2025
             9:00 a.m.
             Trial



             844 King Street
             Wilmington, Delaware



BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
    United States Magistrate Judge



APPEARANCES:


     McCARTER & ENGLISH, LLP
     BY:  DANIEL M. SILVER, ESQ.

             -and-

     MORRISON & FOERSTER, LLP
     BY:  TIMOTHY CHEN SAULSBURY, ESQ
     BY:  DARALYN DURIE, ESQ.
     BY:  HANNAH JIAM, ESQ.
     BY:  RAMSEY FISHER, ESQ.
     BY:  JOYCE LI, ESQ.

                    Counsel for the Plaintiff
```

APPEARANCES CONTINUED:

    MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
    BY:  MICHAEL J. FLYNN, ESQ.
    BY:  CAMERON CLARK, ESQ.

    -and-

    CAHILL, GORDON & REINDEL, LLP
    BY:  CHRIS CAMPBELL, ESQ.
    BY:  BRITTON F. DAVIS, ESQ.
    BY:  MATTHEW WOOD, ESQ.
    BY:  RAHUL SARKAR, ESQ.
    BY:  HALIMA NDAI, ESQ.
    BY:  KATHERINE VESSELS, ESQ.

    -and-

    GIBSON, DUNN & CRUTCHER, LLP
    BY:  ELI BALSAM, ESQ.

               Counsel for the Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - -

COURT CLERK:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Christopher J. Burke presiding.

THE COURT:  All right.  Everybody please remain standing.  Before we get the jury in, just for counsel, my goal will be not to interrupt your flow.  But if it happens that you get to like within two minutes of the end of your time, I'll just briefly say "two minutes left," and then, of course, you get to the end of your time.  Otherwise, you won't hear from me.  Okay.

All right.  Let's bring the jury in.

(Jury enters courtroom.)

THE COURT:  All right.  Please be seated.

Good morning, ladies and gentlemen of the jury. We're here for the beginning of day five of our trial in the matter of Stodge, Inc. d/b/a Postscript versus Attentive Mobile, Inc., civil Action Number 23-87-CJB.

And as we said yesterday at the end of our day, we're now at the point where we're going to have closing arguments.  I'll turn first to counsel for plaintiff's side to now make their closing argument.

Ms. Durie.

MS. DURIE:  Thank you, Your Honor, and good morning, everyone.

I just want to start by saying we really appreciate you.  We appreciate your being here, taking time out of your lives to hear the evidence in this case.  This case is really, really important to us.  And I want to try to explain over the next few minutes why that is and why we believe the evidence in this case shows that Attentive is infringing our patent.

Now, I want to start with just anchoring us a little bit in Attentive and Postscript and who we are.  You heard that Attentive was the incumbent, right.  They had come along first, they were bigger.  And their idea was to

target mostly big companies.  Which makes sense, right.  A lot of revenue from big companies.

Postscript was founded with a different idea, an idea to come up with a solution that was really well tailored for small shops, like Old Bisbee Roasters and BUBS.  And that wound up being a really good strategy too.  Customers loved their products.

Now, it says up here, PTX-571.  You're going to get a set of the exhibits that were admitted into evidence, and you can look through them.  And since I see that some of you are taking notes, I tried to put up here in pretty big letters, the exhibit numbers.  So if there's an exhibit that you want to look at, you can write that number down and it will be easier for you to find when you're in the jury room.

So PTX-571, this is this customer testimonial, remember?  Not paid for.  And this customer at BUBS was talking about the fact that they switched from Attentive to Postscript and they had a really great experience.  Why was that?

Well, you remember Mr. Jhawar said, "Attentive is focused on big companies."  So someone with 21,000 subscribers, they're not going to get a lot of crystalized attention, right.  That's not the Attentive model.  But it is the Postscript model.  And part of what they meant -- part of what that means is that Postscript spends a lot of

time with its customers, understanding their business and understanding their needs.  And these brainstorming sessions are actually what gave rise to the invention here, listening to the customers' problems and trying to come up with a solution, and that was the origin of Campaign Flows.

You heard from Alex Meyer, one of the inventors, about how he talked to customers and figured out this pain point that they had with the existing solutions and how to solve it.  What was that pain point?

There were two existing ways of sending messages to customers.  One was automations, individual customer does a thing, that sort of sets off a cascading chain of messages.  Other way was a blast campaign.  You could send a message to a whole lot of people at the same time, right, but it's just going out to everyone.  But there was a gap between those two ways.

So automations, let's talk about that in a little bit more detail.  Because all three of the things that Attentive is saying were prior art, all of those things are automations.  And they all basically work the same way. A user, an individual user does something, like leaves something in a shopping cart, and that then sets off messages, like here, "still thinking about pet supplies, don't forget the items in your cart."  But it's one user doing one thing triggering a message to that one user.

I said at the beginning, Journeys, right, everyone goes on their own journey, and that's the basic idea of automations as they existed in the prior art, specific to an individual user, and that individual user's action sends them off automatically on their own journey.

Blast campaigns, exactly what it sounds like. You send out an e-mail blast or a text blast to a whole bunch of people, but it's not targeted, not tailored, not specific to any individual user.

And Mr. Meyer explained, there was a space between these two products, right. Customers were saying they weren't able to do something they wanted to be able to do, send a large group of subscribers a message and be able to follow up individually. And learning about that and hearing about this pain point caused Postscript to realize, we could come up with a solution to that problem and develop a product that would be able to do that.

And that's what Campaign Flows is. It allows you to send the right message to the right people at the right time. So what does that mean in practice?

You can send an e-mail to a whole bunch of people, "We're going to have a big sale this weekend, check it out, Labor Day sale." You can send that, for example, to all of your subscribes. Then you can see what your subscribers do.

And let's say you've got some subscribers that get the e-mail, they maybe click on the e-mail, but they don't place an order.  So you want to be able to send messages that are specific to that group.  So what do you do?  You can identify them and you can say, "In case you missed it, we have a great sale this weekend.  First 100 orders get a free collar," targeted to those particular users based on what it is that they did.

And customers loved it.  That is what BUBS says here, right, "They loved how Campaign Flows builder let them target subscribers based on their previous behavior or their engagement with the flow."  Now we have those touchpoints so we can be more thoughtful about the who, what, when, and we got a patent on that invention.

Now, Campaign Flows came out in 2021, and Attentive, monitoring what Postscript was doing, saw it right when it came out, right.  October 15th, 2021, this is an internal Attentive e-mail, right, PTX-179, "Postscript recently hosted a product launch event.  They announced new products.  One of those new products, Campaign Flows.  It's now live," PTX-179.

And what did they do when they saw it?

Mr. Greenberg, who you heard from by deposition, by video, Mr. Long, e-mailing to each other, right, "sequential campaign, add additional messages as Drip

retargeting."  That's the product, right, that's the Postscript product, "Postscript differentiates on this feature today."  It's a selling point for us, it's a way that we are different from the competition, a way that we're different from Attentive.  "Let's close the gap."  There was a gap, let's close it.  So what do they do?  They close the gap by coming out with Magic Composer in 2023.

And you heard Mr. Miao very candidly admit, Attentive looked at Campaign Flows while it was developing Magic Composer.  They looked at our functionality and they copied it.  And that's why the products look the same and act the same.  And it is also why Attentive infringes our patent, because our patent was written to cover our product, and the products are the same.

So the first question that you're going to be asked -- you're going to get a verdict form, it's going to have a series of questions for you to answer.  The first question is infringement:  Did Postscript prove by a preponderance of the evidence that Attentive's Magic Composer functionality directly infringes any of the following claims?

Four claims at issue, and you have to write in your answer to each of those questions.

Now, you also got jury instructions yesterday. And one of those instructions was about direct infringement.

This is the instruction.  "The patent owner must prove by a preponderance of the evidence, i.e., that it is more likely than not that the alleged infringer made, used, sold, or offered for sale within the United States, a product or process that meets all the requirements of the claim."

How you do that?  You compare the product to the claim.  If they match, there's infringement.

Now, you heard the standard is a preponderance of the evidence.  What does that mean?  It means more likely than not.  It means if you find the evidence tips a little bit in our favor, we have met our burden of proof with respect to infringement.

What's the evidence?  The evidence came from Ms. Frederiksen.  She walked through each of the requirements of the claim, and she explained to you where those requirements were found in Magic Composer, in the Attentive product.  So she conducted that infringement analysis to show you how they match up.  She did that for Claim 1, and then she walked through each of the four dependent claims that have all of those requirements from Claim 1 and add these individual requirements.  And she showed you how that matches up.

So what does Attentive say in response to that?  They have a bunch of arguments, a bunch of excuses for why they say they don't infringe.  And the first one is, they

say, we don't have a trigger condition, right. That's their first argument. So let's take a look at the patent and what the patent says about that.

You all have copies of the patent. You're going to have them in the jury. It's JTX-1, and you've got your own copy. This is Figure 8(a). So in the patent, this is our patent. When you open it, you'll see there is a bunch of figures. And you get here, Figure 8(a) looks like that. You'll be able to look at it some more. Okay, Figure 8(a). So what is Figure 8(a) about? It's got target recipient criteria.

So you're going to have recipients for your message, right, and you're going to have criteria that decides who gets the message, right, who the recipients are going to be. So what are those criteria? So it explains here in this example, "the target recipient criteria include all subscribers and remove a subscriber if an order is created." And then you've got an estimate, 786 subscribers estimated as meeting those conditions, meaning that's going to be the set of subscribers who are going to receive that message.

What about trigger condition? The patent talks about what a trigger condition is. This is in the text, it's at Column 23, and it talks about trigger condition 809. So when there's a number like that in the text, it's

referring to a number on one of the figures.  And so here 809 means 809 in that figure.

We've blown it out so you can see it a little more easily.

809 is that box where you put in here all subscribers, and it says "includes."  So it's got like a drop-down menu.  See the little caret, right, "includes," and you can then pick who you are going to include in your set of recipients.

So the trigger condition in this case is, "subscribe."  You've subscribed, that's the trigger condition for being included in the set of recipients who are going to get the message.  So here, just to sort of give the example, you meet the trigger condition of subscribing, you are included in that set.

Now, the patent also talks about a different kind of trigger condition, an exclusion trigger condition.  So here the exclusion trigger condition is 810.  810 are these boxes here where you can select a segment, exclude subscribers messaged within the last 18 hours because you don't want to, like, overwhelm people with text messages or remove a subscriber if, and again drop-down menu, order created, right?

So these are conditions, right, that you can use, triggers.  If a user places an order, that trigger is

going to be excluded from the set of people who are going to receive the message.

So you've got all of your subscribers, that's your first condition.  Then somebody creates an order, they get removed, right, and now you've got the set of people who are going to get your message.

Now, you can have one exclusion trigger condition, you can have more than one.  The patent says you can have additional exclusion triggers; that's 811.  So you could have another condition that causes more people to get removed.

This is customizable, but at the end of the day, the trigger conditions tell you based on the users' actions who is going to get the message.  And then you send them a message, and the patent explains you can schedule or launch.  That's in the upper right-hand corner of Figure 8(a), 825 in the patent, schedule or launch.

So what does that mean?  You can either send the e-mail right away or the text right away, based on the subscriber's action, or you can wait.  You can set this up ahead of time and you can say, I want the message to go out 9:00 a.m. on Labor Day.  And everyone who meets these trigger conditions as of 9:00 a.m. on Labor Day is going to get the message.  So you schedule the message to be sent at a future point in time.

And so if you've applied your trigger conditions at 9:00 a.m. on Labor Day, four people created an -- four people were subscribers, one created an order, another one did something else to get them excluded, that message is going to go out to the people who satisfy those trigger conditions at 9:00 a.m. on Monday morning, we've got a great sale this weekend, in case you missed it; 10:00 a.m.

Magic Composer does exactly the same thing. It has trigger conditions. These are the trigger conditions. They're right there, right. Recipients who didn't click the previous message, recipients who didn't open the previous message -- this is the drop-down menu -- recipients who clicked the previous message and did not purchase. Each of those is a trigger condition, each of those is going to define the universe of people who is going to receive a message. It's right there.

So what's their next excuse? Well, even if we have trigger conditions, we don't monitor them. Now, I want you to take a step and think about this for a minute. If you have trigger conditions who are going to define who you send the message to, how are you going to use them to do that if you don't monitor them, right? Of course they monitor them, and they do.

So the Court has told us what monitoring the trigger condition means; tracking whether a trigger

condition for a message has occurred through the continuous, repeated, or periodic detection of one or more event to trigger candidates associated with the trigger condition. That is exactly what Magic Composer does.

We heard testimony from Mr. Greenberg, their vice president of engineering. Subscriber events, those are the things that subscribers are doing. Those are the potential trigger conditions, right. Leaving something in a shopping cart, placing an order. They are written to the data lake. I didn't know about data lakes until this case, but they are written to something called a data lake, and they're queried as operations execute. What's a data lake? It's just where all the data is stored.

So what does this mean? Data is getting generated, subscribers are doing things. All of that information is getting continuously detected and stored in the data lake. So it's all coming in, it's getting stored in the data lake. And then that information is getting used by the system to define who is going to get the messages. And remember we saw this. This, again, is Magic Composer, this is Attentive's product. And it's got this way here, set up the e-mail, message one, blast, message two, retargeted for nonpurchase. You've got this thing for estimated recipients, 2316. So you've got your trigger conditions, they're being monitored.

You can go in here, if you're a merchant, and say, okay, as of now, how many people are going to get this message.  So let's say you set up this message, like yesterday, Thursday.  You've scheduled it to go out on Labor Day, on Monday.  You can go back in and check how many people are going to get this message based on how many people have satisfied those trigger conditions as of today.

Sound familiar?  Estimated recipients.  Yeah, it's exactly the same thing we saw in the patent.  Remember the patent says you set up your triggers, and it tells you how many subscribers are estimated to meet those as of that point in time.  Exactly the same thing that's in the patent.

So then what do they do?  They say, oh, we have this smoking gun document.  Right?  Remember this, this is the smoking gun.

All right.  So let's take a look.  This is -- obviously this is a Postscript document, right, comparing features in Postscript and Attentive, and then Attentive has added all of this annotation.  This is their slide.  This is one of the slides they used, right, their smoking gun.

Well, remember Mr. Meyer was asked about this: "Are the features that are taught in here different from what we were going through with respect to the patent?"  And he said, "yeah, they're different.  They don't really have anything to do with the patent?"  That's exactly right.

So what is the first feature they've been talking about?  Create conversational campaigns where the next message can be determined by how the subscriber responds.  That's different from what we've been talking about.  We've been talking about things the subscriber does, like place an order or leave something in a shopping cart.  This is about how the subscriber responds, check out our sale.  How is it going -- how long is it going on?  And you can respond to that text message:  All month.  Right.  Cool feature.  Not the patent, right?

And I actually asked Dr. Polish:  "You don't have an opinion in your report that the ability to text back to a subscriber in response to a query is required by the claims?"

He said:  I think that's correct, right.

He agreed, this doesn't have anything to do with the patent.  Other features?  Same thing.  This is the ability to have multiple branches, right?  Branch, branch, branch.  Cool feature.  Not in the patent; right?

And he admitted that.  You don't have an opinion that nested branching is required by the claim.

Yeah, I don't think I've said that.

So sure, we have other cool features that Attentive doesn't have because we are constantly adding cool features to the product.  That's what we do, that's how we

try to have a better product, that's how we try to compete. But the fact that we made our product better has nothing to do with whether Attentive infringes because these features have nothing to do with the patent.  Infringement is measured by the claim.

So what do they say next?  They say, oh, the user interface doesn't say the word "trigger condition" on it.  Well, I mean, of course it doesn't.  Why would it? That would be sort of an odd thing to tell your users.

And Ms. Frederiksen explained that, she's like that's not how it works.  Infringement isn't you go look for the words of the claim.  Infringement is you look at how the thing works, right?  You look at the actual functionality in the claim element, and then you see if that is in the system.  This is just like a red herring.

And then they say, oh, the code doesn't say the words "trigger condition."  Well, again, like, it doesn't matter what English words are in the code.  What matters is what the code does and the functionality that is delivered by the code.  And again, that's what Ms. Frederiksen said, right?  It's not surprising that a particular word doesn't appear in there.

And then they say our code has a bug.  I have no idea what this is about.  They say -- and this was Mr. Greenberg's testimony, we had a bug that let it happen

that people would click on message one, and then the campaign message would execute to zero subscribers successfully.

I don't know what that means.  I really don't know why it would matter.  And the idea that, like, a bug that sometimes, occasionally, causes your system not to send a message, I mean obviously the system has to send messages, otherwise it wouldn't work.  So at this point, like, no clue.

All right.  Here's the bottom line.  Walks like a duck, talks like a duck, looks like a duck, it's a duck, right?  Their system does all of the things, and that is why Magic Composer infringes the '660 Patent.  It does all of the things.

And again, it's not the least bit surprising that it does all of the things because it was designed to copy our system, and the patent was written to cover our system.  So no big surprise that it does all the things.  So when it comes to Question 1, infringement, we would ask you to write in here for each of Claim 4, Claim 6, Claim 10, and Claim 14, "yes."

So what's their next excuse?  They say, well, we don't infringe, but even if we do infringe, your patent is no good.  Your patent is invalid, and you should take this patent, our property right that we got from the Patent

Office, and just rip it up and throw it out because it's not good.  And that's what they're asking us to do.  And "this" is a really hard thing to do.  Patent rights are important, property rights are important.

And you were instructed yesterday for that reason you have to have clear and convincing evidence in order to invalidate a patent.  It is a much higher burden.  It is a higher standard or burden of proof because we presume that patents are valid and they have to overcome that presumption with clear and convincing evidence.

So I said infringement means scale tips a little bit our way.  Invalidity, it's Attentive's burden and is a much heavier burden.  They have to prove that to you with more evidence, clear evidence, convincing evidence in order to take that property right away from us.

So here's the question you're going to be asked: Did Attentive prove by clear and convincing evidence that any of the following claims are invalid as anticipated and/or obvious?  "No" is a finding in favor of Postscript.

So first thing there, anticipation.  What does that mean?  Judge instructed you on that yesterday.  That means each and every element of the claim has to be present in a single prior art reference.  So you've got to have it exactly in the prior art.  In other words, the prior art was doing the exact invention in one system, in one thing.

So what is Attentive's argument?  They say Journeys and Klaviyo Flows and Sephora Replen were identical.  That's the test, identical to the patent.

First important point.  We told the Patent Office about this automation prior art, right?  These Journey prior art references.  And if you look in the patent, you'll see there's a long list at the beginning of prior art that the patent examiner considered.  You can look through it yourself, but you're going to see here under, you know, references cited -- here.  Other publications, it's on page 4.  Attentive, Attentive, Attentive, Attentive, Attentive, Attentive, and you can look at this and see this for yourself, right?  And all of this stuff, branching and segments, concierges and journeys, right, how PAWZ uses Attentive's Journeys.

That one you actually can look at the reference itself; that's PTX-595.  But that's just one example of references that were provided to the Patent Office to look at in deciding whether we had made an invention, and we also provided the Patent Office with references about Klaviyo.  So all of that was disclosed to the Patent Office and considered by the Patent Office.

So what does Attentive say?  They say you gave the Patent Office too much stuff.  Again, they had that whole big stack of material to read.

Now, I want to be clear, we had an obligation to tell the Patent Office about everything we knew about the art that might be relevant and that the Patent Office might want to know about in deciding whether we had made an invention.  And you heard about that back on Monday, which probably now feels like a long time ago -- it does to me -- in the patent video where Judge Fogle was explaining the patent.

(Video played.)

JUDGE FOGLE:  Because the job of examining so many applications is challenging, the law requires the applicant to tell the examiner whatever he or she knows about the prior art that might be important to the examiner's decision whether to allow the patent.  We call this the applicant's duty of candor.  One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the examiner, either in the original application or in other submissions called Information Disclosure Statement.

(Video ended.)

MS. DURIE:  And you may remember I asked Dr. Polish, "Did you go through that stack and identify anything in there we shouldn't have submitted?"  And he said, "No, I didn't do that."  Right?

There's no suggestion we did anything wrong.

What we did is exactly what we were required to do.

And the examiner said -- and I think this is totally fair -- "That was a lot of stuff, right?  Can you point me to the things that you think are the most relevant?"

And we said, "Yeah, absolutely, we'll do that."

And we arranged for an interview, and we invited the examiner to follow up if they wanted additional information or detail.

And we followed up again, and we said, "What would be most helpful to you?"

And in view of that discussion, we said we're going to file a supplemental IDS with additional information, including citations to specific page numbers believed to be most relevant out of all the references.

So the ask was, point us to the things that you think are the most relevant.  What did we do?  We submitted this additional Information Disclosure Statement, resubmitting the references that we thought were the most relevant.  They're all about journeys.

I would say we did pretty well because this entire trial pretty much has been about Journeys.  So it would seem that Attentive agreed that we submitted the most relevant prior art to the Patent Office and gave the examiner an opportunity to consider that again.

And that's exactly what the examiner did.  He sent back an Information Disclosure Statement.  He said that supplemental Information Disclosure Statement is acknowledged, and the references have been considered in the examination of the claims.

So the examiner looked at Journeys again, and said, "It's different, it's not your invention, you have shown that you should get a patent, that you deserve a patent."  And so Attentive comes in and says "Well, you didn't tell the examiner about Klaviyo again."

Now, remember, what did the examiner say? "Point me to the set of things that you think are most relevant."  Klaviyo and Journeys are the same.  That's exactly what Mr. Miao said in his testimony.  Klaviyo Flows is a name for what Attentive calls Journeys.  It was based on more or less the same ideas as Attentive's Journeys product.  That was his testimony.  They're the same.  They work the same way.  They're all automations.  Sephora is the same.  It's also an automation.  That is the art the examiner considered and found not relevant.

And, remember, the examiner had told us, get rid of cumulative stuff.  We had an obligation to give the examiner everything.  The examiner said get rid of the stuff that's cumulative.  Klaviyo was cumulative because it's the same.  That's why we didn't resubmit it again.  The whole

point was get rid of stuff.

So let's talk about now this set of prior art. As I said, they're all automations. They start with an event, a user does something, and the user then goes off on their journey. They all work the same way. And Ms. Frederiksen explained to you, in each case, the subscriber is going on their own journey. The subscriber controls when they receive messages. The merchant can't schedule a follow-up message at a certain date and time. All of those references suffered from the same defects.

Remember, that's why we came up with our product, and that's why Attentive came up with Magic Composer. Journeys was the problem. This is an Attentive document. This is PTX-565. They're identifying the problem. Today we artificially forced our client to send either a single batch and blast campaign message or a sequential automated journey. That's Journeys. Journeys was the problem.

The solution -- and it left a significant product gap for users. The solution, something that could control when to send promotional messages to the list, be able to define a sequence of follow-up messages, have consolidated reporting, that was Magic Composer. So they're coming in here and telling you that the thing that was the problem was actually the solution all along. And I would

suggest to you that simply makes no sense.

Ms. Frederiksen explained to you what is not surprising in view of that, that Journeys doesn't meet these requirements of the claim and that none of these automation references meet those requirements. And for that reason, there is no anticipation.

So then Dr. Polish got on the stand, and he put up this slide. And he said, "And there's this doctrine that's called obviousness."

He didn't do anything more than that. He told you, "All right. There's this thing called obviousness."

He didn't explain to you how anything would be obvious. There's absolutely nothing for you to base anything on there. It was just, like, kind of the word.

The Court did give you jury instructions, though, on how to think about obviousness. And this is one of those instructions. "In determining whether the claimed invention is obvious, you should take into account any objective evidence, sometimes called secondary considerations, that may shed light on whether or not the claimed invention is obviousness, such as" -- and then there's a bunch of things.

First one I didn't highlight, but whether the claimed invention was commercially successful. Yeah. Our invention was commercially successful. We were stealing,

stealing, stealing.  We were winning customers away from Attentive, right?  Like a million in the month right before they launched Magic Composer, so I would say the invention was pretty successful.  That's thing number one.

Thing number two, whether the claimed invention satisfied a long-felt need, right?  And that makes sense because if there's a need for something and that need hasn't been fulfilled, that's an indication that it's not obvious, because somebody would have done it.

Same thing with commercial success, right?  The assumption is if there's money to be made, you would have come up with it yourself instead of, you know, waited.  So whether the claimed invention satisfied a long-felt need, was there a long felt need?  Yeah, there was.  How do we know that?  We know that from Attentive's documents.

This is a document about Magic Composer, PTX-562, product priority, right?  They've seen our product.  They want to come out with their own copy.  Problem statement.  Our Legacy Compose flow irritatingly forced marketers to compose multi-message strategies one by one with no intelligent relationship between messages to enable use cases like rolled-up reporting or retargeting.  This friction led to a lack of inspiration and creativity for our users, and over time, likely suppressed the average messages scheduled per session.

Our Legacy product wasn't that great, right?  We have a problem.  And we are going to implement this new thing, Magic Composer, to try to solve that problem.  There was a need.  There was an invention that met that need.  And that is one of the things the Court says to you is important to think about in thinking about this question of obviousness.

What else are you supposed to think about?  Whether others copied the claimed invention.  Why is that relevant to obviousness?  Because if something is obvious, you don't need to copy somebody else, right?  It's common sense, right?  The fact that you bothered to copy it shows that maybe it was something you hadn't already thought of yourself, shows that it wasn't obviousness.

So what is the evidence on that, right?  We come out with our feature, our product.  They see it right away, November 6th, 2021.  Postscript differentiates on this feature today.  Let's close the gap.  That's what Mr. Greenberg says.

What does Mr. Long say?  Does Mr. Long say, "Oh, yeah, that thing, that was obvious, right.  We just decided not to do it, but that's obvious"?  No, he doesn't say it's obvious.

He says, "This is cool.  But I worry it's a big project."  That is the opposite of obviousness.  That's

saying this is cool, right?  It's a new thing.  But I worry it's a big project.

Now, that's what they said at the time, right?  That's what they were thinking at the time, that you can't run away from the documents.  Now, they came into court and they said -- Mr. Greenberg in his deposition said, "Oh, well, you know, I think the person we asked to do it took like three weeks, and it wasn't actually that big a deal after all."

Well, you know, takes me a long time to write as a general matter, but, like, it wouldn't take me that long to write if I were copying the plot, right?  Why was it relatively fast for them to be able to do this?  Because like somebody else had already specified all the features for them.  All they had to do was code it.

So, yeah, it turned out it wasn't as big a project as he expected, but that has nothing to do with whether it was obvious that this was a thing you would be able to do and that you would need to do.

And then again, just like practical reality here, they copied us, right?  Look at it.  They look the same.  They do exactly the same thing.  They copied us. It's not obvious.

So question on the verdict form, "Did Attentive prove by clear and convincing evidence that any of the

following claims of Postscript's '660 Patent are invalid as anticipated and/or obvious?"

And I want to say, you know why Dr. Polish didn't spend a whole lot of time talking about obviousness? I just want you to ask yourselves that question. Why not? Why not, right? Because he didn't have anything good to say.

So the answer to each of these questions: No, no, no, no. They did not prove by clear and convincing evidence that the patent is invalid and should be taken away from us.

And that brings us to their third excuse. They say we didn't infringe, but if we did infringe, it's invalid. But if it's not invalid and we did infringe a valid patent, it doesn't matter because it's not worth anything, right? It's worthless. That's their third basic excuse. Don't give them any money, or give them a really tiny amount of money in the grand scheme of things.

So, look, the experts agree here on the framework. You have to go back and imagine that we had made a deal. That's this hypothetical negotiation people keep talking about. Imagine you made a deal. We're sitting across the table from each other, Postscript is on one side, Attentive is on one side, and we're negotiating over their right to use our patent to compete with us and take away

that product differentiation, right?  How much would they be willing to pay, how much would we be willing to take for them to be allowed to use that feature?

Now, first thing, and, again, the experts agree on this, you have to assume that everyone agrees the patent is valid and the patent is infringed.  So this is a negotiation where if they want to have this feature, they have to take a license, right?  The patent is valid and infringed.  How much are they going to pay?

So let's just think a little bit about the state of the world as of this hypothetical negotiation when this sort of bargaining would supposedly have taken place.  What was the state of the world?  So state of the world was we were competitors, right?  Attentive was targeting the top end of the market.  We came out with a product that was really good for small businesses.

But you heard Mr. Turner say, "Our products turned out really good for some big businesses, too."  And we were starting to make some inroads into Attentive's customer base.  So competitors.

But I would say not just competitors, pretty fierce competitors.  This is an Attentive internal document.  This is from the second half of 2023 strategy.  So they're writing this at the end of the first half, so probably May, June.  What is our strategy for the second half of the year

for 2023?

The company -- so this is right when they're launching Magic Composer. This is right when this hypothetical negotiation would take place. The company is currently facing the most intense competitive environment in its history. We need a mindset shift. We need to shift from defense to offense.

So Attentive is sitting there at the bargaining table. How much are we willing to pay to get this feature that puts us in a level playing field with Postscript where they can't differentiate against us on this feature when we're trying to shift from defense to offense?

And what does that mean in Attentive-land? You heard it. These are in the documents, PTX-99, PTX-111. We want to crush them, it's going to be shock and awe. We're going to aggressively price them into bankruptcy. So, look, it's a hypothetical negotiation, right? It may be a little hard to imagine that these parties were actually at the bargaining table.

But the construct here is, this level of competition, what are they going to be willing to pay in order to take this differentiation away from us? And what would we be willing to accept to give to our fiercest competitor? So what else would be on Attentive's mind? They think it's going to make a really big difference,

right?

We saw they thought that internally, they ran tests internally that showed 8 and 9% lift, 8 or 9% increase in message volume, and then turned around and that's what they were saying to their customers.

So now they come in and they're like oh, well, the tests were pretty small, and we don't really know how reliable they were.  But at the time, they turned around and said to their customers, 10% average conversion rate lift, right.  Take them at their word.

So they're sitting there, when they're launching the product right at this point in time, thinking, this is going to increase our message volume by 10%, right.  So the experts.

Now, it's interesting -- this is one of Attentive's slides.  This is one of their slides from their examination.  And I think it's interesting, you know, Mr. Kidder, Mr. Kennedy, they mostly did the same thing, right.  Their actual analysis is not very different.  The big thing that's different are the input to that analysis.

So Mr. Kidder basically assumed, you've got this pool of infringing revenue, and most of it's infringing.  And Mr. Kennedy came along and he said, no, no, no, I think almost all of that revenue is not infringing, there's only a little tiny slide, this 2.5%, that might possibly be

infringing.

Now, remember, the damage expert has to assume the patents are valid and infringed, right. That's the assumption. So the question is: What is the revenue attributed to that infringement, assuming that it is infringing? So, first thing to keep in mind, this is a claim to a system, right. The thing that infringes is the system. So it's not really that complicated. It's what revenue is associated with the system.

And Mr. Kidder explained, it's not just retargeted messages that are relevant here, because when Attentive was doing this testing and talking about an increase in message volume, he was asked: Are we talking about just retargeted messages or messages more generally?

And he said: No, what they're testing here is whether or not there are more messages in total send because of the ability to target.

So the ability to have this retargeting and this feature, what does that do to overall message volume? And Mr. Kidder said that's what they were testing and that's what I looked at, what does it do to overall increase in message volume? So his analysis was actually completely right.

Now let's talk about Mr. Kennedy. So Mr. Kennedy said he understood that 2.5% of the messages

were potentially infringing. And it turned out that 2.5%, that corresponded to situations where the retargeting condition was clicked but didn't buy.

So, remember, we saw this drop-down menu from the Attentive product. Three different triggers, three different retargeting conditions. Recipients who didn't click the previous message, recipients who didn't open the previous message, recipients who clicked the previous message and didn't purchase. Mr. Kennedy's analysis was limited to that last one. That's the one that was 2.5%.

Now I want you to think to yourself, it's not surprising that's pretty low, you click but you don't buy, as opposed to recipients who don't click at all. I mean, common sense, right, you would expect way more people not to click at all than to click but then not buy. But he didn't count those. They're all retargeting criteria.

Dr. Polish admitted that. I asked him: You'd agree that the three different retargeting criteria that are shown here didn't click, didn't open, clicked and didn't purchase, they're all retargeting criteria, they're all ways of implementing the invention. But Mr. Kennedy didn't take them into consideration. He excluded that infringing revenue from his analysis.

Now, I want to be really clear, I'm not blaming Mr. Kennedy for this, right. I think he's very

well-credentialed, he's a straight-shooter.  I think he did an analysis with the information that he got.  But garbage in, garbage out, right.  The analysis is only as good as the information that it's based on.  And what he got told was the infringing, potentially infringing revenue is just that last condition, and that's just flat-out wrong.

So the number is not 2.5%.  We don't know under their analysis what the number would be because they didn't tell us, right.  But we know it's not 2.5% because all three of those are retargeting conditions.  And that is how Mr. Kennedy was able to come up with a world in which there is $562 million in messaging revenue and have a reasonable royalty that is one-tenth of the 1% of that, $571,000.

So Mr. Kidder did the analysis, Attentive revenues, he thought -- came up with a royalty rate of 3.28%.  He explained how using this like Rule of 40 and came up with a number for damages of $17.6 million.  He also said that even if you were to use sort of a version of the Attentive analysis and looked at infringing revenue from the patent based on the actual use of these retargeting conditions, the revenue for that would be about $46.4 million.

Now, look, the question of damages and what is the right number is up to you.  You're going to get a verdict form, it's going to have this blank.  You're going

to write in a number.  I'm not going to tell you what number to put in there.  That's up to you, right.  You've heard the evidence.  I would suggest to you that if the right number were $571,000, do you really think we'd be here?  Do you really think we would have spent a week and a week of your time for a case that was worth $571,000?  And do you really think that these two fierce competitors sitting across the bargaining table negotiating for the right to use a feature that we were selling against them as one of our points of differentiation, do you really think that's where the negotiation would have landed?

I would suggest to you just as a matter of common sense, that's nuts.

Now, where would it have landed?  As I said, that's up to you.  Mr. Kidder has given you some information to use.  He thinks 17.6 million is a reasonable royalty. He's given you some other numbers to consider as well.  And when you go back in the jury room, you will talk amongst yourselves and you will decide, I hope, what is the correct number to compensate Postscript for Attentive's infringement of its patent.

That's our case.  I'm going to sit down, and Attentive's counsel is going to have an opportunity to come up here and talk to you.  And then I'm going to get back up. I'm going to have a chance to get back up, I'll probably

respond to a few things that he says.  And then you will get the case to deliberate.  So I look forward to talking to you then.  Thanks.

THE COURT:  All right.  Thank you, Ms. Durie.

Now we'll hear closing arguments from the defendant's side, Mr. Campbell.

MR. CAMPBELL:  Thank you, Your Honor.

Good morning, ladies and gentlemen of the jury. I want to thank you very much for your time.

Let me start by saying, I don't have as much time left as my colleague does, and there's a reason for that, because we came to you to present the evidence and we have a limited amount of time so we can all get out of here hopefully today and get on with our lives because there have been a lot of sacrifices made both by yourselves, by Postscript, for sure, and as well by Attentive.  There are a lot of important executives and business can come to a stop when we have important executives here.  We are thrilled to tell our story.  We told it in our case.

I have fewer minutes left than my colleague, so she may be able to go on and she's going to respond to what I'm about to tell you, but at its core, this is a software case.  This is a software case.  And I promised you at the very beginning that the thing you need in a software case, and I told you what they were not going to give you, is

what, the source code.  Where is it?  Where is the Magic Composer source code that does all of those screen captures? It's not there.  They didn't give it to you because they don't have it.

So I think you need to bear in mind what you don't have, rather than screenshots, because in every software case, the code determines how it works.  And they don't want you to have it because it's not there.

Journeys, on the other hand, we gave you the code, that's our prior art, and that's how we invalidate their patent.  And we believe Journeys, they did it first, there's no question about it.  Journeys was prior to their patent.  That's October of 2022.  And if we did it one day before and we did it well before, that qualifies as invalidating prior art.  We have the code.

But even yesterday, when she was asked -- it's hard to sit up there, I get it, you're under oath and you're in front of this whole crowd, this crowded room.  My colleague, Mr. Davis, was talking to Ms. Frederiksen and he said:  You did not show the jury one piece of Journey code to say that it doesn't meet the limitations of the claim? She didn't do it.

So what matters most in a patent case is the claim itself, and there's a lot of limitations, quite long. So we're going to take a look at that.  I just wanted to get

a few things out there, and we're thrilled to be here, we're happy that our day has finally come.

So I made these promises to you at the beginning of the case.  Not one document showing monitoring trigger conditions.  I told you how the process works.  We had to turn over everything, and we gave them everything we had.  A million pages of documents.  That's a lot.  They have an army of lawyers over here.  They spent a year and a half pouring over our documents, source code.

Ms. Frederiksen told you she visited it, dozens of times they visited our source code.  All she had to do when you got to our source code, everybody knows this, is pull up the code and then you do one thing, control F.  We know what control F is.  That's "find," pops up and you just have to say "monitoring," not there, "trigger," not there. "Trigger condition," not there.  "Monitor trigger condition," not there.  It would have been that simple.

And had they found that in our Magic Composer code, we wouldn't be here, we would have changed our code, we would have done something different.  There's no need to change code that already is different.  So I kept my promises to you, and I want to talk, you know, about the case a little bit more.  Let's start with Magic Composer.

So Magic Composer is the product that's accused, it's gone by many different names throughout its life cycle.

It's been called Drips, Sequential Campaigns, Magic Composer, Campaign Composer.  They're all out there.  In fact, there was a document that our colleagues entered into evidence, it was PTX-230.  And you saw that document.  You have it.  And what that document shows is that, you know, we were doing this technology very early on, you know, prior to the filing date of the patent.

So the big issues you need to consider in this case are infringement and invalidity.

On infringement, they bear the burden of proof.  You just heard that, no doubt about that.  Validity, so do we.  We invite that burden.  We think we cleared that bar so easily.  Yes, clear and convincing evidence, no problem, we lined it up identically.  Dr. Polish did with every limitation of the claims, the claim that matters.

So on infringement, this is the verdict form, and we would submit to you that we provided you with the evidence -- so they're talking about a feather.  Well, I got to tell you, on the other side, at best, they give you a feather, we gave you -- we gave you the brick.  We gave you the lead weight.  It pulled their -- their feather shot into the sky, there was so much evidence that we gave you that Magic Composer does not infringe.

So this is how you should answer when you get to Question 1:  Did Postscript prove by a preponderance of the

evidence that Magic Composer functionality directly infringes any of the claims?

Functionality.  Functionality.  That is not what is on a GUI, what is on a graphical user interface.  Functionality, we know this, it's in the code.  They had it.  They didn't show you where in the code those functions occurred.  Those functions are written in the code.  And they couldn't do it because it's not there.

Okay.  So you learned a lot about patents this week, you know, pretty foreign, I'm sure, to most of you.  It's -- this patent in the upper -- you see it on the left, upper right-hand.  11,709,660, that means the U.S. Patent Trademark Office.  They do it every week on Tuesday.  They print out these patents.

July 25th of 2023, they issued the 11 million, you know, patents.  So that's a lot of patents that have been issued in that period of time.  So the issue -- I'm going to go back.

The issue always starts with the claim.  The claim is the chocolate chip cookie, it is the recipe.  You heard about this, and there's a lot of limitations in that claim.  To infringe, we have to satisfy every single limitation.  That's their burden.

But we focused you on one, just to make the job a little bit easier on you.  There are a lot of others that

we don't satisfy, but that one -- we can prove to you, and we believe we have, that if we are missing this one limitation, then this case is over. And it's easy for you to answer Question 1, you say "no."

Okay. So Judge Burke did us all a favor. There is -- certain terms of the claims required definitions. This is the only one, it will be in your instructions, and this is monitoring the trigger condition. And so this is what it means -- it's going to be in your binder -- but three words: Continuous, repeated, or periodic detection. Those are going to be three important words, and those three words you're going to have to determine whether Magic Composer is doing that or whether it's just using a timer.

So there's a difference. The claim says "monitoring." We saw this. So what we have here is the radar scope. So think about, you know, air traffic control. You've got the planes, they're too close, they're too low, and it sweeps around. So it's sort of repeatedly or periodically detecting, probably not continuously detecting but it's moving around.

And what we have on the screen are blips, not airplanes, but here empty carts. So when you shop online, you know, you go to a site, your cart is empty, but all of a sudden you say, oh, I like that product, I want to add that to my cart. Watch what happens on the screen. Click, there

it is.  And then the scope comes around, hits that cart that an item has been added to it, and it triggers a message.

So that is the essence of monitoring the trigger condition, sweeping around -- it's either continuous, repeated, or periodic, and it hits that trigger.  That trigger causes a message to be sent.  The trigger is something the user did, the user added an item to their shopping cart.

Magic Composer, very different.  With Magic Composer, there's a timer that is set.  Let me play this again because I think this is a pretty cool video.

Continuous, repeated, or periodic detection.

Let me back up.  One more time.

This right here is what the monitoring limitation means, this is Magic Composer.  You set the kitchen timer and out goes the messages to everybody.  It's a blast send.  It has nothing to do with any action by what the user has done, what the consumer has done.  It's just going to blast out to 500 people, 1,000, 10,000.  That is what Magic Composer is doing.  It's setting a timer, and it's blasting out messages.

So an easier way to think about patents, you can, you know, set aside all of the words in the claims, is think of it as like a soccer ball versus a football.  You know what those are?  The soccer ball made of leather,

stitched together, filled with compressed air, and it's round.  Get a patent on that, fantastic.  And then football made of leather, stitched together, filled with compressed air, but it's oblong.  Oblong.  Very different, and according to the instructions from Judge Burke, it's not the same.

We don't infringe.  You have to find one limitation, and that one limitation that we have focused you on, there are others, is monitoring the trigger condition.

The evidence of infringement, we believe, is overwhelming.  What did they have?  On the right, they had a bunch of, you know -- I'm not sure what it is, you know, images from Ms. Frederiksen's, you know, presentation that appeared to be drawn.  They are pointing to something, but the one thing they're not pointing to is source code.

On the left side with Attentive, you've got all of our documents that we gave to them; nothing in there.  All the source code.  Then you have the testimony of Mr. Miao, Dr. Polish, you have Jesse Greenberg, you have our CEO, Amit Jhawar, and they had told you that all it does is sets a timer.  Magic Composer is time based; Mr. Miao.

What Mr. Miao said is Magic Composer does something totally different, which -- which is send this message at this time.  Send the message at the time.  Don't monitor what's going on, just follow the rules.  It's not

monitoring anything, it's just setting a timer.  The kitchen timer.  We don't infringe.

Mr. Jhawar, the CEO, said the same thing.  So Campaign Composer, same thing as Magic Composer, was basically an idea that you set up messages based on a timeline.  Okay.  So this document is interesting.  I mean, they don't like it.  I told you at the beginning it's going to be the smoking gun.  It is.  It is the smoking gun.  This document, I would implore you, I would ask you to write it down, 198.

There are two other numbers I want to give you because they are the two I gave to Mr. Turner when he was examined.  Let me get these numbers.

So you have on the screen DTX-198 -- and I'm going to walk through it.  The other two are DTX-100 and DTX-223.  So it's 198, 100, 223, all defendant trial exhibits, DTX.

Okay.  So this document is a key feature document.  I was talking to Mr. Turner about this.  It's an important document.  It's a living document.  They update it and they updated it both before the litigation was filed and they updated it is after the litigation was filed.

What did Mr. Turner say when I asked him about it?  Oh, it's got additional features.  I then came back and asked him, where does it say additional features in the

document.  I challenged him, offered him.  I gave him the opportunity to explain.  There's no additional features listed in this document.  This is what the document is.

What it is doing, it is giving the marketing and sales department the roadmap, and you will see it in those three that I just gave you.  This is they're trying to understand what -- how their products work versus those out in the marketplace.

So let me focus you on these rows because you've got to get to those rows.  DTX-198, and it's Rows 57, 58, 59, and 60 and 61.  Those are important rows.  But let's look at 59.  I just -- 59 is the game-ender for them.  It's over when it comes to Magic Composer.

59, subscriber response branching.  It says, "Creating conversational messages where the next message can be determined by how the subscriber responds."

That's their patent.  That is it.  So what they say in this document, yes, that is how Campaign Flows work.  Move over a column to Attentive, they say, no, but not Campaigns.  That's Magic Composer.

They are admitting to you -- this is a diary entry.  Go to these documents.  They are consistent, they say the same thing over and over again.  They come up with excuses, say, oh, there are additional features.  Oh, this is something that's not in the product.

No, this document says exactly what it says. This is common sense. You can read these words. This is not source code. I'm sure they wish it was source code. You wouldn't have it; you have it.

Okay. Speaking of -- speaking of source code, and we talked about this, millions of lines of code. There were a million pages of documents, and we're looking for these two, "trigger conditions," "monitoring trigger conditions." Where are they? Not a single Magic Composer document uses those words.

You'll find them all over Journeys. They're everywhere in our Journeys documentation. We didn't come up here and change our code just because we were worried about them. We had never even heard of this patent.

So they -- they get a patent, they know how to say "trigger conditions." Trigger conditions, you've got the patent info. It's everywhere. It's in every paragraph saying trigger condition here, trigger condition there. It's not in our documents.

You know, how could that possibly be? Was there an all -- if we had sent out a memo to our employees and said, oh, by the way, we're going to develop Magic Composer, but don't use the word "trigger condition" anywhere, don't use the word "monitor trigger condition." Guess what? They would have that document. They would have it. Like we're

trying to cover something up. It doesn't exist. It does not exist. We gave them everything.

They gave -- they had every version of our Magic Composer code and unfettered access to it. We didn't stand out. We were, come see it. You want to see it again next week, the week after, we're happy to give it to you.

I couldn't believe this when I heard this testimony. So no value in the source code. This is what Ms. Frederiksen said to you. I'm not going to presume that the jury would get the specific value out of the source code. I don't know their background. I don't know if they read source code.

I mean, come on, we're looking for one word, "trigger." Trigger conditions, monitoring trigger conditions. She didn't have it, she didn't want you to have it, she doesn't have it. She should have given it to you -- she would have given it to you, but it's not there.

Invalidity, that's our burden. We accept it. It's -- we believe Journeys is spot-on. It is everything you need to invalidate this patent, as is Klaviyo Flows, as is Sephora Replen.

Okay. Verdict form, very quickly. This is going to be Question 2. The verdict form is actually -- you probably haven't seen it yet. It's surprisingly short, you know, as these things go. But it's -- you know, you have

very few questions to answer.  It's really easy to follow.

So for this, answer, "yes":  Did Attentive prove by clear and convincing evidence that any of the following claims are invalid as anticipated and/or obvious?

Anticipated or obvious.  There's two different ways it could be invalidated, either all the limitations or if there is a something that would have been obvious in Journeys that would have been -- met all of those elements.

And we would tell you that we believe, based on the evidence that you saw in Journeys, that Dr. Polish methodically, meticulously walked you through every one of those limitations.  The evidence is there.

Okay.  So this is the patent video, and I think it's worth taking a look again at this.  So let's take a quick look at it.  I'll play it.

Just to remind you, this -- this video is here for a reason.  Patents get invalidated.  They're suggesting to you that the Patent Office gets it right.  No, they don't.  They're human, they're busy, they have a lot of work to do.  There's some paper -- but I'll play the video.

(Video played.)

Sometimes in a court case you are also asked to decide about validity.  That is whether the patent should have been allowed at all at the PTO.  A party accused of infringement is entitled to challenge whether the asserted

patent claims are sufficiently new and not obvious in light of the prior art and whether other requirements of patentability have been met.

In other words, a defense to an infringement lawsuit is that the patent in question is invalid. You may wonder why it is that you would be asked to consider such things when the patent has already been reviewed by a government examiner. There are several reasons for this.

First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.

In addition, there is, of course, the possibility that mistakes were made or important information overlooked. Examiners have a lot of work to do, and no process is perfect.

Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringing, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

(Video ends.)

MR. CAMPBELL: Okay. So you've got the patent. Patent Number 11,709,660. Do you think the Patent Office and these examiners from this video get it right? They've gotten it right 11,709,660 times out of that same number?

They're batting a thousand?  Use your common sense.

That video would not exist if it weren't for juries like yourself that get to assess the validity of the patent independent of the Patent Office.  They are a different branch of the government.  We're here in the judicial branch.  We all know that.  You get to take a fresh look, and it's incumbent upon us to come forward with evidence.

And what we're going to do and what we've done is we brought that evidence to you that never, just has not been considered by the Patent Office.  They're pointing to -- sure, there's Attentive stuff on that, you know, narrowed list -- I'm going through it -- of prior art.  Absolutely.  We embrace that.  But there's important evidence that you heard that the patent examiner did not have.

So you heard from Dr. Polish.  Dr. Polish is accomplished.  He is a software expert.  He lives, breathes, he loves software.  He knows how to read code.  It's like speaking -- I don't know how many languages he reads.  Like, five or ten.  It's like speaking a foreign language.  There are words in there.  We can all see them when we need to.  And they can be explained to us.  He was here to teach you source code to the extent he could in this very short period of time.

That was Ms. Frederiksen's job.  She didn't want to touch anything involving source code.  It was her job.  She's been doing this for 50 years.  Why isn't she showing you any code and trying to teach you at least the basics, the functionalities that occur in that code?

So Dr. Polish, you heard him say he's got 12 patents of his own, and he told you that in cases like these, the defendant, that's us, often provide juries with more prior art than the Patent Office considered.  That's what we have right here.  There's three in particular we're asking you to look at.  There are many others, but we narrowed it down to three.  And Dr. Polish, sure enough, has seen juries invalidate patents many times.

So ask yourself, 11,709,660, did the Patent Office get it right every time?  Of course not.  Of course not.  It defies logic.  They get it wrong, and that's what that video is telling you.

So what I have here on the counsel table -- you saw this earlier in the trial -- this is the additional prior art that Postscript gave to the Patent Office.  And it just lines up exactly with that video.  The examiner is busy.  They make mistakes.  And the examiner got this.  And she raised her hand and she said, "You got to help me.  It's too much."

So, listen, they tried to give the Patent Office

what they had, but they didn't give the Patent Office the three most relevant things.  And the first and foremost was the source code.

But when she raised her hand, the patent examiner, she says applicant's duty of disclosure of material and information is not satisfied by presenting the patent examiner with a mountain of largely irrelevant material.  She's speaking to that, right there on the table.

So what does she say?  She says at the bottom of this, "Make a disclosure to the patent examiner in such a way as not to bury it within other disclosures of less relevant prior art.  Okay.  So take that mountain and make it into a molehill.  Give it to me that way, you know."

So they -- and she also said, "It's up to them. You've got to particularly point out the relevant material." And at the bottom of DTX-619, this is called a file history. You're going to have it.  You're going to have a lot of paper.  It says that the examiner performed a cursory review of these records, a cursory review.

You know, we've been studying for a week over one patent.  So imagine doing a cursory review of that. That would not get you very far.

So what Postscript did is they tried to condense that stack of paper -- it's huge, it's 315 references -- into this 13 right here.  They focused on one in particular.

It's this PAWZ reference.  It's the PAWZ reference, and it's Number 8 on the list.  And they were asking Dr. Polish about it.

And they asked Dr. Polish, "Did you consider this?"

He said, "Yes, and the Patent Office considered it."

That's not what the issue is.  It's not about PAWZ and these other Attentive references.  It's about these three, and they don't want to talk about these three.  These three are the ones that we presented to you, and what the Patent Office did not have was the Journeys source code.  That's Exhibit 308.  They didn't have Klaviyo Flows, Exhibit DTX-603.  And they didn't have Sephora Replen, DTX-597.

So, remember, invalidity, we only have to beat them by one day.  Those three references are over a year before they filed for their patent application and in some cases many years before.  We did it first, as I told you at the outset, and so did others.

So you heard this about retargeting.  It's a decades-old technology.  So we have Eric Miao, Brian Long.  You heard all of these witnesses testify regarding retargeting.

So Eric told you -- so you didn't file a patent on Magic Composer?  No.  It's been around for a long time,

before Journeys.  And he was talking about Journeys here, excuse me.

"You didn't file a patent on Journeys?  It's been around a long time."

He said, "That's right."

And so Mr. Jhawar was asked about Campaign Composer, and then he was asked, how long have campaigns been used in the industry?  25 years.  And so this has been around.  This tech is not new.

Sephora Replen, you heard about that from Brian Long.  It was one of the important early customers of Attentive.  And Sephora was sending reminder follow-up messages to consumers that you might want to refresh your, you know, moisturizer or whatever you had from Attentive, so retargeting.

Zack Magdovitz, same thing, it's been around for a decade.  He was with Attentive.  You heard from him by deposition.  Adam Turner.  You remember that.  Yeah, that specific one already existed, this feature of retargeting.

Okay.  And then we asked the inventor, Alex Meyer, the same thing.  Yeah.  He agreed with that.

So let's look more specifically at Journeys.  So this is 2021.  This is DTX-308.  And what you have to do when you get the source code, there's a lot of it, you've got to actually look at the page at the bottom.  It's got

some strange number, but this is page 527, 527 of the source code, and there you're going to find all of these trigger conditions listed.

It says -- you know, there's a dozen of them -- "Product view, add to cart, purchase, join marketing, order created, order fulfilled" -- it goes on and on.  These were all internals in 2021 before the file date.

Okay.  So, again, monitoring, here's the radar. It's looking around, trying to figure out -- and this is -- you can think about Journeys doing this.  And this is in the '660 Patent.  You add an item to the cart.  It hits it, triggers, text message sent.  That's exactly what Journeys was doing.  So you can see right here, it's building.  This is a Journeys document that you will have.

Dr. Polish walked through all of this, so you've got enrollment at the top, and this is DTX-598, an important document in the back.  It's not going to animate for you, and you're not going to have the phone on the right, but this is what it is doing.  And I will play it, again.  And you can see we've got enrollment, we've got the trigger, we've got the determining step, and we've got the send.  And all of those are the limitations of the claim.

Let me play it again.  Let me back it up.  Okay. Here we go, enrollment, trigger, determining.  Then it's sending a message.  That is the flow.  That is exactly

happening in Journeys.

And Dr. Polish walked you through the code lining up with this flow diagram. He gave it to you. You have that evidence. Clear and convincing. Clear and convincing. Klaviyo, okay. So this is again one of the pieces of prior art that was not provided to the examiner when she asked for help. You got to help me out.

And so Dr. Polish again walked you through in detail the Klaviyo prior art reference. What I have on the screen on the right is the '660 Patent and on the left I've got Klaviyo Flows. It matches up. It shows the same flow. And so this document is DTX-603, and you'll have that in the back as well. So it lines up very, very cleanly, and that's clear and convincing evidence. He walked you through every limitation for Klaviyo Flows.

So, again, and we -- Sephora Replen, same thing. I'm not going to, you know, go in to Sephora -- we've got Sephora Replen. You heard Mr. Miao testify at length about Sephora Replen, as well as Dr. Polish pointed you to the trigger conditions, T1 through T8, "T" for trigger. You heard that yesterday.

So invalidity. So you've got the patent on the -- to the right, and this is the trigger conditions that are in the '660 Patent. It's the soccer ball, made of leather, stitched together, filled with compressed air and

round.

On the left you've got Journeys.  And so, again, made of leather, stitched together, filled with compressed air and it's round.

The challenge, however, that they face is we're a year before them.  They're both soccer balls.  So we've got Journeys and Klaviyo Flows on the left, soccer balls, and on the right we've got the filing date in 2022 for their patent covering trigger conditions.  They're all soccer balls.

And here's the problem.  They're all soccer balls.  The one on the far right, the Postscript patent, is deflated, that soccer ball, because it was predated by these three prior art references.  And we told you at the outset of this case that we were going to show that to you.

So this was yesterday.  You heard this.  So my colleague, Mr. Davis, was asking Ms. Frederiksen when she was coming back to respond to Dr. Polish on, you know, the invalidity over Journeys and the other references.

He says, "So in your invalidity rebuttal again" -- that's my colleague asking -- "you didn't point to a single piece of code, did you?"

"In my testimony?"

"No.  Right now.  She didn't show you a single piece of source code."

"That's correct."

"You don't show the jury any single piece of evidence other than the patent itself, did you?

"I believe that's correct."

They have to come forward to show -- we provided clear and convincing evidence.  It is overwhelming.  And what does Ms. Frederiksen do?  She waves at the patent.  That's all she did.  That, I would submit to you, is clear and convincing evidence that stands unrebutted.  Unrebutted.  You can discount her testimony because she did not give you anything to respond to Dr. Polish.

Let's talk about damages very briefly.  You heard about this.  So Campaign Composer sends a lot of messages out.  And so some of them are for multi-message campaigns.  So you've got a first message.  And you saw all the bubbles go out, and you have a second message.  But it's not until you do retargeting that the '660 Patent comes in to play.  We don't do retargeting.  We just don't.  We just set the timer.  But if we did retargeting and you think we did --  I submit to you we don't.  We think the evidence is overwhelming that we don't.  The kitchen timer is not retargeting.

Mr. Kennedy has appropriately brought down the overall impacted revenues to what they are, the retargeting.  In fact, they were in the lower when Mr. Miao, when Eric

came up here.

I asked him, "What percent of the revenues are associated with retargeting messages?"

And he told you, "They're .5%."

And Mr. Kennedy and Mr. Miao, when they both testified, they told you this wasn't some subset of retargeting, just, you know, SMS. No. It was all retargeting. All retargeting is 2.5%.

And Mr. Miao said, all retargeting is 0.5%, so the numbers are very small.

Mr. Kidder, he grabs everything. Of course he does. It's a land grab. He's trying to grab as much revenue, so it's a simple math equation. It depends on who you believe. If you think Kidder is right, it's a larger number. If Kennedy is right, it's a smaller number. And you just have to substitute it.

I did the math for you on the screen. And when I did that math, that math showed that it's about $400,000. But, again, the damages in this case should be zero. We don't infringe, and the patent is invalid.

So you heard about Attentive. You know, they were very small and, you know, very humble beginnings. Postscript, they were right behind us. You know, they have this narrative that they've been trying to tell you that we were out there, we're the incumbent.

I showed you in 2017, right before they came into being, right before they were born -- we're born in '16. They're born in '18. I mean, we're like siblings, you know. And in 2017 we have $150,000 in revenue. 150,000. We weren't some big behemoth that was picking on them. We were building a company.

These guys are proud of what they did. These are guys from Philly. They're local guys who did right, came up with a cool idea, built a really nice company, and it was about Two-Tap. It wasn't about retargeting. That's not -- Attentive was successful.

I told you about that, pop-up our phone that you get. You know, some of you may find it annoying. Just say no thanks and get rid of it. My client came up with that. Hit it once. Boom. Yes. I want the coupon. SMS text opens. You get all the offering and all the legalese and, boom, you hit it again, and you can be signed up and you have consented to receive text messages.

As Mr. Jhawar said, the CEO of Attentive, you don't want it anymore, you type one word, "stop," and they have to stop.

So these guys came up with a great idea, and that is the foundation of this company, not this subset of an idea off of a much larger platform, Campaign Composer. Campaign Composer, they're talking about, you know, giving

you the idea that we did it because of retargeting.  No.

You heard Mr. Miao testify, our customers were irritated because prior to Campaign Composer you had to use three different screens.  So you have to do -- let me do my e-mail over here and then I've got to do my SMS over here and then I've got to do my MMS over here.  That's annoying.

So what they did with Campaign Composer, the inspiration behind it was bring those into one user interface.  It wasn't -- had nothing to do about this retargeting feature that we don't use in accordance with the patent.  We don't use it because we don't monitor.  We are a timer.

So jury instructions.  You heard about that, credibility.  Credibility matters.  It really does.  You don't check your common sense at the door when you come into this courtroom and you take a pledge to be a juror.  You didn't hear Judge Burke asking you to do that.  No.  You bring your common sense here.

And what Ms. Frederiksen did is not give you a single piece of source code.  So you're going to get this from Judge Burke, and here he gave it to you, read it into the record.  You should consider how reasonable or unreasonable the testimony is.  You think it's reasonable in a source code case, a patent case involving functionality you don't get a single piece of source code, a single line?

I submit to you, that is not credible. And you can take that and look at her testimony and reject it outright because she hasn't given you that. She should know better. It's inconceivable that she would come here and not at least -- I challenged her at the beginning of the case. They were on notice. They've had this for a year and a half, and I put them on notice. I'm going to tell you in closing, they knew this, that they're not going to come forward with code. And they didn't because they can't.

So take that into consideration when you evaluate credibility of witnesses.

All right. So direct infringement. So Magic Composer, in order to infringe, you've got to compare, it's a soccer ball, football. And so what it says, "You must compare the product or process with each and every one of the requirements of a claim to determine whether all of the requirements are met."

So they have to satisfy every element of that long list of checkmarks in that cookie recipe, and if they're round, the soccer ball, and we're oblong, that's cool, we're different, we don't infringe because -- and that is in your instruction. If you determine we are oblong, we are that football, we don't infringe.

Okay. This is an important one too. It goes to that right there, that stack. This is prior art considered

or not considered by the PTO.  What this is saying to you, and you've been instructed on this and you've received a lot of instructions yesterday, "If you decide it is different and more relevant," that is the prior art, "you may weigh that prior art more heavily when considering whether Attentive has carried its clear and convincing burden of proving invalidity."

That art is the Journeys source code that wasn't in there.  The Patent Office didn't have it; you did.  We presented it to you.  You're going to have it in the back. It's the Sephora Replen, and it's the Klaviyo Flows.

That art is more relevant than what the Patent Office had.  It's not about this PAWZ reference.  That was considered by the Patent Office, we'll grant you that. Dr. Polish considered it, we'll grant you that.  What they didn't consider was those three.  Very important instruction.

Invalidity, it's like infringement, so anticipation is like infringement.  You'll be asked to determine whether one prior art reference included each and every element of an asserted claim.  We would submit that we showed you that in Journeys, we showed you that in Klaviyo Flows and in Replen, and Eric Miao walked us through Replen in detail.

On Journeys in particular, we've got the source

code and painstakingly showed it to you.  We wanted to leave no room for doubt that every limitation was met.

Obviousness, this is a slightly different way. It's going to be on the verdict form.  "An alleged infringer may establish that a patent claim is invalid by proving by clear and convincing evidence," we accept that burden, "that the claimed invention would have been obvious to a person having ordinary skill in the art at the time the invention was made in the field of the invention."

So if there's something close, and you say, okay, you know, it feels like it's there, it's there.  That gives you the right on that patent video to say it's obvious, that instruction.  They didn't get it right at the Patent Office.  11,700,000 times in a row.  They just did not, they don't, they're human.

THE COURT:  Mr. Campbell, about two minutes left.

MR. CAMPBELL:  Thank you, Judge.

So find infringement.  You're going to say "no" to these questions.  We can submit to you, the evidence is there.

Invalidity, you're going to say "yes," that we have proven that, there's no damages, not applicable.

Ladies and gentlemen, we have been waiting for this day.  We have been waiting for this day.  We are

thrilled to be here.  We want to clear our name, and I want to thank you on behalf of my client, my entire team, for your focus and attention.  It's very clear that you've done your job.  We ask you to deliberate, and we would submit to you that we don't infringe and the patents are invalid.

Thank you.

THE COURT:  All right.  Thank you, Mr. Campbell.

Lastly, I'll ask plaintiff's counsel if they have any rebuttal closing?

MS. DURIE:  I do, Your Honor.

The patent at issue in this case is about functionality.  It's about how something works.  The first question on infringement:  Did Postscript prove that Attentive's Magic Composer functionality directly infringes?  It's about what the product does.

So it's not surprising that when Ms. Frederiksen came in here, what she talked to you about was what the product does, right.  Because that's the question you're being asked to decide.

Now, that doesn't mean she didn't review source code, right.  She was asked:  Do you have a sense for how many lines of code you reviewed, probably several thousand?

And she said:  Oh, way more than that, right. She looked at the code, and she analyzed the code.  But what matters ultimately for her opinion and what matters

ultimately for your decision is how the product works.  The code may help you to understand that, but this case is about functionality.

So Attentive comes in here and says, oh, well, these words don't appear in the code, right, we didn't do a search.  But that's because that's not the question that you're being asked to decide.  The question is not, does the word "trigger" appear somewhere?  It's, how does it work?  And that's why Ms. Frederiksen said, you know, it's not surprising that a particular word isn't in there.  What matters is how the code works, what matters is how the product works.

And when it comes to how the product works, there's really no question, right.  This is how the product works.  This is Magic Composer.  And she explained to you that each of these are trigger conditions that result in the message being sent to a person who satisfies those conditions.  That is the evidence that is important in this case.

The patent tells us what a trigger condition is.  We heard this sort of suggestion that there's no trigger condition because the words aren't there, but a trigger condition is the thing in the patent that lets you identify the people who are going to get the message based on what they do.  You can see that for yourself in the patent.

The patent itself also makes clear that the message can be sent right away or the message can be sent later.

We've heard a lot about kitchen timers, and I think the suggestion is that the patent requires you to send the message right away.  We had this example, they gave you this example of a shopping cart.  And I just mocked this up, so I'm sorry that it's kind of ugly.  I was just doing it at the table.  But they have this example of a shopping cart, and it says -- a little iPhone, it said, "Notice this item is still in your cart."  And they said, "Oh, it hits the trigger, and it goes there right away."

Now, I want you to stop and think for a minute, does that even make sense?  You put something in your shopping cart, and you immediately get a text message that says, "Notice it's still in there"?  Like, you would never do that, right.  The whole point is you would want to wait and have that item sitting in the cart for some period of time and then send a message later that's like, "Oh, I notice it is still in there, maybe you forgot about it."

So the patent says, you have a trigger condition, you identify the thing that you care about, the people who are going to get the message, and then you either launch the message right away, if that makes sense, or you schedule the message for a future point in time, if that

makes sense.  That's what we do.  That's what they do, that's what infringes.

I didn't think they -- I wasn't sure if they were going to go back to this document, this is their smoking gun document, and they did.

And we heard an argument from Attentive's counsel that, "Oh, this is still the smoking gun because this is about things that are in the patent."

So Attentive's counsel is telling you that.  But his own expert disagrees with him, right.  Dr. Polish disagrees.

Dr. Polish admitted this ability to text back, it's not required by the claims, right.  So his expert admits he's talking about something that is not in the patent.

Let's talk about what was disclosed to the Patent Office because we've heard a lot about this giant stack of paper.  And I wandered over there because I trying to see whether I could find this submission in that stack.  I didn't.  But, you know, it's 13 references.  It's not that.  It's probably about, I don't know, that much.

And their big argument seems to be, one, you didn't tell them about Klaviyo again in response to a request that we narrow down and get rid of stuff that was duplicative.  You didn't tell them about Sephora again, even

though it too was duplicative, and this seems to be their big one, you didn't give the Patent Office the source code.

Now, I want to stop and think about this for a minute. Obviously we didn't have the source code for our competitor's product, right. Obviously. So you can never give them the source code in that situation. If that were the standard, like this whole category of patents wouldn't be valid if you've got to give people source code. You don't. There's no requirement for that. You haven't heard a suggestion there's any requirement for that. And it makes sense, because again, what matters is the functionality.

We provided the Patent Office with documents about the functionality of the prior art, because the patent is about functionality. And with respect to these references, Attentive hasn't shown you anything that would have mattered to the decision that wasn't disclosed. They haven't said, oh, there was some function in the prior art that the Patent Office couldn't tell from reading these references. They haven't pointed you to anything.

We have a presumption that patent examiners do their job. Does that mean they do their job perfectly a hundred percent of the time? No. But you have a presumption that they do their job correctly.

And in this case, they got the right art, the art that we have been talking about all week. They reviewed

it, and they concluded something that seems completely unsurprising, which is, the thing that was developed to be an improvement over Journeys is different from Journeys. And for that reason, we were entitled to a patent on it.

I want to touch briefly on this question about damages. You heard no response to that, right. You heard Attentive's counsel say, "Oh, Mr. Miao on the stand came up with a different number," but in terms of the information that was provided to Mr. Kennedy for Mr. Kennedy to do his analysis, we walked through it and showed you that that 2.5% number came from one and only one retargeting condition, right. Recipients who clicked and didn't purchase. And they excluded all of the other uses when they were using the patented invention. You heard no response to that, because it's true.

But it also means that Mr. Kennedy's analysis is not reliable, because he wasn't given the right data. It's kind of like Dr. Polish, right, who arrived at a conclusion that there was no copying, because Attentive's counsel didn't give him the documents that showed that there was copying. Garbage in, garbage out. The analysis is only as good as the data that the experts are given.

So look, I've said these companies are fierce competitors, right. And I asked Mr. Jhawar, "Attentive wants to stop all its competitors from being successful in

SMS," and he said, "Yes, I would say that."

So competition is fine, right.  But there's a right way to compete, and there's a wrong way to compete.  And the wrong way to compete is to copy your competitor's patented innovation and refuse to pay for it.  That is the wrong way to compete.

Now, you're going to go in the jury room, and you're going to talk to each other.  And when you do, I want you to have four questions in mind.  And think about the answer to these questions.

So first of all, if the invention was just Journeys all over again, right, if the solution was the problem, and if there really wasn't any gap, like all of their documents say there was, like if they could do this with Journeys, why didn't they?  Like, why come out with Magic Composer if it was already all in the prior art?  And if this was just an obvious improvement, why hadn't they already done it?  And why did they say it was cool?  And worry that it would be a big project if it was just some obvious thing?

And if Magic Composer is so different, what's the difference?  What's the difference between our product and their product?  What's the difference between what the patent does and what their product does?  What is it?  Because there's not one.

And if this invention's only worth, you know, roughly $500,000, why are we all here?  Why do we have experts getting paid hundreds of thousands of dollars to testify?  Why do we have all of these lawyers and why have we spent all of this time and brought in, as counsel said, these executives and all these people, right?

We've done that.  We've done that because this is really important.  You know, Postscript, Adam and Colin and Alex, trusted us with this case, and that was a really big deal for us.  And it's now the point in the case where we hand that off to you.

I think the jury system in America is amazing.  It's the reason I do the thing that I do, because, as far as I know, this is the only country in the world where the way that we resolve disputes like this is we bring in people from all walks of life, different backgrounds, different experiences, and we give you the facts and we ask you to go into a room and talk to each other.  That's pretty amazing.  And we are incredibly appreciative that you are here to do that.

We are handing our case to you.  I want to thank you for your time and for your attention.  And we look forward to receiving your verdict.

Thank you very much.

THE COURT:  Okay.  Thank you, Ms. Durie.

All right.  Ladies and gentlemen, now you've heard the closing arguments from the parties, and so there is only a little more for us to do right now before you go begin your deliberations.

The first thing that I need to do is to finish reading the very last portions of the final jury instructions that you have a copy of that relate to the deliberation and verdict session in Section 8.  It starts on page 37.  So I'm going to do that now.

And so, ladies and gentlemen, the prior instructions I've given you included my instructions on the law.  Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

Once you start deliberating, do not talk to the jury officer or to me, or to anyone else, except each other, about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.

I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this court, is Juror Number 1.

One more thing about messages, do not ever write down or tell anyone, other than your fellow jurors, how you stand on your votes.  For example, do not write down or tell anyone that you are split four to four or six to two or whatever your vote happens to be.  Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.  It's your duty as jurors to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but you should not give up on your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors -- solely because of the opinion of your fellow jurors or for the purpose of returning a verdict.

Remember at all times that you are not partisans, you are judges of the fact.  Your sole interest

is to seek the truth from the evidence in a case.  A verdict form has been prepared for you, and I'll review it with you in a moment.

You'll take this form to the jury room, and when you have reached a unanimous agreement as to your verdict, you'll have your foreperson fill in, date, and sign the form.  You'll then return to the courtroom, and my deputy will read aloud your verdict.  Do not show the completed verdict form to anyone or share it with anyone until you are in the courtroom.

I'll remind you that nothing said in these instructions and nothing in the verdict form is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

Now that all the evidence is in, and the arguments are completed, you're free to talk about the case in the jury room.  In fact, it's your duty to talk with each other about the evidence and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each others' views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you're convinced that

other jurors are right and that your original position was wrong, but don't ever change your mind just because other jurors see things differently or just to get the case over. In the end, your vote must be exactly that, your own vote. It's important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you said, so you should all feel free to speak your mind. Listen carefully to what the other jurors have to say, and then decide for yourself.

During your deliberations you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, iPhone, iPad, tablet, or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, LinkedIn, YouTube, Instagram, TikTok, Snapchat or Twitter, now X. You should not communicate to anyone any information about this case or conduct any research about the case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow

jurors during deliberations.

Let me finish by repeating something I said to you earlier:  Nothing that I may have said or done was intended to indicate or should be taken by you as indicating what your verdict should be.  You must decide the case yourselves based on the evidence presented.

So now I've finished reading the jury -- the final jury instructions to you, ladies and gentlemen of the jury.  I did mention in one of those instructions that I would review the verdict form with you.

Now, of course, counsel on both sides have done that quite a bit in their closing argument.  You all will get a copy of the verdict form.  There will be one official copy of the verdict, the one that you ultimately will sign at the end when you have the verdict that my courtroom deputy will give your foreperson as you begin your deliberations.

But just briefly, I'll just review what ^ you have heard about.  That is, on the first page on the verdict form it reads:  In answering the following questions and completing this verdict form, you are to follow all of the instructions that you were given in the Court's final jury instructions.  Your answers to each question must be unanimous.  Some of the questions contain legal terms that are defined and explained in detail in the final jury

instructions.  You should refer to and consider the final jury instructions as you answer the questions in this verdict form.

And then it says:  It is very important that you follow the instructions provided in this verdict form.

So then, as you heard, the next page is entitled, "Findings on Postscript's infringement claims," and it has the first question that you'll need to answer:

Question 1.  Infringement of United States Patent 11,709,660, or the '660 Patent.  And the question is:  Did Postscript prove by a preponderance of the evidence that Attentive's Magic Composer functionality directly infringes any of the following claims of the '660 Patent?

And then it says that you will put yes as a finding in favor of Postscript, and that no is a finding in favor of Attentive.  And then there is a space to put either yes or no for each of the four asserted claims at issue; Claim 4, Claim 6, Claim 10, and Claim 14.

Then on page 3, that's titled, "Findings on Invalidity of the Postscript Patent," and it has Question 2, which is, Invalidity of Postscript's '660 Patent.

That question asks:  Did Attentive prove by clear and convincing evidence that any of the following claims of Postscript's '660 Patent are invalid as anticipated under 35 U.S.C. Section 102 and/or obvious under

35 U.S.C. Section 103?

And then it notes that an answer yes is a finding in favor of Attentive and an answer of no is a finding in favor of Postscript. And then there's a place, again, for you to put either yes or no with regard to each of the four claims at issue; Claims 4, 6, 10, and 14.

And then the instructions go on to say: If you found any claim of the Postscript '660 Patent infringed in Question 1 above, and also found that any of those same infringed claims is not invalid above, answer Question 3 below, which is on the next page.

It says: For example, if you answered yes for any claim in Question 1 and answered no for that same claim in Question 2, then you would answer Question 3. Otherwise, you've reached the end of the verdict form and should proceed to the last page.

Page 4 of the verdict form is titled, "Damages for Infringement of the Postscript Patent." It has Question 3, which you would answer if the conditions on the last page were no, and that question which relates to damages for infringement of the Postscript patent, as I've noted, reads: What is the amount of money that Postscript has proven by a preponderance of the evidence to be a reasonable royalty to compensate Postscript for Attentive's infringement through the date of trial?

And then lastly, when you're finished answering the questions, you go to the final page of the verdict form on page 5.  It says:  You've now reached the end of the verdict form, and you should review it to ensure that it accurately reflects your unanimous determinations.  All jurors should then sign the verdict form in the space below and notify the Court's security officer, who will be outside the jury room, that you have reached a verdict.

The foreperson should retain possession of the verdict form when you go into the courtroom and bring it into the courtroom with the jury.  Then there is a date and a place for the foreperson to write the date, today's date, and then a place for the foreperson to sign the top line, and then for each of the other jurors to sign as well.

All right.  Okay.  So with that completed, I'm going to call up our court security officer, who is going to serve as our jury officer and to be sworn.  Then we'll have the jury led out to begin their deliberations.

(Court officer sworn.)

THE COURT:  All right.  We'll now have the jury brought out to begin deliberations.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Everyone may be seated.

I just ask counsel to remain here for a minute.

My courtroom deputy is going to come back, and we'll ask each side to get, for redundancy purposes, at least two cell phone numbers for the teams on each side so that when we have a verdict, or if there's a question, we'll be able to call and make sure we can get someone from each side quickly.

I just ask -- you don't necessarily have to remain in the courtroom or the courthouse, but if you're not going to be at the courthouse, we just ask that you remain relatively close by so we can get you back relatively quickly.  Okay?

All right.  With all that said, then the Court will stand in recess.  Thank you.

COURT CLERK:  All rise.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Please be seated, everybody.

Okay.  So counsel, as you know, we have a note from the jurors which we marked as Juror Note No. 1.  Just to try to aid in the discussion in the little bit of time we had before counsel returned, I drafted a possible proposed response.  But I'm certainly interested in hearing from counsel if they have any suggestions or disagreements with that proposal.

MS. DURIE:  We agree with your proposed response.

THE COURT:  Okay.  So on the plaintiff's side. And then on defendant's side?

MR. CAMPBELL:  Yeah, we would -- we think it's a little bit confusing.  And it's -- what we're suggesting is after the "whether" in the first line, that become "whether or not."

THE COURT:  Okay.

MR. CAMPBELL:  It becomes "whether or not" -- if I may read it, Your Honor.

THE COURT:  Sure.

MR. CAMPBELL:  -- "Claims 4, 6, 10, and 11 are invalid."

MR. DAVIS:  14.

MR. CAMPBELL:  14, excuse me.  "Whether or not Claims 4, 6, 10, and 14 are invalid," is our proposal.

THE COURT:  Is there any difference substantively between "whether or not Claims 4, 6, 10, and 14 are invalid," and the proposal, which is "whether Claims 4, 6, 10, and 14 are or are not invalid"?

MR. CAMPBELL:  It's a different way of saying it.  We think it's "whether or not" up front frames it easier and we think a little bit more normal parlance when you're saying "whether or not" when you introduce a cause of

that sort.  So that would be the reason for that proposal. And that happens again in the last sentence, "So in determining whether or not, you would add "or not" Claims 4, 6, 10, and 14 are," and you would strike out, "or are not," and leave "invalid."  Such that -- "So in determining whether or not Claims 4, 6, 10 and 14 are invalid, you must also consider..." through the end.

We would propose as well striking the last parenthetical and make it very clear to the jury --

THE COURT:  Can I stop you there just before I get to that, because I think you're now moving to a next issue.

I think we've agreed that the two proposed suggestions, which is so far to put "or not" after the word "whether" on line one and on line five, and then to remove the "or are not" on line two and line five.  Those aren't substantive differences, but you're proposing it because you think it reads more naturally or easier, is that fair?

MR. CAMPBELL:  That is fair, Your Honor.  You've summed it up perfectly.

THE COURT:  Okay.  And now I you think you were moving on to something else.

MR. CAMPBELL:  I was.  Thank you.  And so we would propose that the last parenthetical that is, "i.e., here Claims 1 and 11" be stricken and replaced with "Claims

4, 6 and 10 referred from Claim 1."  "Claim --

THE COURT:  So the suggestion is to say, "i.e., here Claims 4, 6, and 10," you said "refer"?

MR. CAMPBELL:  Yeah.  We use that word because that was the word you had chosen.  Depends is fine as well.

THE COURT:  "Refer to Claim 1."

MR. CAMPBELL:  Yeah, "refer to Claim 1" or "depend from Claim 1."

And then the next sentence will be "Claim 14" -- it could be "refers" or "depends from Claim 11."

THE COURT:  So, "i.e., here Claims 4, 6 and 10 refer to Claim 1."  And "Claim 14 refers to Claim 11."

MR. CAMPBELL:  Yeah.  They're confused, Judge, and that's why we're trying to help to clarify it.  As I said, it could be "refers to" or "depends from" in those last two sentences, just trying to give them what they appear to be to understand the relationship between independent claims and dependent claims.  That's always a struggle for lay people.

THE COURT:  Got it, okay.

So just to sum up, the proposals are, from Attentive's side, to change the first sentence to read dot dot dot, "you are to determine whether or not Claims 4, 6, 10, and 14 are invalid."  And beginning in line five, the proposal is that the wording would change to say, "So in

1257

determining whether or not Claims 4, 6, 10, and 14 are invalid.

And then additionally the other proposal is to replace the parenthetical at the end of the proposal with, "i.e., here Claims 4, 6, and 10 refer to or depend from Claim 1."  And "Claim 14 refers to or depends from Claim 11," is that right?

MR. CAMPBELL:  That's fair, Your Honor.  And we'd be content if Your Honor chose whichever you prefer, "refers to" or "depends from" if you wish not to be redundant.  And that may create additional confusion with the jury so probably selecting one of those --

THE COURT:  I meant to say that you suggest I pick one or the other.

MR. CAMPBELL:  Correct.  And I leave that to Your Honor's discretion.

THE COURT:  Okay.  I guess the question would be to plaintiff's counsel, hearing defendant's suggestions, do you have any objection to adopting it?

MS. DURIE:  I am agnostic on point one.  I'm happy with the way Your Honor wrote it.  But I agree that there is no substantive difference.  And I'm fine with the proposed edit to the parenthetical.

THE COURT:  Okay.  Then here's what I'll do. Since defendant's proposal isn't objected to as to the first

bucket, and since I think it doesn't change the meaning that I was suggesting in any way, we'll adopt that.  So I will edit the final version to say, in the first line, dot dot dot, "you are to determine whether or not Claims 4, 6, 10, and 14 are invalid."  And then in line five, I'll edit to say, "So in determining whether or not Claims 4, 6, 10, and 14 are invalid," dot dot dot.

And then in the parenthetical, I will change it to say, "i.e., here Claims 4, 6, and 10" -- I think we'll go with "depend from."

MS. DURIE:  Sure.

THE COURT:  You guys okay with that?

MR. CAMPBELL:  Yes.

THE COURT:  "i.e., here Claims 4, 6, and 10 depend from Claim 1."  And "Claim 14 depends from Claim 11."

Okay.  So then with the parties' agreement there, we'll go ahead and make those changes, send this responsive note back to the jurors and let them continue in their deliberations.

With all that said, we'll let the Court stand in recess.

(A brief recess was taken.)

COURT CLERK:  All rise.

THE COURT:  All right.  Good afternoon again, everyone.  Please remain standing.  I understand the jury

has a verdict.  This may take a moment, but my courtroom deputy will get them together and bring them in.  Okay.  Thank you.

(Jury enters.)

THE COURT:  All right.  Please be seated, everybody.

Ladies and gentlemen of the jury, good afternoon again.  Mr. Foreperson, I understand the jury has reached a verdict; is that correct?

JUROR NO. 1:  Correct.

THE COURT:  I'm going to ask my courtroom deputy to come down and she will take the verdict form from you and she's going to bring it up here for my reading.

All right.  Now I'm going to ask my courtroom deputy to publish the verdict; that is, to read it aloud reflecting the jury's verdict.

COURT CLERK:  Question 1: Infringement of U.S. Patent No. 11,709,660.

Did Postscript prove, by a preponderance of the evidence, that Attentive's Magic Composer functionality directly infringes any of the following claims of the '660 Patent?

Claim 4, yes.

Claim 6, yes.

Claim 10, yes.

Claim 14, yes.

Question 2: Invalidity of Postscript's '660 Patent.

Did Attentive prove, by clear and convincing evidence, that any of the following claims of Postscript's '660 Patent are invalid as anticipated(under 35 U.S.C. Section 102) and/or obvious (under 35 U.S.C. Section 103.)?

Claim 4, no.

Claim 6, no.

Claim 10, no.

Claim 14, no.

Question 3: Damages for infringement of the Postscript patent.

What is the amount of money that Postscript has proven by a preponderance of the evidence to be a reasonable royalty to compensate Postscript for Attentive's infringement from the date of trial?

$1,522,000.

Signed on August 29th, 2025, by the jury panel.

THE COURT:  All right.  Thank you.  Does plaintiff wish to poll the jury?

MS. JIAM:  No.

THE COURT:  All right.  Does the defendant wish to poll the jury?

MR. CAMPBELL:  Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, in just a second my courtroom deputy is going to ask each of you to confirm that the verdict, as published, in fact constitutes your individual verdict as well.

So we'll have the jury polled now.

COURT CLERK: Juror No. 1, having heard the verdict delivered, is this your verdict?

JUROR NO. 1: Yes.

COURT CLERK: Juror No. 2, having heard the verdict delivered, is this too your verdict?

JUROR NO. 2: Yes.

COURT CLERK: Juror No. 3, having heard the verdict delivered, is this too your verdict?

JUROR NO. 3: Yes.

COURT CLERK: Juror No. 4, having heard the verdict delivered, is this too our verdict?

JUROR NO. 4: Yes.

COURT CLERK: Juror No. 5, having heard the verdict delivered, is this too your verdict?

JUROR NO. 5: Yes.

COURT CLERK: Juror No. 6, having heard the verdict delivered, is this too your verdict?

JUROR NO. 6: Yes.

COURT CLERK: Juror No. 7, having heard the verdict delivered, is this too your verdict?

JUROR NO. 7:  Yes.

COURT CLERK:  Juror No. 8, having heard the verdict delivered, is this too your verdict?

JUROR NO. 8:  Yes.

THE COURT:  All right.  Thank you.

With that, then I'll direct my courtroom deputy in our Court's office to file and record the verdict.

Ladies and gentlemen of the jury, I want to say, not only on my behalf and on behalf of our court staff, but also on behalf of all the parties here and their representatives, how much we deeply, deeply appreciate your service, your hard work, and your attention throughout this week.  We know how much it takes to serve on a jury like this and how important it is, and we very, very much appreciate it and I want you to know that.

In just a second I'm going to have you led out of the courtroom to be excused.  I'll ask if you'd be willing just to wait for a few minutes in the jury room as you pack up your things.  I'm going to come in briefly with my staff.  We have a couple things to give you administratively and I may have just a question of two and another word of thanks and we'll get you on your way.

Okay.  With all that said, we'll have our jury led out.

COURT CLERK:  All rise.

(Jury exits.)

THE COURT:  All right.  Please be seated, everyone.

Counsel, I want to add my thanks to all of you, as I mentioned to some of your colleagues at our pretrial conference, for the professional way that you tried this case, it was a well-tried case, for the respect and professionalism you gave to the each other, to the Court and staff.  It is much appreciated.  I know we are about to head into Labor Day weekend, we have long weekend.  So I'm going to let you go.  What I'll likely do is issue an order on Monday that will ask the parties for a joint status report in the coming days and go from there.

Is there anything further we need to take up before we adjourn, on plaintiff's side?

MS. JIAM:  Nothing further.  Thank you, Your Honor.

THE COURT:  All right.  And on defendant's side?

MR. CAMPBELL:  Nothing, Your Honor.

THE COURT:  All right.  With wishes for safe travel for all of our out-of-town guests and with again my thanks, the Court will stand adjourned.  Thank you.

COURT CLERK:  All rise.

(Court adjourned at 4:22 p.m.)

1264

----------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court